UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, | ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |
| | ) |

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Washtenaw County Employees' Retirement System ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Dollar General Corporation ("Dollar General" or the "Company"), as well as other filings, reports, and advisories about the Company, investor releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a securities fraud class action brought on behalf of all purchasers of Dollar General common stock between May 28, 2020 and August 30, 2023, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act"). The claims

herein are asserted by plaintiff against Dollar General, its Chief Executive Officer ("CEO") Todd J. Vasos, its former CEO Jeffrey C. Owen, its Chief Financial Officer ("CFO") Kelly M. Dilts, and its former CFO John W. Garratt.

2.     Defendant Dollar General is a discount retailer that sells consumer goods, including packaged foods, fresh foods and produce, beauty and household products, and beer and wine, primarily throughout the southern, southwestern, midwestern, and eastern United States. The Company's core customers are low- and fixed-income households. Over 80% of the Company's items are priced at or below $5.

3.     Over the past decade, Dollar General continued to expand its stores, distribution centers, and sales even as consumers' shift to online retail sales adversely impacted many of its brick-and-mortar peers. The Company's focus on low-cost goods and on opening stores in areas without numerous retailers helped the Company grow its store footprint. Indeed, between 2012 and 2022, the Company increased its store count by more than 90% from approximately 10,000 locations to more than 19,000 locations.

4.     Dollar General relies heavily on branded and unbranded consumables to generate visitor store traffic (which constituted 77% of fiscal 2021 sales), with other categories boosting margins and ticket growth. Between 2012 and 2022, Dollar General's net sales rose at a compound annual growth rate ("CAGR") of 9%, while its earnings per share ("EPS") grew at a CAGR of 14%. This, in turn, drove the price of Dollar General stock up by more than 40% to its Class Period high of over $262 per share in April 2022.

5.     Unbeknownst to investors, however, these seemingly favorable results were the product of a fraudulent scheme designed to artificially inflate Dollar General's reported revenue and profits. Specifically, Dollar General chronically understaffed its stores and declined to remediate

known logistical problems and other significant operational difficulties leading to the buildup of unwanted inventory, the destruction and loss of tens of millions of dollars' worth of store merchandise, the mispricing of items, and the systematic overcharging of Dollar General's customers at checkout above the listed retail price. Defendants knowingly limited store labor hours in a manner which placed employees in situations where the assigned tasks could not possibly be completed within the allotted time.

6.     As a result of chronic understaffing, employees both rang up merchandise and stocked shelves, among numerous other tasks, and therefore lacked sufficient time to update merchandise pricing or deal with inventory issues as they arose. Merchandise often arrived with no place to display it. Items were regularly lost, broken, or otherwise unsaleable. Items which were not selling at Dollar General steadily piled up. Stores became so crowded with disorganized merchandise that some were closed by fire marshals for being dangerously over-packed, preventing safe ingress and egress. Employees had insufficient time or resources to focus on the growing glut of non-selling inventory on store shelves, much of which was being stored in plain sight in rolling steel "rolltainer" storage bins parked at the ends of aisles, with merchandize never unpacked or displayed for sale. In addition to the glut of merchandise that should have been *timely* written-off as unsalable, these practices resulted in a slovenly and uninviting shopping environment which dissuaded consumers from shopping at Dollar General.

7.     Furthermore, and as later confirmed by several adverse regulatory actions, Dollar General implemented a campaign of systematically overcharging customers at the register for items that were marked at much lower prices on the shelf. The overcharges dropped directly to the bottom line as profits. Dollar General's deceptive pricing was so pervasive that, in November 2022, Ohio's Attorney General brought a lawsuit against the Company. An audit had "found error rates ranging

from 16.7% to 88.2%" in pricing at Dollar General stores located in Ohio. In January 2023, the Ohio Attorney General found that Dollar General had continued its over-price-ringing scheme despite the lawsuit, which resulted in the Ohio Attorney General seeking an order enjoining Dollar General from continuing to violate state law. To avert the Ohio Attorney General's motion, in January 2023, Dollar General shut down all stores in Ohio for a day to self-audit its pricing practices. In February 2023, Dollar General agreed to ostensibly correct all prices at the register and to cease its over-pricing scheme.

8.     In March 2023, *Barron's* issued an article titled, "When the Price Isn't Right: Dollar General's Record of Overcharging," which discussed defendants' over-pricing scheme and noted that, in addition to Ohio, the states of Arizona, Louisiana, Mississippi, and North Carolina had also fined Dollar General for similar pricing irregularities in 2021 and 2022. Despite Dollar General's purported agreement to cease its over-pricing scheme, on September 13, 2023, the Missouri Attorney General filed suit alleging that Dollar General was continuing its pattern of "routinely overcharging" and deceiving customers. According to the Missouri Attorney General's complaint, a majority, or "92 of the 147 [Dollar General] locations where investigations were conducted failed inspection . . . with an average overcharge of $2.71 for the over 5,000 items price checked by investigators." The Missouri Attorney General pled violations of Missouri state law and sought among other things, penalties of up to $1,000 per violation, restitution, "[d]isgorgement of Defendant's ill-gotten gains acquired in connection with its unlawful practices," and other injunctive relief. In addition to exposing the Company to fines, penalties, legal judgments, and reputational harm, defendants' long-running over-pricing scheme artificially inflated Dollar General's sales during the Class Period, unlawfully boosting the Company's reported revenue and profits in an unsustainable fashion that would not continue once discovered. Defendants' over-pricing scheme also risked dissuading

customers who felt cheated by Dollar General's sales practices from returning to its stores, further impairing the Company's sales results.

9.     Taking advantage of the artificial inflation caused by the fraudulent scheme detailed herein, Dollar General and certain of its key executives sold hundreds of millions of dollars' worth of Dollar General stock during the Class Period.  For example, during the Class Period, CEO Todd J. Vasos sold more than *$283 million* of his Dollar General shares at prices as high as $244 per share, while then-CFO John W. Garratt sold more than *$31 million* of his Dollar General shares at prices as high as nearly $245 per share.  This insider selling spree presaged both executives' departure from the Company.  In July 2022, Dollar General announced that defendant Vasos was stepping down as CEO, and, in January 2023, the Company announced that defendant Garratt was stepping down as CFO.

10.    On February 23, 2023, Dollar General unexpectedly pre-released its preliminary fourth quarter 2022 and fiscal year 2022 ("4Q22" and "FY22," respectively) financial results.[1]  The Company disclosed that 4Q22 sales and earnings would come in materially below what defendants had led investors to expect based on their Class Period statements, blaming winter storm Elliott (which had occurred at the end of 2022), for the sales miss and admitting that the results were negatively impacted by lower sales and higher inventory damages.  On this news, the market price of Dollar General stock declined more than $8 per share, closing at just over $217 per share, on unusually high trading volume of more than 4.5 million shares.

11.    On March 16, 2023, Dollar General reported its final 4Q22 and FY22 financial results.  For the 4Q22, the Company's net sales rose only 17.9% year-over-year, and for the full year net sales only rose 10.6% year-over-year, missing the Company's prior guidance which had been

---

[1]     Dollar General's fiscal year ends on the Friday closest to January 31 of the subsequent calendar year.  Thus, Dollar General's FY22 ended on February 3, 2023.

updated as recently as December 2022. Acknowledging that the Company had experienced a "decrease in customer traffic," Dollar General attributed the sales miss to "the impact of store closures." As a portent of the pain to come in cleaning up its stores and sorting out the Company's significant undisclosed inventory problems, Dollar General announced a one-time "'incremental investment of approximately $100 million in our stores, primarily in incremental labor hours, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience.'"

12. On this news, the market price of Dollar General stock closed down $6.47 per share on March 16, 2023, on unusually high trading volume of more than 3 million shares. Nevertheless, defendants continued to materially misrepresent Dollar General's 2023 business operations and financial results, causing the price of Dollar General stock to remain artificially inflated. For example, defendants failed to disclose the impact that Dollar General's dilapidated stores and over-pricing scheme had on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory. Defendants also failed to disclose the impact of the various regulatory enforcement actions pending against the Company and the reduction in revenue that would necessarily result when customers were no longer overcharged at the register.

