UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DOLLAR GENERAL CORPORATION, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:23-cv-01250<br><br>CLASS ACTION<br><br>Judge Aleta A. Trauger |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPOINTMENT AS LEAD
PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | STATEMENT OF FACTS | 1 |
| III. | ARGUMENT | 8 |
| | A. North Carolina Is the "Most Adequate Plaintiff" and Should Be Appointed Lead Plaintiff | 8 |
| | 1. North Carolina's Motion Is Timely | 9 |
| | 2. North Carolina Has the Largest Financial Interest in the Relief Sought by the Class | 10 |
| | 3. North Carolina Is Typical and Adequate of the Putative Class | 10 |
| | B. The Court Should Approve North Carolina's Selection of Counsel | 11 |
| IV. | CONCLUSION | 13 |

4867-7303-6191.v1

Case 3:23-cv-01250   Document 32   Filed 01/26/24   Page 2 of 20 PageID #: 377

**CASES**

*Burges v. Bancorpsouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017)........................................................................12

*Franchi v. SmileDirectClub, Inc.*,
2020 WL 6479561 (M.D. Tenn. Jan. 27, 2020)................................................................9, 10, 12

*HsingChing Hsu v. Puma Biotechnology, Inc.*,
No. 8:15-cv-00865-AG-JCG (C.D. Cal.)...................................................................................12

*In re Cardinal Health, Inc. Sec. Litig.*,
No. 2:04-cv-00575-ALM (S.D. Ohio) .......................................................................................13

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001).......................................................................................................11

*In re Enron Corp. Sec. Litig.*,
No. 4:01-cv-03624 (S.D. Tex.) ...................................................................................................13

*In re Envision Healthcare Corp. Sec. Litig.*,
2023 WL 8110157 (M.D. Tenn. Nov. 20, 2023) ........................................................................12

*In re HealthSouth Corp. Sec. Litig.*,
No. 2:03-cv-01500-KOB-TMP (N.D. Ala.)...............................................................................13

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
No. 1:01-cv-01451-REB-KLM (D. Colo.) ................................................................................13

*In re UnitedHealth Grp. Inc. Sec. Litig.*,
No. 0:06-cv-01691-JMR-FLN (D. Minn.) .................................................................................13

*Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*,
No. 1:02-cv-05893 (N.D. Ill.) ....................................................................................................13

*Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2019 WL 494129 (M.D. Tenn. Jan. 9, 2019).............................................................................12

*Ret. Sys. v. Psychiatric Sols., Inc.*,
2010 WL 1790763 (M.D. Tenn. Apr. 30, 2010).........................................................................12

*Ret. Sys. v. Psychiatric Sols., Inc.*,
2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ........................................................................10

4867-7303-6191.v1

*Schuh v. HCA Holdings, Inc.*,
    No. 3:11-cv-01033, ECF 567 (M.D. Tenn. Apr. 11, 2016) ......................................................12

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78u-4 ...............................................................................................8, 9, 11, 12
    §78u-4(a)(1) ...........................................................................................................8
    §78u-4(a)(3)(A).......................................................................................................9
    §78u-4(a)(3)(A)(i)...................................................................................................9
    §78u-4(a)(3)(B)(i)................................................................................................1, 8
    §78u-4(a)(3)(B)(iii)................................................................................................1
    §78u-4(a)(3)(B)(iii)(I).............................................................................................9
    §78u-4(a)(3)(B)(v) ............................................................................................1, 11

Federal Rules of Civil Procedure
    Rule 23 ............................................................................................................9, 10

4867-7303-6191.v1

## I.  INTRODUCTION

Presently pending before this Court is a securities class action brought on behalf of purchasers of Dollar General Corp. ("Dollar General" or the "Company") common stock for alleged violations of the Securities Exchange Act of 1934 (the "1934 Act").  In securities class actions such as this, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires courts to "consider any motion made by a purported class member in response to the notice" and "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  *See* 15 U.S.C. §78u-4(a)(3)(B)(i).

