# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, <br><br> Defendants. | Case No. 3:23-CV-01250 <br><br> CLASS ACTION <br><br> Judge Aleta A. Trauger |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 6

    A.    Dollar General's Business.......................................................................... 6

    B.    The COVID-19 Pandemic Created Increased Demand and Uncertainty................ 8

    C.    In 2021, Dollar General Continued to Face Unprecedented Uncertainty ............. 11

    D.    Emerging From the Pandemic in 2022, Dollar General Saw Changing Demand, Lowered its Projections, and Reported Lower than Anticipated Results........................................................................................... 13

    E.    In 2023, Dollar General Continued to Report Lower Than Anticipated Results and Disclosed Investments and Efforts to Address Certain Operational Challenges........................................................................ 15

    F.    In 2024, Dollar General Faces Continued Headwinds but Expects That its Investments Will Begin to Show Results............................................. 17

    G.    Leadership Changes ................................................................................ 19

    H.    Former Employee Allegations ................................................................ 19

    I.    Statements Challenged by Plaintiffs ....................................................... 20

        a.    Accounting Statements ................................................................ 21

        b.    Inventory Statements ................................................................... 21

        c.    Staffing Statements ..................................................................... 22

        d.    Pricing Statements ...................................................................... 23

LEGAL STANDARDS ........................................................................................................ 23

ARGUMENT......................................................................................................................... 24

I.    THE COMPLAINT CANNOT PLEAD SECURITIES FRAUD BASED ON CRITICISMS OF DEFENDANTS' EXECUTION OF THE COMPANY'S FULLY-DISCLOSED BUSINESS PLAN ........................................................ 24

    A.    The FEs Are Not Alleged to Have Relevant Company-Wide Knowledge........... 27

    B.    The FE Allegations Are Not Pled With Particularity ......................................... 29

II.    THE COMPLAINT FAILS TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS OR LOSS CAUSATION ....................................................... 31

    A.    Accounting Statements ........................................................................... 32

    B.    Inventory Statements .............................................................................. 36

    C.    Staffing Statements ................................................................................ 47

    D.    Pricing Statements ................................................................................. 52

    E.    The Complaint Cannot Manufacture a Claim Based on Item 303 ........................ 54

i

III. THE COMPLAINT DOES NOT PLEAD WITH PARTICULARITY FACTS CREATING A STRONG INFERENCE OF SCIENTER ................................................ 54

    A. The Complaint Does Not Identify Internal Reports That Were Inconsistent With the Company's Public Statements ............................................................... 56

    B. The FE Allegations Do Not Give Rise to a Strong Inference of Scienter ............ 57

    C. The Complaint Does Not Allege Defendants' Had Actual Knowledge that Statements Concerning "Soft Information" Were False or Misleading................ 59

    D. The Complaint Cannot Rely on Stock Sales to Plead Scienter............................ 59

    E. The Complaint Does Not Allege Any of the Remaining *Helwig* Factors............. 65

    F. Scienter Cannot Be Inferred From "Critical Operations" or the Challenged Statements Themselves...................................................................................... 65

    G. The Competing Nonculpable Inferences Are Far More Compelling.................... 66

IV. THE COMPLAINT FAILS TO PLEAD A SCHEME LIABILITY CLAIM ................... 69

V. THE COMPLAINT FAILS TO PLEAD SECTION 20(a) OR 20A CLAIMS ................ 70

CONCLUSION.................................................................................................................. 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2016) ................................................................... 34

*Amgen Inc. v. Conn. Ret. Plans*,
568 U.S. 455 (2013) ................................................................................................ 23

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ................................................................................. 49

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ........................................................................... 63

*Bailey v. Esperion Therapeutics, Inc.*,
2019 WL 3296235 (E.D. Mich. Feb. 19, 2019) ............................................... 65, 69

*Beaver Cnty. Ret. Bd. v. LCA-Vision Inc.*,
2009 WL 806714 (S.D. Ohio Mar. 25, 2009) ........................................................ 65

*Bondali v. YUM! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ..................................................... 26, 42, 44, 66

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021) .................................................................... 30

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2024 WL 4375775 (N.D. Cal. Oct. 2, 2024 ........................................................... 43

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................. 62

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ............................................................................ 24, 56

*City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ........................................................... 63, 65

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ................................................................................... 32

*City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*,
2024 WL 4370833 (D.N.J. Oct. 2, 2024) ............................................................... 41

*City of Taylor Gen. Emples. Ret. Sys. V. Magna Int'l, Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013)......................................................................... 64

*Corban v. Sarepta Therapeutics, Inc.*,
  868 F.3d 31 (1st Cir. 2017) ....................................................................................... 61

*Courie v. Alcoa Wheel & Forged Prods.*,
  577 F.3d 625 (6th Cir. 2009) .................................................................................... 24

*D.E. & J. Ltd. P'ship v. Conaway*,
  133 F. App'x 994 (6th Cir. 2005) .............................................................................. 36

*Doshi v. Gen. Cable Corp.*,
  386 F. Supp. 3d 815 (E.D. Ky. 2019) ....................................................................... 65

*Doshi v. Gen. Cable Corp.*,
  823 F.3d 1032 (6th Cir. 2016) ....................................................................... 24, 65, 70

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) .................................................................................... 56

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S 336 (2005)................................................................................................... 32

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...................................................................................... 38

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) ..................................................................................... 26

*Fischer v. Vantive Corp. (In re Vantive Corp. Secs. Litig.)*,
  283 F.3d 1079 (9th Cir. 2002) .................................................................................. 61

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*
  *(In re KBC Asset Mgmt. N.V.)*,
  572 F. App'x 356 (6th Cir. 2014) .............................................................................. 52

*Frank v. Dana Corp.*,
  547 F.3d 564 (6th Cir. 2008) .................................................................................... 24

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)....................................................................... 65

*Gavish v. Revlon, Inc.*,
  2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)........................................................... 30

*GBR Grp., Ltd. v. Biogen Inc. (In re Biogen Inc. Sec. Litig.)*,
  857 F.3d 34 (1st Cir. 2017)....................................................................................... 59

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................... 61

*Grillo v. Tempur-Pedic Int'l, Inc.*,
553 F. Supp. 2d 809 (E.D. Ky. 2008) ................................................................. 62, 64

*Gruhn v. Tween Brands, Inc.*,
2009 WL 1542795 (S.D. Ohio June 2, 2009) ............................................................ 64

*Hampshire Cty. Council v. Newell Brands Inc.*,
837 F. App'x 869 (3d Cir. 2020) ............................................................................... 29

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................................................................................... 4

*Hunter v. Elanco Animal Health Inc.*,
2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) .................................................... 29, 50

*I.B.E.W. v. Ltd. Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) .................................................... 39, 40, 68

*In re AST Rsch. Sec. Litig.*,
887 F. Supp. 231 (C.D. Cal. 1995) ........................................................................... 70

*In re Astea Int'l Inc. Sec. Litig.*,
2007 WL 2306586 (E.D. Pa. Aug. 8, 2007) .............................................................. 62

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................. 27, 66

*In re Career Educ. Corp. Securities Litig.*,
2006 WL 999988 (N.D. Ill. Mar. 28, 2006).............................................................. 30

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................... 70

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008),
*aff'd sub nom. Konkol*, 590 F.3d 390...................................................................... 56

*In re Enovix Corp. Sec. Litig.*,
2024 WL 349269 (N.D. Cal. Jan. 30, 2024) ............................................................. 45

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ................................................. 55, 70

*In re Envoy Corp. Sec. Litig.*,
133 F. Supp. 2d 647 (M.D. Tenn. 2001)................................................................... 65

v

*In re Federated Dep't Stores, Inc.*,
  2004 WL 444559 (S.D.N.Y. Mar. 9, 2004) ................................................................. 66

*In re Hertz Glob. Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018) ..................................................................................... 60

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) .......................................................... 31

*In re Invensense, Inc. Sec. Litig.*,
  2017 WL 11673462 (N.D. Cal. Apr. 12, 2017) ......................................................... 53

*In re Medtronic Inc., Sec. Litig.,*
  618 F. Supp. 2d 1016 (D. Minn. 2009),
  *aff'd*, 621 F.3d 800 (8th Cir. 2010) ......................................................................... 63

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...................................................................... 70

*In re Peabody Energy Corp. Sec. Litig.,*
  2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) .............................................................. 50

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017),
  *aff'd*, 955 F.3d 738 (8th Cir. 2020) ......................................................................... 44

*In re Target Corp. Sec. Litig.,*
  955 F.3d 738 (8th Cir. 2020) ............................................................................. 40, 45

*In re TECO Energy, Inc. Sec. Litig.*,
  2006 WL 845161 (M.D. Fla. Mar. 30, 2006) ........................................................... 36

*In re TransDigm Grp., Inc. Sec. Litig.*,
  440 F. Supp. 3d 740 (N.D. Ohio 2020) .................................................................... 52

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ................................................................................... 24

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ............................................................................ passim

*Iron Worker Loc. Union No. 405 Annuity Fund v. Dollar Gen. Corp.*,
  2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018) ...................................................... 26

*J&R Mktg. v. GMC*,
  549 F.3d 384 (6th Cir. 2008) ................................................................................... 54

vi

*Kakkar v. Bellicum Pharms., Inc.*,
 2020 WL 2845279 (S.D. Tex. May 29, 2020) ................................................................... 55

*KBC Asset Mgmt. N.V. v. Omnicare, Inc.*,
 769 F.3d 455 (6th Cir. 2014). ............................................................... 30, 32, 59

*Kolominsky v. Root, Inc.*,
 100 F.4th 675 (6th Cir. 2024) ................................................................... passim

*Kolominsky v. Root, Inc.*,
 667 F. Supp. 3d 685, 713 (S.D. Ohio 2023),
 *aff'd*, 100 F.4th 675 (6th Cir. 2024) ................................................................... 56

*Konkol v. Diebold, Inc.*,
 590 F.3d 390 (6th Cir. 2009) ............................................................... 54, 58, 60, 62

*Lachman v. Revlon, Inc.*,
 487 F. Supp. 3d 111 (E.D.N.Y. 2020) ................................................................... 43

*Ley v. Visteon Corp.*,
 543 F.3d 801 (6th Cir. 2008) ................................................................... 24

*Lim v. Hightower*,
 2024 WL 4349409 (N.D. Ohio Sept. 30, 2024) ................................................................... 31

*Lynn v. Helf*,
 2014 WL 5431221 (M.D. Tenn. Oct. 24, 2014) ................................................................... 6

*MacPhee v. MiMedx Grp., Inc.*,
 73 F.4th 1220 (11th Cir. 2023) ................................................................... 32

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
 601 U.S. 257 (2024) ............................................................... 24, 31, 54

*Mart v. Tactile Sys. Tech., Inc.*,
 595 F. Supp. 3d 788 (D. Minn. 2022) ................................................................... 63

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
 2024 WL 2890968 (2d Cir. June 10, 2024) ................................................................... 70

*Mauss v. Nuvasive, Inc.*,
 2014 WL 4161431 (S.D. Cal. Aug. 19, 2014) ................................................................... 30

*Miller v. Champion Enters., Inc.*,
 346 F.3d 660 (6th Cir. 2003) ............................................................... 36, 38, 55, 68

*Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.*,
 239 F. App'x 318 (9th Cir. 2007) ................................................................... 60

*Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp.)*,
  123 F.3d 394 (6th Cir. 1997) ................................................................ 33

*Ohio Pub. Emples. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*,
  830 F.3d 376 (6th Cir. 2016) ................................................................ 32

*Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
  444 F. Supp. 3d 550 (S.D.N.Y. 2020) ................................................... 50

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
  614 F. App'x 237 (6th Cir. 2015) ......................................................... 53

*Pittman v. Unum Grp.*,
  861 F. App'x 51 (6th Cir. 2021); ......................................................... 66

*Plumber & Steamfitters Local 773 Pension Fund, v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) .................................................................... 33

*Plymouth Cty. Ret. Ass'n v. Array Techs., Inc.*,
  2023 WL 3569068 (S.D.N.Y. May 19, 2023) ......................................... 41

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ......................................................... 60, 66

*Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co.*,
  381 F.3d 563 (6th Cir. 2004) ................................................................ 38

*Quinones v. Frequency Therapeutics, Inc.*,
  106 F.4th 177 (1st Cir. 2024) ......................................................... 60, 64

*Robeco Capital Growth Funds SICAV v. Peloton Interactive, Inc.*,
  2024 WL 4362747 (S.D.N.Y. Sep. 30, 2024) ................................... 28, 39

*Ryan v. FIGS, Inc.*,
  2024 WL 187001 (C.D. Cal. Jan. 17, 2024) ......................................... 66

*S.E.C. v. Rio Tinto PLC*,
  41 F.4th 47 (2d Cir. 2022) .................................................................... 70

*Shafer v. Lightning Emotors, Inc.*,
  2024 WL 691458  (D. Colo. Feb. 20, 2024) ......................................... 45

*Sophia Zhou v. Desktop Metal, Inc.*,
  2024 WL 4589490 (1st Cir. Oct. 28, 2024) ..................................... 37, 48

*State Tchrs. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*,
  2024 WL 3258293 (D. Mass. July 1, 2024) ........................................... 63

*Stein v. United States Xpress Enters.*,
 2020 WL 3584800 (E.D. Tenn. June 30, 2020)..................................................................... 56, 66

*Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin.*,
 988 F.3d 157 (2d Cir. 2021)......................................................................................................... 39

*Studen v. Funko, Inc*.,
 2024 WL 2209686 (W.D. Wash. May 16, 2024)............................................................. 39, 67

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
 2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ,
 *aff'd*, 83 F.4th 514 (6th Cir. 2023)........................................................................................ 30

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,*
 83 F.4th 514 (6th Cir. 2023) ............................................................................................. passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,
 551 U.S. 308 (2007).......................................................................................................................... 55

*USM Holdings Inc. v. Simon*,
 2016 WL 4396061 (E.D. Mich. Aug. 18, 2016) ...................................................................... 35

*Wanca v. Super Micro Comput., Inc*.,
 2018 WL 3145649 (N.D. Cal. June 27, 2018) ......................................................................... 35

*Waswick v. Torrid Holdings, Inc*.,
 2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) .......................................................................... 42

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ................................................................................................ 60, 68

*Zaluski v. United Am. Healthcare Corp.*,
 527 F.3d 564 (6th Cir. 2008) ........................................................................................................ 31

*Zucco Partners, LLC v. Digimarc Corp*.,
 552 F.3d 981 (9th Cir. 2009) ............................................................................................... 24, 30

**Statutes**

15 U.S.C. § 78u-4(b)....................................................................................................................... 24, 54

15 U.S.C. § 78u-5 .................................................................................................................................... 24

17 C.F.R. § 229.303(a)(3)(ii) ............................................................................................................... 54

Defendants Dollar General Corporation, Todd J. Vasos, Jeffery C. Owen, John W. Garratt, and Kelly M. Dilts (the "Individual Defendants," and together with Dollar General, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Second Consolidated Amended Complaint ("Complaint" or "SCAC") pursuant to Federal Rule 12(b)(6).

## PRELIMINARY STATEMENT

This is a stock drop case in search of a fraud. At the onset of the COVID-19 pandemic in 2020, Dollar General remained open as an "essential business," and its stock price rose as the Company's sales and profits increased substantially. Over the next two-plus years, the Company's performance was first buoyed by increased demand for higher-margin products and government subsidies that supported its core customers, but then challenged by supply chain disruptions, high inflation and increased theft of its merchandise. The Company repeatedly cautioned investors about a range of risks it faced from the pandemic and the resulting economic uncertainty, noting specifically that it expected its business would revert to the less-favorable historical sales mix at some uncertain point in time. Starting in late 2022, as the country emerged from the pandemic, Dollar General announced its growth was slowing amid disclosed shifts in consumer demand, increases to its inventory balances due to both internal and external supply chain dynamics, and continued high inflation and economic uncertainty. The Company's stock price declined.

Plaintiffs claim that Dollar General and its senior executives misled shareholders over a four-year putative class period that started with the pandemic in May 2020 and ended in August 2024 (the "Class Period"), one of the most tumultuous periods in the Nation's economic history. The Complaint, however, does not allege any facts suggesting that the Company, its current and former CEOs Todd Vasos and Jeff Owen, and its current and former CFOs Kelly Dilts and John Garratt, engaged in a multi-year securities fraud. The Company never corrected or restated any of the statements Plaintiffs challenge as false or misleading, the adverse developments it disclosed

were all the subject of robust risk disclosures and cautionary statements to investors, and there is no basis alleged to infer anyone acted with scienter. This case should be dismissed.

Dollar General is the largest retailer in the country by number of stores, with more than 16,000 stores and 155,000 employees in May 2020. The Company added stores and employees each year, reaching more than 20,000 stores and 193,000 employees by August 2024. As a discount retailer, the Company operates a low-cost, low-price business model. The Company's core customers have low income and limited discretionary spending ability and are especially subject to the impact of economic uncertainty, increased inflation and reductions in government subsidy programs, exactly what developed as the pandemic subsided and ultimately ended.

The Complaint focuses on a number of recurring statements about inventory management and staffing. These statements reflect the Company's essential business model to purchase and distribute merchandise (inventory) to its stores for retail sales, while keeping costs and prices low for consumers. Those statements further describe the risks facing the Company and its ability to execute its business plan, including supply and distribution chain disruptions, shifting consumer demand, and inflation and economic uncertainty limiting its customers' discretionary spending. All of these risks were exacerbated by the pandemic, which the Company disclosed at the outset and updated throughout the Class Period. The Complaint fails to show that those statements about the Company's operations were false or misleading in any way.

The Complaint largely ignores the reality that Defendants were managing one of the Nation's largest retailers through the unprecedented challenges and unpredictability created by the pandemic. Instead, Plaintiffs seek to manufacture a securities fraud claim based almost entirely on allegations of relatively low-level former employees who allegedly witnessed operational challenges at specific locations where they worked. These individuals were not officers and did

2

not have any role in the Company's financial reporting, inventory accounting, overall staffing and labor management, or financial or operational analysis of the Company as a whole. They did not work with Defendants or identify any reports to Defendants that were inconsistent with the Company's statements. And their anecdotes are not tethered to any specific public statements.

Plaintiffs' core theory that Dollar General's inventory management was "broken at every level" is not plausible. Notwithstanding the disclosed operational challenges, the Company sold about $155 billion of merchandise during the Class Period (with each item at a low price), managing billions of goods each year through its supply and distribution channels and on to the shelves in its thousands of stores. Dollar General could not have sold that much merchandise to so many consumers around the country if it did not have systems to manage inventory and estimate consumer demand. Ignoring that indisputable reality, the Complaint asserts that nearly every statement about inventory accounting, inventory management, staffing, and product pricing throughout the Class Period were all false or misleading for the same reasons, without regard to context or timing in 2020, 2021, 2022, 2023 or 2024. The Company's operating environment changed dramatically over that multi-year period, however, and the Complaint does not provide the statement-by-statement allegations required to plead a securities fraud claim.

