# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, <br><br> Defendants. | Civil Action No. 3:23-cv-01250 <br><br> <u>CLASS ACTION</u> <br><br> Judge Aleta A. Trauger |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

                                                                    **Page**

GLOSSARY ................................................................................................ xii

INTRODUCTION ......................................................................................... 1

SUMMARY OF RELEVANT FACTS ......................................................... 5

    A.    Dollar General's Operations And Related Public Statements To Investors ........... 5

    B.    Dollar General Suffered From Severe Inventory Control Failures And Chronically Understaffed Its Stores ........................................................................ 6

        1.    Inventory Control Failures ................................................................ 6

        2.    Chronically Insufficient Staffing Levels ......................................... 9

        3.    Widespread Pricing Discrepancies ................................................ 10

    C.    Defendants Made Multiple Misstatements To Investors ..................................... 11

    D.    As The Truth Gradually Emerged, Defendants First Denied Reality Then Scrambled To Fix The Problems While Continuing To Mislead Investors ......... 11

LEGAL STANDARDS ................................................................................ 13

ARGUMENT .............................................................................................. 14

I.    THE SAC ADEQUATELY ALLEGES A SECTION 10b-5(B) CLAIM ............................ 14

    A.    The SAC Pleads Securities Violations Not Mismanagement .............................. 14

    B.    The Court Should Credit The Consistent Reports From Former Employees ....... 15

    C.    The SAC Sufficiently Alleges Defendants' Materially Misleading Statements ........................................................................................................ 17

        1.    Inventory Misstatements ................................................................ 17

        2.    Staffing Misstatements ................................................................... 24

        3.    Pricing Misstatements .................................................................... 26

        4.    Materially Misleading Earnings Metrics And Related Misstatements ................................................................................. 28

    D.    Defendants' Remaining Challenges To The Misstatements Fail ......................... 31

i

1.     The Misstatements Are Not Inactionable Puffery Or Optimism .............. 31

     a.    The Inventory Misstatements Are Not Puffery............................ 32

     b.    The Staffing Misstatements Are Not Puffery .............................. 36

     c.    The Pricing Misstatements Are Not Puffery................................ 37

2.     The Misstatements Are Not Inactionable Opinions................................. 37

     a.    The Inventory Misstatements Are Not Inactionable Opinions .................................................................................... 38

     b.    The Staffing Misstatements Are Not Inactionable Opinions........ 39

     c.    The Pricing Misstatements Are Not Inactionable Opinions ......... 40

3.     Defendants' Forward-Looking/Cautionary Language Arguments Fail ............................................................................................... 40

     a.    The Inventory Misstatements Are Outside The Safe Harbor........ 41

     b.    The Staffing Misstatements Are Outside The Safe Harbor .......... 42

E.    Defendants' Erroneous And Premature Truth On The Market Defenses Fail .................................................................................................... 43

F.    The SAC Pleads That Defendants Violated Item 303 ......................................... 45

G.    The SAC Adequately Pleads Scienter................................................................. 46

1.     *Helwig* Factors 2 and 6: Defendants Knew Or Recklessly Disregarded Information Contrary To Their Misleading Public Statements ................................................................................... 47

     a.    Defendants Received Internal Reports Informing Them Of Dollar General's Inventory And Staffing Problems ..................... 47

     b.    Defendants' Repeated Public Statements About Inventory And Staffing Confirms Their Knowledge Or Recklessness ......... 53

     c.    Defendants Are Presumed To Be Knowledgeable About Core Operations Like Inventory And Staffing............................. 54

     d.    The Widespread Nature Of The Staffing and Inventory Problems Contributes To Defendants' Scienter........................... 56

2. *Helwig* Factors 1 and 9: Defendants Were Motivated To Reap Over $315 Million In Insider Trades And Keep Their Executive Jobs ................................................................................................ 56

3. *Helwig* Factor 5: Dollar General Paid Millions Of Dollars To Settle Regulatory Actions Due To Its Inventory And Staffing Abuses ............. 62

4. *Helwig* Factor 7: Defendants' Confusing Accounting Disclosures Concealed The Company's Inventory Problems ...................................... 64

5. The Complaint Satisfies A Majority Of The *Helwig* Factors And Pleads A "Holistic" Inference Of Scienter.................................................. 65

H. Defendants' Competing Inferences Are Not More Compelling Than The Inference Of Scienter .................................................................................... 65

II. THE SAC ADEQUATELY ALLEGES LOSS CAUSATION ............................................ 66

III. THE SAC ADEQUATELY ALLEGES A SECTION 20A CLAIM.................................... 69

IV. THE SAC ADEQUATELY ALLEGES A SCHEME LIABILITY CLAIM ....................... 69

V. THE SAC ADEQUATELY ALLEGES A SECTION 20(a) CLAIM ................................. 70

VI. CONCLUSION........................................................................................................ 70

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd* 579 F.3d 878 (8th Cir. 2009) .................65

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).................................................................................................68

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2016), *aff'd* 731 F. App'x 35 (2d Cir. 2018).........................29

*In re Am. Int'l Grp., Inc.*,
965 A.2d 763 (Del. Ch. 2009)...........................................................................................62

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ............................................................31, 64

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ..............................................................................................36

*In re Astea Int'l Inc. Sec. Litig.*,
2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ..........................................................................59

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)...............................................................................16, 55

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) .........................................................................................61

*Beach v. Healthways, Inc.*,
2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) ........................................................................69

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)..................................................................................................51

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022).......................................................................... *passim*

*Bondali v. YUM! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .....................................................................................15, 55

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................................64

Case 3:23-cv-01250     Document 84     Filed 01/21/25     Page 5 of 85 PageID #: 2861

*Buhrke Family Revocable Tr. v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024)................................................................32

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)................................................................16

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ...........................................32, 57, 60, 65, 66

*In re CBL & Assocs. Props., Inc. Sec. Litig.*,
2022 WL 1405415 (E.D. Tenn. May 3, 2022)...........................................28, 46, 63, 68

*Chamberlain v. Reddy Ice Holdings, Inc.*,
2010 WL 5056184 (E.D. Mich. Dec. 6, 2010) ........................................................64

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2024 U.S. Dist. LEXIS 179887 (N.D. Cal. Oct. 2, 2024)........................................21

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...................................................................... *passim*

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013)................................................................61

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................62

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................65

*D.E. & J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ................................................................67

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...........................................................34, 37

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ...................................................................... *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................66

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................32, 38

*In re Enovix Corp. Sec. Litig.*,
2024 WL 349269 (N.D. Cal. Jan. 30, 2024) ........................................................23

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ............................................................ *passim*

*In re Federated Dep't Stores, Inc., Sec. Litig.*,
2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) ...................................................................54

*In re Firstenergy Corp. Secs. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .................................................................. *passim*

*In re FirstEnergy Corp. Secs. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)......................................................................... *passim*

*Fouad v. Isilon Sys., Inc.*,
2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ...........................................................62

*Franchi v. SmileDirectClub, Inc.*,
633 F. Supp. 3d 1046 (M.D. Tenn. 2022)......................................................................55

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) .......................................................................................46

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................46, 51, 64

*Freudenberg v. E\*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................14, 66

*Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ......................................................53, 54

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)........................................................... *passim*

*Grillo v. Tempur-Pedic Int'l, Inc.*,
553 F. Supp. 2d 809 (E.D. Ky. 2008) ...........................................................................59

*In re Guilford Mills, Inc., Sec. Litig.*,
1999 WL 33248953 (S.D.N.Y. July 21, 1999) ...............................................................62

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................................................................................... *passim*

*Heritage Global Network L.A. v. Welch*,
2024 WL 695772 (M.D. Tenn. Feb. 20, 2024) ..............................................................65

*In re Hertz Global Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)..........................................................................................58

*Holmes v. Baker,*
   166 F. Supp. 2d 1362 (S.D. Fla. 2001) ...................................................................62

*In re Huffy Corp. Sec. Litig.,*
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ..................................................................54

*IBEW Local 697 Pension Fund v. Ltd. Brands, Inc.,*
   788 F. Supp. 2d 609 (S.D. Ohio 2011) ..................................................................34

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.,*
   583 F.3d 935 (6th Cir. 2009) ...........................................................................33, 67

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.,*
   2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)......................................................37

*J&R Mktg. v. GMC,*
   549 F.3d 384 (6th Cir. 2008) ................................................................................46

*Karimi v. Deutsche Bank Aktiengesellschaft,*
   607 F. Supp. 3d 381 (S.D.N.Y. 2022).....................................................................14

*In re KBC Asset Mgmt. N.V.,*
   572 F. App'x 356 (6th Cir. 2014) ...........................................................................69

*Kolominsky v. Root, Inc.,*
   100 F.4th 675 (6th Cir. 2024) ................................................................................29

*Konkol v. Diebold, Inc.,*
   590 F.3d 390 (6th Cir. 2009) .................................................................................46

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.,*
   2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ............................................... *passim*

*Lamartina v. VMware, Inc.,*
   2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)........................................................61

*In re LDK Solar Sec. Litig.,*
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...........................................................67, 68

*Lorenzo v. S.E.C.,*
   587 U.S. 761 (2019).................................................................................................70

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.,*
   601 U.S. 257 (2024)......................................................................................17, 20, 45

*Mart v. Tactile Sys. Tech., Inc.,*
   595 F. Supp. 3d 788 (D. Minn. 2022).....................................................................61

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
  2024 WL 2890968 (2d Cir. June 10, 2024) ...............................................................70

*Mediacom Se LLC v. BellSouth Telecomms., Inc.*,
  672 F.3d 396 (6th Cir. 2012) ...............................................................................21

*In re Merck & Co., Inc. Sec. Litig*,
  432 F.3d 261 (3d Cir. 2005)...................................................................................35

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020)....................................................................70

*N. Port Firefighters' Pension-Local v. Fushi Copperweld*,
  929 F. Supp. 2d 740 (M.D. Tenn. 2013) ................................................................53

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  877 F.3d 687 (6th Cir. 2017) ....................................................................4, 66, 67, 69

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................18, 32, 33

*NVIDIA Corp. v. E. Ohman J:or Fonder AB*,
  2024 WL 5058572 (U.S. Dec. 11, 2024) ...............................................................51

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................35, 39

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) .................................................................................50

*In re Omnicare Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) .................................................................................52

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................37, 40

*Padilla v. Cmty. Health Sys.*,
  2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ........................................17, 25, 50

*Pittman v. Unum Grp.*,
  861 F. App'x 51 (6th Cir. 2021) ...........................................................................55

*Plagens v. Deckard*,
  2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ........................................47, 48, 53

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ...................................................................................29

Case 3:23-cv-01250    Document 84    Filed 01/21/25    Page 9 of 85 PageID #: 2865

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ......................................................................................54, 59, 61

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007).........................................................................31, 56

*Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ..............................................................................35

*Quinones v. Frequency Therapeutics, Inc.*,
106 F.4th 177 (1st Cir. 2024).............................................................................................58

*Ret. Sys. of U.S. V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)................................................................................................18

*Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ............................................................................61

*Robeco Capital Growth Funds SICAV v. Peloton Interactive, Inc.*,
2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024).....................................................................16

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Ohio 2007) .......................................................................57, 60

*Ryan v. FIGS, Inc.*,
2024 WL 187001 (C.D. Cal. Jan. 17, 2024) .......................................................................55

*San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024)..................................................................................53

*Shafer v. Lightning eMotors, Inc.*,
2024 WL 691458 (D. Colo. Feb. 20, 2024), *adopted*, 2024 WL 1509166 (D. Colo. 2024)....23

*Shupe v. Rocket Cos.*,
660 F. Supp. 3d 647 (E.D. Mich. 2023)........................................................................43, 44

*Sophia Zhou v. Desktop Metal, Inc.*,
120 F.4th 278 (1st Cir. 2024)..............................................................................................42

*St. Clair Cty. Emps. Ret. Sys. v. Acadia Healthcare Co.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021).................................................................24, 36

*State Tchrs. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*,
2024 WL 3258293 (D. Mass. July 1, 2024).........................................................................61

*Stein v. U.S. Xpress Enters.*,
2020 WL 3584800 (E.D. Tenn. June 30, 2020)..............................................................41, 55

*In re StockerYale Sec. Litig.*,
   453 F. Supp. 2d 345 (D.N.H. 2006)......................................................................66

*Studen v. Funko, Inc.*,
   2024 WL 2209686 (W.D. Wash. May 16, 2024).........................................33, 34, 54

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021)...............................................................................33

*In re Syncor Int'l Corp. Sec. Litig.*,
   239 F. App'x 318 (9th Cir. 2007) .......................................................................59

*In re Target Corp. Sec. Litig.*,
   955 F.3d 738 (8th Cir. 2020) .............................................................................35

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
   83 F.4th 514 (6th Cir. 2023) .............................................................................70

*In re TECO Energy, Inc. Sec. Litig.*,
   2006 WL 845161 (M.D. Fla. Mar. 30, 2006) .......................................................67

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).......................................................................................4, 46

*In re TransDigm Grp., Inc. Sec. Litig.*,
   440 F. Supp. 3d 740 (N.D. Ohio 2020)...............................................................70

*USM Holdings Inc. v. Simon*,
   2016 WL 4396061 (E.D. Mich. Aug. 18, 2016)....................................................30

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ..........................................................................58

*Wanca v. Super Micro Comput., Inc.*,
   2018 WL 3145649 (N.D. Cal. June 27, 2018) ......................................................31

*Washington State Inv. Bd. v. Odebrecht S.A.*,
   461 F. Supp. 3d 46 (S.D.N.Y. 2020)...................................................................34

*Waswick v. Torrid Holdings, Inc.*,
   2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ........................................................20

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ....................................................43

*Winslow v. BancorpSouth, Inc.*,
   2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)...............................................17, 20

x

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ......................................................................................58

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018).....................................................38

**STATUTES AND RULES**

15 U.S.C. § 78t-1(a)............................................................................... *passim*

17 C.F.R. § 229.303(a)-(b)(2)(ii) ...............................................................................45

17 C.F.R. § 240.10b-5................................................................................ *passim*

Fed. R. Civ. P. 12.......................................................................................13, 41, 65

# GLOSSARY

| Term | Description |
|---|---|
| Class Period | May 28, 2020 to August 28, 2024, inclusive. |
| "Complaint" or "SAC" | The Second Consolidated Amended Complaint, filed on October 17, 2024. ECF No. 73. |
| "Defendants" | Defendants Dollar General, Vasos, Owen, Garratt, and Dilts. |
| "Dilts" | Defendant Kelly M. Dilts, current Chief Financial Officer (May 2023 to present). |
| "Dollar General" or the "Company" | Dollar General Corporation. |
| "Executive Defendants" | Defendants Vasos (former CEO), Owen (former COO), Garratt (former CFO), and Dilts (CFO). |
| "FE" or "FEs" | Former employees of Dollar General referenced in the SAC. |
| "Garratt" | Defendant John W. Garratt, former Chief Financial Officer (December 2015 through April 2023) and former President (September 2022 through June 2023). |
| "GAAP" | Generally Accepted Accounting Principles. |
| "Misstatements" | False and/or misleading statements alleged in the Complaint and set forth in Appendix 1. |
| "Mot." | Defendants' Corrected Memorandum of Law in Support of Defendants' Motion to Dismiss, filed as ECF No. 81. |
| "Owen" | Defendant Jeffrey C. Owen, former Chief Operating Officer (August 2019 through November 2022) and former Chief Executive Officer (November 2022 until October 2023). |
| "Vasos" | Defendant Todd J. Vasos, Chief Executive Officer of Dollar General (June 2015 through November 2022, October 2023 through present). |

## INTRODUCTION

This securities class action arises from Defendants' misleading statements to investors about key aspects of Dollar General's business—its inventory and staffing practices. As one of the largest discount retailers in the U.S., Dollar General's business depended on having effective systems and controls to track and account for inventory, and sufficient staffing in stores to receive and manage the inventory. To convince investors that Dollar General had these critical features in place, Defendants repeatedly touted their "efficient management" of inventory and claimed that they "closely monitor[ed] and manage[ed]" inventory balances. They similarly boasted of the Company's "record staffing levels" and "proactive" staffing investments. Defendants' public statements conveyed to investors that Dollar General was efficiently and effectively managing its inventory, had adequate inventory controls in place, and sufficiently staffed its stores.[1]

Defendants' statements were materially misleading. Unbeknownst to investors, Dollar General's inventory management and staffing levels were woefully deficient and not what Defendants represented. As reported by dozens of the Company's own former employees, Dollar General's inventory controls were broken, which caused a massive amount of excess, obsolete, and damaged inventory to build up in stores and distribution centers. At the distribution centers, excess product piled up and shipping trucks waited to be unloaded, with the Company incurring millions of dollars of fees as they idled. As a result, Dollar General would (i) stuff the excess inventory into off-site warehouses, where the Company did not track inventory; (ii) dispose of the inventory without properly accounting for it; and (iii) force ship the inventory to stores that had no need or capacity to store it. At the store level, the piles of inventory were so excessive that they

---

[1] Capitalized terms are defined in the Glossary or the SAC, "¶_" refers to SAC paragraphs, emphasis is added, and internal marks are omitted. The Misstatements are listed in Appendix 1.

overflowed from stockrooms, lined the corridors at stores, and blocked fire exits. As such, the glut of inventory created dangerous and unsafe work conditions, which in turn subjected the Company to a litany of regulatory investigations and ultimately cost the Company millions in penalties for workplace safety violations under the federal Occupational Safety and Health Act (OSHA).

The widespread reports from numerous former Dollar General employees were strikingly consistent: Dollar General's inventory system was a "house of cards" or a "shell game," that was "built on sand," and, like the Titanic, was "going down." Defendants were well aware of these problems—indeed, Dollar General employees emailed them directly to flag the excess inventory chaos plaguing the Company internally. Defendants had their subordinates respond to ensure that the problems were not publicly disclosed.

Defendants exacerbated these severe inventory problems by chronically understaffing Dollar General's stores. Defendants represented publicly that they staffed stores with five or more employees, but former employees reported that the reality inside the Company was far different, as stores were often staffed with just one single worker. Indeed, Defendants' "strategy was to . . . *limit payroll to the bone*," which left employees severely underequipped to deal with the stockpiles of excess inventory clogging stores. Company employees also could not properly price inventory, causing widespread discrepancies between shelf and register prices and costing Dollar General millions more to settle consumer protection actions brought by regulators in multiple states.

