# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | Case No. 3:23-CV-01250 |
| Plaintiff, | CLASS ACTION |
| v. | Judge Aleta A. Trauger |
| DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 3

    I.    The Complaint Fails to Allege Any Actionable Misleading Statements ......................... 3

    II.    The Complaint Fails to Allege a Strong Inference of Scienter .................................... 10

        A.    The FE Allegations Do Not Create a Strong Inference of Scienter ...................... 10

        B.    The Stock Sale Allegations Do Not Support a Strong Inference of Scienter ....... 13

        C.    The Opposition's Remaining Arguments Fail ....................................................... 14

        D.    The Non-Culpable Inferences are the Most Plausible ......................................... 15

    III.    The Complaint Fails to Plead Loss Causation ............................................................. 16

    IV.    The Complaint Fails to Allege a Scheme Liability Claim ............................................ 18

    V.    The Complaint Fails to Allege a Section 20A Claim.................................................... 18

CONCLUSION.................................................................................................................... 18

**TABLE OF AUTHORITIES**

**Cases**

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015).................................................................................. 7

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017) ........................................................................................ 15

*Doshi v. Gen. Cable Corp.*,
386 F. Supp. 3d 815 (E.D. Ky. 2019).......................................................................... 15

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018)....................................................................................... 12

*Evergreen Equity Tr. v. Fannie Mae*,
503 F. Supp. 2d 25 (D.D.C. 2007) .............................................................................. 18

*Fischer v. Vantive Corp.*,
283 F.3d 1079 (9th Cir. 2002)..................................................................................... 13

*Fla. Carpenters Reg'l Council Pens. Plan v. Eaton Corp.*,
572 F. App'x. 356 (6th Cir. 2014)............................................................................... 16

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) .......................................................... 6

*Grae v. Corr. Corp. of Am.*,
329 F.R.D. 570 (M.D. Tenn. 2019).............................................................................. 16

*Gruber v. Gilbertson*,
2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ............................................................ 18

*In re Carlotz, Inc. Sec. Litig.*,
2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024) ............................................................ 18

*In re Century Bus. Servs. Sec. Litig.*,
2002 WL 32254513 (N.D. Ohio June 27, 2002).......................................................... 13

*In re Enovix Corp. Sec. Litig.*,
2024 WL 349269 (N.D. Cal. Jan. 30, 2024) ............................................................... 10

*In re Omega Healthcare Investors Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)........................................................................... 9

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)........................................................... 15

ii

*KBC Asset Mgmt N.V. Omnicare, Inc.*,
769 F.3d 455 (6th Cir. 2014)..........................................................................................13

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024)...........................................................................................4

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009).........................................................................................11

*Lim v. Hightower*,
2024 WL 4349409 (N.D. Ohio Sept. 30, 2024) ...................................................... 4, 8, 11

*Macquarie Infra. Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) .........................................................................................................3

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013).......................................................................................17

*Mi v. Waterdrop Inc.*,
2024 WL 159191 (2d Cir. Jan. 16, 2024)..........................................................................3

*Miller v. Champion Enters., Inc.*,
346 F.3d 660 (6th Cir. 2003)............................................................................................7

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017)....................................................................................12, 13

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016)..........................................................................................16

*Perez v. Target Corp.*,
2024 WL 4804656 (D. Minn. Nov. 15, 2024)..................................................................10

*Plagens v. Deckard*,
2023 WL 2711263 (N.D. Ohio Mar. 30, 2023).........................................................11, 12

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004)..........................................................................................11

*Quinones v. Frequency Therapeutics, Inc.*,
106 F.4th 177 (1st Cir. 2024) .........................................................................................13

*Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*,
2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024) ...........................................................10, 16

*SEC v. SolarWinds Corp.*,
741 F. Supp. 3d 37 (S.D.N.Y. 2024) ...............................................................................18

iii

*Shupe v. Rocket Cos.*,
  2024 WL 416377 (E.D. Mich. Feb. 25, 2024) ........................................................................ 18

*St. Clair Cnty. Emps. Ret. Sys. v. Acadia Healthcare Co.*,
  2021 WL 195370 (M.D. Tenn. Jan. 20, 2021) .......................................................................... 8

*Stein v. United States Xpress Enters.*,
  2020 WL 3584800 (E.D. Tenn. June 30, 2020) ....................................................... 3, 11, 12, 15

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
  83 F.4th 514 (6th Cir. 2023).................................................................................... 12, 15, 18

*Tian v. Peloton Interactive, Inc.*,
  2025 WL 510043 (E.D.N.Y. Feb. 14, 2025) ............................................................................ 3

*Waswick v. Torrid Holdings, Inc.*,
  2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ............................................................................ 7

**Other Authorities**

AS 2510: Auditing Inventories (https://pcaobus.org/oversight/standards/auditing-
  standards/details/AS2510)..................................................................................................... 9

iv

**PRELIMINARY STATEMENT**

The Complaint makes the implausible claim that Dollar General and its most senior officers engineered a four-plus year fraud that supposedly misrepresented the Company's "inventory and staffing practices." Opp. at 1. The Complaint alleges that nearly every statement Defendants made concerning inventory and employees from May 28, 2020 through May 30, 2024 was misleading by omission for the same reasons, regardless of the specific content or context of the statements, their timing, or any accompanying cautionary language. Plaintiffs lift generalized statements out of context and ignore the Company's steady stream of warnings, including that it did not expect the early-COVID boom would last, it was facing an increasingly challenging macroeconomic environment, its inventory balances were growing substantially, it was building new facilities to improve inventory distribution, and inventory shrink, damages and markdowns were all expected to increase. The Opposition confirms the Complaint does not sufficiently plead: (1) facts that render any affirmative statements misleading when made, (2) facts giving rise to a strong inference of scienter, or (3) that Defendants made disclosures that corrected any prior statements.

