# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,** | ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-01250** |
| | ) | **Judge Aleta A. Trauger** |
| **DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The defendants have filed a Motion to Dismiss (Doc. No. 76), which, for the reasons set forth herein, will be granted without prejudice.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Lead Plaintiffs Universal-Investment-Gesellschaft mbH and Quoniam Asset Management GmbH,[1] on behalf those who acquired Dollar General Corporation common stock between May 28, 2020 and August 28, 2024, inclusive (the "Class Period"), bring this putative securities fraud class action against Dollar General Corporation ("Dollar General" or the "Company") and four individual defendants: Todd Vasos and Jeffrey Owen, who were each Chief Executive Officer

---

[1] Washtenaw County Employees' Retirement System originally filed this action. (Doc. No. 1.) Following notice of pendency (*see* Doc. No. 29-5), competing Motions for Appointment as Lead Plaintiff (Doc. Nos. 27, 30, 35), and Responses (Doc. Nos. 47–49), the court appointed the current Lead Plaintiffs and approved current lead and liaison counsel. (*See* Doc. No. 51 at 7.)

("CEO") at some point during the Class Period, and Kelly Dilts and John Garratt, who were each Chief Financial Officer ("CFO") at some point during the Class Period ("Individual Defendants").[2] (Second Consolidated Amended Complaint ("Complaint"), Doc. No. 73 ¶¶ 25–29.)

Dollar General is one of the largest discount retailers in the United States. (*Id.* ¶ 3.) Toward the end of the Class Period, it had over 20,000 stores in forty-eight states and Mexico (*id.* ¶ 34), roughly 185,000 employees (*see* Doc. No. 78-53 at 11, Mar. 14, 2024 4Q23 Earnings Call Corrected Transcript (Vasos thanking "our approximately 185,000 employees")), and net sales of about $10 billion per quarter (*see* Doc. No. 78-57 at 5, Aug. 29, 2024 2Q24 Form 10-Q).[3] Dollar General sells groceries, clothing, home goods, and seasonal items, among other products, and caters to consumers with modest incomes who live in towns and small cities without many other similar stores. (Complaint ¶¶ 34–35.)

The Complaint alleges, on the basis of the observations of twenty-four former employee anonymous witnesses ("FEs"), that, at the same time the Company inadequately staffed stores and improperly managed a glut of merchandise it improvidently ordered—which caused myriad problems—its corporate officers painted a misleadingly rosy picture through 113 false or

---

[2] Some of the Individual Defendants are alleged to have held other roles, in addition, during the Class Period. Vasos resigned as CEO on November 1, 2022, stayed on as an advisor and then consultant, and then was reappointed as CEO on October 12, 2023. (Complaint ¶ 26.) Owen was Chief Operating Officer from the beginning of the Class Period until he was elevated to CEO, replacing Vasos, after which he was replaced by Vasos. (*Id.* ¶ 27.) Garratt served as CFO from before the beginning of the Class Period until April 2023 and also served as President from September 2022 through June 2023. (*Id.* ¶ 28.)

[3] "[I]n considering a motion to dismiss a securities complaint, the court 'may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached' to the complaint." *SEC v. AgFeed Indus., Inc.*, No. 3:14-CV-00663, 2016 WL 10934942, at *2 (M.D. Tenn. July 21, 2016) (Crenshaw, J.) (quoting *Bovee v. Coopers & Lybrand*, 272 F.3d 356, 360–61 (6th Cir. 2001)). The Complaint discusses Vasos' statements during the March 14, 2024 earnings call (*see* Complaint ¶ 481) and Dollar General's August 29, 2024 Form 10-Q for the second quarter ending August 2, 2024 (*see* Complaint ¶¶ 204, 207, 486, 489).

2

misleading statements or omissions ("Misstatements")[4]—mostly in SEC filings (*see, e.g.*, *id.* ¶ 212 (Forms 10-K and 10-Q)), but also in earnings calls, meetings, and one press release. (*See, e.g.*, *id.* ¶¶ 386 (earnings call), 325 (shareholder meeting), 244 (press release)). The Complaint alleges that the Company's mismanagement emerged through a series of partial corrective disclosures, beginning December 1, 2022 and ending August 29, 2024 (*id.* ¶ 456)—in the form of financial disclosure forms and earnings and conference calls. (*See, e.g.*, *id.* ¶¶ 477 (Dec. 7, 2023 Form 8-K, Form 10-Q, and an earnings call), 464 (March 16, 2023 conference call).) As a result of these partial disclosures, the Company's stock price plummeted, to the detriment of shareholders who acquired Dollar General stock during its artificially inflated heyday. (*Id.* ¶ 456.) In addition, the Complaint alleges, Vasos and Garratt traded Dollar General stock without disclosing their nonpublic, material knowledge. (*See id.* ¶¶ 523–24.)

The FEs discussed in the Complaint worked for Dollar General in roughly a dozen states[5] and held jobs with varying levels of responsibility.[6] Some comparatively senior FEs are alleged to have had broad insight into the operations of many stores. For example, FE-20, a Senior Manager, visited "upwards of 2,500" stores between 2020 and 2023. (*Id.* ¶ 110.) FE-22, a Senior Project Manager in Project Execution Support, visited 1,400 stores in twenty-three states over two years.[7]

---

[4] The court refers to both affirmative misstatements and omissions that render statements misleading as "Misstatements," following the plaintiffs' lead.

[5] (*See* Complaint ¶¶ 44 (FE-1, Massachusetts), 46 (FE-2, North Carolina), 50 (FE-3, Georgia, Florida, and Alabama), 54 (FE-4, Tennessee), 73 (FE-8, Missouri), 81 (FE-11, Ohio and Pennsylvania), 84 (FE-12, Minnesota), 85 (FE-13, Texas), 108 (FE-23, Arkansas and Missouri).)

[6] (*See, e.g.*, Complaint ¶¶ 85 (FE-13, Inventory Checker at San Antonio's distribution center), 44 (FE-1, Store Manager), 65 (FE-6, Director of Operations for Atlanta's distribution center), 81 (FE-11, Regional Asset Protection Manager for Northern and Central Ohio and Western Pennsylvania), 73 (FE-8, Regional Director of Store Operations in Kansas City, Missouri).)

[7] The Complaint alleges only that FE-22 visited 1,400 stores "over a two-year period" at some point during her ten years with Dollar General, from 2013 to 2023. (Complaint ¶ 116.)

3

(*Id.* ¶ 116.) FE-3, Director of Distribution Center Maintenance for warehouses east of the Mississippi River, oversaw seventeen warehouses in three states. (*Id.* ¶ 50.)

The Complaint alleges three, interrelated categories of corporate mismanagement: inventory mismanagement, inadequate staffing, and pricing discrepancies. The Complaint alleges that the defendants knew about the problems but, through years of deliberate misstatements and omissions, concealed the information from investors until slowly disclosing it through a series of partial disclosures, which caused Dollar General stock to drop precipitously. The Complaint alleges four categories of misstatements regarding the mismanagement: misstatements about inventory, staffing, pricing, and accounting.

