# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | Case No. 3:23-CV-01250 |
| Plaintiff, | CLASS ACTION |
| v. | Judge Aleta A. Trauger |
| DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

A.     Dollar General Disclosed the Operational Risks and Challenges It Faced ........................ 3

B.     The Court's June 2025 Decision .......................................................................... 6

C.     New Allegations in the Proposed Third Amended Complaint ........................................ 7

ARGUMENT ......................................................................................................................... 8

I.     The Proposed Amendment Is Futile Because the TAC Fails to Plead Scienter ................. 9

      A.     Insider Trading (*Helwig* Factor 1) ............................................................. 9

      B.     Divergent Reports (*Helwig* Factor 2) ....................................................... 14

      C.     Time Between Misstatements and Corrective Disclosures (*Helwig* Factor 3) ..... 20

      D.     Ancillary Lawsuits Charging Fraud (*Helwig* Factor 5) ..................................... 20

      E.     Disregard of Current Factual Information (*Helwig* Factor 6) .............................. 21

      F.     Confusing Disclosure of Accounting Information (*Helwig* Factor 7) .................. 22

      G.     Self-Interested Motive (*Helwig* Factor 9) ................................................... 22

      H.     Holistic Review ....................................................................................... 23

II.     The Amendment Is Futile Because the TAC Does Not State a Claim for the Additional Reasons in Defendants' Motion to Dismiss the SAC ................................... 24

CONCLUSION ..................................................................................................................... 25

APPENDIX A ................................................................................................................... A-1

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Baker Hughes, Inc.*,
292 F.3d 424 (5th Cir. 2002) ........................................................................................ 18

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ................................................................................... 14

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .................................................................................. 25

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ......................................................................................... 11

*City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ........................................................................................ 21

*City of Taylor Gen. Emples. Ret. Sys. v. Magna Int'l, Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013) ........................................................................... 13

*Doshi v. Gen. Cable*,
823 F.3d 1032 (6th Cir. 2016) ................................................................................. 20, 22

*GMAC Mortg., LLC v. McKeever*,
651 F. App'x 332 (6th Cir. 2016) .................................................................................... 9

*Grillo v. Tempur-Pedic Int'l, Inc.*,
553 F. Supp. 2d 809 (E.D. Ky. 2008) ............................................................................ 13

*Gruhn v. Tween Brands, Inc.*,
2009 WL 1542795 (S.D. Ohio June 2, 2009) ............................................................... 18

*Hoffman v. Comshare, Inc.*,
183 F.3d 542 (6th Cir. 1999) ........................................................................................ 12

*In re Appharvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023) ........................................................................... 18

*In re Canopy Growth Sec. Litig.*,
2024 WL 3445436 (S.D.N.Y. July 17, 2024) ............................................................... 17

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) ............................................................... 10

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011) ........................................................................... 19

Case 3:23-cv-01250    Document 98    Filed 10/24/25    Page 3 of 33 PageID #: 3633

*In re Ferro Corp.*,
2007 WL 1691358 (N.D. Ohio June 11, 2017)..................................................................... 24

*In re FirstEnergy Corp. Sec. Litig*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022).......................................................................... 12

*In re Gentiva Secs. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................................. 15

*In re Hertz Glob. Holdings, Inc.*,
905 F.3d 106 (3d Cir. 2018)................................................................................................. 12

*In re Illumina Securities Litigation*,
2025 WL 2739655(S.D. Cal. Sep. 26, 2025)........................................................................ 24

*In re Medtronic Inc., Sec. Litig.,*
618 F. Supp. 2d 1016 (D. Minn. 2009)................................................................................. 14

*In re UiPath, Inc. Sec. Litig.*,
2025 WL 2065093 (S.D.N.Y. July 23, 2025) ........................................................... 17, 18, 25

*In re Vantive Corp. Secs. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ............................................................................................. 13

*KBC Asset Mgmt. N.V. v. Omnicare, Inc*,
769 F.3d 455 (6th Cir. 2014) ........................................................................................... 9, 20

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ......................................................................................... passim

*Kuyat v. BioMimetic Therapeutics, Inc.*,
747 F.3d 435 (6th Cir. 2014) ................................................................................................. 9

*Lim v. Hightower*,
2025 WL 2965692 (6th Cir. Oct. 21, 2025)............................................................................ 9

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
838 F.3d 76 (1st Cir. 2016).................................................................................................. 12

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021).................................................................................. 18

*Miller v. Champion Enters. Inc.*,
346 F.3d 660 (6th Cir. 2003) ................................................................................................. 9

*N.Y.C. Pub. Pension Funds v. Coupang, Inc.*,
2025 WL 2613650 (S.D.N.Y. Sep. 10, 2025)........................................................... 11, 21, 25

iii

*Newtyn Partners LP v. All. Data Sys. Corp.*,
 2025 WL 872967 (S.D. Ohio Mar. 20, 2025).........................................................................21

*Pittman v. UNUM Group*,
 861 F. App'x 51 (6th Cir. 2021) .........................................................................................22

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.,*
 556 F. Supp. 3d 772 (N.D. Ohio 2021),
 *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022) ...............................................................17

*Porter v. Graftech Int'l Ltd.*,
 2025 WL 2393087 (N.D. Ohio Aug. 18, 2025) .....................................................................9

*Quinones v. Frequency Therapeutics, Inc.*,
 106 F.4th 177 (1st Cir. 2024)...............................................................................................12

*Stephens v. Maplebear Inc.*,
 2025 WL 1359125 (N.D. Cal. May 9, 2025) ........................................................................11

*Sun v. TAL Educ. Grp.*,
 2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023).....................................................................13

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
 83 F.4th 514 (6th Cir. 2023) .............................................................................16, 17, 20, 23

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ........................................................................................12, 24

*Zank Payment Processing, Inc. v. Custom Payment Consulting, Inc.*,
 2025 WL 2405612 (E.D. Tenn. Aug. 19, 2025) ....................................................................9

iv

Defendants Dollar General Corporation, Todd J. Vasos, Jeffery C. Owen, John W. Garratt, and Kelly M. Dilts respectfully submit this memorandum in opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint (the "TAC").

## PRELIMINARY STATEMENT

The PSLRA's "elephant-sized boulder" continues to block Plaintiffs' claims. Granted two months to continue their years-long search for fraud, Plaintiffs again came up empty. Plaintiffs' brief vastly overstates the new allegations in the proposed complaint and their impact on the Court's analysis dismissing the prior complaint. Now on their third try, Plaintiffs' motion should be denied as futile. The TAC does not cure the flaws the Court identified and does not create the required strong inference that Defendants acted with scienter.

The TAC, like its predecessors, alleges that Dollar General and its senior officers engineered a four-plus-year fraud that misrepresented the Company's inventory, accounting, staffing and pricing practices as the Company (and the Nation) dealt with and then emerged from the COVID-19 pandemic. In rejecting this claim, the Court explained that Defendants' alleged knowledge of "various issues facing the Company's core operations," even if credited, does not support a strong inference that any Defendant recklessly disregarded information that contradicted the alleged misstatements. Considering the alleged facts holistically, the Court concluded the nonculpable inferences that the Company disclosed operational issues as they arose after the pandemic were more plausible than any inference of scienter. Without reaching Defendants' other arguments for dismissal, the Court held that defect alone was fatal. The TAC fares no better.

*First*, the TAC does not allege Defendants read or were aware of the emails sent by FE-1 or FE-2 between July 2021 and July 2022. Plaintiffs' brief highlights new FE-25, but by her own admission she left the Company in May 2021 before those emails allegedly were sent. FE-25 has no knowledge about those emails. She only speculates that Defendants' "would have read the

1

emails," and does not assert that Defendants actually "read these emails," as Plaintiffs claim in their brief. Nor did Plaintiffs add new allegations about the contents of those emails to show they diverged from any public statements. The Court held a complaint must allege "specific facts" showing the "reports were known to Defendants and that they reflect the allegedly fraudulent scheme." Order at 17-18. Plaintiffs ignored the Court's latter holding in drafting the TAC.

