# EXHIBIT 35

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): July 6, 2022

## DOLLAR GENERAL CORPORATION

(Exact name of registrant as specified in its charter)

| Tennessee | 001-11421 | 61-0502302 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

100 MISSION RIDGE
GOODLETTSVILLE, TN     37072

| (Address of principal executive offices) | (Zip Code) |
|---|---|

Registrant's telephone number, including area code: (615) 855-4000

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.875 per share | DG | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Case 3:23-cv-01250    Document 99-35    Filed 10/24/25    Page 2 of 18 PageID #: 4238

**ITEM 5.02    DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.**

On July 6, 2022, Todd Vasos informed Dollar General Corporation (the "Company") of his decision to step down from his position as Chief Executive Officer of the Company effective November 1, 2022. To assist in the transition of leadership, Mr. Vasos is expected to serve in a senior advisory position with the Company beginning November 1, 2022, and continuing through April 1, 2023, at which time he will retire from employment with the Company. The Company anticipates that it will enter into a 2-year consulting agreement with Mr. Vasos following his retirement from the Company. Mr. Vasos is expected to continue to serve as a member of the Company's Board of Directors (the "Board"), including following his retirement from the Company.

On July 8, 2022, the Board approved the promotion of Jeffery Owen, 52, to Chief Executive Officer of the Company effective immediately following Mr. Vasos' resignation from the Chief Executive Officer role. Mr. Owen has served as the Company's Chief Operating Officer since August 2019. He returned to Dollar General in June 2015 as Executive Vice President of Store Operations, with over 21 years of previous employment experience with the Company, including Senior Vice President, Store Operations (August 2011-July 2014); Vice President, Division Manager (March 2007-July 2011); Retail Division Manager (November 2006-March 2007); and various other operations roles of increasing importance and responsibility. He began his employment at Dollar General in 1992. Mr. Owen has also served as a director of Kirkland's, Inc. since March 2015. The Board anticipates that it will elect Mr. Owen to serve as a member of the Board for a term beginning on the date on which he assumes the position of Chief Executive Officer.

On July 8, 2022, in connection with the approval of Mr. Owen's promotion, the Compensation Committee of the Board approved, in each case effective upon the date on which Mr. Owen assumes the position of Chief Executive Officer:

- an increase in Mr. Owen's annual base salary from $925,000 to $1,125,000; and
- an increase in Mr. Owen's targeted annual incentive opportunity from 100% to 150% of his base salary (with the annual incentive target and any actual incentive payout to be prorated to reflect the portion of the year in each position), with respect to the current fiscal year and based on the achievement of the adjusted EBIT performance target previously established by the Compensation Committee in accordance with the terms of the Company's annual incentive plan.

The Compensation Committee also determined that a one-time long-term incentive having an approximate value of $6,000,000 will be awarded to Mr. Owen in connection with his promotion to Chief Executive Officer. This long-term incentive will be delivered in non-qualified stock options (the "Option") to purchase shares of the Company's common stock at a per share exercise price equal to the closing price of the Company's common stock on the grant date of the Option, which date shall coincide with the start of Mr. Owen's term as Chief Executive Officer. The Option will be scheduled to vest ratably in installments of 33 1/3% on each of the third, fourth and fifth anniversaries of the grant date, subject to holding requirements through the fifth anniversary of the grant date.

In addition, in connection with such promotion, on July 11, 2022, the Company entered into an employment agreement with Mr. Owen (the "Employment Agreement"), effective November 1, 2022 (the "Effective Date"), which will supersede and replace his existing employment agreement on the Effective Date pursuant to the terms and conditions of the Employment Agreement. The term of the Employment Agreement will extend from the Effective Date until May 31, 2026, unless earlier terminated in

1

accordance with the provisions of the Employment Agreement. The Employment Agreement is subject to automatic one-year renewal periods; provides for the terms and conditions of his employment as Chief Executive Officer of the Company; commits to annually nominating Mr. Owen to serve on the Board during his term as Chief Executive Officer of the Company; sets forth the material terms of his compensation as Chief Executive Officer of the Company; and contains certain business protections provisions, including non-competition and non-solicitation provisions for two years following his service termination date. The Employment Agreement is attached to this Form 8-K as Exhibit 99.2 and is incorporated by reference as if fully set forth herein.

Pursuant to the Employment Agreement, if Mr. Owen is terminated by the Company without cause (as defined in the Employment Agreement) or if he resigns from the Company for good reason (as defined in the Employment Agreement), he will receive (1) severance benefits of continued base salary payments over 24 months plus a lump sum payment equal to two times his annual target bonus under the Company's annual bonus program for senior executive officers in respect of the Company's fiscal year in which the termination date occurs; (2) a lump sum payment, payable at such time as annual bonuses are paid to other senior executives of the Company, of a pro rata portion of the annual bonus, if any, that he would have been entitled to receive for the fiscal year of termination, if such termination had not occurred; (3) a lump sum payment equal to two times the annual contribution that would have been made by the Company for the plan year in which the employment termination occurs for his participation in the Company's medical, pharmacy, dental and vision benefits programs; and (4) reasonable outplacement services, as determined and provided by the Company, for one year or until other employment is secured, whichever comes first.

The foregoing description of the Employment Agreement is a summary only, does not purport to be complete, and is qualified in its entirety by reference to Exhibit 99.2.

There are no arrangements or understandings between Mr. Owen and any other persons pursuant to which Mr. Owen was selected to become Chief Executive Officer, nor are there any family relationships between Mr. Owen and any of the Company's directors or other executive officers. Neither Mr. Owen nor any related person of Mr. Owen has a direct or indirect material interest in any existing or currently proposed transaction to which the Company is or may become a party that would require disclosure under Item 404(a) of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended.

**ITEM 7.01.    REGULATION FD DISCLOSURE.**

On July 12, 2022, the Company issued a press release regarding certain of the matters discussed in Item 5.02. A copy of the press release is attached to this Form 8-K as Exhibit 99.1 and is incorporated by reference as if fully set forth herein.

The information contained within this Item 7.01, including the information in Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and shall not be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended.

**ITEM 9.01    FINANCIAL STATEMENTS AND EXHIBITS.**

(a)    Financial statements of businesses acquired. N/A
(b)    Pro forma financial information. N/A
(c)    Shell company transactions. N/A
(d)    Exhibits. See Exhibit Index to this report.

2

**EXHIBIT INDEX**

Exhibit No.    Description

| 99.1 | News release issued July 12, 2022 |
| 99.2 | Employment Agreement between the Company and Mr. Owen effective November 1, 2022 |
| 104 | The cover page from this Current Report on Form 8-K, formatted in Inline XBRL |

3

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: <u>July 12, 2022</u>

**DOLLAR GENERAL CORPORATION**

By: /s/ Rhonda M. Taylor

Rhonda M. Taylor
Executive Vice President and General Counsel

4

**DOLLAR GENERAL**

**FOR IMMEDIATE RELEASE**

### Dollar General Corporation Announces CEO Transition Plan
### Todd Vasos to Transition from CEO to Special Advisory Role Effective
### November 1, 2022; Jeffery Owen Named as Successor

**Goodlettsville, Tennessee – July 12, 2022 –** Dollar General Corporation (NYSE: DG) today announced Todd Vasos's decision to retire from his position as Chief Executive Officer (CEO) effective November 1, 2022. Additionally, the Company's Board of Directors approved the promotion of Jeffery Owen, its Chief Operating Officer since 2019, to succeed Vasos as CEO effective immediately following Vasos's retirement from the CEO role. To assist in the transition of leadership, Vasos is expected to serve in a senior advisory position beginning November 1, 2022, and continuing through April 1, 2023, at which time Vasos will retire from employment with the Company. Vasos is expected to enter into a two-year consulting agreement and continue to serve as a member of the Company's Board of Directors following his retirement from the Company.

