# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br> vs.<br><br>DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS<br><br>    Defendants. | Civil Action No. 3:23-cv-01250<br><br><u>CLASS ACTION</u><br><br>Judge Aleta A. Trauger |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

**Page(s)**

Divergent Reports and Disregard of Information (Factors 2 and 6) ............................................... 1

Self-Interested Motivation (Factor 9) ..................................................................................... 4

Insider Trading (Factor 1) ...................................................................................................... 6

Ancillary Lawsuits (Factor 5) ................................................................................................. 8

Time Between Misstatements and Correctives (Factor 3) ......................................................... 9

Holistic Review ..................................................................................................................... 9

Falsity Is Adequately Alleged ............................................................................................... 10

Conclusion ........................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ........................................................6

*In re AppHarvest Secs. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)........................................................................4

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)....................................................................2

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) ...........................................................6

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .....................................................................................9

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
29 F.4th 802 (6th Cir. 2022) ......................................................................................7

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013)........................................................................8

*Doshi v. Gen. Cable*,
823 F.3d 1032 (6th Cir. 2016) ...................................................................................5

*In re Firstenergy Corp. Secs. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022).........................................................4, 8

*In re Five Below, Inc. Sec. Litig.*,
2025 WL 2447794 (E.D. Pa. Aug. 25, 2025) .........................................................1, 5

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................2

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ............................................................................ *passim*

*Hilton Hotels Corp. v. Dunnet*,
275 F. Supp. 2d 954 (W.D. Tenn. 2002)....................................................................7

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) .....................................................................................3

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
838 F.3d 76 (1st Cir. 2016).........................................................................................8

Case 3:23-cv-01250    Document 100    Filed 11/07/25    Page 3 of 16 PageID #: 4308

*New York City Pub. Pension Funds v. Coupang, Inc.*,
  2025 WL 2613650 (S.D.N.Y. Sept. 10, 2025)....................................................................9, 10

*Oklahoma F'fighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ........................................................................................2

*Pittman v. Unum Grp.*,
  861 F. App'x 51 (6th Cir. 2021) ...................................................................................5

*Plagens v. Deckard*,
  2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ...................................................1, 4

*In re Sirrom Cap. Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999)........................................................................10

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holds., Inc.*,
  83 F.4th 514 (6th Cir. 2023) ........................................................................................3

*In re UiPath, Inc. Secs. Litig.*,
  2025 WL 2065093 (S.D.N.Y. July 23, 2025) ...........................................................4, 10

*Weiner v. Tivity Health, Inc.*,
  365 F. Supp. 3d 900 (M.D. Tenn. 2019)......................................................................1

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .......................................................................................8

*Zornberg v. NAPCO Sec. Techs., Inc.*,
  778 F. Supp. 3d 516 (E.D.N.Y. 2025) .........................................................................8

**OTHER AUTHORITIES**

S.E.C. Rule 10b5–1....................................................................................................8

Plaintiffs respectfully submit this reply in support of their Motion.[1] Plaintiffs have alleged a strong inference of scienter, including under *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001); *Plagens v. Deckard*, 2023 WL 2711263, at \*28 (N.D. Ohio Mar. 30, 2023) (two *Helwig* factors sufficient to plead scienter). Plaintiffs should be granted leave to file the TAC.

**Divergent Reports and Disregard of Information (Factors 2 and 6)**. Defendants claim that the TAC pleads no divergent reports or disregard of current information. Opp. 14-20, 21-22. They are wrong. The FE reports confirm Defendants' knowledge or reckless disregard of reports and information confirming the Company's broken inventory, staffing, and pricing controls. These firsthand accounts from multiple former Dollar General employees expose as knowingly or recklessly misleading Defendants' assurances to investors that, for example, the Company "efficient[ly] manage[d]" and "closely monitor[ed]" inventory. ¶¶277-80; *In re Five Below, Inc. Sec. Litig.*, 2025 WL 2447794, \*26-27 (E.D. Pa. Aug. 25, 2025) (FE allegations confirmed that defendants misled investors about inventory controls); *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 908 (M.D. Tenn. 2019) (the PSLRA's "elephant-sized . . . boulder [can] be circumnavigated, pushed aside, or . . . squeezed past"). Defendants' arguments fail.

