# EXHIBIT A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NEWTYN PARTNERS, LP; NEWTYN TE PARTNERS, LP, individually and on behalf of all others similarly situated,

                *Plaintiffs-Appellants*,

    *v.*

ALLIANCE DATA SYSTEMS CORPORATION, nka Bread Financial Holdings, Inc.; CHARLES L. HORN; JOHN J. CHESNUT; RALPH J. ANDRETTA,

                *Defendants-Appellees*.

No. 25-3313

_____

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-01451—Edmund A. Sargus Jr., District Judge.

Argued:  October 23, 2025

Decided and Filed:  January 21, 2026

Before:  THAPAR, READLER, and HERMANDORFER, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Jonathan D. Lamet, SAXENA WHITE P.A., Boca Raton, Florida, for Appellants. Charles S. Duggan, DAVIS POLK & WARDWELL LLP, New York, New York, for Appellees Alliance Data Systems Corporation and Ralph J. Andretta.  Peter A. Stokes, NORTON ROSE FULBRIGHT US LLP, Dallas, Texas, for Appellees Charles L. Horn and John J. Chesnut.  **ON BRIEF:**  Jonathan D. Lamet, Lester R. Hooker, Dianne M. Pitre, SAXENA WHITE P.A., Boca Raton, Florida, Steven B. Singer, SAXENA WHITE P.A., White Plains, New York, for Appellants.  Charles S. Duggan, Matthew Drocton, DAVIS POLK & WARDWELL LLP, New York, New York, for Appellees Alliance Data Systems Corporation and Ralph J. Andretta.  Peter A. Stokes, Michael A. Swartzendruber, NORTON ROSE FULBRIGHT US LLP, Dallas, Texas, for Appellees Charles L. Horn and John J. Chesnut.

----

**OPINION**

----

READLER, Circuit Judge.    Facing mounting debt, Columbus-based Alliance Data Systems (ADS) spun off its LoyaltyOne division as a standalone company.  As the spinoff was taking form, ADS executives pitched Loyalty to investors as a healthy business with long-term potential.  But Loyalty was not without its challenges.  In the months leading up to the spinoff, Loyalty's crown jewel—its Canadian AIR MILES rewards program—began hemorrhaging clientele, culminating in the loss of its second largest customer a few months after the spinoff.  And in the days ahead, those headwinds only grew stronger for Loyalty.  Approximately a year and a half after the spinoff, Loyalty slid into bankruptcy, leaving investors in the red.

Two funds within the investment firm Newtyn Management brought a class action on behalf of investors who, like Newtyn, purchased Loyalty's stock, alleging securities fraud by ADS and three corporate executives.  The district court, however, dismissed Newtyn's complaint.  To the district court's mind, Newtyn both failed to explain in its complaint how defendants misled investors and failed to allege sufficiently defendants' intent to do so.  We agree and affirm.

I.

Alliance Data Systems (known today as Bread Financial) offers marketing and financial services.  At one time, ADS consisted of three operating segments:  (1) Card Services, which issues store-branded credit cards and remains ADS's principal line of business, (2) Epsilon, which provided digital marketing services, and (3) LoyaltyOne, which operated loyalty programs for retail businesses.  Challenges in the marketplace forced ADS to change that model.  Unlike ADS's competitors in the banking industry, who could extend credit card loans with depositor monies, ADS had to take on ever-increasing debt to fund Card Services's operations.  By 2019, ADS had accumulated over $5 billion in debt.  Hoping to dig out of that hole, company management settled on parting with ADS's side businesses to raise cash.  ADS sold off Epsilon in July 2019.  And in May 2021, ADS announced that by year's end it would spin off

LoyaltyOne as a standalone company called Loyalty Ventures Inc. (hereinafter referred to as Loyalty).

A.   The soon-to-be-spun-off Loyalty contained two segments:  BrandLoyalty and AIR MILES.  At the time, BrandLoyalty was a Netherlands-based marketing company that ran short-term rewards campaigns for retailers worldwide.  AIR MILES, for its part, was a Canadian-based customer rewards program in which participating retail clients (called sponsors) issued participating shoppers (called collectors) "AIR MILES" rewards points, which collectors could redeem for travel and other rewards.  Sponsors paid Loyalty based on the number of miles issued.  In return, AIR MILES provided the services to run the program.  AIR MILES sponsors generally entered contracts with Loyalty on a three-to-five-year basis.  For Loyalty, it was crucial to secure renewal of those contracts, particularly for the largest sponsors.  As Loyalty cautioned investors, AIR MILES's ten largest sponsors made up most of the program's revenue.  Much like anchor tenants at a mall, the loss of too many key sponsors would not only hurt earnings but also diminish the program's overall value for shoppers and sponsors alike, creating a cascade effect as all involved jump ship.

By ADS's estimate, "two-thirds of Canadian households participat[ed]" in LoyaltyOne's AIR MILES program.  R.30, PageID 311.  But in 2020 and 2021, challenges began to mount. Several of AIR MILES's ten largest sponsors announced their intent to leave the program, including Rexall (a pharmacy chain), Lowe's Canada (RONA), and the Liquor Control Board of Ontario (LCBO).  Making matters worse, in late 2020, Sobeys, one of Canada's largest grocers and AIR MILES's second largest sponsor, "informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation" in the AIR MILES program.  R.51-2, PageID 1573.  In early 2021, Sobeys relayed its intention to depart the program by the end of 2022.  By March of that year, ADS believed it had no other option but to renegotiate its agreement with Sobeys.  Those discussions produced a compromise.  Sobeys agreed to push back the start of its early termination window from July 2021 to July 2022.  In exchange, ADS took a 50% cut to its annual contract fee and pushed forward the contract's regular expiration date from 2024 to 2023.

It was against this uneven backdrop that the spinoff took place. Although higher-ups at ADS supported the spinoff in principle, its terms were the subject of intense debate. On one side, ADS's CEO (defendant Ralph Andretta), ADS's board chairman, and others proposed that the spun-off Loyalty should pay ADS a $750 million dividend, which Loyalty would fund with debt of its own. On the other, defendants Charles Horn and John Chesnut, whom ADS tapped to become Loyalty's CEO and CFO, respectively, wanted more favorable terms for Loyalty. When Horn and Chesnut objected to the size of the dividend, other ADS executives told them to "get with the program, or they would no longer be employed by ADS or [Loyalty]." R.30, PageID 334. ADS's CFO promised Chesnut that supporting the spinoff would be to his personal benefit, given that a current ADS director would chair Loyalty's board and could influence his compensation. As for Horn, ADS's chairman told him to think of it "like a kidney stone; it's painful but all you can do is wait for it to pass." *Id.*, PageID 336.