13. On June 1, 2023, Dollar General shocked the market by reporting deeply disappointing first quarter 2023 ("1Q23") results for the period ended May 5, 2023, revealing 1Q23 revenue *$130 million* below analyst estimates. The Company slashed its fiscal year 2023 ("FY23") earnings forecast, stating it only expected FY23 same-store sales to rise between 1% and 2% for the year, a reduction of more than 50% at the midpoint from its prior same-store sales growth forecast of 3% to 3.5%, and that it only expected FY23 sales growth in the range of 3.5% to 5% for the year, down 26% at the midpoint from the prior 5.5% to 6% range provided in March 2023. Moreover,

Dollar General reported that its EPS were on track to **_decline_** by up to 8% year-over-year, not **_grow_** by 4% to 6% as defendants had represented to the market.

14.     On this news, the market price of Dollar General stock closed down over $39 per share, or nearly **_20%_**, on June 1, 2023, on unusually high trading volume of more than 18 million shares.  However, once again defendants failed to disclose the full truth regarding Dollar General's business, operations, and financial results, causing the price of Dollar General stock to remain artificially inflated.

15.     On August 31, 2023, Dollar General reported its second quarter 2023 ("2Q23") financial results, again slashing its FY23 sales and profit outlook.  This time the Company blamed a "headwind," including weaker consumer spending on non-essential purchases and increasing theft. For the quarter, same-store sales **_decreased_** 0.1%, operating profits **_decreased_** 24.2%, and EPS **_decreased_** 28.5%.  The release quoted defendant Jeffrey C. Owen as stating that "'[w]hile we are not satisfied with our overall financial results, we made significant progress in the second quarter improving execution in our supply chain and our stores, as well as reducing our inventory growth rate and further strengthening our price position.'"  The release further conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers," and "expect[ed] an incremental operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments."  Of that, $95 million would be for markdowns taken on the Company's existing inventory.  Another $75 million would be spent on increased personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining on store shelves.

16.     As defendant Owen acknowledged on an earnings call held that same day, Dollar General was deploying "smart teams," or groups of employees who move between multiple stores to organize excess inventory and clean up its stores.  The teams, one in each of Dollar General's districts in the United States, were part of the $75 million the Company had dedicated to improving employee operations and store appearance.  According to an August 31, 2023 report by *Business Insider*, "[o]ne former Dollar General employee who worked on a smart team in Texas told Insider that the job involves taking unpacked inventory off of rolltainers, or metal carts that hold boxes of merchandise and have become a common sight at the ends of aisles at many Dollar General stores," noting that the "employee's smart team was usually sent to stores right before they underwent an annual inventory review."  According to the former employee, "'[i]t was basically doing a whole-store revamp,'" "'[w]e'd throw all the penny stuff away,' the employee said, referring to Dollar General items that have been marked down to one cent each in the store's inventory and have become targets for bargain hunters."  According to another *Business Insider* report, the Company had taken to marking items down to just one penny when it intended to throw them out, but with no employee resources available to cull the shelves for this penny inventory, the generally unsaleable goods simply remained in stores on shelves at the end of the Class Period.

17.     On this news, the market price of Dollar General stock declined another $19.16 per share, or 12%, on August 31, 2023, on unusually high trading volume of more than 19 million shares.

18.     Defendants' fraudulent scheme together with their false and misleading statements and omissions caused Dollar General stock to trade at artificially inflated prices throughout the Class Period.  As defendants' misconduct – and the consequences thereof – reached the market, Dollar General's stock price collapsed, declining more than 45% from its Class Period high and causing

hundreds of millions of dollars in damages to Dollar General investors, who suffered economic harm as the truth about Dollar General, its operations, and its prospects began to be revealed. This action seeks to recover the damages suffered by Class members (defined below).

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

21. Venue is proper in this District pursuant to §27 of the 1934 Act, because Dollar General's headquarters are located in this District and certain of the acts and practices complained of herein occurred in this District.

22. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

23. Plaintiff Washtenaw County Employees' Retirement System purchased Dollar General stock, as set forth in the accompanying certification incorporated herein by reference, and has been damaged thereby.

24. Defendant Dollar General Corporation operates a chain of discount stores and is headquartered in Goodlettsville, Tennessee. As of March 28, 2023, Dollar General operated over 18,000 stores in the continental United States and Mexico. Dollar General stock traded in an efficient market on the NYSE throughout the Class Period under the ticker symbol "DG."

25. Defendant Todd J. Vasos ("Vasos") was, until his resignation in November 2022, the CEO of Dollar General, having assumed that role in 2015. Defendant Vasos continued to serve as a

Senior Business Advisor to Dollar General between November 2022 and April 2023 and served as a Senior Retail Business Consultant to Dollar General beginning April 2023. Defendant Vasos also served as a member of the Dollar General Board of Directors throughout the Class Period and was reappointed as CEO in October 2023.

26.     Defendant Jeffrey C. Owen ("Owen") served as the CEO of Dollar General and a Company director from November 2022 until the reappointment of defendant Vasos in October 2023, having previously served as the Company's Chief Operating Officer ("COO").

27.     Defendant John W. Garratt ("Garratt") served as the CFO of Dollar General between September 2022 and April 2023 and as its President between September 2022 and June 2023. Previously he served as its Executive Vice President and CFO between December 2015 and September 2022; as the interim CFO between July 2015 and December 2015; and as a Senior Vice President, Finance & Strategy between October 2014 and July 2015.

28.     Defendant Kelly M. Dilts ("Dilts") has served as the CFO of Dollar General since May 2023.

29.     Defendants referenced above in ¶¶25-28 are referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "defendants." Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, false and misleading statements being

issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

30.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' misrepresentations during the Class Period violated these specific requirements and obligations.

31.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, investor releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

32.     Defendants are liable for failing to disclose adverse facts known to them about Dollar General and perpetrating a fraudulent scheme to deceive investors as disclosed herein. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Dollar

- 11 -

General stock was a success, as it: (i) deceived the investing public regarding Dollar General's business metrics and financial prospects; (ii) artificially inflated the prices of Dollar General stock; and (iii) caused plaintiff and other members of the Class to purchase Dollar General stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

33.     Dollar General is not a true "dollar store" that sells all of its products for a dollar. Instead, the Company purports to sell most of its products at lower price points than superstores like Walmart and online retail giants like Amazon.  Dollar General relies on branded and unbranded consumables for traffic, with other categories boosting margins and ticket growth.  With its retail footprint focused on thinly populated areas that cannot support numerous retailers, Dollar General has used its burgeoning scale and proximity to customers to grow its sales to its core modest-income customer base.

34.     Over the past decade, Dollar General continued to expand its stores, distribution centers, and sales even as consumers' shift to online retail sales adversely impacted many of its brick-and-mortar peers.  The Company's focus on low-cost goods and on opening stores in areas without numerous retailers helped the Company grow its store footprint.  Between 2012 and 2022, the Company increased its store count by more than 90% from approximately 10,000 locations to more than 19,000 locations.

## DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS

35.     The Class Period starts on May 28, 2020.  On that date, prior to the opening of trading, Dollar General issued a release providing the Company's results for the first quarter ended May 1, 2020 ("1Q20").  The release stated that net sales increased 27.6%, same-store sales increased 21.7%, and operating profit increased 69.2%, while diluted EPS increased 73% to $2.56.  The

release also emphasized that "[g]ross profit as a percentage of net sales was 30.7% in the first quarter of 2020 . . . , an increase of 49 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales and higher initial markups on inventory purchases."