In this case, the Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, and the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans ("North Carolina") should be appointed lead plaintiff because North Carolina has filed a timely motion, has a substantial financial interest in the outcome of this litigation, and will typically and adequately represent the class's interests.  *See* 15 U.S.C. §78u-4(a)(3)(B)(iii).  In addition, North Carolina's selection of Robbins Geller Rudman & Dowd LLP as lead counsel for the putative class should be approved.  15 U.S.C. §78u-4(a)(3)(B)(v).

## II.  STATEMENT OF FACTS

Defendant Dollar General is a discount retailer that sells consumer goods, including packaged foods, fresh foods and produce, beauty and household products, and beer and wine, primarily throughout the southern, southwestern, midwestern, and eastern United States.  The Company's core customers are low- and fixed-income households.  Over 80% of the Company's items are priced at or below $5.

- 1 -

Over the past decade, Dollar General continued to expand its stores, distribution centers, and sales even as consumers' shift to online retail sales adversely impacted many of its brick-and-mortar peers. The Company's focus on low-cost goods and on opening stores in areas without numerous retailers helped the Company grow its store footprint. Indeed, between 2012 and 2022, the Company increased its store count by more than 90% from approximately 10,000 locations to more than 19,000 locations.

Dollar General relies heavily on branded and unbranded consumables to generate visitor store traffic (which constituted 77% of fiscal 2021 sales), with other categories boosting margins and ticket growth. Between 2012 and 2022, Dollar General's net sales rose at a compound annual growth rate ("CAGR") of 9%, while its earnings per share ("EPS") grew at a CAGR of 14%. This, in turn, drove the price of Dollar General stock up by more than 40% to its Class Period high of over $262 per share in April 2022.

The Complaint alleges that, unbeknownst to investors, however, these seemingly favorable results were the product of a fraudulent scheme designed to artificially inflate Dollar General's reported revenue and profits. Specifically, Dollar General chronically understaffed its stores and declined to remediate known logistical problems and other significant operational difficulties leading to the buildup of unwanted inventory, the destruction and loss of tens of millions of dollars' worth of store merchandise, the mispricing of items, and the systematic overcharging of Dollar General's customers at checkout above the listed retail price. Defendants knowingly limited store labor hours in a manner which placed employees in situations where the assigned tasks could not possibly be completed within the allotted time.

As a result of chronic understaffing, employees both rang up merchandise and stocked shelves, among numerous other tasks, and therefore lacked sufficient time to update merchandise

pricing or deal with inventory issues as they arose.  Merchandise often arrived with no place to display it.  Items were regularly lost, broken, or otherwise unsaleable.  Items which were not selling at Dollar General steadily piled up.  Stores became so crowded with disorganized merchandise that some were closed by fire marshals for being dangerously over-packed, preventing safe ingress and egress.  Employees had insufficient time or resources to focus on the growing glut of non-selling inventory on store shelves, much of which was being stored in plain sight in rolling steel "rolltainer" storage bins parked at the ends of aisles, with merchandize never unpacked or displayed for sale.  In addition to the glut of merchandise that should have been timely written-off as unsalable, these practices resulted in a slovenly and uninviting shopping environment which dissuaded consumers from shopping at Dollar General.

Furthermore, and as later confirmed by several adverse regulatory actions, Dollar General implemented a campaign of systematically overcharging customers at the register for items that were marked at much lower prices on the shelf.  The overcharges dropped directly to the bottom line as profits.  Dollar General's deceptive pricing was so pervasive that, in November 2022, Ohio's Attorney General brought a lawsuit against the Company.  An audit had "found error rates ranging from 16.7% to 88.2%" in pricing at Dollar General stores located in Ohio. ECF 1 at ¶7.  In January 2023, the Ohio Attorney General found that Dollar General had continued its over-price-ringing scheme despite the lawsuit, which resulted in the Ohio Attorney General seeking an order enjoining Dollar General from continuing to violate state law.  To avert the Ohio Attorney General's motion, in January 2023, Dollar General shut down all stores in Ohio for a day to self-audit its pricing practices.  In February 2023, Dollar General agreed to ostensibly correct all prices at the register and to cease its over-pricing scheme.