The Complaint lifts isolated statements from the Company's risk factor disclosures and presents them as if they were representations of historical fact. As the Sixth Circuit recently held, risk factor disclosures cannot be excised from their context to support a fraud claim. The generalized statements that, for example, the Company closely monitored and managed its inventory and invested in its employees, in addition to being truthful, were expressly qualified by cautionary language, underscoring that things could go wrong. The Complaint itself references the Company's expansive warehouse management system ("WMS"), foreclosing any possible

3

claim that the Company lacked an inventory management system or did not monitor its inventory at all. Plaintiffs' allegations that certain inventory stored in temporary warehouses was not properly tracked (primarily in late 2022 and early 2023) do not show that any specific statements were false or misleading when made. At most, Plaintiffs suggest that the Company's executives could have done a better job implementing the Company's disclosed business strategies, an allegation that the Sixth Circuit has long recognized is not securities fraud.

The anecdotes of former, non-officer employees from individual stores, districts or distribution centers do not support Plaintiffs' fraud claims. For example, while some of these individuals characterize certain inventory as "excess," they were not involved in, and had no knowledge of, Company-wide inventory positions, aging and obsolescence analyses or demand levels. Nor do they offer any definition of "excess inventory" or show that any specific inventory-related statement was false when made. Significantly, these individuals do not claim to be involved in, or have knowledge of, the manner in which the Company accounted for or disclosed its inventory, let alone state facts showing that any accounting policies were misapplied or that any publicly-reported inventory balances were materially misstated. The former employees also had no role in Company-wide human resource matters, such as staffing analyses, investments or retention efforts. Conclusory assertions that employee turnover was "high" lack any supporting context to show the Company's turnover rates rendered its public statements misleading. Notably, the Company cautioned investors that it operated in an industry with "high rates of employee turnover" and, at appropriate times, that the pandemic increased risks of staffing shortages.

The Complaint also fails to plead the required strong inference of scienter. The Sixth Circuit held in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001), that the most important factor with regard to scienter is identification of internal reports to the defendants that diverged from

4

their public statements. On this factor, the Complaint comes up empty. Plaintiffs vaguely identify three emails allegedly sent by two former employees to certain Defendants, but there are no allegations that the emails contained material information inconsistent with any specific, challenged statement. Nor do Plaintiffs allege that Defendants responded, or even read, the emails.

Plaintiffs' scienter theory hinges on stock sales by two of the four individual Defendants, occurring largely in the first 19 months of the 51-month Class Period. But Plaintiffs ignore the fact that Owen bought 1,500 shares in June 2023. Owen's investment of more than $235,000 late in the Class Period demonstrates his good faith belief in the Company's historical disclosures and future prospects and precludes any inference of scienter. In addition, Plaintiffs do not allege facts showing that the timing of the sales by Vasos and Garratt was suspicious—the sales are not linked to any particular alleged misstatement, they occurred well below the stock price peak, and they were made long before any alleged corrective disclosures (and largely before the alleged inventory issues arose). Notably, in May 2020, just before the first alleged sales, the Company sought to temper investor expectations by withdrawing its forward-looking guidance in light of the uncertainties created by the pandemic, which is entirely inconsistent with an inference of fraudulent intent.

Plaintiffs are improperly pursuing an insider trading-by-hindsight theory, using an inordinately long, multi-year Class Period to sweep in innocuous stock sales. In addition, in 2022 Vasos increased his holdings through the vesting of stock awards, such that his economic ownership of Company stock remained the same. He transitioned from CEO to Senior Advisor in November 2022 and retired in April 2023. In June 2023, Vasos exercised options that were set to expire and acquired a net of 4,772 shares in the transaction. When he returned as CEO in October 2023, he also agreed to a stock option award that does not vest until 2027 as a substantial part of

5

his new compensation plan. His actions only show his confidence in the Company's disclosures and prospects and dispel any suggestion he knew the Company's stock was inflated by years of fraud. Garratt also increased his holdings through vesting in 2022 and, when he exercised options in 2023 (after he retired), he retained more than 2,000 shares. Any inferences of scienter are further weakened because Dilts is not alleged to have sold shares, and the Company repurchased large amounts of its stock in each quarter between mid-2020 and late-2022.

When considered holistically, the more compelling inference is that Dollar General's executives acted in good faith at all times as they managed the Company's massive retail organization through the substantial economic turmoil created by the pandemic, including supply chain disruptions, high inflation and other macroeconomic changes, and provided investors with timely updates on the Company's performance in the shifting operating environment.

**BACKGROUND[1]**

**A.      Dollar General's Business**

Dollar General is "one of the largest discount retailers in the United States." SCAC ¶ 34. As of February 2020, the Company had more than 16,000 stores in 45 states and 143,000 employees. Ex. 1 (March 2020 10-K) at 4, 6, 8.[2] In fiscal year 2019, Dollar General reported $27.8 billion in net sales. *Id.* at 23.[3] Dollar General offers "a broad selection of merchandise, including consumable items, seasonal items, home products and apparel." *Id.* at 4. Consumables, which include paper and cleaning products, perishables, health and beauty and pet products, comprise the "largest merchandise category." *Id* at 5. This category "typically accounts for the

---

[1] On a motion to dismiss, the Court "may consider the full text of the SEC filings … analysts' reports and statements integral to the complaint." *Lynn v. Helf*, 2014 WL 5431221, at *1 n.2 (M.D. Tenn. Oct. 24, 2014).

[2] Citations to an Exhibit refer to an exhibit to the Declaration of Milton S. McGee ("McGee Decl.").

[3] Like many retailers, the Company's fiscal year ends on the Friday closest to January 31.

lowest gross profit margin." *Id.* at 6.  In 2019, it "continued to become a larger percentage of total sales," comprising 78% of Dollar General's sales.  *Id.* at 29–30.

Dollar General's stores feature a "low-cost, no frills building with limited maintenance capital, low operating costs, and a focused merchandise offering."  *Id* at 6.  As a "low-cost operator," Dollar General provides "basic everyday" needs at "everyday low prices (typically $10 or less)" to consumers, many of whom have "low incomes and limited discretionary spending." *Id.* at 4, 9.  Dollar General's "core customers are often among the first to be affected by negative or uncertain economic conditions and among the last to feel the effects of improving economic conditions particularly when trends are inconsistent and of an uncertain duration." *Id.* at 25.  These conditions include "high unemployment or underemployment," "inflation," "interest rates," and "decreases in, or elimination of, government subsidies." *Id.* at 9.

Before the Class Period, the Company operated 22 distribution centers with nearly 20 million square feet of space and had plans to open additional capacity. *Id.* at 18.  The Company leased approximately 1.1 million feet of warehouse space and disclosed that it leased "additional temporary warehouse space as necessary to support [its] distribution needs." *Id.* at 7, 18.  Dollar General cautioned that "[a]ny disruption, unanticipated or unusual expense or operational failure" related to its distribution network "could negatively impact sales and profits." *Id.* at 13.

As of January 31, 2020, Dollar General's $4.7 billion merchandise inventory balance was the largest current asset on its balance sheet. *Id.* at 43.  The Company disclosed its "critical accounting policies and estimates" for determining its merchandise inventory balance. *Id.* at 36–37.[4]  Given the size of the asset and stated importance of the policy, Dollar General's independent

---

[4] Dollar General's inventory is "stated at the lower of cost or market" with cost "determined using the retail last in, first out ('LIFO') method." *Id.* at 36.  To value its inventory, Dollar General uses the "retail inventory method" which incorporates, among other things, obsoletion "analyses" and

auditors reviewed the Company's inventory accounting processes in detail. The Complaint does not allege that the auditors raised any concerns about the Company's internal controls relating to inventory accounting. ***Indeed, the Complaint barely mentions the Company's inventory accounting policies, and none of the former employees cited in the Complaint purport to have had any role in, or knowledge of, the application of the Company's inventory accounting policies or the calculation of the inventory balances disclosed to shareholders.***

Dollar General's March 2020 Form 10-K extensively described risks relating to inventory management, shrink (theft) and staffing among the risk factors facing its business:

- The Company must "maintain sufficient inventory levels and an appropriate product mix to meet [its] customers' demands" while not "allowing those levels to increase such that" storage costs "unduly impact[] [its] financial results or increase[] the risk of inventory shrinkage." *Id.* at 11.

- If Dollar General does "not accurately predict customer trends, spending levels, or price sensitivity, [it] may have to take unanticipated markdowns to dispose of the excess inventory, which also can adversely affect [its] financial results." *Id.*

- The Company "cannot make assurances that [it] will be successful in [its] inventory management" and if it is "not successful in managing [its] inventory balances" then "cash flows from operations and financial condition may be negatively affected." *Id.*

- Dollar General "experience[s] significant inventory shrinkage" and there "can be no assurance that [efforts to reduce shrinkage] will be successful" and "higher rates of shrinkage" may "negatively affect" its "operations and financial condition." *Id.* at 11.

- If the Company is "unable to attract" and retain employees, its "operations," "customer service," and "legal and regulatory compliance" functions "could suffer." *Id.* at 16. At the same time, the retail industry is "challenged by historically high rates of employee turnover" and its "ability to meet [its] labor needs" is uniquely "constrained by [its] everyday low price model," as well as "many external factors." *Id.* at 6, 16.

**B.      The COVID-19 Pandemic Created Increased Demand and Uncertainty**

---

"management judgments and estimates" as to anticipated markdowns. *Id.* at 36–37. Dollar General similarly estimates shrink in "between physical inventories" performed at "virtually all stores" each year. *Id.* at 37. If the estimated accrual varies from actual results, Dollar General records an adjustment in the following reporting period. *Id.* Dollar General "believe[s its] estimates and assumptions . . . reasonably approximate cost on a consistent basis." *Id.*

8

Starting in early 2020, the COVID-19 pandemic created uncertainty "for retailers worldwide." SCAC ¶ 3. While many retailers were required to close during the pandemic, Dollar General was "classified as an essential business" and remained open nationwide. *Id.* As a result, it "experienced a significant surge in demand and sales." Ex. 4 (May 2020 Tr.) at 4. In the first quarter of 2020, Dollar General reported nearly $9 billion in sales—an increase of 27.6% compared to 2019. Ex. 5 (May 2020 10-Q) at 1–2. Driven by the higher sales, merchandise inventories decreased from $4.6 to $4.1 billion, or 5.5% on a per store basis. *Id*. at 1.

On May 28, 2020—the day Plaintiffs claim Defendants started to mislead investors— Dollar General withdrew its forward-looking guidance, recognizing the "inherent and significant uncertainty" created by the pandemic. Ex. 4 (May 2020 Tr.) at 6. The Company emphasized the "unprecedented," "unusual," and "rapidly-changing" environment, *id.* at 4-7, and did not provide guidance for the remainder of 2020. *See* Ex. 7 (Aug. 2020 Tr.) at 7; Ex. 12 (Dec. 2020 Tr.) at 5.

Throughout 2020, Dollar General's results were positively impacted by the pandemic-related extension of unemployment benefits and government support programs that provided direct cash payments to people who met the requirements, many of whom shopped at Dollar General.[5] At the same time, the Company reported "a significant increase in demand in many non-consumable products," which resulted in an "overall significant mix shift into non-consumable categories." Ex. 8 (Aug. 2020 10-Q) at 14. *See also* Ex. 4 (May 2020 Tr.) at 4. Because non-consumables tended to have higher gross margins, the Company's profit margin expanded throughout 2020. Ex. 8 (Aug. 2020 10-Q) at 15. Dollar General also experienced a "reduction

---

[5] *See* Ex. 7 (Aug. 2020 Tr.) at 13 ("We saw the benefit of course of stimulus"). *See also* Council of the Inspectors General on Integrity and Efficiency, *Three rounds of stimulus checks. See how many went out and for how much.*, available at https://www.pandemicoversight.gov/data-interactive-tools/data-stories/update-three-rounds-stimulus-checks-see-how-many-went-out-and (stimulus payments in March 2020, December 2020, and March 2021).

[of] markdowns," "higher initial markups," and "a reduction in shrink as a percentage of sales." Ex. 12 (Dec. 2020 Tr.) at 4.[6] While the Company reported record sales, it cautioned it expected sales to "moderate to more normalized levels." Ex. 4 (May 2020 Tr.) at 7.

Dollar General also began to disclose specific risks and heightened expenses related to COVID-19, which it continued to update throughout the pandemic:

- **Inventory.** Dollar General disclosed that while "consumer behavior driven by the COVID-19 pandemic had a significant positive effect on net sales," the demand was unpredictable in "volume" and "product category," and a "departure from seasonal norms." Ex. 5 (May 2020 10-Q) at 6, 19.

- **Supply Chain.** The Company disclosed "risks related to the COVID-19 pandemic" on its "supply chain," including "distribution center closures." *Id.* at 27. Dollar General repeatedly disclosed increased "distribution and transportation" costs related to the pandemic. *Id.* at 14. As the pandemic progressed, Dollar General anticipated these higher costs would continue. Ex. 12 (Dec. 2020 Tr.) at 12.

- **Macroeconomic Impacts.** Dollar General warned that the pandemic may have "significant adverse impact on [its] core customers," including due to "continued elevated unemployment" and the "recessionary economic environment that is expected to persist after the COVID-19 pandemic." Ex. 5 (May 2020 10-Q) at 14.

- **Labor Shortages.** Dollar General warned investors that the increased sales volume led to "increased workload" for its employees. Ex. 8 (Aug. 2020 10-Q) at 26. At the same time, the Company faced "reduced labor availability." *Id.*

- **Staffing-Related Investments.** Dollar General announced significant investments in its employees, including increased hiring, employee appreciation bonuses, COVID-19 health and safety investments, and expanded paid time off for employees. *Id.* at 14.

For the full year, the Company reported net sales of $33.7 billion, a 21.6% increase over 2019. Ex. 16 (March 2021 10-K) at 25. In 2020, the Company paid $355.9 million in dividends to shareholders and repurchased 12.3 million shares for $2.5 billion. *Id.* at 37–38. It opened 1,000

---

[6] Inventory "initial markups" represent the difference between the original cost and the original sales price above cost. Markdowns are amounts deducted from the current sales price to arrive at a new reduced sales price. Merchandise inventories are stated at the lower of cost or market ("LCM") with no material adjustments made to the Company's LCM reserve during the class period. Ex. 1 (Mar. 2020 10-K) at 36–37). The reduction of markdowns during the Class Period primarily related to higher unit and retail sales impacted by higher consumer demand.

new stores, hired 15,000 net new employees, and distributed $167 million in employee appreciation bonuses. Ex. 15 (March 2021 Tr.) at 3, 10, 12. Moreover, in February 2021, Dollar General was inducted into Training Magazine's Hall of Fame, in recognition of the Company's training and development program for its employees. Ex. 16 (Mar. 2021 10-K) at 8.

**C.      In 2021, Dollar General Continued to Face Unprecedented Uncertainty**

In 2021, Dollar General continued to see high demand and report positive sales results. However, the Company projected an end to its 30-year streak of same-store sales growth, estimating a 4-6% decline in 2021 compared to 2020. Ex. 14 (Mar. 2021 8-K) at 6. As the year progressed, the Company continued to disclose the risks of adverse demand trends, supply chain disruptions and higher inflation that impacted its core customers. *See, e.g.*, Ex. 20 (May 2021 10-Q) at 14 ("We expect to continue to be affected…[by] changing consumer demand…supply chain interruptions, increased distribution and transportation costs, increased payroll expenses…").

In March 2021, Dollar General issued forward-looking guidance for the first time since the pandemic began. But the projections were expressly "cautious . . . given the significant uncertainty that still exists," Ex. 14 (Mar. 2021 8-K) at 7, including issues with "distribution center closings," "driver shortages," and "delivery delays to stores as a result of COVID-19 related absenteeism." Ex. 16 (Mar. 2021 10-K) at 10. In response to a question on an earnings call, Garratt declined to provide additional guidance and warned investors that the Company faced "a lot of unknowns" and "a lot of potential pressures." Ex. 15 (Mar. 2021 Tr.) at 15.

The Company reported that "changes in consumer behavior" and "supply chain disruption[s]" resulted in lower "[i]nventory levels in the 2020 period." Ex. 23 (Aug. 2021 10-Q) at 22–23. Dollar General disclosed that out-of-stocks were high, and markdown rates had been unusually low in 2020 and it expected they would increase. *Id*. at 6–7. The Company noted that it had strategically accelerated "certain inventory purchases." Ex. 19 (May 27, 2021 Tr.) at 5. The

11

Company cautioned it anticipated sales mix would shift back towards consumables, resulting in pressure on the gross margin rate. Ex. 20 (May 2021 10-Q) at 15, 19. However, the timing of that dynamic and its impact on gross margin were uncertain. *See id.* The Company noted that, although shrink in 2020 was lower than 2019, "it is uncertain at this time whether these trends, which differ from our recent historical trends prior to 2020, will continue." Ex. 16 (Mar. 2021 10-K) at 33. The Company also planned to hire 20,000 additional employees. Ex. 19 (May 2021 Tr.) at 14.

In addition, in March 2021, the Government enacted the largest stimulus program of the pandemic, resulting in many Dollar General customers receiving a third round of stimulus checks. Dollar General warned, however, that the end of Government stimulus programs could have an uncertain impact on its core customers. Ex. 16 (March 2021 10-K) at 27–28.

The Company informed investors that the operating environment remained challenging (i) in August 2021 due to uncertainties around to the COVID-19 Delta variant and pressures on the global supply chain (Ex. 22 (Aug. 2021 Tr.) at 3); and (ii) in December 2021 due to elevated cost pressures from inflation and "broad-based supply chain disruptions" (Ex. 26 (Dec. 2021 Tr.) at 3). *See also* Ex. 16 (Mar. 2021 10-K) at 10 (disclosing supply chain disruptions); Ex. 30 (Mar. 2022 10-K) at 10 (same). The Company reported increased product cost inflation, a greater proportion of sales in the consumables categories (with a lower profit margin), and an increase in inventory damages. Ex. 22 (Aug. 2021 Tr.) at 4. The Company anticipated higher supply chain costs in the second half of the year due to transit and port delays and elevated demand for third-party carriers. *Id.* at 6. In addition, management stated that it was not satisfied with in-stock levels and was focused on improvements. Ex. 26 (Dec. 2021 10-Q) at 5.

As anticipated, the Company's fourth quarter 2021 performance was impacted by higher inflation, supply chain pressures, and a surge in Omicron cases that disrupted distribution center

12

staffing. Ex. 29 (Mar. 2022 Tr.) at 3. Over the fiscal year, the Company reported that the supply chain constraints "negatively impacted" sales due to "lower merchandise in-stock levels" in stores. Ex. 30 (Mar. 2022 10-K) at 27. The Company's supply chain and transportation expenses alone resulted in a headwind of approximately $100 million. Ex. 29 (Mar. 2022 Tr.) at 5. Dollar General also reported that its retail labor costs increased in 2021. *Id.*

Notwithstanding the operational pressures, the Company had net sales of $34.2 billion in fiscal year 2021, a 1.4% increase from 2020. Ex. 30 (Mar. 2022 10-K) at 29, 31. Its merchandise inventory balance similarly increased 1.4% on a per-store basis to $5.6 billion. *Id.* at 43. The Company paid $392.2 million in dividends and repurchased 12.1 million shares for $2.5 billion. *Id.* at 36–37. It opened 1,050 new stores and hired 15,000 additional employees. *Id.* at 6, 9.