The truth concerning Defendants' misrepresentations gradually emerged through a series of corrective disclosures during the Class Period. Yet even as the truth emerged, Defendants concealed the true extent and severity of the problems. By the time the complete truth was fully revealed on August 29, 2024, the Company's share price plummeted to a Class Period low of $84.03 per share and billions of dollars in shareholder value had been erased.

2

Defendants' attacks on these well-pled allegations are meritless. **<u>First</u>**, Defendants argue that none of the 113 Misstatements is actionable, claiming they were not false, were puffery, opinion, or forward-looking, or were covered by purported risk disclosures. But Defendants dispute or ignore the facts pled in the SAC (which are accepted as true here), mischaracterize the Misstatements, and misstate the law. For example, Defendants' assurances that they "efficient[ly] manage[d]" and "closely monitor[ed] and manage[d]" the Company's inventory (Misstatements 1 and 4) were materially misleading statements of fact. In truth, the Company was plagued by excess inventory and lacked internal controls to manage, track, and account for vast amounts of inventory, which led to misreporting and lost, damaged, and outdated product. Similarly, Defendants' claims that the Company had "very robust" staffing levels (Misstatement 77) and "record low store manager turnover" (Misstatement 67) were materially misleading. When these statements were made, the Company's stores were severely understaffed, leading to high turnover rates in store manager positions and regulatory fines for workplace safety violations. The SAC pleads facts establishing that each Misstatement was materially misleading.

Defendants also make scattershot claims that investors purportedly knew the truth about Defendants' misrepresentations. This thinly guised *truth-on-the-market* defense cannot be credited at the pleading stage under controlling Sixth Circuit law. Even if it were not premature (it is), this defense fails on the merits. Defendants repeatedly assured investors that everything was fine and that any issues were being fixed—until the full nature and severity of the problems gradually became clear through a series of disclosures of mounting inventory shrink, damages, and markdowns as well as the need to devote massive spending to remediation. Defendants also ignore that, in response to each of the alleged corrective disclosures, Dollar General's stock price declined precipitously, as surprised investors learned more about the nature and depth of the problems

3

plaguing the Company and scrambled to sell their stock. Investors do not react that way when confronted with information that they already know.

**Second**, Defendants wrongly argue that the SAC fails to plead scienter. To the contrary, the SAC pleads a litany of facts establishing the requisite strong inference of scienter for each Defendant, including based on the non-exhaustive factors of *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001). For example, former employees (FEs) personally emailed Defendants Vasos (CEO), Owen (COO/CEO), and Garratt (CFO) about the Company's excess inventory and staffing problems, including by explaining that its stores were being ***bombarded with merchandise that they did not need***. ¶¶45, 48-49. In response, Defendants had subordinates contact these internal whistleblowers to avoid publicity. *Id*. These allegations, all accepted as true at this stage, show Defendants' knowledge of and access to information contradicting their public representations. Plus, Defendants Vasos and Garratt lined their pockets with over $315 million from suspiciously timed insider trades during the Class Period, which allowed them to profit from stock prices that were artificially inflated by their misrepresentations. ¶¶449-54. Through these and other facts that satisfy the *Helwig* analysis, the SAC holistically pleads an inference of scienter that is cogent and at least as compelling as any innocent inference—which is all that is needed to survive at the pleading stage. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 324 (2007).

**Third**, Defendants challenge loss causation by disputing whether they issued corrective disclosures for any of the Misstatements. Defendants are wrong. The SAC readily satisfies the pleading requirements for loss causation, which do not "impose a great burden." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc*., 877 F.3d 687, 695 (6th Cir. 2017). The SAC details both the corrective information disclosed and the resulting stock price declines. ¶¶455-92. For example, after Dollar General reported declining profits due to "***increased markdowns***," "***increased***

4

*inventory damages*," and "*increased shrink*" on August 29, 2024, the Company's stock price declined by over 32%. ¶¶486-92. Nothing more is required.

**Fourth**, Defendants' remaining challenges also fail. The SAC adequately pleads a Section 20(A) insider trading claim because Defendants traded Dollar General shares while in possession of material non-public information concerning the abysmal internal condition of the Company. The SAC pleads a Rule 10(b)-5(a) and (c) scheme liability claim by alleging that Defendants carried out a scheme to deceive the public about Dollar General's inventory and staffing deficiencies, including through their "deceptive act" of disseminating false assurances about these issues. The SAC also adequately pleads a Section 20(a) control person claim by alleging a predicate violation and culpable control by Defendants.

In sum, Defendants' motion should be denied, and this case should proceed to discovery.

**SUMMARY OF RELEVANT FACTS**

**A.      Dollar General's Operations And Related Public Statements To Investors**

Dollar General is one of largest discount retailers in the U.S. ¶34. During the Class Period, its operations depended on two critical functions: effective inventory management and adequate staffing. ¶37. The Company needed effective systems and controls to track and manage inventory through all levels of its internal supply chain, including the stores where inventory was stocked and sold, as well as the regional distribution centers that warehoused and shipped inventory to stores. ¶¶34, 37. Delays at one level impacted the entire system. ¶59 n.4. It was also important for Dollar General to maintain adequate staffing to ensure that stores had sufficient employees to manage inventory deliveries, store and stock inventory, and price inventory. ¶¶3, 37.

Recognizing these features were critical and topics of keen market focus, Defendants assured investors that Dollar General had effective inventory controls and adequate staffing levels during the Class Period. For example, Defendants told investors that they "*closely monitor[ed]*

5

*and manage[ed] [the Company's] inventory balances*" (Misstatement 1) and touted their "*efficient management of our inventory*" (Misstatement 4). Then, as inventory problems gradually arose, Defendants assured investors that they were "*well ahead of any inventory issues*" and "the quality of our *inventory couldn't be better*" (Misstatement 40).

Defendants also misleadingly touted their staffing practices. They boasted of the Company's "record staffing levels" and "record low store manager turnover" (Misstatement 67), and said they were "proactively" investing in the Company's workforce (Misstatement 63). They further claimed that stores were staffed with five or more employees (Misstatement 62).

### B. Dollar General Suffered From Severe Inventory Control Failures And Chronically Understaffed Its Stores

Contrary to Defendants' statements but unbeknownst to investors, Dollar General's inventory management and staffing levels were woefully deficient and not what Defendants represented. These and other problems are detailed in the SAC based on, among other things, facts reported by dozens of former Dollar General employees who independently reported similar problems while working in different positions at different levels and diverse geographical areas. These former employees described Dollar General's inventory system in strikingly consistent terms: it was a "house of cards" or a "shell game," that was "built on sand," and, like being on the Titanic after hitting the iceberg, was "going down." ¶¶8, 52, 55, 61, 93.

#### 1. Inventory Control Failures

*Excess Inventory at Distribution Centers.* Dollar General's distribution centers suffered from severe inventory control failures. As FE-5 explained, "the Company's distribution centers were being sent 40-50 containers of inventory per day but unloading only 10-20, which meant that they could never catch up" (¶62), causing "*31 football fields worth of trailers* sitting on parking lots with unloaded inventory" (¶52). These failures subjected Dollar General to massive penalties

6

of ***$19 million per month*** (¶52) and ***$50 to $60 million per quarter*** (¶63).

As a stopgap, Dollar General stuffed excess inventory into off-site facilities. ¶¶51, 66, 77. But this exacerbated the inventory problems, as "Dollar General only had WMS [its inventory tracking system] in its distribution centers—but ***not*** in its off-site warehouses." *E.g.*, ¶53. Thus, "the Company simply did not know what was in [these facilities]." ¶67. Even more, distribution center employees routinely failed to enter inventory in the system even when available. ¶85 (FE-13: "in the distribution centers, the product was not properly checked in"). These control failures created a "***vicious circle***," where the Company "kept buying and merchandise kept stacking up outside Company distribution centers." ¶67. The result was untrammeled excess inventory.

***Excess Inventory at the Store Level.*** Dollar General's deficient inventory controls caused stores to be bombarded with excess inventory, which they could not turn away or stock safely. As FE-2 and FE-10 reported, the Company's "automatic" ordering systems caused stores to receive constant shipments of inventory they did not need.[2] Once in stores, "items were not cycled on a first in, first out basis, and this caused product to expire as well as fire code issues." ¶80. These problems were exacerbated by rampant "force-outs," where distribution centers would ship excess inventory "to stores at random" (¶90)—which FEs overseeing hundreds of stores reported was a common practice (¶82) and made stores a "wreck" (¶119). Under Dollar General policy, managers could not turn these deliveries away (¶¶47, 74, 82, 120-24), had no control over inventory management (¶84), and could not "make corrections to the system" (¶80).

As a result, Company stores had excess inventory lining their corridors, covering safety equipment, and blocking egress routes, which created unsafe work conditions and resulted in

---

[2] ¶¶47, 74 (FE-8: Dollar General sent a "blanket order of product to stores regardless of what a store was selling"); ¶80 (FE-10 describing "automatically shipping products regardless of need").

7

Case 3:23-cv-01250    Document 84    Filed 01/21/25    Page 20 of 85 PageID #: 2876

millions of dollars in fines. *E.g.*, ¶80 (FE-10 reporting "disorganized stockpiles of inventory that spilled onto sales floors"); ¶¶81-83 (FE-11, Regional Manager of 246 stores: "***half of them are disasters***," where "excess inventory sat in boxes, piled up, and caused OSHA violations").

These inventory control failures directly harmed the Company's financial performance due to higher "inventory shrink" (*i.e.*, lost or damaged inventory, ¶41 n.1) and "markdowns" (*i.e.*, reduced pricing to move excess, obsolete or unwanted merchandise, ¶2). As Defendants later acknowledged, "any time you have ***too much inventory in the store,*** you've got ***too much shrink and damages***." ¶194. The Company also could not timely move seasonal product into stores, resulting in lost sales and markdowns to fire-sale prices when it arrived months late. ¶¶39, 58, 62.

***Improper Accounting Practices***. Distribution centers did not properly account for the excess inventory, which was not tracked. For example, FE-15 reported that her distribution center alone carried over ***$2 million*** in merchandise not logged in the Company's systems, which the Company simply "force-billed" to stores at random. ¶93. FE-15 described this as the Company's "intentional disregard of compliance with SOX." *Id*. FE-18 reported that the Company lacked accurate means for correcting errant purchase orders for millions of dollars' worth of inventory. ¶101. Further, distribution centers engaged in large-scale disposal of inventory without properly "damaging it" out, *i.e.*, reducing or marking down the value of the inventory in the Company's systems. ¶94. Indeed, they were routinely throwing out tens of thousands of dollars of sellable inventory ***every day*** without properly accounting for the losses. FE-17 reported that a single distribution center destroyed up to $45,000 of inventory ***per day***. ¶99. Other distribution centers reportedly emptied dumpsters of product ***two to four times per day*** without properly damaging out inventory (¶¶89-90), committed "***SOX violation[s]***" through large-scale disposals of sellable inventory (*id*.), "***never properly damaged out***" obsolete merchandise (¶94) and "discarded the

damaged merchandise without performing the proper accounting for it" (¶107).

Yet throughout the Class Period, Defendants touted their purported compliance with GAAP and LIFO accounting and claimed to undertake an "actual valuation" of Dollar General's inventory. ¶¶425-31. GAAP required Defendants to "recognize the difference between the book value and the market value of Dollar General's inventory" during each period when the damage occurred. ¶429 (ASC-330-10-35-1C and ASC-330-10-35-2 standards to value inventory). But, as described above, Defendants had no ability to track excess inventory in off-site facilities or accurately count the "impacted," inaccessible, and un-trackable inventory in its stores. *E.g.*, ¶¶80 n.5, 86-108. Thus, Defendants could not possibly undertake an accurate valuation.

### 2. Chronically Insufficient Staffing Levels

These inventory problems were worsened by Defendants' refusal to invest in Dollar General's workforce—contrary to their representations to investors. As multiple FEs reported, Dollar General's under-staffed and under-resourced stores had too few employees to manage the overflowing excess inventory or even perform basic tasks like adequately stocking or pricing inventory. Because Dollar General "*limit[ed] payroll to the bone*" (¶83), it lacked "enough 'bodies' to get the product onto the shelves" (¶111), so "it was impossible . . . to put away the amount of merchandise required" (¶80) and "stores had no time to correct inventory discrepancies due to the . . . labor shortage" (¶117).

Contrary to Misstatement 62 that stores were operated by five or more employees, FEs reported that "stores would operate with only *one individual*" for extended periods each day (¶¶82, 111), making "it impossible to unpack items, restock shelves, and serve customers at the same time" (¶¶10, 82, 114), and "result[ing] in key tasks like price changes not being performed" (¶111). FE-20, who evaluated *2,500* stores during the Class Period, reported that these understaffing issues impacted "*between 30% and 50% of Dollar General stores*" (¶111).

9

Dollar General's deficient staffing practices overburdened employees, which caused high turnover rates, directly contrary to Defendants' claims of "record low turnover." ¶121. FE-10 said high turnover rates were a "chronic issue," "because store managers would get burnt out" due to understaffing. ¶123. This exacerbated the already unsustainable inventory problems, as "store managers did not have enough time . . . to check for available in-store inventory, and instead simply marked the item as zero, causing the distribution center to send additional inventory." ¶83; *see also* ¶120 (FE-24: excess inventory driven by inaccurate stock counts). These staffing deficiencies also impacted the "barely manned" distribution centers (¶123), which could not handle the excess inventory. *E.g.*, ¶62. As FE-23 explained, "there is *of course a correlation between understaffing and the excess/elevated inventory*." ¶118.

Due to its excess inventory and chronic understaffing, Dollar General faced 128 OSHA enforcement investigations for dangerously unsafe work conditions at the Company's stores, including "repeated fines for failing to have clear paths to fire exits, blocked electrical panels . . . and other damages, and improper stacks of merchandise and over-stocked materials that placed employees at risk of being seriously injured while at work." ¶¶124-43. After over 200 failed inspections, an OSHA Area Director stated: "we can only conclude that [Dollar General] choose[s] to continue exposing their employees to hazardous conditions." ¶137. Dollar General had to pay tens of millions of dollars in fines and penalties to resolve these issues. ¶¶124-42, 441.

### 3. Widespread Pricing Discrepancies

Defendants' labor and inventory control deficiencies also led to widespread discrepancies between the prices charged at the register and those displayed on the shelf. At Dollar General, the prices needed to be updated every week but understaffing stopped that from timely happening. ¶¶83, 111, 147. The resultant overcharging of customers was so pervasive at Dollar General that state Attorneys General imposed millions of dollars in fines, citing a "mountain of evidence" of

pricing discrepancies "that Dollar General simply doesn't care to fix." ¶145 (Ohio AG suit resulting in $1 million settlement); ¶148 (Missouri AG finding deceptive pricing on thousands of items); ¶149 (Wisconsin AG finding customers were overcharged 17% on average; $850,000 settlement); ¶150 (New Jersey regulators imposing $1.2 million penalty).

## C.     Defendants Made Multiple Misstatements To Investors

Contrary to the reality within the Company, Defendants misled investors during the Class Period through multiple misstatements. By way of summary, the Misstatements alleged in the SAC can be grouped into the following four main categories:

> **(1)** *Inventory Misstatements*. For example, Defendants touted their purportedly "efficient management" of inventory (Misstatement 4) and claimed they "closely monitor[ed] and manage[d] inventory balances" (Misstatement 1). This category comprises Misstatements 1 through 61.

> **(2)** *Staffing Misstatements*. For example, Defendants misleadingly claimed that they staffed Dollar General stores with five or more employees (Misstatement 62), they were "proactively investing" in employees (Misstatement 63), and had "record low store manager turnover" and "record staffing levels" (Misstatement 67). This category comprises Misstatements 62 through 78.

> **(3)** *Pricing Misstatements*. For example, Defendants told investors the Company was in a "great position right now with price" (Misstatement 79), would "do whatever we have to do to ensure that we're priced right" (Misstatement 83) and took a "very targeted . . . and surgical approach" to pricing (Misstatement 100). This category comprises Misstatements 79 through 100.

> **(4)** *Misleading Earnings Metrics*, *GAAP and SOX Certifications*. Defendants repeatedly issued misleading financial metrics, including operating profit, net income, gross profit, net sales, inventory turnover, and merchandise inventories (Misstatements 101 through 111). Defendants also made misstatements concerning GAAP compliance (Misstatement 112) and issued misleading SOX certifications (Misstatement 113). This category comprises Misstatements 101 through 113.

## D.     As The Truth Gradually Emerged, Defendants First Denied Reality Then Scrambled To Fix The Problems While Continuing To Mislead Investors

In this case, the truth regarding the existence and severity of Dollar General's inventory and staffing problems gradually emerged over a series of quarterly disclosures. Throughout this

11

period, Defendants continued to misleadingly assure the market—initially by making statements designed to mask and deny the nature and existence of the problems and then, when they could not deny reality any longer, by misrepresenting the severity and scope of the problems.

On December 1, 2022 and February 23, 2023, Defendants reported that Dollar General's 3Q22, 4Q22 and full year results missed expectations. ¶¶152, 158. The price of Dollar General's common stock fell in response to each disclosure. ¶154 (7.56% decline), ¶159 (3.62% decline). Still, Defendants misleadingly assured investors there was no cause for concern, labeling the issues "transitory," "driven by inflation," and not indicative of systemic deficiencies. ¶¶155, 160.

On March 16, 2023, the Company reported that gross profits materially declined due to "increases in inventory shrink, damages and markdowns" (¶162) and that the Company needed to spend an additional $100 million to address staffing in its stores (¶163). This news caused Dollar General's stock price to decline by 2.96% on March 16, 2023, and then another 1.54% on March 17, 2023. ¶166. Defendants continued to reassure investors that "the quality of our inventory is in good shape" and portrayed Dollar General's $100 million in additional spending as a proactive "investment" to "drive greater on-shelf availability"—not to address problems that struck to the core of the Company's business model. ¶¶165-68.

On June 1, 2023, Defendants reported that 1Q22 operating profits were materially down, "increases in shrink, markdowns and inventory damages," and they needed to pull forward more than $40 million of the $100 million investment into the upcoming quarter. ¶¶170-72. In response, Dollar General's stock price plummeted by *19.5% in a single day*. ¶173. Yet Defendants still did not disclose the full truth and continued to mislead investors. For example, they attributed the increased shrink to "cost inflation" and "Winter Storm Elliott" while touting the quality of Dollar

General's inventory. ¶¶174-75. They also assured investors they had a "new structure" that would reduce inventory levels. ¶176.