The Complaint hinges on allegations of 24 former employees (the FEs) who claim they saw operational weaknesses at the various locations where they worked. Dollar General operated 16,000 stores and had 155,000 employees in May 2020, and grew to 20,000 stores and 193,000 employees by August 2024. None of the FEs held senior roles at the corporate level or have any Company-wide information about inventory management, human resources, or store labor matters. None were involved in preparing the challenged statements or communicated with Defendants about those statements. They do not identify specific Company-wide information Defendants should have disclosed or explain how any alleged omissions rendered any affirmative statements misleading. The Opposition leans heavily on allegations by two FEs who supposedly recall sending a total of three emails (one anonymously) to certain Defendants that focused on what they

1

thought about working at a Dollar General store and how to improve the operations of that individual store. The Complaint's high-level summary does not include any facts that show the information in those emails related to, let alone diverged from, the Company's public statements.

The Complaint ignores that the Company's long-time CEO Todd Vasos retired in 2022 and then agreed to come back to the CEO role in 2023 with a long-term equity compensation award. At the same time, Jeff Owen, former COO and CEO, held all his shares and purchased a large amount of stock in June 2023. Those undisputed actions demonstrate their confidence in the Company and foreclose any inference that they knew the Company was "broken at every level" or that its stock was propped up by years of fraud. The Opposition has no meaningful response.

The Complaint fails to plead the required strong inference of scienter based on periodic stock sales by Vasos and John Garratt (former CFO) as they approached retirement. The four-plus year Class Period was plainly structured around those trades, rather than any particular statements, to skew the control period analysis. As courts have recognized, the exceptional length of the Class Period undermines any culpable inferences from the sales. The May 2020 sales were not suspicious at all, as before the trades the Company had withdrawn its guidance. The Opposition ignores that key fact. In addition, the sales in 2020 and 2021 were long before the FEs allege any problems tracking inventory in temporary warehouses, two of three FE emails were allegedly sent, and the Company issued any alleged corrective disclosures. There is no basis to infer scienter from the sales in 2020 and 2021, and the sales in 2022 fit the established, innocuous pattern of the prior two years. In 2022, Vasos and Garratt also maintained their interests in the Company through the vesting of shares. Viewed holistically, the most plausible inference is that Defendants acted in good faith as they dealt with the shifting pandemic environment and subsequent economic turmoil.

2

**ARGUMENT**

**I.    The Complaint Fails to Allege Any Actionable Misleading Statements**

The Opposition confirms that this is a case of alleged omissions, not outright falsities.  Opp. at 18, 25.  An omission is only actionable if it "renders affirmative statements" misleading and the complaint pleads "facts [] needed to make those statements not misleading."  *Macquarie Infra. Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263–65 (2024).  A statement is only materially misleading if the "representations, taken together and in context, would have mis[led] a reasonable investor."  *Mi v. Waterdrop Inc.*, 2024 WL 159191, at \*3 (2d Cir. Jan. 16, 2024).[1]

The Opposition improperly ignores the Company's steady stream of cautionary statements. On the Class Period's first day, the Company withdrew its forward-looking guidance and disclosed new or heightened risks due to the pandemic.  Mot. at 9.  Dollar General subsequently disclosed the developing challenges and increased costs due to shifting consumer demand, supply and distribution disruptions, changing government benefit programs, and high inflation, and warned investors it expected those challenges to continue or grow as the economic environment evolved. *Id.* at 12–13; *see e.g.*, Ex. 29 (Mar. 2022 Tr.) at 5–6; *Tian v. Peloton Interactive, Inc.*, 2025 WL 510043, at \*9 (E.D.N.Y. Feb. 14, 2025) ("when a registration statement warns of the exact risk that later materialized, a [securities fraud] claim will not lie as a matter of law").

Specifically relating to inventory, in March 2022 the Company informed investors that it expected the rates of markdowns and shrink to increase and that those increased costs would be "headwinds" throughout 2022.  Ex. 29 (Mar. 2022 Tr.) at 5–6.  Dollar General issued similar

---

[1] The Opposition argues that considering the context of statements or related disclosures is an impermissible "truth on the market defense."  Opp. at 43–45.  But context is essential in a securities case.  *Mi*, 2024 WL 159191, at \*3.  Defendants are not raising an affirmative defense by pointing to disclosures they made.  *Stein v. United States Xpress Enters*., 2020 WL 3584800, at \*24 n.24 (E.D. Tenn. June 30, 2020).  In this brief, internal citations and quotations are omitted from cites.