## A.    Categories of Mismanagement

<u>Inventory</u>. The Complaint alleges that the Company's broken inventory management process caused a glut of unaccounted for inventory at distribution centers, ancillary warehouses, and stores. (*See id.* ¶ 1.) In brief, the Company purportedly over-ordered merchandise, failed to adequately track it, and had insufficient space for it—both in stores and at distribution centers. (*Id.* ¶¶ 4–5.) This problem was exacerbated by insufficient staffing and contributed to pricing problems and various fines and fees, described below. (*Id.* ¶¶ 1, 4–5, 118.)

At Dollar General's overstuffed distribution centers, for example, the Company's over-buying without regard to demand caused excess inventory to accumulate in trailers waiting to be unloaded. (*Id.* ¶ 51.) According to one FE, there were "31 football fields worth of trailers sitting on parking lots with unloaded inventory," which cost the Company $19 million per month in fees for overdue shipping containers. (*Id.* ¶¶ 6, 52.) Some of this merchandise was thrown away without being appropriately accounted for. (*Id.* ¶¶ 7, 89, 94.) To find space for inventory that was not discarded, Dollar General directed some merchandise in trailers bound for distribution centers, instead, to off-site warehouses that the Company leased at further expense. (*Id.* ¶¶ 6, 51, 53, 66–

4

67.) But, because the warehouses did not have an inventory tracking system or even wireless internet that would have enabled inventory tracking—as the stores and distribution centers did—the Company was unable to track the inventory it sent to warehouses, and it continued to over-order merchandise. (*Id.* ¶¶ 51, 53, 67–68, 77, 85, 90.) That is, without tracking inventory in the warehouses, the Company did not know what inventory it had, which created an insidious cycle of over-buying and insufficient storage space. (*Id.* ¶¶ 67, 86–87.)

According to the Complaint, conditions at stores were no better. Warehouses sent stores unneeded merchandise, some of which piled up, spoiled, or otherwise needed to be thrown out. (*Id.* ¶¶ 44–45, 47, 84, 90.) Furthermore, the Company's automated ordering system sent stores merchandise they did not need. (*Id.* ¶¶ 47, 112.) And, by Company policy, store managers could neither change the automated ordering nor decline unneeded deliveries. (*Id.* ¶¶ 47, 74, 80, 82, 120.)

Staffing. Meanwhile, the Complaint alleges, stores were understaffed, by inadequately trained employees, and the Company was plagued by high turnover. (*Id.* ¶¶ 10, 82, 111, 114, 119, 121, 123.) With excess inventory flooding stores, too few workers could not sort items onto overstuffed shelves, and unwanted, expired, and damaged inventory would not fit in overflowing storage rooms, so it spilled onto the sales floors. (*Id.* ¶¶ 10, 80, 83, 111.) Excess inventory blocked corridors and fire exits, causing unsafe working conditions, which led to millions of dollars in fines, over 100 OSHA citations, and settlements with state governments. (*Id.* ¶¶ 5, 11, 124–139, 144–50.) Distribution centers, too, were understaffed. (*Id.* ¶ 123.)

Pricing. Because merchandise prices need to be regularly updated, excess inventory and understaffing led to discrepancies between prices listed on the shelf and those charged at the register. (*Id.* ¶¶ 13, 83, 111, 144, 147.) This, too, contributed to the millions of dollars in fines and settlements resulting from investigations. (*Id.* ¶¶ 13–14, 144–146, 148–150.)

5

### B. Categories of Misstatements

<u>Inventory</u>. The Complaint alleges that the Company misled investors about its inventory management. (*See id.* ¶¶ 211–312.) Broadly, the Complaint alleges that, despite the various inventory management problems described above, the Company assured investors that all was well. For example, repeated in Form 10-Ks and Form 10-Qs throughout the class period, the defendants assured investors that, "on an ongoing basis, we closely monitor and manage our inventory balances." (*Id.* ¶ 212.) However, the plaintiffs argue, Dollar General did not. (*See id.* ¶ 213.)

<u>Staffing</u>. Second, the Complaint alleges that the Company misled investors about its staffing. (*See id.* ¶¶ 313–46.) The plaintiffs allege that defendants' positive statements about staffing were false or misleading because they, for example, falsely or misleadingly stated the number of employees who staffed individual stores (*see id.* ¶ 315) and that the Company "invest[ed] in" employees (*id.* ¶ 317).

<u>Pricing</u>. Third, the Complaint alleges that the Company misled investors about its pricing practices. (*See id.* ¶¶ 347–90.) The Complaint alleges that the statements about pricing were false or misleading because of the widespread discrepancies between advertised prices and the prices customers were charged at checkout, which led to government investigations, fines, and settlements. (*See, e.g., id.* ¶ 350.)

<u>Accounting</u>. Fourth, the Complaint alleges that the Company misled investors about accounting metrics in various SEC filings. (*See id.* ¶¶ 391–438.) In broad strokes, the Complaint alleges that, throughout the Class Period, the financial metrics were rendered false or misleading by the alleged corporate mismanagement. For example, many quarterly SEC filings contained "financial metrics that were tied to or impacted by inventory." (*See, e.g., id.* ¶¶ 393, 396, 402, 405, 408, 414, 420.) But, because the defendants "knowingly or recklessly failed to efficiently manage

6

Dollar General's inventory balances" and "did not have the ability to track" excess inventory, the financial reports that relied on accurate inventory accounting contained either untrue material facts or omitted material facts necessary to render them not misleading. (*See, e.g.*, *id.* ¶ 394.)

### C.    Legal Claims

The Complaint asserts a claim against all defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5(a) & (c) (scheme liability) and (b) (misstatements and omissions) (Count I) (*id.* ¶¶ 505–15); a claim against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), (Count II) (*id.* ¶¶ 516–22); and a claim against Vasos and Garratt for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78-t-1, (Count III) (*id.* ¶¶ 523–32). The plaintiffs seek class certification, compensatory damages, and costs and fees. (Complaint at 213–214.)[8]

### D.    The Motion to Dismiss

The defendants have jointly filed a Motion to Dismiss (Doc. No. 76) under Federal Rule of Civil Procedure 12(b)(6), seeking dismissal with prejudice; an accompanying Corrected Memorandum (Doc. No. 81) with Appendices A–D (Doc. Nos. 82-1 through 82-4); and the Declaration of defendants' counsel Milton McGee (Doc. No. 78), with Exhibits 1–70 (Doc. Nos. 78-1 through 79-70). The defendants argue that this is a "stock drop case in search of a fraud." (Doc. No. 81 at 11.) At most, the defendants argue, the plaintiffs allege mismanagement, not fraud. (*Id.* at 36.) The plaintiffs have filed a Response (Doc. No. 84) with an Appendix (Doc. No. 84-1). The defendants have filed a Reply (Doc. No. 86).