*Second*, the TAC does not address the Court's questions about the meetings attributed to FE-3, FE-4 or FE-7. The Court found that those allegations were too vague—including as to whether the FEs attended the meetings or only heard about them—to constitute divergent reports that suggested scienter. Plaintiffs did not add anything about those meetings, effectively conceding the FEs lacked sufficient personal knowledge and abandoning those allegations.

*Third*, the new allegations about other meetings Defendants allegedly attended are more of the same vague and conclusory assertions that the general topics of inventory and staffing were discussed at various points in time. Dollar General had more than 16,000 stores, 155,000 employees and $5 billion in inventory. Unremarkable allegations that Defendants attended a town hall or other meeting where unspecified "inventory" or "staffing" issues were discussed do not show that they received specific information that diverged from any public statements or otherwise satisfy this Court's pleading requirements. None of the FEs attempt to link the information discussed at any alleged meeting or in any alleged report to the Company's public statements.

*Fourth*, Plaintiffs misstate the Company's share ownership guideline in an effort to explain the absence of stock sales by Owen and Dilts during the Class Period. To begin with, the guideline did not require either Defendant to "acquire" any additional shares, as Plaintiffs assert. To the contrary, it merely provides that they could not sell more than 50% of vested stock or options until they had reached the guideline threshold, with a five-year timeframe to do so. Thus, Owen and

2

Dilts absolutely could have sold stock; but they chose not to of their own accord. In any event, the TAC does not allege sufficient facts about their holdings, leaving the Court to speculate. Significantly, the TAC completely ignores the stock options, performance stock units (PSUs), and/or restricted stock units (RSUs) Owen and Dilts held, even though the guideline at that time expressly included all holdings including vested in the money options, and earned but unvested PSUs and vested or unvested RSUs. The Company's proxy statements show that Owen held over 9 times the guideline amount at all relevant times. The guideline thus in no way explains the lack of sales by Owen and Dilts, as the Court held was necessary. And Plaintiffs continue to ignore that Owen purchased $235,000 in stock in June 2023, which is entirely inconsistent with any inference he had been participating in a multi-year fraud.

As with the SAC, the most compelling inference remains that "as the Company emerged from the pandemic, and demand shifted, and as the Company addressed operational challenges it disclosed over time, the stock price dropped—without any of the defendants intentionally or recklessly making false or misleading statements or trading on inside information." Order at 31-32. Plaintiffs merely seek to repackage the core operations theory the Court rejected as inadequate here. The TAC does not allege new facts sufficient to change the Court's prior conclusion.

**BACKGROUND**

**A. Dollar General Disclosed the Operational Risks and Challenges it Faced**

Dollar General is the country's largest discount retailer by number of stores. In the year before the Class Period, the Company had more than 16,000 stores, 143,000 employees, and $27.8 billion in net sales. Ex. 1 (Mar. 2020 10-K) at 4, 6, 8, 23. Dollar General operated 22 distribution centers with nearly 20 million square feet of space and was planning to grow that capacity. *Id.* at 18. It also leased "approximately 1.1 million square feet" of additional "temporary warehouse space" to support its distribution centers. *Id.* at 7, 18. As of January 2020, the Company had an

3

inventory balance of over $4.6 billion and had turned over its inventory balance 4.4 times during the prior year. *Id.* at 28, 43. Given the huge volume of inventory the Company purchased, stored, distributed and sold, Dollar General's Form 10-K disclosed extensive risk factors related to its inventory management, its distribution network, its low-cost operating model, and potential changes to consumer demand trends, among other risks. *Id.* at 6-7, 9, 11, 13, 16.

Following the onset of the COVID-19 pandemic, Dollar General experienced a "significant surge" of consumer demand. Ex. 2 (May 2020 Tr.) at 4. But the Company cautioned the demand was unpredictable in "volume" and "category mix," and a "departure from seasonal norms." Ex. 3 (May 2020 10-Q) at 14. The Company repeatedly emphasized the pandemic created an "unprecedented," "unusual," and "rapidly-changing" environment. Ex. 2 (May 2020 Tr.) at 4; 8 Ex. 38 (Aug. 2020 Tr.) at 7; Ex. 4 (Dec. 2020 Tr.) at 5-6, 10. Highlighting these uncertainties, in May 2020 the Company withdrew its forward-looking guidance. Ex. 2 (May 2020 Tr.) at 6.

In 2020, Dollar General had annual net sales of $33.7 billion. Ex. 5 (Mar. 2021 10-K) at 32. As the Company reported record sales, it repeatedly warned investors that it "expected [] sales [to] moderate to more normalized levels." Ex. 2 (May 2020 Tr.) at 4. In addition to unpredictable demand trends, the Company also disclosed specific risks and heightened expenses related to COVID-19. *E.g.,* Ex. 2 (May 2020 Tr.) at 4-6, 14-15; Ex. 36 (Aug. 2020 10-Q) at 14.

In 2021, Dollar General had annual net sales of $34.2 billion. Ex. 6 (Mar. 2022 10-K) at 31.[1] The Company continued to highlight the risks of unpredictable demand trends, supply chain disruptions and higher inflation that impacted its core customers. *E.g.*, Ex. 7 (Dec. 2021 Tr.) at 3-5. The Company predicted its sales mix would shift back toward consumables (which generally

---

[1] In March 2021, Dollar General issued "cautious" forward-looking guidance, emphasizing the "significant uncertainty that still exists." Ex. 31 (Mar. 2021 Rel.).

4

were less profitable than non-consumable goods) at some point.  Ex. 8 (Aug. 2021 Tr.) at 5, 12.  In the meantime, the Company accelerated certain inventory purchases in anticipation of supply chain delays to meet current demand.  *Id.* at 5; Ex. 9 (May 27, 2021 Tr.) at 5.  It disclosed its temporary warehouse space had nearly doubled to approximately 2.0 million square feet.  Ex. 6 (Mar. 2022 10-K) at 21.  For the year, the Company's inventory increased by only 1.4% on a per store basis, in line with its increase in net sales.  Ex. 6 (Mar. 2022 10-K) at 29-30, 43.

In 2022, the Company generated annual net sales of $37.8 billion.  Ex. 37 (Mar. 2023 10-K) at 31.  But the Company warned investors in the first quarter that demand had shifted back toward consumables, other challenges emerged, and the Company's gross profit margin decreased by 151 basis points.  Ex. 10 (May 2022 Tr.) at 3-4, 15; *see also* Ex. 30 (Mar. 2022 Tr.) at 6 (predicting increases in shrink and markdowns).  Exacerbated by high inflation and the end of government stimulus programs, by the second quarter, the "evolving" consumer demand had a greater impact than predicted, as demand for non-consumables dropped below pre-pandemic levels.  Ex. 11 (Aug. 2022 Tr.) at 3; Ex. 12 (Aug. 2022 10-Q) at 13-14.  Due to these and other factors, the Company reported its inventory "increased by 25.1%" on a per store basis.  *Id.*  at 16.

In December 2022, the Company reported these headwinds led it to lower its forward-looking guidance.  Ex. 13 (Dec. 2022 Tr.) at 6.  The Company further disclosed it experienced "unexpected" delays in finding temporary warehouse space and incurred detention fees from delays returning shipping containers.  *Id.* at 4.  Subsequently, Winter Storm Elliott shut down stores around the country in the crucial week before Christmas, adding to the Company's challenges.  Ex. 14 (Feb. 2023 8-K) at 4; Ex. 15 (Mar. 2023 Tr.) at 3.[2]

---

[2] Contrary to the TAC, the Company did not blame its FY 2022 financial results wholly on Winter Storm Elliot.  ¶ 225.  It disclosed that the Storm "significantly impacted our operations during the *month of December*."  Ex. 37 (Mar. 2023 10-K) at 29.  No FE alleges that to be false.