"On behalf of the Board of Directors, I want to thank Todd for his many years of service to Dollar General, his outstanding leadership, commitment to our values and dedication to the Company, its employees, customers, communities and shareholders. Todd led Dollar General through a period of significant transformation, accelerated growth and innovation. We are a stronger, more resilient, and longer term strategically driven organization than when he took the reins in 2015. DG is a better company today as a result of Todd's leadership," said Michael Calbert, Chairman of Dollar General's Board of Directors. "The Board is looking forward to continuing this strong trajectory under the leadership of Jeff Owen, who is a strategic thinker, strong collaborator and proven leader known for his motivational leadership and deep knowledge of DG."

Vasos has served as Chief Executive Officer and as a member of the Company's Board of Directors since June 2015. He joined Dollar General in 2008 as Executive Vice President, Division President and Chief Merchandising Officer and served as Chief Operating Officer from 2013 until being named CEO. During Vasos's tenure as CEO, the Company expanded its store base by approximately 7,000 stores, added nearly 60,000 net new jobs, increased annual sales revenue by more than 80%, and more than doubled its market capitalization to approximately $58 billion. Vasos was named a Most Admired CEO by *Nashville Business Journal* in 2021 and currently serves on the boards of directors for Retail Industry Leaders Association (RILA) and KeyCorp.

Under Vasos's leadership, the Company created and delivered on key strategic initiatives including self-distribution of frozen and refrigerated goods (DG Fresh), as well as various non-consumable initiatives, including its newest retail concept pOpshelf, and significant digital expansions. He also led DG's efforts to expand the availability of fresh produce to more than 2,300 stores, launched the DG Private Fleet driver program, opened 16 additional distribution centers, and most recently, announced the Company's planned expansion into Mexico.

---

During Vasos's tenure as CEO, DG was named to *Fortune Magazine's* World's Most Admired Companies List in 2020 and 2022; *Forbes* Top 25 Responders to the Covid-19 Pandemic in 2020; *Mass Market Retailers Magazine's* Retailer of the Year in 2019 and 2020 and recognized by the *Human Rights Campaign Foundation's* Corporate Equality Index for its workplace inclusion efforts in 2020, 2021 and 2022.

"Serving my fellow employees, our customers and our communities as CEO has been the greatest privilege of my career," said Vasos. "Together, we ushered in an era of unrivaled growth while staying true to our mission of *Serving Others*. Today, we are so much more than a dollar store, proudly serving millions of Americans as their neighborhood general store. Having worked with Jeff for many years, I am confident in his leadership abilities and capability to lead Dollar General into our next chapter of growth and service."

Owen assumed Dollar General's Chief Operating Officer role in August 2019 having previously held the roles of Executive Vice President, Store Operations from 2015-2019 and Senior Vice President, Store Operations from 2011-2014. Prior to August 2011, Owen served DG as a Vice President, Division Manager; Retail Division Manager; Senior Director, Operations Process Improvement; and Store Manager, among other roles. He began his employment at Dollar General in 1992 as a store manager trainee in a Nashville, Tennessee store. Owen is expected to be elected to serve as a member of Dollar General's Board of Directors upon the effectiveness of his promotion to CEO. He has also served as a director of Kirkland's Inc. since March 2015.

"I am deeply honored to have the opportunity to build on Todd's incredible tenure as CEO. I am equally humbled to lead Dollar General as we continue to serve our customers with value and convenience, support the communities we proudly call home and provide our employees with career and growth opportunities," said Owen. "For the past three decades, I've grown and developed within our Company, and I couldn't be prouder to serve as CEO alongside an amazing team in our stores, distribution centers, private fleet and Store Support Center."

During Owen's nearly 30-year tenure with Dollar General, the Company has grown from 1,500 stores in 23 states into the largest retailer by store count in the U.S. with more than 18,000 stores and 28 distribution centers in 47 states as of April 2022.

Additional information regarding Owen, including his corporate biography and headshot, may be obtained by visiting the DG Newsroom.

---

***Forward-Looking Statements***

This press release contains "forward-looking statements" as that term is used in the Private Securities Litigation Reform Act of 1995. A reader can identify forward-looking statements because they are not limited to historical fact, they address future events, developments or results, or they are preceded by, followed by or include words such as (and without limitation) "believe, "anticipate," plan," "expect," "opportunities," "continue," or "look forward," and similar expressions. Any statements contained in this press release that are not statements of historical fact may be deemed to be forward-looking statements, including without limitation statements concerning our plans and expectations in connection with the transition of CEO leadership from Mr. Vasos to Mr. Owen, the relationship of Mr. Vasos to the Company post-retirement, and other plans and expectations.

Forward-looking statements are subject to risks, uncertainties and other factors that may cause actual results to differ materially from those stated in or implied by the forward-looking statements. All forward-looking statements should be evaluated in the context of these risks, uncertainties and other factors, including those factors disclosed under "Risk Factors" in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on March 18, 2022. All forward-looking statements are qualified in their entirety by these and other cautionary statements that the Company makes from time to time in its SEC filings and public communications. Dollar General cannot assure the reader that it will realize the results or developments the Company anticipates or, even if substantially realized, that they will result in the consequences or affect the Company or its operations in the way the Company expects. Forward-looking statements speak only as of the date made. The Company undertakes no obligation, and specifically disclaims any duty, to update or revise any forward-looking statements as a result of new information, future events or circumstances, or otherwise, except as otherwise required by law. As a result of these risks and uncertainties, readers are cautioned not to place undue reliance on any forward-looking statements included herein or that may be made elsewhere from time to time by, or on behalf of, the Company.

***About Dollar General Corporation***

*Dollar General Corporation has been delivering value to shoppers for more than 80 years. Dollar General helps shoppers Save time. Save money. Every day.® by offering products that are frequently used and replenished, such as food, snacks, health and beauty aids, cleaning supplies, basic apparel, housewares and seasonal items at everyday low prices in convenient neighborhood locations. Dollar General operated 18,356 stores in 47 states as of April 29, 2022. In addition to high-quality private brands, Dollar General sells products from America's most-trusted manufacturers such as Clorox, Energizer, Procter & Gamble, Hanes, Coca-Cola, Mars, Unilever, Nestle, Kimberly-Clark, Kellogg's, General Mills, and PepsiCo. Learn more about Dollar General at www.dollargeneral.com.*

**Exhibit 99.2**

**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of July 11, 2022, but effective November 1, 2022 ("Effective Date"), by and between **DOLLAR GENERAL CORPORATION** (the "Company") and Jeffery C. Owen ("Employee").

**W I T N E S S E T H:**

**WHEREAS**, the Company desires to continue to employ Employee upon the terms and subject to the conditions hereinafter set forth, and Employee desires to accept such continued employment; and

**WHEREAS**, the Company and Employee previously entered into an Employment Agreement effective April 1, 2021, which Employment Agreement and any related amendments or waivers will be superseded in their entirety by this Agreement on the Effective Date.

**NOW, THEREFORE**, for and in consideration of the premises, the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1.** **Employment.** Subject to the terms and conditions of this Agreement, the Company agrees to employ Employee as Chief Executive Officer of the Company beginning on the Effective Date.