*First*, Defendants claim that the TAC provides no indication that Defendants read the emails flagging the inventory and staffing problems. Opp. 1-2, 14-15. Their claim is belied by the TAC. FE-25, who worked directly for Owen and Vasos's personal secretary (¶96), reported that ***established Dollar General practices required that Defendants Vasos, Garratt, and Owen personally review these emails***. ¶¶11, 53, 58, 96-98. Indeed, FE-25 confirmed that, if an employee expressed concerns in an email, then "***members of the Dollar General C-suite would have read***

---

[1] Unless noted, emphasis is added, internal cites and quotation marks are omitted, and capitalized terms are defined in Plaintiff's Opening Brief ("Br."). Dkt. 94, 93-1. "Opp." refers to Defendants' opposition. Dkt. 98. "DX" refers to Defendants' exhibits. "PX" refers to Plaintiffs' exhibits.

*those emails*." ¶97.[2] Thus, FE-1's email to Vasos about being "bombarded by inventory" (¶52) and FE-2's two emails to Vasos, Owen, and Garratt about staffing and inventory management issues were necessarily read by these Defendants. Further, FE-25 reported that concerns about issues being mentioned in the media—the exact concern that FE-1's email raised (¶52)—would have necessarily been flagged to Vasos. ¶97.[3] Likewise, FE-25 confirmed that written customer complaints—like the complaints that FE-28 described about excess inventory and understaffing (¶110)—were necessarily reported directly to Defendants Owen and Vasos, with a hard copy of the complaints placed on their desks. ¶111. Defendants argue that FE-25 worked at Dollar General before the emails were sent (Opp. 15)—but they do not point to any change in the "established Dollar General practices" described by FE-25 that necessitated that Defendants read these emails. Defendants' purported "factual or evidentiary infirmities" are not "grounds for dismissal" here. *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 673-74 (M.D. Tenn. 2022) (Trauger, J.).

Relatedly, FEs need not "be a fly on every relevant wall" to support scienter. *Oklahoma F'fighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023). FE-1's and FE-2's reports about their emails detailed their substance, timeframe, and Defendants' subordinates' responses, including Vasos's direct report. ¶¶51-58. These facts are not "vague." Opp. 15. *In re Gentiva Sec. Litig.* is inapposite because, unlike here, the email there did not "concern the subject matter that is at issue." 932 F. Supp. 2d 352, 374 (E.D.N.Y. 2013) (Opp. 15).

<u>Second</u>, Defendants say that the TAC lacks detail about internal meetings regarding excess inventory. Opp. 15-18. Defendants are incorrect. For example, the TAC details that:

- FE-26 ***personally attended*** meetings, including ***monthly meetings during the 2020-22 period***, where Vasos asked about overstocked inventory and even expenses relating to excess

---

[2] The "C-suite" included Defendants Vasos, Owen, Garratt, and Dilts. ¶11, n.1; ¶96, n.7.

[3] These allegations show the TAC does not rely solely on "reported up the chain" allegations. Opp. 16. Defendants were ***directly*** informed about excess inventory and staffing problems.

2

inventory—and Vasos was told *inter alia* that inventory was not entered in WMS. ¶¶99-103.

- FE-27 ***personally attended*** meetings with Vasos, Owen, Garratt, and Dilts ***on August 1 of every year*** from 2012 to 12/2024 concerning problems with inventory. ¶¶104-07.

- FE-31 ***personally attended*** multiple meetings, including ***monthly*** forecast reviews, with Defendants from August 2017 to June 2021 discussing excess inventory issues. ¶¶117-25.

Defendants' cases are inapposite. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (meetings lacked "any details about most" of the witnesses); *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holds., Inc.*, 83 F.4th 514, 531 (6th Cir. 2023) (details "completely absent").

*Third*, Defendants seek to distract from FE-26's report confirming Vasos's knowledge of excess inventory by pointing to the disclosure of "additional temporary warehouse space." Opp. 17. This is a red herring. FE-26 detailed her one-on-one conversations with Vasos that the distribution centers were full and out of space. ¶¶100-01. She also confirmed that Defendants learned from monthly "executive meetings" throughout 2020 that their temporary inventory control measures were ineffective and left distribution centers with excess, untracked inventory not entered into WMS. *Id*. Contrary to these facts, Defendants repeatedly told investors that "we closely monitor and manage our inventory balances." ¶277. Again, Defendants' arguments merely raise improper factual disputes, which cannot be resolved at this stage as they require discovery.