Ultimately, the board approved the spinoff as Andretta and other ADS management proposed. ADS then announced to investors that it would spin off LoyaltyOne on a tax-free basis by distributing 81% of Loyalty's shares to existing ADS stockholders. ADS would retain the remaining 19% share, through which it would receive a $750 million dividend. ADS, however, indicated that it would sell off that minority interest (valued at around $50 million) within a year to pay down its debts.

B. The purported fraud in this case stems from a series of alleged misrepresentations made to ensure the deal's success. Some of the complaint's allegations are tied to Horn, Chesnut, and the ADS defendants' allegedly withholding information about Sobeys's threatened exit from consultants, accountants, and lenders to secure financing for the $750 million payment. Others arise from Loyalty's October 2021 filing of a registration statement with the SEC to allow Loyalty's stock to be publicly traded upon the deal's completion.

As to the latter series of allegations, Loyalty's registration statement, in listing the company's "competitive strengths," read as follows: "We have maintained deep, long-standing relationships with large consumer-based businesses, including well-known worldwide brands, such as Shell Canada, Sobeys Inc., Bank of Montreal, Rewe and Albert Heijn." R.36-1, PageID 456–57 (emphasis omitted). As for risks, the statement cautioned that AIR MILES faced

"intense" competition for sponsors, which Loyalty "expect[ed] to intensify"; that Loyalty "may not be able to continue to compete successfully against current and emerging loyalty program providers"; that Loyalty's business depended on "maintaining relationships" via "fixed term[]" agreements with sponsors who "may elect an alternative provider"; and that Loyalty "depend[ed] on a limited number of large clients." *Id.*, PageID 462–64 (emphasis omitted). Loyalty further warned that its ten largest AIR MILES clients represented 55% of its revenue in 2020 and that "the loss of any of these clients could cause a significant reduction in [its] combined revenue." *Id.* at 462 (emphasis omitted). Around the same time, Loyalty filed an investor presentation with the SEC. One slide in the deck displayed Sobeys's logo among other AIR MILES sponsors and touted how Loyalty's "[s]table client base generates recurring campaign demand." R.30, PageID 344 (emphasis omitted). Loyalty incorporated these statements in subsequent SEC filings even after the spinoff.

Loyalty's November 5, 2021, spinoff went off without a hitch, with Loyalty closing its first trading day at an impressive $49.08 per share. It also paid the $750 million dividend to ADS, $650 million of which came from debt taken on by Loyalty.

That initial success, however, did not last. According to the complaint, three revelations caused Loyalty's stock price to tank. First, on February 3, 2022, Loyalty filed a Form 8-K disclosing its poor 2021 financial results, including a 7% year-over-year decline in the number of air miles issued, which Loyalty attributed to the exits of RONA and LCBO. Loyalty's stock price fell 11% as a result. Second, on April 28, 2022, Loyalty filed another Form 8-K, this time disclosing poor Q1 2022 results, which Loyalty again blamed on the two departures. The stock price fell 24% over a few days. And most consequentially, on June 7, 2022, Sobeys informed Loyalty that it would gradually exit AIR MILES starting in August. Loyalty broke the news to investors the following day, explaining that the two "were unable to align on extension terms." R.30, PageID 321. Loyalty further disclosed that Sobeys represented roughly 10% of the company's overall earnings. Loyalty's stock price fell 45% in a single day.

Stock prices aside, AIR MILES's sponsor losses severely affected Loyalty's ability to service its $650 million debt. By March 2023, Loyalty's dire circumstances caused it to file a bankruptcy petition in the Southern District of Texas. In support of that petition, Horn filed a

declaration explaining Loyalty's slide into bankruptcy, including AIR MILES's sponsor troubles before and after the spinoff, as well as the hit to BrandLoyalty's European business caused by the Russian invasion of Ukraine. Loyalty then began to liquidate its assets. In service of Loyalty's liquidating trust, the trustee commenced an adversary proceeding against ADS, seeking to claw back the $750 million dividend as a fraudulent transfer. Those proceedings remain pending. *Pirinate Consulting Grp., LLC v. Bread Fin. Holdings, Inc.*, No. 24-ap-03027 (Bankr. S.D. Tex. Sep. 10, 2025).

C. Invoking this series of events, Newtyn filed suit on its own behalf and on behalf of all other investors who purchased Loyalty's stock before the announcement of Sobeys's departure. Named as defendants were ADS, Andretta, Horn, and Chesnut. Newtyn alleged violations of § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5). Specifically, Newtyn asserted both a garden variety securities fraud claim under Rule 10b–5(b) and a "scheme liability" claim under Rule 10b–5(a) and (c). Newtyn also sought to hold defendants indirectly liable for those violations as "control[] person[s]." 15 U.S.C. § 78t(a). Newtyn has twice since amended its complaint. Newtyn's most recent pleading relied in large part on Horn's declaration in the bankruptcy proceeding as well as allegations taken from the bankruptcy trustee's adversary complaint.

Defendants moved to dismiss Newtyn's second amended complaint on the grounds that Newtyn failed to plead vital elements of its securities fraud claim, including misrepresentation, scienter, and loss causation. The district court dismissed the action, citing the absence of viable allegations supporting the misrepresentation and scienter elements of the securities fraud claim and rejecting the remaining claims. Newtyn now appeals that decision.

## II.

Familiar rules frame our review. We examine the complaint's dismissal de novo. *Operating Eng'rs' Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co.*, 43 F.4th 617, 621 (6th Cir. 2022). Save for allegations that are subject to heightened pleading requirements, we take as true Newtyn's well-pleaded factual allegations as well as any reasonable inferences derived from those allegations. We then ask whether those allegations moved Newtyn's claims

across the line from possible to plausible, thereby surviving dismissal. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In doing so, we may consider documents "referred to in the complaint" and "central to the claims contained therein," *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011), as well as "public records," *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023).