36.     Also on May 28, 2020, Dollar General hosted an earnings call to discuss the 1Q20 results led by defendants Vasos, Garratt, and Owen. During the Q&A portion of the conference call, defendant Owen, then serving as the Company's COO, lauded the Company's strong store merchandizing and stocking capabilities, stating:[2]

> I'm extremely proud of the way the team responded to the in-stock challenges that all retailers faced. And our merchant team was involved very, very early with our suppliers in partnering with ways to get our fair share of product, but also thinking about creative ways to provide alternative pack sizes or substitute items for our stores. And then also, we were able to stand up even new SKUs during this period of time. *So [the] merchant team did an outstanding job and then the supply chain, obviously, you can't do that without the supply chain. So they were able to flex up to our demand. And then also, they're able to deliver the product to our stores on time. And then finally, as Todd mentioned as well, Fast Track earlier is – was one of our initiatives that really paid off during this because the stores were able to get the product on the shelf.*
>
>          As I think out and when it will end, a lot of that depends on the customer. And it also depends on the way the economy in terms of the shelter in place. So as you know, many of the nation is opened up for business now, so we'll have to wait and see. *But I can tell you this, our supply chain is ready to deliver the product to the stores when it's available, and our store teams are ready to get it on the shelf. So we'll be in a great position for the customer once the products are available.*

37.     Also on May 28, 2020, Dollar General filed with the SEC its 1Q20 financial report on Form 10-Q (the "1Q20 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 1Q20 Form 10-Q provided the same financial results reported in the 1Q20 release and stated that "[g]ross profit, as a percentage of net sales, was 30.7% in the 2020 period . . . , an increase of 49 basis points, primarily reflecting

---

[2]     Emphasis added here and throughout unless otherwise noted.

favorable markdowns and higher initial inventory markups." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

38.     On August 27, 2020, prior to the opening of trading, Dollar General issued a release providing the Company's results for the second quarter ended July 31, 2020 ("2Q20"). The release reported net sales increased 24.4%, same-store sales increased 18.8%, and operating profit increased 80.5%, while diluted EPS increased 89.1% to $3.12. The release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the second quarter of 2020 . . . , an increase of 167 basis points," noting that "[t]his gross profit rate increase was attributable to higher initial markups on inventory purchases . . . and a reduction in markdowns as a percentage of net sales."

39.     Also on August 27, 2020, Dollar General hosted an earnings call to discuss the 2Q20 results led by defendants Vasos, Garratt, and Owen. During his opening remarks, defendant Owen stated that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand."

40.     During the call, defendant Vasos similarly stated: "Moving now to Fast Track, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on shelf availability," "[w]e continue to be pleased with the labor productivity investments we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

41.     Also on August 27, 2020, Dollar General filed with the SEC its 2Q20 financial report on Form 10-Q (the "2Q20 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 2Q20 Form 10-Q

provided the same financial results reported in the 2Q20 release and stated that "[g]ross profit, as a percentage of net sales, was 32.5% in the 2020 period . . . , an increase of 167 basis points, primarily reflecting higher initial inventory markups, a significant increase in sales of non-consumable products, and favorable markdowns." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

42. On December 3, 2020, prior to the opening of trading, Dollar General issued a release providing the Company's results for the third quarter ended October 30, 2020 ("3Q20"). The release stated that net sales increased 17.3%, same-store sales increased 12.2%, while diluted EPS increased 62.7% to $2.31. The release also quoted defendant Vasos, who emphasized that "'[o]verall, our ongoing operating priorities, coupled with our key strategic initiatives, position us well to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders.'" The release also emphasized that "[g]ross profit as a percentage of net sales was 31.3% in the third quarter of 2020 . . . , an increase of 178 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales, higher initial markups on inventory purchases, a greater proportion of sales coming from the non-consumables product categories, which generally have a higher gross profit rate than the consumables product category, and a reduction in inventory shrink as a percentage of net sales."

43. Also on December 3, 2020, Dollar General hosted an earnings call to discuss the 3Q20 results led by defendants Vasos, Garratt, and Owen. During his prepared remarks, defendant Owen highlighted purported customer satisfaction with Dollar General store operations, stating: "We continue to build on our success with Fast Track, which Todd will discuss in more detail later" and

that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand as evidenced by our recent customer survey results, where we continue to see overall satisfaction scores at all-time highs."

44.     Defendant Vasos similarly stated: "We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

45.     Also on December 3, 2020, Dollar General filed with the SEC its 3Q20 financial report on Form 10-Q (the "3Q20 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt.  The 3Q20 Form 10-Q provided the same financial results reported in the 3Q20 release and stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2020 period . . . , an increase of 178 basis points, primarily reflecting favorable markdowns, higher initial inventory markups, and an increase in sales of products in our non-consumable categories."  Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

46.     On March 18, 2021, prior to the opening of trading, Dollar General issued a release providing the Company's results for the fourth quarter and fiscal year ended January 29, 2021 ("4Q20" and "FY20," respectively).  The release stated that net sales increased 17.6%, same-store sales increased 12.7%, and operating profit increased 21%, while diluted EPS increased 24.8% to $2.62.  The release quoted defendant Vasos as stating that "'[w]e continue to operate from a position of strength, and are excited about our plans for 2021 to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders.'"  The

release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the fourth quarter of 2020 . . . , an increase of 77 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales; higher initial markups on inventory purchases . . . and a reduction in inventory shrink as a percentage of net sales."

47.     Also on March 18, 2021, Dollar General hosted an earnings call to discuss the Company's 4Q20 and FY20 results led by defendants Vasos, Garratt, and Owen.  During prepared remarks:

(a)     Defendant Vasos represented that "[c]ollectively, our fourth quarter and full year results reflect strong and disciplined execution across many fronts and further validate our belief that we are pursuing the right strategies to enable sustainable growth while creating meaningful long-term shareholder value";

(b)     Defendant Garratt stated that "[w]hile a lot of stocks remain higher than we would like for certain high-demand products, we continue to make good progress with improving our in-stock position and are pleased with our overall inventory levels"; and

(c)     Defendant Owen stated that "[w]e continue to build on our success with electronic article surveillance by increasing the number of items tagged while further leveraging technology to drive even higher levels of in-store execution."  He also lauded the purported strength of the Company's store stocking procedures, stating that "[o]ur Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability," adding that "[w]e continue to be pleased with the labor productivity improvements we are seeing as a result of our

efforts around both rolltainer and case pack optimization, which have led to the more efficient stocking of our stores."

48.     Responding to an analyst's question about margin sustainability, defendant Garratt highlighted the purported optimization of the Company's product pricing efforts, stating:

> Again, when you look at our scale and our growing scale as a limited SKU shop, it really puts us in a very favorable position to get best pricing there and protect our margins while also being well priced.  And on the price front, we'll always reserve the right to invest as needed.  ***But as we look at now and as we've seen for quite a while now, we feel like we're in the best position on pricing we've been in and don't see, at least the foreseeable future, the need to invest there.  So we feel good about the long-term ability to continue to grow gross margin while also driving traffic and sales***.

49.     On March 19, 2021, Dollar General filed with the SEC its FY20 financial report on Form 10-K (the "FY20 Form 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt.  The FY20 Form 10-K provided the same financial results reported in the FY20 release and stated that "[o]ur gross profit rate increased by 117 basis points due primarily to lower markdowns as a percentage of sales and higher initial markups on inventory purchases."  Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY20 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."  The FY20 Form 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

50.     On May 27, 2021, prior to the opening of trading, Dollar General issued a release providing the Company's results for the first quarter ended April 30, 2021 ("1Q21").  The release

stated that while same-store sale decreased 4.6%, and operating profit increased 4.9%, while diluted EPS increased 10.2% to $2.82. The release quoted defendant Vasos as stating that "'[g]iven our first-quarter outperformance, we are raising our financial outlook for fiscal 2021 ['FY21'],'" adding that "'we are well-positioned to continue delivering long-term sustainable growth and value for our shareholders.'" The release also emphasized that "[g]ross profit as a percentage of net sales was 32.8% in the first quarter of 2021 . . . , an increase of 208 basis points," noting that "[t]his gross profit rate increase was primarily attributable to higher initial markups on inventory purchases; a reduction in markdowns as a percentage of net sales; a greater proportion of sales coming from the non-consumables product categories . . . ; and a reduction in inventory shrink as a percentage of net sales."

51.    Also on May 27, 2021, Dollar General hosted an earnings call to discuss the 1Q21 results led by defendants Vasos, Garratt, and Owen. Opening his remarks, defendant Garratt stated that Dollar General was "pleased with the overall quality of our inventory." Defendant Garratt concluded his opening remarks by representing that the Company's purportedly efficient store management practices were sustainable and would drive long-term shareholder value, stating that "we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

52.    During his opening remarks, defendant Owen likewise highlighted the increased efficiency of the Company's store operations, stating:

> Over the years, we have established a clear and defined process to control spending, which governs our disciplined approach to spending decisions. This zero-based

budgeting approach, internally branded as Save to Serve, keeps the customer at the center of all we do while reinforcing our cost control mindset. ***Our Fast Track initiative is a great example of this approach where our goals include: increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts, both around rolltainer and case pack optimization, which have led to even more efficient stocking of our stores***.