- 3 -

In March 2023, *Barron's* issued an article titled, "When the Price Isn't Right: Dollar General's Record of Overcharging," which discussed defendants' over-pricing scheme and noted that, in addition to Ohio, the states of Arizona, Louisiana, Mississippi, and North Carolina had also fined Dollar General for similar pricing irregularities in 2021 and 2022. Despite Dollar General's purported agreement to cease its over-pricing scheme, on September 13, 2023, the Missouri Attorney General filed suit alleging that Dollar General was continuing its pattern of "routinely overcharging" and deceiving customers. According to the Missouri Attorney General's complaint, a majority, or "92 of the 147 [Dollar General] locations where investigations were conducted failed inspection . . . with an average overcharge of $2.71 for the over 5,000 items price checked by investigators." ECF 1 at ¶8. The Missouri Attorney General pled violations of Missouri state law and sought among other things, penalties of up to $1,000 per violation, restitution, "[d]isgorgement of Defendant's ill-gotten gains acquired in connection with its unlawful practices," and other injunctive relief. *Id.* In addition to exposing the Company to fines, penalties, legal judgments, and reputational harm, defendants' long-running over-pricing scheme artificially inflated Dollar General's sales during the Class Period, unlawfully boosting the Company's reported revenue and profits in an unsustainable fashion that would not continue once discovered. Defendants' over-pricing scheme also risked dissuading customers who felt cheated by Dollar General's sales practices from returning to its stores, further impairing the Company's sales results.

Taking advantage of the artificial inflation caused by the fraudulent scheme detailed herein, Dollar General and certain of its key executives sold hundreds of millions of dollars' worth of Dollar General stock during the Class Period. For example, during the Class Period, CEO Todd J. Vasos sold more than $283 million of his Dollar General shares at prices as high as $244 per share, while then-CFO John W. Garratt sold more than $31 million of his Dollar General shares at prices as high

- 4 -

as nearly $245 per share.  This insider selling spree presaged both executives' departure from the Company.  In July 2022, Dollar General announced that defendant Vasos was stepping down as CEO, and, in January 2023, the Company announced that defendant Garratt was stepping down as CFO.

On February 23, 2023, Dollar General unexpectedly pre-released its preliminary fourth quarter 2022 and fiscal year 2022 ("4Q22" and "FY22," respectively) financial results.  The Company disclosed that 4Q22 sales and earnings would come in materially below what defendants had led investors to expect based on their Class Period statements, blaming winter storm Elliott (which had occurred at the end of 2022), for the sales miss and admitting that the results were negatively impacted by lower sales and higher inventory damages.  On this news, the market price of Dollar General stock declined more than $8 per share, closing at just over $217 per share, on unusually high trading volume of more than 4.5 million shares.

On March 16, 2023, Dollar General reported its final 4Q22 and FY22 financial results.  For the 4Q22, the Company's net sales rose only 17.9% year-over-year, and for the full year net sales only rose 10.6% year-over-year, missing the Company's prior guidance which had been updated as recently as December 2022.  Acknowledging that the Company had experienced a "decrease in customer traffic," Dollar General attributed the sales miss to "the impact of store closures."  ECF 1 at ¶11.  As a portent of the pain to come in cleaning up its stores and sorting out the Company's significant undisclosed inventory problems, Dollar General announced a one-time "'incremental investment of approximately $100 million in our stores, primarily in incremental labor hours, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience.'" *Id.*  On this news, the market price of Dollar General stock

- 5 -

closed down $6.47 per share on March 16, 2023, on unusually high trading volume of more than 3 million shares.

Nevertheless, defendants continued to materially misrepresent Dollar General's 2023 business operations and financial results, causing the price of Dollar General stock to remain artificially inflated.  For example, defendants failed to disclose the impact that Dollar General's dilapidated stores and over-pricing scheme had on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory.  Defendants also failed to disclose the impact of the various regulatory enforcement actions pending against the Company and the reduction in revenue that would necessarily result when customers were no longer overcharged at the register.