**D.      Emerging From the Pandemic in 2022, Dollar General Saw Changing Demand, Lowered its Projections, and Reported Lower than Anticipated Results**

In March 2022, Dollar General continued to caution investors about the uncertain environment it was facing, reporting that it "continue[d] to operate in [a] time of uncertainty regarding" "changes in consumer behavior," "labor markets," and "government stimulus" programs for its customers. Ex. 29 (Mar. 2022 Tr.) at 5. It "anticipate[d] a challenging first quarter due to elevated supply chain disruptions" and "product cost inflation." Ex. 28 (March 2022 8-K) at 7. The Company also warned that it anticipated eventual increases in shrink and markdowns more in line with historical norms. Ex. 29 (Mar. 2022 Tr.) at 6.[7]

In May 2022, Dollar General again reported "materially higher supply chain costs and, in some instances, shipping delays, as a result of shipping capacity shortages, port congestion and industry labor shortages." *See* Ex. 34 (May 2022 10-Q) at 15. The Company planned to make

---

[7] In March 2022, the Federal Reserve started raising interest rates substantially to combat inflation. *See* https://www.federalreserve.gov/newsevents/pressreleases/monetary20220316a.htm.

"targeted investments" in "incremental labor hours" to, among other things, improve in-stock levels in stores. Ex. 33 (May 2022 Tr.) at 6. At the same time, the Company disclosed that its gross profit rate decreased by 151 basis points due in part to a continued product mix shift to consumables, increased transportation and distribution costs, increased markdowns as a percentage of sales and increased inventory damage. *Id.* at 4. In July 2022, the Company announced that Owen would replace Vasos as CEO in November.[8] Ex. 60 (July 2022 8-K) at 2.

In August 2022, Dollar General continued to report increased supply chain and inventory costs, including "greater than anticipated" product cost inflation. Ex. 36 (Aug. 2022 Tr.) at 5. *See also* Ex. 37 (Aug. 2022 10-Q) at 15. The Company warned investors that it was experiencing "shipping capacity shortages" and the global and domestic supply chain disruptions negatively impacted sales. Ex. 37 (Aug. 2022 10-Q) at 14–15. At the same time, the Company cautioned that it faced "evolving" consumer demand, exacerbated by high inflation and the end of government stimulus programs. *See* Ex. 36 (Aug. 2022 Tr.) at 3; Ex. 33 (May 2022 Tr.) at 14. Dollar General reported that demand for non-consumable goods returned to pre-pandemic levels, and that its inventory "increased by 25.1%" on a per store basis compared to the prior year. Ex. 37 (Aug. 2022 10-Q) at 13, 16.

In December 2022, Dollar General reported earnings below analyst estimates and lowered its guidance for the year. Ex. 40 (Dec. 2022 Tr.) at 6. Owen attributed the results, in large part, to "significantly higher-than-anticipated cost pressures, including challenges within our internal supply chain, sales mix pressures, and higher inventory damages and shrink." *Id.* at 3. These pressures included "unanticipated delays in acquiring additional temporary warehouse space sufficient for [its] inventory" and "detention fees" due to delays in "returning shipping containers."

---

[8] Vasos remained employed as a senior consultant from November 2022 to April 2023.

14

Case 3:23-cv-01250    Document 77    Filed 11/15/24    Page 24 of 82 PageID #: 1544

Ex. 42 (Dec. 2022 10-Q) at 16; Ex. 40 (Dec. 2022 Tr.) at 4 (disclosing $40m in additional supply chain fees). The Company "continued to see" a shift in consumer spending away from non-consumable goods. Ex. 40 (Dec. 2022 Tr.) at 3, 19.

In February 2023, the Company released preliminary financial results for fiscal year 2022, with annual results underperforming guidance. Ex. 43 (Feb. 2023 8-K) at 4–5. Among other challenges, Winter Storm Elliott shut down much of the country in the days before Christmas, a critical period for retailers, negatively impacting sales.[9] *Id.* at 3. In March 2023, consistent with the preliminary financial results, Dollar General reported lower-than-expected results for the 2022 fiscal year. Ex. 45 (Mar. 2023 10-K) at 30–31. Consistent with the trends Dollar General previously disclosed, it continued to face "higher product costs" and "increases in inventory markdowns, damages and shrink." *Id.* at 31. Dollar General disclosed that the sales mix shift towards consumables "exceeded pre-pandemic levels." *Id.* at 27. It also disclosed increased retail labor costs and an investment in training hours in 2022. Ex. 44 (Mar. 2023 Tr.) at 5, 10.

For fiscal year 2022, the Company reported net sales of $37.8 billion, an increase of 10.6% over 2021. Ex. 45 (Mar. 2023 10-K) at 30–31. Its merchandise inventory balance was $6.8 billion, an increase of 14.3% on a per store basis. *Id.* at 44. The Company paid $493.7 million in dividends to shareholders and repurchased 11.6 million shares for $2.7 billion. *Id.* at 36–38. It opened 1,039 new stores and hired 7,000 net additional employees. *Id.* at 10, 28.

**E.** **In 2023, Dollar General Continued to Report Lower Than Anticipated Results and Disclosed Investments and Efforts to Address Certain Operational Challenges**

As it entered fiscal year 2023, Dollar General continued to warn investors of significant headwinds, including ongoing "sales mix pressure," "increased shrink and damages," and the

---

[9] Before and continuing throughout the Class Period, the Company cautioned investors of the risk of "unusual or unanticipated adverse weather" resulting in "lower-than-planned sales" in the Christmas season. Ex. 1 (Mar. 2020 10-K) at 17.

"residual impact" of the previously disclosed "warehouse capacity constraints." Ex. 44 (Mar. 2023 Tr.) at 6; Ex. 45 (Mar. 2023 10-K) at 26. It also announced an anticipated investment of $100 million primarily in labor hours to improve "store standards" and "compliance efforts." Ex. 45 (Mar. 2023 10-K) at 20. In May 2023, Dilts became CFO. Ex. 54 (Mar. 2024 10-K) at 24.

In June 2023, the Company lowered its guidance to reflect the "challenging macroeconomic environment." Ex. 47 (June 2023 Tr.) at 7. Specifically, the Company reported the shift in product mix toward consumables was exacerbated by "inflationary pressures," the reduction in SNAP (food stamp) benefits, and "lower tax refunds than customers expected." *Id.* at 3–4. In August 2023, the Company predicted the product mix "challenges" would "persist through at least the duration of 2023." Ex. 50 (Aug. 2023 10-Q) at 15. By December 2023, the "shift toward consumables" was "at historic highs." Ex. 52 (Dec. 2023 10-Q) at 15.

Although inventory growth had "moderated," inventory levels were "still elevated" into 2023. Ex. 47 (June 2023 Tr.) at 6. In June 2023, Dollar General announced steps to "refin[e]" its "inventory management process" at retail stores and a plan to accelerate $40 million of its planned investment in labor hours. *Id.* at 5, 7. In August 2023, Dollar General announced plans to "accelerate the pace of [its] inventory reduction efforts, including additional promotional markdowns" (Ex. 50 (Aug. 2023 10-Q) at 16), which it anticipated would create "an operating profit headwind of approximately $95 million." Ex. 49 (Aug. 2023 Tr.) at 6. At the same time, the Company announced an additional $50 million investment in retail labor hours and warned the "shrink environment has continued to worsen." *Id.*; Ex. 50 (Aug. 2023 10-Q) at 16.

In October 2023, Vasos returned from retirement and replaced Owen as CEO. Ex. 41 (Oct. 2023 8-K) at 2. In December 2023, Dollar General announced it had accelerated its inventory reduction efforts and the growth rate of inventory had been reduced. Ex. 52 (Dec. 2023 10-Q) at

16

17; *id.* at 23 ("Total merchandise inventories increased by 9% in the 2023 period compared to an increase of 27% in the 2022 period."). Although Vasos noted Dollar General had begun to see improvement in inventory levels, he expected "continued improvement in inventory levels as we move through 2024." SCAC ¶ 190. Dollar General also would begin a "SKU rationalization" process to identify items that can be discontinued from sale in its stores to improve inventory efficiency and simplify store and distribution center operations. Ex. 51 (Dec. 2023 Tr.) at 4–5. Similarly, because it was largely "past the capacity constraints" it experienced in 2022, the Company planned to "significantly reduce the amount of temporary warehouse space." *Id.* at 4. While Dollar General reported improvements at distribution centers, it recognized that "additional opportunity for improvement" existed for deliveries to stores. *Id.*

In fiscal year 2023, Dollar General's operating profit decreased to $2.45 billion from $3.33 billion in 2022. Ex. 54 (Mar. 2024 10-K) at 30. Although operating profit decreased, it reported $38.69 billion in net sales—an increase of 2.2% from 2022—and issued $518 million in dividends. *Id.* at 30–31, 38. By year end, its inventory balance decreased 1.1% on a per store basis. *Id.* at 30. The Company also continued to disclose that shrink was attributable, in part, to operational challenges such as the self-checkout initiative. *Id.* at 28.

**F.      In 2024, Dollar General Faces Continued Headwinds but Expects That its Investments Will Begin to Show Results**

In 2024, Dollar General continued to disclose that it faced "significant headwinds." Ex. 53 (Mar. 2024 Tr.) at 13. In March 2024, it anticipated the "sales mix headwind" to continue "all year," as customers continued to feel the impact of inflation. *Id.* at 6, 15. The Company also "expect[ed] shrink to be an ongoing headwind," although it was optimistic that the results of its shrink prevention initiatives would "begin to manifest in the back half of the year." *Id.* at 6. In May 2024, the Company reported that "shrink" was "trending worse" than expected, and

17

accordingly it forecasted shrink rate improvement "later in the back half of 2024 than we had previously anticipated." Ex. 55 (May 2024 Tr.) at 6.

At the same time, Dollar General reported continued improvements in its supply chain and inventory levels. Specifically, its inventory levels decreased by 9.5% on a per store basis in the first quarter of 2024, including a 22.5% reduction in non-consumable inventory. Ex. 55 (May 2024 Tr.) at 5; Ex. 56 (May 2024 10-Q) at 18. The Company exited seven temporary warehouses in 2023 and planned to exit five more by the end of 2024. Ex. 55 (May 2024 Tr.) at 8.

In July 2024, Dollar General entered into a settlement with the Occupational Safety and Health Administration related to Company-challenged notices of violation at certain retail stores. Ex. 59 (OSHA Settlement). Dollar General agreed to pay $12 million in penalties (a significant reduction from the original fines OSHA proposed). *Id.* at 3. Dollar General also committed to implementing "store-level" measures designed to, among other things, ensure unobstructed access to emergency exits, electrical panels, fire extinguishers, and sales floors, and ensure proper storage of "loose inventory," and to develop a corporate safety committee, maintain a reporting hotline, and provide health and safety training. *Id.* at E-1 to E-2. As previously planned and disclosed, Dollar General agreed to reduce SKU assortment, and it implemented new procedures to optimize efficiency of deliveries to stores. *Id.* at 9–10. Dollar General also retained an independent consultant to analyze its operations and identify improvements. *Id.* at 4. Based on the consultant's findings, the Company agreed to reduce the SKU count of inventory, reduce use of floor stands, use CCTV cameras to monitory safety issues and identify stores requiring extra support, and implement phased distribution enhancements that "increase stocking efficiency." *Id.* at 4–5.

In August 2024, Dollar General reported quarterly sales of $10.21 billion. Ex. 57 (Aug. 2024 10-Q) at 19. Although its market share continued to grow "in both dollars and units," its

18

same-store sales growth was lower than anticipated, which it attributed to the lack of consumer confidence, as a majority of its customers "feel worse off financially than they were six months ago as higher prices, softer employment levels and increased borrowing cost have negatively impacted low-income consumer sentiment." Ex. 58 (Aug. 2024 Tr.) at 3. The Company, however, reported improvement in optimizing its supply chain, including closures of temporary warehouses. improvement in truck deliveries to retail stores, and a reduction of its SKU assortment. *Id.* at 5.

## G. Leadership Changes

As noted above, in July 2022, Dollar General announced Owen would replace Vasos as CEO in November 2022 and Vasos would remain as Senior Advisor through April 1, 2023. Ex. 60 (July 2022 8-K) at 2. In January 2023, Dollar General announced Garratt would retire in June 2023 (Ex. 61 (Jan. 2023 8-K) at 4), and in April 2023 announced Dilts would replace Garratt as CFO on May 1, 2023. Ex. 54 (Mar. 2024 10-K) at 24. In October 2023, Vasos returned as CEO. *Id*. The following chart summarizes their roles during the period May 2020 to August 2024:

| Individual Defendant | Role and time period |
|---|---|
| Todd Vasos | CEO (May 2020–November 2022; October 2023–August 2024) Senior Advisor (November 2022-April 2023) |
| Jeff Owen | COO (May 2020–November 2022) CEO (November 2022–September 2023) |
| John Garratt | EVP (May 2020-September 2022) President (September 2022–June 2023) CFO (May 2020–May 2023) |
| Kelly Dilts | SVP, Finance (May 2020-May 2023) CFO (May 2023–August 2024) |

## H. Former Employee Allegations

The Complaint includes allegations from 24 "former employees" ("FEs"), none of whom held senior management positions with the Company. These FEs fall in the following categories:

- ***Retail FEs***. Six FEs were allegedly store managers, assistant store managers, or held other retail positions. S*ee* SCAC ¶¶ 44–45, 440(a) (FE-1, Store Mgr.); ¶¶ 46–49, 440(b) (FE-2, Assistant Store Mgr. and Store Mgr.); ¶ 84 (FE-12, Store Mgr.); ¶¶ 110–13 (FE-20

19

("multiple retail-related positions"); ¶ 114 (FE-21, Store Mgr.); ¶¶ 115–17 (FE-22, Project Mgr.). These individuals do not claim to have any information about Company-wide accounting, inventory, staffing, or pricing or related disclosures.

- *District or Regional Managers*. Five FEs were allegedly regional or district managers. *Id.* ¶¶ 73–74 (FE-8, Regional Dir. of Store Ops.); ¶¶ 79–80 (FE-10, District Mgr.); ¶¶ 81–83 (FE-11, Regional Asset Protection Mgr.); ¶ 108 (FE-23, District Mgr.); ¶¶ 119–22 (FE-24, District Mgr.). In such roles, these FEs are provided visibility into financial and operational data solely about their specific region or district, not about Company-wide accounting, inventory, staffing or pricing or related disclosures.

- *Supply Chain FEs.* Ten FEs allegedly worked in distribution centers or supply chain logistics. *Id.* ¶ 50–53 (FE-3, Dir. of Distribution Center Maintenance); ¶¶ 59–64 (FE-5, Dir. of International Logistics); ¶¶ 65–69 (FE-6, Dir. of Ops.); ¶¶ 75–78 (FE-9, Sr. Level Dir.); ¶ 85 (FE-13, Inventory Checker); ¶ 89 (FE-14, Inventory Control Counter); ¶¶ 92–95 (FE-15, Supply Chain Specialist); ¶¶ 98–99 (FE-17, Distribution Supv.); ¶¶ 100–05 (FE-18, Inventory Control/Quality & WMS SuperUser Mgr.); ¶¶ 106–07 (FE-19, Inbound Outbound Ops. Mgr.). In such roles, these individuals are not provided financial or operational data for, and otherwise have no insight into staffing, pricing, or conditions at stores, nor do they purport to have any insight into Company-wide accounting, inventory, staffing or pricing information or forecasts or related disclosures.

- *Demand FEs.* Two FEs allegedly worked in demand chain positions. *Id.* ¶¶ 54–58 (FE-4, Dir. of Allocation and Sr. Dir. of Demand Chain); ¶¶ 70–72 (FE-7, unspecified Senior Demand Analyst). Although Plaintiffs do not allege these individuals' job duties with any level of detail, they are not alleged to have any insight into Company-wide demand, pricing, accounting, inventory, or staffing topics or related disclosures.

- *Senior Internal Auditor.* FE-16, a Senior Internal Auditor (*id.* ¶¶ 96–97) alleges that the Company bought items at the end of the quarter supposedly to increase or decrease margin. FE-16 does not allege when this may have occurred nor any detail of who or what inventory was involved or the basis for her knowledge of either the timing or purpose of the purchases. Nor do these allegations tie directly to any alleged misstatement or omission.

No FE purports to have Company-wide knowledge about the Company's SEC filings, public disclosures, or accounting policies or to have received any direct contact from the Individual Defendants. And no FE is alleged to have worked at Dollar General after January 2024.

## I.     Statements Challenged by Plaintiffs

Based solely on the allegations of those 24 FEs, Plaintiffs challenge four broad categories of statements regarding Dollar General's (a) financial metrics and accounting practices (the

20

"Accounting Statements"); (b) inventory management and/or controls (the "Inventory Statements"); (c) retail store staffing practices (the "Staffing Statements"); and (d) competitive pricing position (the "Pricing Statements"). The Complaint alleges the statements between May 2020 and August 2022 were false or misleading, the statements between December 2022 and May 2024 were both misleading and corrective, and the statements in August 2024 were corrective.[10]

### a. Accounting Statements

The Complaint challenges only one category of objectively verifiable historical information. According to the Complaint, each of Dollar General's "financial metrics" between May 2020 and August 2024 are *per se* false because Dollar General could not adequately track unspecified amounts of inventory stored in temporary off-site warehouses at unspecified times.[11] For the same reason, the Complaint challenges financial or performance metrics related to the Company's inventory balance.[12] Plaintiffs also allege that Dollar General's financial statements are inconsistent with GAAP (*id.* ¶¶ 425–26), and that Defendants' certifications of those financial statements are false or misleading (*id.* ¶¶ 432–35).

### b. Inventory Statements

*Inventory Management:* Plaintiffs challenge statements regarding Defendant's management of Dollar General's inventory levels for every quarter in the Class Period. *Id.* ¶ 212 ("[W]e closely monitor and manage our inventory levels").[13] *See also id.* ¶¶ 274, 283 ("data-

---

[10] Appendices A-D identify each alleged misstatement and the reasons why the statements do not support a securities fraud claim.

[11] These metrics include operating profit, net income, gross profit, net sales, inventory turnover, and merchandise inventories. *See* SCAC ¶¶ 393–94, 396–97, 399–400, 402–03, 405–06, 408–09, 411–12, 413–15, 417–18, 420–21, 423–24.

[12] *See* SCAC ¶¶ 216–17, 222–23, 240, 242–47, 249–51, 253–54, 256–58, 264, 267. Although the Complaint categorizes these statements as "inventory statements," Defendants consider statements which challenge the calculation of specific financial metrics as Accounting Statements.

[13] *See also id.* ¶¶ 214, 218, 274, 276; 278 (efficient management of inventory); ¶¶ 242, 249, 265, 266, 269, 274, 297 (improvement in Dollar General's in-stock position).