On August 31, 2023, Dollar General reported a material drop in gross profits as a percentage of sales due to "increased shrink, markdowns, and inventory damages." ¶178. The Company also revealed a *$95 million* loss from excess inventory (¶180(a)), an additional *$50 million* in labor spending (¶180(b)), and another *$25 million* spend on inventory tracking tools (¶180(c)). This caused Dollar General's share price to decline 12% on August 31, 2023, another 5.94% on September 1, 2023, and then another 2.4% through September 6, 2023. ¶184. While investors had a sense that Dollar General faced inventory challenges, Defendants continued to mislead the market about the scope and severity of those issues. ¶182.

On December 7, 2023, March 14, 2024, and May 30, 2024, Defendants disclosed that Dollar's General faced "increased shrink, lower inventory markups, and increased markdowns." ¶¶188, 193, 199. Dollar General's stock price declined in response to each of these disclosures. ¶192 (1.2% decline), ¶198 (5% decline), ¶203 (over 8% decline). Yet Defendants continued to conceal the full extent of Dollar General's ongoing problems. ¶¶190, 195-96, 201.

On August 29, 2024, Defendants finally disclosed that the Company's inventory problems were more severe, far-ranging, and persistent than previously revealed. ¶¶204-05. Contrary to their repeated assurances that the Company's inventory problems were temporary and under control, they *inter alia* admitted that "*now, shrink is a constant battle*." ¶206(f). On this news, the share price *declined a staggering 32%* in a single day on abnormally high trading volume. ¶209.

## LEGAL STANDARDS

On a Rule 12 motion, courts "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) (Trauger, J.). The inquiry is whether Plaintiffs are "entitled to offer

13

evidence to support the claims, not whether the[y] can ultimately prove the facts alleged." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *15 (M.D. Tenn. Dec. 18, 2017) (Trauger, J.).

## ARGUMENT

### I.  THE SAC ADEQUATELY ALLEGES A SECTION 10b-5(B) CLAIM

#### A.  The SAC Pleads Securities Violations Not Mismanagement

To plead a Section 10(b) claim, the plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018).

The SAC readily pleads each element. For example, Defendants repeatedly assured investors that they "closely monitor and manage our inventory balances" and touted their "efficient management of our inventory." ¶¶3, 212, 218. Contrary to those statements, Dollar General's grossly deficient inventory controls caused excess inventory to flood every level of the Company, and Defendants' inadequate staffing compounded their inability to efficiently manage this massive glut of excess inventory. *E.g.*, ¶¶41-108, 109-123, 213. The SAC readily alleges Defendants' scienter, including for example through emails sent directly to Defendants by internal whistleblowers concerning the crippling inventory and staffing problems. *E.g.*, ¶¶45, 48-49, 442-43. And loss causation is shown by the stock price drops and shocked analyst reactions as Defendants incrementally revealed the truth about Dollar General's serious problems. ¶¶455-92.

In response, Defendants sweepingly assert that the SAC alleges only mismanagement. Mot. at 25-27. Defendants are wrong. Here, "because Plaintiff alleges that Defendants intentionally [or recklessly] misled the public, rather than simply made bad business decisions, [p]laintiff has pled more than mere mismanagement." *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381,

14

397-98 (S.D.N.Y. 2022) (misstatements that "relate to corporate mismanagement" are actionable). The SAC challenges Defendants' misrepresentations, not their business decisions. Defendants' boasts about sales, store openings, or stock repurchases (Mot. at 26-27) are irrelevant and ignore the SAC's focus on misrepresentations about inventory, staffing, and related issues.[3]

**B.      The Court Should Credit The Consistent Reports From Former Employees**

Defendants ask the Court to ignore the facts reported by former employees. Mot. at 27-30. Defendants are wrong. Plaintiffs may rely on confidential witnesses where, as here, supporting facts are pled with "sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Bond*, 587 F. Supp. 3d at 667. This showing is made by alleging their "job descriptions and periods of employment, as well as specific allegations regarding how the [former employee] came to possess the information that they did." *Id*. Those facts are amply pled in the SAC. For example, for FE-1, the SAC pleads (i) her role, title, and region; (ii) dates of employment; (iii) the basis for her first-hand knowledge; (iv) the specifics of her email to Vasos, including time frame and contents; and (v) the response to her email, including details of her call with Vasos's secretary. ¶¶44-45. The SAC pleads similar (or more) detail for each of the other FEs.[4] Defendants' sweeping dismissal of the detailed FE reports is belied by the fundamental truth that each FE report both makes sense internally and each one supports and corroborates the others, as they all confirm the same or similar problems.

---

[3] *Bondali v. YUM! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) is inapposite. Here, Defendants expressly touted, *e.g.*, their "efficient management" of inventory (Misstatement 4) and claimed to "closely monitor and manage" inventory (Misstatement 1). Thus, unlike *Bondali*, this case concerns misstatements directly concerning the alleged inventory problems, not mismanagement.

[4] The SAC pleads each FE's job description, period of employment, and sufficiently details the basis of the facts that each FE reported. ¶¶44-123.

Defendants' blanket assertion that the FEs lack "Company-wide knowledge" is incorrect. Mot. at 27. The FE reports detail inventory and staffing problems due to ***Company-wide*** policies and practices. *E.g.*, ¶¶53 (FE-3: The Company lacked WMS in its off-site facilities); 67 (FE-6: Dollar General's off-site facilities lacked Wi-Fi making it impossible to track inventory in WMS); 120 (FE-24: "under ***Dollar General policy***, stores were not allowed to refuse truck deliveries"); 74 (FE-8: "***Dollar General stores*** did not have a process for sending back overallocated merchandise."). Defendants also ignore that multiple FE reports are based on visits to ***thousands*** of Dollar General stores during the Class Period.[5] These are quintessential Company-wide issues. The Company's broad array of regulatory violations further confirms the same reality. ¶¶124-50.

Moreover, Defendants disregard that the twenty-four FE reports are from people who worked at Dollar General in different roles, at different times, and in different geographical regions. ¶¶43-123. Yet their reports are strikingly consistent and, thus, confirm that the problems were in fact Company-wide. These "consistent [FE] accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002). Defendants' contrary assertions impermissibly dispute the facts alleged in the SAC, which cannot succeed at this stage. The FE reports should be credited.

---

[5] *E.g.*, ¶¶110-111 (FE-20 reporting rampant inventory, staffing and pricing problems across ***2,500 different Dollar General stores***); ¶116 (FE-22 reporting "systemic" inventory management failures across ***1,400 Dollar General stores*** in 23 states). Here, the robust FE reports are distinct from the cursory facts provided in Defendants' cases. *C.f. In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. 2020) (FE accounts concerned "a ***tiny fraction***" of defendants' stores); *Robeco Capital Growth Funds SICAV v. Peloton Interactive, Inc.*, 2024 WL 4362747, at *35 (S.D.N.Y. Sept. 30, 2024) (FEs reported "some [sales] staff missed their sales quotas" in only one sales channel "which comprised a minority of total sales" of the company).

16

**The SAC Sufficiently Alleges Defendants' Materially Misleading Statements**

To allege falsity, a plaintiff need only "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Bond*, 587 F. Supp. 3d at 668. "Half-truths"—"representations that state the truth only so far as it goes, while omitting critical qualifying information"—are actionable. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 258 (2024). "[T]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead." *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011); *Padilla v. Cmty. Health Sys.*, 2022 WL 3452318, at *19 (M.D. Tenn. Aug. 17, 2022) ("A speaker must provide the whole truth . . . literal accuracy is not enough."). Here, the Misstatements should be sustained.

In their brief, Defendants launch two categories of attacks that cut across the various Misstatements, which are addressed separately herein. Defendants' misguided arguments on bespeaks caution, opinion, and puffery are addressed *infra* in §I.D. Defendants' incorrect claims that they "never corrected" any alleged Misstatement are addressed *infra* in §II.

### 1. Inventory Misstatements

Defendants misled investors about the efficiency and efficacy of their inventory management. For example, Defendants touted their purportedly "efficient management" of inventory (Misstatement 4) and claimed that they "closely monitor[ed] and manage[ed] inventory balances" (Misstatement 1). In truth, Defendants' inventory management practices were woefully deficient, which caused massive inventory buildup that they did not track, properly account for, or efficiently manage. For example, the Company had "***31 football fields of trucks***" and "***10,000 trailers***" full of excess inventory it could not unload, causing "***$19 million a month***" in shipping penalties and a battery of problems for stores and distribution centers. ¶52 (FE-3). These facts rendered the Misstatements misleading.

17

Courts have repeatedly sustained similar inventory misstatements. *E.g.*, *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *1 (S.D. Ohio Sept. 27, 2021) (defendants' statements that they "were able to offer reliable, trackable inventory" were misleading by failing to disclose "inventory management and tracking problems"); *Emps.' Ret. Sys. of U.S. V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (sustaining misstatements that Defendants had "appropriate inventory levels" where "inventory was decidedly not at appropriate levels"); *Novak v. Kasaks*, 216 F.3d 300, 312, 315 (2d Cir. 2000) (sustaining misstatements that inventories were "under control," "in good shape," and at "reasonable" or "expected" levels).

Defendants' attacks are meritless. **<u>First</u>**, they claim that the SAC does not allege facts showing falsity. Mot. at 40-41. This is wrong. The SAC details the reasons why each Misstatement was misleading, including by identifying the material facts omitted. ¶¶210-438. For example, Misstatement 1 that Defendants "closely monitor[ed] and manag[ed] inventory" was misleading because they "failed to 'closely monitor and manage' Dollar General's inventory" and omitted their inability to "track the vast amounts of excess inventory," which caused excess inventory to flood the Company. ¶¶212-13. Misstatement 4 touting Defendants' "efficient inventory management" was misleading because Defendants "failed to manage . . . inventory efficiently" and "allowed the Company to be clogged with a massive glut of excess inventory." ¶¶214-15. Misstatement 38 touting Defendants' purported "data-driven inventory management" was misleading because they caused the massive excess inventory buildup, sent inventory to stores without regard for demand or need, and could not even track off-site inventory. ¶¶274-75.

In truth, Defendants concede that falsity facts *are* pled by arguing that those facts are too similar despite changed circumstances. Mot. at 40-41. But this is a red herring. Defendants ignore that the excess inventory and related issues existed through the entire Class Period: (i) multiple

former employees confirmed these problems from 2020 through 2023;[6] (ii) Defendants' settlement with OSHA confirms their existence in July 2024 (¶¶139-42) (after Defendants' last Misstatements on May 30, 2024); and (iii) Defendants admitted on August 29, 2024 that the excess inventory problems continued and would remain "constant battle" into 2025 (¶206(f)).[7]

Defendants also complain that the SAC uses the word "glut" without defining it. Mot. at 41. The definition of "glut" is well-established to be "an excessive quantity,"[8] which accurately describes the problems at Dollar General. The SAC alleges in great detail the excess inventory build-up at each level of Dollar General's supply chain, offers specific examples, and even provides particularized quantities to gauge its massive size. *E.g.*, ¶52 (FE-3: the Company had "*31 football fields worth of trailers*"—an estimated 10,000 trailers—"costing the Company *$19 million a month* in detention fees"); ¶93 (FE-15: one distribution center had over *$2 million* in excess inventory not logged in the WMS). Further, the FEs explained that the Company could not account for or track the massive excess inventory flooding its supply chain—and had to spend hundreds of millions of dollars to try to fix the problem. ¶¶53, 59-69, 85, 179. Thus, the meaning of "glut" is well-pled in the SAC and further detail regarding its size must wait for discovery.

**Second**, Defendants argue that Misstatements 59, 60, and 61 touting reductions in inventory levels were true. Mot. at 41-42. But these statements were misleading "half-truths that omitted critical qualifying information." ¶¶308, 312. Defendants used these statements to reassure investors that the inventory problems were purportedly diminishing—only to later admit that was

---

[6] *E.g.*, ¶¶110-11 (FE-20: inventory problems across "upwards of 2,500 stores . . . from 2020 to 2023"); ¶74 (FE-8: from August 2021 through July 2023, "deficiencies with Dollar General's inventory management process" caused "inventory levels [to rise] more than 20%"); ¶108 (FE-23: during tenure through December 2023, "stores she oversaw suffered from excess inventory").

[7] Given these facts, it is irrelevant that no FE worked at the Company in May 2024. Mot. at 42.

[8] *Glut*, Merriam-Webster at https://www.merriam-webster.com/dictionary/glut (last visited January 21, 2025).

untrue, and the problems were more severe. The law is clear that half-truths are actionable, *Moab Partners, L.P.*, 601 U.S. at 258, as a misstatement is not measured by "literal truth, but by its ability to accurately inform rather than mislead." *Winslow*, 2011 WL 7090820, at *16.

**Third**, Defendants argue that Misstatements 38 and 44 touting the Company's "data-driven inventory management" were true. Mot. at 42. But contrary to Defendants' argument, the SAC *does* plead that Defendants were not using data-driven inventory management. For example, FE-8 reported that Defendants were ***not*** "using sales data specific to each store" but were "***blindly sending***" inventory to stores through "***automatic[]***" "***blanket***" ordering. ¶74. Other FEs reported that Defendants did not track inventory in off-site facilities, so they lacked "data" for vast amounts of inventory. ¶¶50, 66-68.[9] Thus, it was misleading to tout "data driven" inventory management.

**Fourth**, Defendants dispute their inability to track inventory in off-site facilities, arguing that FE-3 and FE-6 did not work at Dollar General for the entire Class Period. Mot. at 42-43. This is meritless. These FEs reported that Dollar General could not track off-site inventory in 2022 and 2023. ¶¶53, 66-68.[10] Those reports, along with the other facts in the SAC, such as the OSHA penalties (¶¶124-43) and Defendants' 2024 admissions of continued inventory problems (¶¶204-09), show that Dollar General lacked this ability throughout the Class Period. These facts must be accepted as true and all inferences drawn in Plaintiffs' favor. *Bond*, 587 F. Supp. 3d at 670. Defendants improperly ask the Court to adopt their unsupported claim that the problems magically

---

[9] Defendants' reliance on *Waswick v. Torrid Holdings, Inc.* is misplaced as that case held that touting a "data-driven approach" was actionable where the defendants "did not use a data-driven approach," which is exactly the allegation here. 2023 WL 9197563, at *4 (C.D. Cal. Dec. 1, 2023).

[10] At minimum, Defendants' concession that these allegations are pled between May 2022 and June 2023 necessitates denial of their Motion as to Misstatements 34 through 53.

disappeared, which cannot be credited here. *Mediacom Se LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (courts must avoid "crediting the defendant's . . . version of facts.").[11]

In any event, Defendants ignore that each of the alleged inventory Misstatements was misleading for additional reasons. As FE-5 reported, "Dollar General's distribution centers failed to log on-hand inventory in the Company's WMS inventory management system," (¶60), which multiple FEs confirmed was a widespread problem preventing the Company from properly tracking, managing, and accounting for inventory. *E.g.*, ¶66 (FE-6); ¶85 (FE-13). Defendants do not (and cannot) dispute that these facts were omitted from their inventory misstatements.

Next, Defendants mischaracterize the "tracking failure" allegations as only "temporary delay[s]" and dispute their materiality. Mot. at 43. Both attacks fail. The SAC does not allege that the Company merely "delayed" entering off-site inventory into the WMS, but rather that it was not tracked at all. *E.g.*, ¶¶53, 67. Defendants' claim that FE-5 and FE-13 described "occasional delays" is belied by the SAC. ¶¶60 (FE-5: "failed to log on-hand inventory" in WMS), 85 (FE-13: "failure to perform physical inventory counts"). Defendants cannot prevail by mischaracterizing the facts alleged in the SAC, which are accepted as true. *Bond*, 587 F. Supp. 3d at 670.

Defendants' materiality challenge is factually and legally wrong. The SAC alleges that Dollar General had "*31 football fields worth of trailers*" of excess inventory "costing the Company *$19 million a month*" in detention fees (¶52) and *$50 to $60 million* in a single quarter (¶63). On August 31, 2023, Defendants were forced to disclose a *$100 million inventory loss*, plus $70 million more in expenses to address the inventory problems. ¶179. These amounts materially impacted key financial metrics—for example, the "operating profit headwind of $170 million in

---

[11] *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2024 U.S. Dist. LEXIS 179887 (N.D. Cal. Oct. 2, 2024) is inapposite—unlike here, it involved events occurring months after alleged misstatements which could not show they were knowingly false when made.

the second half of 2023" (¶¶179, 180(d)) represented over *11.8%* of the Company's first half 2023 operating profits of $1.43 billion. ¶170 (1Q23 operating profit of $740.9 million), ¶178 (2Q23 operating profit of $692.3 million). Thus, Defendants are factually incorrect. Their attack is legally misguided because materiality is an "inherently fact-specific" issue unripe for resolution on the pleadings. *Cardinal Health*, 2021 WL 4397946, at \*4.

Defendants also argue that Misstatements 15, 20, 31-34, 36-3, and 52 deal only with "in-stock" inventory positions unrelated to the tracking failures. Mot. at 43. Not so. In each of these alleged Misstatements, Defendants broadly touted the Company's inventory management and financial performance.[12] These representations were misleading given the Company's undisclosed inability to track excess inventory. *E.g.*, ¶¶243, 250, 267, 270, 275, 298.

**Fifth**, Defendants argue that their Misstatements 8, 11, 13, 15, 18, 23, 24, and 27, which touted the efficiency of the Company's inventory distribution systems, were literally true. Mot. at 44-45. This argument fails. These Misstatements are actionable half-truths that omitted critical facts, such as that Dollar General's bloated supply chain failed to timely deliver inventory to stores, resulting in lost sales and diminished profits from marking down obsolete inventory. ¶¶58, 62; *see also* ¶39 (profits from seasonal merchandise declined throughout Class Period). Defendants did not disclose *these* facts. Nor can they show these Misstatements were literally true. They point to Dollar General's higher sales when these Misstatements were made (Mot. 44), but that shows only

---

[12] Defendants touted their "overall inventory levels" and "overall quality of our inventory" (Misstatements 15 and 20), their "reduction[s] in inventory shrink" and "lower markdowns" (Misstatement 31), claimed that higher in-stock levels were "driving sales" (Misstatement 32), were the product of having sufficient staffing to manage inventory (Misstatement 33) and would "drive strong top line performance" (Misstatement 34) and "strong sales results" (Misstatement 36), and touted "progress on working down the non-consumable inventory" (Misstatement 52).

that the Company sold more than the prior year, not that their distribution systems operated efficiently. Defendants at most raise factual disputes inappropriate for resolution at this stage.