3

cautions in May 2022, predicting increased markdowns, damage and distribution costs. Ex. 33 (May 2022 Tr.) at 3–4. In March 2022, the Company also disclosed the risk of increased labor costs due to "increased workload associated with … inconsistent deliveries from our distribution centers to our stores," which is the truck delivery issue Plaintiffs claim was concealed. Ex. 30 (Mar. 2022 10-K) at 10–11; *see* SCAC ¶ 4. With respect to staffing, the Company repeatedly cautioned the retail industry was "challenged by historically high rates of employee turnover" and "its ability to meet its labor needs" is uniquely "constrained by [its] everyday low price model" and "external factors." Ex. 1 (Mar. 2020 10-K) at 16. In May 2022, the Company disclosed it planned "targeted investments" in "incremental labor hours" to, among other things, improve store in-stock levels. Ex. 33 (May 2022 Tr.) at 6. Plaintiffs ignore those disclosures and fail to plead with particularity facts that were not disclosed and rendered the affirmative statements misleading by omission. *Lim v. Hightowe*r, 2024 WL 4349409, at \*11 (N.D. Ohio Sept. 30, 2024).

**Risk Factors.** Under *Kolominsky v. Root, Inc*., 100 F.4th 675, 689 (6th Cir. 2024), Dollar General's risk factor disclosures are not actionable representations of fact. For example, Plaintiffs challenge the risk factor statement that "[e]fficient inventory management is a key component of our business success and profitability" (Statement 2), which was in a paragraph that cautioned "we cannot make assurances that we will be successful in our inventory management" and our "financial condition may be negatively affected" "[i]f we are not successful in managing our inventory balances." Ex. 1 (Mar. 2020 10-K) at 11. The Opposition does not dispute that this and similar statements were risk factor disclosures or that they are not actionable under *Root*. Mot. at 36–40. The Opposition's conclusory argument that the risk factors were "vague" ignores that they address the specific risks concerning inventory and staffing matters underlying Plaintiffs' claims.

**Inventory Statements.** Plaintiffs challenge general statements from May 2020 to May

2024 that "we closely monitor and manage our inventory balances" and "efficient management of our inventory has been and continues to be an area of focus for us." Opp. at 17. The Opposition argues that each of those statements, regardless of date, were misleading by omission because the FEs alleged operational inefficiencies where they worked. *Id*. at 17–19. The FEs, however, did not have Company-wide roles or knowledge to show that statements about inventory monitoring were misleading by omission when made. The affirmative statements did not guarantee perfection and, in context with other statements and cautionary language, no such inference is reasonable.

The Opposition claims these statements (starting in May 2020) were misleading because in "February or March 2023" FE-3 allegedly heard a discussion about unloaded trailers in parking lots leading to detention fees. *Id*. at 17, 19. The Opposition does not link that allegation to any statements and largely ignores that the Company disclosed the detention fees in December 2022:

> December 2022 Earnings Call: "[A]s we moved through Q3, we experienced unexpected delays in opening additional temporary storage facilities, primarily due to external challenges such as permitting. At the same time, seasonal goods came in earlier than anticipated. **The resulting constraints from these factors led to more than $40 million in additional supply chain costs in Q3, compared to what we had previously expected. These costs included: detention fees incurred for delays in returning shipping containers**, costs associated with inefficiencies in moving freight within our distribution centers . . .". Ex. 40 (Dec. 2022 Tr.) at 4; *see also* Ex. 42 (Dec. 2022 10-Q) at 5, 7 (similar).

This deficiency plagues the Complaint. Plaintiffs argue that statements between May 2020 and December 2021 relating to inventory distribution were misleading because Defendants did not disclose that Dollar General's "bloated supply chain failed to timely deliver inventory to stores, resulting in lost sales and diminished profits from marking down obsolete inventory." Opp. at 22. But over that same period, Dollar General disclosed it was facing supply chain constraints, delivery delays and out-of-stock products on its store shelves.[2] The Opposition does not address the context

---

[2] *See, e.g.*, Ex. 12 (Dec. 2020 Tr.) at 12 ("anticipate higher transportation and distribution costs in Q4 to continue"); Ex. 26 (Dec. 2021 10-Q) at 5–6 (stating Company was unsatisfied with in-stock

5

of the disclosures or the specific statements. The May 2020 statement that "the supply chain is ready to deliver product when it's available" concerned COVID-related product supply shortages, an issue the FEs do not address or dispute. Ex. 4 (May 2020 Tr.) at 17–18. In addition, the Company disclosed lower markdowns in 2020, which the FEs do not dispute. Ex. 12 (Dec. 2020 Tr.) at 12. The Opposition does not identify specific information Defendants should have disclosed or explain how any omission rendered any affirmative statements misleading.

Similarly, Plaintiffs challenge the statement that "[e]fficient inventory management is a key component of our business success and profitability." Opp. at 11, 17. In addition to being a protected risk factor disclosure, the Opposition fails to show how the actual statement was misleading by omission due to a supposed (and unquantified) "glut of excess inventory." *Id.* at 18. The FEs do not purport to have any knowledge about company-wide inventory management or allege any facts about an alleged "glut" until mid-2022, by which time the Company disclosed its inventory was increasing substantially and it experienced "increased inventory damages." Ex. 30 (Mar. 2022 10-K) at 30–31. By August 2022, the Company disclosed its inventory levels "increased by 25.1%" on a per store basis. Ex. 37 (Aug. 2022 10-Q) at 16.[3]

Moreover, the Opposition cannot sustain a fraud claim by mischaracterizing statements that the Company "closely monitor[s] and manage[s] inventory balances" as a guarantee of perfect inventory management. Opp. at 3. The Complaint's theory does not account for the Company's repeated disclosures about efforts to improve inventory management, including by building new

---

levels and describing "higher costs due to transit and port delays").