---

[8] The court has stayed a related, consolidated derivative action pending resolution of the Motion to Dismiss in this case. *See* Order Staying Case at 1, *In Re Dollar Gen. Corp. S'holder Derivative Litig.*, No. 3:24-cv-00083, (M.D. Tenn. May 22, 2024) (ECF No. 41).

7

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 754 (6th Cir. 2023) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).

### B. Securities Fraud Pleading Standards

Ordinarily, under Rule 8(a)(2), a complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4 *et seq.*, impose heighted pleading standards on securities fraud claims. *See Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 524 (6th Cir. 2023).

Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a plaintiff's complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 810 (6th Cir. 2022) (quoting *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (internal quotation marks omitted)). Under Rule 9(b), plaintiffs can allege state of mind generally. Fed. R. Civ. P. 9(b). However, the PSLRA imposes "additional and more '[e]xacting pleading requirements' for pleading scienter." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007)). Plaintiffs must (1) "specify each statement alleged to have been misleading[] [and] the reason or reasons why the statement is misleading," and (2) "with respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2). *See also ServiceMaster*, 83 F.4th at 524 (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018)).

## III. DISCUSSION

After the Great Depression, to which "a lack of transparency and accountability in the securities market" contributed, *SEC v. Jarkesy*, 603 U.S. 109, 180 (2024) (Sotomayor, J., dissenting), "Congress enacted a series of laws to ensure that 'the highest ethical standards prevail in every facet of the securities industry.'" *Kokesh v. S.E.C.*, 581 U.S. 455, 457–58 (2017) (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186–187 (1963) (footnote omitted)). The "fundamental purpose" of each of these laws, including the Exchange Act, was to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,

510 F. Supp. 3d 583, 609 (M.D. Tenn. 2020) (Campbell, J.) (quoting *Cap. Gains Rsch.*, 375 U.S. at 186).

The Complaint's three claims are brought under different provisions of the Exchange Act and its implementing rules. "Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 478 (quoting *Frank*, 547 F.3d at 569). Section 20(a) "provides liability for '[e]very person who, directly or indirectly, controls any person liable' for violation of the securities law." *Taylor*, 29 F.4th at 816 (quoting 15 U.S.C. § 78t(a)) (alteration in *Taylor*)). And Section 20A creates a cause of action for "any person" who traded "securities of the same class" "contemporaneously" with an insider trader. 15 U.S.C. § 78t-1(a); *see Shupe v. Rocket Cos.*, 348 F.R.D. 431, 441 (E.D. Mich. 2024).

## A.     Count I: Section 10(b)and Rule 10b-5(b) Claims

Section 10(b) forbids any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) (citing 15 U.S.C. § 78j(b)); *see also* 15 U.S.C. § 78j(b).[9] Rule

---

[9] Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

10b-5, promulgated under Section 10(b), proscribes "the making of any untrue statement of material fact or the omission of any material fact necessary in order to make the statements made . . . not misleading.'" *Ohio Pub. Emps.' Ret. Sys.*, 830 F.3d at 383 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (alterations in original, internal quotation marks omitted)). *See* 17 C.F.R. § 240.10b-5.[10] To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must plead with particularity six elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *ServiceMaster*, 83 F.4th at 525 (first quoting *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); and then citing *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014)). Thus, "[i]f a plaintiff fails to plausibly allege even one of these elements, a securities-fraud claim cannot proceed." *Pittman v. Unum Grp.*, 861 F. App'x 51, 53 (6th Cir. 2021).

The defendants argue that the plaintiffs have failed to plead three of these elements—material misrepresentations or omissions by the defendants, scienter, and loss causation—as to

---

[10] Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

*each* of the 113 alleged Misstatements in the plaintiffs' 533-paragraph Complaint. (*See* Doc. No. 81 at 41–79.) Considerations of judicial economy preclude an individual analysis of *each* of the alleged 113 Misstatements and corresponding scienter and loss causation analyses. Instead, the court begins and ends its analysis with scienter.

       *1.    Scienter*

           *a)    Background*

      Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs*, 551 U.S. at 319). Scienter must be pled in accordance with Rule 9(b) and the PSLRA's heightened pleading standards. *Taylor*, 29 F.4th at 810. To plead scienter in a securities fraud case, "the complaint shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A)— that is, either a "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). "'Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care,' where the 'danger . . . must at least be so obvious that any reasonable man would have known of it.'" *ServiceMaster*, 83 F.4th at 526 (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)). To draw an inference of recklessness, "courts typically require multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi*, 823 F.3d at 1039 (citation and internal quotation marks omitted). The court analyzes scienter on a "defendant-by-defendant basis." *Taylor*, 29 F.4th at 816 (citing *City of Monroe Emps.' Re. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684–87 (6th Cir. 2005)).

      Under *Tellabs*, courts employ a three-part test to determine whether a complaint sufficiently pleads scienter. *Dougherty*, 905 F.3d at 979 (citing *Tellabs*, 551 U.S. at 322–23). First,

12

courts must accept the complaint's factual allegations as true. *Taylor*, 29 F.4th at 812 (citing *Tellabs*, 551 U.S. at 322). Second, courts "review the allegations holistically 'to determine whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Taylor*, 29 F.4th at 812 (quoting *Dougherty*, 905 F.3d at 979 (emphasis in original) (some internal quotation marks omitted)). Third, the court must "take into account plausible opposing inferences" to determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24; *see also ServiceMaster*, 83 F.4th at 526. That is, despite Rule 12(b)(6)'s requirement to draw all reasonable inferences in the plaintiffs' favor, "[i]t is not enough that the inference is 'merely plausible or reasonable.'" *Pittman*, 861 F. App'x at 54 (quoting *Tellabs*, 551 U.S. at 314). At the same time, scienter need not be the *most* plausible inference that could be drawn from the facts. *Frank*, 646 F.3d at 957 (citing *Tellabs* 551 at 324). In other words, a tie goes to the plaintiffs.

As part of the scienter analysis, courts within the Sixth Circuit conduct a holistic review of the facts using a set of non-exhaustive considerations "probative of securities fraud," as originally set forth in *Helwig v. Vencor, Inc*., 251 F.3d 540, 552 (6th Cir. 2001) (*en banc*), *abrogated on other grounds by Tellabs*, 551 U.S. at 314. *See Taylor*, at 813 (citing *Doshi*, 834 F.3d at 1039–40); *see also JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 23-5538, 2024 WL 2874575, at *11 n.8 (6th Cir. June 7, 2024) ( "As part of our holistic review of a plaintiff's allegations, we normally rely on nine non-exhaustive factors, known as the '*Helwig* factors,' to decide whether the allegations give rise to a strong inference of scienter." (citing *Doshi*, 823 F.3d at 1039–40)).