Throughout 2023 and 2024, Dollar General continued to warn investors of headwinds, including the "residual impact" of "capacity constraints" (Ex. 15 (Mar. 2023 Tr.) at 3), "challenging macroeconomic" conditions (Ex. 16 (June 2023 Tr.) at 3), and anticipated investments in inventory reduction and management initiatives, including increased labor hours, promotional markdowns, and SKU reduction initiatives (Ex. 17 (Aug. 2023 10-Q) at 16; Ex. 18 (Dec. 2023 Tr.) at 4-5, 7). In 2023, the Company's net sales increased to $38.69 billion but its operating profit decreased from $3.33 billion in 2022 to $2.45 billion. Ex. 19 (Mar. 2024 10-K) at 30-31. In 2024, Dollar General predicted the headwinds would continue "all year." Ex. 20 (Mar. 2024 Tr.) at 13. At the same time, the Company's inventory levels decreased by 9.5% on a per-store basis in the first quarter of 2024, including a 22.5% reduction in non-consumable inventory. Ex. 21 (May 2024 10-Q) at 18.

In July 2024, Dollar General resolved Occupational Safety and Health Administration ("OSHA") investigations related to workplace safety conditions at certain retail stores. Ex. 22 (OSHA Settlement). Dollar General agreed to pay $12 million in penalties—far less than OSHA initially proposed—and to implement certain initiatives. *Id.* at 3.

## B. The Court's June 2025 Decision

On June 24, 2025, this Court dismissed the Second Amended Complaint (the "SAC") because it failed to allege a strong inference of scienter under the *Helwig* analysis (the "Order").

- *Helwig* **Factor 1 (insider trading):** Sales by only two of four Defendants could not support an inference of scienter. Order at 16–17. The Court did not reach other deficiencies in these allegations. *See* MTD (ECF 81) at 59–65.

- *Helwig* **Factor 2 (divergent internal reports):** Three emails purportedly sent by two FEs did not support scienter because none of the Defendants were alleged to have read them. Order at 19–20. Three meetings were also not divergent reports because Plaintiffs failed to allege facts about attendance and timing. *Id.* at 23-25. As the SAC did not allege Defendants received the internal reports, the Court did not consider whether they actually diverged from external statements. *Id.* at 25; MTD at 56–57.

6

- *Helwig* **Factor 5 (existence of ancillary lawsuits charging fraud):** There were no allegations the Company settled any lawsuits related to fraud, that the settlements were reached quickly, or that the settlements were secret. Order at 27–29.

- *Helwig* **Factor 6 (disregard of current facts):** Other than purported divergent reports, Plaintiffs failed to plead "what particular factual information Defendants disregarded." *Id.* at 26.

- *Helwig* **Factor 7 (confusing disclosure of accounting information):** There were no allegations that only a sophisticated reader could understand the negative implications of Dollar General's accounting disclosures. *Id.* at 29–30.

- *Helwig* **Factor 9 (self-interested motive):** The allegation that Defendants wanted to keep their jobs, without more, was not sufficient to support scienter. *Id.* at 30–31.

On its holistic review, the Court concluded the SAC did not allege facts that "give rise to a strong inference of scienter as plausible as the defendants' proffered nonculpable inference" that the Company disclosed operational issues that arose after the pandemic and the stock dropped without anyone acting with scienter. *Id.* at 31–32. The Court emphasized the "deficiencies" in the SAC were not "mere[ly] procedural" and not all were addressed in the Order. *Id.* at 33.

## C. New Allegations in the Proposed Third Amended Complaint

Plaintiffs claim that the TAC "remedies the grounds for dismissal" that the Court identified." Mem. at 1. But the new allegations suffer from the same deficiencies as the SAC.

- *Helwig* **Factor 1:** The TAC alleges Dilts and Owen did not sell shares because the Company's share ownership guideline required them to increase their holdings. TAC ¶ 530 (cited as "¶").

- *Helwig* **Factor 2:** With respect to email communications, FE-25, a supposed executive assistant to Owen and other officers until May 2021, speculates that "members" of the C-Suite "would have read" an email from an employee relaying operational concerns. ¶ 97.

  With respect to meetings, five FEs allege internal meetings and unspecified inventory reports. None of the FEs allege both dates and specific contents of any meeting or report.

  o FE-26 (VP, Distribution Centers, July 2016 – Sep. 2022) allegedly attended meetings on unspecified dates at which Vasos was present concerning "inventory management," discussed expenditures on storage trailers with Vasos "in 2020," and

7

discussed the inventory management system for those trailers with Vasos on an unspecified date (¶¶ 99–101);

- o FE-27 (Store Manager/District Manager, 2010 or 2012 – Dec. 2024) allegedly attended annual August 1 meetings with all Defendants where "problems with inventory were always discussed" (¶¶ 104–07);

- o FE-31 (Director, Merchandising Planning, Aug. 2017 – June 2021) alleged Defendants received information about "inventory issues" in routine aging inventory and store operations reports, she attended monthly forecast reviews with Garratt and later Dilts, and she attended town hall meetings with Vasos and Garratt where "inventory and staffing issues" were discussed (¶¶ 117–25);

- o FE-34 (Director, Merchandising, Feb. 2019 – Mar. 2025) alleged her supervisor described meetings with Defendants at unspecified times where "excess inventory problems" were discussed, and she attended meetings with Vasos concerning "inventory problems" (¶¶ 133–37); and

- o FE-36 (District Manager, Dec. 2010 – Jan. 2025) allegedly helped clear excess inventory from stores prior to investor visits that Vasos attended (¶¶ 164–71).

Further, four FEs allege that "Company management was completely aware" of inventory and staffing issues because of unspecified complaints made to non-defendants. ¶¶ 112-13 (FE-29, Asst. Manager, Dec. 2019 – Feb. 2023); *see also* ¶ 115-16 (FE-30, Dir., Private Fleet, May 2023 - Sep. 2024); ¶ 163 (FE-35, Asst. Dir., 2018 to mid-2020); ¶ 110 (FE-28, District Manager, June 2017 – Apr. 2023). Two FEs allege that Dollar General executives had access to unspecified third-party inventory audits. ¶ 129 (FE-32, District Manager, Nov. 2020 to July 2024); ¶ 132 (FE-33, Training Director, Nov. 2020 to Feb. 2022).

- *Helwig* **Factor 5:** The TAC adds allegations about the July 2024 OSHA settlement, including that senior executives must "receive training regarding corporate responsibility for workplace safety and health" and "review the Company's compliance" with the settlement "quarterly." ¶¶ 207, 507. Additionally, quoting a press release by a Wisconsin agency, the TAC alleges a settlement with those regulators was "secret." ¶¶ 214, 508.

- *Helwig* **Factor 7:** Based on selective quotes from a March 2023 Credit Suisse analyst report, the TAC alleges the net impact of LIFO inventory accruals was confusing. ¶ 554.

- *Helwig* **Factor 9:** The TAC alleges that Company executives, including Defendants, had "incentive-based compensation packages" pegged to operating profit. ¶¶ 534–36.