**2.** **Term.** The term of this Agreement shall begin on the Effective Date and shall continue until May 31, 2026 ("Term"), unless otherwise terminated pursuant to Sections 8, 9, 10, 11 or 12 hereof. The Term shall be automatically extended, commencing May 31, 2026 and on each successive anniversary thereof, for an additional one (1) year period, unless the Company gives written notice to Employee at least ninety (90) days prior to the expiration of the original or any extended Term that no extension or further extension, as applicable, will occur or unless the Company replaces this Agreement with a new agreement or, in writing, extends or renews the Term of this Agreement for a period that is longer than one (1) year from the expiration of the original Term or the extended Term, as applicable. Unless otherwise noted, all references to the "Term" shall be deemed to refer to the original Term and any extension or renewal thereof.

**3.** **Position, Duties and Administrative Support.**

    a.    Position. As Chief Executive Officer, Employee shall be the most senior executive of the Company and all other senior executives of the Company, including the

President, if any, shall report directly or indirectly to Employee. Employee shall report to the Board of Directors of the Company (the "Board") and perform such duties and responsibilities as may be prescribed from time to time by the Board, which shall be consistent with the duties and responsibilities of chief executive officers of comparable companies in similar lines of business. During the Term, the Board or a duly authorized committee of the Board shall nominate Employee to serve as a member of the Board each year that Employee is slated for reelection to the Board, and Employee agrees to serve in such capacity if so elected by the shareholders.

    b.    Full-Time Efforts. Employee shall perform and discharge faithfully and diligently such duties and responsibilities and shall devote Employee's full-time efforts to the business and affairs of Company. Employee agrees to promote the best interests of the Company and to take no action that is likely to damage the public image or reputation of the Company, its subsidiaries or its affiliates.

    c.    Administrative Support. Employee shall be provided with office space and administrative support commensurate with his position as Chief Executive Officer of the Company.

    d.    No Interference With Duties. Employee shall not devote time to other activities which would inhibit or otherwise interfere with the proper performance of Employee's duties and shall not be directly or indirectly concerned or interested in any other business occupation, activity or interest without the express approval of the Chairman of the Board other than by reason of holding a non-controlling interest as a shareholder, securities holder or debenture holder in a corporation quoted on a nationally recognized exchange (subject to any limitations in the Company's Code of Business Conduct and Ethics). Employee may not serve as a member of a board of directors of a for-profit company, other than the Company or any of its subsidiaries or affiliates, without the express approval of the Board or a duly authorized committee of the Board and further will comply with any limits on the number of boards on which he may serve as set forth from time to time in any policy adopted by the Board or a duly authorized committee of the Board.

**4.** **Work Standard.** Employee agrees to comply with all terms and conditions set forth in this Agreement, as well as all applicable Company work policies, procedures and rules. Employee also agrees to comply with all federal, state and local statutes, regulations and public ordinances governing Employee's performance hereunder.

**5.** **Compensation.**

    a.    Base Salary. Subject to the terms and conditions set forth in this Agreement, for the Term of this Agreement the Company shall pay Employee, and Employee shall accept, an annual base salary ("Base Salary") of no less than One Million One Hundred Twenty-Five

Thousand Dollars ($1,125,000). The Base Salary shall be paid in accordance with the Company's normal payroll practices (but no less frequently than monthly), will be reviewed annually by, and may be increased from time to time at the sole discretion of, the Board or a duly authorized committee of the Board.

      b.      <u>Annual Incentive Bonus</u>. Employee's incentive compensation for the Term of this Agreement shall be determined under the Company's annual bonus program, as it may be amended from time to time, provided to senior executive officers of the Company. The actual bonus paid pursuant to this Section 5(b), if any, shall be based on criteria established by the Board or a duly authorized committee of the Board in accordance with the terms and conditions of the annual bonus program for senior executive officers. Any bonus payments due hereunder shall be payable to Employee no later than two and one half (2 ½) months after the end of the Company's taxable year or the calendar year, whichever is later, in which Employee is first vested in such bonus payments for purposes of Section 409A of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

      c.      <u>Vacation</u>. Employee shall be entitled to five (5) weeks paid vacation time for the Term of this Agreement. Vacation time is granted on the anniversary of Employee's hire date each year. Any available but unused vacation as of the annual anniversary of employment date or at Employee's termination date shall be forfeited.

      d.      <u>Business Expenses</u>. Employee shall be reimbursed for all reasonable business expenses incurred in carrying out the work hereunder. Employee shall adhere to the Company's expense reimbursement policies and procedures. In no event will any such reimbursement be made later than the last day of Employee's taxable year following Employee's taxable year in which Employee incurs the reimbursable expense.

      e.      <u>Perquisites</u>. During the Term of this Agreement, Employee shall be entitled to receive such other executive perquisites, fringe and other benefits as are provided generally to senior executive officers of the Company under any of the Company's plans and/or programs in effect from time to time.

3

**6.**      <u>**Cooperation**</u>**.** Employee agrees to cooperate with the Company in the investigation review, audit, or assessment, whether internal or external, of any matters involving Dollar General as well as the defense or prosecution of any claims or other causes of action made against or on behalf of the Company, including any claims or actions against its affiliates, officers, directors and employees. Employee's cooperation in connection with such matters includes, without limitation, being available (upon reasonable notice and without unreasonably interfering with his other professional obligations) to meet with the Company and its legal or other designated advisors regarding any matters in which Employee has been involved; to prepare for any proceeding (including, without limitation, depositions, consultation, discovery or trial); to provide truthful affidavits; to assist with any audit, inspection, proceeding or other inquiry; and to act as a witness to provide truthful testimony in connection with any legal proceeding affecting the Company. Employee further agrees that if Employee is contacted by any person or entity regarding matters Employee knows or reasonably should know to be adverse to the Company, Employee shall promptly (within forty-eight (48) hours) notify the Company in writing by sending such notification to the General Counsel, Dollar General Corporation, 100 Mission Ridge, Goodlettsville, Tennessee 37072; facsimile (615) 855-5517. The Company agrees to reimburse Employee for any reasonable documented expenses incurred in providing such cooperation.

**7.**      <u>**Benefits**</u>**.** During the Term, Employee (and, where applicable, Employee's eligible dependents) shall be eligible to participate in those various Company welfare benefit plans, practices and policies in place during the Term (including, without limitation, medical, pharmacy, dental, vision, disability, employee life, accidental death and travel accident insurance plans and other programs, if any) to the extent allowed under and in accordance with the terms of those plans. In addition, Employee shall be eligible to participate, pursuant to their terms, in any other benefit plans offered by the Company to other senior executive officers of the Company or other employees from time to time during the Term (excluding plans applicable solely to certain officers of the Company in accordance with the express terms of such plans). Collectively the plans and arrangements described in this Section 7, as they may be amended or modified in accordance with their terms, are hereinafter referred to as the "Benefits Plans." Notwithstanding the above, Employee understands and acknowledges that Employee is not eligible for benefits under any other severance plan, program, or policy maintained by the Company, if any exists, and that the only severance benefits Employee is entitled to are set forth in this Agreement.

**8.**      <u>**Termination for Cause**</u>**.** This Agreement is not intended to change the at-will nature of Employee's employment with Company, and it may be terminated at any time by either party, with

4

or without cause. If this Agreement and Employee's employment are terminated by Company for "Cause" (Termination for Cause) as that term is defined below, it will be without any liability owing to Employee or Employee's dependents and beneficiaries under this Agreement (recognizing, however, that benefits covered by or owed under any other plan or agreement covering Employee shall be governed by the terms of such plan or agreement). Any one of the following conditions or Employee conduct shall constitute "Cause":

      a.      Any act involving fraud or dishonesty, or any material act of misconduct relating to Employee's performance of his duties;

      b.      Any material breach of any SEC or other law or regulation or any Company policy governing trading or dealing with stocks, securities, public debt instruments, bonds, or investments and the like or with inappropriate disclosure or "tipping" relating to any stock, security, public debt instrument, bond or investment;

c.      Any material violation of the Company's Code of Business Conduct and Ethics (or the equivalent code in place at the time);

d.      Other than as required by law, the carrying out of any activity or the making of any public statement which prejudices or reduces the good name and standing of Company or any of its subsidiaries or affiliates or would bring any one of these into public contempt or ridicule;

e.      Attendance at work in a state of intoxication or being found with any drug or substance possession of which would amount to a criminal offense;

f.      Assault or other act of violence;

g.      Conviction of or plea of guilty or nolo contendre to any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy; or

h.      Willful or repeated refusal or failure substantially to perform Employee's material obligations and duties hereunder or those reasonably directed by the Board (except in connection with a Disability).