*Fourth*, Defendants gloss over FE-36's report that the Company systematically hid excess inventory from investors. Opp. 17-18. The uncontroverted facts alleged in the TAC establish that up to 50 employees deliberately covered up excess inventory from investors—***with Vasos or his direct report approving expenditures to hide inventory***. ¶¶166-71. This gives rise to a strong inference of scienter—unlike *In re AppHarvest Secs. Litig.*, 684 F. Supp. 3d 201, 244 n.6 (S.D.N.Y. 2023) (defendants merely "concerned about an image of uncleanliness") (Opp. 18).

*Fifth*, Defendants claim that the TAC lacks details about the inventory reports they received and reviewed showing excess inventory. Opp. 18-20. Not true. The TAC's allegations about these

reports provide sufficient detail. *E.g.*, ¶121 (FE-31: controller reports showed quarterly levels of "inventory that was between six and eighteen months old" and detailed, *e.g.*, "when the products were first received, last received, the recent flow, the total quantity bought, total quantity on hand, sales, how much supply was left."); ¶132 (FE-33: audit results that "revealed that each store had more inventory than the year before" were reported to Garratt and Vasos).[4] In *In re UiPath, Inc. Secs. Litig.* (Opp. 18 n.10), unlike here, the plaintiffs did not "plead the specific contents of any [report] reviewed by [defendants]." 2025 WL 2065093, at *15 (S.D.N.Y. July 23, 2025).

Despite reviewing these continuous updates about excess inventory problems, Defendants misleadingly told investors "the quality of our inventory couldn't be better." ¶343. These new facts readily establish Defendants' scienter. *In re Firstenergy Corp. Secs. Litig.*, 2022 WL 681320, at *20 (S.D. Ohio Mar. 7, 2022) ("omniscience" not required to plead securities fraud); *Plagens*, 2023 WL 2711263, at *27 (scienter focuses on "the role of these reports in perpetuating the alleged fraud" and "[d]efendants' decision-making process," "not particular details about the reports themselves"). *Helwig* Factors 2 and 6 are amply pled, which justifies leave to file the TAC.

**Self-Interested Motivation (Factor 9)**. Defendants argue the TAC does not "link" their compensation and the misstatements. Opp. 23. This is wrong. Defendants' compensation increased in direct proportion to the Company's yearly Operating Profit, which was calculated by subtracting SG&A from total sales. ¶¶537-38. Because spending on labor and inventory management increased SG&A, Defendants misleadingly concealed these problems to ***maximize*** their compensation. Unlike *Pittman v. Unum Grp.*, Defendants' compensation here ***was*** "tied to a single key metric," not just their "overall performance." 861 F. App'x 51, 57 (6th Cir. 2021) (Opp. 22).

---

[4] These reports are not "inconsistent" with the Company's lack of inventory visibility. Opp. 18-19. Defendants received reports showing a glut of excess inventory—and they ***also*** knew that there was even more ***untracked, excess inventory*** in locations with no access to the WMS. *E.g.,* ¶101.

4

Contrary to their assertions (Opp. 23), Defendants' misrepresentations increased their compensation by enabling the Company to meet (and exceed) specific Operating Profit thresholds in 2020, 2021 and 2022, resulting in lucrative bonuses and stock awards that Defendants would otherwise not have received. ¶¶539-40, 542-43, 545-46. Indeed, Defendants concede they were *denied* bonuses and shares in 2023, when they were forced to disclose that Operating Profit fell *below* the threshold due to the $150 million SG&A increase to remedy staffing and inventory problems. ¶¶548-49. Here, unlike *Doshi v. Gen. Cable*, the "misstatements actually increased incentive compensation." 823 F.3d 1032, 1042 (6th Cir. 2016) (Opp. 20). The Company's limited ability to clawback compensation does not exonerate Defendants (Opp. 23, n.13), rather it *enhances* their motive, as Defendants wanted to conceal the truth to keep their ill-gotten gains.