To state a viable claim for securities fraud, Newtyn must have alleged, (1) "in connection with the purchase or sale of securities," (2) "the misstatement or omission of a material fact," (3) "made with scienter," (4) "upon which the plaintiff justifiably relied" and (5) "which proximately caused the plaintiff's injury." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (citation modified). At issue here are elements two (material misrepresentation) and three (scienter).

A. Begin with element two. To plead this element, Newtyn was required to allege facts demonstrating that defendants made a false or misleading statement or omission concerning a material fact. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).

As Newtyn puts before us a range of purportedly misleading acts on the part of defendants, it bears noting that in the securities fraud setting, our precedents distinguish between different forms of deception. "Misstatements," on one hand, naturally encompass a company's affirmatively false statements. *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 608–09 (6th Cir. 2025). Literally true statements that misleadingly omit key context, known as "half-truths," can also qualify as misstatements. *Id.* "Omissions," on the other hand, refer to instances when the company chooses not to divulge new information that renders a once true statement misleading. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014). Unlike misstatements, omissions are only actionable when it comes to "hard" facts—that is, "objectively verifiable" information. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004). A company can keep quiet about newly-acquired "soft" facts—predictions, matters of opinion, and the like—until they become "virtually as certain as hard facts." *In re Omnicare*, 769 F.3d at 471 (citation modified). And even as to those "hard" facts, Rule 10b–5(b) does not punish "pure"

omissions. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 892 (2024). Unless its silence has some "particular meaning," a company that says nothing at all, no matter how significant the information withheld, does not invite a securities fraud claim. *Id.* at 890.

No matter which avenues a securities fraud plaintiff chooses to pursue, it must be precise in the way it alleges that a defendant misrepresented material facts. *See In re Omnicare*, 769 F.3d at 461 (describing the "elephant-sized boulder" plaintiffs face). This obligation flows from two sources. One is the Private Securities Litigation Reform Act, which requires the plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, for any allegations made "on information and belief," specify "all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The other is Federal Rule of Civil Procedure 9(b), which commands a plaintiff to "state with particularity the circumstances constituting fraud," save for questions of state of mind. We have understood this rule to require the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 478 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). "[G]eneral allegations" that raise the "possibility" of fraud will not do; instead Newtyn must "provide the factual predicates necessary to convince us that [the underlying fraud] in all likelihood" occurred. *United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 882 (6th Cir. 2017).

In addition to actionable misrepresentations or omissions, Newtyn must also plead materiality. In other words, even if a securities fraud plaintiff adequately alleges falsity, no liability will arise unless "a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Basic*, 485 U.S. at 232). "[V]ague, soft, puffing statements or obvious hyperbole" will not do. *In re Ford Motor Sec. Litig.*, 381 F.3d at 570.

Newtyn alleges that defendants made misrepresentations (and/or omissions) regarding two topics. First, it alleges defendants kept investors in the dark about Sobeys's exit. Second, it alleges defendants misled investors about the impact of other sponsor departures.

1.    Taking the Sobeys-related information first, Newtyn brings to our attention two instances of alleged falsity.  One is Loyalty's SEC registration statement, which promoted the AIR MILES program as having "maintained deep, long-standing relationships with large consumer-based businesses, including well-known worldwide brands, such as Shell Canada, Sobeys Inc., Bank of Montreal, Rewe and Albert Heijn."  R.30, PageID 339 (citation modified). Loyalty incorporated this statement by reference in subsequent SEC filings.  The other is information included in an ADS investor presentation given the same day Loyalty filed its registration statement.  One slide described Loyalty as having a "stable client base" that "generates recurring campaign demand," while another slide displayed Sobeys's logo among Loyalty's other clients.  *Id.*, PageID 342–44 (emphasis omitted).  Loyalty filed that presentation as a Form 8-K, and it later filed another presentation containing the same slides after the spinoff.

Newtyn maintains that these statements were misleading "half-truths" because they omitted two key facts:  that Sobeys intended to terminate its contract with Loyalty in 2022; and that Loyalty renegotiated a less favorable agreement with Sobeys in the interim.  As Newtyn tells it, because defendants opted to mention Sobeys in their public statements, they needed to tell investors what was going on with Sobeys behind the scenes.

We disagree.  The Sobeys-related statements instead amount to little more than the type of puffery that is ubiquitous in the corporate world.  "[R]osy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace" like those Newtyn cites are at best immaterial misstatements.  *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (quoting *In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570–71).  That type of corporate speak is predictable, with corporate leaders "expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994).  Yet nothing in our securities jurisprudence demands that corporations treat every glass as half empty. *See id.* ("People in charge of an enterprise are not required to take a gloomy, fearful[,] or defeatist view . . . .").  Nor would we expect a reasonable investor to base their investment decisions on "vague," "loosely optimistic statements." *Ind. State Dist. Council*, 583 F.3d at 944. The statements at issue here are thus a poor basis on which to mount a securities fraud claim.

Consider, on that note, the Second Circuit's decision in *In re Synchrony Financial Securities Litigation*, 988 F.3d 157 (2d Cir. 2021).  Like here, Synchrony, in a Form 10-K, touted its "longstanding and collaborative relationships with [its] partners, including . . . well-known consumer brands, such as Lowe's, *Walmart*, Amazon, and Ashley Furniture HomeStore."  *Id.* at 173 (emphasis added).  Even though Synchrony's relationship with Walmart had begun to fray by the time the 10-K was submitted to the SEC, *id.* at 163–64, the appeals court deemed this statement "too vague" to support a securities fraud claim, *id.* at 173.  If anything, the court reasoned, investors should expect that a company will take "a generally optimistic view of the state of business partnerships."  *Id.*; *see In re Express Scripts Holding Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (mem.) (deeming as puffery a description of a fraying client relationship as "great" and "very, very solid").

So too here.  Defendants described Loyalty's "client base" as "stable" and listed Sobeys among those businesses with which Loyalty had "maintained deep, long-standing relationships."  That is little more than a sunny portrayal of Loyalty's business model, not a substantive analysis of the AIR MILES program's sponsor relationships.  In particular, nothing in that statement amounted to a pronouncement on the then-current status of Sobeys's contract.  These are the sorts of "loosely optimistic" and "rosy affirmation[s]" upon which no reasonable investor would rely.  *Ind. State Dist. Council*, 583 F.3d at 944.