53.     Also on May 27, 2021, Dollar General filed with the SEC its 1Q21 financial report on Form 10-Q (the "1Q21 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 1Q21 Form 10-Q provided the same financial results reported in the 1Q21 release.

54.     The 1Q21 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 32.8% in the 2021 period . . . , primarily reflecting higher initial inventory markups, favorable markdowns, and an increase in sales of products in non-consumable categories." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q21 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

55.     On August 26, 2021, prior to the opening of trading, Dollar General issued a release providing the Company's results for the second quarter ended July 30, 2021 ("2Q21"). The release stated that while same-store sales decreased 4.7%, Dollar General had achieved operating profit of $849.6 million, and diluted EPS of $2.69.

56.     Also on August 26, 2021, Dollar General hosted an earnings call to discuss the 2Q21 results led by defendants Vasos, Garratt, and Owen. Defendant Vasos stated that "[w]e believe we will ultimately exit the pandemic with a larger, broader and more engaged customer base than when we entered it, resulting in an even stronger foundation from which to grow." He went on to state: "In short, I feel very good about the underlying strength of the business, and we're confident we are

pursuing the right strategies to enable balanced and sustainable growth by creating meaningful long-term shareholder value."

57. During his opening remarks, defendant Garratt commented on the Company's current inventory levels, stating that "we were pleased with our strong inventory position for the back-to-school shopping season, and our teams continue to work closely with suppliers to ensure delivery of seasonal and other goods in the remaining back half of the year." Defendant Garratt concluded his opening remarks by highlighting the purported sustainability of the Company's efficient business model, stating: "As always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

58. Defendant Owen similarly highlighted Dollar General's efforts to optimize store stocking, stating:

> *Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of optimizing our rolltainers and case pack sizes, resulting in the more efficient stocking of our stores.*

59. Also on August 26, 2021, Dollar General filed with the SEC its 2Q21 financial report on Form 10-Q (the "2Q21 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 2Q21 Form 10-Q provided the same financial results reported in the 2Q21 release and stated that "[g]ross profit, as a percentage of net sales, was 31.6% in the 2021 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q21 Form 10-Q stated that the "[e]fficient

management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

60.     On December 2, 2021, prior to the opening of trading, Dollar General issued a release providing the Company's results for the third quarter ended October 29, 2021 ("3Q21"). The release stated that net sales increased 3.9%, while Dollar General had achieved operating profit of $665.6 million, and diluted EPS of $2.08. The release also emphasized that "[g]ross profit as a percentage of net sales was 30.8% in the third quarter of 2021," noting that the Company had experienced "higher inventory markups and a reduction in inventory shrink as a percentage of net sales."

61.     Also on December 2, 2021, Dollar General hosted an earnings call to discuss the 3Q21 results led by defendants Vasos, Garratt, and Owen. During his prepared remarks, defendant Vasos stated that "[c]ollectively, our third quarter results reflect strong execution across many fronts and further validates our belief that we are pursuing the right strategies to enable sustainable growth, while supporting long-term shareholder value creation."

62.     Defendant Garratt highlighted the Company's cost efficiencies, stating that "[a]s always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance, while strategically investing for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

63.     Defendant Owen highlighted the Company's purportedly efficient and effective store operations in his opening remarks, stating:

> **Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability**.

*The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.*

64. Also on December 2, 2021, Dollar General filed with the SEC its 3Q21 financial report on Form 10-Q (the "3Q21 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 3Q21 Form 10-Q provided the same financial results reported in the 3Q21 release.

65. The 3Q21 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 30.8% in the 2021 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q21 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

66. On March 17, 2022, prior to the opening of trading, Dollar General issued a release providing the Company's results for the fourth quarter and fiscal year ended January 28, 2022 ("4Q21" and "FY21," respectively"). The release stated that although 4Q21 diluted EPS decreased 1.9% to $2.57, Dollar General's net sales increased 2.8% during the quarter. The release quoted defendant Vasos as stating that Dollar General's "'teams remained focused on executing our operating priorities and advancing our strategic initiatives, which we believe position us well for solid sales and profit growth in 2022 and beyond.'" The release also emphasized that "[g]ross profit as a percentage of net sales was 31.2% in the fourth quarter of 2021," noting that factors positively contributing to the result were "a reduction in markdowns as a percentage of net sales and higher inventory markups."

67. Also on March 17, 2022, Dollar General hosted an earnings call to discuss Dollar General's 4Q21 and FY21 results led by defendants Vasos, Garratt, and Owen. Defendant Garratt opened his remarks by highlighting the Company's inventory levels, stating that "we have begun to

see a meaningful improvement in our in-stock levels since the end of the year and expect continued improvement as we move through 2022, underscoring our optimism that we are well positioned to serve our customers with the products they want and need."

68. Defendant Garratt also highlighted the purported sustainability of the Company's efficient operating model, stating that "[a]s always, we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing in our business and employees for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

69. Defendant Owen likewise emphasized the Company's store stocking practices, stating:

> ***Notably, the Save to Serve program contributed more than $800 million in cumulative cost savings from its inception in 2015 through the end of 2021.  Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability***.
>
> ***The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores***.

70. On March 18, 2022, Dollar General filed with the SEC its FY21 financial report on Form 10-K (the "FY21 Form 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt.  The FY21 Form 10-K provided the same financial results reported in the FY21 release.  Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY21 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."  The FY21 Form 10-K further stated that "[e]fficient

inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

71.     On May 26, 2022, prior to the opening of trading, Dollar General issued a release providing the Company's results for the first quarter ended April 29, 2022 ("1Q22"). The release stated that although diluted EPS decreased 14.5% to $2.41, Dollar General's net sales increased 4.2% during the quarter. The release quoted defendant Vasos as stating that "'[w]e continue to drive strategic innovation as we further differentiate Dollar General in the discount retail channel, while delivering long-term sustainable growth and value for our shareholders.'" The release also emphasized that "[g]ross profit as a percentage of net sales was 31.3% in the first quarter of 2022," noting that "higher inventory markups" contributed to the gross profits.

72.     Also on May 26, 2022, Dollar General hosted an earnings call to discuss the 1Q22 results led by defendants Vasos, Garratt, and Owen. Defendant Vasos opened his remarks by emphasizing that he was "pleased to report that [Dollar General] ha[d] continued to make improvements in [its] overall in-stock position, which [we] believe position [it] well to drive strong top line performance through the remainder of the year."

73.     Commenting on inventory levels in his opening remarks, defendant Garratt emphasized that "[i]mportantly, we continue to believe the quality of our inventory is in good shape and that we are well positioned with the right mix and balance of products."

74.     During the call, defendant Owen highlighted the Company's store stocking functions as being beneficial to the Company's business metrics and financial prospects, stating:

> ***Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer***

*convenience and further improving on-shelf availability. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores*.

75.     Also on May 26, 2022, Dollar General filed with the SEC its 1Q22 financial report on Form 10-Q (the "1Q22 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt. The 1Q22 Form 10-Q provided the same financial results reported in the 1Q22 release.

76.     The 1Q22 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2022 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

77.     On August 25, 2022, prior to the opening of trading, Dollar General issued a release providing the Company's results for the second quarter ended July 29, 2022 ("2Q22"). In addition to reporting that net sales increased 9%, same-store sales increased 4.6%, and operating profit increased 7.5%, while diluted EPS increased 10.8% to $2.98, the release quoted defendant Vasos as stating: "'Looking ahead, we are confident that our strategic actions, which have transformed this company in recent years and solidified Dollar General as the clear leader in small-box discount retail, have positioned us well for continued success, while supporting long-term shareholder value creation.'" The release also emphasized that "[g]ross profit as a percentage of net sales was 32.3% in the second quarter of 2022," noting that "[t]his gross profit rate increase was primarily attributable to higher inventory markups."

78.     Also on August 25, 2022, Dollar General hosted an earnings call to discuss the 2Q22 results led by defendants Vasos, Garratt, and Owen. In his prepared remarks, defendant Garratt represented that "importantly, we continue to believe the quality of our inventory is in good shape."