On June 1, 2023, Dollar General shocked the market by reporting deeply disappointing first quarter 2023 ("1Q23") results for the period ended May 5, 2023, revealing 1Q23 revenue $130 million below analyst estimates.  The Company slashed its fiscal year 2023 ("FY23") earnings forecast, stating it only expected FY23 same-store sales to rise between 1% and 2% for the year, a reduction of more than 50% at the midpoint from its prior same-store sales growth forecast of 3% to 3.5%, and that it only expected FY23 sales growth in the range of 3.5% to 5% for the year, down 26% at the midpoint from the prior 5.5% to 6% range provided in March 2023.  Moreover, Dollar General reported that its EPS were on track to decline by up to 8% year-over-year, not grow by 4% to 6% as defendants had represented to the market.  On this news, the market price of Dollar General stock closed down over $39 per share, or nearly 20%, on June 1, 2023, on unusually high trading volume of more than 18 million shares.  However, once again defendants failed to disclose the full truth regarding Dollar General's business, operations, and financial results, causing the price of Dollar General stock to remain artificially inflated.

On August 31, 2023, Dollar General reported its second quarter 2023 ("2Q23") financial results, again slashing its FY23 sales and profit outlook. This time the Company blamed a "headwind," including weaker consumer spending on non-essential purchases and increasing theft. ECF 1 at ¶15. For the quarter, same-store sales decreased 0.1%, operating profits decreased 24.2%, and EPS decreased 28.5%. The release quoted defendant Jeffrey C. Owen as stating that "'[w]hile we are not satisfied with our overall financial results, we made significant progress in the second quarter improving execution in our supply chain and our stores, as well as reducing our inventory growth rate and further strengthening our price position.'" *Id.* The release further conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers," and "expect[ed] an incremental operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments." *Id.* Of that, $95 million would be for markdowns taken on the Company's existing inventory. Another $75 million would be spent on increased personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining on store shelves.

As defendant Owen acknowledged on an earnings call held that same day, Dollar General was deploying "smart teams," or groups of employees who move between multiple stores to organize excess inventory and clean up its stores. The teams, one in each of Dollar General's districts in the United States, were part of the $75 million the Company had dedicated to improving employee operations and store appearance. According to an August 31, 2023 report by *Business Insider*, "[o]ne former Dollar General employee who worked on a smart team in Texas told Insider that the job involves taking unpacked inventory off of rolltainers, or metal carts that hold boxes of

4867-7303-6191.v1

Case 3:23-cv-01250   Document 32   Filed 01/26/24   Page 11 of 20 PageID #: 386

merchandise and have become a common sight at the ends of aisles at many Dollar General stores," noting that the "employee's smart team was usually sent to stores right before they underwent an annual inventory review." ECF 1 at ¶16. According to the former employee, "'[i]t was basically doing a whole-store revamp,'" "'[w]e'd throw all the penny stuff away,' the employee said, referring to Dollar General items that have been marked down to one cent each in the store's inventory and have become targets for bargain hunters." *Id.* According to another *Business Insider* report, the Company had taken to marking items down to just one penny when it intended to throw them out, but with no employee resources available to cull the shelves for this penny inventory, the generally unsaleable goods simply remained in stores on shelves at the end of the Class Period. On this news, the market price of Dollar General stock declined another $19.16 per share, or 12%, on August 31, 2023, on unusually high trading volume of more than 19 million shares.

Defendants' fraudulent scheme together with their false and misleading statements and omissions caused Dollar General stock to trade at artificially inflated prices throughout the Class Period. As defendants' misconduct – and the consequences thereof – reached the market, Dollar General's stock price collapsed, declining more than 45% from its Class Period high and causing hundreds of millions of dollars in damages to Dollar General investors, who suffered economic harm as the truth about Dollar General, its operations, and its prospects began to be revealed.

## III.    ARGUMENT

### A.    North Carolina Is the "Most Adequate Plaintiff" and Should Be Appointed Lead Plaintiff

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the 1934 Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(1); *see also* 15 U.S.C. §78u-4(a)(3)(B)(i). First, "[n]ot later than 20 days" after the complaint is filed, a notice must be published "in a widely

circulated national business-oriented publication or wire service" advising members of the purported plaintiff class "of the pendency of the action, the claims asserted therein, and the purported class period" and that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. §78u-4(a)(3)(A)(i). The statutory notice issued in connection with the filing of this action was published on November 27, 2023. *See* Declaration of Christopher M. Wood in Support of Motion for Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel ("Wood Decl."), Ex. A.