21

driven inventory management"). Plaintiffs allege these statements were false because "Defendants knowingly or recklessly failed to 'closely monitor and manage' Dollar General's inventory." *See, e.g., id.* ¶ 213. *See also id.* ¶¶ 215, 219, 250, 267, 270, 275, 277, 279, 299. Plaintiffs similarly challenge Dollar General's risk disclosure that the failure to "accurately predict customer trends" may "adversely affect our financial results" (*id.* ¶ 224(b)), and statements regarding Defendants' management of demand trends (*id.* ¶ 227, 296).

*Inventory Levels and Quality.* Plaintiffs challenge statements in which Defendants' express their "feel[ings]" about inventory quality and inventory levels. *See id.* ¶ 155 ("we feel very good about the quality of the inventory [and our] ability to mitigate the markdown risk"). *See also id.* ¶¶ 167, 238, 242, 249, 262, 271, 274, 278, 283, 288, 297–98, 301–03, 306, 310–11. Plaintiffs similarly challenge statements regarding reductions in Dollar General's inventory levels (*id.* ¶ 307 ("[W]e have materially reduced inventory levels"). S*ee also id.* ¶¶ 282, 297, 302, 310–11) and statements regarding reduction in markdowns or shrink (*id.* ¶¶ 244, 247, 260).

*Supply Chain and Distribution*: Plaintiffs challenge Dollar General's risk factor disclosure which warns that a "significant disruption" to Dollar General's "distribution network . . . could "adversely affect sales or increase our transportation costs." *Id.* ¶ 224(d). Plaintiffs also challenge subsequent disclosures concerning the Company's supply chain, including the disclosure of costs related to supply chain constraints. *Id.* ¶ 293 ("[A] temporary shortage of available warehouse capacity, primarily due to delays in opening temporary warehouse space . . . significant[ly] impact[ed] . . . operating results."). *See also id.* ¶¶ 227, 230, 233, 281, 282, 289–90.

### c. Staffing Statements

The Complaint challenges general statements about the Company's staffing, including: (1) overall staffing levels (*id.* ¶¶ 314, 318, 320, 323, 333, 337, 340, 342, 344–45); (2) Company-wide employee turnover and other metrics (¶¶ 323, 325, 327, 337, 340, 342); and (3) investments in

22

employees (¶¶ 316, 323, 325, 327, 329, 331, 335, 337, 340, 342, 344–45).  Plaintiffs allege these statements were false based on a handful of FEs allegations that individual retail stores, out of the thousands of total stores, were "chronically understaffed."  *See e.g.*, *id.* ¶ 326.

### d.   Pricing Statements

Plaintiffs challenge statements about Dollar General's pricing position compared to competitors.  *See id.* ¶ 374 ("we continue to feel very good about our price position relative to competitors and other classes of trade").  *See also id.* ¶¶ 348–49, 351, 354–55, 358, 361–62, 365, 368–71, 374–75, 378, 381, 384, 387–89.[14]  Every Pricing Statement supposedly was misleading for the same reason: four FEs allege employees in certain stores were unable to "properly price merchandise" on shelves resulting in "regulatory investigations, citations, fines and penalties." *See id.* ¶¶ 83, 108, 111, 147, 350, 352, 356, 359, 363, 366, 372, 376, 379, 382, 385, 390.

### LEGAL STANDARDS

**Securities Fraud:** To state a securities fraud claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455, 460–61 (2013).  Because Section 10(b) "does not proscribe pure omissions," an omission is only actionable if it "renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 259, 263, 265 (2024).

**Rule 12(b)(6):** To avoid dismissal, a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Courie v. Alcoa Wheel &*

---

[14] Plaintiffs also challenge a statement at the Company's May 31, 2023 Annual Meeting that "[w]e strive to provide our customers with . . . shelf pricing they can count on every day" and take "swift action to identify the root cause" if the Company falls short."  SCAC ¶ 384.

*Forged Prods*., 577 F.3d 625, 629 (6th Cir. 2009). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d 896, 903 (6th Cir. 2009).

**Rule 9(b) and PSLRA:** Under Rule 9(b), a securities fraud complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008). Under the PSLRA, the complaint must, for each alleged misstatement, plead "the reason or reasons why the statement is misleading," and "facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(1), 4(b)(2)(A). The PSLRA also enacted a safe harbor for forward-looking statements. *Id*. § 78u-5(c)(1). Accordingly, "to survive a motion to dismiss, a federal securities fraud claim must 'withstand an exacting statement-by-statement analysis.'" *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp*., 399 F.3d 651, 682 (6th Cir. 2005).

**Confidential Witness Allegations:** Confidential witness allegations must "pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 995 (9th Cir. 2009). The complaint must show that a person in the "witness's position would possess the information alleged," *Doshi v. Gen. Cable Corp*., 823 F.3d 1032, 1037 n.2 (6th Cir. 2016), and the statements must be pled with particularity. *Ley v. Visteon Corp*., 543 F.3d 801, 811 (6th Cir. 2008) ("vague and conclusory" allegations not "accorded much weight.").

## ARGUMENT

**I. THE COMPLAINT CANNOT PLEAD SECURITIES FRAUD BASED ON CRITICISMS OF DEFENDANTS' EXECUTION OF THE COMPANY'S FULLY-DISCLOSED BUSINESS PLAN**

Dollar General extensively disclosed to investors its business model, along with the external and operational challenges and risks it faces in executing that model. Dollar General is a

24

"low-cost operator" that maintains "low-cost, no frills" retail stores and primarily sells products at low prices, generally $10 or less.  Ex. 1 (Mar. 2020 10-K), at 4, 6.  As Dollar General repeatedly disclosed, implementing this business model requires navigating fluid and unpredictable challenges in the retail industry, including the challenges underlying Plaintiffs' claims: supply chain disruptions; shifting consumer demand; employee retention; inventory shrink; and, for Dollar General in particular, the sensitivity of its core customers to inflation and economic uncertainty.  The pandemic exacerbated these challenges and greatly disrupted global and domestic supply chains (which Dollar General disclosed).[15]  It strained labor supply and necessitated increased investment in retail store staffing (which Dollar General disclosed).[16]  And the pandemic's effects on the macroeconomic landscape, including high inflation, continue to impact the Company's core customers, as well as its expenses (which Dollar General disclosed).

The Complaint strings together risk disclosures, statements of opinions, and accurate financial data to challenge the Company's execution of its fully disclosed business model.  But as the Ninth Circuit recently held, "[d]issatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, [may] make for interesting reading but [it is] not an actionable securities fraud claim."  *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024).  *See also Iron Worker Loc. Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, 2018 WL 10152459, at *13 (M.D. Tenn. Mar. 8, 2018) (A "business is not required to identify and implement the 'best'

---

[15] *See, e.g.*, Ex. 16 (Mar. 2021 10-K.) at 5, 10, 15 (disclosing "distribution center closings," "[s]upply chain disruptions, including shipping and procurement delays," and "[i]ncreased distribution and transportation costs"); Ex. 26 (Dec. 2021 Tr. at 3 (reporting "broad-based supply chain disruptions"); Ex. 28 (Mar. 2022 Rel.) at 7 ("anticipat[ing] a challenging first quarter due to… ongoing supply chain disruptions"); Ex. 30 (Mar. 2022 10-K) at 10 (disclosing "[s]upply chain disruptions and capacity constraints," "distribution center closings" and "[i]ncreased distribution and transportation costs").

[16] *See, e.g.*, Ex. 20 (May 2021 10-Q) at 14 (noting $167m in COVID-19 bonuses); Ex. 33 (May 2022 Tr.) at 6 (reporting "targeted investments" in "labor hours").

strategy for counteracting shifting economic conditions."). The Complaint's repeated allegations that Defendants "failed to efficiently manage" inventory,[17] failed to properly staff stores,[18] or failed to predict shifting consumer demand,[19] at most, "raise a claim of corporate mismanagement, not investor deception." *Bondali v. YUM! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (rejecting claim based on alleged inefficiency of management controls). For example, FE-5's allegation that Owen was too focused on ensuring stores had sufficient inventory in stock, which supposedly led to over-ordering (SCAC ¶¶ 60–61), clearly reflects business and operational judgments about how best to meet anticipated customer demand, not securities fraud.

Moreover, the Complaint's central contention that Dollar General is a "house of cards" and "broken at every level" (SCAC ¶ 8) is divorced from reality and not a basis for a securities fraud claim. Dollar General's sales *increased* every quarter of the Class Period (compared to the prior year), growing to $10.2 billion in the last quarter of the Class Period. Ex. 57 (Aug. 2024 10-Q) at 19. In total, the Company has sales of about $155 billion during the Class Period[20]—successfully managing billions of items through its external supply chain and internal distribution channels, on to store shelves and into the hands of its customers. Over the same time period, the Company hired approximately 38,000 additional employees,[21] opened over 4,000 retail stores,[22] paid

---

[17] SCAC ¶¶ 219, 221, 223, 225, 250, 279, 284, 286, 291, 299, 304, 308, 312, 343, 394, 397, 400, 403, 406, 409 ("Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances").

[18] SCAC ¶¶ 228, 234, 243, 246, 254, 257, 315, 319, 321.

[19] SCAC ¶¶ 275, 277, 284, 286, 291, 321 ("Defendants had no regard for demand or need when ordering excess inventory"). *See also* ¶¶ 294, 299, 304, 308, 312.

[20] *See* Ex. 5 (May 2020 10-Q) at 2 ($9 billion in sales Q1 2020); Ex. 16 (Mar. 2021 10-K) at 25 ($34 billion in sales FY20); Ex. 30 (Mar. 2022 10-K) at 31 ($34 billion in sales FY21); Ex. 45 (Mar. 2023 10-K) at 31 ($38 billion in sales FY22); Ex. 54 (Mar. 2024 10-K) at 31 ($39 billion in sales FY23); Ex. 56 (May 2024 10-Q) at 3 ($10 billion in sales Q1 2024); Ex. 57 (Aug. 2024 10-Q) at 3 ($10 billion in sales Q2 2024).

[21] Ex. 4 (May 2020 Tr.) at 11; Ex. 58 (Aug. 2024 Tr.) at 8.

[22] Ex. 5 (May 2020 10-Q) at 15; Ex. 57 (Aug. 2024 10-Q) at 16.

shareholders nearly $2 billion in dividends,[23] and repurchased substantial amounts of stock.[24] Plaintiffs' challenge to Dollar General's execution of its disclosed business model as somehow "unsustainable" does not state a securities fraud claim as a matter of law. *See, e.g.*, *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 529 (S.D.N.Y. 2020).

### A. The FEs Are Not Alleged to Have Relevant Company-Wide Knowledge

The Complaint is premised on allegations of operational challenges by twenty-four FEs. These twenty-four FEs, among the hundreds of thousands who worked for the Company during the Class Period, do not claim to have Company-wide knowledge relevant to Plaintiffs' securities fraud claims, but rather possess only anecdotal information about their individual stores, districts and distribution centers. None of the FEs were corporate officers, held senior managerial roles or had any direct relationships with the individual Defendants. None of the FEs were involved in preparing the Company's financial reports, Company-wide operational analyses, macroeconomic conditions, customer research, or applying the Company's accounting policies. And none of the FEs were involved in, or have Company-wide insight into, the Company's processes for managing inventory or human resources. *See, e.g.*, *In re AT&T/DirecTV*, 480 F. Supp. 3d at 526 (rejecting claims where "none of the CWs on whom Plaintiffs rely had a companywide view of AT&T's business"). The FEs do not, and cannot, support a securities fraud claim because they do not purport to have Company-wide knowledge necessary to plead that any of the challenged statements were false or misleading when issued, or made with scienter. The Complaint does not link any of the operational allegations by the FEs to specific Company-wide statements made to investors.

There is a fundamental mismatch between the Complaint's Company-wide allegations and

---

[23] Ex. 5 (May 2020 10-Q) at 5; Ex. 16 (Mar. 2021 10-K) at 38; Ex. 30 (Mar. 2022 10-K) at 37; Ex. 45 (Mar. 2023 10-K) at 38; Ex. 54 (Mar. 2024 10-K) at 38; Ex. 57 (Aug. 2024 10-Q) at 19.
[24] Ex. 16 (Mar. 2021 10-K) at 31; Ex. 30 (Mar. 2022 10-K) at 30; Ex. 45 (Mar. 2023 10-K) at 30.

27

the FEs' personal anecdotes about operations at isolated retail stores or distribution centers. *Robeco Capital Growth Funds SICAV v. Peloton Interactive, Inc*., 2024 WL 4362747, at \*11 (S.D.N.Y. Sep. 30, 2024) ("[Confidential witnesses'] anecdotal allegations [] say nothing about Peloton's performance as a whole" and "do not support an inference of falsity."). For example, Plaintiffs allege that Dollar General was "over-ordering [ ] inventory without regard for demand." *See, e.g.,* SCAC ¶ 4. But no FE purports to have had any role in or knowledge of the Company's processes for evaluating inventory aging, estimating future demand or ordering merchandise inventory. In fact, the Complaint contradicts itself when it alleges that Owen not only considered demand but was "overly-focused" on improving the Company's in-stock position, where empty shelves in retail stores are an indisputable measure of customer demand. SCAC ¶ 61. And, the Company's actual sales of billions of products each year to customers are the clearest indication of all that it was focused on and meeting customer demand, even if it experienced operational challenges in doing so. The Complaint's anecdotes about too many bottles of Tylenol (*id.* ¶ 112) and hand sanitizer (*id.* ¶ 47), only suggest that Dollar General, like many retailers,[25] did not perfectly predict demand for all products at all stores. That is a disclosed risk, not securities fraud.

Similarly, the FEs repeatedly allege in generic terms that Dollar General had "excess inventory." SCAC ¶¶ 47, 51–53, 66–68, 74, 77, 82, 83, 85, 86, 103, 108, 111–12, 118–20. But no FE provides any benchmark to support the characterization of inventory as "excess." The Complaint does not place "excess inventory in context" of Dollar General's multi-billion-dollar inventory balance, "an omission that hinders a finding that the defendants issued false and

---

[25] In early 2020, hand sanitizer was "nearly impossible to find" at any retailer. By 2021, sales had dropped 80% and news agencies reported on the industry-wide "glut." *See* Jaewon Kang, *Retailers Couldn't Stock Hand Sanitizer Fast Enough. Now They Can't Give It Away*, WALL STREET J. (May 20, 2021), https://www.wsj.com/articles/america-is-awash-in-hand-sanitizer-11621522829.

misleading statements." *Hunter v. Elanco Animal Health Inc.*, 2022 WL 3445173, at \*18 (S.D. Ind. Aug. 17, 2022). In addition, the FEs do not provide information about specific product categories, or anticipated demand for those products, to support a claim that the goods were "excess" or "obsolete" under the Company's accounting policies. The FEs do not allege anything about the actual aging and expected demand for products. *See Hampshire Cty. Council v. Newell Brands Inc.*, 837 F. App'x 869, 875 (3d Cir. 2020) (dismissing claim that lacked allegations suggesting "that the excess inventory had a material financial effect on [the company]").[26]

Instead, the Complaint relies heavily on FE allegations that stray beyond each FE's alleged role. The Complaint alleges Company-wide inventory balance calculations were false because the Company failed to track certain inventory in WMS that was stored at temporary warehouses. These allegations rest almost entirely on FE-3, a director of maintenance at a distribution center for eight months. SCAC ¶¶ 50–53. But FE-3 does not claim to have knowledge about how inventory tracking challenges may have impacted inventory balances on Company financial statements. Similarly, FE-15, a purported supply chain specialist, complains of "intentional disregard of compliance with SOX," but does not allege any involvement in Dollar General's financial reporting or SOX compliance. *Id.* ¶ 93. Courts routinely disregard these types of allegations. *See Zucco*, 552 F.3d at 996 (discrediting human-resources employee with "no firsthand knowledge of the workings of the finance or corporate departments."); *In re Career Educ. Corp. Securities Litig.*, 2006 WL 999988, at \*4 (N.D. Ill. Mar. 28, 2006) (disregarding witness allegations "that require knowledge beyond the areas of their job duties").

**B. The FE Allegations Are Not Pled With Particularity**

Even where the FEs purport to speak within their job descriptions, they fail to plead with

---

[26] While the Complaint challenges the Company's statement about the impact of Winter Storm Elliott (SCAC ¶¶ 160, 285), the FEs do not say anything about the storm or its impact.

particularity how any specific statement was false or misleading when made. Instead, "multiple" unspecified FEs echo "some variation of the same five or so generalized, conclusory" allegations that purportedly show each of the challenged statements were false or misleading, regardless of context, content, or timing during a two-year pandemic and the subsequent two-year post-pandemic period. *Born v. Quad/Graphics, Inc*., 521 F. Supp. 3d 469, 478 (S.D.N.Y. 2021) (finding a similar form of "puzzle pleading" is "insufficient to support Plaintiffs' allegations [spanning] over 18 months' worth of statements"). Merely "affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation" does not satisfy the PSLRA. *Gavish v. Revlon, Inc*., 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004); *see Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc*., 2022 WL 989240, at *29 (W.D. Tenn. Mar. 31, 2022) (confidential witnesses "cannot simply echo conclusory allegations with their own vague affirmations"), *aff'd*, 83 F.4th 514 (6th Cir. 2023).

Moreover, except for alleged employment dates, the FE allegations are largely unmoored from any specific time within the four-year Class Period. *Mauss v. Nuvasive, Inc*., 2014 WL 4161431, at *8 (S.D. Cal. Aug. 19, 2014) (discrediting allegations when "the sole context regarding the timing . . . comes from their period of employment"). Without allegations about timing, the FE allegations cannot show that any specific statement was false or misleading "at the time it was made." *KBC Asset Mgmt. N.V. v. Omnicare, Inc.*, 769 F.3d 455, 471 (6th Cir. 2014). For example, FE-8 "believe[s]" "inventory levels" rose "during her tenure" between 2018 through 2023. SCAC ¶¶ 73–74. *See also* ¶ 108 (FE-23 alleging "excess inventory issues" between 2016 and 2023). These allegations are insufficient, especially in light of the Company's disclosures that its inventory levels increased in 2022 and 2023. *See, e.g.,* Ex. 37 (Aug. 2022 10-Q) at 16; Ex. 45 (Mar. 2023 10-K) at 37; Ex. 47 (June 2023 Tr.) at 6. *See In re Intel Corp. Sec. Litig.*, 2023 WL

30

2767779, at *23 (N.D. Cal. Mar. 31, 2023) (rejecting allegations that fail to specify timing).