**Sixth**, Defendants argue in a footnote that the SAC "do[es] not allege any facts about inventory quality." Mot. at 44, n.34. Defendants are wrong. The SAC alleges that "the quality of the Company's inventory was ***not*** in 'good shape'" (¶275) but rather had material amounts of excess, obsolete or unwanted merchandise that harmed the Company's financial performance. ¶10 (Dollar General's "practices left the Company's distribution centers and stores with ***tens of millions of dollars' worth of . . . damaged inventory***"). Defendants' omissions "rendered misleading [their] statements about . . . the overall quality of Dollar General's inventory." ¶250.

**Seventh**, Defendants assert that the SAC turns "generic" COVID-related "supply chain problems" into securities fraud. Mot. at 44. This is incorrect. The SAC alleges detailed facts reported by two-dozen former employees concerning Company-wide inventory control failures and ensuing problems about which Defendants misled investors during the Class Period. These facts are further confirmed by multiple regulatory investigations, fines, and penalties. Defendants' blanket factual disputes cannot be credited and their authorities are inapposite.[13]

**Eighth**, Defendants mischaracterize certain inventory Misstatements as purportedly "accounting" statements. Mot. at 21, n.12.[14] These Misstatements deal broadly with inventory management and touted the purported success of Dollar General's inventory controls, such as "reduction in inventory shrink" (Misstatement 14), "improving [] in-stock position" (Misstatement 15), "overall [inventory] quality" (Misstatement 20), and their "strong inventory position"

---

[13] *Shafer v. Lightning eMotors, Inc.*, 2024 WL 691458, at *12 (D. Colo. Feb. 20, 2024), *R&R adopted*, 2024 WL 1509166 (D. Colo. 2024) (there, unlike here, the plaintiff failed to establish falsity); *In re Enovix Corp. Sec. Litig.*, 2024 WL 349269, at *12 (N.D. Cal. Jan. 30, 2024) (same).

[14] This includes Misstatements 3, 6, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 29, 30, and 33.

(Misstatement 23). These Misstatements were misleading due to the rampant undisclosed inventory management problems, excess inventory, and because they did not accurately report inventory levels, which the Company could not accurately track. ¶223. *See infra* §I.C.1.

### 2. Staffing Misstatements

Defendants misled investors about the sufficiency of Dollar General's staffing levels and practices. For example, Defendants told investors that Dollar General stores were staffed by at least five (5) employees, including "a store manager, one or more assistant store managers, and three or more sales associates." Misstatement 62. They also claimed to be "proactively . . . investing" in their workforce (Misstatement 63), resulting in "record low store manager turnover" and "record staffing levels" (Misstatement 67).

In reality, contrary to Misstatement 62, "Dollar General stores would operate with only *one individual*" for extended periods each day. ¶¶82, 111. Indeed, "the Company's strategy was to . . . *limit payroll to the bone*" (¶83), which left distribution centers "barely manned" (¶123), "stores [with] no time to correct inventory discrepancies due to the Company's labor shortage" (¶117), and "caused *high turnover rates*" (¶121). These omitted facts rendered Defendants' staffing Misstatements materially misleading.

Courts frequently sustain similar misstatements. *St. Clair Cty. Emps. Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *4 (M.D. Tenn. Jan. 20, 2021) (sustaining misstatements regarding the "adequacy of staffing at [the defendant's] facilities" because "Defendants failed to disclose that [the Company] was understaffing facilities"); *Grae*, 2017 WL 6442145, at *3 (sustaining misstatements concerning staffing levels where the defendants failed to disclose "insufficient staffing levels" and "issues with staff turnover").

Defendants' disputes fail. **First**, Defendants argue that the SAC does not allege "tailored" facts rendering each Misstatement misleading. Mot. at 49. Defendants are wrong. Each alleged

24

Misstatement is followed by a paragraph specifically detailing the reasons it is misleading and the material facts that Defendants omitted.[15] Defendants improperly dispute the facts.

**Second**, Defendants argue that Misstatement 62 claimed that "typical" Dollar General stores were operated by five or more employees, but not all. Mot. at 49. Defendants miss the point. The SAC pleads facts showing that Company stores were typically not operated by a 5-plus team, but by only *one individual*, which impacted *up to 50% of Dollar General stores*. ¶111. Defendants also argue that FE-21 admitted that her store "employed" seven employees. Mot. at 49. This is sleight of hand. Defendants' representation was not that 5-plus teams were "*employed*" by stores— but rather that they "*operated*" the stores. ¶314; Misstatement 62. Also, FE-21 stated that the Company did not allow "enough hours for a store to properly function." ¶114. Defendants' mischaracterization of their misstatement and FE-21's report cannot suffice. At most, Defendants raise a factual dispute to be explored in discovery.

**Third**, in a footnote, Defendants claim that they made no "affirmative statements about workplace safety." Mot. at 49 n.38. Defendants again miss the point. The Company's excess inventory and staffing problems *caused* the workplace safety violations. *E.g.*, ¶¶111, 124. Defendants omitted the truth that the OSHA violations resulted from these problems, which made the inventory and staffing Misstatements actionable half-truths. *Padilla*, 2022 WL 3452318, at *6.

**Fourth**, Defendants argue that Misstatement 67 regarding Defendants' purported investments in employees, record low turnover, and record staffing levels was "objectively true." Mot. at 50. Defendants ignore that their half-truths are actionable. *Padilla*, 2022 WL 3452318, at

---

[15] *C.f., e.g.*, ¶314 (Misstatement 62 claiming stores were operated by teams of 5+ employees) *with* ¶315 (Defendants failed to disclose they "chronically understaffed Dollar General stores . . . by staffing them with only one individual during the day"); *compare* ¶327 (Misstatement 67 touting "record low store manager turnover" and "record staffing levels") *with* ¶328 (Defendants did not disclose that "chronically understaff[ing] Dollar General stores" led to "high employee turnover").

*17-18. They failed to disclose the chronic understaffing and related problems reported by multiple FEs (¶324), which caused a "***labor shortage***" (¶123 (FE-19)) and "***high turnover rates***" (¶121 (FE-24)). Defendants do not argue otherwise. Defendants also are wrong that the SAC does not tie the high turnover to store managers. In truth, FE-24 and FE-10 directly connected high turnover to store management. ¶121 (FE-24: "high turnover rates in Dollar General store management positions"); ¶123(a) (FE-10: "the Company had a chronic issue with turnover [of] store managers"). Again, Defendants simply dispute the SAC.

**Fifth**, Defendants argue that Misstatements 71 and 77, in which Defendants touted "investing" in employees, were true because Dollar General won a training award, offered bonuses and paid leave, instituted COVID protections, and raised wages. Mot. at 50-51. But Defendants disregard the reports from multiple former employees that Defendants cut "payroll to the bone" (FE-11, ¶83), the Company lacked the people and payroll to get stores stocked efficiently (FE-20, ¶111), Defendants imposed hours restrictions (FE-21, ¶114), and stores suffered from chronic understaffing (FE-24, ¶119). Defendants also ignore other misleading parts of Misstatement 77 claiming the Company's "staffing levels [were] very robust" and had "great success hiring the talent we need." ¶344. Yet again, Defendants cannot secure dismissal by disputing or ignoring the facts alleged in the SAC, which are accepted as true at the pleading stage.

### 3.  Pricing Misstatements

Defendants misled investors concerning Dollar General's pricing practices. For example, Defendants told investors the Company was in a "great position right now with price" (Misstatement 79) and took a "very targeted" and "surgical approach" to pricing (Misstatement 100). In reality, the Company's chronic failures to adequately staff stores caused "huge" price discrepancies because "with staffing and payroll issues, the prices were not changed in a timely manner at Dollar General." ¶¶83, 147. The Company also faced regulatory penalties due to

26

"widespread discrepancies between the price . . . customers were charged at the register and the price displayed on the shelf" at stores. ¶¶144-50.

Defendants' attacks fail. **First**, Defendants argue that the pricing discrepancies were "sporadic" issues and not Company-wide. Mot. at 53. The SAC proves otherwise, as it sets forth detailed factual allegations, based both on multiple FE reports (¶¶83, 147) and extensive regulatory findings (¶¶145-50), that these problems were systematic and Company-wide, not sporadic.

**Second**, Defendants claim that these statements concerned "overall pricing" relative to competitors, and not how "shelf pricing compared to register pricing." Mot. at 53. Defendants are wrong. Defendants chose to speak to investors about pricing and even directly referred to shelf pricing. *E.g.*, ¶384 (Misstatement 97: "we . . . provid[e] [customers] with the shelf pricing they can count on every day"). When doing so, Defendants omitted that the Company had widespread discrepancies between shelf prices and the prices customers were charged, which caused customers to be overcharged and resulted in regulatory penalties. ¶¶83, 144-50. That is misleading. There is no "mismatch," the omitted facts relate directly to the misstatements—they are all about pricing.

**Third**, Defendants say Misstatement 97 claiming that the Company provides "shelf pricing [customers] can count on every day," or they will swiftly correct it, was true. Mot. at 53. This is wrong. For example, the SAC pleads the widespread shelf pricing discrepancies (¶¶83, 144-50, 384) as well as the Ohio Attorney General's finding that "[t]here's a mountain of evidence showing that Dollar General simply doesn't care to fix the issue." ¶145. Defendants also are wrong that none of the FEs have "Company-wide insight" into the pricing issues. *E.g.*, ¶147 (FE-11: pricing discrepancies were discussed on Company calls and known to regional directors). Plus, regulatory actions in eight different states show these problems were Company-wide. ¶¶145-50.

27

#### 4. Materially Misleading Earnings Metrics And Related Misstatements

The SAC alleges that Misstatements 101-111 misrepresented Dollar General's financial metrics, including operating profit, net income, gross profit, net sales, inventory turnover, and merchandise inventories. The SAC also alleges that, contrary to Defendants' statements, the Company's financial statements did not comply with GAAP (Misstatement 112) and Defendants issued misleading SOX certifications (Misstatement 113). The SAC explains that these statements were misleading due to Dollar General's systematic failures to track and account for vast amounts of inventory, which prevented the Company from performing an accurate valuation based on true inventory levels. ¶¶391-424 (earnings metrics); ¶¶425-31 (GAAP violations); ¶¶432-35 (SOX certifications). Financial metrics are actionably misleading where, as here, they fail to disclose material facts. *In re CBL & Assocs. Props., Inc. Sec. Litig.*, 2022 WL 1405415, at *31-32 (E.D. Tenn. May 3, 2022) (sustaining misstatements where "reported revenues are partly attributable to the wrong source, *i.e.*, a fraudulent scheme rather than its legitimate business practices").

Defendants' attacks fail. **<u>First</u>**, they contend that the misleading earnings metrics (Misstatements 101-111) are "accurate historical data." Mot. at 32-33. Defendants are wrong. The earnings metrics were ***not*** accurate, including because (i) they were based on inventory valuations that were necessarily incorrect due to Dollar General's inability to track vast amounts of inventory; and (ii) employees routinely disposed of inventory on a large-scale basis without properly accounting for it by accurately "damaging it out" or writing it down. ¶¶394-424. Defendants are wrong to claim that "no FEs" reported that the WMS was the "exclusive mechanism" for tracking inventory. Mot. at 33. For example, FE-6 stated that "***the WMS was the only way*** to create visibility into what inventory the Company had in store" and the inventory "unloaded into the warehouses was not accounted for." ¶67. Coupled with the other FEs who reported that the

28

Company did not track inventory at off-site facilities (*e.g.*, ¶¶53, 60, 85), the SAC adequately alleges that Defendants' earnings metrics were materially misleading.

Defendants sweepingly claim that "none of the FEs address . . . accounting or disclosure policies." Mot. at 33. This is flatly incorrect. Multiple FEs explicitly reported that Dollar General was not properly accounting for inventory. For example:

- FE-14 recounted product being thrown away without proper accounting (¶89);

- FE-15 reported intentional disregard of SOX compliance and improper "damag[ing] out" of inventory (¶94);

- FE-17 described "dumpsters full of un-accounted for merchandise" being removed daily (¶99);

- FE-18 recalled "thousands of improperly accounted for" purchase orders for "millions of dollars' worth of merchandise" (¶¶101-102); and

- FE-19 and FE-23 stated that the Company failed to properly "damage out" and write down inventory (¶¶107-108).

At bottom, Defendants' earnings metrics were misleading because they inaccurately and materially understated the Company's losses from excess inventory. *Cardinal Health*, 2021 WL 4397946, at *2 (earnings guidance was materially misleading where it failed to accurately reflect "debilitating inventory management and tracking problems" and "excess, obsolete, expired, missing and unaccounted-for inventory in its warehouses"). Because the metrics were themselves inaccurate, Defendants' cases are inapposite, including *Kolominsky v. Root, Inc.*, which concerned "[t]he disclosure of ***accurate*** historical data." 100 F.4th 675, 686 (6th Cir. 2024); *see also Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S,* 11 F.4th 90, 98-100 (2d Cir. 2021) ("***accurately*** reported" metrics); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2016), *aff'd* 731 F. App'x 35 (2d Cir. 2018) ("plaintiffs ***d[id] not contest the accuracy*** of" metrics).

**Second**, Defendants assert that the SAC fails to allege GAAP violations, claiming that no FE has knowledge about how Dollar General operated its accounting policy. Mot. at 34.

Defendants are wrong. As noted above, multiple FEs reported that Dollar General failed to properly "damage out" or write down inventory, including destroyed inventory, so it was not valued properly. ¶¶89-108. Under GAAP, Defendants were "required to (but did not) recognize the difference between the book value and the market value of Dollar General's inventory as a loss . . . when faced with evidence that the sale value of the inventory . . . will be less than cost." ¶429. "Where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading." *Bond*, 587 F. Supp. 3d at 662.

Defendants also claim that any improperly discarded merchandise would "subsequently be accounted for as shrink." Mot. at 34. This argument rests on the assumption that Defendants *were* properly accounting for inventory—the opposite of what multiple former employees reported in the SAC. Thus, Defendants disregard the law requiring the SAC's allegations to be assumed true and all inferences drawn in Plaintiffs' favor. *Bond*, 587 F. Supp. 3d at 667.

**Third**, contrary to Defendants' claim (Mot. at 35), the amounts of unaccounted inventory were material. ¶93 (FE-15 reporting *$2 million* in inventory not logged into WMS at single distribution center); ¶99 (FE-17: distribution center reportedly destroyed up to *$45,000 per day* without properly accounting for it). Defendants argue this was immaterial compared to Dollar General's $5 billion-plus inventory balance—but that is not the relevant comparator. The proper comparator is operating profit, which was materially impacted by the inventory problems as Defendants admitted. For instance, on August 31, 2023, Defendants announced "*an incremental operating profit headwind* of up to *$170 million* in the second half of 2023" (¶¶179, 180(d)), which represented over *11.8%* of the Company's first half 2023 operating profits. ¶¶170 (2Q23 operating profit of $740.9 million), 178 (2Q23 operating profit of $692.3 million). Defendants' case, *USM Holdings Inc. v. Simon*, is inapposite. 2016 WL 4396061, at *5-6 (E.D. Mich. Aug. 18,

2016). There, a $4 million accounting error was immaterial to the sale of a $300 million company—a 2% discrepancy that fell well below the SEC's "5% rule of thumb for assessing the materiality of accounting discrepancies." *Id.* at *5. Here, the $170 million headwind (11% of second half FY2023 profits) far exceeds that 5% threshold. Plus, the SAC pleads ***qualitative*** facts showing Defendants' misrepresentations were critical to investors, which *Simon* held supports materiality regardless of amount. *Id.* ("[E]ven relatively small financial errors can be material."); *Helwig*, 251 F.3d at 563 ("Materiality is about marketplace effects, not just mathematics.").

**Fourth**, Defendants argue that their misleading SOX certifications (Misstatement 113) are not actionable because they lacked "actual knowledge" of falsity. Mot. at 35. But the SAC explains in great detail how Defendants were informed of the excess inventory and control failures that Plaintiffs allege rendered their certifications misleading. *See supra* §I.C.4; *see also In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *42 (M.D. Tenn. Mar. 31, 2009) (SOX certification claims actionable based on former employee allegations that defendants knew of "structural deficiencies"); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (signed SOX certifications "provide evidence either that [defendant] knew about the improper accounting practices or, alternatively, knew that the controls [defendant] attested to were inadequate"). Unlike *Wanca v. Super Micro Comput., Inc.*, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018) (cited in Mot. at 35), Defendants here had actual knowledge that their certifications were misleading.

### D.    Defendants' Remaining Challenges To The Misstatements Fail

#### 1.    The Misstatements Are Not Inactionable Puffery Or Optimism

Defendants argue that certain Misstatements are inactionable puffery. Mot. at 37-40 (inventory), 48-49 (staffing), 52 (pricing). Defendants are wrong. "[C]orporate self-praise must be evaluated in context to determine if [it] convey[s] more than just a generalized optimism." *Bond*, 587 F. Supp. 2d at 670. "What might be innocuous puffery or mere statement of opinion standing

alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce [investor] reliance." *Grae*, 2017 WL 6442145, at *15. Sixth Circuit courts "proceed cautiously" before dismissing statements as "puffery." *Cardinal Health*, 426 F. Supp. 2d 688 at n.70. Here, none of the Misstatements constitute immaterial puffery.

### a. The Inventory Misstatements Are Not Puffery

Defendants fail to show that the inventory Misstatements were puffery. **First**, Defendants argue that Misstatements concerning Dollar General's ability to "closely monitor and manage our inventory balances," "efficient inventory management" and "sufficient inventory levels" were puffery. Mot. at 37-38; Misstatements 1, 2, 4, 5, 39. Defendants are wrong. "Given the central importance of inventory management to [a retail] business," statements regarding the "implementation of an effective inventory management system and supply chain" are not immaterial puffery. *E.g.*, *Cardinal Health, Inc.*, 2021 WL 4397946, at *7; *see also Novak*, 216 F.3d at 315 (statements that the company's inventory was "in good shape" or "under control" were not puffery); *Buhrke Family Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 337 (S.D.N.Y. 2024) (courts "decline[] to excuse as puffery specific representations about . . . the status of inventory"). Here, the inventory Misstatements were material because they "were built around a core contention that was factual and definite in nature: the claim that the [inventory systems] *actually worked*—and did so on a scale that was capable of translating into" the Company's successful performance. *Bond*, 587 F. Supp. 3d at 670.[16]

**Second**, Defendants argue that their Misstatements touting Dollar General's business model are puffery. Mot. at 38; Misstatements 28 ("we've never felt better about the business

---

[16] *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir. 2009) is inapposite. There, the Second Circuit rejected generic statements about risk management and integrity of risk controls that are nothing like the Misstatements here.