[3] As this Court recognized in *Grae v. Corr. Corp. of Am.*, Dollar General's general positive statements about "inventory quality" and being "well-positioned" do not support a claim because they "lack[] a standard against which a reasonable investor could expect them to be pegged." 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017). Unlike in *Grae*, Dollar General did not peg these statements "to something concrete." *Id.*

distribution centers to increase efficiencies and by canceling inventory orders. Ex. 30 (Mar. 2022 10-K) at 7, 16; Ex. 36 (Aug. 2022 Tr) at 18. Nor does the Complaint allege the Company did not have a "data-driven inventory system." SCAC ¶ 274. Alleged connectivity issues in certain locations do not suggest the WMS system did not exist. *See Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *4–5 (C.D. Cal. Dec. 1, 2023); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (mismanagement allegations not actionable). The Opposition also ignores the Company's repeated, specific cautionary statements that it "cannot make assurances that we will be successful in our inventory management." *See, e.g.*, Ex. 16 (Mar. 2021 10-K) at 13.[4]

**Staffing Statements.** The Opposition claims that each of the Staffing Statements was misleading because the Company failed to disclose that stores were chronically understaffed. Opp. at 24. But the Opposition does not provide the necessary link between the FEs' assertions of understaffing and the Company's actual statements. For example, the Complaint challenges the statement that the Company "proactively seeks ways to continue investing" in its employees in support of its "goal" to attract "talented personnel." SCAC ¶ 109; Ex. 30 (Mar. 2022 10-K) at 29. In context, this is clearly an aspirational, forward-looking statement protected by the safe harbor. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 677 (6th Cir. 2003). Nor do the FEs allege anything about investments in employee development to suggest the statements were misleading. The refrain that stores were understaffed is a *non sequitur* that does not show any omissions.[5]

---

[4] The Opposition mischaracterizes the Company's statements about Winter Storm Elliott. Opp. at 35. The Company disclosed that the Storm was linked to reduced foot traffic, lower sales and inventory damage. Ex. 43 (Feb. 2023 8-K) at 4; Ex. 45 (Mar. 2023 10-K) at 29. The Company did not blame general inventory problems on the Storm, as the Opposition suggests.

[5] The FEs do not dispute the Company's numerous investments, including increasing wages, nearly $170 million in COVID bonuses, expansive training programs, and education benefits, such as employer-paid college degree programs, online, on-demand learning programs with college-level courses at no cost, and truck driver training programs for employees changing careers. *See* Ex. 15 (Mar. 2021 Tr.) at 3; Ex. 29 (Mar. 2022 Tr.) at 10; Ex. 33 (May 2022 Tr.) at 9–10.

7

The Complaint's challenge to the Company's employment metrics, including employee headcount growth and manager turnover rates is unsupported. *See, e.g.*, Opp. App'x A Statement 68 ("[I]n 2020, we saw our lowest store manager turnover on record."). The Opposition does not dispute the accuracy of the reported metrics, which relate to Company-wide numbers and rates. There is no dispute the Company hired tens of thousands of new employees and none of the FEs purport to have any insight into Company-wide employment metrics.[6]

Finally, the Opposition attempts to rewrite the general statement that a "typical" store was "*operated* by" a manager, one or more assistant managers, and three or more sales associates into a representation that each store was simultaneously "*staffed* by" five or more employees at all times. Opp. at 24, App'x A Statement 62. Plaintiffs cannot rewrite a statement and then claim it is misleading. The statement appears in a general discussion of the Company's business model, not a report on daily store staffing levels, and there is nothing to suggest that a reasonable investor would interpret it to mean that every manager, assistant manager and sales associate worked simultaneously all day, every day at each store. *E.g.*, Ex. 16 (Mar. 2021 10-K) at 4–6.

**Pricing Statements.** The Opposition concedes all but one of the Pricing Statements relate to the Company's prices compared to its competitors. Opp. at 26–27. There are no FE allegations about the Company's prices or competitors' prices that show the competitive pricing statements were misleading. The allegations about shelf price discrepancies are unrelated to the affirmative statements and do not support an omission claim. *Hightower*, 2024 WL 4349409, at *12.

Plaintiffs claim that during the May 2023 shareholders meeting, Defendants said "they will

---

[6] The Opposition's reliance on *St. Clair Cnty. Emps. Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370 (M.D. Tenn. Jan. 20, 2021), is misplaced. Opp. at 24. There, the plaintiffs challenged statements specifically about the "adequacy of staffing," after a public report revealed that 90% percent of the defendants' 31 hospitals were understaffed based on government inspections. *Id.* at *1–2. Here, the alleged divergent reports do not contradict any public statement.

swiftly correct" shelf-pricing issues.  Opp. at 27.  But Defendants said something else:

> [w]e strive to provide our customers … with the shelf pricing they can count on every day. In those situations where we fail to live up to this expectation, we take swift action to identify the root cause of the issue and correct it.  Sometimes those root causes relate to systems and sometimes they relate to store level execution.  Regardless, we take action designed to ensure we prevent their reoccurrence.