The "*Helwig* factors" are:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*ServiceMaster*, 83 F.4th at 526 (quoting *Helwig*, 215 F.3d at 552). As the Sixth Circuit has recently reiterated, "[t]he more of these factors that are present, the stronger the inference that the defendant [acted] with the requisite state of mind." *Id.* (quoting *Omnicare*, 769 F.3d at 473 (alteration in *ServiceMaster*)). The *Helwig* factors are decidedly not a checklist, however. If some factors are inapplicable, that "does not meaningfully detract from a strong inference of scienter, as the factors are 'non-exhaustive.'" *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 851 (M.D. Tenn. 2021) (Crenshaw, C.J.) (quoting *Helwig*, 251 F.3d at 552); *see also Dougherty*, 905 F.3d at 981–82 (finding a strong inference of scienter where three *Helwig* factors supported the inference and six factors were inapplicable).

        b)     *Analysis of Helwig factors*

The defendants concede that the plaintiffs have pled facts that could support *Helwig* factors 1, 2, and 7, though none support a strong inference of scienter, but they argue that the plaintiffs have not pled the remaining *Helwig* factors—numbers 3, 4, 5, 6, 8, 9. The plaintiffs concede that

they have not pled *Helwig* factors 3, 4, or 8. The plaintiffs argue that they have pled *Helwig* factors 1, 2, 5, 6 , 7, and 9 and, that, on a holistic review, the Complaint alleges facts allowing the court to draw an inference of scienter at least as plausible as any non-culpable inference. (*See* Doc. No. 84 at 46–66.) The court finds that, on holistic review, the Complaint does not plead facts that allow the court to draw a strong inference of scienter at least as compelling as any innocent inference.

FACTOR 1

*Helwig* factor 1 is insider trading at a suspicious time or in an unusual amount. *Helwig*, 251 F.3d at 552. As the Sixth Circuit has enumerated, "[c]ourts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were normal or routine for the insider; (2) whether profits reaped were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious." *Taylor*, 29 F.4th at 814 (quoting *In re Cardinal Health Inc., Secs. Litig.*, 426 F. Supp. 2d 688, 728 (S.D. Ohio 2006) (internal quotation marks omitted).[11]

The Complaint alleges that two of the four individual defendants, Vasos and Garratt, sold tens of millions of dollars' worth of stock timed to follow misleading Company statements regarding inventory, staffing, and pricing, including some sales the day after making such statements. For example, on August 25, 2022 Vasos, Garratt, and Owen led an earnings call to discuss financial results for the quarter that had recently ended. (Complaint ¶ 339.) The plaintiffs allege that, during that call, Owen and Vasos made false or misleading statements regarding staffing and inventory. (*Id.* ¶¶ 340–41.) The day after the allegedly misleading statements, on

---

[11] The Complaint contains no allegations about the Individual Defendants' compensation levels.

August 26, 2026, Vasos allegedly sold 70,109 shares of Dollar General Stock, netting $26,167,063.68 (*id.* ¶ 451), and Garratt sold 4,807 shares, netting $1,77,240.07 (*id.* ¶ 453). All told, the plaintiffs argue, Vasos and Garratt made hundreds of millions of dollars "from suspiciously timed insider trades during the Class Period." (Doc. No. 84 at 17; *see also id.* at 69–71).)

The parties argue at length about whether Vasos and Garratt's stock sales support an inference of scienter. (*See* Doc. No. 81 at 69–75; Doc. No. 84 at 69–75.) Even assuming they can, as the defendants argue (*see* Doc. No. 81 at 73–55), any such inference would be undermined by the *lack* of any allegations that the other two defendants engaged in insider trading. The Complaint alleges no facts to explain why, in an alleged securities fraud scheme, half of the Individual Defendants did not engage in insider trading. *Accord Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821 (E.D. Ky. 2008) (finding no inference of scienter from suspicious stock trades where, for among other reasons, "three of the eight individual Defendants sold no stock at all during the Class Period"); *Local N. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84-85 (1st Cir. 2016) (finding that an increase in stock sales by some defendants did not support the inference of scienter where other defendants did not suspiciously trade, and where there was no explanation for a difference in knowledge among the defendants).

The plaintiffs make several arguments in response. First, they argue that the "'absence of insider trading' does not 'defeat[] an inference of scienter.'" (Doc. No. 84 at 74 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004)).) But in *PR Diamonds*, *no* insider trading was alleged. *PR Diamonds*, 364 F.3d at 691 ("The Complaint includes no allegations that the Individual Defendants ever took advantage of Intrenet's purportedly inflated stock prices by selling shares during the class period."). The case is therefore inapposite. Second, they note that

one of our sister courts in the Sixth Circuit has found that "the absence of suspicious stock sales by other Officer defendants does not negate their scienter." (Doc. No. 84 at 74–75 (quoting *In re Firstenergy Corp.*, No. 2:20-CV-4287, 2022 WL 681320, at *19 n.22 (S.D. Ohio Mar. 7, 2022) (quoting *PR Diamonds*, 364 F.3d at 691)).) In *Firstenergy*, the court found that insider trading by four defendants, notwithstanding lack of insider trading by two defendants, "slightly" favored the plaintiffs' narrative and concluded that the "change in trading volume by several senior executives is *consistent with* scienter." *Firstenergy*, 2022 WL 681320, at *19 (emphasis added). Third, the plaintiffs cite a case for the proposition that "executives may 'keep their insider trading to a limit . . . to avoid getting caught." (Doc. No. 84 at 75 (quoting *In re Am. Int'l Grp. Inc.*, 975 A.2d 763, 801 (Del. Ch. 2009) (omission in original)).) But the plaintiffs do not allege that either Owen or Dilts strategically declined to suspiciously trade Dollar General stock. Notwithstanding *Firstenergy*, which found that two of six defendants' failing to suspiciously trade did not doom the inference of scienter as to the four defendants who did, this court finds that the fact that two of four Individual Defendants are not alleged to have engaged in any insider trading, without explanation, does not permit *Helwig* factor 1 to advance the plaintiffs' scienter argument.

FACTOR 2

The Sixth Circuit has described factor 2, divergence between internal reports and external statements on the same subject, as "the 'key factor' to a finding of scienter." *Dougherty*, 905 F.3d at 981 (quoting *Monroe*, 399 F.3d at 688). The plaintiffs acknowledge that such divergence is "the key factor" and add that they "need only plead that Defendants had 'access to information contradicting their public statements.'" (Doc. No. 84 at 60 (first quoting *Dougherty*, 905 F.3d at 891; and then quoting *Plagens v. Deckard*, No. 1:20-CV-2744, 2023 WL 2711263, at *27 (N.D. Ohio Mar. 30, 2023)).) But, as the court in *Plagens* clarifies, alleging *access* to information is

17

insufficient. *Plagens*, 2023 WL 2711263, at *27 ("'The standard from *Tellabs* requires *specific* facts' that the 'reports were known to Defendants' and that they reflect the allegedly fraudulent scheme." (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 398 (6th Cir. 2009) (emphasis in *Konkol*))).