## ARGUMENT

Although courts "freely give leave" to amend pleadings, those "usual liberal standards" do

not apply to securities fraud cases. *Kuyat v. BioMimetic Therapeutics, In*c., 747 F.3d 435, 445

8

(6th Cir. 2014). The PSLRA "restricts the scope of Rule 15(a) … such that plaintiffs have more limited ability to amend." *Lim v. Hightower*, 2025 WL 2965692, at *14 (6th Cir. Oct. 21, 2025) (quotation omitted). Leave to amend should be denied if the amendment is futile because it fails to cure deficiencies or could not withstand a motion to dismiss. *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 692 (6th Cir. 2003). A motion to amend cannot be used "to relitigate the issue[s] the Court has already addressed." *Zank Payment Processing, Inc. v. Custom Payment Consulting, Inc.*, 2025 WL 2405612, at *2 (E.D. Tenn. Aug. 19, 2025). This Court's legal rulings are law of the case. *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 339 (6th Cir. 2016).

## I. The Proposed Amendment is Futile Because the TAC Fails to Plead Scienter

Plaintiffs claim the TAC "pleads new facts specifically addressing the scienter-related concerns that the Court identified." Mem. at 2. But the TAC's vague and conclusory allegations—almost all undated—"do not shed any light on whether the Defendants, at the time [the statements] were made, knew of or were reckless regarding the falsity of those statements." *Konkol v. Diebold, Inc.*, 590 F.3d 390, 404 (6th Cir. 2009). Accordingly, the proposed amended complaint is futile.[3]

### A. Insider Trading (*Helwig* Factor 1)

#### 1. The Company's Share Ownership Guideline Does Not Support Plaintiffs' New Scienter Theory

The TAC fails to explain why two Defendants did not sell any stock. Order at 16-17; *accord Porter v. Graftech Int'l Ltd.*, 2025 WL 2393087, at *38 (N.D. Ohio Aug. 18, 2025) ("[That] the other Individual Defendants accumulated stock during the class period [] undermines a finding of scienter."). Plaintiffs argue that "Owen and Dilts did not sell meaningful amounts of stock"

---

[3] In addition, the TAC's new allegations fail to plead "defendants had actual knowledge" that any statements of "soft information," such as opinions and other non-objectively verifiable information, "were false or misleading at the time that they were made." *KBC Asset Mgmt. N.V. v. Omnicare, Inc*, 769 F.3d 455, 474, 78 (6th Cir. 2014); *see also* MTD at 29-31.

9

because "they were required to increase their holdings to meet the Company's executive stock holding requirements." Mem. at 11. This argument misstates the policy and ignores their holdings.

First, Dollar General's "Share Ownership Guidelines" establish "target ownership level[s]" over a five-year period and require officers "to retain ownership of 50% of all net after-tax shares issuable upon vesting or exercise of compensatory awards," which include shares, options and PSUs/RSUs, until the target level is achieved. Ex. 23 (2021 Proxy) at 29-30. The guideline allowed them to sell up to 50% of the referenced shares, even if they had not reached the target. As a result, it does not explain why they failed to sell any stock; in fact, Plaintiffs' allegations establish that they could have sold stock, but chose not to. *See In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at \*20 (S.D.N.Y. May 19, 2025) (policy which did not "wholly prevent[]" defendant from selling did not defeat non-culpable inferences from lack of sales).

Second, both Owen's and Dilts' share ownership during the Class Period far exceeded the target. Significantly, the TAC ignores vested options and PSUs/RSUs entirely, although vested in the money options, earned but unvested PSUs, and vested or unvested RSUs are considered holdings for the purposes of the guideline. Appx A (citing Proxy statements). And the TAC does not allege Owen's holdings at any time, let alone show that he was ever below the target. As COO from 2019 until November 2022, Owen's ownership guideline was 4x his salary or $3.3 million (as of March 2021). ¶ 532. As of January 2021, he held $31.8 million, more than 9x the target. Appx. A. By January 2022, through additional vesting, his holdings grew to $42.0 million. *Id.* As of February 2023, Owen held $56.0 million, nearly 10x his target of $5.7 million as CEO. ¶¶ 531-32. Plaintiffs argue Dilts was "scrambling" to increase her holdings but do not allege any facts about her holdings before May 1, 2023. ¶ 531. Nor do they allege she made any misstatements during that time. After her promotion to CFO in May 2023, she was expected to

10

increase her holdings from $1.3 million to $2.3 million (3x salary) within five years. *Id*. The TAC ignores that by February 2024, seven months later, Dilts held $3.1 million. Appx. A.[4]

The new allegations only serve to highlight that Owen—who as Chief Operating Officer would be closest to the Company's alleged operational issues—could have sold at the same time as Vasos and Garratt, but he chose not to. Indeed, the TAC undermines its new theory by contradicting itself. When focusing on the stock holding guideline, the TAC alleges that Owen's "first alleged misstatement to investors was made on December 1, 2022." ¶ 532. But the TAC elsewhere alleges he made misstatements from the first day of the Class Period. *E.g.*, ¶¶ 291-92 (May 2020 Inventory statement); ¶¶ 385-86 (Aug. 2020 Staffing statement). The TAC concedes the guideline does not explain Owen's lack of trading from May 2020 to December 1, 2022, when Vasos and Garratt made 98.5% and 100% of their sales, respectively. ¶¶ 518, 521. And the TAC continues to ignore Owen's June 2023 $235,000 stock purchase. Ex. 24 (Owen 2023 Form 4).

Finally, Plaintiffs' new theory rests on the irrational assumption that Owen and Dilts participated in a multi-year fraud while knowing they would be required to increase their holdings of inflated stock. Courts do not infer scienter from allegations of such irrational conduct. *See Hubiack v. Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *9 (S.D.N.Y. June 10, 2024); *N.Y.C. Pub. Pension Funds v. Coupang, Inc.*, 2025 WL 2613650, at *26 (S.D.N.Y. Sep. 10, 2025). The unsupported claim "that defendants would undermine their long-term credibility—and risk considerable bad press—just to pump up [the Company's] share price … is 'not even plausible, much less convincing.'" *Boykin v. K12, Inc.*, 54 F.4th 175, 186 (4th Cir. 2022).

Because only two Defendants are alleged to have sold stock, the Court "must hypothesize

---

[4] The TAC alleges Dilts sold a small amount in April 2024 to cover tax liability on vesting of options (¶ 531) but does not contend these sales suggest scienter. Nor could it. *Stephens v. Maplebear Inc.*, 2025 WL 1359125, at *8 (N.D. Cal. May 9, 2025).

either that the [fraud] was obvious only to those defendants …, or that it was obvious to all, yet the [others] nevertheless went along with" it. *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84 (1st Cir. 2016) (cited in Order at 16). The Court should not reconsider its Order where the TAC "offers no fact suggesting that the sellers knew more than the nonsellers" or any reason for the non-trading Defendants to go along with the supposed scheme. *Id.*[5]

### 2.    The TAC Fails to Allege That Sales Were Suspiciously Timed

Even if the guideline cured those defects as to Owen and Dilts (it does not), Plaintiffs' allegations that Vasos and Garratt sold stock during the Class Period are "not sufficient to establish an inference of scienter on [their] own." *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 184 (1st Cir. 2024); *Hoffman v. Comshare, Inc.*, 183 F.3d 542, 553 (6th Cir. 1999) (insider sales "do not, without more, give rise to a strong inference of scienter"). "Courts have routinely found that even large percentages of holdings sold at first blush appearing suspicious are not sufficient to infer scienter when other factors, such as the timing of the relevant sales, weigh against that inference." *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 121 (3d Cir. 2018).