A termination for Cause shall be effective when the Company has given Employee written notice of its intention to terminate for Cause, describing those acts or omissions that are believed to constitute Cause, and has given Employee ten (10) days to respond.

**9.    Termination upon Death.** Notwithstanding anything herein to the contrary, this Agreement shall terminate immediately upon Employee's death, and the Company shall have no

further liability to Employee or Employee's dependents and beneficiaries under this Agreement, except for those benefits owed under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement.

**10.    Disability.** If a Disability (as defined below) of Employee occurs during the Term, unless otherwise prohibited by law, the Company may notify Employee of the Company's intention to terminate Employee's employment. In that event, employment shall terminate effective on the termination date provided in such notice of termination (the "Disability Effective Date"), and this Agreement shall terminate without further liability to Employee, Employee's dependents and beneficiaries, except for those benefits owed under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement. In this Agreement, "Disability" means:

a.      A long-term disability, as defined in the Company's applicable long-term disability plan as then in effect, if any; or

b.      Employee's inability to perform the duties under this Agreement in accordance with the Company's expectations because of a medically determinable physical or mental impairment that (i) can reasonably be expected to result in death or (ii) has lasted or can reasonably be expected to last longer than ninety (90) consecutive days. Under this Section 10(b), unless otherwise required by law, the existence of a Disability shall be determined by the Company, only upon receipt of a written medical opinion from a qualified physician selected by or acceptable to the Company. In this circumstance, to the extent permitted by law, Employee shall, if reasonably requested by the Company, submit to a physical examination by that qualified physician. Nothing in this Section 10(b) is intended to nor shall it be deemed to broaden or modify the definition of "disability" in the Company's long-term disability plan.

**11.    Employee's Termination of Employment.**

a.      Notwithstanding anything herein to the contrary, Employee may terminate employment and this Agreement at any time, for no reason, with ninety (90) days written notice to the Company (and in the event that Employee is providing notice of termination for Good Reason, Employee must provide such notice within thirty (30) days after the event purported to give rise to Employee's claim for Good Reason first occurs). In such event, Employee shall not be entitled to those payments and benefits listed in Section 12 below unless Employee terminates employment for Good Reason, as defined below, or unless Section 12(a)(iii) applies.

b.      Upon any termination of employment, Employee shall be entitled to any earned but unpaid Base Salary through the date of termination and such other vested benefits under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement. Notwithstanding anything to the contrary herein, such unpaid Base Salary shall be paid to Employee as soon as practicable after the effective date of termination in accordance with the Company's usual payroll practices (not less frequently than monthly); provided, however, that if payment at such time would result in a prohibited acceleration under Section 409A of the Internal Revenue Code, then such amount shall be paid at the time the amount would otherwise have been paid absent such prohibited acceleration.

c.      Good Reason shall mean any of the following actions taken by the Company:

(i)      A reduction by the Company in Employee's Base Salary or target bonus level (i.e., percentage of Base Salary for which a bonus may be earned under the Company's annual bonus program);

(ii)     The Company shall fail to continue offering or providing Employee any significant Company-sponsored compensation plan or benefit (without replacing it with a similar plan or with a compensation equivalent), unless (A) such failure is in connection with across-the-board plan changes or terminations similarly affecting at least ninety-five percent (95%) of all officers of the Company; or (B) such failure occurs after having received notice of Employee's voluntary resignation or retirement;

(iii)    The Company's principal executive offices shall be moved to a location outside the middle-Tennessee area, or Employee is required (absent mutual agreement) to be based anywhere other than the Company's principal executive offices;

(iv)    Without Employee's written consent, the assignment to Employee by the Company of duties inconsistent with, or the significant reduction of the title, powers and functions associated with, Employee's position, title or office as described in Section 3 above, unless such action is the result of Employee's failure to meet pre-established and objective performance criteria;

(v)     Any material breach by the Company of this Agreement; or

(vi)    The failure of any successor (whether direct or indirect, by purchase, merger, assignment, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this

Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

Good Reason shall not include Employee's death, Disability or Termination for Cause or Employee's termination for *any* reason other than Good Reason as defined above.

d.      Prior to Employee being entitled to the payments or benefits described in Section 12 below, the Company shall have the opportunity to cure any claimed event of Good Reason within thirty (30) days after receiving written notice from Employee specifying the same.

**12.    <u>Termination without Cause or by Employee for Good Reason</u>.**

a.      The continuation of Base Salary and other payments and benefits described in Section 12(b) shall be triggered *only* upon one or more of the following circumstances:

(i)     The Company terminates Employee (as it may do at any time) without Cause; it being understood that termination by death or Disability does not constitute termination without Cause;

(ii)    Employee terminates for Good Reason;

(iii)   The Company fails to offer to renew, extend or replace this Agreement before, at, or within one (1) year after, the end of its original Term (or any term provided for in a written renewal or extension of the original Term), and Employee resigns from employment with the Company within ninety (90) days after such failure, unless such failure is accompanied by a mutually agreeable severance arrangement between the Company and Employee or is the result of Employee's retirement or other termination from the Company other than for Good Reason notwithstanding the Company's offer to renew, extend or replace this Agreement.

b.      In the event of one of the triggers referenced in Sections 12(a)(i) through (iii) above, then, on the sixtieth (60th) day after Employee's termination of employment, but subject to the six (6)-month delay (called the "409A Deferral Period") provided in Section 24(o)(iii) below, if applicable, and contingent upon the execution and effectiveness of the Release attached hereto and made a part hereof, Employee shall be entitled to the following:

(i)     Continuation of Employee's Base Salary as of the date immediately preceding the termination (or, if the termination of employment is for Good Reason due to the reduction of Employee's Base Salary, then such rate of Base Salary as in

effect immediately prior to such reduction) for twenty-four (24) months, payable in accordance with the Company's normal payroll cycle and procedures (but not less frequently than monthly) with a lump sum payment on the sixtieth (60th) day (or at the end of six (6) months if the 409A Deferral Period applies) after Employee's termination of employment of the amounts Employee would otherwise have received during the sixty (60) days (or six (6) months if the 409A Deferral Period applies) after Employee's termination had the payments begun immediately after Employee's termination of employment.

(ii)    A lump sum payment in an amount equal to two times Employee's annual target bonus under the annual bonus programs for senior executive officers in respect of the Company's fiscal year in which the termination date occurs.

(iii)   a lump sum payment, in cash, payable at such time as annual bonuses are paid to other senior executives of the Company, of a pro-rata portion of the annual bonus, if any, that Employee would have been entitled to receive pursuant to Section 5(b) hereof for the fiscal year of termination, if such termination had not occurred, multiplied by a fraction, the numerator

of which is the number of days during which Employee was employed by the Company in the fiscal year of Employee's termination, and the denominator of which is 365 ("Pro-Rata Bonus").

(iv)    A lump sum payment in an amount equal to two times the annual contribution that would have been made by the Company in respect of the plan year in which such termination of employment occurs for Employee's participation in the Company's medical, pharmacy, dental and vision benefits programs.