Defendants dispute that the $150 million SG&A cost was used to remedy staffing and inventory problems. Opp. 23, n.14. But Defendants admitted these funds were for "incremental labor hours" (¶¶230, 245(b)) to "accelerate . . . inventory reduction" (¶244). Indeed, after finally spending on labor to account for previously untracked inventory, inventory balances rose from *$6.76 billion* in 4Q22 (PX1 at 10) to *$7.53 billion* by 2Q23 (PX2 at 9). Confirming this was unmarketable excess inventory, it was marked down to fire-sale prices in 3Q23. ¶253 ("increased shrink" and "markdowns"); PX3 at 9 (inventory decreased from $7.53 billion to $7.36 billion). The ensuing Operating Profit miss cost Defendants their 2023 incentive compensation. ¶¶548-49. Defendants' improper factual disputes cannot suffice at the pleading stage.[5]

**Confusing Accounting Disclosures (Factor 7)**. Credit Suisse ("CS") flagged the Company's confusing accounting disclosures based on "client feedback and related

---

[5] Defendants' attempt to downplay the $150 million increase fails. Opp. 23, n.14. They revealed that the Company had to *increase spending* on staffing and inventory control to *earn less profit*. The resulting stock price decline and analysts' dismay confirms this was material to investors.

misperceptions in the marketplace." ¶554. Defendants ignore that CS expressly stated that the Company's LIFO disclosure was "not clearly understood." Opp. 22; DX29. Defendants' admission that they used this confusing LIFO methodology before and after the Class Period confirms their disclosures were consistently "intended to confuse." *In re Am. Serv. Grp., Inc.,* 2009 WL 1348163, at *51-52 (M.D. Tenn. Mar. 31, 2009); *see* ¶¶490-96, 553-55.

**Insider Trading (Factor 1)**. *First*, Defendants argue that Dilts and Owen were not restricted from selling because they could sell a portion of shares awarded as incentive compensation. Opp. 10. But they still *had to meet the minimum ownership levels*, even if they could sell *after* meeting them. At most, Defendants raise improper factual disputes.[6]

Defendants also fail to show that Dilts and Owen met their applicable thresholds. Defendants picked an arbitrarily high closing share price of $136.16 on February 2, 2024 to argue that Dilts's holdings were worth $3.1 million. Opp. 10-11; A-1. They ignore that, between February 2, 2024 and the Class Period end of August 29, 2024, Dollar General's share price *declined another 38%* to $84.03 per share, as the truth was gradually revealed. ¶274. Thus, by August 29, 2024, Dilts' claimed 22,983 shares were worth $1.93 million—*below her threshold*.[7]

Defendants similarly fail to show that Owen maintained the minimum threshold. Opp. 10. They inflate Owen's holdings by including nearly 200,000 options without limiting their analysis to "*vested in the money options*"—*i.e.*, ones where the "exercise price . . . is below the market value of the stock"[8]—which they concede were the only ones that counted toward the threshold.

---

[6] *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400 (S.D.N.Y. May 19, 2025) (Opp. 10) is inapposite as it did not involve non-selling defendants and, there, a *selling* defendant had "de minimis" sales at prices "substantially *lower*" than after the corrective disclosures. *Id.*

[7] Defendants' Appendix A is excess briefing that violates the Court's page limit Order. Dkt. 97.

[8] *Hilton Hotels Corp. v. Dunnet*, 275 F. Supp. 2d 954, 957 n.2 (W.D. Tenn. 2002). Dollar General strictly "prohibit[ed] repricing underwater stock options . . . without shareholder approval." PX4.

*Id.*; A-1 (claiming Owen had 184,346 "options" without excluding ineligible ones). Excluding the faulty options figure, Owen held 61,159 stock shares and PSUs, which were not sufficient to reliably keep him above the $5.7 million threshold due to the declining share price.

Recognizing this, Defendants again pick an arbitrarily high share price of $228.09 per share on February 3, 2023. A-1, n.17. But between then and October 13, 2023 (when Owen departed the Company), ***seven of the eight corrective disclosures occurred***, causing a ***51% decline*** to $111.16. ¶¶563-77. It is clear that, as Owen's holdings plummeted from $13.9 million to $6.2 million (barely above the $5.7 million minimum), Owen "strategically declined" to sell his existing shares and rushed to buy more. Order at 17.[9] Defendants' manufactured factual disputes cannot suffice here.