Even if we overlooked Newtyn's materiality problem, that defendants waited to disclose Sobeys's withdrawal from the AIR MILES program until Sobeys gave formal notice of its departure did not render any of their statements misleading.

Start with the investor presentation.  One slide, which featured Sobeys's logo along with those of other Loyalty clients, touted how Loyalty's "[s]table client base generates recurring campaign demand."  R.30, PageID 343.  As defendants point out, that "stable client base" does not refer to AIR MILES or even Loyalty overall, but rather to BrandLoyalty, the other wing of Loyalty's business.  Recall that only BrandLoyalty's business model—short-term rewards campaigns for retailers—has anything to do with "recurring campaign demand."  AIR MILES, by contrast, depended on three-to-five-year contracts.  So defendants' interpretation appears to be correct.  True, as Newtyn emphasizes, we must make all reasonable inferences in its favor.

*See Forman*, 40 F.4th at 450.  Yet Newtyn does not explain how it is reasonable to assume that investors interpreted the slide contrary to a more common understanding.  *See Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).  As for defendants' use of Sobeys's logo throughout the presentation, because Sobeys was, in fact, an AIR MILES sponsor at the time, it was not misleading for defendants to identify Sobeys as such.

Now turn to the other alleged misstatement—that AIR MILES "ha[d] maintained deep, long-standing relationships" with sponsors like Sobeys.  R.30, PageID 338–39 (emphasis omitted).  Again, as Sobeys was and had long been an AIR MILES sponsor throughout this time, this snippet from Loyalty's registration statement is not false in a literal sense.  Nonetheless, Newtyn contends that the statement gave the misleading impression that Sobeys would not exit the AIR MILES program soon thereafter.

Would a reasonable investor have inferred such a promise?  We do not believe so. Generally speaking, "a company's disclosure of accurate historical data" typically does not give rise to liability "even if less favorable results might be predictable in the future." *Sofamor Danek*, 123 F.3d at 401 n.3 (citation modified).  So defendants' accurate "portrayals of the status" of Loyalty's business at the time would not have misled a reasonable investor as to "potential" "termination or modification of its contract[s]." *Zaluski United Am. Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008); *see also River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, No. 17-cv-9193, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019) (citing *Sofamor Danek*, 123 F.3d at 401 n.3) ("[H]istorical statements of fact regarding its [client] contract, past success in contract renewal negotiations, and status as a trusted provider" are "nonactionable." (citation modified)).

A wrinkle here is that Loyalty chose to use the words "deep" and "long-standing," adjectives that hint at a certain stickiness to Loyalty's relationship with Sobeys, or at least some continuity into the near future.  Reading the statement in isolation, it might be difficult to decide which party's preferred inference is most likely.  That alone bodes ill for Newtyn given its heightened pleading obligations.  *See Hirt*, 846 F.3d at 881.  And reading the statement "in context," as we must, makes this an even easier call.  *Kolominsky v. Root, Inc.*, 100 F.4th 675, 686 (6th Cir. 2024).  Multiple cautionary warnings in the registration statement disclosed that the

AIR MILES program could face sudden sponsor troubles.  Case in point, Loyalty warned that its business depended on "maintaining relationships" via "fixed term[]" agreements with sponsors who "may elect an alternative provider" at the end of their terms; that it faced "intense" competition for sponsors and "expect[ed] it to intensify"; and that Loyalty "may not be able to continue to compete successfully against current and emerging loyalty program providers." R.38-2, PageID 771–72 (emphasis omitted).  To the extent one can view the remark about the "deep" relationship Loyalty "ha[s] maintained" with Sobeys as forward-looking, *id.*, PageID 834, defendants coupled it with "meaningful cautionary language."  *Kolominsky*, 100 F.4th at 688.  All things considered, no fair investor would read the registration statement as guaranteeing the safety of any one sponsor, Sobeys included.

Alternatively, Newtyn points to the fact that Sobeys forced Loyalty to accept an unfavorable contract renegotiation in March 2021, months before defendants pitched the spinoff to investors.  So even if defendants did not need to warn of Sobeys's future exit in their registration statement or investor presentations, Newtyn explains, defendants' failure to disclose the existing developments with Sobeys turned their statements into misleading half-truths.

We disagree.  When it comes to alleged half-truths, a statement cannot be misleading when the words spoken and the facts omitted operate on different "levels of generality."  *In re Omnicare*, 769 F.3d at 484.  Put simply, the omitted facts must have a reasonably close fit to what defendants disclosed.  *Contrast Helwig v. Vencor, Inc.*, 251 F.3d 540, 554–56 (6th Cir. 2001) (en banc) (stating that the company was "comfortable" with profit predictions required disclosure of internal reports that directly contradicted those predictions), *and City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) (stating confidence in safety of tires required disclosure of evidence demonstrating lack of safety), *with Zaluski*, 527 F.3d at 574 (stating general facts about a contract with key customer did not require disclosure of illegal payments that resulted in the contract's termination).  Here, Newtyn accuses defendants of failing to disclose that Loyalty agreed to cut Sobeys's annual fee in exchange for Sobeys extending its exit window from the AIR MILES program.  Contrast that with Loyalty's loosely optimistic remarks about its "stable client base" and "deep, long-standing relationships" with its sponsors, which included Sobeys.  R.30, PageID 313, 344 (emphasis omitted).  Those generic

remarks would not cause a reasonable investor to infer anything about the terms of Loyalty's specific contractual relationships.  For instance, it is not as though defendants endeavored to "speak[] on [the] emerging issue" with Sobeys.  *Helwig*, 251 F.3d at 560.  True, as Newtyn highlights, ADS had represented in early 2020 that its contract with Sobeys would expire in 2024.  Reply Br. 9 n.3.  But Newtyn's operative complaint never alleged that defendants committed a material omission by failing to correct *that* statement, and Newtyn cannot expand its legal theory at this late date.  *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011– 12 (6th Cir. 2022).  As to the statement at issue here—Loyalty's mere mention of Sobeys—it is too general to have misled investors about the contract terms.