As to his update on the Company's financial outlook for FY22, defendant Garratt stated that "we are confident in the business, and as Todd mentioned, we are increasing our sales outlook for 2022," noting that "[f]or the full year, we now expect the following: net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week," and "[a]dditionally, we are reiterating the remainder of our financial guidance for 2022, which includes EPS growth of approximately 12% to 14%."

79.    Defendant Owen highlighted the Company's purported optimization of its store stocking operations, stating:

> ***Our Fast Track initiative is a great example of this approach, where our current goals include increasing labor productivity in our stores and enhancing customer convenience.  The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores***.

80.    During the Q&A session, defendant Vasos represented that the Company's inventory "couldn't be better," stating:

> ***As it relates to the inventory levels, we couldn't be happier with where we sit today on inventory.  We did all the right things early on, Michael, as you would imagine, coming from a Dollar General.  We were well ahead of any inventory issues that may pop up unlike some of our competitors out there***.  We canceled orders as early as December because we saw where the customer was headed.  We actually have canceled orders not only into Q2, but into the back half of the year.  And all of our guidance is contemplated on that.  ***So we feel very strong.  The quality of our inventory couldn't be better.  And as we move forward, we believe that will benefit us as we move into the back half of this year and into next year***.

81.    Also on August 25, 2022, Dollar General filed with the SEC its 2Q22 financial report on Form 10-Q (the "2Q22 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Vasos and Garratt.  The 2Q22 Form 10-Q provided the same financial results reported in the 2Q22 release.

82.    The 2Q22 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 32.3% in the 2022 period . . . , an increase of 69 basis points, primarily reflecting higher

inventory markups." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

83. On December 1, 2022, prior to the opening of trading, Dollar General issued a release providing the Company's results for the third quarter ended October 28, 2022 ("3Q22"). The release stated that net sales increased 11.1%, same-store sales increased 6.8%, and operating profit increased 10.5%, while diluted EPS increased 12% to $2.33. The release quoted defendant Owen as emphasizing that Dollar General was "'pleased with [its] strong sales growth in the quarter, as well as a modest increase in customer traffic and continued share gains in both consumable and non-consumable product sales.'"

84. The 3Q22 release provided the following update to the Company's 4Q22 and FY22 guidance:

> The Company now expects the following:
>
> - Same-store sales growth of approximately 6% - 7% for the fourth quarter of fiscal year 2022, which would result in growth toward the upper end of its previously expected range of 4.0% - 4.5% for fiscal year 2022;
>
> - Diluted EPS in the range of $3.15 - $3.30 for the fourth quarter of fiscal year 2022, which would result in growth in the range of approximately 7% - 8% for fiscal year 2022; compared to its previous expectation in the range of approximately 12% - 14% for fiscal year 2022[.]
>
>         *       *       *
>
> The Company continues to expect the following for fiscal year 2022:
>
> - Net sales growth of approximately 11%, including an estimated benefit of approximately two percentage points from the 53rd week . . . .

85. Also on December 1, 2022, Dollar General hosted an earnings call to discuss the 3Q22 results led by defendants Garratt and Owen. Commenting on the quarterly increase in

inventory levels, defendant Garratt represented that the increase was primarily due to cost inflation, mix changes, and seasonal impacts, stating:

> Merchandise inventories were $7.1 billion at the end of the third quarter, an increase of 34.8% overall and 28.4% on a per store basis. ***Similar to the first half of the year, this increase primarily reflects the impact of product cost inflation, a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of our non-consumables' initiative, and the early receipt of seasonal goods***.

86.    Providing an update on Dollar General's financial outlook for FY22, defendant Garratt stated:

> On year-to-date sales performance and our expectations for the remainder of Q4, ***we are reiterating our fiscal 2022 full year expectations for net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week, and we are updating our expectation for same-store sales growth for Q4, which we expect same-store sales growth in the range of 6% to 7%, which would result in growth toward the upper end of our previous range of approximately 4% to 4.5%***.

Garratt went on to emphasize that "despite the near-term challenges, we are confident in the business and our outlook for the remainder of the year," adding that "we feel good about the sales momentum going into next year, coupled with moderating cost pressures."

87.    During his opening remarks, defendant Owen emphasized that the Company's "third operating priority is to leverage and reinforce [its] position as a low-cost operator." Defendant Owen further represented that Dollar General had "a clear and defined process to control spending, which continues to govern [its] disciplined approach to spending decisions," and stated that "[t]his approach, internally branded as Save to Serve, keeps the customer at the center of all we do, while reinforcing our cost control mindset."

88.    During the Q&A session, in response to an analyst's question as to "just what inning do you see the drivers of inventory markup in today," defendant Garratt stated that Dollar General was effectively managing its inventory and mitigating markdown risks, stating:

You asked about markdowns as well. I didn't want to miss that question. As you look at markdown risk, while up from the unusually low levels last year, markdowns are still well below pre-pandemic levels. *If you look at the majority of the inventory growth, it's really driven by inflation*.

*The team has done a good job anticipating the mix shift in consumer demand and has proactively been adjusting orders. And as a result, we feel very good about the quality of the inventory, ability to mitigate the markdown risk. As always, we've set aside, what we believe is an appropriate markdown level for the upcoming Christmas season. And of course, this is all reflected in our guidance*.

89.     Later in the call, defendant Garrett downplayed the risk of significant inventory losses, claiming any adverse effects would be short-lived and were being effectively addressed by the Company, stating:

The other piece – we did see – we mentioned as we progressed through Q3 is a greater headwind from inventory shrink and damages. And that shrink can have a tail to that. Rest assured, the team knows how to deal with this and is taking actions to address it. *But it does have a tail to it. And then while we are making good progress resolving our storage capacity constraints with the capacity online, we do believe, as we mentioned, that some of this will carry over into Q4, but be largely resolved by Q1*.

90.     Also on December 1, 2022, Dollar General filed with the SEC its 3Q22 financial report on Form 10-Q (the "3Q22 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Owen and Garratt. The 3Q22 Form 10-Q provided the same financial results reported in the 3Q22 release. The 3Q22 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 30.5% in the 2022 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

91.     The statements above in ¶¶35-90 were materially false and misleading when made, and omitted facts necessary to make the statements made not false or misleading, because they failed to disclose the true facts that were then known to or recklessly disregarded by defendants, including:

(a)     that Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items;

(b)     that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory;

(c)     that the allotment of employee hours per store per week imposed by Dollar General management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time;

(d)     that Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio;

(e)     that Dollar General's reported revenue and earnings during the Class Period were artificially inflated by defendants' over-pricing scheme;

(f)     that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout;

(g)     that Dollar General was not on track to achieve the 4Q22 guidance provided to investors of 6% to 7% same-store sales growth or quarterly diluted EPS of $3.15 to $3.30, and was running more than one hundred million dollars behind the Company's annual net sales guidance of 11% growth; and

(h) that as a result (a)-(g) above, defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading and/or lacked a reasonable factual basis when made.

92. Then, on February 23, 2023, Dollar General unexpectedly pre-released its preliminary 4Q22 and FY22 financial results. The Company disclosed that 4Q22 sales and earnings would come in materially below what the Company had led investors to expect as recently as December 2022. The release stated:

> The company expects to report financial results for the fiscal 2022 fourth quarter and full year below the expectations provided on its conference call on December 1, 2022. Despite continued market share gains in sales of both consumable and non-consumable products, same-store sales for the fourth quarter increased 5.7%, compared to the company's previous expectation of approximately 6% - 7%. The company now expects diluted earnings per share for the fourth quarter in the range of $2.91 - $2.96, compared to its previous expectation in the range of $3.15 - $3.30.

> For the fiscal year, same-store sales increased 4.3%, compared to the company's previous expectation of being toward the upper end of a range of 4.0% - 4.5%, and the company expects diluted earnings per share growth in the range of approximately 4.5% - 5.0%, compared to its previous expectation of approximately 7% - 8%.

93. On this news, the market price of Dollar General stock declined by more than $8 per share to close at $217.11 per share on February 23, 2023, on unusually high trading volume of more than 4.5 million shares.