Next, the PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person that –

(aa) has either filed the complaint or made a motion in response to a notice . . .;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §78u-4(a)(3)(B)(iii)(I); *Franchi v. SmileDirectClub, Inc.*, 2020 WL 6479561, at *3 (M.D. Tenn. Jan. 27, 2020). North Carolina meets these requirements and should be appointed Lead Plaintiff.

### 1. North Carolina's Motion Is Timely

The November 27, 2023, statutory notice published in connection with the filing of this action advised class members of the pendency of the action, the claims asserted, and the right to move the Court for appointment as lead plaintiff within 60 days, or by January 26, 2024. *See* Wood Decl., Ex. A; 15 U.S.C. §78u-4(a)(3)(A). This Motion is timely filed and North Carolina is eligible for appointment as lead plaintiff.

4867-7303-6191.v1

## 2. North Carolina Has the Largest Financial Interest in the Relief Sought by the Class

As evidenced by its Certification and loss chart, North Carolina purchased 125,715 shares of Dollar General stock and suffered over $8.3 million in losses as a result of defendants' alleged misconduct. *See* Wood Decl., Exs. B, C.[1] To the best of its counsel's knowledge, there are no other named plaintiffs with a larger financial interest. Therefore, North Carolina satisfies the PSLRA's prerequisite of having the largest financial interest.

## 3. North Carolina Is Typical and Adequate of the Putative Class

"The next step is to determine whether [North Carolina] satisfies the typicality and adequacy factors set forth in Rule 23." *Franchi*, 2020 WL 6479561, at *4. The Court should easily conclude that North Carolina meets these requirements.

"In the Sixth Circuit, the test for typicality is whether a named plaintiff's claims 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2012 WL 1071281, at *37 (M.D. Tenn. Mar. 29, 2012) (certifying securities class action) (emphasis omitted). "Inquiry into the adequacy elements requires the Court to consider whether '"(1) the representative[s] . . . have common interests with unnamed members of the class, and (2) it [] appear[s] that the representatives will vigorously prosecute the interests of the class through qualified counsel."'" *Id*.

Here, North Carolina, like other class members: (1) purchased Dollar General stock during the Class Period; (2) was adversely affected by defendants' false and misleading statements; and (3) suffered damages therefrom. Thus, North Carolina's claims are typical of those of other class members because its claims and the claims of other class members arise out of the same course of

---

[1] North Carolina's LIFO (last in, first out) loss is $6.6 million.

- 10 -

events and are based on the same legal theories. North Carolina's significant financial interest ensures it will vigorously represent the class.

Moreover, as an institutional investor, North Carolina is precisely the type of investor whose participation in securities class actions Congress sought to encourage through the enactment of the PSLRA. *See generally In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001) ("Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit absent class members."). Indeed, the Department of State Treasurer administers the North Carolina Retirement Systems and the North Carolina Supplemental Retirement Plans for the benefit of North Carolina's more than one million active and retired public employees, including teachers, police officers, firefighters, and public servants throughout the state. With more than $100 billion in assets, collectively, North Carolina is among the largest U.S. public pension funds. And, as set forth in more detail below, North Carolina has retained Robbins Geller as proposed lead counsel, a law firm with vast experience prosecuting securities class actions.

Because North Carolina filed a timely motion, has a large financial interest in the relief sought by the class, and demonstrated its typicality and adequacy, the Court should adopt the presumption that it is the "most adequate plaintiff."

**B.     The Court Should Approve North Carolina's Selection of Counsel**

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to the Court's approval. *See* 15 U.S.C. §78u-4(a)(3)(B)(v). North Carolina has selected Robbins Geller to serve as Lead Counsel.