The Complaint also fails to support any theories based on alleged omissions, rather than affirmative misrepresentations. *See, e.g.*, SCAC ¶ 33 ("Defendants are liable for failing to disclose adverse facts known to them about Dollar General"). Section 10(b) does not impose a duty of disclosure. *Macquarie*, 601 U.S. at 259. Dollar General did not have a generalized duty to disclose details about operational challenges that the FEs may have witnessed at the locations where they worked. The Complaint does not tie the FE allegations to specific statements, identify any omitted information at the Company-wide level, or explain how the allegedly omitted information rendered any "affirmative statements made misleading." *Id*. at 258; *see, e.g.*, *Lim v. Hightower*, 2024 WL 4349409, at *11 (N.D. Ohio Sept. 30, 2024) ("[W]ithout alleging specific facts contradicting existing statements, Plaintiffs fail to plead omissions with the required particularity."). Indeed, most of the challenged statements are "accurate portrayals of the status of" Dollar General or "loosely optimistic statements" that "do not give rise to a duty to disclose." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, at 571, 575 (6th Cir. 2008). *See also Hightower*, 2024 WL 4349409, at *10 (similar).

## II. THE COMPLAINT FAILS TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS OR LOSS CAUSATION

For a statement to be actionable under Section 10(b), it must: (1) be misleading "at the time [it] was made"; (2) be material, and (3) have caused the plaintiffs' loss. *Omnicare, Inc.,* 769 F.3d at 469–71. An omitted or misrepresented fact is material "only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Id.* at 472. The alleged misstatement "must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d

31

Cir. 2014).  The Complaint must also explain "the causal connection" between the alleged loss and the challenged misrepresentation.  *Ohio Pub. Emples. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016).  The Sixth Circuit recognizes that loss causation may be pled by alleging either a (1) corrective disclosure, *i.e.*, a new revelation of "fraud" to which "the market reacted negatively"; or (2) materialization of the risk, *i.e.* that "negative investor inferences drawn from a particular event or disclosure" caused the alleged loss and were a "foreseeable materialization of the risk concealed" by the fraud.  *Id.*[27]

### A.  Accounting Statements

While Plaintiffs challenge Dollar General's historical "financial metrics" that were "tied to or impacted by inventory" calculations,[28] they do not identify any specific financial metric that was false, estimate by what amount, or even say in what direction, the metric was misstated.  No FE mentions any financial metrics, let alone purports to have insight into Defendants' inventory balance calculations.  And Defendants never revised or restated even one publicly filed financial statement over the four-year Class Period.  Plaintiffs' failure to allege corrective disclosures further demonstrates that Defendants did not make any false or misleading Accounting Statements.

### i.   The Complaint Fails to Allege That Financial Metrics Were False or Misleading

"It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Murphy v. Sofamor Danek Grp. (In re Sofamor Danek*

---

[27] Plaintiffs allege a series of nine corrective disclosures over a two-year period gradually "corrected" the challenged statements but also provided false "assurances" regarding inventory. As the Eleventh Circuit recently explained, such disclosures cannot be "corrective."  A plaintiff cannot "'have it both ways' by alleging the defendants made certain misstatements" while "simultaneously alleging that the misstatements constituted corrective disclosures" because doing so would "transform a private securities action into a partial downside insurance policy."  *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1245 (11th Cir. 2023) (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336. at 347–48 (2005)).

[28] SCAC ¶¶ 393, 396, 399, 402, 405, 408, 411, 414, 417, 420, 423.

*Grp.)*, 123 F.3d 394, 401 n.3 (6th Cir. 1997). And "the disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 686 (6th Cir. 2024) (quoting *Sofamor*, 123 F.3d at 401 n.3). *See also Plumber & Steamfitters Local 773 Pension Fund, v. Danske Bank A/S*, 11 F.4th 90, 98–99 (2d Cir. 2021) ("[A]ccurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results.").

Here, the Complaint does not allege facts suggesting any financial metric was inaccurate, let alone materially so. Instead, Plaintiffs argue that Defendants' financial metrics are "necessarily misleading"—whether accurate or not—because the Company was "not properly tracking inventory" at temporary warehouses in WMS. SCAC ¶ 7. *See also id.* ¶¶ 217, 394. But the Complaint does not explain how an inability to *track* the physical location of inventory would render the Company unable to *account* for inventory on its financial statements. No FEs allege that WMS was the exclusive mechanism for inventory accounting or explains the interplay between WMS and the Company's financial statements or how Dollar General accounts for inventory not in WMS (such as inventory in transit to distribution centers).

Critically, none of the FEs address the Company's accounting or disclosure policies. For example, the Company's disclosed inventory accounting policy states that inventory is carried at the *lower* of cost or market price. The Complaint does not allege that material amounts of inventory should have been carried below their cost. Similarly, the Company also disclosed that its method for valuing merchandise inventories incorporates management judgments and estimates as to shrink and markdowns. Ex. 1 (Mar. 2020 10-K) at 36–37. The Complaint alleges no facts that show these policies were improperly applied in any way.

Plaintiffs cannot rely on conclusory statements and vague speculation to plead that financial metrics were misstated. All the more here, where Plaintiffs do not even speculate as to whether Dollar General's inventory balance was materially overstated or understated or by how much, at any point in time. *See, e.g., Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2016) (rejecting the "far-fetched claim" that Etsy's "performance metrics" were misleading where complaint did not allege Etsy's calculations were inconsistent with its disclosed methodology).

### ii. The Complaint Fails to Plead that the Company's Financial Statements Were Inconsistent with GAAP

The Complaint alleges that Defendants "violated" a GAAP rule requiring inventory to be valued at the "lower of cost or market" but never mentions the Company's full inventory accounting policy. SCAC ¶ 429. Dollar General's Form 10-K states that the Company values inventory at the lower of cost or market through the methodologies disclosed in its accounting policy. Ex. 1 (Mar. 2020 10-K) at 36–37. The FEs do not have first-hand knowledge, or even second-hand knowledge, about how Dollar General implements and applies this policy.

Nor does any FE allege facts that suggest an actual GAAP violation. Plaintiffs challenge Dollar General's statement that "virtually all" retail stores conducted "physical inventories . . . on an annual basis" (SCAC ¶ 431). But no retail FE explains how or why an incomplete inventory at a particular store would be inconsistent with the statement that "virtually all" of its stores completed annual inventories. Although a few FEs allege that "damaged" products were not properly processed (SCAC ¶¶ 99, 430), the Company disclosed that inventory lost through damage or shrink will be estimated and ultimately recorded following physical inspections. Ex. 1 (Mar. 2020 10-K) at 36–37. Thus, even if an employee improperly discards merchandise without recording it as damaged, it will subsequently be accounted for as shrink.

Moreover, the Complaint does not even try to plead that any of these alleged "violations"

34

Case 3:23-cv-01250    Document 77    Filed 11/15/24    Page 44 of 82 PageID #: 1564

involving any Accounting Statements are material to Dollar General's inventory balance, which exceeded $5 billion for almost the entire Class Period. *See, e.g.*, *USM Holdings Inc. v. Simon*, 2016 WL 4396061, at *5 (E.D. Mich. Aug. 18, 2016) (financial inaccuracies totaling "less than 2%" of annual net sales were immaterial).

### iii. The Complaint Does Not Allege that SOX Certifications Were False or Misleading

Plaintiffs similarly challenge Defendants' certification of Dollar General's financial statements. SCAC ¶¶ 433–35. As discussed above, the Complaint does not plead any facts suggesting that any financial report was materially false or misleading. Moreover, "to successfully plead falsity [of a SOX Certification], Plaintiff must also allege facts explaining why the declarants knew the financial reporting was false at the time it was made." *Wanca v. Super Micro Comput., Inc.*, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018). The Complaint does not plead that any Defendant had actual knowledge of any misstatements at the time any financial report was issued—the only fact Defendants certified. *See* SCAC ¶ 433 (certifying that "[b]ased on my knowledge, this report does not contain any untrue statement").

### iv. Dollar General Never Corrected Any Accounting Statement

The Complaint's failure to allege that any of the Accounting Statements were false or misleading when made is compounded by its additional failure to allege loss causation. The purported "corrective" disclosures cited in the Complaint do not mention, let alone correct, any of the Company's historical Accounting Statements. *See D.E. & J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 1000-01 (6th Cir. 2005) (loss causation must relate to information concealed by misrepresentations); *In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, at *5 (M.D. Fla. Mar. 30, 2006) (loss causation not adequately pled where alleged corrective disclosures did not "reference any prior misstatement, omission, or improper accounting practice"). In fact, none of

35

the Accounting Statements was ever revised or restated. Nor does the Complaint allege the Company changed its accounting practices during the Class Period. There is no link between any stock price declines after the alleged "corrective" disclosures and the Accounting Statements.

## B. Inventory Statements

The Inventory Statements broadly fall in three categories: inventory management (SCAC ¶¶ 189, 195); inventory levels and quality (¶¶ 271–72); and supply chain and distribution (¶¶ 227, 230). None of the statements support a securities fraud claim. In addition, as with the Accounting Statements, the Company never corrected or revised any of the Inventory Statements, which independently requires dismissal for failure to allege loss causation.

### i. Risk Disclosures and Other Forward-Looking Statements Are Not Actionable

The "Bespeaks Caution doctrine will shield [] companies from liability when the forward-looking statements are accompanied by meaningfully cautionary language so that a reasonable investor would understand the statements." *Kolominsky,* 100 F.4th at 689. As the Sixth Circuit recently held, risk disclosures "accompanied by meaningfully cautionary language" fall "squarely within the Bespeaks Caution doctrine's protection." *Id.* In addition, the PSLRA's safe harbor immunizes forward-looking statements that are accompanied by cautionary language. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

The Complaint challenges the Company's risk factor statement that "[e]fficient inventory management is a key component of [Dollar General's] business success and profitability." *Compare* SCAC ¶ 218 *with* Ex. 16 (Mar. 2021 10-K) at 13. Plaintiffs similarly challenge other sentences from the same risk disclosure in separate paragraphs of the Complaint, ***but never acknowledge that the statements were plucked from risk factor disclosures, rather than statements of historical results***. *See* SCAC ¶ 220 (Dollar General "must maintain sufficient

36

inventory levels and an appropriate product mix to meet [its] customers' demands . . ."); ¶ 224(b) ("If we do not accurately predict customer trends, spending levels, or price sensitivity, we may have to take unanticipated markdowns to dispose of the excess inventory . . . ."); ¶ 224(c) ("If we are not successful in managing our inventory balances, our cash flows from operations and financial condition may be negatively affected.").  Not only are Dollar General's statements framed in conditional language such as "if we do not" or "if we are not successful," that same risk disclosure cautions that the Company "cannot make assurances that we will be successful in our inventory management." Ex. 16 (Mar. 2021 10-K) at 13.  As the First Circuit recently found, these risk disclosures are "best understood as a 'cautionary statement,' which disclaims full compliance rather than promises it." *Sophia Zhou v. Desktop Metal, Inc*., 2024 WL 4589490, at *9 (1st Cir. Oct. 28, 2024).  These statements are not actionable because they fall "squarely within the Bespeaks Caution doctrine's protection." *Kolominsky*, 100 F.4th at 689.

Similarly, many of the Inventory Statements are forward-looking statements generally expressing confidence in the Company.  *See, e.g.*, SCAC ¶ 238 ("[W]e feel like we're in a good position for the back half and we'll be there and ready to serve the customer"); *id.* ¶ 256 ("[A]s you think about the future and the back half of the year . . . we feel good about our inventory position.").  These are, at most, "optimistic projections" combined with "cautionary language" affecting "the materiality and reasonableness of relying on forward-looking statements." *Kolominsky*, 100 F.4th at 688.  Accordingly, they are protected by the Bespeaks Caution doctrine, as well as the PSLRA's statutory safe harbor.  *Id.*; *Miller*, 346 F.3d at 672.

### ii.  Inventory Statements Are Inactionable Opinions, Statements of Corporate Optimism, or Puffery

The Inventory Statements include the "kind of rosy affirmation[s] commonly heard from corporate managers" which are "so vague, so lacking in specificity, or so clearly constituting the

opinions of the speaker, that no reasonable investor could find them important." *Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co.*, 381 F.3d 563, 570–71 (6th Cir. 2004). *See also Ind. State Dist. Council of Laborers v. Omnicare, Inc*., 583 F.3d 935, 943 (6th Cir. 2009) ("liability does not attach to mere corporate puffery or statements of corporate optimism"). In addition, statements of opinion are only actionable if the Complaint alleges that the Defendants had actual knowledge they were false and did not believe they were true. *Omnicare*, 583 F.3d at 943.

*Inventory Management:* Plaintiffs challenge statements about the "efficienc[y]" of Dollar General's inventory management in each quarter of the Class Period. SCAC ¶ 218 ("efficient inventory management is a key component of our business success and profitability"); ¶ 214 ("efficient management of our inventory has been and continues to be an area of focus"); ¶ 212 ("we closely monitor and manage our inventory balances."); ¶ 220 ("We must maintain sufficient inventory levels."); ¶ 276. Even if these disclosures were not protected by the Bespeaks Caution doctrine (and even if Plaintiffs' challenges to these statements were not an impermissible attempt to repackage alleged mismanagement into securities fraud), the statements are immaterial and inactionable. Courts routinely find that investors "would not depend on" statements regarding "effective" management and controls "in assessing a potential investment." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 206 (2d Cir. 2009).

For the same reasons, statements such as "we've never felt better about the business model" and "the fundamentals are fantastic" are not actionable. SCAC ¶ 301 ("[T]he fundamentals of [Dollar General] are absolutely unchanged and this model remains strong."). Courts routinely hold a company is "permitted 'to be confident about' its business model at this level of generality without risking liability" for securities fraud. *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin.*, 988 F.3d 157, 170 (2d Cir. 2021); *see Omnicare*, 583 F.3d at 943–44

(statement that "revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy" was not material).

*Inventory Levels and Quality:* Plaintiffs challenge statements in which Defendants' express their "feel[ings]" about "inventory quality"[29] and "inventory levels." *See* SCAC ¶ 155 ("we feel very good about the quality of the inventory [and our] ability to mitigate the markdown risk"); ¶ 167 ("Importantly, we continue to believe the quality of our inventory is in good shape"); ¶ 242 ("We. . . are pleased with our overall inventory levels."); ¶ 238 ("[W]e feel like we're in a good position for the back half and we'll be there and ready to serve the customer"); ¶ 262 ("we've never felt better about the business model").

Statements beginning with "we feel" and "we believe" are inactionable statements of corporate optimism and opinion. *See Studen v. Funko, Inc.*, 2024 WL 2209686, at *15 (W.D. Wash. May 16, 2024) (holding that "[w]e believe that inventory is generally high quality" was "both opinion and puffery"). Similarly, management's belief that the company is "well positioned" is "clearly puffery." *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 635 (S.D. Ohio 2011); *see Peloton*, 2024 WL 4362747 at *12 (statement that "inventories are healthy, and our logistics teams are well-equipped" was puffery). All the more here, where the supposedly fraudulent opinions are themselves expressed in cautionary language. For example, Plaintiffs challenge Dilts' statement that "[w]e continue to feel good about the quality of the inventory" which she immediately follows with "[b]ut I will say, inventory management remains a focus for us." SCAC ¶ 297. Not only is Dilts' opinion inactionable, but viewed in context, it is clear that the Company disclosed it had more work to do to reduce its inventory balance.

---

[29] *See also* SCAC ¶¶ 306, 310 ("[W]e continue to believe that the quality of our inventory remains good"); SCAC ¶ 288 ("[W]e feel really good about the quality of the inventory"); ¶ 278 ("the quality of our inventor couldn't be better").

39

Similarly, Plaintiffs challenge Defendants' feelings and beliefs that Dollar General is "on track" in its goal to reduce inventory levels. SCAC ¶ 302. *See also, e.g., id.* ¶ 303 ("We feel that we're on the right track . . . and if it happens not to move the way we want, we will then make an adjustment."). Plaintiffs do not allege that Defendants did not feel that they were on the right track, nor do Plaintiffs explain how that feeling is "misleading" to a reasonable investor if the Company recognized that the progress may not "move the way" it planned.

***Supply Chain and Distribution:*** Many of the challenged statements concerning supply chain and distribution capabilities are puffery. SCAC ¶ 230 ("[M]any of the initiatives we have in place have allowed us to get the products in and out of the supply chain and the distribution center fast"); ¶ 236 ("our team is very good at stripping out cost as relates to both distribution as well as that transportation side); ¶ 289 ("we are pleased to have the storage capacity constraints largely behind us which we believe positions us well moving forward.");[30] *see I.B.E.W.*, 788 F. Supp. 2d at 635 (statement that company was "very strong and that we are very well positioned" is "clearly puffery"). *See also In re Target Corp. Sec. Litig.,* 955 F.3d 738, 743 at n.2 (8th Cir. 2020) (statement that "[w]e're right where we want to be right now" was "inactionable puffery.").

### iii. The Complaint Fails to Plead that the Inventory Statements were False or Misleading When Made

The Complaint does not allege facts showing that any Inventory Statement was false or misleading when made. Instead, the Complaint flouts the applicable pleading requirements and alleges that all Inventory Statements were false for the same reasons at all times, even though Dollar General's inventory position, disclosures and challenges changed substantially over the four-year Class Period. *See City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.,*

---

[30] The SCAC also fails to plead that the storage capacity constraints were not largely behind Dollar General at the time of this statement in March 2023.

2024 WL 4370833, at \*7 (D.N.J. Oct. 2, 2024) ("The court should not be forced to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim."); *Plymouth Cty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at \*9 (S.D.N.Y. May 19, 2023) ("[S]hotgun approach" to pleading falsity "falls short of what Rule 9(b) requires.").

***Inventory Levels and Quality:*** Throughout the Class Period, Dollar General's inventory position ranged from $4.1 billion in May 2020 to a high of $7 billion in August 2024. Ex. 5 (May 2020 10-Q) at 1; Ex. 57 (Aug. 2024 10-Q) at 2. The Complaint asserts that the same inventory "glut" issues existed in 2020 (when inventory was decreasing due to pandemic demand) as in 2021 (when Dollar General accelerated inventory purchases) as in 2022 (when Dollar General reported increased inventory levels as its supply chain reopened and consumer demand shifted). *See, e.g.,* SCAC ¶ 231 (2020); ¶ 250 (2021); ¶ 277 (2022). The Complaint, however, does not allege any specific inventory statement was inaccurate or untimely when made, nor identify any specific undisclosed fact about Company-wide inventory levels. Even the word "glut," which appears over 60 times in the Complaint, is never defined, quantified, or placed in context of Dollar General's multi-billion-dollar inventory balance. *See, e.g.*, *Hayward Holdings*, 2024 WL 4370833, at \*7 ("general and conclusory" statement that defendant was "saturated with inventory" during COVID-19 "do not explain why the [statement] was false").

Plaintiffs challenge statements regarding reductions in Dollar General's inventory levels in 2023 and 2024. *See, e.g.*, SCAC ¶ 307 ("[W]e have materially reduced inventory levels"); *id.* ¶ 310 ("The team continues to do great work reducing our overall inventory position"). For example, Plaintiffs challenge Vasos's May 2024 statement regarding Dollar General's "aggressive but impressive reduction in inventory." *Id* ¶ 311. At that time, however, Dollar General reported that its inventory levels decreased 9.5% on a per store basis compared to the prior year. Ex. 56

41

(May 2024 10-Q) at 18.  The Complaint does not allege that Dollar General did not, in fact, reduce its inventory levels on a per store basis in the first quarter of 2024.  Instead, the Complaint alleges Defendants did not "fully disclose" the "true nature" of Defendants' alleged inventory "problems." SCAC ¶ 312.  But the Complaint does not describe *what* inventory problems existed in May 2024. Indeed, no FE is even alleged to have worked at Dollar General in May 2024.