32

model") and 54 ("the fundamentals of this business are absolutely unchanged and this model remains strong"). Not so. Statements about a company's "business model" are material where, as here, they fail to disclose important "fact[s] that ***would call into question the viability*** of the defendant's business model." *Grae*, 2017 WL 6442145, at *17. Here, the Misstatements touted Dollar General's business model and contained assurances about the Company's inventory management, among other issues of vital importance to investors. That is not mere puffery.[17]

**Third**, Defendants argue that their assurances concerning "inventory quality" and "inventory levels" are mere puffery, including "[w]e were well ahead of any inventory issues that may pop up" and "[t]he quality of our inventory couldn't be better." Mot. at 39; Misstatement 13, 15, 40, 47, 58, 60. Again, given inventory's importance to Dollar General's operations, these statements were not mere puffery. *E.g.*, *Novak*, 216 F.3d at 312 (statements that inventory situation was "in good shape" not puffery); *Buhrke Family Revocable Tr.*, 726 F. Supp. 2d at 337 (representations about "the status of inventory" not puffery).[18]

Defendants claim they can escape liability because certain Misstatements began with "we feel" or "we believe." Mot. at 39. Defendants are wrong. The law is clear that "appending 'we believe' or 'we think' does not . . . render statements non-actionable." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019). Defendants' own case, *Studen v. Funko, Inc.*, holds that "feel good monikers" will be misrepresentations where they give a "misleading impression of a state of affairs that differed in a material way from" reality. 2024

---

[17] Defendants' cases are inapposite. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (puffery that "partner-centric business model has been successful" did not omit material facts—unlike here); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (puffery that "revenue and earnings growth outlook remains positive" had no context showing materiality and did not omit material facts—unlike here).

[18] Defendants claim Misstatement 28 concerned inventory levels, but it states "we've never felt better about the business model" (¶262), which is not inactionable puffery as described above.

WL 2209686, at *15 (W.D. Wash. May 16, 2024). This is true here, as detailed in the SAC.

**Fourth**, Defendants argue that Misstatement 31 that the Company was "well positioned" was puffery. Mot. at 39. But Defendants misleadingly cite only part of Misstatement 31, which in full claimed there was "***meaningful improvement in our in-stock levels***," they expected "continued improvement," and, thus, they were "***well positioned to serve our customers with the products they want and need***." ¶265. In context, Defendants assured investors that their inventory systems and supply chains were effective and, specifically, that Dollar General "meaningful[ly] improve[d]" inventory levels. These specific assurances that explain ***why*** the Company was "well positioned" based on assertions of present or historical facts are not puffery. *Cardinal Health, Inc.*, 2021 WL 4397946, at *2; *c.f. IBEW Local 697 Pension Fund v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 623 (S.D. Ohio 2011) (cited in Mot. at 38) (statement that "we do believe that our brands are very strong and that we are very well positioned with respect to our assortment, our inventory levels and expense discipline" lacked context that supports materiality here).

**Fifth**, Defendants argue that their assurances about being, for example, "***on track*** in our [inventory] reduction efforts" were immaterial "feelings and beliefs." Mot. at 40; Misstatements 55, 57. In truth, these statements responded to analyst questions (¶¶302-03) and were designed to reassure investors about "specific risks" concerning critical inventory management issues. Thus, these statements "cannot be dismissed as mere puffery." *Washington State Inv. Bd. v. Odebrecht S.A.,* 461 F. Supp. 3d 46, 73 (S.D.N.Y. 2020); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284-85 (E.D.N.Y. 2023) (misstatements answering analyst questions not puffery). Defendants also argue these Misstatements were not misleading (Mot. at 40), but ignore the SAC's allegations that they failed to disclose the excess inventory problems were ***not*** "on track" to resolution (¶304), as would only be revealed at the end of the Class Period. ¶¶486-91.

34

Case 3:23-cv-01250   Document 84   Filed 01/21/25   Page 47 of 85 PageID #: 2903

**Sixth**, Defendants assert that Misstatements touting the Company's supply chain are puffery, including "the initiatives we have in place have allowed us to get the products in and out of the supply chain and the distribution center fast" and "we are pleased to have the storage capacity constraints largely behind us." Mot. at 40; Misstatements 10, 12, 48. For retailers like Dollar General, Misstatements about "an effective inventory management system and supply chain [are] important" to investors and not puffery. *Cardinal Health, Inc.*, 2021 WL 4397946, at \*7; *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) ("investors would have wanted to know that . . . inventory had swollen to unusual levels").

Defendants ignore the context of these Misstatements, which further reinforces their materiality. Misstatements 10 and 12 were made in response to analyst questions about supply chain "challenges" (¶230) and "opportunities" (¶236)—reflecting that the market viewed them to be material. Defendants made Misstatement 48 in the context of falsely blaming the inventory problems on Winter Storm Elliot, underscoring both materiality and falsity as it misleadingly signaled to investors that the Company's inventory problems were due to an isolated, one-time, external event, and not systemic inventory control failures. ¶160; *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1294 (N.D. Ga. 2021) (sustaining misstatements when "Defendants' explanations for its rising inventories . . . omitted material facts"). These facts distinguish *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 at n.2 (8th Cir. 2020) (Mot. at 40), where the puffery statements lacked any of the surrounding context reinforcing materiality here.

Finally, the dramatic market reactions and investor selling that occurred when Defendants revealed the truth through the corrective disclosures is powerful evidence of materiality. *See In re Merck & Co., Inc. Sec. Litig*, 432 F.3d 261, 269 (3d Cir. 2005) (Materiality is shown by "movement . . . of the [stock] price" occurring "immediately following disclosure").

Courts hold that misstatements concerning a company's staffing levels are material and not puffery. *Acadia Healthcare Co.*, 2021 WL 195370, at *14; *Grae*, 2017 WL 6442145, at *2. Despite broadly asserting that the staffing Misstatements are "largely" inactionable, Defendants challenge only Misstatements 67 and 72 as puffery. Mot. at 48-49. Neither is puffery.

Misstatement 67 claimed that the success of Dollar General's staffing investments was "evidenced by continued record low store manager turnover, record staffing levels, healthy applicant flows, and a robust internal promotion pipeline." ¶323. Misstatement 72 claimed that the Company was "in a great spot in terms of staffing levels." ¶333. Defendants label these Misstatements as "generalized praise" that "escapes objective verification." Mot. at 48. But here, Defendants' claims of "continued ***record*** low store manager turnover, ***record*** staffing levels, ***healthy*** applicant flows, and a ***robust*** internal promotion pipeline" are misleading given that multiple former employees recounted that Dollar General's stores were chronically understaffed. ¶¶322-24; *e.g.*, ¶111 (FE-20: "Dollar General stores did not have enough people" for "between 30% and 50% of Dollar General stores"), ¶82 (FE-11: describing how store operations were crippled because there would be "***one person running a Dollar General store for five hours***"). Courts routinely reject motions to dismiss that raise this argument, holding that "statements regarding staffing levels" are "capable of objective measurement and verification using standard tools of evidence," *Acadia Healthcare Co.*, 2021 WL 195370, at *6, including "evidence from knowledgeable experts." *Grae*, 2017 WL 6442145, at *14 (puffery challenges to staffing statements raised fact questions concerning materiality requiring expert discovery). Defendants' authority *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (Mot. at 48) is inapposite, as that case did not involve staffing at all, but rather statements that bond investments were "safe and secure," which were "too vague to qualify as material."

36

### c. The Pricing Misstatements Are Not Puffery

Defendants declare that their assurances that "we feel very good about where we're priced now" and that "we continue to feel very good about our price position relative to competitors and all classes of trade" are "classic" puffery. Mot. at 52; Misstatements 81, 96.[19] This is wrong. Defendants ignore that Misstatement 81 was given in direct response to an analyst's question about what was driving the Company's gross profits, reinforcing that it addressed a subject of importance to investors. *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d at 284-85 (statements given in response to analyst questions were not puffery). The pricing issues addressed in Misstatement 96 were similarly material to investors, as the Company's pricing practices were a repeated subject of analyst and investor concern throughout the Class Period, as underscored by the question posed to Defendants at the Company's 2023 Annual Meeting, which specifically addressed the problem of "price[s] on shelf often . . . not match[ing] the price charged at checkout." ¶384. Defendants cannot dismiss such material misstatements as mere puffery.

### 2. The Misstatements Are Not Inactionable Opinions

Defendants argue that certain Misstatements are inactionable opinions. Mot. at 37-40 (inventory); 48-49 (staffing); 52 (pricing). Defendants are wrong. Even an opinion is actionable if: (i) it does not "fairly align[] with the information in the issuer's possession at the time" (*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015); (ii) it "contains a materially false embedded statement of fact" (*Zwick Partners, LP v. Quorum*

---

[19] In raising puffery and opinion challenges, Defendants do not specifically address any other pricing Misstatements, including Misstatements 79-80, 82-95, and 97-100. Defendants' Appendix C includes a bullet point for each that claims each statement constitutes "inactionable opinions and puffery." *See* Def. App'x C (ECF No. 77-3). However, this does not represent sufficient argument, and Defendants' purported puffery and opinion challenges to these unaddressed Misstatements should be "deemed waived for purposes of the Motion." *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021). Plaintiffs reserve all rights regarding any effort by Defendants to address these statements in reply.

*Health Corp.*, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018)); or (iii) "it was subjectively false (i.e. not honestly held)." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *9. As with puffery, "merely appending 'we believe' or 'we think' does not . . . render statements non-actionable," and opinion statements are actionable if they "omit[] material facts about the basis or reliability of the opinion." *Id*. No Misstatement here is an inactionable opinion.

### a.  The Inventory Misstatements Are Not Inactionable Opinions

**First**, Defendants' Table of Challenged Inventory Statements contains bullet points stating that Misstatements 1, 2, 4, 5, 28, 39, and 49 each constitute "inactionable opinions" but their brief does not explain how any are opinions or inactionable. Mot. at 38. Nor can they, as these Misstatements are not opinions, but rather representations of fact.[20] Defendants' sole legal support, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009), does not involve opinion challenges. Yet even if analyzed as opinions, these Misstatements omitted material facts, rendering them materially misleading and actionable. *In re Envision Healthcare*, 2019 WL 6168254, at *8-9; *see supra* §I.C.1.

**Second**, Defendants argue that Misstatements 13, 15, 28, 40, 47, and 60 concerning Dollar General's "inventory quality" and "inventory levels" were opinions because some of them "begin[] with 'we feel' or 'we believe.'" Mot. at 39. But Defendants ignore that these statements contain embedded representations of current or historical fact. *E.g.*, Misstatement 60 (¶310: claiming the Company experienced "significantly lower inventory levels"); *In re Envision Healthcare*, 2019 WL 6168254, at *11 (statements that "state unequivocally the reasons for [company's] growth"

---

[20] For example, they asserted that "expand[ing] our distribution network . . . allow[s] us to . . . pull cost out of the system and enable us to continue to grow" (Misstatement 39), "[e]fficient inventory management is a key component of our business success and profitability" (Misstatement 4), and that Defendants "closely monitor and manage our inventory balances" (Misstatement 1). These are not mere opinions.

were not opinions). Further, "merely appending 'we believe' or 'we think' does not . . . render statements non-actionable" if they omitted facts making them materially misleading, which is the case here. *Id.*; *see also Bond*, 587 F. Supp. 3d at 673 ("the word 'believe' is no shield when the profession of belief itself is a lie"). Courts routinely reject the notion that descriptions of a company's inventory levels are opinions. *E.g.*, *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 31.

**Third,**, Defendants argue that Misstatement 52 is inactionable (Mot. at 38) where Defendant Dilts responded to an analyst question about inventory by stating "[w]e continue to feel good about the quality of the inventory," "our supply chain service levels improved faster than we expected," and "we made some progress on working down the non-consumable inventory." Misstatement 52 contains multiple representations of fact that cannot reasonably be classified as opinions. For example, Defendant Dilts stated that "inventory management ***remains*** a focus for us," Dollar General had "***made some progress*** on working down the non-consumable inventory," and that the Company's "supply chain service levels ***improved*** faster than we expected." *Id.* Each of these representations expresses certainty about Dollar General's operations, and cannot be classified as opinion. *See Lexmark Int'l*, 367 F. Supp. 3d at 31-34.

Moreover, the Misstatements are actionable regardless because, *inter alia*, they concealed Dollar General's ongoing inventory management problems that rendered Defendant Dilts' assurances materially misleading. ¶298. While Defendants argue Dilts' Misstatement separately is inactionable because she disclosed that inventory "remains a focus" for the Company, Defendants fail to show (and do not even argue) that they disclosed ***these*** facts to investors.

> **b.** **The Staffing Misstatements Are Not Inactionable Opinions**

Defendants argue that Misstatements 67, 70, 72, and 77 touting the Company's "record" and "robust" staffing levels and "record low manager turnover" are inactionable opinions. Mot. at 48-49. Defendants claim that the SAC does not allege that Defendants "did not actually believe

they were true." Mot. at 48. But opinions are actionable if they did not "fairly align[] with the information in the issuer's possession" (*Omnicare*, 575 U.S. at 183) or "omit[ted] material facts about the basis or reliability of the opinion" (*In re Envision Healthcare*, 2019 WL 6168254, at *11). Here, these Misstatements are actionable because, Defendants had "actual knowledge" of their strategy to "limit payroll to the bone" (¶83) and understaff Doller General stores, which was contrary to what they told investors. *See infra* §I.G. Defendants fail to show otherwise.

### c. The Pricing Misstatements Are Not Inactionable Opinions

Defendants argue that Misstatements 81 and 96 touting their pricing practices are inactionable opinions.[21] Mot. at 52. Defendants ignore that these Misstatements are actionable because they possessed facts, which Defendants omitted, that did not "fairly align" with the statements. Defendants also had "actual knowledge" the statements were misleading. *Infra* §I.G.

### 3. Defendants' Forward-Looking/Cautionary Language Arguments Fail

The PSLRA's "limited" safe harbor provision only applies to forward-looking statements that were (1) "accompanied by meaningful cautionary statements" or (2) not "made with actual knowledge that the statement was false or misleading." *Dougherty*, 905 F.3d at 983 (cleaned up). Importantly, the safe harbor "does not extend to a statement of present or historical fact." *Id.* Nor are statements "automatically" considered forward-looking merely because they concern the future. *Id.* Thus, "[t]he critical inquiry . . . is whether its veracity can be determined at the time the statement is made. If so, then the statement is not forward-looking." *Id.* (cleaned up).

"A boilerplate litany of generally applicable risk factors does not qualify as meaningful." *In re Envision*, 2019 WL 6168254, at *15. Further, the "[m]isrepresentation of present or historical

---

[21] Defendants' brief does not challenge on opinion grounds any pricing Misstatements other than Misstatements 81 and 96. Defendants' "bullet-points" challenging otherwise unaddressed Misstatements are insufficient and any such challenges are deemed waived. *See supra* n.19.

facts cannot be cured by cautionary language." *Stein v. U.S. Xpress Enters.*, 2020 WL 3584800, at *29 (E.D. Tenn. June 30, 2020) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Courts routinely hold that "the meaningfulness of [a] cautionary statement cannot be determined without a determination of the facts," which is beyond the scope of a Rule 12 motion. *In re Envision*, 2019 WL 6168254, at *16.

Contrary to Defendants' arguments, none of the inventory nor staffing Misstatements is protected by PSLRA's "safe harbor" provision. Mot. at 36-37, 45-46, 47-48, 51-52.

### a. The Inventory Misstatements Are Outside The Safe Harbor

Defendants wrongly claim Misstatements 4, 5, 7, 13, and 24 are forward-looking. Mot. at 36-37. **First**, Misstatements 4, 5, 13, and 24 include statements of present or historical fact. ¶218 (Misstatement 4: "Efficient inventory management *is* a key component of our business success and profitability"); ¶220 (Misstatement 5: "We must *maintain* sufficient inventory levels"); ¶238 (Misstatement 13: "*We've been able* to bring these [new inventory] items [in and get them] . . . on the shelf"); ¶256 (Misstatement 24: "[O]ur team *has done* a really nice job . . . to get the merchandise here . . . for the customer"). These statements' "veracity can be determined at the time the statement is made" and thus are "not forward-looking." *Dougherty*, 905 F.3d at 983.

Plus, none of these Misstatements is accompanied by meaningful cautionary language. Defendants point to Dollar General's statements that it "cannot make assurances that we will be successful in our inventory management" (Mot. at 37) and that "delays in constructing, opening, or staffing new distribution centers" could affect its results (Mot. at 47 n.35). But these vague, boilerplate warnings could apply to any retailer at any time—they are not meaningful Company- or context-specific warnings that warrant protection under the safe harbor. *In re FirstEnergy*, 316 F. Supp. 2d at 596 ("vague and insipid cautionary language is insufficient to afford the statements protection under PSLRA's safe harbor provision"). Defendants rely on *Sophia Zhou v. Desktop*

41

*Metal, Inc.*, 120 F.4th 278 (1st Cir. 2024), but that decision arose from much more robust and meaningful disclosures that "emphasiz[ed] the cost and time-burden of compliance" in the "highly regulated" healthcare market that is "subject to frequent and sudden change." *Id.* at 294. At best, Defendants raise fact questions concerning the meaningfulness of the risk disclosures that cannot be resolved on the pleadings. *In re Envision*, 2019 WL 6168254, at *15.

### b.    The Staffing Misstatements Are Outside The Safe Harbor

Defendants challenge staffing Misstatements 63, 64, 65, 73, 75, 76, 77, and 78 as forward-looking statements. Mot. at 47-48. Their attacks fail. **First**, Defendants argue that Misstatements 64 and 65 are not actionable, again relying solely on an inapposite decision of the First Circuit. Mot. at 48 n. 36 (citing *Desktop Metal*, 2024 WL 4589490, at *10). As noted, Sixth Circuit law confirms the opposite, holding that "vague and insipid" warnings like Misstatements 64 and 65 are actionable where, as here, they fail to provide meaningful warnings to investors. *In re FirstEnergy*, 316 F. Supp. 2d at 596.