SCAC ¶ 384.  Plaintiffs have not alleged facts suggesting this statement was misleading in context, and no FE allegation about shelf-price issues is contemporaneous with this statement.

**Accounting Statements.**  The Complaint does not allege any facts showing Dollar General's financial metrics, including net income, net sales and various inventory-related metrics, were false or misleading when reported, or that they have ever been found materially incorrect. The FEs did not have a role in preparing the Company's financial statements or its corporate-level inventory accounting.  Significantly, the Company's inventory balances were audited, subject to a specific auditing standard, and there are no allegations that the auditors ever questioned the Company's reported balances (and they did not).  *See* AS 2510: Auditing Inventories (https://pcaobus.org/oversight/standards/auditing-standards/details/AS2510).

The Opposition speculates that the Accounting Statements were "necessarily incorrect" due to Dollar General's supposed inability to physically track certain inventory in temporary warehouses.  Opp. at 28.  But the Company's reported inventory balances are based on its retail stock ledger, including inventory purchase accruals among other things, not just data in the WMS system.  The FEs do not allege facts linking any alleged gaps in the WMS system to the Company's actual reported inventory balances.  The Complaint cannot sustain a claim without particularized facts showing what additional information should have been disclosed and how it would have impacted the reports.  *In re Omega Healthcare Investors Sec. Litig.*, 563 F. Supp. 3d 259, 273 (S.D.N.Y. 2021) (dismissing claim based on accurate financial statements where only "a tenuous

connection between the affirmative statement and the specific information . . . that plaintiffs claim should have been disclosed").[7]

*      *      *

Courts have rejected similar efforts to manufacture securities fraud claims following the COVID pandemic. For example, in *Perez v. Target Corp.*, 2024 WL 4804656, at *10 (D. Minn. Nov. 15, 2024), the court rejected claims that Target misrepresented its inventory because there were "no allegations to suggest any of the [Confidential Witnesses] analyzed Target's companywide sales or demand, knew customer-purchasing patterns across Target's business, let alone what merchandise Target was purchasing and when." The court also found many challenged statements about "well-positioned" inventory were "nonactionable corporate puffery." *Id.* at *12; *see also, e.g., Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*, 2024 WL 4362747, at *12 (S.D.N.Y. Sept. 30, 2024); *In re Enovix Corp. Sec. Litig.*, 2024 WL 349269, at *11, *14 (N.D. Cal. Jan. 30, 2024). Plaintiffs' claims here fail for the same reasons.

## II. The Complaint Fails to Allege a Strong Inference of Scienter

There is no dispute the Complaint must plead with particularity facts giving rise to a strong inference of scienter for each Defendant as to each alleged misstatement. The Opposition improperly relies on the same conclusory allegations to support all 113 alleged misstatements over four years, without regard to timing or defendant. *Enovix*, 2024 WL 349269, at *15 (no scienter when "complaint does not state with specificity what defendants knew and when").

### A. The FE Allegations Do Not Create a Strong Inference of Scienter

Plaintiffs concede that particularized allegations showing a divergence between internal

---

[7] For the same reasons, the Complaint fails to show Defendants' SOX certifications were false or misleading, or that the Company had a duty to disclose any trends pursuant to SEC Item 303.

10

reports and external statements are the "key factor" to scienter. Opp. at 47. Contrary to Plaintiffs' contention, (*id.*), mere "access" to information is insufficient. *Plagens v. Deckard* held a complaint must allege "specific facts that the reports were known to Defendants" and "reflect the allegedly fraudulent scheme." 2023 WL 2711263, at *27 (N.D. Ohio Mar. 30, 2023); *see also Hightower*, 2024 WL 4349409, at *16 ("cannot infer fraudulent intent solely from Defendants' … alleged access to information"). The Complaint relies solely on the FEs for those "specific facts." But 22 of the 24 FEs do not allege any "interaction with any of the [individual] Defendants" and accordingly provide no basis to infer scienter. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009); *see also Stein*, 2020 WL 3584800, at *40. The Opposition's argument that these FEs "corroborate the others" (Opp. at 15) is just a disguised "must have known" theory that is insufficient as a matter of law. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 694 (6th Cir. 2004).

FE-1 and FE-2—who managed two of Dollar General's 16,000+ stores and left in 2022— cannot satisfy Plaintiffs' burden. SCAC ¶¶ 44, 46, 49. FE-1 allegedly sent an email to Vasos in February 2022 "to explain what it was like working at a Dollar General store" and "provid[e] suggestions on how to fix" the operational "problems" related to "hiring," "inventory," and "maintenance" at a store. *Id*. ¶ 45. FE-2 allegedly sent an anonymous email to executives including Vasos and Owen in July 2021 about "staffing, truck delivery problems, and inventory management issues." *Id.* ¶ 48. When she quit in June 2022, she claims to have emailed "everyone in the top three tiers of the Company" a "long list of problems," including "inventory" and "trucking" problems. *Id.* ¶ 49. Neither FE is alleged to have reported any wrongdoing. The Complaint does not allege the emails said anything about inventory tracking in temporary warehouses, pricing or inventory accounting or that *any* of the emails were sent to Dilts.