The defendants argue that the Complaint fails to identify internal reports that diverge from the Company's external statements. (*See* Doc. No. 81 at 66–67.) The plaintiffs respond that they have pled "that defendants directly received 'internal reports' concerning Dollar General's inventory and staffing problems." (Doc. No. 84 at 60 (citing Complaint ¶¶ 43–45, 48–49, 57, 64, 72, 91, 95, 103, 105, 113, 118).) As support for this contention, they refer to two categories of internal reports—emails, and calls and meetings. The court addresses both below.

      i.    *Emails*

First, the plaintiffs refer to three emails sent by two FEs to some of the Individual Defendants. (Doc. No. 84 at 60–61.) Indeed, the Complaint alleges that FE-1, a Store Manager at a Massachusetts Dollar General Store from 2012 until February 2022, emailed Vasos in February 2022 "to explain what it was like working at a Dollar General store," including issues regarding excess inventory, hiring, and maintenance, and to "provid[e] suggestions on how to fix the problems at Dollar General stores." (Complaint ¶¶ 44–45.) And the Complaint alleges that FE-2, an Assistant Store Manager and Store Manager at a North Carolina Dollar General store during an unspecified period of multiple years during the Class Period, sent two emails to Company officers: one, sent anonymously in July 2021 to "top corporate executives," including Vasos and Owen, described various problems she[12] observed; the other, sent in her own name upon her resignation,

---

[12] The plaintiffs use feminine pronouns for all of the FEs, whose gender is not disclosed in the interest of confidentiality. (Complaint at 26 n.2.)

in June 2022, to "everyone in the top three tiers of the Company," including Vasos, Owen, and Garratt, contained "a long list of problems that she saw while working at Dollar General." (*Id.* ¶¶ 46–49.) In response to these emails, FE-1 received a call from Vasos's secretary (*id.* ¶ 45), and FE-2 received a call from a Dollar General Senior Vice President (*id.* ¶ 49). The plaintiffs argue that these emails "serve[] as glaring red flags sent directly to Defendants—who had their subordinates respond." (Doc. No. 84 at 61.) The defendants make several arguments in response.

First, the defendants correctly note that the Complaint does not allege that any email constituting an internal report was sent to Dilts.[13] (Doc. No. 86 at 16.) Second, necessarily, the court cannot infer scienter from internal reports that post-date alleged Misstatements. The first email was allegedly sent in July 2021 (Complaint ¶ 48), so the emails cannot support an inference of scienter as to any alleged Misstatement before then. (*E.g.*, Complaint ¶¶ 227, 402, 405 (alleged Misstatements appearing only in SEC filings before July 2021); *id.* ¶¶ 233, 236, 238 (alleged Misstatements made only during conferences before July 2021); *id.* ¶¶ 227, 242, 245, 249, 239, 260, 262, 320, 323, 327, 348–49, 351, 354–55, 358 (alleged Misstatements made only during earnings calls before July 2021); *id.* ¶ 244 (alleged Misstatement made only in a March 2021 press release).

Third, and decisively, the defendants correctly note that the Complaint does not allege that any of the Individual Defendants actually read or responded to the emails. (Doc. No. 81 at 68.) On this point, after first merely noting that the emails "prompted . . . response[s] from Defendants' subordinates," the plaintiffs state that two Individual Defendants "had their subordinates respond."

---

[13] The Complaint alleges that FE-2 sent an email to "everyone in the top three tiers of the Company" in July 2021. (Complaint ¶ 49.) The Complaint does not allege that Dilts was employed by Dollar General in July 2021 or, if she was, what her position was—which could have conceivably allowed the court to infer whether she was among the Company's "top three tiers."

19

(Doc. No. 84 at 60–61.) But the Complaint does not actually allege that any defendant directed anyone to respond to either FE. Thus, consistent with the facts alleged in the Complaint, certain Individual Defendants' subordinates could have read the emails and responded, or forwarded them to other Company employees for response, without consulting any Individual Defendant. While it may be a plausible inference from the facts alleged that subordinates would not respond to emails of this sort—or forward them to another high-level official for response—without consulting their bosses, it strikes the court as also plausible that, at a company of Dollar General's size, CEOs and CFOs may not manage their own inboxes and are not consulted about emails from individual Store Managers or mass-emails individual Store Managers send upon their resignation, listing problems with the Company. More importantly, however, under the PSLRA, "if an allegation regarding the [fraudulent] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *accord Omnicare*, 769 F.3d at 482 ("[The plaintiff] never alleged any specific facts to explain the basis for its belief that the results of the Wave II Audit were communicated to the Individual Defendants beyond the conclusory statement that the results must have been given to them."); *Konkol*, 590 F.3d at 401 ("[G]eneralized statements cannot substitute for *specific* facts through which a factfinder can strongly infer that the Defendants themselves knew of or recklessly disregarded the falsity of the earnings statements, especially because the majority of the Confidential Witnesses are not identified as having any contact or interaction with any of the Defendants." (emphasis in original)). Here, the Complaint does not allege that any defendant read the emails and does not allege with particularly any fact showing that any defendant either knew about the emails or directed their subordinates to respond.

      ii.     *Meetings and Calls*

Second, the plaintiffs argue that certain meetings and calls, where participants discussed the problems the Complaint describes, are internal reports that diverge from external statements. The plaintiffs point to three such meetings or calls.

### a. 2023 Leadership Call

FE-3, who, from October 2022 to June 2023, was Director of Distribution Center Maintenance with responsibility for seventeen warehouses in Georgia, Florida, and Alabama, "recounted"[14] a "senior leadership call in February or March 2023," during which a Senior Vice President estimated that "31 football fields worth of trailers" were sitting, unloaded, in parking lots, costing the Company $19 million per month in fees. (Complaint ¶¶ 50, 52, 440(c).) The Complaint alleges that FE-3's boss's boss's boss' boss, Anthony Zuazo—then the Company's Executive Vice President for Global Supply Chain—and "other senior Dollar General Executives who reported to the Company's C-suite" attended the call. (Complaint ¶¶ 50 & n.3, 52.) The defendants argue that the court cannot infer scienter from a meeting the Individual Defendants are not alleged to have attended; nor, the defendants argue, can the court infer scienter based on what non-defendant Company officials knew. (Doc. No. 81 at 67–68.)