The TAC pleads no additional facts showing the sales by Vasos or Garratt were "suspicious" and "probative of the fact that [they] knew or at least suspected that [the company's disclosures] were misleading." *Konkol*, 590 F.3d at 399. Instead, Plaintiffs improperly presume that all trades in the four-year Class Period should be deemed "suspicious" because they were larger than sales in the four years before the Class Period. Courts routinely find "an inference of scienter from insider trading is lessened when, as here, the class period is well over a year." *Hertz*, 905 F.3d at 120; *accord Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014);

---

[5] Contrary to Plaintiffs' claim (Mem. at 11-12), *In re FirstEnergy Corp. Sec. Litig*, 2022 WL 681320 (S.D. Ohio Mar. 7, 2022), is inapposite because the complaint there alleged that executives had varying levels of knowledge of the company's admitted bribery scheme. *Id*. at *15-16.

Case 3:23-cv-01250    Document 98    Filed 10/24/25    Page 17 of 33 PageID #: 3647

*In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002) (With an "unusually long" Class Period, it is "difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made.").

Vasos and Garratt began trading stock at regular intervals in May 2020. The TAC alleges no facts supporting scienter (or falsity) in the first year of the Class Period. Moreover, even though the Company reported record sales in May 2020, the Company reported that it expected sales "will moderate" and withdrew its forward-looking guidance because of pandemic-related uncertainties. Ex. 2 (May 2020 Tr.) at 6-7. Those statements are inconsistent with any intent to inflate the stock price. In addition, approximately 85% of Garratt's and 70% of Vasos' sales were completed by December 2021—one year before the first alleged corrective disclosure in December 2022. ¶¶ 518, 521. Courts recognize that "the longer the time between stock sales and the disclosure, the more scienter is negated." *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 822 (E.D. Ky. 2008); *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *29 (S.D.N.Y. Sept. 29, 2023) (sales "more than a month prior" to purported corrective disclosures are not "inherently suspicious"). The only reasonable inference is that Plaintiffs structured the start of the Class Period to improperly make stock sales appear "suspicious" without any basis. *Vantive*, 283 F.3d at 1092. For example, the Court's Order focused on the stock sales in August 2022 (Order at 15-16), but those sales were entirely consistent with Defendants' trading history in 2020 and 2021. Plaintiffs cannot manufacture an inference of scienter by manipulating the start date of a multi-year Class Period.

Moreover, Vasos' August 2022 sales occurred in the first trading window after his retirement was announced in July 2022. Ex. 35 (July 2022 8-K) at 2. Courts do not view sales in advance of retirement as suspicious or otherwise supporting an inference of scienter. *City of Taylor Gen. Emples. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (sales are

13

a "normal and expected consequence of [] retirement") (collecting cases).  This is especially true here because the Company generally requires executives to exercise options within 90 days of their departure date.  Ex. 25 (2022 Proxy) at 40-41; Ex. 26 (2024 Proxy) at 40 (Vasos had 90 days to exercise options).  *See also In re Medtronic Inc., Sec. Litig.,* 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009) (sale of expiring options does not support scienter), *aff'd*, 621 F.3d 800 (8th Cir. 2010).  In addition, in June 2023, Vasos sold expiring options after his employment ended and retained 4,772 shares, which undermines any inference of scienter.  Ex. 27 (June 2023 Form 4).  Finally, when Vasos returned as CEO, he accepted a compensation package granting 250,000 options scheduled to vest four years later in 2027.  Ex. 28 (Oct. 2023 8-K) at 2.  This "signals only confidence in the future of [the] company" and dispels any inference he had defrauded investors for years.  *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009).[6]

### B.  Divergent Reports (*Helwig* Factor 2)

The TAC, like its predecessors, fails to plead any divergent reports, which the Court recognized as the "'key factor' to a finding of scienter."  Order at 17.  Where, as here, Plaintiffs rely on "confidential witnesses," the Sixth Circuit "expect[s] those witnesses to be able to provide more details about the reports and to be able to specifically connect them to the Defendants."  *Konkol*, 590 F.3d at 398.  The TAC fails to allege "specific facts" about divergent reports that were "known to Defendants" and "reflect[ed] the [fraudulent] scheme."  *Id.*; *see* Order at 18.  Indeed, no FE accuses Defendants of holding views contrary to their public statements.

**Emails.**  The TAC relies on the three vaguely described emails from two store managers the Court previously considered: (1) a July 2021 anonymous email from FE-2 to executives including Vasos and Owen (¶ 56); (2) a June 2022 email from FE-2 with a "list of problems" to

---

[6] In 2022, Garratt acquired stock then-valued at $3,113,435 by vesting.  Ex. 32 (Apr. 2023 Proxy) at 38.  After retiring in June 2023, he exercised expiring options and retained roughly 2,000 shares.

"everyone in the top three tiers of the Company" (¶ 57); and (3) a February 2022 email from FE-1 to Vasos "provid[ing] suggestions on how to fix the problems" (¶ 52). The Court found the emails did not support scienter because there were no allegations Defendants read or responded to them. Order at 19-20. The TAC purports to cure that defect through FE-25, whom Plaintiffs argue "worked directly with Defendants" and "explain[ed] that, pursuant to well-established Company practices, Defendants read these emails and were consulted about them by [] underlings." Mem. at 2. But Plaintiffs mischaracterize FE-25's allegations. She left Dollar General in May 2021—before any of the emails were sent. ¶ 96. She does not, and cannot, allege any Defendant "read these emails." She only speculates that "members of the Dollar General C-suite would have read those emails sent to them." ¶ 97. While Plaintiffs claim Vasos, Owen and Garratt were "required" to read the emails (¶ 11), neither FE-25 nor any other FE alleged that. Nor would FE-25 have any basis to allege Defendants "were consulted about them" by underlings, which the TAC does not attribute to her. ¶¶ 96-98, 111, 505 (only paragraphs citing FE-25).

Even crediting FE 25's allegation, the TAC does not add any specific facts about the contents of these emails, leaving only vague allegations about "staffing," "delivery," and "inventory management issues." *See In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 374 (E.D.N.Y. 2013) (no scienter from a "vague" email outlining an "employee's 'thoughts and concerns'"). The TAC does not allege how those emails diverged from Defendants' public statements and therefore cannot support scienter. Order at 18.

**Meetings.** This Court found the SAC failed to plead three purported meetings were divergent reports because it did not allege "when the meetings happened," whether Defendants "attended these meetings," or whether the FE "attended these meetings." *Id.* at 36. The TAC does not address the Court's questions and does not allege that FE-3, FE-4, and FE-7 attended any

15

meetings with any Defendant or otherwise allege any basis for those FEs' personal knowledge about the contents of any meetings. The only inference is that these FEs have no basis even to speculate as to Defendants' state of mind, and the Court should deem those allegations abandoned.[7]

Plaintiffs argue that the TAC "contains new facts" about meetings "Defendants personally attended." Mem. at 10. But with only two exceptions, Plaintiffs do not plead when any specific meeting happened. Instead, FEs report that, at unspecified points in time, they attended "multiple meetings" with one or more Defendants. ¶ 135 (FE-34); ¶¶ 121-25 (FE-31) ("monthly forecast[] meetings" and "town hall meetings" between 2017 and 2021); *id.* ¶ 100 (FE-26) (monthly "executive meetings" between 2016 and 2022). FE-34 pleads she attended town hall meetings at "the end of 2023" (¶ 135), but she does not allege any Defendant attended these meetings.

Through FE-27, the TAC newly alleges that every year, on August 1, the "Chief Officers" attended an "annual meeting" where "problems with inventory were always discussed." ¶ 105. But "attendance at such meetings, without more, does not support a finding of scienter given that the complaint does not allege that the [alleged] scheme was discussed in the meetings." *Konkol*, 590 F.3d at 398–99. The TAC "offers no detail that allows an assessment of whether [Dollar General's] disclosures differed in any significant way from those internal discussions." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 533 (6th Cir. 2023). At most, the TAC alleges inventory "problems" were "discussed" at meetings. ¶¶ 105, 135. But alleging amorphous "inventory problems" does not identify what those problems were, let alone show that information discussed at any meetings diverged from Defendants' public statements or

---

[7] The TAC continues to rely on the "reported up the chain" allegations this Court rejected. *E.g.*, ¶¶ 112-13 (FE-29) (complaints to "upper-level management"), ¶ 116 (FE-30) (complaints to "corporate office"). For example, FE-28 alleged that between 2017 and 2023 customer complaints would be provided to Regional Managers who would "report[] up the chain." ¶ 110. The TAC fails to plead which Defendants learned what information from which reports at what time.