(v)    Reasonable outplacement services, as determined and provided by the Company, for one year or until other employment is secured, whichever comes first.

All payments and benefits otherwise provided to Employee pursuant to this Section 12 shall be forfeited if a copy of the Release attached hereto executed by Employee is not provided to the Company within twenty-one (21) days after Employee's termination date (unless otherwise required by law) or if the Release is revoked; and no payment or benefit hereunder shall be provided to Employee prior to the Company's receipt of the Release and the expiration of the period of revocation provided in the Release.

c.    In the event that there is a material breach by Employee of any continuing obligations under this Agreement or the Release after termination of employment, any unpaid

amounts under this Section 12 shall be forfeited and the Company shall retain any other rights available to it under law or equity. Any payments or reimbursements under this Section 12 shall not be deemed the continuation of Employee's employment for any purpose. Except as specifically enumerated in the Release, the Company's obligations under this Section 12 will not negate or reduce (i) any amounts otherwise due but not yet paid to Employee by the Company, or (ii) any other amounts payable to Employee outside this Agreement, or (iii) those benefits owed under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement. The Company may, at any time and in its sole discretion, make a lump-sum payment of any or all amounts, or any or all remaining amounts, due to Employee under this Section 12 if, or to the extent, the payment is not subject to Section 409A of the Internal Revenue Code.

d.    To the extent permitted by applicable law, in the event that the Company reasonably believes that Employee engaged in conduct during his employment that would have resulted in his termination for Cause as defined under Section 8, any unpaid amounts under Section 12 of this Agreement may be forfeited and the Company may seek to recover such portion of any amounts paid under Section 12.

**13.**    **Effect of 280G.** Any payments and benefits due under Section 12 that constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code ("Code Section 280G"), plus all other "parachute payments" as defined under Code Section 280G that might otherwise be due to Employee (collectively, with payments and benefits due under Section 12, "Total Payments"), shall be limited to the Capped Amount. The "Capped Amount" shall be the amount otherwise payable, reduced in such amount and to such extent so that no amount of the Total Payments, would constitute an "excess parachute payment" under Code Section 280G. Notwithstanding the preceding sentence but contingent upon Employee's timely execution and the effectiveness of the Release attached hereto and made a part hereof as provided in Section 12 hereof, Employee's Total Payments shall not be limited to the Capped Amount if it is determined that Employee would receive at least fifty thousand dollars ($50,000) in greater after-tax proceeds if no such reduction is made. The calculation of the Capped Amount and all other determinations relating to the applicability of Code Section 280G (and the rules and regulations promulgated thereunder) to the Total Payments shall be made by the tax department of an independent public accounting firm, or, at Company's discretion, by a compensation consulting firm, and such determinations shall be binding upon Employee and the Company. Unless Employee and the Company shall otherwise agree (provided such agreement does not cause any payment or benefit hereunder which is deferred compensation covered by Section 409A of the Internal Revenue Code to be

in non-compliance with Section 409A of the Internal Revenue Code), in the event the Total Payments are to be reduced, the Company shall reduce or eliminate the payments or benefits to Employee by first reducing or eliminating those payments or benefits which are not payable in cash and then by reducing or eliminating cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the date of the "change in ownership or control" (within the meaning of Code Section 280G). Any reduction pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing Employee's rights and entitlements to any benefits or compensation.

**14.**    **Publicity; No Disparaging Statement.** Except as otherwise provided in Sections 15 and 23 hereof, Employee and the Company covenant and agree that they shall not engage in any communications to persons outside the Company which shall disparage one another or any of the Company's subsidiaries or affiliates or interfere with the existing or prospective business relationships of either party hereto or the Company's subsidiaries or affiliates.

**15.**    **Confidentiality and Legal Process.** Employee agrees to keep the proprietary terms of this Agreement confidential and to refrain from disclosing any information concerning this Agreement to anyone other than Employee's immediate family and personal agents or advisors. Notwithstanding the foregoing, nothing in this Agreement is intended to prohibit Employee or the Company from performing any duty or obligation that shall arise as a matter of law. Specifically, Employee and the Company shall continue to be under a duty to truthfully respond to any legal and valid subpoena or other legal process. This Agreement is not intended in any way to proscribe Employee's or the Company's right and ability to provide information to any federal, state or local agency in response or adherence to the lawful exercise of such agency's authority. To the extent Employee accepts any payments under this Agreement and signs and does not revoke the Release, Employee expressly waives and releases

any right to recover any future monetary recovery directly from the Company, including Company payments that result from any complaints or charges that Employee files with any federal, state or local government agency or that are filed on Employee's behalf as they relate to any matters released by Employee.

16. **Business Protection Provision Definitions**.

    a.    <u>Preamble</u>. As a material inducement to the Company to enter into this Agreement, and in recognition of the valuable experience, knowledge and proprietary information Employee has gained or will gain while employed, Employee agrees to abide by and adhere to the business protection provisions in Sections 16, 17, 18, 19 and 20 herein.

    b.    <u>Definitions</u>. For purposes of Sections 16, 17, 18, 19, 20 and 21 herein:

11

    (i)    "Competitive Position" shall mean any employment, consulting, advisory, directorship, agency, promotional or independent contractor arrangement between Employee and (x) any person or Entity engaged wholly or in material part in the business in which the Company is engaged (i.e., the discount consumable basics or general merchandise retail business), including but not limited to such other similar businesses as Albertsons/Safeway, ALDI, Big Lots, Casey's General Stores, Circle K, Costco, CVS, Dollar Tree Stores, Family Dollar Stores, Kmart, Kroger, 99 Cents Only Stores, The Pantry, Pilot Flying J, Rite-Aid, Sam's Club, 7-Eleven, Target, Tractor Supply, Walgreen's and Wal-Mart, or (y) any person or Entity then attempting or planning to enter the discount consumable basics retail business, whereby Employee is required to perform services on behalf of or for the benefit of such person or Entity which are substantially similar to the services Employee provided or directed at any time while employed by the Company or any of its subsidiaries or affiliates.

    (ii)    "Confidential Information" shall mean the proprietary or confidential data, information, documents or materials (whether oral, written, electronic or otherwise) belonging to or pertaining to the Company, other than "Trade Secrets" (as defined below), which is of tangible or intangible value to the Company and the details of which are not generally known to the competitors of the Company. Confidential Information shall also include any items marked "CONFIDENTIAL" or some similar designation or which are otherwise identified as being confidential.

    (iii)    "Entity" or "Entities" shall mean any business, individual, partnership, joint venture, agency, governmental agency, body or subdivision, association, firm, corporation, limited liability company or other entity of any kind.

    (iv)    "Restricted Period" shall mean two (2) years following Employee's termination date.
    (v)    "Territory" shall include individually and as a total area those states in the United States or those countries outside the United States in which the Company maintains stores at Employee's termination date or those states or countries in which the Company has specific and demonstrable plans to open stores within six (6) months of Employee's termination date.

    (vi)    "Trade Secrets" shall mean information or data of or about the Company, including, but not limited to, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial

12

data, financial plans, product plans or lists of actual or potential customers or suppliers that: (A) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and (C) any other information which is defined as a "trade secret" under applicable law.

    (vii)    "Work Product" shall mean all tangible work product, property, data, documentation, "know-how," concepts or plans, inventions, improvements, techniques and processes relating to the Company that were conceived, discovered, created, written, revised or developed by Employee while employed by the Company.