*Second*, Vasos and Garratt say their sales were not suspicious. Opp. 12. But they sold large quantities at suspicious times in the Class Period—far more than the Control Period—including:

- $40 million after the May 28, 2020 misstatements (¶¶291-93, 412-15, 517-22);
- $58 million after the May 26-27, 2021 misstatements (¶¶312-15, 390-93, 517-22); and
- $81 million after the December 2, 2021 misstatements (¶¶323-28, 396-97, 517-22).

The suspicious timing of these sales supports scienter. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 814 (6th Cir. 2022). Plaintiffs did not "structure[]" the Class Period around Defendants' insider sales. Opp. 13. The Class Period begins on May 28, 2020 because the misstatements began on that date. ¶277. Further, the fact that Defendants did most of their selling early in the Class Period ***supports*** scienter. Opp. 13. Vasos and Garratt executed 41 of their 42 sales ***before*** the first corrective disclosure (¶¶518, 521), capitalizing on their fraud by selling near Class Period highs, including selling $85 million worth of stock only three months before the first corrective disclosure. *Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 527 (E.D.N.Y.

---

[9] Owen bought 1,500 shares on June 6, 2023. DX24. But given that Defendants' disclosures on June 1, 2023 had just caused a ***20%*** decline in the value of Owen's holdings (¶571), this purchase confirms he was seeking to maintain his minimum share ownership threshold.

2025) (scienter found from insider sales six and nine months before corrective disclosure).[10]

Vasos's retirement does not explain away these sales, unlike Defendants' case. *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (insider's retirement planned 5 months *before* class period). Vasos had until January 31, 2023 to exercise his options (Opp. 14), which makes it ***more suspicious*** that he chose to exercise ***prior*** to the corrective disclosures starting on December 1, 2022 and alongside Garratt, who did not retire until June 2023 (¶33). Vasos's acceptance of options when he returned as CEO does not negate scienter (Opp. 14)—his sales were completed long ***before*** his October 2023 return. In sum, there is nothing "irrational" about Plaintiffs' insider trading allegations. Opp. 11. Vasos and Garratt reaped over $300 million by selling their stock at fraud-inflated prices (¶¶518-522) and Dilts and Owen reaped lucrative bonuses and stock awards (¶¶539-47).[11]

**Ancillary Lawsuits (Factor 5)**. Defendants dispute that Dollar General's regulatory lawsuits add to scienter. Opp. 20-21. This is incorrect. <u>First</u>, Defendants ignore that Dollar General swiftly settled pricing fraud claims. ¶¶214 (Wisconsin regulators: Dollar General "falsely represent[ed] the prices on the shelves"); 215 (Dollar General paid largest-ever settlement to N.J. fraud regulators to resolve overcharging violations). These pricing violations related directly to the understaffing that Defendants misrepresented to investors. ¶212 (FE-11: "understaffing caused prices not to be changed in a timely manner"). These swift settlements support scienter.

<u>Second</u>, Defendants concede that the OSHA settlement "significantly overlaps" with their

---

[10] Defendants' cases (Opp. 12-13) are inapposite. *E.g.*, *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (sales were "under non-discretionary Rule 10b5–1 plans").

[11] The "absence of suspicious stock sales by other [defendants] does not negate their scienter." *FirstEnergy*, 2022 WL 681320, at *15, 19 n.22 (non-selling defendants knew of and participated in the fraudulent scheme, like here). Defendants fail to distinguish *FirstEnergy* (Opp. 3) and rely on inapposite cases. *E.g.*, *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84 (1st Cir. 2016) (Opp. 12) (non-selling defendants had no financial motive to join the fraud).

8

inventory misstatements. Opp. 21. OSHA targeted Vasos and "all other senior executive leadership" to implement "the OSHA-mandated overhaul *of the Company's inventory and distribution system*." ¶¶202-08. Defendants reference post-Class Period remedial efforts to try to minimize Dollar General's misconduct during the Class Period. Opp. 21. But Defendants' July 2024 OSHA settlement of "willful" and "repeated" violations shows that Dollar General's illegal inventory and staffing practices continued through the latest misstatements in May 2024.[12] ¶¶202-08; 109 (FE-28: "excess inventory blocking Dollar General stores' exits" caused OSHA penalties).