2.  The remainder of Newtyn's cited statements are tied to the exits of other top sponsors (namely, Rexall, RONA, and the LCBO) from the AIR MILES program.  Newtyn zeroes in on the registration statement's warning that the AIR MILES program's "10 largest clients represented 55% and 46%, respectively, of [its] combined revenue" for 2020 and 2019, and that "the loss of any of these clients could cause a significant reduction in [Loyalty's] revenue." R.30, PageID 341 (emphasis omitted).  From these assertions, Newtyn derives four arguments.

First, Newtyn claims that the exits of three of AIR MILES's ten largest sponsors made it misleading for Loyalty's registration statement both to describe Loyalty's top sponsor relationships as "long[-]standing" and to highlight the 25-year average tenure of AIR MILES's top six sponsors.  Newtyn Br. 37.  As to the former, those words, as already explained, constitute non-actionable puffery.  *See Synchrony*, 988 F.3d at 173.  And in any event, the registration statement mentions its "long-standing" client ties only *generally*, and not in reference to its ten largest sponsors specifically, a discussion that occurs elsewhere.  R.38-2, PageID 834.  As to the latter, Newtyn does not dispute the assertion that Loyalty's top six AIR MILES sponsors in fact had an average 25-year tenure.  Accurate statements of historical fact like this are not actionable. *See Sofamor Danek*, 123 F.3d at 401 n.3.

Second, Newtyn, after acknowledging that Rexall, RONA, and the LCBO's departures in late 2020 and early 2021 had been publicly reported, nonetheless argues that defendants never revealed that this trio of exiting sponsors "were three of Loyalty's crucial top 10 sponsors" during that time.  Newtyn Br. 38 (emphasis omitted).  A savvy investor undoubtedly would have

liked to know as much. But Rule 10b–5(b), remember, demands disclosure only to the extent needed to render "statements made [not] misleading," regardless of the information's importance. *Macquarie*, 144 S. Ct. at 892. And on that front, Newtyn does not point to any statements supposedly infected by defendants' non-disclosure. If anything, that defendants "never identified who the top 10 [sponsors] were," Newtyn Br. 39, confirms that Loyalty made no representations about the ten largest AIR MILES sponsors by which investors could have been misled.

Third, Newtyn targets Chesnut's comments about the LCBO and RONA exits. During an investor Q&A, an analyst inquired about the sponsor turnover. In explaining the motivations behind the exits of LCBO and RONA, Chesnut assured that AIR MILES's "biggest partners" in banking, grocery, and gas still "represent north of 2/3 of all MILES issued," and promised to "focus on delivering . . . new sponsors." R.30, PageID 351–52 (emphasis omitted). As Newtyn tells it, Chesnut's answer "misleadingly downplayed" the significance of the losses. Newtyn Br. 39 (emphasis omitted). But Newtyn does not claim that Chesnut's "2/3" figure was wrong. Nor did Chesnut's remark imply that LCBO and RONA's exits would *not* have the negative effects Loyalty's registration statement foreshadowed. Rather, Newtyn's gripe seemingly boils down to the fact that Chesnut did not "take a gloomy, fearful, or defeatist view" of Loyalty's future. *Shields*, 25 F.3d at 1129. But optimism alone is not a fair basis for asserting securities fraud. Newtyn also alleges that Chesnut misleadingly implied that LCBO and RONA were not among Loyalty's "biggest partners." Newtyn Br. 40 n.6. Yet even if he had implied as much, which is not obvious from his statement, the fact that LCBO and RONA were top 10 sponsors does not necessarily mean they were Loyalty's "biggest partners." So Chesnut's statement cannot support Newtyn's claim.

Fourth, Newtyn takes issue with the registration statement's warning that "the loss of any [top 10] clients could cause a significant reduction" in revenue. R.36-1, PageID 462 (emphasis omitted). As Newtyn sees it, this language was misleading because the warned-of risk "had already materialized." Newtyn Br. 42 (emphasis omitted). Setting aside the fairly generic nature of this statement, it bears noting that risk disclosures in SEC filings are "inherently prospective in nature." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (citation

modified).  So the use of future tense in a risk disclosure, standing alone, would not cause a reasonable investor to infer anything about the present.  Said differently, Loyalty's warning that top sponsors could exit the AIR MILES program does not falsely impart that top sponsors have not departed.  We appropriately do not deem "cautionary statements . . . actionable" in instances where a plaintiff claims that "defendants should have disclosed risk factors *are* affecting financial results rather than *may* affect financial results."  *Kolominsky*, 100 F.4th at 689 (citation modified).

All told, Newtyn failed to allege a single materially false statement or omission.  This alone dooms Newtyn's Rule 10b–5(b) claim.

B.  Even had Newtyn identified an actionable misrepresentation, we agree with the district court that Newtyn did not adequately allege scienter.  Scienter refers to the "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).  To overcome a motion to dismiss, a securities fraud plaintiff must plausibly allege that the defendant acted with either (1) "knowing and deliberate intent to manipulate, deceive, or defraud," or (2) "recklessness."  *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016).  When the alleged misstatements concern "soft information," however, the bar is even higher:  Only full knowledge of the "misrepresented or omitted facts" will suffice.  *In re Omnicare*, 769 F.3d at 472.

Pleading scienter under the PSLRA is a tall order.  For "each act or omission alleged," a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  We employ a three-step process to measure whether a "strong inference" exists.  *Tellabs*, 551 U.S. at 322–23.  As with any Rule 12(b)(6) motion, we begin by accepting as true the complaint's plausible allegations of fact.  *Id.* at 322.  Then, we look at the facts "collectively," consulting not just the complaint but also the documents referenced by the complaint and any matter of which we may take judicial notice.  *Id.* at 322–23.  Finally, we consider any "plausible opposing inferences."  *Id.* at 323.  If the inference of scienter is "cogent and at least as compelling" as any benign explanation, the plaintiff has established a "strong" inference.  *Id.* at 324.  But if the plaintiff's inference is not "strong in light of other explanations," the claim cannot go forward.  *Id.*

In implementing this standard, we sometimes look at nine non-exclusive factors for determining whether to infer that a defendant acted with intent to deceive. *See Helwig*, 251 F.3d at 552 (listing factors). Using that framework here, of the nine, Newtyn emphasizes just three on appeal: "divergence between internal reports and external statements on the same subject"; "evidence of bribery by a top company official"; and "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552).