94. Next, on March 16, 2023, prior to the opening of trading, Dollar General issued a release providing the Company's 4Q22 and FY22 results. The release revealed that during 4Q22 net sales rose only 17.9% year-over-year to $10.2 billion and for the full year net sales only rose 10.6% to $37.8 billion, missing the Company's prior annual net sales guidance by approximately ***$140 million***. Similarly, the Company reported annual EPS growth of only 5%, up to 38% below the prior growth range provided to investors. Acknowledging that the Company had experienced a "decrease

in customer traffic," Dollar General attributed the sales miss to "the impact of store closures." Furthermore, Dollar General revealed it would be required to make a one-time "'incremental investment of approximately $100 million in our stores, primarily in incremental labor hours, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience.'"

95.     On this news, the market price of Dollar General stock closed down $6.47 per share on March 16, 2023, on unusually high trading volume of more than three million shares. Nevertheless, defendants failed to disclose the full truth and instead continued to materially misrepresent Dollar General's business, operations, and financial results, causing the price of Dollar General stock to continue to trade at artificially inflated levels.  For example, defendants continued to conceal the impact that the dilapidated stores and over-pricing scheme had on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory.  Defendants also failed to disclose the impact of the various regulatory enforcement actions pending against the Company and the reduction in revenue that would necessarily result when customers were no longer being systematically overcharged at the register.

96.     In the FY22 release, defendant Owen (who by then had transitioned to CEO to replace defendant Vasos who had purportedly retired from the position), represented that the Company's "'incremental investment will yield strong returns as we continue creating long-term sustainable growth and value for our shareholders.'"  The released emphasized that "[g]ross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022," noting that factors positively contributing to the result were "higher inventory markups and a reduction in transportation costs."

97.     Also on March 16, 2023, Dollar General hosted an earnings call to discuss the FY22 results led by defendants Owen and Garratt.  During his prepared remarks, defendant Owen

emphasized that Dollar General's "storage capacity constraints [are] largely behind us, which we believe positions us well moving forward."

98.     Defendant Garratt likewise downplayed the significant growth in inventories, stating:

***This increase continues to reflect the impact of product cost inflation as well as a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of NCI as well as the earlier receipt of seasonal goods. While inventory growth is still elevated, the pace is moderating as we expected***.  Notably, our Q4 inventory growth rate per store was essentially half of what it was in Q3.  Looking ahead, we anticipate more normalized growth rates as we move through 2023.

***Importantly, we continue to believe the quality of our inventory is in good shape***.

99.     As to the Company's financial outlook for FY23, defendant Garratt stated: "We anticipate the challenging economic and operating environment to continue into 2023, but we believe we are well positioned to drive strong growth as we move throughout the year," adding that "[f]or 2023, we are reiterating the financial guidance we provided on February 23, 2023" of same-store sales growth of 3% to 3.5% and diluted EPS growth of 4% to 6% compared to the prior year.

100.    Later in the call, defendant Garratt once again downplayed the Company's inventory growth and claimed the Company was satisfied with inventory levels, stating:

In terms of the AP to inventory, what we have seen is the driver of that is really higher inventory levels, coupled with the timing of payments.  As you look at the timing of payments, one of the things, for instance, that impacts with the 53rd week, it then pulls in the week 1 rent payment.

***So as we look further, we expect inventory levels to normalize***.  As you look at – in Q4, we saw our inventory per store dropped in half.  It went – it was 14% on a per store basis, which was about half the growth rate we saw in the previous period – or previous quarter.  ***And again, it reflects the same drivers that's really the product cost inflation and a greater mix of higher-value products, particularly in NCI as we completed the rollout of that***.

Important thing to note here is it is seasonal goods – or it's early receipt of seasonal goods or was there other driver.  But it's important to note that these are evergreen-type products, which aren't time-sensitive.  ***So we feel really good about***

*the quality of the inventory, the ability to move through that and expect this to continue to normalize as we move through the year*.

101.    On March 24, 2023, Dollar General filed with the SEC its FY22 financial report on Form 10-K (the "FY22 Form 10-K"), which was signed by defendants Owen, Garratt, and Vasos and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Owen and Garratt.  The FY22 Form 10-K provided the same financial results reported in the FY22 release.  Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY22 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."  The FY22 Form 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

102.    The statements above in ¶¶96-101 were materially false and misleading when made, and omitted material facts necessary to make the statements made not false or misleading, because they failed to disclose the true facts that were then known to or recklessly disregarded by defendants, including:

(a)    that Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items;

(b)    that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory;

- 35 -

(c)     that the allotment of employee hours per store per week imposed by Dollar General management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time;

(d)     that Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio;

(e)     that Dollar General's reported revenue and earnings during the Class Period were artificially inflated by defendants' over-pricing scheme;

(f)     that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout;

(g)     that Dollar General was not on track to achieve its FY23 guidance provided to investors of 5.5% to 6% net sales growth, 3% to 3.5% same-store sales growth, or 4% to 6% diluted EPS growth, and was running more than one hundred million dollars behind the Company's annual net sales guidance and actually suffering *declining* diluted EPS rather than the growth represented to investors; and

(h)     that as a result (a)-(g) above, defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading and/or lacked a reasonable factual basis when made.

103.     On June 1, 2023, Dollar General shocked the market by reporting deeply disappointing 1Q23 results for the period ended May 5, 2023. The Company reported 1Q23 revenue of *$130 million* below analysts' estimates. The Company also slashed its FY23 financial forecast,

stating it only expected FY23 same-store sales to rise between 1% and 2% for the year, a reduction of more than 50% at the midpoint from its prior same-store sales growth forecast of 3% to 3.5%, and that it further only expected FY23 net sales growth in the range of 3.5% to 5% for the year, down 26% at the midpoint from the prior 5.5% to 6% range provided in March 2023. Moreover, Dollar General reported that its diluted EPS was on track to *decrease* by up to 8% for the year compared to the Company's previously projected EPS *growth* of 4% to 6%.

104. During a related earnings call that same day, defendant Owen conceded that "[w]ith our previously announced investment in incremental store labor hours, we continue to enhance the customer experience, including a material improvement in customer satisfaction scores since prior year-end," finally partially acknowledging the extent to which Dollar General stores had fallen into disarray during the Class Period, damaging customer perceptions of the Company and, ultimately, its sales.

105. On this news, the market price of Dollar General stock closed down over $39 per share, or *nearly 20%*, on June 1, 2023, on unusually high trading volume of more than 18 million shares, and multiple analysts slashed their price targets for Dollar General shares. However, once again defendants failed to disclose the full truth regarding Dollar General's business, operations, and financial results, causing the price of Dollar General stock to continue to trade at artificially inflated levels.

106. The 1Q23 release quoted defendant Owen as stating that Dollar General had "'made significant progress improving our execution on multiple fronts, including on our supply chain recovery efforts and enhancements to the customer experience with our previously announced investment in incremental labor hours.'" Defendant Owen added that "'[l]ooking ahead, we feel good about our position, and are taking action to better serve our core customer, which is our most

important calling at Dollar General'" and that "'[o]verall, we remain well positioned to serve all of our customers with our unique combination of value and convenience, while also creating long-term shareholder value.'"

107.    The 1Q23 release also provided updated guidance, stating:

The Company remains confident in the business and its long-term growth prospects, but is revising its outlook for fiscal year 2023, provided on March 16, 2023, to reflect these more challenging macroeconomic headwinds, and now expects:

- Net sales growth in the range of approximately 3.5% to 5.0%, compared to its previous expectation of 5.5% to 6%; both of which include an anticipated negative impact of approximately two percentage points due to lapping the fiscal 2022 53rd week

- Same-store sales growth in the range of approximately 1.0% to 2.0%, compared to its previous expectation of 3.0% to 3.5%

- Diluted EPS in the range of an approximate 8% decline to flat, compared to its previous expectation of growth of approximately 4% to 6%, both of which include an anticipated negative impact of approximately four percentage points due to lapping the fiscal 2022 53rd week

  o  The updated Diluted EPS guidance includes an anticipated negative impact of approximately four percentage points due to higher interest expense in fiscal 2023, compared to the anticipated negative impact of approximately three percentage points included in the prior EPS guidance.

                    *        *        *

- Capital expenditures, including those related to investments in the Company's strategic initiatives, in the range of $1.6 billion to $1.7 billion, compared to its previous expectation of $1.8 billion to $1.9 billion.