Robbins Geller, a 200-attorney firm with an office in this District, regularly represents institutional and individual investors in nationwide securities litigation, including within the Sixth

- 11 -

Circuit and this District.[2] District courts throughout the country, including the judges of this Court, have noted Robbins Geller's reputation for excellence. *See, e.g.*, *Franchi*, 2020 WL 6479561, at *5 ("On more than one occasion, this Court has previously found Robbins Geller to be well-qualified to represent a class in a securities action."); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2019 WL 494129, at *6 (M.D. Tenn. Jan. 9, 2019) (appointing Robbins Geller as lead counsel, finding that "this Court has previously found Robbins Geller to be 'well qualified' for the task of representing a class in a securities action"); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) (certifying class and appointing Robbins Geller as class counsel); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2010 WL 1790763, at *4 (M.D. Tenn. Apr. 30, 2010) (finding Robbins Geller attorneys to be "well qualified and experienced to represent the class"). Notably, Robbins Geller attorneys involved in this case are responsible for obtaining each of the three largest securities fraud class action recoveries ever obtained in this District. *See, e.g.*, *Schuh v. HCA Holdings, Inc.*, No. 3:11-cv-01033, ECF 567 at 12-13 (M.D. Tenn. Apr. 11, 2016) (in granting final approval to a $215 million recovery, the largest securities class action recovery ever in Tennessee, while recognizing that Robbins Geller and its local counsel "were gladiators" and expressing the court's "appreciat[ion for] the work that you all have done on this"); *In re Envision Healthcare Corp. Sec. Litig.*, 2023 WL 8110157, at *7 (M.D. Tenn. Nov. 20, 2023) (granting preliminary approval of $177.5 million settlement). Robbins Geller has also obtained the largest securities fraud class action recoveries in the Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits, as well as a 2019 PSLRA class action trial victory in *HsingChing Hsu v. Puma*

---

[2] For a detailed description of Robbins Geller's track record, resources, and attorneys, please *see* http://www.rgrdlaw.com. A hard copy of the Firm's resume is available upon the Court's request, if preferred.

- 12 -

*Biotechnology, Inc.*, No. 8:15-cv-00865-AG-JCG (C.D. Cal.), where the jury returned a verdict for plaintiff, finding that defendants Puma Biotechnology, Inc. and its CEO committed securities fraud.[3]

Based upon Robbins Geller's extensive experience and proven track record as counsel in securities class actions, North Carolina's selection of Robbins Geller as lead counsel is reasonable and should be approved.

## IV.     CONCLUSION

North Carolina satisfies each of the PSLRA's requirements for appointment as lead plaintiff. Accordingly, North Carolina respectfully requests that the Court appoint it as Lead Plaintiff and approve its selection of Robbins Geller as Lead Counsel for the class.

DATED:  January 26, 2024                     Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

---

[3]     *See In re Enron Corp. Sec. Litig.*, No. 4:01-cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the Fifth Circuit); *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) ($600 million recovery is the largest securities class action recovery in the Sixth Circuit); *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 1:02-cv-05893 (N.D. Ill.) ($1.575 billion recovery is the largest securities class action recovery following a trial as well as the largest securities class action recovery in the Seventh Circuit); *In re UnitedHealth Grp. Inc. Sec. Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery is the largest securities class action recovery in the Eighth Circuit); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery is the largest securities class action recovery in the Tenth Circuit); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery is the largest securities class action recovery in the Eleventh Circuit).

- 13 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead
Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

- 14 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 26, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
Email: cwood@rgrdlaw.com

# Mailing Information for a Case 3:23-cv-01250 Washtenaw County Employees' Retirement System v. Dollar General Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Joshua Sean Bolian**
  jbolian@rjfirm.com,sfordice@rjfirm.com

- **Amy L. Dawson**
  amy.dawson@stblaw.com

- **Peter E. Kazanoff**
  pkazanoff@stblaw.com,managingclerk@stblaw.com,4097583420@filings.docketbird.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,rsarna@barrettjohnston.com,elusnak@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rjfirm.com,dgibby@rjfirm.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Steven Allen Riley**
  sriley@rjfirm.com,dgibby@rjfirm.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

- **Kevin H. Sharp**
  ksharp@sanfordheisler.com,nabbey@sanfordheisler.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:23-cv-01250    Document 32    Filed 01/26/24    Page 20 of 20 PageID #: 395