*Inventory Management*:  As discussed above, Plaintiffs' challenges to statements regarding efficient inventory management are, at most, inactionable claims of mismanagement. For example, while Plaintiffs challenge statements regarding Defendants' "data-driven inventory management" (SCAC ¶¶ 274, 283), they do not allege that Defendants did not have a data-driven inventory system.  *Waswick v. Torrid Holdings, Inc*., 2023 WL 9197563, at *4 (C.D. Cal. Dec. 1, 2023) ("To adequately allege falsity" of statement regarding "use of data-driven approach to" inventory, "Plaintiffs must plead that [defendant], in fact, did not use a data-driven approach."). To the contrary, the Complaint acknowledges the Company had a warehouse management system and merely "take[s] issue with the efficiency or effectiveness" of that and other systems—a claim for "corporate mismanagement, not investor deception."  *Bondali*, 620 F. App'x at 490.

The Complaint alleges that every Inventory Statement is false because Dollar General "did not have the ability" to track inventory at temporary warehouses in WMS.[31]  But the only two FEs who discuss WMS tracking at temporary warehouses worked between May 2022 and June 2023. SCAC ¶¶ 50–53 (FE-3, Oct. 2022–June 2023); *id*. ¶¶ 65–67 (FE-6, May 2022–May 2023).  There are no allegations about inventory tracking at temporary warehouses in 2020, 2021, or 2024.  *See, e.g.*, *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc*., 2024 WL 4375775,

---

[31] SCAC ¶¶ 213, 215, 217, 219, 221, 223, 225, 228, 231, 234, 237, 239, 243–44, 246–47, 250, 254, 257, 260–61, 267, 270, 272, 275, 277, 279, 284, 286, 291, 294, 299, 304, 308, 312.

at *2 (N.D. Cal. Oct. 2, 2024) ("[confidential witnesses] describe what was happening in . . . November 2021, so they can't show that any statements made in September were false.").

Nor do the FEs explain how any temporary delay in physically tracking inventory in WMS would render any specific statements false or misleading. For example, the Complaint does not allege how WMS tracking at temporary warehouses impacted the Company's statements about "in-stock" positions at retail stores (i.e., stock on retail store shelves) (SCAC ¶¶ 242, 249, 265–66, 269, 274, 297), or the delivery of product from distribution centers to retail stores (*id.* ¶ 243). *See, e.g.*, *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 128 (E.D.N.Y. 2020) ("[R]epeating [an] identical, untailored allegation even when portions of it are plainly inapplicable" fails to "satisfy the requirements of the PSLRA.").

Even assuming the alleged inability to use WMS to track inventory at temporary warehouses was well-pled or relevant to any challenged statement, the Complaint does not allege that the untracked inventory was material to Dollar General. There is no dispute that the Company generally tracked all but "stray product" at its 22 distribution centers, which spanned 20 million square feet and could maintain the vast majority of the Company's inventory.[32] The Complaint does not allege how many temporary warehouses could not track inventory, or the amount of inventory that may have been held in those warehouses at any particular time without being recorded in WMS. *Bondali*, 620 F. App'x at 491 (holding that "plaintiffs have not alleged facts suggesting the issues . . . would have resulted in financial loss" when plaintiffs alleged neither the "proportion" of products nor quantity of suppliers impacted).

***Supply Chain and Distribution:*** The Complaint's allegations about the Company's supply

---

[32] At most, the FEs suggest that there were occasional delays or "stray product" not checked into WMS. *See* SCAC ¶ 59 (FE-5); ¶ 85 (FE-13).

43

chain and distribution further demonstrate the flaws in Plaintiffs' copy-paste pleading strategy. Throughout the four-year Class Period, Dollar General's disclosures about the supply chain and distribution changed significantly, but Plaintiffs' allegations do not.[33] For example, Plaintiffs challenge the May 2020 statement that the "supply chain is ready to deliver the product to the stores when it's available." SCAC ¶ 227. But, in the first quarter of the pandemic, Dollar General reported $8.4 billion in sales—an increase of over 27% compared to 2019—as well as shortages of certain high-demand items. Ex. 5 (May 2020 10-Q) at 1–2. Nothing in the Complaint shows that the Company was not ready to deliver product when it was "available." Similarly, the Complaint alleges that Dollar General was not "ready to timely deliver inventory" in August 2021 (SCAC ¶ 254), but at that time Dollar General reported record sales of products that had been delivered to stores, and disclosed that it was facing supply chain constraints and shipping delays that it expected to continue throughout 2021. Ex. 23 (Aug. 2021 10-Q) at 17.

The Complaint's generic allegations do not show that any specific statements were false or misleading when made. *See, e.g.*, *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1081 (D. Minn. 2017) (dismissing 10(b) claim where complaint offered only "general, nonspecific allegations that systemic supply chain problems persisted throughout the Securities Class Period"), *aff'd*, 955 F.3d 738 (8th Cir. 2020). Federal courts have repeatedly rejected attempts to turn generic and untailored "supply chain problems" related to the COVID-19 pandemic into sweeping securities fraud actions.[34] *See Shafer v. Lightning Emotors, Inc.*, 2024 WL 691458, at *12 (D.

---

[33] Plaintiffs repeat generic allegations that Dollar General did not deliver product to stores on time and did not get product on the shelf due to chronic understaffing. *See, e.g.,* SCAC ¶¶ 228, 234, 239, 243, 246, 254, 257, 261.

[34] Plaintiffs' copy-paste pleading strategy makes it impossible to determine why Plaintiffs challenge certain statements. For example, Plaintiffs challenge statements about "inventory quality," but they do not allege any facts about inventory quality.

44

Colo. Feb. 20, 2024) (finding statement not misleading when "although Defendants were optimistic about whether [the] supply chain issues were surmountable, they repeatedly tempered their predictions with warnings to investors"); *In re Enovix Corp. Sec. Litig.*, 2024 WL 349269, at *12 (N.D. Cal. Jan. 30, 2024) (dismissing Section 10(b) claim when plaintiffs "essentially argue[d] that every reference to installation of equipment, supply chain constraints, and vendor support should have included [unrelated omitted facts].").

### iv. Defendants Never Corrected Any Inventory Statement

The Complaint does not allege that Defendants "corrected" any of the challenged Inventory Statements. Instead, the disclosures all announce new or anticipated costs that arose from previously disclosed risks. At most, Dollar General did not accurately predict the extent of headwinds it anticipated. That is not a revelation of fraud.

*Inventory Management:* Dollar General disclosed higher than anticipated shrink and damages between December 2022 and August 2024. SCAC ¶¶ 153, 158, 162, 164, 171, 178, 188, 194, 200–01, 204, 206. The risk of increased shrink and damage was fully and consistently disclosed. Prior to (and during) the pandemic, Dollar General disclosed that "[t]here can be no assurance that [Dollar General] will be successful in [its] efforts to contain or reduce inventory shrinkage." Ex. 16 (Mar. 2020 10-K) at 13. The Company further warned that the "success of our Fast Track initiative" which was designed to enhance in-store productivity and on-shelf availability depended in part on customer adoption of self-checkout and ability to control shrink levels from the initiative. *Id.* at 12. In the early stages of the pandemic, the Company disclosed that it was experiencing historically low rates of shrink and damages, and specifically noted that the trend may not continue. *Id.* at 33. By mid-2021, the Company reported increased inventory damages. Ex. 23 (Aug. 2021 10-Q) at 19. By March 2022, Dollar General predicted that inventory shrink would return to historical levels. Ex. 29 (Mar. 2022 Tr.) at 6. In August 2022, Dollar

45

General reported increased shrink and damages. Ex. 36 (Aug. 2022 Tr.) at 5 (disclosing "increases in markdowns…and damages"). In March 2024, the Company disclosed that the risk it had warned of had materialized, with increased shrink partly attributable to damages resulting from the self-checkout initiative (part of Fast Track). Ex. 54 (Mar. 2024 10-K) at 12, 28. At most, shrink and damages were higher than anticipated between December 2022 and August 2024, but an incorrect prediction is not an undisclosed risk.

*Inventory Levels:* Dollar General did not correct any prior disclosures about its inventory levels. To the contrary, Dollar General reported both the increase of its inventory levels generally and specifically as to non-consumable products. By August 2022, Dollar General reported that inventory "increased by 25.1%" on a per store basis as the demand for non-consumables dropped. Ex. 37 (Aug. 2022 10-Q) at 16. Between December 2022 and June 2023, Dollar General continued to disclose that the sales mix shift towards consumables "exceeded pre-pandemic levels." Ex. 45 (Mar. 2023 10-K) at 27. By August 2023, Dollar General reported $95 million in planned markdowns and associated costs that would primarily reduce anticipated sales proceeds, but it did not make any material adjustments to the Company's LCM reserve during the Class Period which would impact inventory balance on the balance sheet. SCAC ¶¶ 16, 180. Dollar General discounted the shelf-price of its product to increase foot traffic and "better serve [] customers" by "accelerat[ing] the pace of inventory reduction efforts." Ex. 50 (Aug. 2023 10-Q) at 16. This is an industry-standard practice, not an admission that the Company's historic valuation of that inventory was overstated nor a reflection of inventory quality or progress on reducing inventory by that point.

*Supply Chain and Distribution:* The same is true of the additional supply chain costs disclosed in December 2022. *See, e.g.*, SCAC ¶ 153. As the pandemic began, Dollar General

disclosed the risk that supply chain constraints or disruptions could impact its financial results. Ex. 1 (Mar. 2020 10-K) at 7, 13. In March 2022, Dollar General reported a supply chain headwind of $100 million, encompassing staffing issues and fuel and distribution costs. Ex. 29 (Mar. 2022 Earnings Tr.) at 3, 5, 12; Ex. 30 (Mar. 2022 10-K) at 7, 28. In December 2022, the Company warned it was experiencing "warehouse capacity constraints" including "unanticipated temporary delays in opening or securing additional storage." Ex. 42 (Dec. 2022 10-Q) at 15.[35] In December 2022, the Company disclosed that it had incurred additional supply chain costs, including costs related to detention fees, which were well within the scope of the Company's prior risk factors and cautionary statements. SCAC ¶ 153.

## C. Staffing Statements

Plaintiffs challenge generalized statements about Dollar General staffing which are either pure puffery (like its "robust internal promotion pipeline") or objectively true (its "record staffing levels" during the pandemic). *See, e.g., id.* ¶ 323. Based on those inactionable or true statements, Plaintiffs improperly attempt to repackage a management decision—the level of staffing at a retail store—into a securities fraud claim.

### i. Risk Disclosures Are Not Actionable

The Complaint challenges statements in Dollar General's risk disclosures: (1) that "[f]ailure to attract, train and retain qualified employees while controlling labor costs, as well as other labor issues, including employee safety issues, could adversely affect our financial performance" (SCAC ¶ 318(a)); and (2) "[i]f we are unable to attract, train and retain adequate numbers of qualified employees, our operations, customer service levels, legal and regulatory compliance, and support functions could suffer" (*id.* ¶ 318(b)). *See also, e.g.,* Ex. 30 (Mar. 2022

---

[35] The Company warned that "delays in constructing, opening, or staffing new distribution centers" could cause materially different results from projections. Ex. 37 (Aug. 2022 10-Q) at 24–25.

10-K) at 18.  These forward-looking disclosures are protected under the Bespeaks Caution doctrine and the PSLRA statutory safe harbor.  *See Kolominsky*, 100 F.4th at 687–88.[36]

The statements are combined with cautionary language, including a warning that Plaintiffs omit: "[Dollar General] operat[es] in an industry challenged by historically high rates of employee turnover."  *See* Ex. 30 (Mar. 2022 10-K) at 18.[37]  Plaintiffs also challenge statements that Dollar General "proactively seek[s] ways to continue investing in" its employees.  SCAC ¶ 316.  *See also* ¶¶ 335, 340, 342, 344–45.  These are presented as a forward-looking "goal" and are protected by the Bespeaks Caution doctrine and statutory safe harbor.  *Kolominsky*, 100 F.4th at 687–88.

### ii.    Staffing Statements Are Inactionable Opinions, Statements of Corporate Optimism, or Puffery

The Staffing Statements are largely "opinions" or "mere corporate puffery or statements of corporate optimism" that cannot support a fraud claim.  *See Omnicare*, 583 F.3d at 943.  The Complaint challenges statements that "escape[] objective verification," including Defendants' generalized praise of the Company's "robust internal promotion pipeline, "low manager turnover," and "positive results" from investments in employees.  SCAC ¶ 323; *see also id.* ¶ 333;  *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (statement which "escapes objective verification" is not actionable).  Similarly, there are no allegations that show Defendants had "actual knowledge" their opinions were false or that they did not actually believe they were true.  SCAC ¶ 323 ("we believe these investments continue to yield positive results across our store

---

[36] *See also Desktop Metal, Inc.*, 2024 WL 4589490 at *10 (risk disclosure that a "failure to comply with regulations 'would have an adverse impact on [its] business and reputation' is best understood as a 'cautionary statement,' which disclaims full compliance rather than promises it").

[37] *See also* Ex. 16 (Mar. 2021 10-K) at 11, 27 (disclosing "increased government regulations and mandates requiring us to provide wage increases or premiums to frontline employees" and "additional payroll related expenses throughout fiscal 2020"); Ex. 30 (Mar. 2022 10-K) at 10–11, 18 (disclosing "increased labor expenses," "significantly increasing our hiring of new store employees," and that "[o]ur ability to meet our labor needs, while controlling our labor costs, is subject to many external factors . . .").

48

base"); ¶ 327 ("we continue to be pleased with our robust internal promotion pipeline and store manager turnover"); ¶ 329 ("we feel like we're in really good position"); ¶ 344 ("our staffing levels being very robust"). *See Omnicare*, 583 F.3d at 945–46.

### iii. The Complaint Does Not Allege the Staffing Statements Were False or Misleading When Made

Plaintiffs allege that all statements Dollar General made regarding staffing were materially false or misleading for the same reason: Seven of the FEs alleged that individual retail stores or distribution centers were "chronically understaffed" which, coupled with the alleged "excess inventory," had adverse effects on store-level operations. *See* SCAC ¶¶ 110–123, 315, 317, 319, 321, 324, 326, 328, 330, 332, 334, 336, 338, 341, 343, 346. The allegations are not tailored on a "statement-by-statement" basis as required by the PSLRA and the Sixth Circuit.

*Staffing Levels:* Dollar General stated that "[t]he typical Dollar General store is operated by a store manager, one or more assistant store managers, and three or more sales associates." *Id*. ¶ 314. The Complaint asserts this is false because certain Dollar General stores reportedly were staffed with "only one individual during the day" for four to five hours. *See, e.g., id.* ¶ 315. That a "typical" Dollar General store employs at least five associates does not suggest those associates all work the same time, all day, every day in every one of its stores. Plaintiffs' misreading of a statement does not render it misleading. In any event, FE-21 admits that her store employed "seven employees"—more than the "five" Plaintiffs allege were required. *Id.* ¶ 114.[38]

*Turnover:* Plaintiffs allege that Dollar General's employment metrics, turnover rates, and

---

[38] While the Complaint alleges the Company's insufficient staffing levels, combined with excess inventory, impacted its ability to maintain safe workplace conditions (*e.g.*, SCAC ¶ 315), the Complaint does not identify any affirmative statements about workplace conditions at all. In any event, courts routinely "dismiss[] as puffery assurances about workplace safety." *Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 561–62 (S.D.N.Y. 2020) (collecting cases); *accord In re Peabody Energy Corp. Sec. Litig.,* 2022 WL 671222 at *13 (S.D.N.Y. Mar. 7, 2022).

internal promotion statistics were false. *See, e.g., id.* ¶ 323. The Staffing Statements also demonstrate the mismatch between the FEs' store-level complaints and Defendants' Company-wide statements. For example, Defendants reported record high staffing rates—an objectively true statement, given that Dollar General hired 38,000 net employees in the Class Period. *See* Ex. 4 (May 2020 Tr.) at 11; Ex. 58 (Aug. 2024 Tr.) at 8. Plaintiffs also challenge statistics across over 16,000 retail stores including customer "satisfaction" nearing "all-time-highs" (SCAC ¶ 320) and "low manager turnover" (*id.* ¶ 323). *See* Ex. 1 (Mar. 2020 10-K) at 18; Ex. 16 (Mar. 2021 10-K) at 4. No FE alleges that these statements are false. Nor does any FE dispute that "approximately 76% of store managers, and thousands of additional employees" were "promoted from within" as of January 28, 2022. Ex. 30 (Mar. 2022 10-K) at 9. Indeed, the Complaint alleges that at least a quarter of the FEs were promoted from within. SCAC ¶ 46 (FE-2); ¶ 54 (FE-4); ¶ 73 (FE-8); ¶ 110 (FE-20); ¶ 115 (FE-22). While a few retail FEs report "high" turnover, none put "high" turnover in context, or tie it specifically to turnover of store managers. *See id.* ¶¶ 82, 121; *Hunter*, 2022 WL 3445173 at *18 (assertions "without any contextual information … do not meet the stringent requirements of the PSLRA and Rule 9(b)"). As Dollar General disclosed, the retail industry is "challenged by historically high rates of employee turnover" and the pandemic increased the risks of labor shortages. Ex. 1 (Mar. 2020 10-K) at 16. Against that backdrop, no FE defines "high" turnover or purports to have knowledge of Company-wide staffing metrics.

*__Investments in Staffing:__* Plaintiffs challenge statements that Dollar General made "significant investments in wages, benefits and training opportunities" for its employees. SCAC ¶ 335; *see also id.* ¶ 344. But in 2020 alone, the Company paid $167 million in employee appreciation bonuses. Ex. 16 (Mar. 2021 10-K) at 27. It also provided expanded paid time off during the pandemic and deployed COVID-19 prevention measures at its retail stores. *Id.* And

50

the average hourly retail wage increased by approximately 23% in the Class Period.  SCAC ¶ 168.  Beyond those investments, Dollar General also invests in training every year.  Ex. 45 (Mar. 2023 10-K) at 9.  Indeed, Dollar General was inducted into "Training Magazine's Hall of Fame, following two consecutive years as the magazine's top training and development program."  Ex. 30 (Mar. 2022 10-K) at 8.  None of the FEs allege facts inconsistent with these disclosures.