**Second**, Defendants again claim that their boilerplate "cautionary language" sanitizes the staffing Misstatements from liability. Mot. at 48. Defendants are wrong. They fail to show how this generic language *meaningfully* warned investors of the risks at issue. Defendants point to their statement that the Company "operat[es] in an industry challenged by historically high rates of employee turnover." Mot. at 48. But this generic statement about the "*industry*" is facially not specific to *Dollar General*. In any event, it does not meaningfully convey risks from *the Company's* specific understaffing problems known to Defendants at the time. These type of boilerplate and generic risk disclosures are routinely rejected by courts as providing meaningful warnings. *In re Envision*, 2019 WL 6168254, at *15 ("[B]oilerplate" risk factors do[] not qualify as meaningful"); *Helwig*, 251 F.3d at 559 (rejecting "blanket" warnings that "offered investors no guidance").

Defendants' reliance on the Company's risk disclosures about COVID-19 potentially requiring "wage increases or premiums" and "additional payroll related expenses" (Mot. at 48 n.37) fares even worse. These generic warnings that Dollar General might have to pay its employees due to COVID-19 are inapposite to the staffing problems alleged in the SAC, which were (i) not caused by COVID-19, and (ii) driven primarily not by deficient wage *rates*, but that stores were not allocated enough hours to adequately function (¶114). Nor was Defendants' statement that "[o]ur ability to meet our labor needs, while controlling our labor costs, is subject to many *external factors*" (Mot. at 48 n.37), adequate to warn investors, as it failed to disclose the Company's *internal* "strategy . . . to limit payroll to the bone" (¶83).

**Third**, contrary to their claim (Mot. at 47-48), the Misstatements containing Defendants' assurance that "we proactively seek ways to continue investing in [employees'] development" are not forward-looking. Misstatements 63, 64, 65, 73, 75, 76, and 77-78. These statements concern present or historical facts—*i.e.*, that Defendants presently invest in employees' development and have in the past—are not forward-looking and therefore cannot be saved by the safe harbor provision.

### E. Defendants' Erroneous And Premature Truth On The Market Defenses Fail

Defendants sprinkle throughout their brief various claims that the market already knew the truth regarding the information that Defendants failed to disclose. Mot. at 24-25, 44-46 (inventory); 48-49 (staffing); 52 (pricing). These arguments are legally premature and factually wrong. **First**, Defendants' truth-on-the-market argument is premature because "the Sixth Circuit *has not applied* the truth-on-the-market defense" at the pleading stage. *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 671 (E.D. Mich. 2023). Relatedly, courts in this Circuit recognize that this defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint for failure to plead materiality." *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *14 (E.D.

Mich. Oct. 21, 2010); *accord Shupe*, 660 F. Supp. 3d at 671. Here, Defendants' arguments are premature because at most, they raise fact questions that are not appropriate for resolution on the pleadings.

**Second**, in any event, Defendants are factually wrong to claim that the market knew the truth regarding the Misstatements. For example, Defendants argue that they disclosed:

- supply chain constraints and shipping delays (Mot. at 44);
- higher than anticipated shrink and damages (Mot. at 44);
- "[t]here can be no assurance that [Dollar General] will be successful in [its] efforts to contain or reduce inventory shrinkage" (Mot. at 45);
- the "success of [the] Fast Track initiative"[22] depended on customer adoption and ability to control shrink (Mot. at 45);
- the Company had historically low rates of shrink and damages and noted that trend may not continue (Mot. at 45);
- the risk of supply chain constraints or disruptions could impact financial results (Mot. at 46-47);
- "temporary warehouse capacity constraints" including "unanticipated temporary delays in opening or securing additional storage" (Mot. at 57, 67);[23]
- the retail industry is "challenged by historically high rates of employee turnover" and the pandemic increased the risks of labor shortages (Mot. at 50);
- "targeted investments" in labor, wage increases, and employees (Mot. at 51).

The problem for Defendants is that none of these generic disclosures establishes that the specific inventory, staffing, and related problems detailed in the SAC were known to the market. For example, none of the above disclosures revealed that the Company was plagued by a massive glut of excess inventory and riddled with crippling inventory controls. Nor did they disclose that

---

[22] Only one of the alleged Misstatements even mentions the Company's "Fast Track" (self-checkout) initiative (Misstatement 8), and that Misstatement contained numerous representations about the effectiveness of Dollar General's supply chains that were false and/or misleading, independent of representations about Fast Track.

[23] As detailed in the SAC, Defendants' characterizations of these problems as "temporary" and "unanticipated" were false and misleading. ¶¶281-82.

Defendants' inadequate staffing practices were exacerbating the inventory problems and exposing the Company to millions in regulatory fines and penalties. Further, Defendants' truth-on-the-market claim is belied by the fact that Dollar General's stock price declined significantly in response to each corrective disclosure, as shocked investors scrambled to sell their stock. Investors do not react that way when presented with information that they already know. *See infra* §II.

### F. The SAC Pleads That Defendants Violated Item 303

The SAC alleges that certain Misstatements were misleading under Item 303 because they failed to disclose required "known trends or uncertainties" that Defendants reasonably expected will materially affect the Company's financial condition or operating performance. 17 C.F.R. § 229.303(a)-(b)(2)(ii). As the U.S. Supreme Court recently reaffirmed, "the failure to disclose information required by Item 303 *can* support a Rule 10b–5(b) claim" where, as here, "the omission renders affirmative statements made misleading." *Moab Partners, L.P.*, 601 U.S. at 258. Each of these Misstatements is specifically identified in the SAC (¶437(a) through (h)), along with the specific facts required by Item 303 that Defendants failed to disclose (¶438).

Defendants' Item 303 attacks are meritless. **First**, Defendants argue that the SAC does not identify "any specific trends that Defendants failed to disclose." Mot. at 54. Defendants are wrong. The SAC identifies the Company's trends that were omitted, including: (i) growing amounts of excess inventory; (ii) continuous over-ordering of merchandise by the Company's buyers and excess deliveries to stores without regard for demand or need; (iii) untracked inventory in temporary warehouses and distribution centers; (iv) chronic understaffing in stores; and (v) increasingly unsafe work conditions and pricing discrepancies exposing the Company to mounting fines, investigations, and sanctions. *E.g.*, ¶438 (collecting facts).

**Second**, Defendants argue that they were unaware of these trends. Mot. at 54. Again, the facts in the SAC show otherwise. For example, Defendants were repeatedly made aware of the

45

above-noted inventory, staffing, and pricing problems that needed to be disclosed pursuant to Item 303. *See infra* §I.G. Contrary to Defendants' claim, the SAC ***does*** plead that the FEs had personal "contact or interaction" with the Individual Defendants (not that it is necessary), as FEs personally sent Defendants emails flagging the crippling inventory and staffing problems. *E.g.*, ¶¶43-45, 48-49. These emails are pled with sufficient detail. *See supra* §I.B, *infra* §I.G.1.a. Thus, Defendants' authorities are inapposite as they lacked the powerful proof of Defendants' knowledge or recklessness that exists here.[24] *CBL*, 2022 WL 1405415, at *8 (sustaining Item 303 claim where "corporate brass had not only conceived but also knowingly participated in an illegal scheme").

## G. The SAC Adequately Pleads Scienter

The SAC pleads scienter by alleging facts showing Defendants' "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness." *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011). Plaintiffs need only plead an inference of fraudulent intent that is equally "compelling as any plausible opposing inference"—it "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the ***most*** plausible" inference. *Tellabs, Inc.*, 551 U.S. at 324. If "equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008). Thus, a draw is awarded to Plaintiffs. *Weiner v. Tivity Health, Inc.*, 365 F.Supp.3d 900, 916 (M.D. Tenn 2019).[25]

---

[24] *J&R Mktg. v. GMC*, 549 F.3d 384, 392 (6th Cir. 2008) (cited in Mot. at 54); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009) (cited in Mot. at 54).

[25] Defendants assert that "ambiguities count against inferring scienter." Mot. at 55. But they ignore that *Tellabs* "reiterate[s] . . . that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." 551 U.S. at 326; *see also Frank*, 646 F.3d at 961 ("[A]fter *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

To evaluate scienter, Sixth Circuit courts analyze the non-exhaustive "*Helwig* factors," which are addressed in detail below. However, "[t]hese factors merely assist the Court's scienter analysis; they are not a checklist of required showings." *In re Firstenergy Corp*., 2022 WL 681320, at \*18 (S.D. Ohio Mar. 7, 2022). Courts have inferred scienter at the pleading stage where only two or three factors are met. *E.g., Plagens v. Deckard*, 2023 WL 2711263, at \*28 (N.D. Ohio Mar. 30, 2023) (two *Helwig* factors); *Dougherty*, 905 F.3d at 981 (three *Helwig* factors).

### 1. *Helwig* Factors 2 and 6: Defendants Knew Or Recklessly Disregarded Information Contrary To Their Misleading Public Statements

The SAC alleges the "key factor to a finding of scienter," Factor 2, which is "divergence between internal reports and external statements." *Dougherty*, 905 F.3d at 981. To satisfy Factor 2, Plaintiffs need only plead that Defendants had "access to information contradicting their public statements." *Plagens*, 2023 WL 2711263, at \*27 ("internal reports and records receive broad construction"). Factor 6, "disregard of the most current factual information before making statements," is routinely analyzed with Factor 2. *Dougherty,* 905 F.3d at 981.

### a. Defendants Received Internal Reports Informing Them Of Dollar General's Inventory And Staffing Problems

**First**, the SAC pleads that Defendants directly received "internal reports" concerning Dollar General's inventory and staffing problems that contradicted Defendants' public assurances. ¶¶43-45, 48-49, 57, 64, 72, 91, 95, 103, 105, 113, 118. For example, FE-1 personally emailed Defendant Vasos (CEO) in February 2022 and specifically explained that Dollar General stores were being ***bombarded with merchandise they did not need***, among other issues such as hiring and basic maintenance. ¶45. Defendant Vasos's personal secretary responded to this email—but showed more concern with avoiding media coverage of the Company's problems than addressing them. *Id*. Separately, FE-2 sent two emails to Dollar General's leadership reporting the Company's staffing, delivery, and inventory management problems, including one directly to Defendants

47

Vasos (CEO), Owen (COO/CEO), and Garratt (CFO) in June 2022. ¶¶48-49. This email also prompted a response from Defendants' subordinates, as a Senior VP responded to FE-2 with a phone call and specifically discussed the Company's inventory management problems, staffing shortages, and the inability of stores to stop trucks from delivering excess merchandise. ¶49.

These emails served as glaring red flags sent directly to Defendants—who had their subordinates respond, including to minimize publicity—and give rise to a powerful inference of scienter. *Plagens*, 2023 WL 2711263, at *27 (scienter based on defendants' access to "internal company records" concerning deficiencies contradicting their statements and that "whistleblowers raised these concerns with four unnamed executives"); *FirstEnergy*, 316 F. Supp. 2d at 597-98.

**Second**, FE-3 described a senior leadership call in early 2023 during which a Senior Vice President "estimated that there were *31 football fields worth of trailers* sitting on parking lots with unloaded inventory and incurring detention fees, . . . which was costing the Company *$19 million a month in detention fees.*" ¶52. FE-3 stated that senior leadership "understood [the Company] was going to be financially impacted, so it was trying to *sweep the problem under the rug* and *hide the fact that its inventory looked this way.*" ¶53.

**Third**, FE-4 stated that, every Sunday, fifty Dollar General officials would determine how many rolltainers, trucks, and drivers were available and what product would be left out of deliveries that week. ¶56. FE-4 explained that Defendant Owen (then COO and later CEO) knew of Dollar General's inventory issues because the decisions being made on these Sunday calls affected store operations, which Defendant Owen oversaw as COO. ¶57.

**Fourth**, FE-7 reported that the inventory problems at Dollar General's distribution centers and the need to get them cleaned up was a constant topic of discussion at Company Town Hall meetings. ¶72. During these meetings, Dollar General Vice Presidents and Senior Directors would

48

always explain that directives regarding the distribution centers were "***coming from the top.***" *Id.* FE-7 said that Dollar General executives spoke about, and "***were fully aware***" how constrained the distribution centers were and the fact that inventory was sitting on lots. *Id.*

These former employee accounts highlight the inconsistencies between Defendants' rosy public statements and their knowledge of the inventory and staffing issues plaguing Dollar General—and, thus, give rise to a strong inference of scienter. *Dougherty*, 905 F.3d at 981 (scienter based on inconsistencies between meeting discussions and defendant's public statements); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005) (contents of meetings where senior officers were present qualified as "internal reports").

**<u>Defendants' Rebuttals Fail</u>**. Defendants' attacks on scienter fail. **<u>First</u>**, Defendants argue that the Complaint "does not identify (or even speculate about the existence of) internal reports that diverged from the Company's statements." Mot. at 56. This is flatly incorrect. Defendants' claim cannot be squared with the emails and other internal reports discussed above. Again, Defendants disregard or dispute the facts in the SAC, which cannot be credited at this stage.

In *Dougherty*, the Sixth Circuit rejected the same argument Defendants now advance. There, a defendant argued that an executive meeting with regulators and minutes of that meeting did "not qualify as 'internal reports' for the purpose of the second *Helwig* factor." 905 F.3d at 981. The Sixth Circuit held that "this formalistic definition is inconsistent with the way we have understood 'internal reports' in the past," and noted that the Sixth Circuit had previously "viewed the contents of meetings at which senior corporate officers were present as 'internal reports.'" *Id*. Defendants list various cherry-picked analyses and reports they claim are absent here—*e.g.,* no "aging analyses" (Mot. at 56)—but they provide no basis or authority supporting the notion that

49

those specific documents are necessary to plead scienter. They are not. Defendants wrongly seek to impose a formalistic definition of internal reports that is contrary to Sixth Circuit law.

**Second**, Defendants dispute the FE reports, claiming for example that no FE "worked with, spoke[] to, or even met" Defendants. Mot. at 57-58. But Defendants ignore that former employees sent emails *directly* to Defendant Vasos in February 2022 and to Defendants Vasos, Owen, and Garratt in June 2022 flagging the excess inventory and staffing problems. ¶¶43-49. Even more, Defendants had their subordinates respond, including by seeking to quell publicity. ¶45. It is disingenuous at best for Defendants to argue that no FE "met" a Defendant when the FEs were personally and directly emailing them. Regardless, "[a] confidential witness does not need to be a fly on every relevant wall — or directly deliver every relevant presentation — to plead allegations supporting an inference of scienter." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023) (scienter even though "[p]laintiff did not allege that FE1 'had any contact with the defendants'").

Defendants also ignore that the SAC includes *twenty-four* former employee reports that confirm the same story: Defendants knew that Dollar General was plagued by excess inventory, deficient inventory controls, and chronic under-staffing, including through direct reports, meetings, and their operational activities. ¶¶43-123. That so many former employees—from diverse positions and different locations—consistently reported the same problems and Defendants' awareness thereof powerfully substantiates the inference of scienter at the top of Dollar General—namely, Defendants. *Padilla, Inc.*, 2022 WL 3452318, at *36.

**Third**, Defendants assert that the FE emails to Defendants "provide no specific facts" and "are consistent with the Company's disclosures." Mot. at 58. Here, Defendants simply dispute the facts alleged in the SAC. Established law requires that the facts pled in the SAC are accepted as

50

true and all inferences are drawn in Plaintiffs' favor. *Frank*, 646 F.3d at 958. Defendants may seek to prevail on their counterfactual version of events at trial, but it cannot succeed at this stage.

Plus, the SAC sufficiently describes the "long" FE emails to Defendants that "covered the issues thoroughly." *E.g.*, ¶45. Defendants seek an impossible pleading standard: it defies logic to fault these former employees for no longer having access to the Company's internal records. *See Firstenergy*, 2022 WL 681320, at *20 ("Plaintiffs would need discovery to discern the contents of internal reports as compared to external statements."); *NVIDIA Corp. v. E. Ohman J:or Fonder AB*, 2024 WL 5058572, at *1 (U.S. Dec. 11, 2024) (dismissing defendants' appeal concerning *inter alia* the necessity of pleading the contents of internal documents with particularity).[26]

Relatedly, Defendants claim that these emails "do not establish that Defendants knew such issues were Company-wide." Mot. at 58. Again, Defendants ignore the rest of the SAC, including the consistent and corroborating accounts of the remaining 22 former employees (¶¶43-123) and the additional scienter facts discussed below such as insider sales. At bottom, Defendants' approach is inconsistent with the "holistic" approach to scienter mandated by *Tellabs* and Sixth Circuit law. *Cardinal Health, Inc.*, 2021 WL 4397946 at 16.[27]

**Fourth**, Defendants claim that the inventory and staffing problems discussed at meetings were previously disclosed to the market. Mot. at 57. This argument rehashes Defendants' misguided truth-on-the-market argument, which cannot be credited here, as discussed *supra* §I.E. Plus, Defendants are wrong. For example, Defendants claim that FE-3's report of a leadership meeting in February or March 2023 discussing ***31 football fields worth of trailers*** of excess

---

[26] Defendants claim that Vasos's secretary's call to FE-1 does not show that Vasos "received" or "reviewed" the email. Mot. at 58 n.45. The opposite is true. The natural inference is that Vasos reviewed the email and sent his subordinate to make sure the information was not public. ¶45.

[27] *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 42 (1st Cir. 2017), is inapt. *Id.* (no former employee allegations "contradict[ed] any of the financial information released by Biogen"); Mot. at 59.

51

inventory was disclosed to investors in December 2022. Mot. at 57 (citing DX 42). But the relevant disclosure, a Form 10-Q, does not discuss excess inventory and, on the contrary, suggests that the temporary warehouse space was required to hold ***needed*** inventory—not excess inventory as detailed in the SAC. DX 42 at 16 (more space required "for our inventory ***needs***").

 **<u>Fifth</u>**, Defendants claim that the SAC fails to allege "actual knowledge," including because there are purportedly no allegations about "internal audits," from "high-level witnesses," or "any direct communications with Defendants inconsistent with any public statements." Mot. at 59. Defendants are wrong across the board. To start, as noted above, the former employees ***do*** allege direct communications with Defendants in the form of emails sent personally to Defendants that flagged the inventory and staffing problems. *See supra* 47-48. On audits, FE-16 was a Senior Internal Auditor at Dollar General from May 2017 through April 2023 who confirmed that the Company would buy unnecessary items to manipulate its financial statements. ¶¶96-97. Multiple other FEs personally visited thousands of stores over multiple years across the nation and reported severe inventory and staffing issues. *E.g.,* ¶¶110-13 (FE-20 visited more than 2,500 stores between 2020 and 2023, estimated inadequate staffing in "between 30% and 50% of Dollar General Stores"), 115-17 (FE-22 visited 1,400 stores in 23 states over two years and reported that it was common for stores to have "impacted" stockrooms).