These emails cannot show any scienter in connection with statements made before they

11

were sent.  Emails in 2022 are not "divergent reports" with respect to statements in 2020 or 2021.  In any event, the Complaint does not plead sufficient "details" about the contents of the emails to show they diverged from any specific statements.  *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 530 (6th Cir. 2023).  The Complaint alleges only that the emails discussed staffing, delivery, and inventory issues at these individuals' stores without providing any specificity.  SCAC ¶¶ 45, 48–49.  Those descriptions are too general and untethered to any statements.  As a result, the Court cannot "analyze meaningfully whether [the emails] diverged from external statements."  *Stein*, 2020 WL 3584800, at *35.

Cases cited in the Opposition demonstrate the insufficiency of the allegations here.  In *Dougherty v. Esperion Therapeutics, Inc*., the complaint referred to statements in minutes of the company's meeting with the FDA that contradicted the company's description of the meeting to investors.  905 F.3d 971, 981 (6th Cir. 2018).  Similarly, in *Plagens*, the complaint identified an internal report of scientific test results about specific products that contradicted public statements about the products.  2023 WL 2711263, at *27.  There is nothing remotely similar alleged here.[8]

Nor does the Complaint allege facts showing that any Defendant "actually read" these emails.  *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017).  The allegation that Vasos' assistant called FE-1 after FE-1 sent the February 2022 email (SCAC ¶ 45) does not show that Vasos read the email and recognized any inconsistencies with his public statements.  Similarly, the allegation that a "Senior VP" responded to an email FE-2 sent to "leadership" says nothing about Defendants and Plaintiffs only speculate that they "had their subordinate respond to it."

---

[8] Plaintiffs cannot avoid their pleading burden by claiming the FEs no longer have access to the emails. Opp. at 51. The Complaint does not allege the emails were sent from Dollar General email addresses, nor could it as store managers do not have the ability to email the CEO or CFO from their stores. If they were sent to Defendants, the FEs must have used personal email accounts.

12

Opp. at 47–48.  Any inference of scienter is "tenuous" at best.  *Neiman*, 854 F.3d at 748.[9]

Finally, the Opposition does not dispute that the Complaint must meet a higher standard of "actual knowledge" to plead scienter for statements of corporate optimism and opinion.  *KBC Asset Mgmt N.V. Omnicare, Inc.*, 769 F.3d 455, 478, 481 (6th Cir. 2014).  None of the FE allegations suggest the Defendants did not actually believe their statements of opinions or optimism.

### B.  The Stock Sale Allegations Do Not Support a Strong Inference of Scienter

The Opposition does not dispute that stock trading "is not sufficient to establish an inference of scienter on its own."  *Quinones v. Frequency Therapeutics, Inc*., 106 F.4th 177, 184 (1st Cir. 2024).  Plaintiffs bury in a footnote Owen's June 2023 purchase of $235,000 of stock (Opp. at 62 n.38), which significantly undermines any inference of scienter as to any Defendant.  *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *8 (N.D. Ohio June 27, 2002).[10]

The Opposition fails to show the periodic sales by Vasos and Garratt were sufficiently suspicious to create an inference of scienter.  Plaintiffs claim Garratt and Vasos sold more shares during the lengthy Class Period than before the Class Period (Opp. at 57), but the only plausible inference is that Plaintiffs structured an "unusually long" four-plus year Class Period to make "the stock sales appear more suspicious."  *Fischer v. Vantive Corp.*, 283 F.3d 1079, 1092 (9th Cir. 2002).  Besides the stock sales, Plaintiffs point to nothing else to indicate scienter early in the Class Period.  In May 2020, the Company *withdrew* its forward-looking guidance, warning of pandemic-created uncertainties.  Ex. 4 (May 2020 Tr.) at 6.  The Opposition ignores that point.  The fact that

---

[9] The allegations about internal meetings fare no better.  Opp. at 48–49.  The FEs do not allege Defendants attended the meetings, so they could not be divergent reports to Defendants that suggest scienter.  The Complaint also does not show the meetings diverged from any statements.

[10] Moreover, the Company repurchased substantial amounts of stock from 2020 to 2022 and the Board routinely authorized additional funds for the repurchases, including in August 2021 and August 2022.  Mot. at 65.  The Complaint does not allege that the Board, comprised of mostly outside directors, acted improperly when it approved additional funds for repurchases.

some of the largest sales occurred immediately after the Company withdrew its guidance is entirely inconsistent with scienter. The sales in 2020 and 2021 were not suspicious, and the sales in 2022 were consistent with the established pattern of periodic sales as they approached retirement. Moreover, Garratt increased his holdings between April 2022 and April 2023. *See* Mot. at 62.[11]

The Opposition also fails to link any trades to material events that provide an indicia of insider trading. The sales began 30 months before the first alleged corrective disclosure and roughly 14 months before the first (anonymous) email alleged to be a divergent report. SCAC ¶¶ 48, 151, 451, 453. Nor does the Opposition link the sales to any major changes in the Company's stock price or any specific information that Vasos or Garratt learned prior to trading. Contrary to the Opposition's suggestion (Opp. at 59), it is standard and innocuous for executives to sell within established trading windows shortly after a company issues its earnings reports.