The Sixth Circuit has rejected a "formalistic definition" of "internal report." *See Dougherty*, 905 F.3d at 981 (citing *Monroe*, 399 F.3d at 688)).) As the Sixth Circuit recently reaffirmed, "the contents of meetings at which senior corporate officers were present [are considered] 'internal reports.'" *ServiceMaster*, 83 F.4th at 533 (quoting *Dougherty*, 905 F.3d at 981) (alteration in *ServiceMaster*). However, "'[t]he standard from *Tellabs* requires *specific* facts"

---

[14] Neither the Complaint nor the plaintiffs' Response states that FE-3 *attended* the call. (*See* Complaint ¶ 51 ("FE-3 recounted *that the Company held* a senior leadership call in February or March 2023) (emphasis added); Doc. No. 84 at 61 ("FE-3 *described* a senior leadership call in early 2023") (emphasis added).) And it is unclear from context whether she did attend or merely heard about it.

that the 'reports were known to Defendants' and that they reflect the allegedly fraudulent scheme." *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 793–94 (N.D. Ohio 2021) (quoting *Konkol*, 590 F.3d at 398 (emphasis in *Konkol*)), *aff'd*, No. 21-3863, 2022 WL 3972478 (6th Cir. Sept. 1, 2022). In this case, the Complaint does not allege that any of the Individual Defendants attended the meeting or were told about the discussion about unloaded trailers. The Complaint alleges only that Zuazo and other executives both attended the meeting and reported to "the Company's C-suite." (Complaint ¶ 52; *see also id* ¶ 404(c) ("senior leadership call . . . involving senior company officials").) Not only does the Complaint fail to allege *which*, if any, defendants the meeting's attendees reported to, but the Complaint does not allege that the attendees relayed this information to their superiors. Rather, the Complaint leaves this matter to speculation.

At the same time, however, as the Sixth Circuit recently noted, the states of mind of the following individuals are probative for determining whether a corporation's misstatement was made with the requisite scienter: the agent who made the representation, the agent who authorized it, or, "[a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *ServiceMaster*, 83 F.4th at 532 (quoting *Omnicare*, 769 F.3d at 476). The Complaint does not allege that any senior controlling officer attended the meeting or that any "high managerial agent" with authority to ratify or tolerate the Company's alleged misstatements was present. *Cf. Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, No. 2:20-cv-02553-STA-tmp, 2022 WL 989240, at *34 (W.D. Tenn. Mar. 31, 2022) ("The Amended Complaint never actually alleges which meetings [defendant CEO] Varty or [defendant CFO] DiLucente attended where the Formosan termite claims in Alabama were discussed, only that other executives who reported to Varty may have attended the meetings."), *aff'd*, 83 F.4th 514 (6th Cir. 2023).

Thus, the court finds that a Senior Vice President's mentioning unloaded trailers, during an unspecified late-winter 2023 meeting that no defendant is alleged to have attended or received reports thereof, does not constitute an internal report that could conflict with an external statement. While "plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged," *Doshi*, 823 F.3d at 1037 n.2, the plaintiffs do not meet that burden here. *Accord Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 680 (E.D. Mich. 2023) (noting that complaints "lack[ing] sufficient 'facts regarding the financial reports, how they were used, and their connection to the Defendants'" do not support inferences of scienter (quoting *Konkol*, 590 F.3d at 397)).

        b.  <u>Sunday Delivery Meetings</u>

FE-4 was a Director of Allocation from February 2019 to February 2021 and then senior Director of Demand Chain until she left the Company in April 2021. (Complaint ¶ 54.) According to the Complaint, "FE-4 recounted that, every Sunday, there was a Company call . . . where approximately 50 Dollar General officials would determine how many rolltainers, trucks and drivers were available and what product would be left out of deliveries that week—and that this information would be reported to Mr. Zauzo and other senior executives." (*Id.* ¶ 56.) In addition, the Complaint alleges, "FE-4 further explained that Defendant Owen (then COO and later CEO) also was informed of the inventory issues because the decisions being made on the . . . Sunday calls affected store operations, which Defendant Owen oversaw as COO. FE-4 also believed that it was likely that Defendant Vasos also knew about the inventory issues and their impact." (*Id.* ¶ 57.) On the basis of this allegation, the plaintiffs argue that the defendants received internal

23

reports informing them about the Company's inventory and staffing issues. (Doc. No. 84 at 60–61 (citing Complaint ¶¶ 56–57).)

For reasons similar to those discussed above, the court finds that the Complaint has not alleged the existence of internal reports in the form of discussions at recurring Sunday meetings. The Complaint does not state (1) when the meetings happened, though, presumably FE-4's knowledge of the meetings ended no later than the end of her time at Dollar General—April 2021; (2) who attended these meetings, other than "50 Dollar General officials"; or (3) whether FE-4 attended the meetings—again, the Complaint states only that FE-4 "recounted . . . that . . . there was a Company call." (Complaint ¶ 56.)

Moreover, the Complaint does not allege with any particularity how any of the defendants received the information discussed on the Sunday calls. To start, the Complaint does not allege that they attended. Instead, the Complaint alleges that defendant Owen knew about the inventory issues discussed "because the decisions being made . . . affected store operations, which defendant Owen oversaw as COO." (Complaint ¶ 57.) That allegation has nothing to do, specifically, with the Sunday meetings, and does nothing to support the case that the discussions at the meetings count as internal reports. Seemingly, the Complaint's allegations about Owen's knowledge are further supported by the Complaint's allegation that Zuazo "absolutely knew" about the inventory issues. (Complaint ¶ 57.) Throughout FE-4's employment at Dollar General, Zuazo was her boss's boss. And, at the time, Zuazo's boss's boss was defendant Vasos. (Complaint ¶ 54.) But the claim that any defendant knew about the conversations during the Sunday calls is wholly conclusory and does not meet the PSLRA's heightened pleading standards. And, as for the Complaint's allegation that "FE-4 also believed that it was likely that Defendant Vasos also knew about the inventory issues and their impact" (Complaint ¶ 57), it fares worse on the same standards.

24

    c.   Company Town Hall Meetings

According to FE-7, a Senior Demand Chain Analyst from 2021 to 2023, at "regular Town Hall meetings involving Company leadership, . . . the inventory problems . . . were constant topics of discussion." (Complaint ¶¶ 70, 72.) During these regular meetings, on unspecified dates, "Dollar General Vice Presidents and Senior Directors would always explain that directives regarding distribution centers were 'coming from the top.'" (Complaint ¶ 440(f).) Therefore, according to FE-7, "Dollar General executives . . . 'were fully aware.'" (*Id.*). The plaintiffs argue that the discussions at these meetings constitute internal reports that diverge from external statements. (Doc. No. 84 at 61–62.) For the same reasons discussed above—including that the Complaint has not alleged a single meeting's date, any individual attendee, a statement from any particular person, or even that FE-7 attended these meetings herself—the court finds that the plaintiffs have not alleged, with sufficient particularly, the existence of internal reports in the form of town hall meetings.

The court finds that the Complaint has not alleged with requisite specificity that the defendants were presented with internal reports that *could* diverge with external statements. Therefore, the court will not address whether the internal reports, such as they are, in fact diverge from any external statements. *Helwig* factor 1 does not advance the plaintiffs' scienter argument.