16

suggest that Defendants fraudulently concealed those problems.[8]  Scienter cannot be inferred from the allegation that a large retailer, with over 16,000 stores and $5 billion in inventory, discussed inventory issues at ordinary course staff meetings.  *Konkol*, 590 F.3d at 398–99 (no scienter inference for revenue recognition scheme from discussions of "financial performance and results"); *ServiceMaster*, 83 F.4th at 531 ("'mere attendance at meetings' where the [] termite crisis was discussed does little to establish the kind of 'red flags' necessary [for] . . . scienter.").[9]

Nor can scienter be inferred from FE-26's allegation that in 2020, she requested $6 million in expenditures for storage trailers.  ¶ 101.  In March 2020, the Company told investors it leased approximately 1.1 million square feet of "additional temporary warehouse space" to support its distribution needs.  Ex. 1 (Mar. 2020 10-K) at 7, 18.  The TAC does not allege the $6 million expense for temporary storage sufficiently diverges from that disclosure to suggest scienter.

While Plaintiffs assert in their Motion that one FE "reported that Defendant Vasos was involved in efforts to hide inventory during investor visits" (Mem. at 11), the FE only alleges that Vasos *attended* the investor visits and that Vasos "or his direct report" approved expenditures for

---

[8] *See, e.g., Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.,* 556 F. Supp. 3d 772, 798 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022) (no scienter from "general statements about [defendants'] attendance at meetings"); *In re UiPath, Inc. Sec. Litig*., 2025 WL 2065093, at *14 (S.D.N.Y. July 23, 2025)  ("[M]ere participation in meetings . . . without any allegations as to how those discussions contradicted [public statements]" does not "constitute the sort of specific, contradictory knowledge required to support an inference of scienter"); *In re Canopy Growth Sec. Litig*., 2024 WL 3445436, at *13 (S.D.N.Y. July 17, 2024) ("Critically absent from the FAC are any specifics about when these alleged meetings occurred and what information was conveyed in them, let alone how such information contradicted defendants' challenged statements.").

[9] The only other "dated" meeting in the TAC was the February or March 2023 meeting pled in the SAC (¶ 505(c)), which the Court held was not an internal report.  Order at 21-23.  In any event, the warehouse capacity constraints and truck detention fees allegedly discussed on that call had been publicly disclosed months earlier in December 2022.  *Compare id. with* Ex. 33 (Dec. 2022 10-Q) at 15 (disclosing "temporary warehouse capacity constraints") *and* Ex. 13 (Dec. 2022 Tr.) at 4 (disclosing more than "$40 million in additional supply chain costs" including "detention fees incurred for delays in returning shipping containers").

17

these visits. ¶ 169.  In any event, Dollar General's over 16,000 retail stores were open and available to investors.  Alleging an executive or someone who reported to him must have been aware that a single store was cleaned before an investor visit is not a particularized allegation that the executive made public statements with fraudulent intent.  *In re Appharvest Sec. Litig.*, 684 F. Supp. 3d 201, 244 n.6 (S.D.N.Y. 2023) (no scienter from allegations that defendants cleaned premises before "investors and news media visited").

**Inventory Reports.**  The TAC's allegations about inventory reports are not particularized allegations of scienter.  FE-31 alleges that "Dollar General leadership received" regular reports "regarding inventory that was between six and eighteen months old" and that Defendants "had knowledge that one-third of stores had way too much product" because that information was "reported up from the store operations group."  ¶¶ 121, 124.  FE-32 and FE-33 allege that Defendants had access to annual inventory audits reports with inventory counts.  ¶¶ 129–32.  No FE alleges that any Defendant read any specific report at any specific point in time.  Nor do they allege "specific facts" about the contents of the reports to Defendants.  Order at 17-18.  The TAC's "non-specific internal reports are [] inadequate . . . to survive a motion to dismiss."  *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).[10]  The TAC does not plead that any report revealed the alleged fraud or contained specific information that diverged from public statements.[11]

---

[10] *Accord Gruhn v. Tween Brands, Inc.*, 2009 WL 1542795, at *8 (S.D. Ohio June 2, 2009) (no scienter from allegation that "[d]efendants 'could regularly track' sales data"); *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *15 ("Plaintiffs' failure to plead the specific contents of any [] forecast . . . precludes an inference of scienter"); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (no scienter from "daily sales reports" unless the complaint pleads "exactly what information was contained in the report or how said information 'contradicted Defendants' public statements.'").

[11] The TAC also cannot support a strong inference of scienter using internally inconsistent theories. On the one hand, the TAC alleges Defendants had "no visibility" into "inventory levels." ¶ 496.

18

Even assuming these inventory reports were alleged to reveal some level of "excess inventory" (they are not), the TAC's vague allegations do not show that they "clearly reflected" the alleged fraud, especially given the Company's disclosures about changing consumer demand, supply chain disruptions and increasing inventories. *Konkol*, 590 F. 3d at 398. For example, in 2020, the Company cautioned that the historic change in consumer demand was unpredictable. Ex. 2 (May 2020 Tr.) at 4. In May 2021, the Company reported inventory of $5.1 billion, and disclosed that "in anticipation of a more challenging supply environment, we strategically pulled forward certain inventory purchases during the quarter" to support the current "sales momentum." Ex. 9 (May 2021 Tr.) at 4-5. The Company "remain[ed] cautious," however, about the remainder of the year as it "anticipated a less favorable sales mix" of consumable and non-consumable products, "an increase in markdown rates" and "fading tailwinds from the most recent round of government stimulus." *Id.* at 5-6; *see also* Ex. 8 (Aug. 2021 Tr.) at 4-5, 10-11. Through 2021, the Company's inventory increased by only 1.4% on a per store basis (to $5.6 billion), the same rate of growth as its net sales. Ex. 6 (Mar. 2022 10-K) at 29-30, 43.

In May 2022, Dollar General reported demand for non-consumable goods returned to pre-pandemic levels. Ex. 40 (May 2022 10-Q) at 14. In August 2022, the Company emphasized demand continued to evolve, with non-consumable demand dropping below pre-pandemic levels, and reported inventory grew to $6.9 billion, "an increase of 25.1%" per-store. Ex. 11 (Aug. 2022 Tr.) at 5; Ex. 12 (Aug. 2022 10-Q) at 13-14, 16. Dollar General also disclosed it was building

---

On the other, the TAC alleges that inventory reports would have revealed the excess inventory problems. ¶¶ 121, 129-132. The TAC does not explain this contradiction. The allegations about periodic aging reports, like FE-31's allegations about the inventory management systems (¶ 121), undermine Plaintiffs' scienter theory and show this case is about alleged mismanagement, not fraud. *See In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1148-49 (D. Colo. 2011) (allegations that Company's growth outpaced capabilities of inventory management systems did not support scienter and instead showed claims were about mismanagement).

19

three new distribution centers and had canceled orders in response to demand shifts. Ex. 11 (Aug. 2022 Tr.) at 8, 18. In 2023, inventory levels were "still elevated." Ex. 16 (June 2023 Tr.) at 6.

The TAC "offers no detail that allows an assessment of whether [the] disclosures differed in any significant way from [the alleged] internal" reports, and thus, does not support an inference of scienter. *ServiceMaster*, 83 F.4th at 533; *see also Konkol*, 590 F. 3d at 398; Order at 18.