17. **Nondisclosure: Ownership of Proprietary Property**.

    a.    In recognition of the Company's need to protect its legitimate business interests, Employee hereby covenants and agrees that, for the Term and thereafter (as described below), Employee shall regard and treat Trade Secrets and Confidential Information as strictly confidential and wholly-owned by the Company and shall not, for any reason, in any fashion, either directly or indirectly, use, sell, lend, lease, distribute, license, give, transfer, assign, show, disclose, disseminate, reproduce, copy, misappropriate or otherwise communicate any Trade Secrets or Confidential Information to any person or Entity for any purpose other than in accordance with Employee's duties under this Agreement or as required by applicable law. This provision shall apply to each item constituting a Trade Secret at all times it remains a "trade secret" under applicable law and shall apply to any Confidential Information, during employment and for the Restricted Period thereafter.

    b.    Employee shall exercise best efforts to ensure the continued confidentiality of all Trade Secrets and Confidential Information and shall immediately notify the Company of any unauthorized disclosure or use of any Trade Secrets or Confidential Information of which Employee becomes aware. Employee shall assist the Company, to the extent reasonably requested, in the protection or procurement of any intellectual property protection or other rights in any of the Trade Secrets or Confidential Information.

c.	All Work Product shall be owned exclusively by the Company. To the greatest extent possible, any Work Product shall be deemed to be "work made for hire" (as defined in the Copyright Act, 17 U.S.C.A. § 101 et seq., as amended), and Employee hereby unconditionally and irrevocably transfers and assigns to the Company all right, title and interest Employee currently has or may have by operation of law or otherwise in or to any Work

Product, including, without limitation, all patents, copyrights, trademarks (and the goodwill associated therewith), trade secrets, service marks (and the goodwill associated therewith) and other intellectual property rights. Employee agrees to execute and deliver to the Company any transfers, assignments, documents or other instruments which the Company may deem necessary or appropriate, from time to time, to protect the rights granted herein or to vest complete title and ownership of any and all Work Product, and all associated intellectual property and other rights therein, exclusively in the Company.

**18.	Non-Interference with Employees.** Through employment and thereafter through the Restricted Period, Employee will not, either directly or indirectly, alone or in conjunction with any other person or Entity: actively recruit, solicit, attempt to solicit, induce or attempt to induce any person who is an exempt employee of the Company or any of its subsidiaries or affiliates (or has been within the last six (6) months) to leave or cease such employment for any reason whatsoever;

**19.	Non-Interference with Business Relationships.**

a.	Employee acknowledges that, in the course of employment, Employee will learn about the Company's business, services, materials, programs and products and the manner in which they are developed, marketed, serviced and provided. Employee knows and acknowledges that the Company has invested considerable time and money in developing its product sales and real estate development programs and relationships, vendor and other service provider relationships and agreements, store layouts and fixtures, and marketing techniques and that those things are unique and original. Employee further acknowledges that the Company has a strong business reason to keep secret information relating to the Company's business concepts, ideas, programs, plans and processes, so as not to aid the Company's competitors. Accordingly, Employee acknowledges and agrees that the protection outlined in (b) below is necessary and reasonable.

b.	During the Restricted Period, Employee will not, on Employee's own behalf or on behalf of any other person or Entity, solicit, contact, call upon, or communicate with any person or entity or any representative of any person or entity who has a business relationship with Company and with whom Employee had contact while employed, if such contact or communication would likely interfere with Company's business relationships or result in an unfair competitive advantage over Company.

**20.	Agreement Not to Work in Competitive Position.** Employee covenants and agrees not to accept, obtain or work in a Competitive Position for a company or entity that operates anywhere within the Territory for the Restricted Period.

**21.	Acknowledgements Regarding Sections 16 – 20.**

a.	Employee and the Company expressly covenant and agree that the scope, territorial, time and other restrictions contained in Sections 16 through 20 of this Agreement constitute the most reasonable and equitable restrictions possible to protect the business interests of the Company given: (i) the business of the Company; (ii) the competitive nature of the Company's industry; and (iii) that Employee's skills are such that Employee could easily find alternative, commensurate employment or consulting work in Employee's field which would not violate any of the provisions of this Agreement.

b.	Employee acknowledges that the compensation and benefits described in Sections 5 and 12 are also in consideration of his covenants and agreements contained in Sections 16 through 20 hereof and that a breach by Employee of the obligations contained in Sections 16 through 20 hereof shall forfeit Employee's right to such compensation and benefits.

c.	Employee acknowledges and agrees that a breach by Employee of the obligations set forth in Sections 16 through 20 will likely cause the Company irreparable injury and that, in such event, the Company shall be entitled to injunctive relief in addition to such other and further relief as may be proper.

d.	The parties agree that if, at any time, a court of competent jurisdiction determines that any of the provisions of Section 16 through 20 are unreasonable under Tennessee law as to time or area or both, the Company shall be entitled to enforce this Agreement for such period of time or within such area as may be determined reasonable by such court.

**22.	Return of Materials.** Upon Employee's termination, Employee shall return to the Company all written, electronic, recorded or graphic materials of any kind belonging or relating to the Company or its subsidiaries or affiliates, including any originals, copies and abstracts in Employee's possession or control.

**23.	Whistleblower and Other Protections.** Nothing in this Agreement is intended to or will be used in any way to limit Employee's rights to voluntarily communicate with, file a claim or report with, or to otherwise participate in an investigation with, any federal, state, or local government agency, as provided for, protected under or warranted by applicable law. Employee does not need prior approval before making any such communication, report, claim, disclosure or participation and is not required to notify the Company that such communication, report, claim, or participation has been made.

Additionally, federal law provides certain protections to individuals who disclose a Trade Secret to their attorney, a court, or a government official in certain, confidential circumstances. Specifically, Employee may not be held criminally or civilly liable under any state or federal trade secret law for the disclosure of a Trade Secret that: (i) is made (A) in confidence to a state, federal, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; or (iii) in a lawsuit alleging retaliation by the Company against Employee for reporting a suspected violation of law, Employee discloses to Employee's attorney and uses in the court proceeding, as long as any document containing the Trade Secret is filed under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

24. **General Provisions.**

a.     Amendment. This Agreement may be amended or modified only by a writing signed by both of the parties hereto.

b.     Binding Agreement. This Agreement shall inure to the benefit of and be binding upon Employee, his heirs and personal representatives, and the Company and its successors and assigns.

c.     Waiver Of Breach; Specific Performance. The waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other breach. Each of the parties to this Agreement will be entitled to enforce this Agreement, specifically, to recover damages by reason of any breach of this Agreement, and to exercise all other rights existing in that party's favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may apply to any court of law or equity of competent jurisdiction for specific performance or injunctive relief to enforce or prevent any violations of the provisions of this Agreement.

d.     Unsecured General Creditor. The Company shall neither reserve nor specifically set aside funds for the payment of its obligations under this Agreement, and such obligations shall be paid solely from the general assets of the Company.

e.     No Effect On Other Arrangements. Except as provided in Section 24(j), it is expressly understood and agreed that the payments made in accordance with this Agreement

are in addition to any other benefits or compensation to which Employee may be entitled or for which Employee may be eligible.

f.     Tax Withholding. There shall be deducted from each payment under this Agreement the amount of any tax required by any governmental authority to be withheld and paid over by the Company to such governmental authority for the account of Employee.

g.     Notices.

(i)     All notices and all other communications provided for herein shall be in writing and delivered personally to the other designated party, or mailed by certified or registered mail, return receipt requested, or delivered by a recognized national overnight courier service, or sent by facsimile, as follows:

If to Company to:                    Dollar General Corporation
                                     Attn: General Counsel
                                     100 Mission Ridge
                                     Goodlettsville, TN 37072-2171
                                     Facsimile: (615) 855-5517

If to Employee to:                   (Last address of Employee known to Company unless otherwise directed in writing by Employee)

(ii)     All notices sent under this Agreement shall be deemed given twenty-four (24) hours after sent by facsimile or courier, seventy-two (72) hours after sent by certified or registered mail and when delivered if by personal delivery.