*Third*, Defendants argue that Dollar General's "propriety and confidential" analysis in the OSHA Settlement and its "non-public settlement" with Wisconsin regulators are not "secret" because they were referenced in public documents. Opp. 21. But courts have found similar facts to support scienter. *E.g., City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005) (sealed settlement agreements in *public* product liability suits showed scienter).

**Time Between Misstatements and Correctives (Factor 3)**. Defendants made misstatements on August 25, 2022, only three months before the December 1, 2022 corrective disclosures. ¶¶283, 558. This closeness in time reinforces the inference of scienter, especially because Defendants made quarterly disclosures to the market—so their reporting period was every three months. And the time between misstatements and correctives *shortened* for the rest of the Class Period. *E.g.*, ¶¶448-450 (May 31, 2023 misstatement), ¶¶568-71 (June 1, 2023 corrective).

**Holistic Review**. The inference of scienter is strong and at least as compelling as any innocent inference. Order at 13 ("a tie goes to the plaintiffs"). Company practice required that Defendants read the emails from FEs regarding the Company's inventory and staffing problems

---

[12] *New York City Pub. Pension Funds v. Coupang, Inc.*, 2025 WL 2613650, at *31 (S.D.N.Y. Sept. 10, 2025) (Opp. 21), concerned *voluntary* remediation outside a regulatory settlement, unlike here.

(¶¶96-98, 111, 505), they personally attended meetings discussing these issues (¶¶99-101, 105, 505), they engaged in efforts to physically conceal excess inventory from investors (¶169), and they had a strong financial motive to mislead investors. ¶¶516-33. Accepting the facts alleged in the TAC as true, which is required at this stage, Defendants' claim that they merely faced "some operational challenges" that they "disclosed over time" does not withstand scrutiny. Opp. at 23. Instead, Defendants knowingly or recklessly concealed excess inventory problems while they repeatedly assured investors that, for example, they "efficient[ly] manage[d]" and "closely monitor[ed] and manage[d]" inventory. ¶¶277-80. That is a violation of the securities laws, not mismanagement. *In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 942 (M.D. Tenn. 1999).

**Falsity Is Adequately Alleged**. Defendants' falsity arguments fail for the reasons set forth in Plaintiffs' Opposition (Dkt. 84), which are incorporated herein.[13] The new FE accounts reinforce that Defendants misled investors about known, material facts. For example, FE-26 told Vasos monthly about excess inventory not entered into WMS and Vasos or his direct report approved expenses relating to hiding excess inventory from investors. ¶¶99-103. Meanwhile, Defendants promised investors that they "closely monitor and manage our inventory balances." ¶277.

Defendants' attacks on FE-35 fail. Opp. 25. FE-35 left in mid-2020, which confirms that excess inventory was a problem at the start of the Class Period (¶162), and that Defendants' statements then were misleading. ¶¶277-90. The new facts about monthly controller and audit reports on excess inventory reinforce contemporaneous falsity. *Supra* at 4; *see also* ¶¶135-37.[14]

**Conclusion.** The Court should grant the Motion, allow the TAC, and commence discovery.

---

[13] Plaintiffs connect the misstatements and the corrective disclosures (Dkt. 84 at 66-69), unlike Defendants' cases. *E.g.*, *UiPath*, 2025 WL 2065093, at *19 ("no contradiction, no correction, and no concession of past inaccuracy").

[14] *Coupang*, 2025 WL 2613650, at *11 (Opp. 25) is inapposite as, unlike here, the defendants' safety statements were "too broad" and did not "trigger a duty to disclose."

DATED: November 7, 2025

Respectfully submitted,

**SANFORD HEISLER SHARP, LLP**

*/s/ Kristi S. McGregor*
Kristi S. McGregor (GA Bar No. 674012)
Brent Hannafan (TN Bar No. 025209)
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7001
Facsimile: (615) 434-7020
kmcgregor@sanfordheisler.com
bhannafan@sanfordheisler.com

*Liaison Counsel for Lead Plaintiff Universal and Quoniam and Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jeremy P. Robinson*
Salvatore J. Graziano (admitted *pro hac vice*)
Jeremy P. Robinson (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Jonathan D'Errico (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com

*Counsel for Lead Plaintiff Universal and Quoniam and Lead Counsel for the Class*

11

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, I authorized the electronic filing of a true and exact copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

*/s/ Kristi S. McGregor*
Kristi S. McGregor

12