At the outset, it bears noting the nature of Newtyn's scienter allegations. Newtyn's complaint borrows extensively from the adversary complaint filed against ADS in bankruptcy court (especially with respect to scienter). To take just one example, the alleged instances of bribery and threats directed at Horn and Chesnut in furtherance of the purported fraud come straight from the adversary complaint. As the district court rightly observed, however, the adversary complaint is not "a neutral party's assessment of the facts," as the document, like the complaint here, was crafted from an adverse perspective. *Newtyn Partners LP v. All. Data Sys. Corp.*, No. 23-cv-1451, 2025 WL 872967, at *19 (S.D. Ohio Mar. 20, 2025). And, it bears adding, the allegations from the adversary complaint are unproven. For these reasons, the district court determined that Newtyn's borrowed allegations did not "significantly contribute" to scienter. *Id.*

We share the district court's view. As required by the Federal Rules of Civil Procedure, every signed pleading carries a representation that it has been prepared "on the basis of the best" of its proponent's "'knowledge, information, and belief.'" 5 *Wright & Miller's Federal Practice & Procedure* § 1224 (3d ed. 2012) (quoting Fed. R. Civ. P. 11(b)). We view this command as imposing a "personal, non-delegable responsibility" on lawyers to investigate facts they include in a complaint, *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989), even if other lawyers have already done so, *see Murphy v. Plain Dealer Publ'g Co.*, 961 F.2d 1578, 1992 WL 102579, at *2 (6th Cir. 1992) (table) (per curiam); *see also Val-Land Farms, Inc. v. Third Nat'l Bank in Knoxville*, 937 F.2d 1110, 1117–18 (6th Cir. 1991). But what if some facts remain outside the pleader's firsthand knowledge despite best efforts? In those circumstances, we allow pleading "on information and belief" if "information furnished by others" gives "sufficient data

to justify interposing an allegation on the subject." *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447–48 (6th Cir. 2014) (citation modified) (quoting *Wright & Miller*, *supra*, § 1224).

That nuance comes to the fore here, where it appears on the face of Newtyn's pleading that the facts underlying the adversary complaint's assertions go beyond Newtyn's direct personal knowledge, and Newtyn has not otherwise claimed to have verified those assertions. To be sure, Newtyn's complaint frames the contentions in the adversary complaint as based on "numerous internal ADS and LoyaltyOne documents." R.30, PageID 323. Yet nowhere does Newtyn identify what those documents were, let alone claim to have seen them. At bottom, then, Newtyn's borrowed snippets from the adversary complaint are based on an interested party's spin on information that Newtyn apparently does not know for itself.

With that in mind, we find it proper to construe Newtyn's secondhand allegations as in the nature of "information and belief." *Starkey*, 573 F. App'x at 447–48 (citing *Wright & Miller*, *supra*, § 1224); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 179–80 (2d Cir. 2015). The PSLRA, however, places special limitations on that style of pleading such that "allegations rest[ing] on mere 'information and belief' . . . cannot support a strong inference of scienter." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (citing 15 U.S.C. § 78u-4(b)(1)); *see In re Omnicare*, 769 F.3d at 481–82. In this setting, courts agree that unproven allegations clipped from other complaints do little, if anything, to establish scienter. *See, e.g.*, *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1262–63 (N.D. Cal. 2015) (collecting cases); *Touchstone Strategic Tr. v. Gen. Elec. Co.*, No. 19-cv-1876, 2022 WL 4536800, at *2–4 (S.D.N.Y. Sep. 28, 2022); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013); *In re Apollo Grp., Inc. Sec. Litig*, No. cv-10-1735, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011). Newtyn's sweeping reliance on the adversary complaint alone thus deeply undermines its claim on scienter grounds.

1. Even if we look past that deficiency, Newtyn's allegations still do not add up to a strong inference of scienter. Start with the "divergence between internal reports and external statements" aspect of our scienter analysis. *Doshi*, 823 F.3d at 1039 (quoting *Helwig*, 251 F.3d at 552). On this point, the parties dispute whether "Sobeys'[s] exit was preordained for 2022," Newtyn Br. 44, or still the subject of "ongoing negotiati[ons]" when defendants spoke to the

public, ADS Br. 20. If the former, then defendants' withholding of "hard," "objectively verifiable" information widens the gap between what they said and what they knew. *City of Monroe*, 399 F.3d at 669 (quoting *Sofamor Danek*, 123 F.3d at 401). But if Sobeys's exit was merely a "potential consequence" of negotiations, *Zaluski*, 527 F.3d at 574, then defendants' promotion of the Sobeys relationship was "not so obviously misleading" as to support a strong inference of scienter, *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 685 (6th Cir. 2003).

We agree with the district court that Newtyn's allegations do not plausibly show that Sobeys's exit was a done deal. As the story goes, Sobeys informed ADS in late 2020 "that it was considering exercising its early termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program." R.51-2, PageID 1573. In early 2021, "Sobeys relayed its intention to terminate [its contract] by the end of 2022." R.30, PageID 316 (alterations in original) (emphasis omitted). That prompted ADS to renegotiate. In March of that year, ADS and Sobeys arrived at an amended contract, which delayed Sobeys's early exit window from July 2021 to July 2022. In exchange, ADS agreed both to a 50% discount on its annual fee and to accelerate the contract's standard expiration date from April 2024 to February 2023. That Sobeys received an adjustment to the overall contract length (presumably at its urging) strongly implies that Sobeys was not necessarily bent on exiting AIR MILES before the end of 2022. Nor, we note, does Newtyn allege that Sobeys reaffirmed its intent to leave after the March 2021 amendment. By all accounts, it was not until more than a year later—in June 2022—that Sobeys definitively declared that it would exercise its early termination rights and begin exiting the program. Loyalty then announced to the public that it and Sobeys were "unable to align on extension terms." R.30, PageID 331. All of this suggests that Sobeys's exit was not a done deal until mid-2022.

Newtyn marshals several counterpoints. To start, it contends that ADS board members knew Sobeys "had not retracted [its] statement that it intended to terminate . . . in 2022." Newtyn Br. 31 (citing R.30, PageID 336–37). Yet Sobeys, remember, made that threat before the renegotiations. While Sobeys did not provide assurances that it would stay, it likewise did not say that the newly negotiated terms were unsatisfactory. In the end, that allegation does not cut either way.