108.    Also on June 1, 2023, Dollar General hosted an earnings call to discuss the 1Q23 results led by defendants Owen and Dilts. Defendant Owen stated that Dollar General was "refining our inventory management process, including making some structural reporting realignments within our team to allow us to move more nimbly to respond to customer demand and the needs of the business."

109.    During the Q&A session of the conference call, defendant Dilts downplayed the extent of the Company's inventory problems, stating:

> **We continue to feel good about the quality of the inventory.  But I will say inventory management remains a focus for us**.  So inventory growth was relatively consistent with Q4, although we had hoped that it would come in somewhat lower this quarter.  The good news here is what I would say is we made some progress on working down the non-consumable inventory.  It was offset, though, by improved consumable in-stock levels.  And as Jeff noted, with the supply chain health, that's where we got those in-stock levels from.
>
> So just a couple of facts for you.  We reacted pretty quickly to the current environment by reducing non-consumable receipts.  And frankly, I'd say we acted historically as well because some of those receipts were pulled back almost a year ago and in reaction to the discretionary spend trends that we were seeing.  So in Q1, our non-consumable receipts were actually down over 30%, and we expect that trend to continue into Q2.
>
> And with that, what we saw was a 3% reduction in non-consumable inventory per store from Q4.  So nice movement there.  **And we do expect it to get more normalized levels in the back half of the year.  Again, at the same time, our supply chain service levels improved faster than we expected, and that drove some consumable products to the store, which was one of the main contributors, as you look, on either a year-over-year basis or a quarter-over-quarter basis**.
>
> **So I'd just end with, we know that inventory remains an opportunity for us, and we're going to continue working on reducing those levels with the goal to remain in line with sales, and we believe that the new structure we put in place will make sure that we get that done**.

110.    Also on June 1, 2023, Dollar General filed with the SEC its 1Q23 financial report on Form 10-Q (the "1Q23 Form 10-Q"), which was signed by defendant Dilts and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Owen and Dilts.  The 1Q23 Form 10-Q provided the same financial results reported in the 1Q23 release.  The 1Q23 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.6% in the 2023 period . . . , an increase of 34 basis points."  Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q23 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to

be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

111.    The statements above in ¶¶106-110 were materially false and misleading when made, and omitted material facts necessary to make the statements made not false or misleading, because they failed to disclose the true facts that were then known to or recklessly disregarded by defendants, including:

(a)    that Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items;

(b)    that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory;

(c)    that the allotment of employee hours per store per week imposed by Dollar General management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time;

(d)    that Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio;

(e)    that Dollar General's reported revenue and earnings during the Class Period were artificially inflated by defendants' over-pricing scheme;

(f) that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout;

(g) that Dollar General was not on track to achieve its already reduced FY23 guidance provided to investors of 3.5% to 5% net sales growth, 1% to 2% same-store sales growth, or flat diluted EPS growth to an 8% diluted EPS decline, and was suffering flatlining same-store sales growth for the year and on track to experience double-digit diluted EPS declines; and

(h) that as a result (a)-(g) above, defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading and/or lacked a reasonable factual basis when made.

112. Then, on August 31, 2023, Dollar General reported dismal 2Q23 financial results and once again slashed its sales and profit outlook for FY23, this time blaming weaker consumer spending on non-essential purchases and increasing theft. For the quarter, Dollar General revealed that its same-store sales had *decreased 0.1%*, operating profits had *decreased 24.2%*, and EPS had *decreased 28.5%*. The release stated that Dollar General was on track to achieve net sales growth of only 1.3% to 3.3% for the year, compared to the prior guidance of 3.5% to 5% annual net sales growth; same-store sales growth of 1% to a 1% *decline* for the year, compared to the prior guidance of 1% to 2% annual same-store sales growth. The release also revealed that Dollar General was on track to suffer a stunning decline in diluted EPS of *negative 22% to negative 34%* for the year, compared to the prior guidance of flat diluted EPS growth to an 8% decline. The release further conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers" and "expect[ed] an incremental

operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments." This amount included $95 million for markdowns taken on backlogged inventory and $75 million on increased spending on personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining on store shelves.

113. As defendant Owen acknowledged on the conference call that morning, in order to clean up its stores, Dollar General was deploying its "smart teams" to move between multiple stores to organize excess inventory. The teams, one in each of Dollar General's districts in the United States, were part of Dollar General's $75 million campaign to enhance store personnel and improve store appearance. According to an August 31, 2023 report by *Business Insider*, "[o]ne former Dollar General employee who worked on a smart team in Texas told Insider that the job involves taking unpacked inventory off of rolltainers, or metal carts that hold boxes of merchandise and have become a common sight at the ends of aisles at many Dollar General stores," noting that the "employee's smart team was usually sent to stores right before they underwent an annual inventory review." According to the former employee, "'[i]t was basically doing a whole-store revamp,'" "'[w]e'd throw all the penny stuff away,' the employee said, referring to Dollar General items that have been marked down to one cent each in the store's inventory and have become targets for bargain hunters." According to another *Business Insider* report, the Company had taken to marking items down to $0.01 when it intended to throw them out, but with no employee resources available to cull the shelves for the penny inventory, it simply remained in stores on shelves at the end of the Class Period.

114. On this news, the market price of Dollar General stock declined $19 per share, or 12%, on August 31, 2023, on unusually high trading volume of more than 19 million shares.

115.     Analysts reacted with surprise and disappointment at the results.  For example, in an

August 31, 2023 "Flash" report titled "DG: It's Even Worse Than Feared; Management Materially

Cuts Guidance as It Attempts Turnaround," Wells Fargo lamented:

> DG has historically been seen as a high quality defensive name, but we see signs of deeper issues.  Management exits, uncharacteristic supply chain execution issues, tangible evidence of some share loss, a ramp in pricing actions, labor hour investments, reduced pOpshelf growth, and a temporary halt of the share repo are concerning.  We are not convinced DG has ripped off the band-aid with investment to fix the issue and believe consensus still needs to come down (we may not see much growth at all in 2024).

116.     Also on August 31, 2023, stock analysts with Truist Securities reduced their price

target by $24 per share to $142 per share, stating:

> While CY23 has been hard on DG (down ~45% YTD), we think it is a result of taking too much price during the pandemic (especially given the price sensitivity of their customer base) and not investing enough labor in the stores.  We suspect more labor hour investments will be needed and, at the very least, seem unlikely to reverse, both helping reset the margin lower.

117.     Similarly, on August 31, 2023, stock analysts at Deutsche Bank Securities Inc.

lowered their price target by $42 per share to $157 per share in a report titled "The Last Cut Is the

Deepest," lamenting among other things that the "additional $95M in markdowns on non-

consumable merchandise starting in 3Q" and that "DG handed in the worst performance thus far

with 2Q EPS coming in 14% below consensus and the full-year guidance moving 25% lower at the

midpoint (and now 31% below the initial outlook provided on 3/16)."

118.     On September 1, 2023, stock analysts with UBS lowered their price target to $181 per

share, emphasizing in a client note:

> Our checks consistently indicate that DG's store standards have slipped with untidy conditions and unacceptable out of stocks.  This contrasts to its historic experience where execution has been sharp.  Ultimately, the dollar store business model is straightforward.  Inventory arrives in the back of the store and goes out of the front door.  When inventory isn't on the shelves or it's hard for a customer to get in or out of the store, the model breaks down.  Now, the question is whether DG is doing enough to address these issues.  The reality is we don't know yet.  If comps improve

in the next couple of quarters, the last year will soon become a distant memory.  If not, the challenges will probably increase at an exponential rate.

119.     In a September 5, 2023 report, a stock analyst with Argus reduced his price target on Dollar General by $70 per share to $165 per share, noting that he "[had] been surprised by the magnitude of the weakness" in the Company's performance and further cautioning:

> The company is subject to litigation, as detailed in the annual report. Barron's recently wrote that DG has been fined over $1 million for price inaccuracies, where the price a customer is charged at the cash register is higher than the price on the shelf.  While the dollar amount [of the fine] isn't material, the bad publicity and the effect on the on the company's reputation are unfortunate.