### iv. The Company Did Not Correct any Staffing Statements

The Complaint also fails to allege loss causation with respect to the Staffing Statements, which were never corrected.  Plaintiffs rely on the Company's March 2023 announcement that it intended to make an "incremental investment of approximately $100 million" over the course of the fiscal year, "primarily in incremental labor hours."  SCAC ¶ 163.  But Plaintiffs do not allege that the announcement "corrected" any prior statements.    To the contrary, the March 2023 announcement did not mention any historic statements in connection with the investment.  *See generally* Ex. 62 (Mar. 2023 8-K).  Indeed, Plaintiffs' argument is inconsistent.  They cannot allege that Dollar General's employment investments—including $167 million in COVID-19 bonuses in 2020 alone—are not "significant" (as they do to allege falsity), while also arguing that a smaller $100 million investment in labor was a material undisclosed risk (as they do to allege loss causation).  *See* SCAC ¶¶ 151, 163; Ex. 16 (Mar. 2021 10-K) at 27.  Nor can Plaintiffs show that increased labor costs were a "concealed" risk.  It was repeatedly disclosed as a risk factor.  Ex. 1 (Mar. 2020 10-K) at 16 (discussing staffing risks).  Moreover, the Company had previously disclosed "targeted investments" in retail labor, wage increases, and significant investments in employees.  Ex. 33 (May 2022 Tr.) at 6; Ex. 44 (Mar. 2023 Tr.) at 4.

Although Dollar General announced it was increasing its investment to $150 million in August 2023, the analyst reports cited by Plaintiffs make clear that the risk was already known to

51

the market.[39]  This is fatal to Plaintiffs' loss causation allegations.  *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp. (In re KBC Asset Mgmt. N.V.)*, 572 F. App'x 356, 360 (6th Cir. 2014) ("The problem with KBC's theory is that . . . the alleged corrective disclosures [] were old news.").

### D.  Pricing Statements

Plaintiffs claim statements made about the Company's pricing position relative to competitors were false and misleading *solely on the basis* that a handful of FEs allege that employees in certain stores were unable to "properly price merchandise" on shelves resulting in "regulatory investigations, citations, fines and penalties."  SCAC ¶¶ 83, 108, 111, 147, 348–49, 351, 354–55, 358, 361–62, 365, 368–71, 374–75, 378, 381, 384, 387–89.

### i.  Pricing Statements Are Non-Actionable Corporate Optimism and Opinion

The Pricing Statements—which range from "we feel very good about where we're priced now" in August 2020 (SCAC ¶ 351) to "we continue to feel very good about our price position" in March 2023 (*id.* ¶ 381)—are classic statements of inactionable corporate optimism or puffery. *See In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 765 (N.D. Ohio 2020) (statements that company "priced its products to 'fairly reflect the value we provide'" were "immaterial puffery"); *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 245 (6th Cir. 2015) ("unspecific reference to the company's 'competitiveness' is immaterial as a matter of law").  They are also statements of opinion, and the Complaint does not allege facts that show Defendants had "actual knowledge" their opinions were false or that they did not actually believe the statements were true. *Omnicare*, 583 F.3d at 945–46.

### ii.  The Complaint Does Not Allege the Pricing Statements Were False or

---

[39] *See* Ex. 63 (Aug. 31, 2023 GS First Take Report) (noting that "the need to increase labor investments has been a top investor concern."); Ex. 64 (Aug. 31, 2023 Truist Report) ("We have continued to highlight our concerns that price and labor investments were likely not all in the rearview mirror and today's outlook suggests that was indeed the case . . .").

**Misleading When Made**

Every Pricing Statement challenged in the Complaint (save one, addressed below) concerns Dollar General's overall pricing position, including relative to its competitors, not how its shelf pricing compared to register pricing in stores. *See e.g.*, SCAC ¶ 389 ("our price position relative to competition continues to be strong").[40] The Complaint says nothing about Dollar General's Company-wide pricing, its competitors, or its competitors' pricing. The Complaint's allegations about sporadic shelf-price accuracy are wholly unrelated to, and cannot establish the falsity of, statements about Dollar General's pricing compared to competitors. *In re Invensense, Inc. Sec. Litig.*, 2017 WL 11673462, at *3 (N.D. Cal. Apr. 12, 2017) ("[T]here is a mismatch between the statement identified as false and misleading on the one hand, and the reasons why plaintiff says the statement was false or misleading on the other.").

Only one Pricing Statement challenged in the Complaint relates to shelf pricing. On May 31, 2023, Owen stated that the Company strives to provide "shelf pricing [customers] can count on every day" and when issues arise, the Company takes "swift action to identify the root cause of the issue and correct it." SCAC ¶ 384. The allegations in the Complaint do not show that Owen's response was false or misleading. Indeed, none of the FEs who make any pricing related-allegations address the Company's stated desire to provide reliable shelf pricing or its efforts to remedy any in-store pricing issues. *See* SCAC ¶¶ 83, 108, 111, 147. Nor do any FEs have Company-wide insight into Dollar General's response to any regulatory issues.

### iii. Dollar General Did Not Correct Any Pricing Statements

Defendants never corrected any statement regarding Dollar General's competitive pricing position. Nor do the August 2023 through August 2024 disclosures "correct" Owen's May 31,

---

[40] *See also id.* ¶¶ 348, 351, 354–55, 358, 361–62, 365, 368–71, 374–75, 378, 381.

2023 comment that steps were taken to remedy shelf-pricing Company-wide.  The Complaint's failure to link supposedly "corrective" disclosures to the Pricing Statements is an independent basis for dismissal on loss causation grounds.  *See, e.g.*, *Omnicare*, 583 F.3d at 944–45.

### E.  The Complaint Cannot Manufacture a Claim Based on Item 303

Plaintiffs cannot manufacture a claim through SEC Disclosure Item 303.  SCAC ¶ 438. Item 303 does not create a stand-alone duty to disclose or establish a Section 10(b) violation.  *See Macquarie*, 601 U.S. at 265.  Item 303 only requires a company to disclose "any known trends or uncertainties that . . . are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income."  17 C.F.R. § 229.303(a)(3)(ii).  The Complaint does not identify, and the FEs do not mention, any specific trends that Defendants failed to disclose.

In any event, Item 303 "only imposes a duty to make forward-looking projections regarding information *known* to the registrant."  *J&R Mktg. v. GMC*, 549 F.3d 384, 392 (6th Cir. 2008) (emphasis added).  Twenty-two of the 24 FEs do not allege any "contact or interaction with any of the Defendants" at all.  *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009).[41]  The Complaint does not plead the specific contents of the emails sent by the two other FEs concerning store-level issues, and vague issues about two retail stores are not a known Company-wide trend. SCAC ¶ 48 (FE-2 July 2021 email); ¶ 49 (FE-2 June 2022 email); ¶ 45 (FE-1 February 2022 email).

### III.  THE COMPLAINT DOES NOT PLEAD WITH PARTICULARITY FACTS CREATING A STRONG INFERENCE OF SCIENTER

The PLSRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter.  15 U.S.C. § 78u-4(b)(2)(A).  A "strong inference" must "be more than merely 'reasonable' or 'permissible'—it must be cogent" and "at least as compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

---

[41] There is no allegation that a single one of the 24 FEs communicated with Defendant Dilts.

U.S. 308, 324 (2007). Any "ambiguities count against inferring scienter." *Id.* at 326. Scienter includes "knowing and deliberate intent to manipulate, deceive, or defraud" and "recklessness." *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,* 83 F.4th 514, 526 (6th Cir. 2023) (citations omitted). Recklessness is "highly unreasonable conduct . . . akin to conscious disregard, and typically require[s] multiple, obvious red flags." *Id.*[42] The PSLRA requires scienter be alleged "with respect to each statement and each defendant." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254 at *21 (M.D. Tenn. Nov. 19, 2019). The complaint "must identify specific facts demonstrating scienter for each alleged misstatement made by each individual Defendant and not just describe what Defendants generally did or knew." *Kakkar v. Bellicum Pharms., Inc.*, 2020 WL 2845279, at *3 (S.D. Tex. May 29, 2020).

The Sixth Circuit has established a non-exhaustive list of nine factors known as the "*Helwig* factors" to assess the adequacy of scienter allegations:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*ServiceMaster*, 83 F.4th at 526. "[T]he absence of [*Helwig*] factors indicate the absence of scienter." *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008), *aff'd sub nom. Konkol*, 590 F.3d 390.

---

[42] Under the PSLRA, forward-looking statements accompanied by meaningful cautionary language are not actionable and "the PSLRA makes the state of mind irrelevant." *Miller*, 346 F.3d at 672. If forward-looking statements "are not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is required." *Id.*

The Complaint's scienter allegations are not tethered to any specific misstatement or omission, or any point in time. Instead, Plaintiffs base their claim on (a) allegations from 24 FEs; (b) stock sales by two of the four Defendants; and (c) non-*Helwig* factors. The Complaint's allegations do not create a plausible, let alone a cogent and compelling, inference that any Defendant acted with scienter. SCAC ¶¶ 439–54. The competing nonculpable inference—that Defendants acted in good faith in providing timely disclosure of successes and challenges as they developed over the course of the four-year Class Period—is far more compelling.

### A. The Complaint Does Not Identify Internal Reports That Were Inconsistent With the Company's Public Statements

The Sixth Circuit has repeatedly held that allegations identifying internal reports that diverge from the defendants' "external statements" is a "'key factor' to a finding of scienter." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018); *see Bridgestone Corp.*, 399 F.3d at 688–89 (same).[43] Here, the Complaint does not identify (or even speculate about the existence of) internal reports that diverged from the Company's statements, let alone allege the specific contents of any such reports. *See ServiceMaster*, 83 F.4th at 530 (plaintiffs failed to "allege[] any details about [defendants'] internal assessment" of the alleged problem). The Complaint focuses on the Company's inventory management and inventory balances, but it does not identify any internal inventory management or aging analyses, inventory accounting reports, or internal assessments of product shrink or damages at all, and certainly none that diverge from Defendants' statements. *See, e.g.*, SCAC ¶¶ 440, 446–48. Plaintiffs also challenge statements about "customer trends" (*e.g.*, *id.* ¶ 224) without pleading any internal market trend

---

[43] Courts "routinely" analyze this factor in "tandem" with the sixth factor—whether Defendants disregarded the most current information. *Stein v. United States Xpress Enters.*, 2020 WL 3584800, at *36 (E.D. Tenn. June 30, 2020). Plaintiffs do not allege "what particular factual information Defendants disregarded." *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 713 (S.D. Ohio 2023), *aff'd*, 100 F.4th 675 (6th Cir. 2024).

reports, and they challenge statements about employee hiring and turnover "trends" (*e.g.*, *id.* ¶ 342) without pleading any internal reports of employment metrics. Despite alleging Defendants did not order merchandise based on an "analysis of actual demand" (*id.* ¶ 96), they do not identify any reports about inventory ordering or compare those analyses with statements about inventory.

While a handful of FEs reference meetings where operational "issues" were discussed, these allegations are not reports that diverge from Dollar General's disclosures that could support an inference of scienter under *Helwig*. For example, the Complaint alleges that warehouse capacity constraints were discussed on a call in February or March 2023, but those issues had been disclosed in December 2022. *Compare* SCAC ¶ 52, 440(c) *with* Ex. 42 (Dec. 2022 10-Q) at 15 (disclosing "temporary warehouse capacity constraints" and "$40 million in additional supply chain costs"); Ex. 40 (Dec. 2022 Tr.) at 4. Similarly, the Complaint alleges the need to improve store standards was discussed at a meeting in February 2023, but that was disclosed in the Company's next SEC filing in March 2023. *Compare S*CAC ¶ 113 *with* Ex. 45 (Mar. 2023 10-K) at 10, 20, 28.[44]

### B. The FE Allegations Do Not Give Rise to a Strong Inference of Scienter

Plaintiffs rely almost exclusively on the unverified statements of 24 FEs to plead scienter for each Defendant and each alleged misstatement over a four-year Class Period. No FE claims to have worked with, spoken to, or even met any of the Defendants and they cannot plausibly opine on any Defendant's state of mind. Twenty-two of the FEs had no contact with any Defendant at any time and their speculation about the Defendants' states of mind is insufficient. *See* SCAC ¶ 440(d) (alleging Vasos "likely" knew of issues). Nor can scienter be inferred from meetings that

---

[44] Although Plaintiffs cite regulatory investigations and the OSHA Settlement, the Complaint does not explain how these are inconsistent with any statements. Nor do Plaintiffs allege which regulatory actions put which Defendant on notice of which issue at what point in time. Finally, the Complaint acknowledges these investigations were publicly known during the Class Period. *See, e.g.*, SCAC ¶ 125 n.8 (citing public database of OSHA complaints). The alleged existence of publicly known regulatory investigations cannot support any inference of an intent to defraud.

Defendants are not alleged to have attended (*id.* ¶¶ 440(c),(f)), or from what other members of "senior leadership" allegedly knew (*id.* ¶¶ 440(c), 440(d)). *See Konkol*, 590 F.3d at 401 (rejecting inference of scienter from "generalized statements" about what was "known within the Company").

Plaintiffs also cannot plead a strong inference of fraudulent intent based on three emails supposedly sent by two former store managers to which no Defendant is alleged to have responded or read. FE-2 allegedly sent an anonymous email to executives including Vasos and Owen in 2021 (*id.* ¶¶ 48, 440(b)) and emailed a "list of problems" to "everyone in the top three tiers of the Company" in June 2022 (*id.* ¶ 49). In her last week, FE-1 allegedly sent an email to Vasos to "provide suggestions on how to fix the problems." *Id.* ¶ 45, 440(a).[45] Although the emails—the only internal documents cited in the Complaint—allegedly were "long" and "covered the issues thoroughly" (*id.* ¶¶ 45, 49), the Complaint provides no specific facts about the contents of the emails. Moreover, these emails—which were sent by former Store Managers of single Dollar General stores (FE-1 and FE-2) do not establish that Defendants knew such issues were Company-wide, as opposed to affecting those particular stores. The Complaint's vague allegations about "staffing," "delivery," and "inventory management issues" are not inconsistent with Defendants' actual disclosures about "labor shortages," "shipping capacity shortages," and "inventory damage." *See, e.g.*, Ex. 23 (Aug. 2021 10-Q) at 17, 19; Ex. 34 (May 2022 10-Q) at 15 (disclosing "materially higher supply chain costs," "shipping capacity shortages," and "industry labor shortages"). FE allegations that are consistent with the Company's disclosures do not suggest the Defendants knew any disclosures were false. *See, e.g.*, *GBR Grp., Ltd. v. Biogen Inc. (In re Biogen*

_____

[45] FE-1 allegedly received a phone call from Vasos's secretary—not Vasos himself. SCAC ¶ 45. This does not establish that Vasos received this email, reviewed it, or understood any of these generic "problems" to render his public statements false.

*Inc. Sec. Litig.*), 857 F.3d 34, 42 (1st Cir. 2017).

**C. The Complaint Does Not Allege Defendants' Had Actual Knowledge that Statements Concerning "Soft Information" Were False or Misleading**

Even if the Complaint's allegations suggested recklessness, a "higher scienter requirement" applies to claims based on "soft information," such as opinions, corporate optimism, and other non-objectively verifiable information. *Omnicare, Inc.*, 769 F.3d at 470–71, 478. To clear that "higher" bar, the complaint must plead that defendants had "actual knowledge" their statements were false or misleading at the time that they were made. *Id.* at 471, 481. In *Omnicare*, plaintiffs identified an internal audit report, the confidential witness was the "former Chief Compliance Officer," and the compliance concerns were directly communicated to a defendant. *Omnicare, Inc.,* 769 F.3d at 482–83. The Sixth Circuit held those allegations did not plead "actual knowledge" because plaintiffs failed to allege specific facts regarding the "timing of this conversation" and the "nature of the concerns." *Id.* Here, the Complaint alleges nothing to suggest any Defendant's "actual knowledge" that statements were untrue or lack of belief in the stated opinions. The allegations are far weaker than those in *Omnicare* because the Complaint does not identify any internal audits, include allegations from high-level witnesses, or allege any direct communications with Defendants inconsistent with any public statements. The claims based on statements of opinion or corporate optimism must be dismissed.

**D. The Complaint Cannot Rely on Stock Sales to Plead Scienter**

Plaintiffs structured the putative Class Period around allegations that two of the four Defendants sold stock in the first 19 months of the 51-month Class Period. "Courts have regularly held that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year." *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 120 (3d Cir. 2018). *See also, e.g., Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (refusing to infer

scienter when plaintiffs alleged "an inordinately long period of 44 months"). In addition, trading by insiders "is not sufficient to establish an inference of scienter on its own." *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 184 (1st Cir. 2024) (citations omitted).

### i. The Alleged Stock Sales Do Not Support a Strong Inference of Scienter

Insider trading is "suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Konkol*, 590 F.3d at 399 (citations omitted). Plaintiffs must plead facts establishing that the trades are "probative of the fact that [defendant] knew or at least suspected that [the disclosures] were misleading." *Id.* If plaintiffs fail to plead facts "confirming their suspicious nature," stock sales cannot "by themselves raise a strong inference of scienter." *Id.* at 400.

Here, Plaintiffs do not plead facts suggesting that the stock sales were suspiciously timed around any specific alleged misstatements. Because there are no allegations tying any specific stock sales to specific statements, at most, Plaintiffs plead a "general motive" and "not fraud." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004); *Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.*, 239 F. App'x 318, 321 (9th Cir. 2007) ("stock sales only demonstrate scienter" when they "relate[] to the challenged statements.") (citations omitted).

Plaintiffs suggest that the stock sales are suspicious because Garratt and Vasos began trading in regular intervals on the first day of the putative Class Period. SCAC ¶¶ 449–54.[46] That is a transparent attempt to manufacture an inference of scienter by selecting an "unusually long"

---

[46] Plaintiffs overstate the value of the alleged trades by roughly 30%. Garratt and Vasos exercised options in cashless transactions where transaction costs are covered by a concurrent sale of the acquired shares. *See, e.g.,* Ex. 65 (Vasos 2021 Form 4); Ex. 66 (Garratt 2021 Form 4). Accordingly, to the extent the sales are relevant, the net proceeds (not gross proceeds) are the appropriate metric. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (declining to infer scienter because the "allegations demonstrate[d] only gross proceeds without identifying net profits and proceeds alone say nothing about a seller's motive").

60

Class Period "to sweep as many stock sales" as possible to make the "stock sales appear more suspicious." *Fischer v. Vantive Corp. (In re Vantive Corp. Secs. Litig*.), 283 F.3d 1079, 1092 (9th Cir. 2002) (sixty-three week class period). Other than the allegations of stock sales, there is nothing in the Complaint to suggest the Company's May 2020 disclosures were misleading. To the contrary, the May 2020 disclosures are especially "poor material for building a fraud claim." *Corban v. Sarepta Therapeutics, Inc*., 868 F.3d 31, 38 (1st Cir. 2017). While Dollar General reported significant sales and profit growth, the Company *withdrew* its forward-looking guidance and warned investors it was unable to predict how long the COVID-driven surge in demand and sales would continue, which was a clear effort to temper expectations rather than inflate the stock price. Ex. 4 (May 2020 Tr.) at 6. The Complaint does not allege any facts about May 2020, let alone suggest Defendants learned of accounting, inventory management, staffing or pricing issues before the disclosure date. Notably, the Complaint's first allegations about inventory management issues at temporary warehouses concern events two years later, in May 2022. SCAC ¶¶ 65–67.