 Further, multiple FEs had senior positions at the Company. *E.g.*, ¶¶54 (FE-4: "Senior Director of Demand Chain"), 70 (FE-7: "Senior Demain Chain Analyst"), 75 (FE-9: "Senior Level Director"); 92 (FE-15: "Senior Supply Chain Specialist"); and 96 (FE-16: "Senior Internal Auditor"). Given the specific facts showing scienter in the SAC, Defendants' reliance on *Omnicare* is misplaced. 769 F.3d at 482 ("KBC merely makes general statements and heaps inference upon inference; the Complaint never alleges that Person A did Act B at Time C.").

52

Case 3:23-cv-01250  Document 84  Filed 01/21/25  Page 65 of 85 PageID #: 2921

### b. Defendants' Repeated Public Statements About Inventory And Staffing Confirms Their Knowledge Or Recklessness

During nearly every earnings call and investor presentation during the Class Period, analysts questioned Defendants about the topics of inventory management and/or staffing.[28] In response, Defendants issued false assurances that misled investors about the integrity of Dollar General's inventory controls and staffing. *E.g.*, ¶303 (with respect to Dollar General's "labor investments, in our inventory investments as well as in our supply chain and merchandising," investors can "[b]e rest assured, we are hitting every single item and we're monitoring every single item every week here to make sure it's on the right track"). Either Defendants investigated and knew their statements were misleading or they recklessly failed to investigate the basis for continuing to make the Misstatements—either alternative establishes their liability. *San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) ("Defendants' detailed statements about inventory, the supply chain, and product defects support the inference of scienter" and if "[individual defendants] didn't monitor these topics but made definitive statements as if they did, they still might have been reckless."); *see also N. Port Firefighters' Pension-Local v. Fushi Copperweld*, 929 F. Supp. 2d 740, 785 (M.D. Tenn. 2013) (finding scienter where defendants did not make "any effort to verify" their public assurances regarding accounting controls); *Garden City Emps. Ret. Sys. v. Psychiatric Sol., Inc.*, 2011 WL 1335803, at *56-57 (M.D. Tenn. Mar. 31, 2011) (inferring knowledge of fraud based on detailed public statements concerning relevant issues).[29]

---

[28] *See, e.g.*, ¶¶227, 230, 233, 236, 238, 242, 245, 256, 262, 266, 271, 276, 278, 288, 297, 301-03, 311, 329, 333, 344-45, 351, 354-55, 358, 362, 369-71, 375, 378, 384, 387-89.

[29] *See also Firstenergy,* 2022 WL 681320, at *18 (statements about "analysts' and investors' primary area of focus" support scienter); *Plagens,* 2023 WL 2711263, at *30 (CEO's "emphasis" on "an important component of the Company's future profitability supports . . . scienter").

Defendants cursorily argue that "[t]he fact that Defendants made statements about accounting, inventory, staffing or pricing, standing alone, cannot support a strong inference of scienter." Mot. at 66. But none of Defendants' authorities resemble this case.[30]

### c. Defendants Are Presumed To Be Knowledgeable About Core Operations Like Inventory And Staffing

"Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations and omissions pertain to central, day-to-day operational matters," and "facts critical to a business's core management." *Garden City Emps.' Ret. Sys*, at \*57; *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) ("[T]he more central a fact is to a company's core operations the more likely its executive acted with scienter.").

Dollar General's inventory management and staffing were "key aspects of [its] business model" and were critical to the Company's financial health. ¶¶1, 3, 37. As the Company's senior-most executives, Defendants Vasos (CEO), Owen (COO), Garratt (CFO), and Dilts (later CFO) possessed unparalleled insight into the critical inventory and staffing operations of the Company, which bolsters the inference that Defendants' misstatements were made with scienter. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d at 1000 (the "more central a fact is to a company's core operations the more likely its executive acted with scienter"); *Bridgestone*, 399 F.3d at 687 (that

---

[30] *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689 (6th Cir. 2004) (challenged statements were in press releases, not in response to direct analyst inquiries); *Funko*, 2024 WL 2209686, at \*17 (generalized statements did not show "intimate, personal knowledge" and were not in response to analysts' primary area of focus); *In re Federated Dep't Stores, Inc., Sec. Litig.*, 2004 WL 444559, at \*7 (S.D.N.Y. Mar. 11, 2004) ("statements evidence no knowledge on the part of Defendants").

subsidiary "was the primary engine fueling" Bridgestone's growth supported Bridgestone's scienter as to its misrepresentation of Firestone's impairment risk).[31]

Further, each Defendant personally certified and signed Dollar General's public disclosures that misleadingly touted Dollar General's inventory controls and staffing. Defendants were thus "situated to be extremely familiar with [the company's] operations such that they would be aware of core financial metrics," and knowledgeable of the inventory and staffing issues that plagued Dollar General. *Franchi v. SmileDirectClub, Inc*., 633 F. Supp. 3d 1046, 1086 (M.D. Tenn. 2022) (inference of scienter bolstered under core operations theory where executive defendants "signed [SEC disclosure] and participated in its preparation and dissemination").

Defendants claim that the "core operations" theory cannot support an inference of scienter. Mot. at 65-66. But courts in the Sixth Circuit have continued to endorse this doctrine as probative of scienter where, as here, it is coupled with other allegations. *Id.* ("The Court will treat 'core-operations' allegations as relevant in the holistic *Tellabs* scienter analysis"); *Firstenergy*, 2022 WL 681320, at *18 ("the central-matters presumption [is based on] the intersection between the executive's responsibilities and the scheme's critical aspects").[32] The core importance of inventory and staffing therefore contribute to the strong inference of Defendants' scienter in the SAC.

---

[31] Thus, the Executive Defendants' scienter is imputed to Dollar General. *Bond*, 587 F. Supp. 3d at 675–76 ("Because the individual defendants in this case were high-ranking executives acting in their official capacities . . . their individual scienter is sufficient to establish [the company's].").

[32] Defendants' authorities are inapposite. *Pittman v. Unum Grp*., 861 F. App'x 51, 55 (6th Cir. 2021) (defendants made numerous disclosures of losses in core business line); *Bondali*, 620 F. App'x at 492-93 (plaintiffs "fail[ed] to include facts sufficiently tying the individual defendants to [select test results]" from only several of nearly 500 suppliers); *Ryan v. FIGS, Inc*., 2024 WL 187001, at *9 (C.D. Cal. Jan. 17, 2024) (no allegations that defendants "had any responsibility or control over [company's] day-to-day operations"); *AT&T/DirecTV*, 480 F. Supp. 3d at 533 (plaintiff offered no "other allegations of scienter"); *Stein*, 2020 WL 3584800, at *39 (core operations theory inapplicable "where 120 of USX's apparently 6,900 drivers—or 1.7%—were assisting on the Walmart routes, even if Walmart accounted for around 10% of USX's business").

### d. The Widespread Nature Of The Staffing and Inventory Problems Contributes To Defendants' Scienter

Two-dozen former employees "from different positions and different locations all consistently observed and reported the same conduct": that that "the Company suffered from massive amounts of excess inventory, lacked basic inventory controls, and chronically understaffed Company stores." ¶¶446-48. The magnitude of these issues forced the Company to invest over $170 million to remedy staffing problems and markdown its existing inventory by $95 million. ¶¶178-84. It is "highly implausible for [Defendants] to have remained in the dark about so widespread an issue." *Bond*, 587 F. Supp. 3d at 677.

*        *        *

In sum, *Helwig* Factors 2 and 6, which concern Defendants' receipt of reports, access to information, and other sources of knowledge contradicting their statements, are amply pled.

### 2. *Helwig* Factors 1 and 9: Defendants Were Motivated To Reap Over $315 Million In Insider Trades And Keep Their Executive Jobs

Courts within the Sixth Circuit routinely hold that "personal financial gain may weigh heavily in favor of a scienter inference." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 738 (E.D. Mich. 2007); *FirstEnergy*, 316 F. Supp. 2d at 598-99 ("insider selling at an opportunistic time supports an inference of fraudulent intent to mislead the market for personal gain"). Defendants Vasos and Garratt collectively sold 1,588,819 shares of their Dollar General stock and reaped illegal insider trading proceeds in excess of ***$315 million*** during the Class Period, which satisfies *Helwig* Factor 1 (insider trading). ¶¶449-54. Also, Vasos and Garratt timed their sales to follow Defendants' false statements to capitalize on the artificially inflated share prices, including:

- Over $40 million in sales one day after the May 28, 2020 inventory and pricing misstatements (¶¶226-28, 347-50, 450-54);
- Over $58 million in sales across the two days following the May 26-27, 2021 inventory and staffing misstatements (¶¶247-50, 325-28, 450-54);

56

- Over $81 million in sales one day after the December 2, 2021 inventory, staffing, and pricing misstatements (¶¶258-63, 331-32, 360-63, 450-54); and

- Over $27 million in sales one day after the August 25, 2022 inventory, staffing, and pricing misstatements (¶¶273-79, 339-41, 373-76, 450-54).

Here, the "timing and extent of [defendants'] sales of stock further substantiate a strong inference of scienter." *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (sales "shortly after [company] announced favorable sales numbers").

Indeed, the suspicious nature of their trading is underscored by the fact that Defendant Vasos and Garratt sold far more shares during the Class Period than during the prior Control Period. For example, during the Class Period, Defendant Vasos sold 1,322,681 shares for a gross profit of $283,571,252.76. ¶451. However, in the prior Control Period, Vasos sold a comparatively small fraction of that volume of shares—only approximately 44,357 shares for total proceeds of just over $5 million. ¶452. Likewise, during the Class Period, Defendant Garratt sold 153,986 shares for a gross profit of $31,664,213.11—but only sold approximately 7,837 shares for proceeds of less than $1 million during the prior Control Period. ¶¶453-54. Defendant Vasos and Garratt's suspicious trading patterns specific to the Class Period further substantiate the inference of scienter. *Firstenergy*, 2022 WL 681320, at *19 (analysis turns on the "difference between Class Period and pre-Class Period trading"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d at 732 (noting "compelling" fact that defendant's "proceeds during the Class Period exceeded his pre-Class Period sales proceeds").

The already-powerful inference of scienter is further supported by the "self-interested motivation of defendants in the form of saving their salaries or jobs." *Helwig*, 251 F.3d at 552 (Factor 9). Each of the Defendants held powerful executive roles and had unparalleled authority across the Company's operations. ¶¶26-29. Defendants were motivated to downplay Dollar General's staffing and inventory deficiencies so the Company's stock would continue to trade at

57

artificially high prices, thereby securing Defendants' executive roles and compensation. Mot. at 64 ("Owen more than doubled his holdings through vesting of equity prior to his departure in October 2023"); *see also Bridgestone Corp.*, 399 F.3d at 684-85 (scienter reinforced by allegations that executives concealed "serious problems . . . so they could report huge profits and their executives could retain their positions of power, prestige and profit").[33]

Defendants go to great lengths to try to explain how Garratt's and Vasos's insider trades of over $315 million—timed suspiciously around the misstatements and completely unlike their prior trading patterns—do not support an inference of scienter. Mot. at 59-65. None of Defendants' arguments has merit, as further discussed below.

**First**, Defendants baselessly claim that Plaintiffs "structured" the Class Period around their insider sales to "manufacture an inference of scienter." Mot. at 59, 60-61. Not so. The Class Period begins on May 28, 2020 because Defendants' misstatements began on that date.[34] *E.g.*, ¶¶212, 226, 314, 392. Plaintiffs structured the Complaint around Defendants' Misstatements and their incremental revelations of the truth. ¶¶210-438 (misstatements spanning every quarter of the Class Period); ¶¶457-491. Defendants' desperate claim that the Class Period was structured around their illegal trades is without factual basis and wholly without merit. Defendants' out of circuit authorities are inapposite.[35]

---

[33] Defendants argue that Vasos and Garratt "decided voluntarily to leave." Mot. at 65 n.51. But a voluntarily departure does not exculpate fraudulent conduct or a lack of fraudulent motivation.

[34] Defendants' claim that "there is nothing in the Complaint to suggest the Company's May 2020 disclosures were misleading" (Mot. at 61) fails for the reasons discussed above. *See supra* §I.C.1.

[35] *C.f. In re Hertz*, 905 F.3d 106, 120 (3d Cir. 2018) ("The lack of any temporally suspicious trades weighs against inferring scienter from the trading activity"); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (defendants sold "shares under non-discretionary Rule 10b5–1 plans"); *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 183 (1st Cir. 2024) (defendant "did not reduce his investment in the company by enough to allow for the strong inference of scienter claimed by plaintiffs"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir.

**Second**, Defendants are wrong to claim that the insider sales were not "suspiciously timed around any specific alleged misstatements." Mot. at 60. As noted above, Garratt and Vasos sold tens of millions of shares immediately following Dollar General's positive assurances to the market about its inventory controls and staffing. These "expedient sales" at an "opportunistic time" are "probative of scienter." *FirstEnergy*, 316 F. Supp. 2d at 599; *c.f. PR Diamonds*, 364 F.3d at 691 ("no allegations that the [defendants] ever took advantage of . . . inflated stock prices by selling shares during the class period."); *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 321 (9th Cir. 2007) (nonprecedential opinion) (no relationship between sales and misstatements).

**Third**, Defendants suggest that the inference of scienter is undercut because the majority of Garrat's and Vasos's sales were "long before" the corrective disclosures. Mot. at 61. At the outset, Defendants ignore that Garratt and Vasos collectively sold over $85 million worth of their stock only four months prior to the December 2022 corrective disclosure.[36] ¶¶451, 453, 457-59. Moreover, the inference of scienter is not somehow lessened because the majority of Garratt's and Vasos's sales occurred during the portion of the Class Period when Dollar General stock was trading at its highest prices. The opposite is true, as that is when these Defendants stood to gain the most from their insider sales. Defendants' argument rests on inapposite cases where the sales were distant from a corrective disclosure and not otherwise suspiciously timed. *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 822 (E.D. Ky. 2008); *In re Astea Int'l Inc. Sec. Litig.*, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 9, 2007) (same).

---

2002) (plaintiff selected 63 week class period "not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period").

[36] Defendants seek to "view[] in isolation" the sales in August/September 2022 and compare these to Garratt's and Vasos' "trading patterns over the prior two years." Mot. at 61 n.47. This argument improperly manipulates the control period. Further, as discussed above, Defendants' bald claim that "Plaintiffs started the Class Period in May 2020 to improperly skew the potential inferences from the sales in 2022" is undercut by the SAC's well-pled misstatements starting that month.

**Fourth**, Defendants argue the sales "were not 'calculated' to maximize profit" because some sales occurred at $205.33 or lower. Mot. at 62. This is not the relevant inquiry. What matters is Garratt's and Vasos's nonpublic knowledge of the true extent of Dollar General's inventory and staffing deficiencies at the time of their sales. That they did not time a sale to coincide perfectly with the highest price does not change the fact that they sold prior to the corrective disclosures when Dollar General's stock price declined. *Cardinal Health*, 426 F. Supp. 2d at 731 ("sales must be viewed along a continuum where maximum profits and total loss of control are at one end, and minimum profits and maximum retention of control are at the other."). From a motive perspective, they reaped hundreds of millions of dollars from suspiciously timed trades at artificially inflated prices—it is irrelevant that they might have made more money trading at different times.

**Fifth**, Defendants argue that Garratt's and Vasos's increased economic exposure to Dollar General—through retaining shares from expiring stock options and long-term vesting—negates an inference of scienter. Mot. at 62-63. They claim that "Plaintiffs overstate the value of the alleged trades by roughly 30%" because "Garratt and Vasos exercised options in cashless transactions where transaction costs are covered by a concurrent sale of the acquired shares." Mot. at 60 n.46. But this concedes that at least 70% of Vasos and Garratt's sales were unrelated to the exercise of stock options, and that is sufficient to establish scienter. *Cardinal Health*, 426 F. Supp. 2d at 730 ("That leaves 69% of his other sales activity to be unrelated to exercising [the] options, and all 69% of these sales . . . could be considered suspicious.").

Further, Garratt's and Vasos's purported increases in exposure through vesting does not negate scienter. These shares vested as a result of the executives' compensation awards (and continued employment at the Company), not because these executives affirmatively purchased shares on the open market. *Ross*, 501 F. Supp. 2d at 1117 (suspicious stock sales "substantiate[d]

a strong inference of scienter" even where "Defendants retained the majority of their holdings");

*Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (individual

defendants' 31% and 19% increases in class period holdings from compensation awards—not

volitional purchases—did not negate scienter).[37]

**Sixth**, to manufacture an exculpatory inference, Defendants argue that Garratt and Vasos's

insider sales arose from "contemplating their eventual departures" and "diversifying their

portfolio." Mot. at 63-64. These arguments are inappropriate factual disputes incapable of

resolution on the pleadings. Moreover, Garratt's and Vasos's sales far predate their eventual

departures, in contrast to Defendants' cited authorities. *Compare with Mart v. Tactile Sys. Tech.,*

*Inc.*, 595 F. Supp. 3d 788, 820–21 (D. Minn. 2022) (insider sale "two weeks before Blake retired"

was "a 'normal and expected' consequence of his retirement"); *City of Taylor Gen. Emps. Ret. Sys.*

*v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (insider "planned his retirement

approximately five months *prior* to the . . . class period").

**Seventh**, Defendants claim that the lack of trading by other executives and during certain

time periods somehow exculpates Garratt's and Vasos's insider sales. Mot. at 61 n.47, 62-63, 64.

This argument has been soundly rejected by the Sixth Circuit and other courts. *PR Diamonds*, 364

F.3d at 691 ("absence of insider trading" does not "defeat[] an inference of scienter");

*Firstenergy*, 2022 WL 681320, at *19 n.22 ("absence of suspicious stock sales by other Officer

---

[37] Defendants' authorities (Mot. at 62-63) are inapposite. *State Tchrs. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*, 2024 WL 3258293, at *15 (D. Mass. July 1, 2024) ("no allegations about Foster and Smith's trading activity 'before and after the class period'"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 835 (W.D. Mich. 2012) ("Plaintiffs fail to show that [defendant's] sale of stock was out of line with his history of prior sales"); *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (defendants affirmatively purchased additional stock on the open market, as opposed to passive vesting).