Like Owen's purchases in June 2023 and the Company's repurchases from 2020-2022, Vasos' decision to return as CEO and receive equity compensation with a four-year vesting period shows confidence in the Company and renders any inference of scienter implausible. Mot. at 62–63. Vasos aligned his interests with shareholders, effectively investing his retirement years in the Company and its stock. There can be no inference he returned as CEO with equity compensation knowing the stock was inflated by years of fraud. *Id.* The Opposition ignores this point entirely.

## C. The Opposition's Remaining Arguments Fail

The Opposition's remaining arguments fall short. Plaintiffs claim that inventory and staffing were "core operations" for a retail chain (Opp. at 54), but courts in this Circuit have not

---

[11] The Opposition argues that the vesting of shares does not "negate scienter," Opp. at 60, but vesting increases ownership interests and offsets reductions from sales. In addition, the fact that in 2023 Vasos and Garratt exercised options and retained thousands of acquired shares further shows they remained invested and is inconsistent with Plaintiffs' scienter theory. Mot. at 62–63.

14

adopted that theory as sufficient to show scienter. *Stein*, 2020 WL 3584800, at *39; Mot. at 66.

And the Complaint does not link any particular allegations about "core operations" to show that specific statements were made with scienter. Similarly, the Company's settlement with OSHA did not involve allegations of fraud, was reached after long negotiations, was settled for far less than OSHA originally assessed, and does not suggest any scienter. *See, e.g.*, *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 837 (E.D. Ky. 2019) (settlements with DOJ and SEC did not support scienter because they do not show company trying "to sweep information under the rug before it is known to the public"). Finally, the Opposition's conclusory argument that the Company's disclosures were "confusing" is unsupported by factual allegations concerning any specific accounting policies or metrics that "concealed" inventory issues and does not satisfy *Helwig* factor 7. Opp. at 64.[12]

### D. The Non-Culpable Inferences are the Most Plausible

Even if a complaint "allege[s] a plausible inference of scienter," a case will be dismissed if the allegations are "consistent with a more plausible nonculpable inference." *ServiceMaster*, 83 F.4th at 527. Here, the more plausible inference is that the Company was continuing to play catch-up as the discount retail industry emerged from the pandemic. Defendants' statements through the Class Period contained a "mix of optimism and caution." *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 38 (1st Cir. 2017). The Company's disclosures, read in full context, show Defendants provided real time updates as consumer demand shifted, supply chain disruptions evolved, and inflation hit its economically vulnerable core customers. Indeed, from the beginning of the Class Period, "rather than promising that the unprecedented demand … would remain at the same level," Defendants withdrew forward-looking guidance and "told investors that the rapid increase in

---

[12] The Opposition's generic argument that Defendants were motivated to keep their jobs (Opp. at 57–58) would apply to any corporate executive and is insufficient to show scienter. *See In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *22–23 (S.D. Ohio Sept. 29, 2023).

15

demand" may reverse as the pandemic progressed.  *Peloton*, 2024 WL 4362747, at *11.[13]

In Opposition, Plaintiffs argue that these cautionary statements "disregard the internal reports by dozens of former employees."  Opp. at 66.  This argument mischaracterizes the Complaint.  Only two FEs are alleged to have communicated with Defendants and the three emails those FEs claim to have sent (one anonymously) did not relate to the Company's disclosures or report any wrongdoing, and therefore do not support a strong inference of scienter.  Defendants are also not attempting to "blame the economy" for the stock price drop.  Opp. at 65.  The Court must consider the cautionary statements about specific risks exacerbated by the pandemic.

Finally, the Opposition cannot wave away the stock purchases by Owen and the Company or Vasos' decision to return to the CEO role in late 2023, which strongly show their good faith belief in the Company, its prospects, and the accuracy of its disclosures to investors.

### III.     The Complaint Fails to Plead Loss Causation

In the Sixth Circuit, loss causation is pled by alleging a corrective disclosure or the materialization of an undisclosed risk.  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016).  The Opposition argues only loss causation "through a series of corrective disclosures," thus waiving the materialization of an undisclosed risk theory.  Opp. at 66.  A corrective disclosure must "reveal some [previously]-undisclosed fact with regard to the specific misrepresentations alleged."  *Grae v. Corr. Corp. of Am.*, 329 F.R.D. 570, 580 (M.D. Tenn. 2019); *Fla. Carpenters Reg'l Council Pens. Plan v. Eaton Corp.*, 572 F. App'x. 356, 360–61 (6th Cir. 2014) (corrective disclosure must reveal "new" information that "corrects the misleading aspect of [the] statements").  While a "disclosure need not precisely mirror" the

---

[13] The non-culpable inferences are particularly strong with respect to Owen, who sold no stock and purchased shares in the open market in June 2023, and Dilts, who also sold no shares and is not alleged to have received any of the FE emails.

statement, it must relate back to the misstatement alleged. *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013). The Complaint does not allege Defendants issued statements that related back to prior statements and revealed new information that had been omitted.