FACTOR 6

*Helwig* factor 6 is "disregard of the most current factual information before making statements." *Helwig*, 251 F.3d at 552. As the parties both note, courts often analyze factor 6 together with factor 2. (*See* Doc. No. 81 at 66 (citing *Stein v. U.S. Xpress Enters.*, No. 1:19-cv-98, 2020 WL 3584800, at *36 (E.D. Tenn. June 30, 2020)); Doc. No. 84 at 60 (citing *Dougherty*, 905 F.3d at 981).) Aside from the internal reports, which the Complaint has not sufficiently alleged,

neither the Complaint nor the plaintiffs' brief specifies "what particular factual information Defendants disregarded." *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 713 (S.D. Ohio 2023) (citing *In re Goodyear Tire & Rubber Co.*, 436 F. Supp. 2d 873, 902 (N.D. Ohio 2006)), *aff'd*, 100 F.4th 675 (6th Cir. 2024), *cert. dismissed sub nom. Plumbers Loc. 290 Pension Tr. v. Root, Inc.*, 145 S. Ct. 838 (2024). Essentially, the Complaint's allegation is that the Individual Defendants ignored the "inventory and staffing issues that plagued Dollar General," of which they can be presumed to be aware because inventory and staffing constitute "key aspects of [Dollar General's] business model." (Doc. No. 84 at 67–68.) That is, the plaintiffs rely on the "core operations" theory. (*See id.* (citing *In re Huffy Corp. Secs. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) ("[T]he more central a fact is to a company's core operations the more likely its executive acted with scienter.")).

While "fraudulent intent cannot be inferred merely from the executives' positions in the company and alleged access to information," *Pittman*, 861 F. App'x at 55 (citation modified), "[t]hat rule, however, is designed to account for the fact that executives may not know about, for example, 'accounting issues that are relatively arcane in nature and scope' and that do not 'pertain to central, day-to-day operational matters,'" *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 677 (M.D. Tenn. 2022) (quoting *PR Diamonds*, 364 F.3d at 688). By contrast, "[c]ourts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to central, day-to-day operational matters." *Shupe*, 660 F. Supp. 3d at 683 (internal quotation marks omitted) (quoting *In re Cardinal Health*, 426 F. Supp. 2d at 724).

The plaintiffs argue that inventory management and staffing were central to Dollar General's operations and that the Individual Defendants "possessed unparalleled insight into the

critical inventory and staffing operations of the Company." (Doc. No. 84 at 54.) The court agrees that the alleged widespread staffing issues are not arcane, technical issues the Individual Defendants theoretically had access to, but, rather, as alleged, fell within their day-to-day purview.

Another judge of this court has previously explained that the core operations theory has survived the enactment of the PSLRA, "albeit only as a supplementary consideration that may bolster other well-pleaded facts," and that, "[a]lthough the 'core-operations' inference generally will not establish a strong inference of scienter by itself, it can be one relevant part of a complaint supporting that inference." *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, No. 3:19-CV-00407, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021) (Richardson, J.) (first citing *Stein*, 2020 WL 3584800, at *39; and then citing *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021)). *See also Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1086 (M.D. Tenn. 2022) (Richardson, J.) (considering the core operations allegations as relevant to the holistic scienter analysis, "without . . . relying on the core-operations doctrine as an independent means of showing scienter").) The plaintiffs acknowledge as much. (*See* Doc. No. 84 at 68 (citing *Franchi*, 633 F. Supp. 3d at 1086).) Therefore, the court will return to the allegations regarding "core operations" in its holistic review. Otherwise, the Complaint does not allege facts such that *Helwig* factor 6 helps the plaintiffs' scienter argument.

FACTOR 5

*Helwig* factor 5 is "the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit." *Helwig*, 251 F.3d at 552. Dollar General has settled with two states regarding claims that it overcharged customers. (*See* Complaint ¶¶ 149 (Wisconsin), 150 (New Jersey).) In addition, Dollar General settled with OSHA to resolve hundreds of citations for unsafe working conditions. (*Id.* ¶¶ 12, 139.)

The Complaint does not allege that Dollar General has settled any lawsuit related to fraud. However, the Sixth Circuit has stated that, even where an ancillary lawsuit does not allege fraud, "the presence of closely related evidence carries some weight." *Monroe*, 399 F.3d at 685. The plaintiffs lean on *Monroe* and other cases finding that settlements with state and federal regulators support a holistic inference of scienter. (*See* Doc. No. 84 at 76–77 (first citing *Frank*, 646 F.3d at 961; then citing *Chamberlain v. Reddy Ice Holdings*, *Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010); and then citing *In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 167 (S.D.N.Y. 2008).).)

None of those cases helps the plaintiffs' case on this point. In *Monroe*, the court emphasized that "Firestone entered into multiple settlement agreements in response to product liability suits under which the settlement agreements with plaintiffs were sealed, the parties entered into stipulated protective orders to conceal discovery, and Firestone would have returned to it 'damaging documents.'" *Monroe*, 399 F.3d at 685. This secretiveness "gets at the same notion as does the *Helwig* factor instructing courts to analyze whether there have been ancillary lawsuits filed charging fraud followed by quick settlement of such suits." *Monroe*, 399 F.3d at 685. No such secrecy is alleged here.

In *Frank*, the Sixth Circuit noted, in one sentence, that one of the plaintiffs' eight allegations meant to support an inference of scienter was an SEC investigation into accounting practices. *Frank*, 646 F.3d at 961. But while the court found that the plaintiffs had "adequately pleaded a strong inference of scienter when viewing the factors holistically," in fact the court does not discuss what role, if any, the SEC investigation played in that analysis. *See id.* at 961–62. The plaintiffs' description of the case—that the "regulatory investigation *contributed to* scienter"—is consistent with, but not dictated by, the text. (Doc. No. 84 at 77 (emphasis added).)

*Chamberlain* was a "tag-a-long" securities fraud class action to a multidistrict litigation concerning price-fixing in the packaged ice industry. *Chamberlain*, 757 F. Supp. 2d at 687. The complaint alleged that, once the illegal anti-competitive activity came to light, the stock price dropped. *Id.* at 688–90. In the court's scienter analysis, it described government investigations and a proposed settlement in a related antitrust action, "in which [one MDL defendant] agrees to provide significant cooperation to plaintiffs by providing evidence in support of a nationwide conspiracy among [the three defendants in the MDL]." *Id.* at 713–14. In *In re Bristol Myers Squibb*, the court found probative of scienter the company's secret settlements with a generic drug company, the revelation of which led to a stock drop and the securities fraud suit before the court. *See In re Bristol Myers Squibb*, 586 F. Supp. 2d at 167.

In this case, the Complaint does not allege that the settlements or investigations were secret or that the settlements were quickly reached. The Complaint does not allege that the settlements or investigations concerned fraud or facts that significantly overlap to the degree they do in the cases the plaintiffs cite for support. *Helwig* factor 5 does not support the plaintiffs' scienter argument.

FACTOR 7

*Helwig* factor 7 is the confusing disclosure of accounting information such that its negative implications could only be understood by highly sophisticated people. *Helwig*, 251 F.3d at 552.