### C. Time Between Misstatements and Corrective Disclosures (*Helwig* Factor 3)

The TAC does not allege that the corrective disclosures followed shortly after the alleged misstatements. While the Court did not consider this factor in its June Order, under Sixth Circuit precedent, the absence of this factor is not neutral. Rather, a "large time lapse" between the alleged misstatements and corrective disclosures "suggest[s] a lack of scienter." *Omnicare*, 769 F.3d at 484. For example, in *Doshi v. Gen. Cable*, 823 F.3d 1032, 1042 (6th Cir. 2016), the Sixth Circuit found that neither a nine month nor an 86-day gap between challenged statements and the corrective restatement "allow[ed] an adverse scienter inference." Here, the first alleged corrective disclosure (December 1, 2022) was 30 months after the first alleged misstatement (May 28, 2020) and 98 days after the last alleged pure misstatement (August 25, 2022). The non-culpable inference is particularly compelling here because the 30-month gap covered one of the most tumultuous times in economic history. The post-pandemic, high inflation economy of December 2022 was substantially different than the economy at the outset of the pandemic in May 2020.

### D. Ancillary Lawsuits Charging Fraud (*Helwig* Factor 5)

Plaintiffs argue that "new facts" pled in the TAC about the Company's (1) July 2024 settlement with OSHA; and (2) November 2023 settlement with Wisconsin regulators, "address[] the Court's concerns under *Helwig* factor 5." Mem. at 12. The new allegations, however, do not give the Court any reason to revisit its ruling. The TAC still does not allege "the settlements or investigations were secret," "quickly reached," or "concerned fraud or facts that significantly

20

overlap to the degree they do in the cases the plaintiffs cite for support." Order at 29.

According to Plaintiffs, the relevant "new facts" alleged in the TAC are that the OSHA settlement requires the Company's senior executives to: (a) "receive training regarding corporate responsibility for workplace safety and health"; and (b) "review the Company's compliance with the OSHA Stipulation on a quarterly basis." Mem. at 12 (citing ¶¶ 207, 507). These allegations, and the TAC more generally, do not show that the OSHA settlement was about fraud, it was quickly reached, or it was secret. Indeed, the TAC alleges OSHA issued multiple press releases about its investigation, highlighting it was not secret. ¶¶ 188-202.[12] Moreover, the measures the Company agreed to implement in July 2024 do not suggest scienter when the challenged statements were made. For example, Dollar General was not required to provide the quarterly compliance reports until after the Class Period ended in August 2024. Ex. 22 (OSHA Settlement) at VI(b). Moreover, courts recognize that "remedial efforts are a prudent course of action that weakens rather than strengthens an inference of scienter." *Coupang*, 2025 WL 2613650, at *31.

The new allegations concerning the Company's settlement with Wisconsin regulators refute themselves. The TAC quotes the Wisconsin regulators' *press release*, which disclosed the material points of the investigation and settlement, when claiming that the Company's settlement was *secret*. ¶ 214; Ex. 39. This is nothing like *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005), where the company "secretly settled" claims "in exchange for lack of disclosure" to avoid revealing safety concerns to consumers.

### E. Disregard of Current Factual Information (*Helwig* Factor 6)

---

[12] While the TAC alleges the Company did not disclose an analysis prepared for the OSHA settlement negotiations (¶ 203), Plaintiffs do not rely on this allegation in their brief. Nor could they. The analysis was disclosed in the settlement agreement (and thus not kept secret). Moreover, the TAC does not allege the Company had any duty to disclose the analysis earlier. *See Newtyn Partners LP v. All. Data Sys. Corp.*, 2025 WL 872967, at *19 (S.D. Ohio Mar. 20, 2025) (no scienter from information defendant "had no duty to disclose").

The TAC fails to plead "what particular factual information Defendants disregarded." Order at 26. The new allegations claim nothing more than Defendants had unspecified access to the same information discussed above in connection with factor 2. Mem. at 9-10. These generic allegations of access to information, with no supporting details, are insufficient. Order at 26.

### F. Confusing Disclosure of Accounting Information (*Helwig* Factor 7)

The TAC's selective citation to a single Credit Suisse analyst report does not suggest Dollar General's accounting information was confusingly disclosed so that only a sophisticated investor could identify negative implications. ¶ 554. To the contrary, the report noted that the Company reported gross LIFO adjustments in accordance with GAAP. Ex. 29. The report merely noted that it was "unclear" if the Company would raise prices sufficiently to fully offset the impact of higher inventory costs, such that the LIFO accrual would have little net impact on profits. *Id.* The report does not remotely suggest the Company's LIFO disclosures were "confusing," let alone drafted with an intent to deceive or hide any negative implications of the LIFO accrual. The Company's LIFO accrual methodology was also consistent before and after the Class Period.

### G. Self-Interested Motive (*Helwig* Factor 9)

Plaintiffs allege Defendants were incentivized to mislead investors about inventory and staffing issues because their compensation was "pegg[ed]" to the Company's operating profit. ¶ 537. But "merely alleging that an executive's 'compensation is directly tied to the company's performance' is not enough to bolster an inference of scienter." Order at 31 (quoting *Pittman v. UNUM Group*, 861 F. App'x 51, 57 (6th Cir. 2021)). Plaintiffs must allege particularized facts showing Defendants received incentive compensation that was "directly tied" to the alleged misrepresentations. *Pittman*, 861 F. App'x at 57; *Doshi*, 823 F.3d at 1042 (factor not pled where complaint "fails to allege that the financial misstatements actually increased incentive

22

compensation").[13]  The TAC does not link the alleged misstatements about inventory and staffing to Defendants' incentive compensation.  The allegations they were motivated to delay operational changes to receive incentive compensation (¶ 537) or retain their positions (¶ 552) do not suggest they made any specific statements with scienter.  The TAC also does not allege facts showing the Company "overhaul[ed] [its] inventory and staffing practices."  ¶ 537.[14]  And Vasos and Garratt voluntarily resigned, showing they were not motivated to commit fraud to maintain their jobs (and Vasos later returned to the Company).  Nor does the Board's decision to replace Owen (¶ 549) suggest he was motivated to mislead investors.

## H.  Holistic Review

Even if a complaint "allege[s] a plausible inference of scienter," a motion to dismiss should be granted if "the allegations are also consistent with a more plausible nonculpable inference." *ServiceMaster*, 83 F.4th at 527.  Here, the nonculpable inferences remain the most compelling.  As this Court found, as "[t]he Company emerged from the pandemic, and demand shifted, and as the Company addressed some operational challenges it disclosed over time, the stock price dropped— without any of the defendants intentionally or recklessly making false or misleading statements or trading on inside information."  Order at 31-32.  The TAC does not change the Court's analysis.

The Company's disclosures, read in full and in context, provided real time updates as consumer demand shifted, supply chain disruptions developed and eased, and inflation hit its

---

[13]  Plaintiffs also ignore that incentive compensation is subject to claw-back if an executive's fraud results in a restatement of the Company's financials.  Ex. 23 (Apr. 2021 Poxy) at 20, 53.  Dollar General has not restated, revised or corrected any of its financial statements.

[14]  Plaintiffs allege that in 2023 the Company incurred "massive SG&A costs to overhaul [its] inventory and staffing practices."  ¶ 537.  However, while the Company invested an additional $150 million primarily in labor expenses in 2023 (¶ 574), its total SG&A costs increased less in 2023 than they had in 2022, both on a dollar and percentage basis.  *See* Ex. 19 (Mar. 2024 10-K) at 31 (SG&A increased by $781 million in 2023 (9%) and by $900 million in 2022 (12%)).  The $150 million expense was only 1.6% of total SG&A for 2023.  *Id.* (2023 SG&A of $9.27 billion).