(iii)     Either party hereto may change the address to which notice is to be sent hereunder by written notice to the other party in accordance with the provisions of this Section.

h.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee (without giving effect to conflict of laws).

i.     Arbitration. In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted within a reasonable period by a single arbitrator in an arbitral forum to be selected by the parties and subject to the Federal Rules of Procedure and Evidence. Such arbitration process shall take place within the Nashville, Tennessee metropolitan area, unless otherwise mutually agreed by the parties. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed

recital of the arbitrator's reasoning. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. Each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator, and each party shall bear an equal portion of the arbitrator's and arbitral forum's fees. Notwithstanding the foregoing, Employee acknowledges and agrees that the Company, its subsidiaries and any of their respective affiliates shall be entitled to injunctive or other relief in order to enforce the covenant not to compete, covenant not to solicit and/or confidentiality covenants as set forth in Sections 14, 16 through 20, and 22 of this Agreement.

j.       <u>Entire Agreement and Agreement Termination</u>. This Agreement contains the full and complete understanding of the parties hereto with respect to the subject matter contained herein and, unless specifically provided herein, this Agreement supersedes and replaces, as of the Effective Date, any prior agreement, either oral or written, which Employee may have with Company that relates generally to the same subject matter. Notwithstanding the above, the Employment Agreement between the Company and Employee effective April 1, 2021 (the "Existing Agreement"), shall not be superseded and replaced by this Agreement unless and until this Agreement becomes effective on the Effective Date, and the Existing Agreement shall govern the relationship between Employee and the Company until such time. If Employee's employment is terminated by the Company or by Employee for any reason, including without limitation due to Employee's death, prior to the Effective Date, this Agreement shall automatically terminate immediately upon such termination of employment.

k.       <u>Assignment</u>. This Agreement may not be assigned by Employee, and any attempted assignment shall be null and void and of no force or effect.

l.       <u>Severability</u>. If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end the provisions hereof shall be deemed severable.

m.       <u>Section Headings</u>. The Section headings set forth herein are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement whatsoever.

n.       <u>Voluntary Agreement</u>. Employee and Company represent and agree that each has reviewed all aspects of

18

this Agreement, has carefully read and fully understands all provisions of this Agreement, and is voluntarily entering into this Agreement. Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with legal, tax or other adviser(s) of such party's choice before executing this Agreement.

o.       <u>Deferred Compensation Omnibus Provision</u>. It is intended that any payment or benefit which is provided pursuant to or in connection with this Agreement which is considered to be deferred compensation subject to Section 409A of the Internal Revenue Code ("Code Section 409A") shall be paid and provided in a manner, and at such time, including without limitation payment and provision of benefits only in connection with the occurrence of a permissible payment event contained in Code Section 409A (e.g. death, disability, separation from service from the Company and its affiliates as defined for purposes of Code Section 409A), and in such form, as complies with the applicable requirements of Code Section 409A to avoid the unfavorable tax consequences provided therein for non-compliance. In connection with effecting such compliance with Code Section 409A, the following shall apply:

(i)       Notwithstanding any other provision of this Agreement, the Company is authorized to amend this Agreement, to void or amend any election made by Employee under this Agreement and/or to delay the payment of any monies and/or provision of any benefits in such manner as may be determined by it to be necessary or appropriate to comply, or to evidence or further evidence required compliance, with Code Section 409A.

(ii)       Neither Employee nor the Company shall take any action to accelerate or delay the payment of any monies and/or provision of any benefits in any manner which would not be in compliance with Code Section 409A.

(iii)       If Employee is a specified employee for purposes of Code Section 409A(a)(2)(B)(i), any payments or benefits under this Agreement that are deferred compensation subject to Code Section 409A, as determined by the Company, and that are paid in connection with a separation from service payment event (as determined for purposes of Code Section 409A) shall not be made until six months after Employee's separation from service (the "409A Deferral Period"). In the event such payments are otherwise due to be made in installments or periodically during the 409A Deferral Period, the payments which would otherwise have been made in the 409A Deferral Period shall be accumulated and paid in a lump sum as soon as the 409A Deferral Period ends, and the balance of the payments shall be made as otherwise scheduled. In the event benefits are required to be deferred, any such benefits may be provided during the 409A Deferral Period at Employee's expense, with Employee having a right to

19

reimbursement from the Company once the 409A Deferral Period ends, and the balance of the benefits shall be provided as otherwise scheduled.

(iv)       For purposes of this Agreement, all rights to payments and benefits hereunder shall be treated as rights to receive a series of separate payments and benefits to the fullest extent allowed by Code Section 409A. If under this Agreement, an amount is to be paid in two or more installments, for purposes of Code Section 409A, each installment shall be treated as a separate payment. In the event any payment payable upon termination of employment would be exempt from Code Section 409A under Treas. Reg. § 1.409A-1(b)(9)(iii) but for the amount of such payment, the determination of the payments to Employee that are exempt under such provision shall be made by applying the exemption to payments based on chronological order beginning with the payments paid closest in time on or after such termination of employment.

(v)       For purposes of determining time of (but not entitlement to) payment or provision of deferred compensation under this

Agreement under Code Section 409A in connection with a termination of employment, termination of employment will be read to mean a "separation from service" within the meaning of Code Section 409A where it is reasonably anticipated that no further services would be performed after that date or that the level of bona fide services Employee would perform after that date (whether as an employee or independent contractor) would permanently decrease to less than fifty percent (50%) of the average level of bona fide services performed over the immediately preceding thirty-six (36) month period.

(vi) For purposes of this Agreement, a key employee for purposes of Code Section 409A(a)(2)(B)(i) shall be determined on the basis of the applicable twelve (12)–month period ending on the specified employee identification date designated by the Company consistently for purposes of this Agreement and similar agreements or, if no such designation is made, based on the default rules and regulations under Code Section 409A(a)(2)(B)(i).

(vii) With regard to any provision herein that provides for reimbursement of expenses or in-kind benefits that are subject to Code Section 409A, except as permitted by Code Section 409A, (x) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, and (y) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year of Employee

shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year of Employee, provided that the foregoing clause (y) shall not be violated with regard to expenses reimbursed under any arrangement covered by Code Section 105(b) solely because such expenses are subject to a limit related to the period the arrangement is in effect. All reimbursements shall be reimbursed in accordance with the Company's reimbursement policies but in no event later than Employee's taxable year following Employee's taxable year in which the related expense is incurred.

(viii) When, if ever, a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within ten (10) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(ix) Notwithstanding any other provision of this Agreement, the Company shall not be liable to Employee if any payment or benefit which is to be provided pursuant to this Agreement and which is considered deferred compensation subject to Code Section 409A otherwise fails to comply with, or be exempt from, the requirements of Code Section 409A.

p. <u>Clawback</u>. Employee acknowledges and agrees that Employee's rights, payments, and benefits with respect to any incentive compensation (in the form of cash or equity) shall be subject to any reduction, cancellation, forfeiture or recoupment, in whole or in part, upon the occurrence of certain specified events, as may be required by any rule or regulation of the Securities and Exchange Commission or by any applicable national exchange, or by any other applicable law, rule or regulation or as set forth in a separate "clawback" or recoupment policy as may be adopted from time to time by the Board or its Compensation Committee. To the extent allowed by state and federal law and as determined by the Board or its Compensation Committee, Employee agrees that such repayment may, in the discretion of the Compensation Committee, be accomplished by withholding of future compensation to be paid to Employee by the Company. Any recovery of incentive compensation covered by Code Section 409A shall be implemented in a manner which complies with Code Section 409A.