Next, Newtyn emphasizes that ADS internally analyzed the potential effects of a Sobeys exit. Again, although this fact reflects that Sobeys never gave assurances to ADS, defendants' consideration of worst-case scenarios does not mean they thought the exit was certain. Prudence would dictate such considerations in any event.

Along these same lines, Newtyn also highlights that Sobeys had been preparing to join a competing loyalty program in coordination with several other companies. This reality, to be sure, hints at the possibility that Sobeys did not intend to stay with AIR MILES. Yet Newtyn does not allege that defendants knew as much at the time.

Citing a handful of cases, Newtyn suggests that we can infer scienter here because ADS plainly concealed the loss of a key client (or clients). But in those cases, negotiations between the company and client had all but broken down. *Contrast Wallace v. IntraLinks*, No. 11-cv-8861, 2013 WL 1907685, at *8 (S.D.N.Y. May 8, 2013) (executive "refus[ed] to renegotiate" with customer, and customer "respon[ded] that it would seek alternative providers"), *and In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013) (defendants knew of "a major customer's repudiation of its long-term contract"), *with In re Express Scripts Holding Co. Sec. Litig.*, No. 16-civ-3338, 2017 WL 3278930, at *18–19 (S.D.N.Y. Aug. 1, 2017) (distinguishing *Hi-Crush* because "it was just as likely that [defendant] believed that . . . [the client's] ongoing negotiating positions . . . would ultimately result in a negotiated agreement"). Here, the complaint is largely silent as to whether Loyalty and Sobeys continued to speak after the March 2021 negotiations. What light the complaint does shed suggests that the two had made at least some attempt to "align on extension terms." R.30, PageID 331. So it is just as likely (if not more) that Loyalty knew it was losing its grip on Sobeys but still believed it could "win[] Sobeys back" before it finally committed to leaving AIR MILES. Adversary Compl., No. 23-90111, Dkt. 339 ¶ 85 (Bankr. S.D. Tex. Feb. 20, 2024).

Falling back, Newtyn raises a more modest point: Even if not "preordained," the Sobeys situation at the least signaled "tough times" ahead, which diverged from defendants' positive public statements. Newtyn Br. 44–46 (quoting *Helwig*, 251 F.3d at 563). That point, although well-taken, does not carry the day. For one, it is not as though defendants' statements were pollyannish; Loyalty's registration statement, remember, warned investors that, among other

things, increasing competition from other loyalty programs could result in key sponsor losses. For another, "a disparity [in] levels of generality" between a company's "internal reports and external statements" diminishes the inference of scienter, even if the statements were "objectively false." *In re Omnicare*, 769 F.3d at 484. As noted above, defendants' loosely positive statements were general in nature (so much as to be puffery). So even if these statements did mislead investors, they do not appear to have been ill-intended. For another still, defendants' decision to hold off on disclosure until Sobeys formally announced its exit complied with Item 1.02 on the SEC's 8-K disclosure checklist. *See* Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, 69 Fed. Reg. 15594, 15620 (Mar. 25, 2004) (permitting non-disclosure "unless and until the agreement has been terminated"). This regulatory guidance, we recognize, does not provide a safe harbor for materially misleading statements. *Id.* at 15606–07. That said, defendants' adherence to the line drawn by regulation suggests an intent to comply with their disclosure obligations, not to mislead.

Lastly, on "divergence," Newtyn argues that Loyalty's internal reports were inconsistent with its public statements because the latter did not reveal RONA, LCBO, and Rexall's identity as top 10 sponsors. The thrust of this objection is that defendants supposedly left investors in the dark about the impact of those departures. That said, we note that Newtyn does not claim that defendants provided inaccurate quarterly financial reports. It is thus difficult to believe that defendants intended to conceal the significance of the three departures while fully disclosing their economic effects. All told, the "divergence" factor gestures if at all only weakly toward an inference of scienter.

2. Turn next to the remaining scienter considerations highlighted by Newtyn: "bribery" and defendants' "motivation" to save "salaries or jobs." *Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). Newtyn makes much of the fact that fellow ADS executives told Horn and Chesnut to "get with the program, or they would no longer be employed by ADS [or Loyalty Ventures]." R.30, PageID 334 (emphasis omitted) (alterations in original). Newtyn insists that this demand came after Horn and Chesnut refused to lie to lenders. The complaint, however, does not tie that quote to any one exchange. To the contrary, the complaint reveals that Horn's and Chesnut's conflict with other ADS executives stemmed from the $750 million payment to

ADS.  Seeing as Horn and Chesnut were expected to lead Loyalty, that they would fight with ADS over the payment's size is neither surprising nor suspicious.  *See In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 868 (W.D. Ky. 2014) ("All members of senior management wish to see their corporations prosper and their personal reputations improve."), *aff'd sub nom.*, *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015).

Newtyn also highlights that ADS's CFO told Chesnut it would be "beneficial" to go along with the spinoff, as a member of the ADS board would serve as chairman of Loyalty and could "influence" Chesnut's compensation.  R.30, PageID 335–36 (emphasis omitted).  But this purported improper enticement contemplated Chesnut "falling in line" with "delivering at least $750 million" to ADS in the spinoff—again in reference to the payment, which defendants disclosed to investors.  *Id.*, PageID 335.  Because generic self-interest does not "bolster an inference of scienter" unless specifically tied to fraudulent acts, this incident does not arouse suspicion of fraud.  *Pittman v. Unum Grp.*, 861 F. App'x 51, 57 (6th Cir. 2021) (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018)).

Finally, Newtyn theorizes that defendants had motive and opportunity to defraud investors.  As Newtyn tells it, ADS, faced with a "staggering $5 billion in debt," "badly needed" a payout.  Newtyn Br. 50.  So defendants assertedly launched the spinoff to pocket $750 million while ridding itself of a faltering business.  That Loyalty could not carry that financial load was no issue for ADS, Newtyn says, because defendants tricked lenders and investors into accepting the spinoff.  In other words, Newtyn alleges, defendants spun off Loyalty knowing it would soon fail.