120.     On Wednesday, September 13, 2023, the Attorney General of Missouri filed suit against Dollar General claiming that hundreds of the Company's retail stores in Missouri are offering "unfair and deceptive pricing."  The lawsuit contends that Dollar General had violated Missouri's consumer protection laws by advertising one price on the shelves and charging a higher price at the register upon checkout.  According to the lawsuit: "Dollar General is routinely overcharging Missouri consumers for every day staples and the necessities of life.  Worse still, consumers are being deceived as to the prices they are actually paying for these items." Furthermore, the Missouri Attorney General found that items sold by Dollar General such as candles, toilet paper, lip balm, lemonade, tire foam, and drink coolers frequently cost more at the point of sale than the prices listed on the shelf.  The lawsuit by the Missouri Attorney General claims Dollar General's misconduct violated the Missouri Merchandising Practices Act and seeks an injunction, full restitution, civil penalties, and other relief.

121.     As a result of defendants' scheme and false and misleading statements and omissions, Dollar General stock traded at artificially inflated prices during the Class Period.  As defendants' misconduct – and the consequences thereof – reached the market, Dollar General's stock price collapsed, declining ***more than 45%*** from its Class Period high and causing hundreds of millions of

dollars in losses to Dollar General investors, who suffered economic harm as the truth about Dollar General, its operations, and its prospects began to be revealed.

## DEFENDANTS' FAILURE TO AFFIRMATIVELY DISCLOSE
## MATERIAL FACTS AS REQUIRED BY APPLICABLE SEC RULES
## AND REGULATIONS

122.    In addition to the materially false and misleading statements identified above, defendants also violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations.   Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

123.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *        *        *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

(Original emphasis omitted.)

124.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)      Is the trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

125.    Item 303 required Dollar General's quarterly and annual financial reports issued during the Class Period to disclose the fraudulent scheme arising from the Company's chronic understaffing, logistical problems, and systematic efforts to overcharge its customers at the counter. Defendants' failure to disclose these adverse facts violated Item 303 because these activities represented known trends and uncertainties that were likely to and did have a material negative impact on the Company's business and financial results.

126.    Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Dollar General] speculative or risky" and an explanation of "how [the] risk affecte[d] [Dollar General]."  Defendants' failure to disclose the fraudulent scheme arising from the Company's chronic understaffing, logistical problems, and systematic efforts to overcharge its customers at the counter violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Dollar General speculative or risky.

## ADDITIONAL SCIENTER ALLEGATIONS

127.    As alleged herein, Dollar General and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Dollar General, their control over,

and/or receipt and/or modification of Dollar General's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Dollar General, participated in the fraudulent scheme alleged herein.

128. The Individual Defendants held themselves out as the ones most knowledgeable about Dollar General's inventory issues and oversight of store operations, and these areas were a critical focus of Dollar General's executive management team during the Class Period. For example, Dollar General's periodic SEC filings during the Class Period stated:

> *Efficient management of our inventory has been and continues to be an area of focus for us*.

*     *     *

> *On an ongoing basis, we closely monitor and manage our inventory balances, and they may fluctuate from period to period based on new store openings, the timing of purchases, and other factors*.

129. Notwithstanding defendants' intimate knowledge of the state of Dollar General's inventory and the management of Dollar General store operations, their public statements confirming the effectiveness of the Company's inventory, labor force, and logistical operations contradicted internal Company reports and the most up-to-date internal Company information – such as the information contained in periodic internal surveys of Company employees, daily sales reports, and inventory reports received by defendants – which demonstrated that the stores were suffering from fundamental inventory, labor, and logistical problems during the Class Period. The close proximity in time between defendants' Class Period statements and the sudden revelation of those statements' false and misleading nature as detailed herein further demonstrates defendants' scienter. For example, with only one month remaining in 2Q23, a quarter in which Dollar General would ultimately acknowledge $170 million was needed to rectify a litany of inventory challenges and

labor shortages, defendants highlighted the Company's purportedly "efficient" and "effective" inventory management in their statements to investors.

130.    Dollar General also suffered repeat adverse regulatory actions as a result of the over-pricing scheme and the Company's excess inventory and, in certain instances, quickly settled with state attorneys general accusing the Company of malfeasance.  For example, Dollar General's systemic pricing irregularities during 2021 and 2022 resulted in enforcement action, fines and/or store closures in Arizona, Louisiana, Mississippi, North Carolina, and Ohio.  On September 13, 2023, the Missouri Attorney General filed suit alleging that Dollar General continued "routinely overcharging" and deceiving customers by charging more at the register than the prices listed on the shelf.  Since 2017, Dollar General has faced more than $21 million in fines after more than 240 inspections nationwide.  Between February 1, 2022 and April 20, 2023, in Alabama, Florida, and Georgia alone inspectors assessed Dollar General nearly $10 million in proposed penalties after more than 30 investigations.  In addition, the Occupational Safety and Health Administration has levied repeat multi-million dollar fines on Dollar General for an "[a]larming trend" of "numerous willful, repeat and serious workplace safety violations" and "choosing to place profits over their employees' safety and well-being."  Dollar General's need to respond to this multitude of adverse regulatory actions further bolsters an already compelling inference of scienter.

131.    Additionally, with the market price of General Dollar stock artificially inflated based on defendants' false and misleading statements and omissions, defendants Vasos and Garratt cashed in, selling nearly 1.5 million Dollar General shares at artificially inflated prices and reaping more than $315 million in gross proceeds between them.  Specifically, between May 2020 and June 2023, defendant Vasos sold more than *$283 million* of his Dollar General shares at prices as high as $244 per share, while defendant Garratt sold more than *$31 million* of his Dollar General shares between

May 2020 and August 2022 at prices as high as nearly $245 per share. These sales by defendants Vasos and Garratt were highly suspicious in both their timing and amounts and out of line with their prior trading practices. Furthermore, both defendants departed their executive roles with Dollar General shortly after cashing in, although defendant Vasos ultimately returned to Dollar General in October 2023 after the disastrous and short-lived tenure of defendant Owen.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

132.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Dollar General stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Dollar General stock; and

(e)    plaintiff and other members of the Class purchased Dollar General stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

133.    At all relevant times, the market for Dollar General stock was efficient for the following reasons, among others:

(a)    Dollar General stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, Dollar General filed periodic public reports with the SEC; and

(c)    Dollar General regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

134.    Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants include omissions of material fact for which there was a duty to disclose.

## LOSS CAUSATION/ECONOMIC LOSS

135.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Dollar General stock and operated as a fraud or deceit on Class Period purchasers of Dollar General stock by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Dollar General stock fell significantly, as the prior artificial inflation came out of the price over time. As a result of their purchases of Dollar General stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

136.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers of Dollar General common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

137.     The members of the Class are so numerous that joinder of all members is impracticable.  Shares of Dollar General stock were actively traded in an efficient market on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Dollar General or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

138.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

139.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

140.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Dollar General; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

142.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    The defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Dollar General stock during the Class Period.

145. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dollar General stock. Plaintiff and the Class would not have purchased Dollar General stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against the Individual Defendants

146. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147. The Individual Defendants and/or persons under their control, violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiff and the other members of the Class. By virtue of their positions as controlling persons, each of these defendants are each liable pursuant to §20(a) of the 1934 Act for the acts and omissions of their co-defendants in violation of the 1934 Act.

148. Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions with Dollar General, participation in and awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to

the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 27, 2023            BARRETT JOHNSTON MARTIN
                                       & GARRISON, LLC
                                     JERRY E. MARTIN, #20193


                                            s/ Jerry E. Martin
                                     _____
                                     JERRY E. MARTIN

                                     200 31st Avenue North
                                     Nashville, TN  37203
                                     Telephone:  615/244-2202
                                     615/252-3798 (fax)
                                     jmartin@barrettjohnston.com

                                     Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
BRIAN E. COCHRAN
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
drobbins@rgrdlaw.com
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Washtenaw County Employees' Retirement System ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  *15*<sup>TH</sup> day of November, 2023.

Washtenaw County Employees' Retirement System

By: _____
       *Scott Miller*

Its: _CHAIRPERSON - BOARD OF TRUSTEES_

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/16/2021 | 405 | $193.70 |
| 05/08/2023 | 850 | $220.04 |
| 05/31/2023 | 2,283 | $203.07 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 06/23/2020 | 1,065 | $190.33 |
| 06/27/2022 | 1,080 | $246.82 |

Prices listed are rounded up to two decimal places.

*Opening position of 2,830 shares.