After May 2020, Garratt and Vasos sold stock at regular intervals with a majority of the trades occurring long before the alleged "corrective" disclosures (or the Class Period stock price high). Approximately 95% of Garratt's and 70% of Vasos's sales were completed by December 2021—one year before the first alleged "corrective" disclosure in December 2022. *Id.* ¶ 453 (145,763 shares); ¶ 451 (956,174 shares). Courts routinely find that even a five-month gap between trades and the alleged "corrective" disclosure undermines any inference of scienter. *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821 (E.D. Ky. 2008) ("The longer the time between stock sales and the disclosure, the more scienter is negated."); *In re Astea Int'l Inc. Sec. Litig.*, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 8, 2007) (collecting cases).[47]

_____

[47] When viewed in isolation, the sales in August/September 2022 are not inconsistent with the

Moreover, the trades were not "calculated" to maximize profit. *Konkol*, 590 F.3d at 399. The Complaint alleges that over 40% of the stock sales occurred at $205.33 per share or lower (SCAC ¶¶ 451, 453)—well below the Class Period high of $260.44. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) ("[W]hen insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know.") (citation omitted).

Their sales (or lack thereof) and holdings between 2022 and 2024 further undermine any possible inferences of scienter. Between April 2022 and April 2023, Garratt's share holdings increased through vesting and he held those shares well after the first alleged "corrective" disclosures. *Compare* Ex. 67 (Apr. 2022 Proxy) at 47 (holding 55,467 shares) *with* Ex. 68 (Apr. 2023 Proxy) at 53 (holding 70,610 shares). In 2022, when Plaintiffs allege the Company's inventory and staffing issues were worsening, Garratt received a net benefit from exercising options of $998,320 and acquired $3,113,435 in additional stock through vesting. Ex. 68 (Apr. 2023 Proxy) at 38. After Garratt retired in June 2023, he exercised his expiring options and retained roughly 2,000 shares, further demonstrating his good faith belief in the Company and its disclosures. *See State Tchrs. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*, 2024 WL 3258293, at *15 (D. Mass. July 1, 2024) ("financial exposure to drops in the Company's stock price increased over the Class Period, weakening the inference that Defendants sought to defraud investors by selling off stock before the disclosure of adverse information"); *City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 835 (W.D. Mich. 2012) (no scienter where corporate insiders "suffered large losses . . . from the shares they retained").

---

trading patterns over the prior two years. Plaintiffs started the Class Period in May 2020 to improperly skew the potential inferences from the sales in 2022. In addition, the alleged 2020-2022 sales do not suggest scienter in 2023 or 2024.

Vasos similarly increased his economic exposure to Dollar General between 2022 and 2024. In 2022, he received net benefits from exercising options of $16,952,118, but also acquired $18,379,181 in additional shares through vesting. Ex. 68 (Apr. 2023 Proxy) at 38. He retired as CEO in November 2022. Ex. 41 (Oct. 2023 8-K) at 2. In June 2023, Vasos exercised 32,099 options that were set to expire on June 30, 2023, but only sold 27,327 shares and retained the remaining 4,772 shares. Ex. 70 (Vasos 2023 Form 4).[48] In October 2023, he agreed to return to the Company from his retirement and was granted 250,000 options scheduled to vest in 2027 as part of his compensation. Ex. 41 (Oct. 2023 8-K) at 2. These actions demonstrate Vasos's confidence in the Company's disclosures and future prospects and defeat any inference of scienter. *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (no scienter from conduct that "signals only confidence in the future of their company").

At bottom, Plaintiffs seek to lift Vasos's and Garratt's sales out of context. By May 2020, both had been with the Company for many years and were contemplating their eventual departures. Stock sales in advance of a potential retirement are "normal and expected," and do not suggest "a conspiracy to defraud." *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 821 (D. Minn. 2022) (citations omitted); *City of Taylor Gen. Emples. Ret. Sys. V. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (collecting cases and holding sales are a "normal and expected consequence of [] retirement.") (citations omitted). In addition, Dollar General's stock option award agreements generally required executives to exercise all options within 90 days after a voluntary departure or the options would terminate. *See* Ex. 67 (Apr. 2022 Proxy) at 40. For long-term executives like Vasos and Garratt, this requirement created a legitimate incentive to avoid the

---

[48] Courts decline to infer scienter when expiring options are exercised. *See In re Medtronic Inc., Sec. Litig.,* 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009), *aff'd*, 621 F.3d 800 (8th Cir. 2010).

risks of large transactions in Company stock concentrated in the period around their departures. Vasos and Garratt were diversifying their portfolio, not "cashing out" at suspicious times.

### ii. Owen's June 2023 Purchase, the Lack of Trading by Dilts, and Repurchases by Dollar General, Undermine any Inference that Trades Were Suspicious

In any event, "[e]ven unusual sales by one insider do not give rise to a strong inference of scienter when other insiders ha[ve] not engaged in suspicious trading during the class period." *Quinones*, 106 F.4th at 183. S*ee also Gruhn v. Tween Brands, Inc*., 2009 WL 1542795, at *10 (S.D. Ohio June 2, 2009) (collecting cases); *Grillo*, 553 F. Supp. 2d at 821 (no scienter when 3 of 8 defendants "sold no stock at all during the Class Period"). And even more so here. Not only is Owen not alleged to have sold stock during the Class Period, but in June 2023, he purchased 1,500 shares for more than $235,000, a clear expression of his confidence in the future prospects of the Company. Ex. 69 (Owen 2023 Form 4). There can be no possible inference that Owen was acting with scienter and yet made a substantial personal investment in the Company's stock. *See, e.g., Quinones*, 106 F.4th at 183. In addition, Owen more than doubled his holdings through vesting of equity prior to his departure in October 2023. *See* Ex. 2 (Apr. 2020 Proxy) at 45 (137,611 shares); Ex. 68 (Apr. 2023 Proxy) at 53 (269,472 shares); Ex. 41 (Oct. 2023 8-K) at 2. Similarly, Dilts is not alleged to have sold stock either. The history of their stock holdings significantly undermines any inference of scienter. *See, e.g., Bailey v. Esperion Therapeutics, Inc*., 2019 WL 3296235, at *4 (E.D. Mich. Feb. 19, 2019) (no sales by CEO and CFO undermines scienter); *City of Pontiac Gen. Emps. Ret. Sys*., 865 F. Supp. 2d at 834–35 ("large losses" on retained shares "undermines an inference of scienter").[49]

In addition, courts hold that "substantial share repurchases tend to negate a finding of

---

[49] Moreover, scienter for Owen and Dilts cannot be inferred from sales by Vasos and Garratt. *In re Envoy Corp. Sec. Litig*., 133 F. Supp. 2d 647, 663 (M.D. Tenn. 2001).

scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp*., 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018). *See also Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 838 (E.D. Ky. 2019); *Beaver Cnty. Ret. Bd. v. LCA-Vision Inc*., 2009 WL 806714 at *24 (S.D. Ohio Mar. 25, 2009). Here, the Company repurchased substantial amounts of its stock in each quarter between mid-2020 and late-2022.[50] Indeed, twice during the Class Period, the Board increased the funding available for repurchases. Ex. 25 (Dec. 2021 8-K) at 2; Ex. 35 (Aug. 2022 8-K) at 4. Plaintiffs' theory that the Company repurchased large volumes of stock knowing it was inflated makes "no economic sense" and should be rejected. *United Techs. Corp*., 336 F. Supp. 3d at 225.

### E. The Complaint Does Not Allege Any of the Remaining *Helwig* Factors

Plaintiffs do not plead the remaining *Helwig* factors. The passage of time between the alleged misstatements (beginning in May 2020) and "corrective" disclosures (from December 2022 through August 2024) undermines an inference of scienter (factor 3). *Doshi*, 823 F.3d at 1042 (86-day gap cannot allow for "adverse scienter inference"). Plaintiffs do not allege any "evidence of bribery" (factor 4), that Defendants "quickly settled" any fraud lawsuits (factor 5), that only "someone with a high degree of sophistication" could understand the negative implications of the accounting disclosures (factor 7), that Defendants concealed their stock trades (factor 8), or that Defendants were uniquely self-interested in saving their jobs (factor 9).[51]

### F. Scienter Cannot Be Inferred From "Critical Operations" or the Challenged Statements Themselves

Plaintiffs cannot show that scienter should be inferred because "inventory" and "staffing" are "critical" to Dollar General. SCAC ¶¶ 444–45. The Sixth Circuit has held that executives'

---

[50] *See* Ex. 14 (Mar. 2021 8-K) at 6; Ex 28 (Mar. 2022 8-K) at 6; Ex. 45 (Mar. 2023 10-K) at 30.
[51] Factor 9 weighs against scienter as to Vasos and Garratt, both of whom decided voluntarily to leave and were not acting to "save" their jobs. Vasos also later returned to the Company.

alleged "intimate[] familiar[ity] with a core component of their business does little to suggest fraudulent intent." *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021); *Bondali*, 620 F. App'x at 492 (no scienter because safety was important to company operations and test results were from "core" of business). Other courts have similarly rejected the core operations theory. *See, e.g., Ryan v. FIGS, Inc.,* 2024 WL 187001 at *9 (C.D. Cal. Jan. 17, 2024) (rejecting argument that defendants are "presumed to have knowledge of adverse facts related to operations, supply chain, merchandising, and inventory management"); *AT&T/DirecTV*, 480 F. Supp. 3d at 533 (collecting cases). To the extent the theory is viable, it is only a "supplementary consideration that may bolster other well-pleaded facts" and not independently sufficient. *Stein v. United States Xpress Enters.*, 2020 WL 3584800, at *39.

Finally, Plaintiffs cannot bootstrap a claim by alleging that "scienter can be inferred merely from the allegedly fraudulent statements themselves," as that "would eliminate the need to plead scienter." SCAC ¶¶ 442–43; *In re Federated Dep't Stores, Inc*., 2004 WL 444559 at *7 (S.D.N.Y. Mar. 9, 2004). The fact that Defendants made statements about accounting, inventory, staffing or pricing, standing alone, cannot support a strong inference of scienter. The Sixth Circuit has rejected nearly identical allegations. *PR Diamonds*, 364 F.3d at 688–89 (reckless disregard of "accounting problems" and "control deficiencies" could not be inferred from press releases touting "careful monitoring" of accounting policies). *See also Funko, Inc.*, 2024 WL 2209686 at *17 (same, with respect to statements about "the quality of our inventory").

**G. The Competing Nonculpable Inferences Are Far More Compelling**

Even if a complaint "allege[s] a plausible inference of scienter," a motion to dismiss should be granted if "the allegations are also consistent with a more plausible nonculpable inference." *ServiceMaster*, 83 F.4th at 527. Here, the more plausible inference is that Dollar General, in good faith, provided accurate and timely disclosures as its business and operating environment, and the

66

surrounding macroeconomic conditions, changed over the course of the pandemic and the four-year Class Period. The Company's repeated disclosures of the positive developments and growing challenges facing the business over time, combined with cautionary language about the Company's uncertainties and risks, undermine any possible inference of scienter.

At the outset of the Class Period, Dollar General reported a "a significant surge in demand," resulting in substantially higher sales. Ex. 4 (May 2020 Tr.) at 4. Recognizing the uncertainties facing the business, however, the Company cautioned investors that it did not know how long the positive operating environment would last and withdrew forward-looking guidance for the entirety of the 2020 fiscal year. *See id.* at 5–6; Ex. 7 (Aug. 2020 Tr.) at 6–7. There can be no inference of fraudulent intent where a company seeks to temper investor expectations by withdrawing forward-looking guidance. The Company further cautioned investors about other increased risks related to the pandemic, including increased "distribution and transportation" costs (Ex. 5 (May 2020 10-Q) at 14; Ex. 16 (Mar. 2021 10-K) at 27)), "reduced labor availability" and potential macroeconomic impacts on its core customer base, such as increased inflation. Ex. 8 (Aug. 2020 10-Q) at 14, 26.

When the Company resumed providing forward-looking guidance in March 2021, the projections were expressly "cautious . . . given the significant uncertainty that still exists." Ex. 14 (Mar. 2021 8-K) at 6–7. Throughout 2021, Dollar General continued to report record sales, but repeatedly warned investors that it expected sales (particularly of non-consumable products) as well as shrink to return to their historical norms and patterns. Ex. 15 (Mar. 2021 Tr.) at 18–19; Ex. 16 (Mar. 2021 10-K) at 32–33. At the same time, the Company disclosed significant product "cost inflation" and "broad-based supply chain disruptions." Ex. 26 (Dec. 2021 Tr.) at 3, 5, 13. Again, the Company's cautionary statements show there was no intent to mislead.

Throughout 2022, Dollar General continued to disclose increased costs and supply chain

constraints, such as "unanticipated temporary delays in opening or securing additional storage." Ex. 42 (Dec. 2022 10-Q) at 15. Dollar General reported that the demand for non-consumable goods dropped below pre-pandemic levels. Ex. 45 (Mar. 2024 10-K) at 12. As the Company's supply chain reopened faster than expected and customer demand shifted away from non-consumables, the Company reported inventory levels increased. Ex. 37 (Aug. 2022 10-Q) at 16.

After all those disclosures, Plaintiffs allege that Defendants began to reveal the truth in December 2022 through a slow drip of "corrective" disclosures over the following two years. But these disclosures were consistent with the robust risk factors and cautionary language the Company had repeatedly issued. At most, Plaintiffs plead that Defendants underestimated the costs related to disclosed operational challenges. But underestimating downside from disclosed risks is not securities fraud. *Miller*, 346 F.3d at 681 (disclosure of "excess inventory in the market" cut against scienter even when defendant "underestimated the true extent of the excess"); *IBEW*, 788 F. Supp. 2d at 630 (finding that defendant's disclosure of issues with the distribution center undercut inference of scienter). As in *ServiceMaster*, "facts in this case are more consistent with a company playing a constant game of catch up" with its shifting business environment "than with fraud." 83 F.4th at 532 (citations omitted). *See also Yates*, 744 F.3d at 888 (repeated disclosures gave "rise to a more compelling inference that [] defendants were attempting—even if imperfectly—to keep the investing public informed, while working strenuously to correct the accounting errors they had discovered"). Indeed, any inference of scienter is even weaker here than in *ServiceMaster*, where the executives of a pest-control company underestimated termite exposure liability. 83 F.4th at 532. Here, the operational challenges arose primarily from external factors management could not control, including supply chain constraints, shifting consumer demand, product theft and the duration of increased inflation.

68

Plaintiffs' complete failure to plead 8 of the 9 *Helwig* factors weighs heavily against an inference of scienter. *See Bailey*, 2019 WL 3296235, at \*5. Instead, Plaintiffs rely solely on stock sales by two of the four individual Defendants primarily in the first half of the four-year Class Period. SCAC ¶¶ 451, 453. But the June 2023 stock acquisitions by both Owen and Vasos, and Vasos's decision to return as CEO and accept a deferred equity grant defeat any inference of scienter. *See* Ex. 41 (Oct. 2023 8-K) at 2; Ex. 69 (Owen 2023 Form 4); Ex. 70 (Vasos 2023 Form 4). The nonculpable inference that they believed the Company's operations and performance had been properly disclosed is far more compelling than any competing inference that they knew the Company was a "house of cards" with its stock propped up by securities fraud. SCAC ¶¶ 4, 8.

Plaintiffs cannot ignore the context of the global pandemic, its impact on the Company's operating environment, and the Defendants' repeated cautionary statements throughout the Class Period. Considered holistically, the most compelling inference is that Defendants acted in good faith at all times and without any fraudulent intent.

## IV.   THE COMPLAINT FAILS TO PLEAD A SCHEME LIABILITY CLAIM

To state a scheme liability claim under Rule 10b-5(a) and (c), the complaint must allege with particularity "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *ServiceMaster*, 83 F.4th at 525. "A scheme-liability claim is therefore different and separate from a nondisclosure claim." *Id.* Plaintiffs' scheme liability claim fails because the Complaint does not allege "any deceptive acts distinct from the alleged (inactionable) misstatements and omissions." *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at \*5 (2d Cir. June 10, 2024). Plaintiffs cannot sidestep the defects in their Rule 10b-5(b) claim "by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020). Nor can Defendants be liable for allegedly misleading

69

statements based on participation "in a scheme through which the statements were made." *S.E.C. v. Rio Tinto PLC*, 41 F.4th 47, 55 (2d Cir. 2022). And, because the scheme claim is based on the "same factual circumstances" as the misstatement claims, it also fails for the reasons discussed above. *ServiceMaster*, 83 F.4th at 533.

## V. THE COMPLAINT FAILS TO PLEAD SECTION 20(a) OR 20A CLAIMS

The Section 20(a) claim fails because the Complaint does not allege a primary violation of Section 10(b). *Doshi*, 823 F.3d at 1045. Defendants also cannot face control person liability for any conduct when they were not officers. *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d at 773 (actual control and culpable participation are elements). Similarly, the Section 20A claim against Vasos and Garratt should be dismissed. First, the Complaint does not allege an independent, predicate securities law violation. *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254 at *25 (M.D. Tenn. Nov. 19, 2019). Second, the Section 20A claim is not pled with particularity or sufficient contemporaneity. *See In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 233–35 (C.D. Cal. 1995). Plaintiffs have not alleged these Defendants "offered [their] securit[ies] for sale before the outsider purchased in order for there to be a possibility that the trade was between them." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1204 (C.D. Cal. 2008).

## CONCLUSION

The Court should dismiss the Second Consolidated Amended Complaint with prejudice.

Dated: November 15, 2024
  Nashville, Tennessee

Respectfully Submitted,

/s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #24150)
**RILEY & JACOBSON, PLC**
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rjfirm.com
tmcgee@rjfirm.com

Peter E. Kazanoff (*admitted pro hac vice*)
Amy L. Dawson (*admitted pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York 10017
Tel: 212.455.2000
pkazanoff@stblaw.com
amy.dawson@stblaw.com

*Counsel for Defendants Dollar General Corporation, Todd J. Vasos, Jeffrey C. Owen, John W. Garratt and Kelly M. Dilts*

71

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on November 15, 2024, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Kevin H. Sharp
Brent A. Hannafan
Kristi S. McGregor
Sanford Heisler Sharp, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
(615) 434-7000
Fax: (615) 434-7020
ksharp@sanfordheisler.com
bhannafan@sanfordheisler.com
kmcgregor@sanfordheisler.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
200 31st Avenue North
Nashville, TN 37203
cwood@rgrdlaw.com

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
darrenr@rgrdlaw.com

James Gerard Stranch, IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com

Mary K. Blasy
Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP 58
S. Service Road, Suite 200
Melville, NY 11747
mblasy@rgrdlaw.com
srudman@rgrdlaw.com

Salvatore J. Graziano
Jeremy P. Robinson
Alexander Noble
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
200 31st Avenue North
Nashville, TN 37203
jmartin@barrettjohnston.com

Thomas C. Michaud
Vanoverbeke, Michaud & Timmony, PC
79 Alfred Street
Detroit, MI 48201
tmichaud@vmtlaw.com

        s/ Steven A. Riley