Defendants does not negate their scienter"); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) (executives may "keep their insider trading to a limit . . . to avoid getting caught").[38]

**Eighth**, Defendants' claim that scienter is negated by Dollar General's share repurchases (Mot. at 64-65) fails. "Buying back stock . . . does not in and of itself refute the strong inference of scienter raised by plaintiffs' other allegations." *In re Guilford Mills, Inc., Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999). Contrary to Defendants' authorities (64-65), Dollar General's stock repurchases during the same time as Defendants' insider trades "could properly be viewed as an attempt to keep the ball rolling—*i.e.*, to propel the Company forward (steadying the stock price, or sending it upward) for a period of time." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008) ("[d]efendants' massive sales [during the company's share repurchase program] are entirely consistent with that view.").

### 3. *Helwig* Factor 5: Dollar General Paid Millions Of Dollars To Settle Regulatory Actions Due To Its Inventory And Staffing Abuses

Under Factor 5, "an ancillary lawsuit charging fraud by a company and [its] quick settlement of that suit" is probative of scienter. *Helwig*, 251 F.3d at 552. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.* is instructive. 399 F.3d 651 (6th Cir. 2005). There, the Sixth Circuit inferred scienter based on a company's secret resolution of non-fraud claims because "[t]he gravamen of these claims and lawsuits . . . was closely parallel to that of this suit." *Id.* at 685. Even though "the claims in question were not based on fraud per se," the "presence of closely related

---

[38] Defendants' authorities (Mot. at 63) concerning the lack of insider sales from every Executive Defendant are irrelevant. Further, Defendant Owen's repurchase of $200,000 of shares and increased holdings (Mot. at 64) do not negate scienter from the alleged $300 million in insider sales. *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (defendant's lack of sales and continued purchases were "not sufficient to overcome the strong inference of scienter"); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001) (insider purchases may have been made to "negate any possible inference of fraud").

evidence carries some weight, particularly given that the list of [*Helwig*] factors is 'non-exhaustive.'" *Id.* "[A] company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire." *Id.*

These same principles hold true here. Dollar General's vast amount of excess inventory, coupled with the Company's continual understaffing and limited storage capacity, led to dangerously unsafe work conditions at Dollar General stores. ¶¶124-143. As a result, during the Class Period, Dollar General was the target of a total of 128 OSHA investigations, resulting in "repeated" and "willful" violations and more than $30 million in regulatory fines and settlements. *Id.* After over 200 failed inspections, OSHA stated: "we can only conclude that [Dollar General] choose to continue exposing their employees to hazardous conditions." ¶¶137, 441.

Company documents reveal that Defendants Vasos and Owen received "notice of the Company's blatant workplace safety noncompliance and record-breaking OSHA penalties *in 2020*." ¶¶143, 441. But "instead of 'addressing the issue of workplace safety head-on,'" the Company "'*chose to sweep its hazardous employee safety violations under the rug*.'" *Id*. Defendants' decision to conceal myriad regulatory violations that arose from the same chronic inventory and understaffing issues at the heart of this lawsuit bolsters the inference of scienter. *CBL*, 2022 WL 1405415, at *14 (allegations of concealed RICO claims in ancillary lawsuit "are sufficiently analogous to the fifth factor's requirements and suffice to satisfy them"); *see also Bridgestone*, 399 F.3d at 685 (same regarding concealed settlement of products liability claims).

Defendants wrongly argue that "publicly known regulatory investigations cannot support any inference of an intent to defraud." Mot. at 57 n.44. While OSHA's complaints are publicly available, its administrative docket is not public—so the public is unable to ascertain many of

63

Dollar General's compliance positions. Moreover, courts have widely recognized that a myriad investigations into the same subject matter as the private securities litigation, like those from OSHA and state regulators here, heightens the "holistic" inference of scienter.[39]

### 4. *Helwig* Factor 7: Defendants' Confusing Accounting Disclosures Concealed The Company's Inventory Problems

"In the Sixth Circuit, misleading financial presentations that are intended to confuse rather than illuminate, can provide a strong inference of scienter." *Am. Serv. Grp.*, 2009 WL 1348163, at *51. Defendants falsely proclaimed the Company's purported compliance with GAAP and usage of LIFO accounting to value inventory. ¶¶425-29; *see, e.g.*, ¶88 (Dollar General performed "'an annual LIFO analysis whereby *all merchandise units* [we]re considered for inclusion in the index formulation' and an '[a]n *actual valuation of inventory* . . . at the end of each year'"). These disclosures were highly technical and concealed Defendants' inability to conduct an accurate valuation based on inventory levels. ¶¶425-26; ¶93 ("FE-15 reported witnessing a *significant amount of intentional disregard of compliance with SOX* at Dollar General"); *see supra* §I.C.4. Further, Defendants also never quantified the Company's inventory shrink. *See supra* §I.C.1. Instead, Defendants offered only vague and unquantified warnings of "higher" or "increase[d]" shrink (*e.g.*, ¶¶153, 162) based on undisclosed assumptions and estimates. *See* Defendants' Ex. 1 at 37 (noting undisclosed "shrink provision" based on "an accrual for estimated shrink").

Defendants' opaque financial reporting helped conceal Dollar General's inventory deficiencies from public view. *See Bridgestone Corp.*, 399 F.3d at 687 ("[T]he 1999 Annual Report, by combining its statement of accounting policy with its silence, can be viewed as

---

[39] *Frank*, 646 F.3d at 961 (regulatory investigation contributed to scienter); *Chamberlain v. Reddy Ice Holdings, Inc.*, 2010 WL 5056184, at *25 (E.D. Mich. Dec. 6, 2010) (same); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 167 (S.D.N.Y. 2008) (same).

'disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication.'"); *FirstEnergy*, 316 F. Supp. 2d at 598 ("accounting errors and improprieties that are significant in nature and magnitude" support an inference of scienter).

### 5. The Complaint Satisfies A Majority Of The *Helwig* Factors And Pleads A "Holistic" Inference Of Scienter

The Complaint pleads nearly all *Helwig* factors, save only for Factors 3 ("closeness in time of [mis]statement or omission and the later disclosure of inconsistent information"), 4 ("bribery by a top company official"), and 8 (directors' "personal interest . . . in not informing disinterested directors of an impending [stock] sale"). 251 F.3d at 552. But Plaintiffs need only "draw upon these factors where applicable." *Cardinal Health*, 426 F. Supp. 2d at 718 n.43.

Defendants argue that Plaintiffs' "failure" to plead all *Helwig* factors "weighs heavily against an inference of scienter." Mot. at 69. But the *Helwig* factors "are not a checklist." *Bond*, 587 F. Supp. 3d at 676. Indeed, "treating the *Helwig* factors as an ironclad set of requirements . . . would make little, if any, sense, given that several of the factors are wholly irrelevant to many fraudulent schemes." *Welch*, 2024 WL 695772, at *13. These factors support scienter here.

### H. Defendants' Competing Inferences Are Not More Compelling Than The Inference Of Scienter

Defendants' attempt to manufacture innocent inferences falls flat. They argue "operational challenges arose primarily from external factors management could not control," including the "pandemic" and "its impact on the Company." Mot. at 66-69. Courts routinely reject such "blame the economy" arguments at the pleading stage. *Countrywide*, 588 F. Supp. 2d at 1173-74 (courts should not "speculate on the causes of the current economic situation" on Rule 12 motion); *In re 2007 Novastar Fin., Inc., Sec. Litig.*, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008), *aff'd* 579 F.3d 878 (8th Cir. 2009) (improper to "take judicial notice of the impact of . . . industry-wide

reversals on the Company."); *In re StockerYale Sec. Litig.,* 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal."). Defendants' recitations of their disclosures and purported "cautionary statements" (Mot. at 66-68) utterly disregard the internal reports provided by dozens of former employees and do not raise any innocent inference that is more compelling than the inference of scienter. *See supra* §§I.D.3, I.E. While Defendants may be free to try to convince a jury that they "acted in good faith at all times" (Mot. at 69), their counter-factual narrative cannot be credited at the pleading stage. Thus, this case should proceed into full and fair discovery.

## II. THE SAC ADEQUATELY ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Norfolk Cnty.*, 877 F.3d 687 at 695 (loss causation is "not meant to impose a great burden upon a plaintiff"). Plaintiffs' allegations readily meet this standard. Defendants progressively exposed Dollar General's deficient inventory management and chronic understaffing through a series of corrective disclosures. ¶¶455-92. Dollar General's share price fell in response to each disclosure. ¶¶457-91. These allegations more than suffice at this stage. *Norfolk Cty. Ret. Sys.*, 877 F.3d at 690.

Defendants' attacks fail. **First**, as noted *supra* in §I.C, Defendants repeatedly assert that they "never corrected" any alleged Misstatement, which rests on their core claim that a corrective disclosure must mirror the alleged misstatements. Mot. at 32, 35-36, 45-47, 51-52, 53-54. Defendants are wrong. "[N]o authority supports defendants' argument that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud." *Cardinal Health Inc.*, 426 F. Supp. 2d at 760–61; *Freudenberg,* 712 F. Supp. 2d at 202 (no requirement that "a corrective

disclosure be a 'mirror image' tantamount to a confession of fraud."). Here, the truth regarding Dollar General's inventory and staffing deficiencies was gradually revealed through a series of partial corrective disclosures, including regarding mounting inventory shrink, damages, and markdowns as well as the need to devote massive spending to remediation—each of which related specifically to the inventory and/or staffing problems. ¶¶455-92. Indeed, Defendant Vasos admitted that "any time you have too much inventory in the store, you've got too much shrink and damages." ¶¶194(c), 481(c). Thus, the corrective disclosures relate directly to the Misstatements.[40]

**Second**, Defendants argue that Plaintiffs' corrective disclosures could not have revealed the falsity of challenged statements and "also provided false 'assurances' regarding inventory." Mot. at 32 n.27. But this is plainly incorrect. Defendants disclosed increasing shrink, markdowns, and damages but simultaneously assured investors that the inventory problems were being fixed. Further, Defendants' disclosures withheld the true severity of Dollar General's inventory and staffing failures until the end of the Class Period. ¶¶455-92. *Norfolk Cty.*, 877 F.3d at 695 ("such revelations need not come all at once, but can come in a series of partial disclosures").

**Third**, as to the accounting Misstatements, Defendants argue that the lack of a restatement or change in accounting nullifies the corrective disclosures. Mot. at 35-36. Defendants are wrong. A restatement is not legally required, or it would effectively give defendants a veto over whether they can be sued. *In re LDK Solar Sec. Litig.,* 584 F. Supp. 2d 1230, 1245-48 (N.D. Cal. 2008) ("[T]he lack of a restatement did not mean that LDK only engaged in legitimate

---

[40] Defendants' cases are inapposite. Unlike here, in *D.E. & J. Ltd. P'ship v. Conaway*, the plaintiff "never alleged that [defendant's] bankruptcy announcement disclosed any prior misrepresentations." 133 F. App'x 994, 1000-01 (6th Cir. 2005); *see also In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, at *5 (M.D. Fla. Mar. 30, 2006) (correctives "d[id] not specifically relate to the issues involved in the alleged fraudulent scheme"); *Omnicare*, 583 F.3d at 944 (no allegations "explain how the statements were revealed to be false").

conduct."); *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir. 2002) (requiring a restatement would give auditors and officers "an unwarranted degree of control over whether they are sued"). The price drops after Defendants' disclosures incrementally revealed Dollar General's inability to accurately use LIFO to value inventory (¶462), which establishes causation for the accounting statements. *LDK Solar Sec. Litig.*, 584 F. Supp. 2d at 1238 (revelations that "inventory accounting skewed the company's reporting on profitability" pled loss causation despite lack of restatement).

**Fourth**, Defendants' claim that the inventory problems were known to the market (Mot. at 45) fails for the reasons described *supra* §§I.C.1, I.D.3, I.E. Defendants did <u>not</u> disclose that the Company was plagued by excess inventory, which it did not track or properly account for. Defendants' boilerplate risk disclosures also do not immunize the Misstatements. *Supra* §§1.D.3, I.E.

**Fifth**, as to the staffing misstatements, Defendants argue that it is "inconsistent" for Plaintiffs to allege that Dollar General's "smaller $100 million investment" primarily in labor hours is significant when the Company previously invested $170 million early in the Class Period. Mot. at 51-52. Not so. Defendants concealed the true extent of Dollar General's need to invest in its labor practices to remedy the underlying deficiencies. For example, as Defendants announced a $170 million headwind, they assured investors: "we feel good about the investments that we're making and the ability for those to set us up for 2024." *E.g.*, ¶¶182-83. Defendants' arguments that labor deficiencies were "repeatedly disclosed as a risk factor" and "already known to the market" fail for the reasons discussed *supra* §§I.C.2, I.D.3, I.E. Moreover, the stock declines following Defendants' March 2023 revelation of the additional $100 million investment confirm that this information was new to the market. ¶¶462-66; *CBL*, 2022 WL 1405415, at *16. This distinguishes

68

*In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (alleged corrective disclosure "was public information that the market absorbed long before").[41]

### III. THE SAC ADEQUATELY ALLEGES A SECTION 20A CLAIM

Under Section 20A, an insider who trades stock "while in possession of material, nonpublic information" is liable to any person who traded contemporaneously, provided the insider has independently violated the Exchange Act. 15 U.S.C. § 78t-1(a). Plaintiffs have alleged this claim against Defendants Vasos and Garratt. ¶¶523-32. The SAC alleges predicate violations of the securities laws. *See supra* at §I. It also alleges that Vasos and Garratt—while in possession of "material, nonpublic adverse information concerning Dollar General's inventory, earnings, staffing, pricing, and accounting practices"—sold over $315 million worth of Dollar General shares at inflated prices contemporaneously with purchases by Plaintiffs and other Class members. ¶¶450-54, 524-27. These allegations state a §20A claim. *Beach v. Healthways, Inc.*, 2009 WL 650408, at *6 (M.D. Tenn. Mar. 9, 2009). Defendants' attack relies on out of jurisdiction authority and ignores Sixth Circuit law.

### IV. THE SAC ADEQUATELY ALLEGES A SCHEME LIABILITY CLAIM

Plaintiffs adequately state a claim for scheme liability. Defendants engaged in acts to conceal the full extent of Dollar General's inventory control lapses and understaffing, including (i) issuing misstatements about inventory and staffing (¶¶210-438); and (ii) "repeated" and "willful" failures to comply with regulatory requirements (¶¶124-43). *Firstenergy*, 2022 WL 681320, at *14-17 (deceptive acts included misleading statements to investors).

---

[41] Defendants raise an inappropriate factual dispute by arguing that analyst reports purportedly "make clear the risk was already known to the market" (Mot. at 51-52). *Norfolk Cty.*, 877 F.3d at 696 ("[W]hether [plaintiff's] losses flowed from the disclosures . . . or anything else is for the parties to dispute at the summary-judgment stage or at trial, rather than . . . on the pleadings here.").

Defendants say no deceptive acts are alleged. Mot. at 69. Not so. Defendants' "disseminati[on] [of] false or misleading information to prospective investors with the intent to defraud" is standard deceptive conduct. *Lorenzo v. S.E.C.*, 587 U.S. 761, 778-79 (2019); *Firstenergy*, 2022 WL 681320, at \*7 ("Scheme liability may rest in part on the same statements or omissions that trigger misstatement liability").[42] Defendants disseminated misleading statements ¶¶26-32. This is not a case where the deceptive acts are "based on participation 'in a scheme through which the statements were made,'" as Defendants suggest. Mot. at 69-70. Defendants' assertion that Plaintiffs' scheme claim is improperly "based on the 'same factual circumstances' as the misstatement claims" fares no better. Mot. at 69-70. Misstatement liability and scheme liability "are not mutually exclusive, and [p]laintiffs' decision to plead both . . . is consistent with a complementary view." *Firstenergy*, 2022 WL 681320, at \*7.

## V. THE SAC ADEQUATELY ALLEGES A SECTION 20(a) CLAIM

The SAC pleads a primary violation of the Exchange Act, and the Executive Defendants culpably participated in the oversight and day-to-day operations of Dollar General. ¶¶26-32; 524-32. Nothing more is required to plead a §20(a) claim. *Firstenergy*, 2022 WL 681320, at \*32.[43]

## VI. CONCLUSION

As set forth herein, Defendants' motion to dismiss should be denied in its entirety.

---

[42] Defendants' cases are inapposite. *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 533 (6th Cir. 2023) (scheme claim dismissed on scienter grounds irrelevant here); *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at \*5 n.5 (2d Cir. June 10, 2024) (no allegations of "what deceptive . . . acts were performed, which defendants performed them, when the acts were performed"); *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020) (scheme solely based on "dissemination").

[43] *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740 (N.D. Ohio 2020) is inapposite. *Id.* at 773 (plaintiff "fail[ed] to adequately plead a primary violation of § 10b and Rule 10b-5").

DATED: January 21, 2025

Respectfully submitted,

*/s/ Kevin H. Sharp*

Kevin H. Sharp (BPR #016287)
Brent A. Hannafan (BPR #025209)
Kristi S. McGregor (GA Bar No. 674012)

**SANFORD HEISLER SHARP
MCKNIGHT, LLP**

611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com
bhannafan@sanfordheisler.com
kmcgregor@sanfordheisler.com

*Liaison Counsel for Lead Plaintiffs Universal-Investment-Gesellschaft mbH and Quoniam Asset Management GmbH*

Salvatore J. Graziano (admitted *pro hac vice*)
Jeremy P. Robinson (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Jonathan D'Errico (*pro hac vice* pending)

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com

*Lead Counsel for Lead Plaintiffs Universal-Investment-Gesellschaft mbH and Quoniam Asset Management GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2025, a true and correct copy of **PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED**
**COMPLAINT** was filed electronically via the Court's CM/ECF system. Notification of such
electronic filing was served on all counsel of record on January 21, 2025 via the CM/ECF system
to the following individuals below:

Amy L. Dawson
Peter E. Kazanoff
Simpson, Thacher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017-3954
amy.dawson@stblaw.com
pkazanoff@stblaw.com

Joshua Sean Bolian
Milton S. McGee, III
Steven Allen Riley
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
jbolian@rjfirm.com
tmcgee@rjfirm.com
sriley@rjfirm.com

*/s/ Kevin H. Sharp*
Kevin H. Sharp (BPR #016287)