**Inventory Statements.** None of the purported corrective disclosures mentioned efficient inventory management or the WMS system or purported to correct any Inventory Statements. The Company disclosed substantial increases to its inventory balances long before the first alleged corrective disclosures. Ex. 30 (Mar. 2022 10-K) at 30, 36; Ex. 34 (May 2022 10-Q) at 16. The Company also disclosed that inventory shrink and markdowns were expected to increase several months before the first alleged corrective disclosure. Ex. 29 (Mar. 2022 Tr.) at 6; Ex. 36 (May 2022 Tr.) at 15. Finally, the Company's August 2023 announcement of planned inventory markdowns only impacted expected future sales proceeds and did not correct any prior inventory balances, which are carried at the lower of cost or market value. Ex. 50 (Aug. 2023 1O-Q) at 16.

**Staffing Statements.** Dollar General's announcements it would make an incremental investment of $100 million into labor hours did not correct any prior Staffing Statements. Opp. at 68. The Staffing Statements did not relate to labor hours or store-level staffing decisions. Plaintiffs cannot show, for example, that an incremental investment in labor hours "corrects" the Company's statement that it "proactively seek[s] ways" to invest in employee development. Opp. at 43. And the Company never corrected its general statement about the employees who "operate" a store.

**Pricing Statements.** Defendants never corrected any statements related to competitive pricing or the March 2023 statement about shelf pricing. The Opposition did not dispute this point.

**Accounting Statements.** Defendants never restated or corrected any financial reports. Nor did they provide any new information about the application of its inventory accounting policies. None of the alleged corrective disclosures suggest the challenged financial statements

17

were incorrect or incomplete. The Opposition argues the stock price drop revealed a flaw in Defendants' LIFO methodology. Opp. at 68. But a stock price drop is not a corrective disclosure.

### IV. The Complaint Fails to Allege a Scheme Liability Claim

The Opposition concedes that alleged misstatements are not sufficient to plead a scheme claim (Opp. at 70). *ServiceMaster*, 83 F.4th at 533. Plaintiffs claim dissemination of misleading statements is a separate deceptive act. But the Complaint does not plead facts showing Defendants disseminated the alleged misstatements. That Defendants signed SEC filings is insufficient. *In re Carlotz, Inc. Sec. Litig.*, 2024 WL 3924708, at *4 (S.D.N.Y. Aug. 23, 2024) ("sending one's own false statements to prospective investors" is not dissemination); *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 98 (S.D.N.Y. 2024) (dismissing scheme claims because sub-certification of misstatements "is the very conduct that the SEC uses to premise its misstatement claims under Rule 10b-5(b)"). In addition, as shown above, the claim does not adequately allege scienter.[14]

### V. The Complaint Fails to Allege a Section 20A Claim

The Opposition does not address the Complaint's failure to allege with particularity that Plaintiffs' purchases were "contemporaneous" with sales by Vasos or Garratt. *Gruber v. Gilbertson*, 2018 WL 1418188, at *18 (S.D.N.Y. Mar. 20, 2018); *Evergreen Equity Tr. v. Fannie Mae*, 503 F. Supp. 2d 25, 46–47 (D.D.C. 2007). Plaintiffs cannot dismiss this precedent as "out of jurisdiction authority" (Opp. at 69). *See Shupe v. Rocket Cos.*, 2024 WL 416377, at *10 (E.D. Mich. Feb. 25, 2024) (noting most courts agree "contemporaneously" means the day after or within a few days). And Plaintiffs also have not alleged the requisite predicate violation.

### CONCLUSION

The Complaint should be dismissed with prejudice.

---

[14] Plaintiffs do not dispute that they cannot sustain a control person claim without a viable primary claim or for conduct when an individual was not an officer of the Company. Opp. at 70.

18

Dated: February 21, 2025
Nashville, Tennessee

/s/ Steven A. Riley
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #24150 )
**RILEY & JACOBSON, PLC**
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rjfirm.com
tmcgee@rjfirm.com

Peter E. Kazanoff (*admitted pro hac vice*)
Amy L. Dawson (*admitted pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York 10017
Tel: 212.455.2000
pkazanoff@stblaw.com
amy.dawson@stblaw.com

*Counsel for Defendants Dollar General Corporation, Todd J. Vasos, Jeffrey C. Owen, John W. Garratt and Kelly M. Dilts*

19

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Kevin H. Sharp
Brent A. Hannafan
Kristi S. McGregor
Sanford Heisler Sharp, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
(615) 434-7000
Fax: (615) 434-7020
ksharp@sanfordheisler.com
bhannafan@sanfordheisler.com
kmcgregor@sanfordheisler.com

Jonathan D'Errico
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020
Jonathan.derrico@blbglaw.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
200 31st Avenue North
Nashville, TN 37203
cwood@rgrdlaw.com

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
darrenr@rgrdlaw.com

James Gerard Stranch, IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com

Mary K. Blasy
Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP 58
S. Service Road, Suite 200
Melville, NY 11747
mblasy@rgrdlaw.com
srudman@rgrdlaw.com

Salvatore J. Graziano
Jeremy P. Robinson
Alexander Noble
Jonathan D'Errico
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
200 31st Avenue North
Nashville, TN 37203
jmartin@barrettjohnston.com

Thomas C. Michaud
Vanoverbeke, Michaud & Timmony, PC
79 Alfred Street
Detroit, MI 48201
tmichaud@vmtlaw.com

s/ Steven A. Riley

20