The plaintiffs allege that, throughout the Class Period, the Company falsely stated in SEC filings that it complied with GAAP (Generally Accepted Accounting Principles) and used LIFO (Last-In-First-Out) accounting to value inventory. (Complaint ¶ 425–31.) These alleged Misstatements make up part of the category of allegedly misleading accounting metrics. In brief, the Complaint alleges that various filings were false or misleading, insofar as they relied on

29

inaccurate inventory calculations due to the significant operational issues the plaintiffs allege. For example, the Complaint alleges, damaged inventory was routinely thrown away without being properly accounted for, and untraceable excess inventory was stored in off-site warehouses. (*Id.* ¶ 430.) For this reason, according to the plaintiffs, the Company's accounting practices were inconsistent with GAAP and LIFO accounting. (*Id.* ¶¶ 425–26, 431.) Thus, the Complaint alleges, Individual Defendants' certifications of financial statements, including that they complied with GAAP and employed LIFO accounting, were false or misleading. (*Id.* ¶¶ 425–35.) As the plaintiffs see it, the SEC filings were "highly technical and concealed Defendants' inability to conduct an accurate valuation based on inventory levels." (Doc. No. 84 at 77 (citing Complaint ¶¶ 425–26, 93).)

While the Complaint alleges knowing or reckless accounting errors, it "lacks allegations that only someone with a high level of sophistication could have understood negative implications from [Dollar General's] accounting disclosures." *Doshi*, 823 F.3d at 1042 (citing *Helwig*, 241 3d at 552); *see also In re CBL & Assocs. Props., Inc. Secs. Litig.*, No. 1:19-CV-00181-JRG-CHS, 2022 WL 1405415, at *13 n.12 (E.D. Tenn. May 3, 2022) (noting that *Helwig* factor 7 "does not apply because Plaintiffs do not allege that CBL disclosed its accounting information in a way that required a high degree of sophistication. Rather, they allege that CBL withheld information that it had a duty to disclose under GAAP."), *opinion clarified*, No. 1:19-cv-00181-JRG-CHS, 2022 WL 1714484 (E.D. Tenn. May 25, 2022). *Helwig* factor 7 does not support the plaintiffs' scienter argument.

FACTOR 9

*Helwig* factor 9 is the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552. The plaintiffs argue that the Individual Defendants "were

motivated to downplay Dollar General's staffing and inventory deficiencies" to keep the stock price high, "thereby securing Defendants' executive roles and compensation." (Doc. No. 84 at 70–71.) The defendants argue that the Complaint does not allege that the Defendants were "uniquely self-interested in saving their jobs." (Doc. No. 81 at 75.)

The fact that the Individual Defendants wanted to keep their jobs and high salaries, some of which was Company stock, without more, does not contribute to a strong inference of scienter. As the Sixth Circuit recently reaffirmed, "merely alleging that an executive's 'compensation is directly tied to the company's performance' is not enough to bolster an inference of scienter." *Pittman*, 861 F. App'x at 57 (quoting *Dougherty*, 905 F.3d at 981).

c)    *Holistic Review*

Of the six *Helwig* factors the plaintiffs have identified as relevant to the scienter inquiry, the court has found that none independently advances their argument. At a broad level, the court agrees, that, as alleged, it is reasonable for the court to infer that the defendants were aware of the various issues affecting the Company's core operations. But other than alleging that all of the alleged 113 misstatements or omissions were false or misleading and that the Individual Defendants had knowledge of operational issues, the Complaint does not specify "what particular [most recent] factual information Defendants disregarded" when making each statement. *Kolominsky*, 667 F. Supp. 3d at 713. In any case, relying on the "core-operations" theory, alone, is insufficient to support a strong inference of scienter, as the court has discussed.

The Sixth Circuit in *Omnicare* wrote that the PSLRA was an "elephant-sized boulder" whose heightened pleading standards are "not easily satisfied." 769 F.3d at 461. In this case, the court finds that the plaintiffs have not alleged facts that, reviewed holistically, give rise to a strong inference of scienter as plausible as the defendants' proffered nonculpable inference: that, as the Company emerged from the pandemic, and demand shifted, and as the Company addressed some

31

operational challenges it disclosed over time, the stock price dropped—without any of the defendants intentionally or recklessly making false or misleading statements or trading on inside information. (*See* Doc. No. 86 at 20–21.) Thus, Count I of the Complaint fails to state a claim upon which relief can be granted.

### B.  Count II: Section 20(a) Claims

The plaintiffs allege that the Individual Defendants are qualifying "controlling person[s]" under 15 U.S.C. § 78t(a), which "provides liability for '[e]very person who, directly or indirectly, controls any person liable' for violation of the securities law." *Taylor*, 29 F.4th at 816 (quoting 15 U.S.C. § 78t(a) (alteration in *Taylor*)). Controlling person claims are derivative of Section 10(b) and Rule 10b-5 claims. *Dougherty*, 905 F.3d at 984. Because the Complaint has not stated a claim for a primary violation of securities law, its Section 20(a) claims fail as well. *See Taylor*, 29 F4th at 816 (noting that Section 20(a) claims "survive to the same extent as their corresponding § 10(b) claims").

### C.  Count III: Section 20A Claims

The Complaint alleges that Vasos and Garratt engaged in insider trading in violation of Section 20A of the Exchange Act, 15 U.S.C. § 78-t-1. (Complaint ¶¶ 523–32.) To plead a Section 20A claim, the Complaint must allege both a predicate violation of the securities law and that the defendant traded securities contemporaneously with the trade of securities that underlies the violation. *See Shupe*, 660 F. Supp. 3d at 684 (citing *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at *5–6 (M.D. Tenn. Mar. 9, 2009) (Campbell, J.)). Because the Complaint has not stated a claim for a primary violation of securities law, its Section 20A claims fail as well.

### D.  Dismissal with or without prejudice

The PSLRA provides that "the court shall, on the motion of any defendant, dismiss the complaint" if the pleading requirements are not met. 15 U.S.C. § 78u-b(3)(A). It does not specify

32

whether the dismissal should be with or without prejudice. *Accord Belizan v. Hershon*, 434 F.3d 579, 583–84 (D.C. Cir. 2006) (contrasting the PSLRA with the Biomaterials Access Assurance Act of 1998's explicit requirement that dismissals be with prejudice, under 21 U.S.C. § 1605(e)). The defendants request that the Complaint be dismissed with prejudice. (Doc. No. 81 at 80; Doc. No. 86 at 23.) Without statutory guidance, the court is guided by Rule 15(a), whose "purpose is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *BLOM Bank SAL v. Honickman*, No. 23-1259, slip op. at 8 (U.S. June 5, 2025) (quoting 6 Wright, Miller, & Kane, Federal Practice and Procedure § 1471 (3d ed. updated 2025)). Moreover, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Brown v. Matauszak*, 415 F. App'x 608, 615 (6th Cir. 2011) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) (internal quotation marks omitted)). The Complaint's deficiencies are not mere procedural technicalities. But the court has not determined that the Complaint's deficiencies—only some of which are addressed herein—could not possibly be cured by the allegation of other facts. In its discretion, therefore, the court will dismiss the Complaint without prejudice to seeking amendment.

## IV. CONCLUSION

The Complaint has failed to state any claim. The court will therefore dismiss the Complaint without prejudice. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

33