23

economically vulnerable core customers. Plaintiffs have no answer for Dollar General's warning in May 2020 that, given pandemic-related uncertainty, it was withdrawing forward-looking guidance. Ex. 2 (May 2020 Tr.) at 6. Dollar General repeatedly cautioned that consumer demand was unpredictable in "volume" and "product mix." Ex. 5 (Mar. 2021 10-K) at 27. As supply chain disruptions grew in 2021, the Company disclosed it accelerated certain inventory purchases to meet current demand. Ex. 9 (May 2021 Tr.) at 5. And as the Company's challenges increased when the Nation emerged from the pandemic in 2022, it repeatedly disclosed adverse information, including shifts in consumer demand, increasing inventory levels and supply chain costs and anticipated increases in shrink and markdowns. Ex. 30 (Mar. 2022 Tr.) at 4-6; Ex. 11 (Aug. 2022 Tr.) at 3-6. This "negate[s] an inference" of scienter. *Yates*, 744 F.3d at 892 (nonculpable inference more plausible when material weaknesses and higher costs than anticipated disclosed). The TAC's generalized allegations of reports about "inventory" and "staffing" issues or other operational challenges merely repackage the "core operations" theory the Court found insufficient. The nonculpable inferences remain more compelling than any inference of scienter.

## II.   The Amendment is Futile Because the TAC Does Not State a Claim for the Additional Reasons in Defendants' Motion to Dismiss the SAC

Defendants previously moved to dismiss the SAC because it failed to allege actionable misstatements or omissions with particularity and loss causation. These defects remain in the TAC and independently render the proposed amendment futile. As before, the TAC's "vague, redundant, and conclusory allegations" fall short of Plaintiffs' pleading burden. *In re Ferro Corp.*, 2007 WL 1691358, at *20 (N.D. Ohio June 11, 2017). Following Plaintiffs' lead (Mem. at 14, n.4), Defendants incorporate their prior briefs into this opposition and will submit supplemental briefing on the non-scienter arguments should the Court prefer that approach. *See* ECF 81, 86.[15]

---

[15] Recent decisions further support dismissal. In *In re Illumina Securities Litigation*, for example,

24

Plaintiffs identify only one "new" allegation in support of falsity. Mem. at 13-14.[16] FE-35—an assistant director at a distribution center until mid-2020—discusses the staffing levels at individual retail stores. ¶ 162, ¶ 186(e). Even ignoring the fact that FE left at the start of the Class Period, she is not alleged to have knowledge of retail store operations. Nor is her allegation inconsistent with Defendants' disclosures. MTD at 59–60. The Company's general statements that it invested in its staff, or sought to improve conditions, are "broad and non-specific," especially for a Company with more than 150,000 employees. *See Coupang*, 2025 WL 2613650 at *11 (statements "[w]e have invested hundreds of millions of dollars" in employees and will "make efforts to create a better working environment" were inactionable "vague corporate speak").

If anything, the TAC's allegations *undermine* Plaintiffs' claims. For example, FE-31 alleged the Company's "corporate controller" "monitored aging inventory and regularly produced a report regarding inventory." ¶ 121; ¶ 132 (FE-32 alleging a "third-party" company would perform "inventory audits"); ¶ 134 (FE-34 alleging existing inventory management systems were "ineffective"). These allegations confirm Plaintiffs' complaint is about the efficiency of the Company's inventory controls, not their existence, which is "a claim of corporate mismanagement, not investor deception." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015).[17]

## CONCLUSION

The Court should deny Plaintiffs' motion and dismiss this case.

---

the court dismissed a complaint alleging misstatements over a three-year period that were corrected by nine disclosures over a two-year period because it failed to "specify which misrepresentations the nine disclosures supposedly correct." 2025 WL 2739655, at *3 (S.D. Cal. Sep. 26, 2025); *see also UiPath*, 2025 WL 2065093, at *19 (no loss causation when corrective disclosure "reflected no contradiction, no correction, and no concession of past inaccuracy").

[16] Excluding ¶ 186(e), the cited paragraphs did not change between the SAC and TAC. *See, e.g.*, ¶¶ 172, 174, 186(a)-(d), 209-213, 277, 279, 388, 409, 511-512.

[17] Plaintiffs do not cite any new allegations in support of loss causation, scheme liability, Section 20A or Section 20(a). *See e.g.,* ¶¶ 20, 37-40, 216-74, 516-19, 521, 606-16, 618-33 (all unchanged).

Dated: October 24, 2025
Nashville, Tennessee

/s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #24150 )
**RILEY & JACOBSON, PLC**
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rjfirm.com
tmcgee@rjfirm.com

Peter E. Kazanoff (*admitted pro hac vice*)
Amy L. Dawson (*admitted pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York 10017
Tel: 212.455.2000
pkazanoff@stblaw.com
amy.dawson@stblaw.com

*Counsel for Defendants Dollar General Corporation, Todd J. Vasos, Jeffrey C. Owen, John W. Garratt and Kelly M. Dilts*

26

## Appendix A

| Defendant Owen's Qualifying Holdings | | | | | |
|---|---|---|---|---|---|
| Date | Stock | Options | Earned PSUs[1]s | Total | Value |
| Jan. 2020 | 12,944[2] | 86,586[3] | 10,830[4] | 110,360 | $16,930,327[5] |
| Jan. 2021 | 17,214[6] | 120,225[7] | 25,937[8] | 163,376 | $31,794,603[9] |
| Jan. 2022 | 27,891[10] | 153,813[11] | 23,678[12] | 205,382 | $41,965,704 [13] |
| Nov. 2022 | Owen is promoted to CEO with a target holding of $5.7 million. | | | | |
| Feb. 2023 | 37,940[14] | 184,346[15] | 23,219[16] | 245,505 | $55,997,235 [17] |

| Defendant Dilts' Qualifying Holdings | | | | | |
|---|---|---|---|---|---|
| Date | Stock | Options | Earned PSUs/RSUs | Total | Value |
| Feb. 2024 | 2,890[18] | 16,228[19] | 3,865[20] | 22,983 | $3,129,365[21] |

[1] Once earned, PSUs vest in equal installments annually for up to three years subject to the executive's continued employment.

[2] 137,611(total shares) – 6,850 (PSUs) – 117,817 (options) = 12,944. *See* Ex. 34 (2020 Proxy) at 45, n. 2

[3] *Id.* at 33

[4] *Id.*

[5] Based on Jan. 31, 2020 closing price ($153.41).

[6] 186,227 (total shares) – 17,608 (PSUs) – 151,405 options) = 17,214. Ex. 23 (2021 Proxy) at 47, n.2.

[7] *Id.* at 34.

[8] *Id.*

[9] Based on Jan. 29, 2021 closing price ($194.61).

[10] 226,402 (total shares) – 16,573 (PSUs) – 181,938 (options). Ex. 25 (2022 Proxy) at 47, n.2.

[11] *Id.* at 34.

[12] *Id.*

[13] Based on Jan. 28, 2022 closing price ($204.33).

[14] 269,472 (total shares) – 17,630 (PSUs) – 213,902 (options) = 37,940. Ex. 32 (2023 Proxy) at 53, n.2.

[15] *Id.* at 36.

[16] *Id.*

[17] Based on Feb. 3, 2023 closing price ($228.09).

[18] 29,324 (total shares) – 963 (RSUs) – 1,519 (PSUs) – 23,952 (options) = 2,890. Ex. 26 (2024 Proxy) at 56, n.2.

[19] *Id.* at 35.

[20] *Id.*

[21] Based on Feb. 2, 2024 closing price ($136.16).

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2025, I authorized the electronic filing of a true and exact copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

*/s/ Steven A. Riley*