[The remainder of this page was intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed, or caused their duly authorized representative to execute this Agreement to be effective as of the Effective Date.

Date: July 11, 2022

DOLLAR GENERAL CORPORATION

By: Rhonda M. Taylor
Name: /s/ Rhonda M. Taylor
Title: EVP, GC
"EMPLOYEE"

/s/ Jeffery C. Owen
**Jeffery C. Owen**

Date: July 11, 2022

**Addendum to Employment Agreement with Jeffery C. Owen**

**RELEASE AGREEMENT**

THIS RELEASE ("Release") is made and entered into by and between Jeffery C. Owen ("Employee") and **DOLLAR GENERAL CORPORATION**, and its successor or assigns ("Company").

WHEREAS, Employee and Company have agreed that Employee's employment with Dollar General Corporation shall terminate on

_____;

WHEREAS, Employee and the Company have previously entered into that certain Employment Agreement, effective _____ (the "Agreement"), in which the form of this Release is incorporated by reference;

WHEREAS, Employee and Company desire to delineate their respective rights, duties and obligations attendant to such termination and desire to reach an accord and satisfaction of all claims arising from Employee's employment, and termination of employment, with appropriate releases, in accordance with the Agreement;

WHEREAS, the Company desires to compensate Employee in accordance with the Agreement for service Employee has provided and/or will provide for the Company;

NOW, THEREFORE, in consideration of the premises and the agreements of the parties set forth in this Release, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

1. **Claims Released Under This Release.**

In exchange for receiving the payments and benefits described in Section 12 of the Agreement, Employee hereby voluntarily and irrevocably waives, releases, dismisses with prejudice, and withdraws all claims, complaints, suits or demands of any kind whatsoever (whether known or unknown) which Employee ever had, may have, or now has against Company and other current or former subsidiaries or affiliates of the Company and their past, present and future officers, directors, employees, agents, insurers and attorneys (collectively, the "Releasees"), arising from or relating to (directly or indirectly) Employee's employment or the termination of employment or other events that have occurred as of the date of execution of this Release, including but not limited to:

a.       claims for violations of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Equal Pay Act, the Family and Medical Leave Act, 42 U.S.C. § 1981, the Sarbanes Oxley Act of 2002, the National Labor Relations Act, the Labor Management Relations Act, the Genetic Information Nondiscrimination Act, the Uniformed Services Employment and Reemployment Rights Act, Executive Order 11246, Executive Order 11141, the Rehabilitation Act of 1973, or the Employee Retirement Income Security Act;

b.       claims for violations of any other federal or state statute or regulation or local ordinance;

c.       claims for lost or unpaid wages, compensation, or benefits, defamation, intentional or negligent infliction of emotional distress, assault, battery, wrongful or constructive discharge, negligent hiring, retention or supervision, fraud, misrepresentation, conversion, tortious interference, breach of contract, or breach of fiduciary duty;

d.       claims to benefits under any bonus, severance, workforce reduction, early retirement, outplacement, or any other similar type plan sponsored by the Company (except for those benefits owed under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement); or

e.       any other claims under state law arising in tort or contract.

2. **Claims Not Released Under This Release.**

In signing this Release, Employee is not releasing any claims that may arise under the terms of this Release or which may arise out of events occurring after the date Employee executes this Release.

Employee also is not releasing claims to benefits that Employee is already entitled to receive under any other plan or agreement covering Employee which shall be governed by the terms of such plan or agreement. However, Employee understands and acknowledges that nothing herein is intended to or shall be construed to require the Company to institute or continue in effect any particular plan or benefit sponsored by the Company, and the Company hereby reserves the right to amend or terminate any of its benefit programs at any time in accordance with the procedures set forth in such plans. Employee further understands and acknowledges that any continuing obligation under a Company incentive-based plan, program or arrangement or pursuant to any Company policy or provision regarding recoupment of compensation is not altered by this Release and nothing herein is intended to nor shall be construed otherwise.

Nothing in this Release shall prohibit Employee from engaging in activities required or protected under applicable law or from communicating, either voluntarily or otherwise, with any governmental agency concerning any potential violation of the law.

3. **No Assignment of Claim.** Employee represents that Employee has not assigned or transferred, or purported to assign or transfer, any claims or any portion thereof or interest therein to any party prior to the date of this Release.

4. **Compensation.** In accordance with the Agreement, the Company agrees to pay Employee or, if Employee becomes eligible for payments and benefits under Section 12 but dies before receipt thereof, Employee's spouse or estate, as the case may be, the amounts provided in Section 12 of the Agreement.

5. **Publicity; No Disparaging Statement.** Except as otherwise provided in Section 15, Confidentiality and Legal Process, and Section 23, Whistleblower and Other Protections, of the Agreement, Section 2 of this Release, and as privileged by law, Employee and the Company covenant and agree that they shall not engage in any communications with persons outside the Company which shall disparage one another or interfere with their existing or prospective business relationships.

**6.      No Admission Of Liability.** This Release shall not in any way be construed as an admission by the Company or Employee of any improper actions or liability whatsoever as to one another, and each specifically disclaims any liability to or improper actions against the other or any other person.

**7.      Voluntary Execution.** Employee warrants, represents and agrees that Employee has been encouraged in writing to seek advice regarding this Release from an attorney and tax advisor prior to signing it; that this Release represents written notice to do so; that Employee has been given the opportunity and sufficient time to seek such advice; and that Employee fully understands the meaning and contents of this Release. Employee further represents and warrants that Employee was not coerced, threatened or otherwise forced to sign this Release, and that Employee's signature appearing hereinafter is voluntary and genuine. EMPLOYEE UNDERSTANDS THAT EMPLOYEE MAY TAKE UP TO TWENTY-ONE (21) DAYS (OR, IN THE CASE OF AN EXIT INCENTIVE OR OTHER EMPLOYMENT TERMINATION PROGRAM OFFERED TO A GROUP OR CLASS OF EMPLOYEES, UP TO FORTY-FIVE (45) DAYS) TO CONSIDER WHETHER TO ENTER INTO THIS RELEASE.

**8.      Ability to Revoke Agreement. EMPLOYEE UNDERSTANDS THAT THIS RELEASE MAY BE REVOKED BY EMPLOYEE BY NOTIFYING THE COMPANY IN**

**WRITING OF SUCH REVOCATION WITHIN SEVEN (7) DAYS OF EMPLOYEE'S EXECUTION OF THIS RELEASE AND THAT THIS RELEASE IS NOT EFFECTIVE UNTIL THE EXPIRATION OF SUCH SEVEN (7) DAY PERIOD. EMPLOYEE UNDERSTANDS THAT UPON THE EXPIRATION OF SUCH SEVEN (7) DAY PERIOD THIS RELEASE WILL BE BINDING UPON EMPLOYEE AND EMPLOYEE'S HEIRS, ADMINISTRATORS, REPRESENTATIVES, EXECUTORS, SUCCESSORS AND ASSIGNS AND WILL BE IRREVOCABLE.**

Acknowledged and Agreed To:

**"COMPANY"**

**DOLLAR GENERAL CORPORATION**

By: _____

Its: _____

**I UNDERSTAND THAT BY SIGNING THIS RELEASE, I AM GIVING UP RIGHTS I MAY HAVE. I UNDERSTAND THAT I DO NOT HAVE TO SIGN THIS RELEASE.**

Date _____

**"EMPLOYEE"** _____

WITNESSED BY:

Date _____

_____