Defendants' stock holdings, however, tell a different story.  In November 2021, just as after the spinoff, Horn filed multiple Forms 4 with the SEC reflecting that he had acquired shares in Loyalty worth roughly $475,000.  Chesnut likewise disclosed that he had purchased shares worth $50,000 on May 4, 2022—just a month before Sobeys announced its exit.  Even one ADS director who had clashed with Horn and Chesnut over the spinoff joined Loyalty's board and purchased $165,000 in Loyalty stock.  What is more, Loyalty itself retained a 19% stake in Loyalty, valued at $50 million.  These decisions would make little sense if defendants believed Loyalty's stock was destined to crater.

Newtyn fails to blunt this innocent inference. To start, its request that we ignore the Forms 4 as unfit for judicial notice, is at odds with the understanding that we generally "consider the full text of . . . SEC filings . . . even if not attached" to the complaint when deciding Rule 12(b)(6) motions. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001). And Forms 4—mandatory filings that reflect a corporate insider's stock purchases—seem more than appropriate to account for when evaluating defendants' scienter. *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019) (considering Forms 4); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 969–70 (S.D. Ohio 2009) (same).

As for ADS's minority interest in Loyalty, Newtyn points to ADS "suspiciously" entering into a Rule 10b5-1 plan to monetize its stake starting in June 2022. Reply Br. 18. But "ADS had made clear to investors" from the start "that it intended to monetize" its minority interest "within [the] year." R.30, PageID 360. And the timing of ADS's plan, if anything, seems far from suspicious. ADS knew that Sobeys could begin exiting in July 2022 with 30 to 70 days' written notice. Had ADS believed that such an announcement was impending, it picked the worst time to put its shares up for sale on the market. Indeed, if ADS thought Loyalty was a melting ice cube, it begs the question: Why did it retain a stake in Loyalty in the first place?

Moving on from stock purchases, Newtyn offers an assortment of other evidence purportedly showing that defendants knew Loyalty would fail. First, Newtyn points to Horn's bankruptcy declaration, where he described the factors that contributed to Loyalty's difficulties. But Horn's hindsight account of what did happen says little about what Horn thought would happen. Second, Newtyn emphasizes Horn's dispute with ADS personnel over the spinoff. Horn complained that it "simply required too much debt for [Loyalty] to service," to which one ADS director replied, "[T]hink of it like a kidney stone; it's painful, but all you can do is wait for it to pass." R.30, PageID 334–36 (emphasis omitted). Newtyn takes this comment to mean that ADS knew of "Loyalty's impending failure." Newtyn Br. 53. But the analogy conveys just the opposite by indicating that any financial pain, though difficult, would be temporary. Third, Newtyn argues that the ADS board "openly contemplate[d] a near-term bankruptcy of [Loyalty]." Newtyn Br. 16 (emphasis omitted) (citing R.30, PageID 337). But the allegations here reveal at most one ADS director asking whether the spinoff's tax-free treatment would

change if Loyalty went bankrupt. That a corporate director would entertain worst-case scenarios before agreeing to a deal does not imply that ADS thought bankruptcy was likely.

To sum up, Newtyn seeks to establish a "strong inference" that defendants—seeking to pocket some cash for ADS and slough off a failing business—concocted a scheme to dupe lenders and investors into accepting the spinoff, knowing that AIR MILES's sponsor troubles spelled doom for Loyalty. Although Newtyn has alleged some facts consistent with that narrative, recall that Newtyn's inference of wrongdoing must be "cogent," "compelling," and "strong in light of other explanations." *Tellabs*, 551 U.S. at 324. And here, the full range of particulars, "taken collectively," *id.* at 323, supports a more innocent explanation. Again, ADS was in a tough spot. Having racked up $5 billion in debt, it needed a way to raise money. Ultimately, ADS settled on parting with its side businesses. ADS sought to spin off Loyalty as a standalone company in exchange for a cash payment. Naturally, the ADS and soon-to-be Loyalty teams clashed over the size of the payment. Even though ADS needed the money, Loyalty did not need the debt, meaning a difficult tradeoff had to be made. ADS finally settled on a plan for the spinoff, which defendants fully disclosed. To be sure, Loyalty's AIR MILES program faced fierce competition. But defendants disclosed that too. And ADS and its management did not regard either of these challenges as insurmountable, even backing their belief that Loyalty would succeed with investments in the stock market.

In the end, of course, the sponsor troubles plaguing AIR MILES combined with shocks to Loyalty's BrandLoyalty segment proved too much to bear. Defendants came up short of their goals. So did Newtyn, whose bet on Loyalty did not pan out. While Newtyn's lament is understandable, that things did not work out for Loyalty does not mean defendants knew the company would fail, let alone that they intended to defraud its investors.

III.

As an alternative to its Rule 10b–5(b) claim, Newtyn alleged scheme liability under Rule 10b–5(a) and (c). Together, those provisions proscribe "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5(a), (c). While that

language contemplates liability for more than just false statements, *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005), there is "considerable overlap" between a typical Rule 10b–5(b) claim and scheme liability, *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019). We have previously cited the Second Circuit's articulation of scheme liability's elements: "To state a scheme liability claim, a plaintiff must show[] (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) (quoting *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)).

The district court dismissed Newtyn's scheme liability theory because it "relie[d] on the same basic facts" as Newtyn's Rule 10b–5(b) theory. *Newtyn*, 2025 WL 872967, at \*20. Newtyn disputes this. In its view, its allegations that defendants deceived lenders, credit agencies, and consultants to affect the spinoff stand apart from Newtyn's main theory, which centered on defendants' purported deception of the public directly. But as we read the complaint, all of the allegedly false statements directed to these third parties concerned the same subject matter as defendants' statements to investors, namely, concealment of Sobeys's exit. Because we have found that Newtyn failed to allege scienter with respect to essentially mirroring misrepresentations, "[t]he same analysis" and ultimate conclusion applies here. *Teamsters*, 83 F.4th at 533.

### IV.

Finally, Newtyn brought a "control person" theory under 15 U.S.C. § 78t(a). Control person liability is not a standalone cause of action, however, but rather a form of indirect liability for those who "controlled" the direct violator. 15 U.S.C. § 78t(a). Accordingly, this claim survives only if Newtyn had alleged a "primary violation of the securities laws." *Doshi*, 823 F.3d at 1045 (citing *Ind. State Dist. Council*, 583 F.3d at 947). Because Newtyn failed to do so, the district court correctly dismissed this claim.

\*        \*        \*        \*        \*

We affirm.