# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS, <br><br> Defendants. | Civil Action No. 3:23-cv-01250 <br><br> <u>CLASS ACTION</u> <br><br> Judge Aleta A. Trauger <br><br><br> THIRD CONSOLIDATED AMENDED COMPLAINT |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ..................................................................................... 2

II. JURISDICTION AND VENUE ............................................................................. 13

III. PARTIES ............................................................................................................... 14

    A. Lead Plaintiffs .............................................................................................. 14

    B. Defendants .................................................................................................... 14

IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME TO DECEIVE
AND MISLEAD INVESTORS .............................................................................. 19

    A. Background On Dollar General ..................................................................... 19

    B. Contrary to Defendants' Public Representations, Multiple Former
Employees Confirmed That Dollar General Lacked Basic Inventory
Controls And Suffered From A Serious Excess Inventory Problem ..................... 22

        1. Defendants Touted Dollar General's Inventory Quality And
Controls .................................................................................................. 22

        2. Former Dollar General Employees Reported Serious Inventory
Control Failures And Massive Excess Inventory Problems ..................... 23

    C. Multiple Former Employees Confirmed That Dollar General Failed To
Properly Account For Inventory, Including Inventory That Was
Improperly Thrown Into Dumpsters ..................................................................... 54

    D. Defendants' Refusal To Invest In The Company's Workforce And
Chronic Understaffing At Dollar General Stores Exacerbated The Excess
Inventory Problems Plaguing The Company ........................................................ 65

    E. The Company's Excess Inventory And Chronic Understaffing Created
Unsafe Working Conditions And Resulted In Numerous Regulatory
Violations ............................................................................................................. 73

    F. The Company's Chronic Understaffing And Inventory Control Problems
Also Gave Rise To Pricing Discrepancies That Sparked Regulatory
Investigations And Penalties ................................................................................. 81

V. THE TRUTH GRADUALLY EMERGES .............................................................. 84

    A. Dollar General's 3Q22 Adverse Financial Results Announced on
December 1, 2022 ................................................................................................. 85

i

B.    Dollar General's Adverse February 23, 2023 Earnings Press Release ................. 87

C.    Dollar General's Adverse 4Q22 and FY22 Results Announced On March 16, 2023 ........................................................................................................ 88

D.    Dollar General's Adverse 1Q23 Results Announced On June 1, 2023 ................ 91

E.    Dollar General's Adverse 2Q23 Results Announced On August 31, 2023 .......... 93

F.    Dollar General Terminates Defendant Owen And Rehires Defendant Vasos ...................................................................................................... 98

G.    Dollar General's 3Q23 Results Announced On December 7, 2023 ..................... 98

H.    Dollar General's Adverse 4Q23 And Fiscal Year 2023 Results Announced On March 14, 2024 ...................................................................................... 101

I.    Dollar General's Adverse 1Q24 Results Announced On May 30, 2024 ............ 104

J.    Dollar General's Adverse 2Q24 Results Announced On August 29, 2024 ........ 108

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING  STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................... 111

A.    Defendants' Material Misstatements And Omissions Concerning Inventory .................................................................................................. 111

    1.    Defendants' Recurring Misstatements Regarding Inventory Management And Controls ................................................................... 111

    2.    May 28, 2020 Inventory Misstatements (1Q20 Earnings Period). ......... 122

    3.    August 27, 2020 Inventory Misstatements (2Q20 Earnings Period) ...... 123

    4.    September 9, 2020 Inventory Misstatements (Barclays Conference) ..... 124

    5.    September 10, 2020 Inventory Misstatements (Goldman Sachs Conference) .................................................................................. 125

    6.    December 3, 2020 Inventory Misstatements (3Q20 Earnings Period) .................................................................................................. 127

    7.    March 18-19, 2021 Inventory Misstatements (4Q20 Earnings Period) .................................................................................................. 128

    8.    May 27, 2021 Inventory Misstatements (1Q21 Earnings Period) .......... 129

    9.    August 26, 2021 Inventory Misstatements (2Q21 Earnings Period) ...... 130

10. September 8, 2021 Inventory Misstatements (Barclays Conference)..... 132

11. December 2, 2021 Inventory Misstatements (3Q21 Earnings Period)................................................................................................ 133

12. March 17-18, 2022 Inventory Misstatements (4Q21 Earnings Period)................................................................................................ 134

13. May 26, 2022 Inventory Misstatements (1Q22 Earnings Period) .......... 136

14. August 25, 2022 Inventory Misstatements (2Q22 Earnings Period)...... 137

15. December 1, 2022 Inventory Misstatements (3Q22 Earnings Period)................................................................................................ 140

16. February 23, 2023 Inventory Misstatements (4Q22 and FY22)............. 142

17. March 16, 2023 Inventory Misstatements (4Q22 and FY22)................. 143

18. March 24, 2023 Inventory Misstatements (4Q22 and FY22)................. 145

19. June 1, 2023 Inventory Misstatements (1Q23 Earnings Period) ............ 146

20. December 7, 2023 Inventory Misstatements (3Q23 Earnings Period)................................................................................................ 147

21. March 14 and 25, 2024 Inventory Misstatements (4Q23 and Fiscal Year 2023 Earnings Period)................................................................. 149

22. May 30, 2024 Inventory Misstatements (1Q24 Earnings Period) .......... 151

B. Defendants' Staffing-Related Misstatements ................................................... 152

1. Recurring Staffing Material Misstatements And Omissions Throughout the Class Period................................................................. 152

2. August 27, 2020 Staffing Misstatements (2Q20 Earnings Period)......... 157

3. December 3, 2020 Staffing Misstatements (3Q20 Earnings Period)...... 157

4. May 26, 2021 Staffing Misstatements (Shareholder Meeting).............. 158

5. May 27, 2021 Staffing Misstatements (1Q21 Earnings Period)............. 159

6. September 8, 2021 Staffing Misstatements (Barclays Conference) ....... 159

7. December 2, 2021 Staffing Misstatements (3Q21 Earnings Period)...... 160

8. March 17-18, 2022 Staffing Misstatements (4Q21 Earnings Period)..... 160

Case 3:23-cv-01250   Document 110   Filed 03/24/26   Page 4 of 253 PageID #: 4433

9. May 25, 2022 Staffing Misstatements (Shareholder Meeting) ............... 161

10. May 26, 2022 Staffing Misstatements (1Q22 Earnings Period) ............. 162

11. August 25, 2022 Staffing Misstatements (2Q22 Earnings Period) ......... 162

12. December 1, 2022 Staffing Misstatements (3Q22 Earnings Period) ...... 163

13. March 16, 2023 Staffing Misstatements (4Q22 and FY22) .................... 164

C. Defendants' Misstatements Concerning Dollar General's Pricing .................... 165

1. May 28, 2020 Pricing Misstatements (1Q20 Earnings Period) .............. 165

2. August 27, 2020 Pricing Misstatements (2Q20 Earnings Period) .......... 166

3. December 3, 2020 Pricing Misstatements (3Q20 Earnings Period) ....... 167

4. March 18, 2021 Pricing Misstatements (4Q20 Earnings Period) ........... 168

5. December 2, 2021 Pricing Misstatements (3Q21 Earnings Period) ....... 169

6. March 17, 2022 Pricing Misstatements (4Q21 and FY21 Earnings Period) ................................................................................................. 170

7. May 26, 2022 Pricing Misstatements (1Q22 Earnings Period) .............. 171

8. August 25, 2022 Pricing Misstatements (2Q22 Earnings Period) .......... 173

9. September 7, 2022 Pricing Misstatements (Goldman Sachs Global Retailing Conference) ............................................................................ 174

10. March 16, 2023 Pricing Misstatements (4Q22 and FY22) .................... 175

11. May 31, 2023 Pricing Misstatements (2023 Annual General Meeting) ................................................................................................. 175

12. June 1, 2023 Pricing Misstatements (1Q23 Earnings Period) ................ 176

D. Defendants' Materially Misleading Financial Metrics During The Class Period ................................................................................................................. 178

1. May 28, 2020 Earnings Misstatements (1Q20 Earnings Period) ............ 178

2. August 27, 2020 Earnings Metrics Misstatements (2Q20 Earnings Period) ................................................................................................. 179

3. December 3, 2020 Earnings Metrics Misstatements (3Q20 Earnings Period) ................................................................................................. 180

iv

4. March 18-19, 2021 Earnings Metrics Misstatements (FY20 and 4Q20 Earnings Period)............................................................. 181

5. May 27, 2021 Earnings Metrics Misstatements (1Q21 Earnings Period).............................................................................................. 183

6. August 26, 2021 Earnings Metrics Misstatements (2Q21 Earnings Period).............................................................................................. 184

7. December 2, 2021 Earnings Metrics Misstatements (3Q21 Earnings Period)............................................................................. 185

8. March 17-18, 2022 Earnings Metrics Misstatements (FY21 and 4Q21 Earnings Periods) ............................................................ 186

9. May 26, 2022 Earnings Metrics Misstatements (1Q22 earnings period).............................................................................................. 188

10. August 25, 2022 Earnings Metrics Misstatements (2Q22 Earnings Period).............................................................................................. 189

11. December 1, 2022 Earnings Metrics Misstatements (3Q22 Earnings Period)............................................................................. 190

E. Defendants' Material Misrepresentations Concerning Dollar General's Accounting Practices and Policies................................................... 191

F. Defendants' Misleading Certifications During the Class Period....................... 195

G. Defendants Violated Item 303(a) of Regulation S-K By Making Materially False And Misleading Statements And Omissions In Dollar General's SEC Filings ................................................................................................. 198

VII. ADDITIONAL ALLEGATIONS OF SCIENTER........................................................ 200

A. Defendants Knew Or Recklessly Disregarded Dollar General's Inventory And Staffing Problems............................................................................. 200

1. Defendants Were Told About The Inventory Problems Plaguing The Company............................................................................. 201

2. Defendants Repeatedly Spoke About Issues At The Center Of The Fraud ............................................................................................... 204

3. Dollar General's Inventory And Staffing Practices Were Critical Operations During The Class Period ....................................... 205

4. Consistent Reports From Multiple Former Employees In Different Positions And Diverse Geographical Locations Further Support A Strong Inference Of Scienter ...................................................... 205

B. Defendants Made Suspiciously Timed Insider Trades During The Class Period, Which Allowed Them To Pocket Millions In Proceeds......................... 206

C. The Executive Defendants Were Subject to Share Ownership and Stock Holding Requirements That Restricted Defendants Owen and Dilts from Selling Stock During the Class Period................................................................. 208

D. The Executive Defendants Were Also Motivated By Lucrative Bonuses and Additional Financial Benefits To Misrepresent and Conceal Dollar General's Excess Inventory and Staffing Problems............................................. 211

E. Defendants' Disclosures of Accounting Information Required a High Degree of Sophistication..................................................................... 219

VIII. LOSS CAUSATION.................................................................................... 220

A. Dollar General's 3Q22 Adverse Financial Results Announced On December 1, 2022 .................................................................................. 221

B. Dollar General's Adverse Financial Results Announced On February 23, 2023........................................................................................ 222

C. Dollar General's Adverse 4Q22 and FY22 Results Announced On March 16, 2023......................................................................................... 222

D. Dollar General's Adverse 1Q23 Results Announced On June 1, 2023 .............. 223

E. Dollar General's Adverse 2Q23 Results Announced On August 31, 2023........ 225

F. Dollar General's 3Q23 Results Announced On December 7, 2023 ................... 227

G. Dollar General's Adverse 4Q23 And Fiscal Year 2023 Results Announced On March 14, 2024 ..................................................................... 228

H. Dollar General's Adverse 1Q24 Results Announced On May 30, 2024 ............ 229

I. Dollar General's Adverse 2Q24 Results Announced On August 29, 2024........ 230

IX. PRESUMPTION OF RELIANCE.................................................................. 233

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................ 234

XI. CLASS ACTION ALLEGATIONS .............................................................. 235

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................ 237

COUNT I ............................................................................................................................ 237

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (b), and (c) Promulgated Thereunder (Against All Defendants) ....................................... 237

COUNT II .......................................................................................................................... 240

For Violations of Section 20(a) of the Exchange Act (Against The Executive Defendants) .............................................................................................................. 240

COUNT III ......................................................................................................................... 241

For Violations of Section 20A of the Exchange Act (Against Defendants Vasos and Garratt) ................................................................................................................... 241

XIII.   PRAYER FOR RELIEF ......................................................................................... 244

XIV.   JURY DEMAND ................................................................................................... 244

Court-appointed Lead Plaintiffs, Quoniam Asset Management GmbH ("Quoniam") and Universal-Investment-Gesellschaft mbH ("Universal" and together with Quoniam, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired Dollar General Corporation ("Dollar General," "DG," or the "Company") common stock during the period from May 28, 2020 to August 28, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiffs assert claims against Dollar General and its corporate officers, Todd J. Vasos, Jeffrey C. Owen, John W. Garratt, and Kelly M. Dilts (collectively, "Defendants"), under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things: (i) a review of Defendants' filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) transcripts, press releases, news articles, analyst reports, and other public statements issued by or concerning Defendants; (iii) information from former Dollar General employees, industry professionals, and other knowledgeable persons described below; and (iv) other publicly available information. Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

1

## I. NATURE OF THE ACTION

1. This securities class action arises from Defendants' deception of investors regarding key aspects of Dollar General's business model: the Company's inventory management and staffing levels. During the Class Period, Defendants touted Dollar General's inventory management and controls and claimed to be adequately staffed and proactively investing in the Company's workforce. These representations helped Defendants portray Dollar General as a financially sound and growing retail company during the pandemic. But Defendants knew (or recklessly ignored) the truth: Dollar General's inventory management processes were broken, which caused a massive bloat of excess product to clog the Company at both its distribution centers and stores, and its workforce had been slashed to the point of harming the Company's operations. As detailed herein, many of Dollar General's own former employees repeatedly confirmed that, during the Class Period, Dollar General lacked basic inventory controls, suffered from ballooning excess inventory, and chronically understaffed its stores. These problems in turn gave rise to a host of dire consequences for the Company, including accounting improprieties, unsafe work conditions, pricing discrepancies, and regulatory fines and penalties.

2. The full truth about Defendants' deception of investors was gradually revealed through a series of corrective disclosures, including Defendants' revelations that Dollar General was forced to reinvest enormous sums to overhaul staffing and markdown its bloated inventory, which directly and materially impacted Dollar General's operating profits, as well as disclosures revealing that the inventory problems were more severe, far-ranging, and persistent than investors were previously led to believe. Each of these disclosures resulted in a precipitous decline in the Company's stock price, which caused investors to suffer enormous damages.

3. Dollar General is one of the largest discount retailers in the United States. As a discount retail chain, the Company's business model depends heavily on proper inventory

2

management and controls, *i.e.*, to ensure that the Company has a handle on its inventory, does not over-order product, calibrates its inventory to customer demand, can place saleable products on store shelves for purchase, and does not needlessly waste inventory. Given this importance, Defendants repeatedly touted Dollar General's inventory management practices to investors during the Class Period. For example, Defendants told investors that "***efficient management of our inventory*** is a ***key component*** of our business success," and stated that they "***closely monitor and manage our inventory balances***." Indeed, when asked about inventory on conference calls, Dollar General's CEO, Defendant Todd Vasos, boasted that "the ***quality of our inventory couldn't be better***." Dollar General's business was equally dependent on having adequate staffing, including, *inter alia*, sufficient employees to manage its stores, stock and price its inventory, and sell its merchandise to customers. To that end, Defendants assured investors that Company stores were adequately staffed and highlighted their purportedly "proactive[]" efforts to "***continue investing***" in the Company's workforce. Defendants' statements about Dollar General's inventory management and staffing helped portray the Company to be financially healthy and delivering on the growth promised to investors—even during the COVID-19 pandemic, which was an uncertain period for retailers worldwide.

4. Defendants' factual representations were false and misleading when made. Contrary to Defendants' statements, but unbeknownst to investors, the Company's inventory management and staffing levels were woefully deficient and not what Defendants represented to investors. As numerous former Dollar General employees confirmed, the Company's inventory management process was broken at every level. Indeed, the Company's inventory tracking system lacked internal controls to account for vast amounts of inventory, which led to misreporting and lost, damaged, and outdated product. This was exacerbated by the Company's over-ordering of

3

inventory without regard for demand or existing inventory stockpiles. These problems were further worsened by Defendants' refusal to invest in Dollar General's workforce—directly contrary to their representations to investors. As such, Dollar General's under-staffed and under-resourced stores had too few employees to unload trucks, adequately stock and price inventory, and properly account for inventory—especially given the vast amounts of excess inventory bombarding Dollar General's stores.

5. These deficiencies caused a glut of excess inventory to clog Dollar General's supply chain at each level. At Dollar General's distribution centers, excess product piled up and shipping trucks waited to be unloaded, with the Company incurring millions of dollars of fees as they idled. As a result, Dollar General would (i) stuff the excess inventory into off-site warehouses, where the Company did not track its inventory; (ii) dispose of the inventory; or (iii) simply force ship the product to stores that had no need for it and no storage capacity. At the store level, former Company employees reported having uncontrolled delivery of inventory to stores that could not price or hold it adequately or safely. Thus, Dollar General stores had excess inventory lining their corridors, blocking access to fire exits, obstructing safety equipment and egress routes, and creating dangerously unsafe work conditions—which in turn exposed the Company to millions of dollars in fines and penalties for regulatory violations.

6. These problems were so severe that, as one former Dollar General employee recounted, Company officials estimated that there were ***31 football fields worth of trailers*** sitting on parking lots with unloaded inventory, costing the Company $19 million a month in detention fees (*i.e.*, penalties incurred for not returning shipping equipment to the transport provider on time). This former employee further reported that, to avoid detention fees, Dollar General leased off-site facilities to store the excess inventory—but this gave rise to even more problems as the

4

Company did not have a system in place to track the inventory stored in these off-site facilities. According to this former employee, Dollar General had a "*reckless disregard*" for proper inventory practices and was trying to "*sweep the problem under the rug*." Another former employee reported that "the Company's distribution centers were being sent 40-50 containers of inventory per day but unloading only 10-20, *which meant that they could never catch up*. Indeed, consistent reports from numerous former Dollar General employees from different levels and diverse geographic locations detailed below confirm that the Company had vast amounts of excess inventory clogging its supply chain.

7. A former employee recounted that Dollar General even systematically covered up this excess inventory during investor visits. She explained that the Company would round up employees to travel to stores in advance of investor visits, stow excess inventory in U-Haul vans before investors arrived, and then return the excess inventory once investors left. She reported personally participating in this process at least three times and said that stores blew their budget to hide the Company's excess inventory from investors during these visits. This former employee further reported that Defendant Vasos participated in these process—flying by private jet to arrive at the long-scheduled investor visits—and that Vasos or his direct report (Steve Sunderland) approved the extra expenditures incurred in connection with hiding the extra inventory from investors.

8. Moreover, multiple former employees reported that Dollar General was not properly tracking inventory and engaged in the improper disposal of inventory on a large-scale basis, including by throwing product in dumpsters without reporting or accounting for it properly. For example, one former Dollar General Inventory Control Counter reported that a lot of product at her distribution center was being thrown away without proper accounting. Another former

5

Dollar General Senior Supply Chain Specialist recalled that about $2 million worth of inventory was not "*showing up*." This former employee said that Dollar General was throwing out inventory to the tune of up to four compact trash containers per day at one distribution center in Jonesville, South Carolina, but that inventory was not properly being "damaged out" in the Company's system (*i.e.*, reduced in value or marked down). Yet another former Dollar General Distribution Supervisor based in Indianola, Mississippi reported that, at her location as well as one in Jackson, Georgia, multiple dumpsters were being filled with $10,000 to $15,000 worth of dry goods per day, but this inventory was not properly tracked or accounted for by Dollar General's inventory control department.

9. Other former employees reported that Dollar General lacked even the most the basic controls to properly track the Company's inventory. For example, one former employee reported that Dollar General only had its inventory tracking system in its distribution centers—but *not* in its off-site warehouses, where Dollar General stuffed its excess inventory. Thus, as this former employee explained, "the Company simply did not know what was in [these facilities]." Another reported that distribution center employees routinely failed to enter inventory in the system even when available. As described by that former employee, these control failures created a "*vicious circle*," where the Company "kept buying and merchandise kept stacking up outside Company distribution centers." The result was a massive build-up of untracked and excess inventory.

10. Indeed, the widespread reports from multiple former Dollar General employees were strikingly consistent: one labeled Dollar General's inventory system a "*house of cards*" that was bound to "*crumble*"; another described it as a "*shell game*"; another said the Company's

6

inventory system was "***built on sand***"; and yet another compared working within Dollar General's supply chain to "***having tickets on the Titanic after it hit the iceberg***," as it was "***go[ing] down***."

11. These former Dollar General employees also recounted multiple facts showing that Defendants knew about (or at least recklessly ignored) the Company's severe excess inventory problem. For example, one former employee personally emailed Defendant Vasos (CEO) in February 2022 and explained that Dollar General stores were ***being bombarded with merchandise they did not need***. Defendant Vasos's personal secretary responded to this email—but (as set forth below) showed more concern about the possible publication of the Company's problems than addressing them. Another former employee sent two emails to Dollar General's leadership reporting the inventory problems, including an email sent directly to Defendants Vasos (CEO), Garratt (CFO), and Owen (COO and later CEO before he was terminated) in June 2022—to which a Senior VP responded with a phone call during which the Company's inventory management problems were specifically discussed. According to a former Dollar General employee, established Dollar General practices required that Defendants Vasos, Garratt, and Owen personally review these emails. Indeed, one former employee who worked at Dollar General as an executive assistant in the Company's C-suite[1] offices—including working directly with Defendant Owen (then COO, later CEO)—reported that Defendants Vasos, Garratt, and Owen read these precise emails pursuant to established Company practices and procedures. According to this former employee, Defendants Vasos and Owen also were kept in the loop on the follow-up discussions that their underlings held with the former employees about the inventory complaints being raised.

---

[1] It is well-established that "C-suite" refers to, *e.g.*, "the group of people with the most important positions in a company, whose job titles usually begin with C meaning 'chief.'" *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/c-suite. At Dollar General, the "C-suite" necessarily included Defendants Vasos (CEO), Owen (COO), Garratt (CFO), and Dilts (CFO).

12. Still other former employees recounted internal Dollar General meetings where the massive amounts of excess inventory plaguing the Company were discussed, including meetings attended by Defendants. For example, one former employee reported personal meetings with Defendant Vasos that were held specifically to discuss the inventory issues, including so Vasos could approve expenditures for the Company to buy trailers to store excess inventory. This former employee explained that she specifically told Defendant Vasos that the distribution centers were full and out of space. She also reported to Vasos that the storage trailers did not solve the excess inventory problems because the merchandise in them was not entered into the Company's inventory management system, including because there was no system to track the location of where the merchandise was stored in the trailer. Other former employees described personally attending both annual and town hall meetings where Defendants Vasos or Owen discussed inventory problems with the other Executive Defendants in attendance. For example, one former employee reported that on August 1 of each year during her tenure (from 2012 to 12/2024), the Company's CEO held an annual meeting that discussed inventory issues, which she personally attended as did Defendants Vasos (CEO), Owen (COO/CEO), Garratt (CFO), and Dilts (CFO). She confirmed that Dollar General's inventory problems were discussed at these meetings. Another former employee reported that Dollar General's C-suite, including Vasos (CEO), Dilts (CFO), Garratt (CFO), and Owen (COO/CEO) received reports generated by the store operations group, which showed that one-third of Dollar General stores had way too much product. Further, as noted above and detailed below, Defendant Vasos even participated in efforts to hide excess inventory from investors during store visits. Indeed, multiple former Dollar General employees said that Defendants absolutely knew about the severe inventory problems plaguing the Company. But, contrary to the facts they knew (or chose to ignore), Defendants repeatedly touted to investors

8

the supposedly "efficient management" and "quality" of Dollar General's inventory and inventory controls.

13.     During this same period, Defendants declined to invest in Dollar General's workforce and, on the contrary, cut staff and hours to the bone (or beyond).  This practice rendered Dollar General stores woefully understaffed and exacerbated the Company's already-unsustainable inventory problems.  For example, directly contradicting Defendants' public representations that stores were operated by four or more employees, former employees reported that the Company often staffed stores with just *a single worker*, making it impossible to unpack items, restock shelves, and serve customers at the same time.  Another former employee recounted that a store employee was expected to run a register and unload one "rolltainer" (*i.e.*, a metal-framed dolly on wheels used to carry inventory) per hour, all while having to assist, and deal with, lines of purchasing customers.  Yet another former employee explained that Dollar General "*limit[ed] payroll to the bone*," so it was impossible to put away the amount of merchandise required and stores lacked sufficient time to correct inventory discrepancies due to the staffing shortages.  One former employee who evaluated *2,500* stores during the Class Period explained that the Company's chronic understaffing impacted "*between 30% and 50% of Dollar General stores*."  These problems left the Company's distribution centers and stores with tens of millions of dollars' worth of expired, unwanted, lost, and damaged inventory.

14.     Defendants' chronic understaffing—coupled with the uncontrolled piling up of massive amounts of excess inventory—also caused the Company to have dangerously unsafe work conditions at Dollar General stores nationwide.  These unsafe conditions exposed the Company to sanctions for workplace safety violations, including violations of the federal Occupational Safety and Health Act (OSHA).  Indeed, Dollar General has faced *more than $21 million in fines* after

9

more than over 110 citations under OSHA. These OSHA violations were the product of Defendants' knowing (or at least reckless) imposition of unsafe work conditions on Dollar General employees. As OSHA Area Director, Danelle Jindra, stated in July 2023:

> After more than 200 failed inspections, Dollar General cannot claim that they misunderstand federal safety requirements. At this point, we can only conclude that they **_choose_ _to continue exposing their employees to hazardous conditions_**.

15. On July 11, 2024, OSHA announced that it had reached a settlement agreement (the "OSHA Stipulation") with Dollar General to resolve hundreds of outstanding regulatory complaints and citations issued against the Company as a result of the unsafe and hazardous conditions in its stores. Pursuant to the OSHA Stipulation, Dollar General was required to pay $12 million in penalties and implement corporate-wide reforms, including sweeping changes to its inventory controls and staffing practices to address many of the same deficiencies described by former Dollar General employees herein. Also pursuant to this settlement Stipulation, OSHA required these reforms to be implemented by Dollar General's CEO (then Defendant Vasos) and "all other senior executive leadership," and further mandated that the Company's "senior leadership" review the Company's compliance with the OSHA Stipulation on a quarterly basis.

16. Defendants' staffing and inventory control deficiencies also led to widespread discrepancies between the prices that customers were charged at the register and the prices displayed on the shelf at Dollar General stores. As recounted by former Company employees detailed below, every week prices changed and needed to be updated, but understaffing issues prevented prices from being changed in a timely manner. One former employee described the differences between prices on the shelf and the register prices charged to customers as "huge," and confirmed that the prices were **_not_** changed in a timely manner at Dollar General. Indeed, overburdened and understaffed store employees had no capacity to perform price changes in between assisting customers and stocking. The systematic overcharging of customers was so

10

pervasive at Dollar General that multiple state Attorneys General investigated the Company's stores, found the pricing errors to be widespread, and imposed adverse regulatory actions resulting in millions of dollars in fines.

17. For example, the Ohio Attorney General brought a lawsuit against the Company in November 2022, reporting that its audit "found error rates ranging from 16.7% to 88.2%" in pricing at Dollar General stores located in Ohio. The states of Arizona, Louisiana, Mississippi, and North Carolina also fined Dollar General for similar pricing irregularities in 2021 and 2022. Further, the Missouri Attorney General filed a complaint in September 2023 stating that a majority, or "92 of the 147 [Dollar General] locations where investigations were conducted failed inspection" with an "average overcharge of $2.71 for the over 5,000 items price checked by investigators." Also in late 2023, Dollar General agreed to pay fines in New Jersey and Wisconsin to settle similar claims of overcharging customers.

18. Defendants' misrepresentations and omissions caused Dollar General's stock price to be artificially inflated during the Class Period. Buoyed by Defendants' misstatements, the Company's stock price soared from $184.11 per share at the outset of the Class Period, to a high of $260.44. Further highlighting their knowledge of the misconduct described herein, top executives at Dollar General, including Defendants themselves, took advantage of its artificially inflated stock price to engage in ***hundreds of millions of dollars in suspiciously timed stock sales***. For example, during the Class Period, Defendant Vasos (CEO) sold more than 1,300,000 shares of his Dollar General shares at prices as high as $244.14 per share, for total proceeds of over ***$283.5 million***. Defendant Garratt (then CFO) sold more than 153,900 of his Dollar General shares at prices as high as nearly $244.90 per share, for total proceeds of over ***$31.6 million***. The vast sums pocketed by Defendants Vasos and Garratt from insider sales during the Class Period dwarfed their

11

respective annual base salaries and provide strong evidence of their motive to mislead investors. Defendants Owen and Dilts did not sell any meaningful amounts of their Company stock holdings during the Class Period because they were each required to increase their respective shareholdings in an effort to comply with Dollar General's executive stock holding requirements. In July 2022, Dollar General announced that Defendant Vasos was stepping down as CEO (although he was later re-appointed as CEO after the end of the Class Period), and, in January 2023, the Company announced that Defendant Garratt was stepping down as CFO. Defendants were also motivated to mispresent and conceal the Company's serious excess inventory and staffing problems so they could personally profit from lucrative Dollar General executive incentive compensation programs that were specifically tied to the Company's Operating Profit—the exact financial metric that was impacted when Defendants' misrepresentations and omissions were exposed as materially misleading.

19. The truth about Defendants' misrepresentations and omissions was revealed to investors through a series of corrective disclosures that began on December 1, 2022, continued through February 23, 2023, March 16, 2023, June 1, 2023, August 31, 2023, December 7, 2023, March 14, 2024, May 30, 2024, and ended on August 29, 2024. Through these corrective disclosures, Defendants gradually revealed, *inter alia*, higher inventory shrink, damages, and markdowns, the Company's need to invest over $100 million to remedy staffing problems, and its need to markdown inventory by $95 million. Eventually, after reassuring investors that the inventory problems were being fixed and the Company was experiencing a turnaround, Defendants revealed on August 29, 2024 that Dollar General's inventory problems were more severe, far-reaching, and persistent than previously disclosed. Each of the corrective disclosures caused the price of Dollar General's stock to decline significantly on unusually high trading volume—and,

12

collectively, they wiped out billions of dollars in shareholder value. Investors suffered enormous damages when the truth was revealed.

20. As set forth herein, Defendants directly and indirectly engaged in conduct that constitutes a scheme to deceive and defraud and they made materially false or misleading statements or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. As a result of Defendants' wrongful scheme, acts, statements and omissions, and the precipitous declines in the market value of the Company's common stock, Plaintiffs and other members of the Class have suffered enormous damages. Plaintiffs bring this action to recover the damages to Dollar General investors caused by Defendants' misconduct and to seek accountability for the violations of the securities laws alleged herein.

## II. JURISDICTION AND VENUE

21. Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

22. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District. Additionally, Dollar General's headquarters are located in this District.

25. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited

13

to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiffs

26.   Quoniam Asset Management GmbH ("Quoniam") is an institutional asset management company with its headquarters in Frankfurt am Main, Germany that manages more than 20 billion euros for investors.  Quoniam is owned and controlled by its parent company, Union Asset Management Holding AG.  As reflected in the Certification filed herewith, Quoniam's funds purchased Dollar General common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

27.   Universal-Investment-Gesellschaft mbH ("Universal") is an investment company based in Frankfurt am Main, Germany, which manages more than 417 billion euros for investors. As reflected in the Certification filed herewith, Universal's funds purchased Dollar General common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B.   Defendants

28.   Defendant Dollar General Corporation ("Dollar General," "DG," or the "Company") is a retail company incorporated in Tennessee with its corporate headquarters located at 100 Mission Ridge, Goodlettsville, Tennessee.  Dollar General operates a chain of discount retail stores that sell consumer goods, including packaged foods, fresh foods and produce, beauty and household products, and beer and wine.  During the Class Period, as of August 2, 2024, Dollar General operated over 20,000 stores located in 48 U.S. states and Mexico, with the greatest concentration of stores in the southern, southwestern, midwestern and eastern United States.

14

Dollar General's common stock traded in an efficient market on the New York Stock Exchange ("NYSE") throughout the Class Period under the ticker symbol "DG."

29. Defendant Todd J. Vasos ("Vasos") was the Chief Executive Officer ("CEO") of Dollar General from 2015 through his resignation, which was effective as of November 1, 2022. After leaving his CEO role, Defendant Vasos continued to serve as a Senior Business Advisor to Dollar General from November 2022 through April 2023 and served as a Senior Retail Business Consultant to Dollar General beginning April 2023. Defendant Vasos also served as a member of the Dollar General Board of Directors throughout the Class Period. Defendant Vasos was reappointed as CEO on October 12, 2023 (replacing Defendant Owen who was forced out), and continues to serve as CEO as of the date of this filing. Defendant Vasos made materially false and misleading statements during the Class Period, as detailed herein. In particular, among other things, Defendant Vasos (i) certified the Company's Form 10-Qs for the second and third quarters of fiscal year 2020, the first, second, and third quarters of fiscal year 2021, and the first and second quarters of fiscal year 2022; and (ii) signed and certified the Company's Form 10-Ks for fiscal years 2020 and 2021—all of which contain materially false and misleading statements, as detailed herein.

30. As detailed below in ¶¶516-22, during the Class Period, Defendant Vasos took advantage of Dollar General's artificially inflated stock price by engaging in improper insider sales, including by selling over 1,300,000 shares of his Company stock for gross profit of over $283 million, which is over *30-times* the amount of Dollar General stock he sold during the 51 months directly preceding the Class Period. As detailed below in ¶¶534-52, Defendant Vasos was also financially motivated to mislead investors regarding Dollar General's serious inventory and

staffing problems in order to obtain tens of millions of dollars in cash bonuses and stock awards under Dollar General's executive incentive compensation programs.

31. Defendant Jeffrey C. Owen ("Owen") was the Company's Chief Operating Officer ("COO") from August 2019 through November 2022. He also served as a Company director from November 2022 to October 2023. Defendant Owen was the CEO of Dollar General from November 2022 until October 2023—less than a year—when he was replaced by Defendant Vasos as CEO. At the time Defendant Owen's termination was announced in October 2023, Board of Directors Chairman Michael Calbert stated: "The Board has determined that a change in leadership is necessary to *restore stability and confidence* in the Company moving forward." Defendant Owen made materially false and misleading statements during the Class Period, as detailed herein. In particular, among other things, Defendant Owen (i) certified the Company's Form 10-Qs for the third quarter of fiscal year 2022 and the first and second quarters of fiscal year 2023; and (ii) signed and certified the Company's Form 10-K for fiscal year 2022—all of which contain materially false and misleading statements, as detailed herein.

32. As detailed below in ¶¶534-52, Defendant Owen was financially motivated to mislead investors regarding Dollar General's serious inventory and staffing problems in order to obtain tens of millions of dollars in cash bonuses and stock awards under Dollar General's executive incentive compensation programs. However, as detailed below in ¶¶523-33, Defendant Owen was unable to sell his Dollar General stock because he was required to increase his holdings at that time in order to meet minimum executive stock holding requirements set by Dollar General executive policies.

33. Defendant John W. Garratt ("Garratt") served as the CFO of Dollar General from December 2015 through April 2023 and as its President from September 2022 through June 2023.

16

Garratt retired from Dollar General effective June 2, 2023. Previously, Garratt served as Dollar General's interim CFO from July 2015 to December 2015 and as a Senior Vice President, Finance & Strategy from October 2014 to July 2015. Defendant Garratt made materially false and misleading statements during the Class Period, as detailed herein. In particular, among other things, Defendant Garratt (i) certified and signed the Company's Form 10-Qs for the second and third quarters of fiscal year 2020, the first, second, and third quarters of fiscal year 2021, and the first, second, and third quarters of fiscal year 2022; and (ii) the Company's Form 10-Ks for fiscal years 2020, 2021, and 2022—all of which contain materially false and misleading statements, as detailed herein.

34. As detailed below in ¶¶516-22, during the Class Period, Defendant Garratt took advantage of Dollar General's artificially inflated stock price by engaging in improper insider sales, including by selling over 150,000 shares of his Dollar General stock for gross profit of over $31 million, which is nearly *20-times* the amount of Dollar General stock he sold during the 51 months directly preceding the Class Period. As detailed below in ¶¶534-52, Defendant Garratt was also financially motivated to mislead investors regarding Dollar General's serious inventory and staffing problems in order to obtain tens of millions of dollars in cash bonuses and stock awards under Dollar General executive incentive compensation programs.

35. Defendant Kelly M. Dilts ("Dilts") served as the CFO of Dollar General from May 2023 until she resigned in July 2025. Defendant Dilts made materially false and misleading statements during the Class Period, as detailed herein. In particular, among other things, Defendant Dilts certified and signed the Company's Form 10-Qs for the first and second quarters of fiscal year 2023—which contain materially false and misleading statements, as detailed herein.

17

36. As detailed below in ¶¶534-52, Defendant Dilts was financially motivated to mislead investors regarding Dollar General's serious inventory and staffing problems in order to obtain tens of millions of dollars in cash bonuses and stock awards under Dollar General's executive incentive compensation programs. However, as detailed below in ¶¶523-33, Defendant Dilts was unable to sell her Dollar General stock during the Class Period because she was required to increase her holdings at that time in order to meet minimum executive stock holding requirements set by Dollar General executive policies.

37. The individual defendants referenced above in ¶¶29-36 are referred to herein as the "Executive Defendants." The Executive Defendants and Dollar General are collectively referred to herein as "Defendants." Each of the Executive Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects. In addition, the Executive Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, materially false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

38. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Executive Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Executive Defendants each had a duty to correct any previously issued statements

18

that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' misrepresentations during the Class Period violated these specific requirements and obligations.

39. The Executive Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, investor releases, and other public statements pertaining to the Company during the Class Period. Each Executive Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Executive Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

40. Defendants are liable for failing to disclose adverse facts known to them about Dollar General and perpetrating a fraudulent scheme to deceive investors as disclosed herein. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Dollar General stock was a success, as it: (i) deceived the investing public regarding Dollar General's business metrics and financial prospects; (ii) artificially inflated the prices of Dollar General stock; and (iii) caused Plaintiffs and other members of the Class to purchase Dollar General stock at artificially inflated prices.

## IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME TO DECEIVE AND MISLEAD INVESTORS

### A. Background On Dollar General

41. Dollar General is one of the largest discount retailers in the United States by number of stores. The Company offers a broad selection of merchandise, including consumable items,

19

seasonal items, home products and apparel. Throughout the Class Period, the Company was one of the fastest-growing retailers in America, opening about 1,000 stores a year. As of August 2, 2024 (near the end of the Class Period), Dollar General operated over 20,000 stores located in 48 U.S. states and Mexico, with stores in the southern, southwestern, midwestern and eastern U.S.

42. As a discount retailer, Dollar General caters to consumers with modest income, largely low and fixed income. The Company focuses on selling low-cost goods and opening stores in areas without numerous retailers. For example, most of Dollar General's stores are concentrated in small towns located in the southern, southwestern, midwestern, and eastern U.S. that are overlooked by most other retailers. In fact, approximately 75% of the Company's stores are located in communities of 20,000 or fewer people. The Company describes its stores as being "low-cost, no frills building[s] with limited maintenance capital, low operating costs, and a focused merchandise."

43. Dollar General's retail operation functions by purchasing merchandise from a wide variety of suppliers and maintaining direct buying relationships with many producers of national brand merchandise. In its SEC filings during the Class Period, the Company claimed to have a "simple business model," which was to provide customers with merchandise at low prices in small-box stores, while remaining focused on increasing profitability, cash generation, and returns for shareholders.

44. As part of its business model, it was critical for Dollar General to ensure that it had: (1) effective inventory management; and (2) adequate staffing levels. Effective inventory management, including effective inventory tracking, was necessary to prevent over-ordering by Company buyers, the piling up of excess inventory, and to maintain the right amount of merchandise per category. Adequate staffing was a basic requirement to stock the stores with

inventory, track inventory, price inventory, and do sufficient store maintenance to allow customers to access the products they needed to purchase.

45. The Company's retail stores are supported by distribution centers for both refrigerated and non-refrigerated merchandise located throughout its geographic footprint. During the Class Period, Dollar General's distribution centers increased from 27 to 32 and the square footage it maintained for inventory storage increased from 20.9 million to 27.9 million.

46. Dollar General's largest merchandise category is consumables, followed by seasonal products, home products, and apparel. Seasonal items include holiday items. Seasonal products, together with the home products category, typically accounted for the Company's highest gross profit margins. However, seasonal products represented the second lowest percentage of net sales, accounting for only 12.1%, 12.2%, 11.0%, and 10.6% of sales, respectively, in the years 2020, 2021, 2022, and 2023. To profit from the wide margins offered by seasonal products, the Company needed an inventory management system focused on getting seasonal products to the stores and on the shelves at the right time—during the selling season for the product.

47. As detailed below, the Company lacked basic inventory processes and controls, which caused massive amounts of excess inventory to pile up and, coupled with Defendants' refusal to adequately staff Dollar General stores, left the Company in chaos and severely harmed the Company. This led to regulatory violations, investigations by states attorneys general, and ultimately caused the Company to devote hundreds of millions of dollars to fixing these problems and writing down excess inventory.

**B.** **Contrary to Defendants' Public Representations, Multiple Former Employees Confirmed That Dollar General Lacked Basic Inventory Controls And Suffered From A Serious Excess Inventory Problem**

**1.** **Defendants Touted Dollar General's Inventory Quality And Controls**

48. Given their critical importance to the success of Dollar General's business model, Defendants repeatedly touted the efficacy, strength and quality of Dollar General's inventory controls and management practices, which they used to help paint the overall picture of a stable and growing company. For example, Defendants told investors that "***efficient inventory management*** is a key component of our business success and profitability" and that it was a specific "***area of focus for us***." They also assured investors that they were watching carefully to balance the maintenance of "***sufficient inventory levels***" with their concern about "***allowing those levels to increase*** such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."[2] Market participants such as securities analysts that followed Dollar General stock asked about inventory throughout the Class Period. Defendants reassured them that everything was under control, stating for example that Defendants were "***pleased with our overall inventory levels***."

49. Defendants' statements touting their inventory management practices and the quality of Dollar General's inventory helped them portray the Company as financially healthy and delivering on the growth promised to investors. Indeed, before the truth was revealed, Defendants touted Dollar General's purportedly decreasing inventory shrink quarter-after-quarter during the Class Period. Defendants also boasted that they "***were well ahead of any inventory issues . . . unlike some of our competitors out there***" and that they were able to "***driv[e] sustainable long-***

---

[2] "Inventory shrink" or "shrinkage" refers to the reduction or loss of inventory, including through operational or administrative problems or inventory being damaged or lost.

*term growth*"—even during the COVID-19 pandemic.  As such, investors flocked to Dollar General and the Company's stock price soared, skyrocketing from $184.11 at the start of the Class Period to a high of $260.44.

### 2. Former Dollar General Employees Reported Serious Inventory Control Failures And Massive Excess Inventory Problems

50. Contrary to Defendants' public statements, numerous former Dollar General employees reported that the Company was plagued by massive amounts of excess inventory and lacked basic inventory controls.  These former employees also recounted facts establishing Defendants' knowledge of the inventory control deficiencies, or at minimum, Defendants' reckless disregard of those problems.  These accounts were provided independently by multiple individuals who had direct experience working at Dollar General in different roles, at different times, and from an array of different geographical locations—but their reports are strikingly consistent and, thus, corroborating.

51. Former employee #1 ("FE-1") was a Store Manager in Dollar General's Dracut, Massachusetts store from 2012 to February 2022.[3]  FE-1 witnessed first-hand Dollar General's inventory management problems, including for example, unnecessary items being excessively shipped to her store. Indeed, FE-1 recalled sending messages to Dollar General warehouses stating, "For the love of God, please stop sending this"—but excess product would still arrive the next week.  FE-1 stated that Dollar General's buyers, who were responsible for ordering inventory from suppliers, would over-order merchandise and, since there was no room in the distribution center warehouses, the Company would force-send the product to stores.  Thus, the excess inventory would pile up at the store level.

---

[3] Former Dollar General employees are referred to herein as "FEs" and are all referenced using feminine pronouns regardless of their actual gender in order to maintain their confidentiality.

52.     FE-1 stated that, toward the end of her last week at the Company in February 2022, she *emailed Defendant Vasos* to explain what it was like working at a Dollar General store. In particular, FE-1 said that her email to Defendant Vasos specifically explained that Dollar General stores were being ***bombarded with inventory***, among other issues such as hiring and basic maintenance. FE-1 described her email to Defendant Vasos as well-written, "good and long," and she said it covered the issues thoroughly as well as providing suggestions on how to fix the problems at Dollar General stores. FE-1 recounted that, in response to her email, Defendant Vasos's personal secretary called her. According to FE-1, the tone of her call with Defendant Vasos's secretary was not one of caring about FE-1's concerns, but instead to ask whether FE-1 intended to go to the media. FE-1 said that Defendant Vasos's secretary asked if FE-1 had voiced her concerns to anyone else and whether she would be speaking to the media.

53.     As set forth below in ¶¶96-98, a former Dollar General employee confirmed that Defendant Vasos was required to review FE-1's email, including due to established Dollar General practices and protocols. Relatedly, there would have been zero chance that Vasos's personal secretary would have acted alone without informing Vasos both before and after her discussions with FE-1. Thus, Vasos clearly knew about FE-1's email, its contents, and the discussions between his secretary and FE-1.

54.     Former employee #2 ("FE-2") was an Assistant Store Manager and Store Manager at a Dollar General in North Carolina for multiple years during the Class Period. As a store manager, FE-2's responsibilities included managing stocking product, registers, customer service, employee scheduling, monitoring payroll budget, and receiving trucks. FE-2 said that about 70% of her time was spent stocking shelves.

24

55.     FE-2 explained that her Dollar General store received excess inventory due to the Company's automated order system, which would send inventory regardless of the store's need. Indeed, FE-2 said that her store would get ***bombarded with product it did not need***.  She gave an example where, even though her store did not need hand sanitizer and already had dozens of bottles in stock (96 to be exact), multiple excess boxes of hand sanitizer would still arrive.  FE-2 reported that, at Dollar General, store managers were not allowed to stop trucks from delivering product. Thus, for example, FE-2 said that a store in her area was shut down by a fire marshal for being dangerous—but the trucks full of inventory kept arriving regardless.  When this store was shut down, FE-2 recounted, Dollar General's Division Vice President Amanda Cauthier visited the store and saw the excess merchandise but still did not offer to stop the truck deliveries.  Likewise, FE-2 explained, even if a store's freezers or coolers were down—there was still no way to stop a delivery, and so spoiled inventory had to be thrown away.

56.     FE-2 stated that senior leadership at Dollar General "absolutely" knew about the inventory management problems that plagued the Company.  FE-2 said she knew this because she personally sent two emails advising Company officials of a list of issues at Dollar General, including the inventory problems.  ***First***, in one email, which she sent anonymously to top corporate executives, including Defendants Vasos and Owen during the first week of July 2021, FE-2 said she advised the Company about the inventory problems she saw and what the Company needed to fix in terms of staffing, truck delivery problems, and inventory management issues.

57.     ***Second***, FE-2 reported sending another email, which she sent in her name (*i.e.*, not anonymously) when she quit working at Dollar General (in June 2022), to "everyone in the top three tiers of the Company," including Defendants Vasos, Owen, and Garratt.  According to FE-2, her second email provided Defendants and the other Dollar General officials with a long list of

25

problems that she saw while working at Dollar General, including the trucking and inventory problems. In response to this email, FE-2 recounted that Sanja Krajnovic, a Senior V.P. at Dollar General, called FE-2 back on her personal cell phone. FE-2 said that, on this phone call, she specifically spoke to Krajnovic about the inventory management problems, staffing shortages, and the inability of stores to stop trucks from delivering excess merchandise.

58. Again, as confirmed by another former Dollar General employee, Defendants Vasos, Owens, and Garrett were required to review FE-2's email pursuant to Company protocol. Further, these Defendants would have discussed the email with each other, and that they would have assigned the task of following up with FE-2 to Senior V.P. Krajnovic. Thus, the facts establish that Defendants reviewed FE-2's emails.

59. Former employee #3 ("FE-3") was the Director of Distribution Center Maintenance for Dollar General's distribution centers and warehouses east of the Mississippi River from October 2022 through June 2023, which included 17 warehouses located in Georgia, Florida, and Alabama. FE-3 reported to Ed Collins, Senior Director of Maintenance who, in turn, reported to James Thursby, Vice President, Distribution Operations. FE-3 said that Mr. Thursby reported to Senior Vice Presidents Rod West and Andy Newkirk, who, in turn, reported to Antonio "Tony" Zuazo, Executive V.P. Global Supply Chain,[4] and the Executive Defendants. FE-3's responsibilities included "everything . . . encompassed in buildings", including the overall upkeep of Dollar General's distribution centers in FE-3's territory, equipment ranging from conveyors to forklifts to cold building freezers, and training for maintenance employees.

---

[4] As detailed herein, Zuazo was Dollar General's Senior Vice President Transportation and Inventory and Vice President Inventory, Demand Management and Supply Chain Services until April 2021 when he became the Company's Executive Vice President, Global Supply Chain until May 2023, when he was fired.

26

60.     FE-3 stated that Dollar General had "***reckless disregard***" for proper inventory practices and confirmed that the Company suffered from an excess inventory problem. According to FE-3, this problem was caused by extreme overbuying by Dollar General's buyers without regard to demand—and the Company's failure to have proper checks on the buyers.

61.     FE-3 stated that, when she joined Dollar General in October 2022, she began hearing from her boss (Mr. Collins) about a push to get excess Dollar General merchandise from trailers into off-site locations by the end of the fiscal year 2022. FE-3 stated that within the January to March 2023 window, Company leadership set an aggressive timeline to get excess inventory sitting in trailers into off-site facilities. According to FE-3, this push occurred at the Stockbridge, Georgia warehouse as well other locations around the country.

62.     FE-3 recounted that the Company held a senior leadership call in February or March 2023, during which Senior V.P. Rod West estimated that there were ***31 football fields worth of trailers*** sitting on parking lots with unloaded inventory and incurring detention fees (*i.e.*, penalties incurred for not returning a shipping container to the transport provider on time), which was costing the Company ***$19 million a month***. FE-3 stated that Mr. Zuazo attended this call, as did other senior Dollar General executives who reported to the Company's C-suite. FE-3 emphasized that it was a "***big red flag***" and "***very unusual***" for the Company to have 31 football fields of trucks and 10,000 trailers on its lots. FE-3 stated that Dollar General had "no check and balance on it [*i.e.*, inventory], just buying." As such, FE-3 believed that senior leadership at the Company "absolutely" knew about the inventory management issues. She further described Dollar General's push to get excess inventory from the trailers into these off-site locations as a ***"shell game"*** played by the Company.

63.     FE-3 said that the excess inventory being unloaded into the off-site facilities was not getting entered into Dollar General's inventory systems, including for example the Company's Warehouse Management System (WMS).  This was because, as FE-3 explained, the inventory stored in these warehouses was not being scanned or properly received given that Dollar General only had WMS in its distribution centers—but ***not*** in its off-site warehouses.  According to FE-3, it was because Dollar General could not track the inventory put into these off-site facilities—where it was shoved with "no rhyme or reason"—that the Company continued over-ordering inventory. FE-3 provided an example from the Stockbridge, Georgia distribution center, where the excess inventory caused the piling up of pallets (*i.e.*, portable rigid platforms used to carry goods via a forklift)—stacked five high and 10 pallets deep.  FE-3 said that these towering stacks of pallets made it impossible to identify the inventory or enter it into the system properly—and they became a safety hazard.  According to FE-3, Company leadership also knew that inventory delivered to the off-site facilities was not being entered and processed into the WMS.  FE-3 added that the Company "understood it was going to be financially impacted, so it was trying to ***sweep the problem under the rug*** and ***hide the fact that its inventory looked this way***."

64.     Former employee #4 ("FE-4") was a Director of Allocation from February 2019 to February 2021, was promoted to Senior Director of Demand Chain in February 2021 and left the Company in April 2021.  FE-4 worked at Dollar General's Nashville, Tennessee corporate headquarters and reported to Jessica Scaggs, Vice President, Inventory and Demand Management, who reported to Mr. Zuazo, who was then Dollar General's Senior V.P. Transportation and Inventory and VP Inventory, Demand Management and Supply Chain Services.  During FE-4's tenure, Mr. Zuazo reported to Michael J. Kindy, Executive Vice President, Global Supply Chain who in turn reported to Defendant Vasos.  In April 2021, Mr. Zuazo became Executive Vice

President, Global Supply Chain, reporting directly to the C-Suite, including Defendants. FE-4 was responsible for inventory management of inbound and outbound inventory support for all stores.

65. FE-4 confirmed that there was an excess inventory problem at Dollar General. FE-4 described the situation at Dollar General as a "*house of cards*" that would "*crumble*" because the Company would not stop buying product, but also would not build the resources needed to handle it properly. According to FE-4, the Company filled its distribution centers, jam-packed its stores, and then was forced to mark down the inventory at fire sale prices.

66. According to FE-4, Dollar General leadership had to pick and choose what items to send to the stores and, although the stores could not fit more product, the Company just continued to buy more inventory. FE-4 further explained that, during peak times in the fall and spring, Dollar General did not even have sufficient equipment—*i.e.*, rolltainers or trucks—to deliver product to Dollar General stores. FE-4 recounted that, every Sunday, there was a Company call at 1:00 p.m. where approximately 50 Dollar General officials would determine how many rolltainers, trucks and drivers were available and what product would be left out of deliveries that week—and that this information would be reported to Mr. Zuazo and other senior executives. FE-4 reported that, during the Sunday meetings, they amply discussed the backlogging of merchandise and the prioritization of which product cartons were delivered to the stores versus withheld from delivery. However, missing from these discussions was a resolution or a plan for how to get ahead of this issue. FE-4 described these calls as "a weekly firefight" and "there was never any discussion about how to make it stop." FE-4 called this a "*dumbfounding*" way to run a supply business when the Company should have addressed the root cause by purchasing less inventory and getting more trailers, distribution centers, and rolltainers to handle the inventory it had to

distribute to stores.  FE-4 stated that, during peak season, attendees on these Sunday calls knew that one-fifth of the inventory could not go out each week.

67.     Given this information, according to FE-4, Mr. Zuazo "absolutely knew" about the backlogged inventory and the reasons for it.  FE-4 further explained that Defendant Owen (then COO and later CEO) also was informed of the inventory issues because the decisions being made on the above-discussed Sunday calls affected store operations, which Defendant Owen oversaw as COO.  FE-4 also believed that it was likely that Defendant Vasos also knew about the inventory issues and their impact.

68.     FE-4 elaborated that the Sunday debates on what to ship often resulted in the seasonal items not getting timely sent out and "fall[ing] to the wayside" in delivery.  For seasonal inventory, the consequence of missing one week of a holiday season meant that the window for selling that product was reduced.  As FE-4 explained, if the holiday sales window was reduced from six weeks to five weeks due to delays, it increased markdown risk as the Company was missing up to 20% of the selling opportunity.  FE-4 reported that often seasonal product did not make it to Dollar General stores' salesfloors until *three months after it was supposed to be sold*, which caused it to become obsolete.  Frequently, the Company could not even turn a profit on it.  As FE-4 explained, this happened repeatedly and for multiple holidays the Company shipped holiday merchandise with delays.

69.     Former employee #5 ("FE-5") was a Director of International Logistics in the Company's Supply Chain Organization from April 2022 through September 2022.  FE-5 reported to Sanjay Mishra, Vice President of Transportation, who reported to Mr. Zuazo (who was then the Company's Executive V.P., Global Supply Chain).  FE-5 was responsible for working with shipping companies, such as steamship lines or trucking companies, with respect to bringing

inventory into the United States and distributing it through a network of ports and partners to Dollar General's distribution centers. FE-5's primary responsibilities included dealing with the fees that Dollar General owed to the shipping companies for demurrage and detention fees, *i.e.*, the penalties that would be charged when Dollar General failed to unload inventory within an agreed time period.[5]

70. FE-5 stated that Dollar General's elevated inventory levels were caused by continuous over-ordering of product by the Company's buyers without knowledge of the on-hand inventory or product in transit (international and domestic). FE-5 said that because Dollar General's distribution centers failed to log on-hand inventory in the Company's WMS inventory management system, Dollar General's buyers would place orders for new inventory not knowing existing product was already in the distribution centers.

71. FE-5 also said that Defendant Owen (CEO) over-focused on stocking inventory, which resulted in the over-ordering of inventory. FE-5 said that working at Dollar General was "***like having tickets on the Titanic <u>after</u> it hit the iceberg*** – once you're on board, you're like 'why all this water?' And it ***begins to go down***."

72. FE-5 elaborated that the Company's distribution centers were being sent 40-50 containers of inventory per day but unloading only 10-20, which meant that they could never catch up. FE-5 stated that this posed a particular problem for seasonal items, which she said "always

---

[5] FE-5 explained that demurrage refers to the initial period when containers arrive by ship or rail and need to be unloaded onto trucks for further distribution. According to FE-5, Dollar General's shipping contracts generally set a three-day period before demurrage fees began to accrue. Detention refers to the period following demurrage when shipments are unloaded from the trucks and all shipping containers and related equipment must be returned to the shipping company. FE-5 stated that Dollar General's contracts generally set a ten-day period before detention fees accrued. FE-5 explained that demurrage penalties were generally more costly and that failing to comply with the demurrage period has a "domino effect" that caused delays throughout the rest of the Dollar General inventory management system.

missed the mark that was set" to unload them in time to reach stores—and caused the Company to "miss the season" for such seasonal inventory.

73. Indeed, FE-5 stated that Dollar General's distribution centers would take months to unload inventory—explaining that a product might arrive in February but would not get unloaded until June. Thus, according to FE-5, the shipping companies would get angry with Dollar General because they needed their containers and chassis (*i.e.*, the trailers used to carry shipping containers) to be returned. She recounted that every quarter Dollar General was trying to negotiate with *each* shipping company over $5 million to $7 million in detention fees that were caused by the Company's buyers over-ordering. Thus, according to FE-5, Dollar General would for example owe *$50 to $60 million* in detention and demurrage fees in total in *a single quarter* (not including ocean transportation fees) to various shipping companies. FE-5 said that the Company kept kicking the can down the road and then tried to get the shipping companies to reduce the fees and renegotiate the contracts—but that would not fix the issues, so the problems would arise again the next quarter. FE-5 stated that she had never seen a more "toxic" relationship than the relationship between Dollar General and the shipping companies.

74. FE-5 specifically raised her concerns and these issues to Dollar General's upper management on multiple occasions, including to Mr. Zuazo (who reported to the Executive Defendants) in September 2022. FE-5 said she provided specific facts and information showing the Company's failures to timely unload and move inventory were exposing the Company to mounting fees and costs. According to FE-5, Mr. Zuazo was never motivated to fix these problems and was dismissive of FE-5's information. FE-5 also said that, after Mr. Zuazo was fired, the Company told FE-5's direct superior, Mr. Mishra, that he had a certain amount of time to fix inventory management problems. However, according to FE-5, they were never fixed.

75. Former employee #6 ("FE-6") was a Director of Operations in the Atlanta metro area distribution center from May 2022 through May 2023. FE-6 reported to Chris McKinley, Vice President of Operations at Dollar General.

76. FE-6 stated that Dollar General's significant increase in inventory was due to over-ordering at the Company, its failure to correctly receive and account for inventory, and its lack of understanding of what product the Company had in its excess or off-site warehouses. FE-6 recounted that Dollar General purchased "quite a bit" of outside storage in its excess warehouses. According to FE-6, Dollar General needed to purchase the extra warehouse space due to the excess inventory sitting in trailers in Company distribution center parking lots. FE-6 said that the Company paid detention costs to trucking companies if trucks were not returned within 48 hours of unloading. FE-6 reported that there was a major Company-wide push to solve the detention fee issue by getting the merchandise into the warehouses, and off the trucks, by the end of January 2023.

77. However, according to FE-6, when Dollar General received product into these excess warehouses, it failed to enter that inventory into the WMS. FE-6 stated that entry into the WMS was the only way to create visibility into what inventory the Company had in store. FE-6 reported that Dollar General's off-site facilities did not even have Wi-Fi, making it impossible to use the WMS. As such, the Company's system and buyers did not know that the inventory existed. She stated, "they unloaded it but didn't count it." FE-6 elaborated that, because there was no room for the inventory and because it was not being booked as received in the inventory system, Dollar General's buyers kept buying and merchandise kept stacking up outside Company distribution centers. Thus, FE-6 stated, the merchandise unloaded into the warehouses was not accounted for, which created a "*big overload of excess inventory*" and a "*vicious circle*."

78. FE-6 further reported that the Company had excess amounts of obsolete merchandise. She explained that there were Dollar General warehouses full of inventory, filled to the roof with product, but there was no order fulfillment coming from those warehouses. FE-6 labeled it a "*big mess*" and stated that no cycle counts were done at these excess warehouses, as the Company simply *did not know what was in them*. FE-6 confirmed that this was "absolutely" a nationwide issue for Dollar General. FE-6 recalled that there was a major push by Vice Presidents of Operations around the country to get all the excess inventory off the trucks and into excess warehouses by the end of January 2023. Then, according to FE-6, "*everyone started dumping product, not receiving it in inventory.*"

79. FE-6 said she told Mr. McKinley about these inventory management issues. FE-6 and Mr. McKinley also did walkthroughs of the Stockbridge off-site warehouse together and Mr. McKinley saw that it was a mess. FE-6 said that Mr. McKinley and other higher-ups were the ones that secured the off-site buildings and figured out the logistics of getting the trailers to the warehouses and unloaded.

80. Former employee #7 ("FE-7") was a Senior Demand Chain Analyst from 2021 through 2023. FE-7's responsibilities included working on the finance side of Dollar General's demand chain and then in inbound transportation (in a non-financial capacity).

81. FE-7 stated that a problem with the Company's inventory system was that it would "*lose visibility of inventory*" when it sat in the distribution center yards. According to FE-7, this lack of visibility and the issues it caused were of great frustration to the demand chain group. FE-7 said that her understanding was that Mr. Zuazo was fired because he could not figure out how to relieve these inventory management issues in the distribution centers. According to FE-7, the

34

Company was not hitting performance markers, nothing was changing, and Mr. Zuazo tried to blame the COVID-19 pandemic for everything.

82. FE-7 reported that Dollar General held regular Town Hall meetings involving Company leadership, including Vice Presidents and Senior Directors. According to FE-7, the inventory problems at Dollar General's distribution centers and the need to get them cleaned up were constant topics of discussion at the Town Hall meetings during FE-7's tenure at the Company (*i.e.*, during the Class Period from 2021 through 2023). FE-7 said it was the same story every quarter, and it did not matter what department you were in, you knew they [*i.e.*, the distribution centers] were terrible. FE-7 also recounted that these Vice Presidents and Senior Directors would always explain that directives regarding the distribution centers were "***coming from the top***." FE-7 further recalled that, while these Company officials continued to discuss the distribution issues at Town Hall meetings, they stopped taking questions about them in February or March of 2023, which is when the Company was presenting its projections for the fourth quarter 2022 results. FE-7 said that Dollar General executives spoke about how constrained the distribution centers were and the fact that inventory was sitting on lots. Referring to Dollar General executives, FE-7 added "***they were fully aware***."

83. Former employee #8 ("FE-8") was a Regional Director of Store Operations at Dollar General in the Kansas City, Missouri area from August 2021 to July 2023. In her position, FE-8 had 10 District Managers who reported to her, and her job responsibility was to develop the District Managers and visit stores in the region to identify any problems and provide support. Previously, FE-8 had served at Dollar General as a Regional Asset Protection Manager from November 2019 to August 2021, and before that she was a District Manager from February 2018 through October 2019.

84.     FE-8 stated that elevated inventory levels at Dollar General were a "*real challenge*."  During her tenure at Dollar General, FE-8 stated that she believed that inventory levels rose more than 20% in the Kansas City, Missouri region.  She also reported that a large majority of the stores in that region had excess inventory.  FE-8 explained that deficiencies with Dollar General's inventory management process included that the Company was "*blindly sending*" inventory to stores.  She said that, instead of using sales data specific to each store, Dollar General would automatically send a blanket order of product to stores regardless of what a store was selling.  For example, the same amount of product was sent to stores selling $1 million as ones selling $3 million.  According to FE-8, the "bottom line" was that the Dollar General stores did not have the holding power for the excess inventory being sent to them.  The increased inventory was coming into stores but there was nowhere to put it—and yet the Company would still send more merchandise.  FE-8 further explained that Dollar General stores did not have a process for sending back overallocated merchandise—they had to "sit on it and deal with it."

85.     Former employee #9 ("FE-9") was a Senior Level Director within the supply chain organization at Dollar General for a year during the Class Period.  FE-9 stated that she reported to senior leaders at the Company, who in turn reported to the Executive Defendants.

86.     FE-9 reported being privy to a significant amount of inventory management challenges, which she said resulted from "*lax systems*" at the Company.  FE-9 explained that the Company's international import team was inundated with orders getting placed, which were overloading the Company's distribution centers.  FE-9 described this as "a major issue and concern" during her tenure at the Company.  She stated that, at Dollar General (unlike other retailers such as Walmart), finance played a role in supply chain decisions and was involved in the

"*gluttonous buying of product from overseas*." FE-9 further stated that Mr. Zuazo knew about initiatives put in place to deal with inventory issues at Dollar General.

87. As FE-9 explained, the Company was forced to get additional storage space to deal with the incoming volume of excess inventory, which was exceeding the capacity of its distribution centers. According to FE-9, the Company "absolutely" had excess amounts of obsolete merchandise, and it was stored in the distribution centers' off-site auxiliary buildings and in containers on the distribution centers' yards. FE-9 explained that, even though there was a significant amount of overage in the distribution center network, Dollar General "*continued to order at a substantial pace*," which exacerbated the issue. FE-9 stated that it was a matter of basic visibility and the Company's system for viewing inventory levels did not "let you see what you ha[d]." For example, FE-9 stated that Dollar General's system would show that the distribution center was 95% full, but not what specific items of inventory it was filled with—and it lacked detail about the items, their department, margins, or if the product was something that stores actually needed to order. FE-9 stated, "in some ways, *it's a free for all*"—with the distribution centers pushing inventory out and the stores getting "stuff they didn't order, want, or need." According to FE-9, this happened because the inventory at Company distribution centers was so high, and it was all part of a lack of process at Dollar General.

88. FE-9 explained that seasonal items further complicated the Company's inventory management problems. According to FE-9, Dollar General lacked controls to get seasonal items to the stores on time. Thus, the wrong mix of merchandise ended up at the distribution centers because there was not a proper mechanism for true visibility into whether the product ordered was selling, what was already in the distribution centers, and what was still in the supply chain. On top of this, FE-9 stated that the product just kept coming to the distribution centers regardless.

37

89. Former employee #10 ("FE-10") worked as a Dollar General District Manager for 17 stores in Missouri from October 2020 through April 2022. FE-10 reported to a Regional Director who reported to a Division Vice President.

90. FE-10 stated that, during her tenure as a District Manager, inventory issues and labor shortages were consistent problems at Dollar General. FE-10 attributed the elevated inventory issue at Dollar General to its practice of automatically shipping products regardless of need, as well as the lack of hours provided to in-store teams to perform product pushouts, which resulted in disorganized stockpiles of inventory that spilled onto sales floors. FE-10 explained that Dollar General had an automatic and perpetual inventory system, and the stores lacked the staff and ability to make corrections to the system. According to FE-10, this caused inventory counts to be off, and the system continued to send more unneeded inventory to the stores. FE-10 stated that, based on a seven-day workforce structure, it was impossible for store employees to put away the amount of merchandise required. FE-10 emphasized that: ***"Fixing inventory issues based on what distribution sent out was not possible*.**" FE-10 explained that this resulted in "impacted" store backrooms.[6] According to FE-10, items were not cycled on a first in, first out basis, and this caused product to expire as well as fire code issues.

91. Former employee #11 ("FE-11") worked at Dollar General as a Regional Asset Protection Manager in Ohio from August 2021 through October 2022. FE-11's territory included 246 stores in Northern and Central Ohio (excluding Columbus) and in Western Pennsylvania. FE-11 reported to Division Asset Protection Manager, Kim Anderson, who in turn reported to Ken Peschier, who reported to the Senior Executive Counsel for the finance department. FE-11's job responsibility was to monitor inventory levels and report on how much the Company lost due to

---

[6] "Impacted" refers to a storeroom being too jam packed with inventory to find or track anything.

inventory issues. This was predominantly monitoring inventory loss, but also included cash loss and theft investigations.

92. FE-11 stated that the Company's excess inventory problems presented constant issues for those tasked with asset protection management. According to FE-11, the factors contributing to Dollar General's inventory problems included inadequate training and staffing of store employees, high rates of turnover in store management, and the lack of effective processes for stores to turn away excess inventory delivered from the distribution centers. As she added, it is difficult to achieve training *when you have one person running a Dollar General store for five hours*. FE-11 explained that stores already backed up with excess inventory would often receive truckloads of new, unneeded inventory from distribution centers. When this occurred, store managers could not turn away the delivery. FE-11 stated, *"there's no dial to turn it down, no real process to get that done."* FE-11 said that the Company's lack of an effective process for stores to turn down truckloads of unwanted inventory resulted in excessive inventory piling up throughout stores. As FE-11 stated: "You go into any major city Dollar General and *half of them are disasters*, and a good inspector would shut them down for cleanliness."

93. FE-11 elaborated that the *Company's strategy was to keep the shelves full and limit payroll to the bone*, which meant that there were not enough employees to both fill the shelves and run the registers. According to FE-11, Dollar General stores grew so full of inventory that the excess inventory sat in boxes, piled up, and caused OSHA violations. FE-11 stated that, due to the Company's chronic understaffing problem, store managers did not have enough time to sort through the store's disorganized inventory to locate additional stock sitting in-store. Thus, managers would frequently fail to check for available in-store inventory, and instead simply marked the item as zero, causing the distribution center to send additional inventory. FE-11 also

39

said there were "huge" issues in the differences between prices on the shelf at stores and the price charged when a product is scanned for purchase. FE-11 explained that prices would change every week and, thus, need to be updated—but with staffing and payroll issues, the prices were not changed in a timely manner at Dollar General.

94. Former employee #12 ("FE-12") was a Store Manager at the Montrose, Minnesota Dollar General store from June 2019 through August 2023. FE-12 explained that her store was perpetually overstocked and would continuously get new product regardless of how well-stocked it was. According to FE-12, Dollar General stores had no control over inventory management. FE-12 recounted that, when seasonal product arrived, she could not physically fit the product in the store. FE-12 stated, "I worked in the same store (for four years), and it was impacted all the time"—which she described as "*severe*." FE-12 also said that this excess delivery of merchandise led to a lot of product being thrown out.

95. Former employee #13 ("FE-13") was an Inventory Checker in the San Antonio, Texas distribution center from November 2021 through November 2022. FE-13 recounted that trailers full of inventory sat in Dollar General's distribution centers' parking lots waiting to be checked in to the WMS. According to FE-13, when there was finally room for the merchandise in the distribution centers, the product was *not properly checked in*. FE-13 explained that the proper way to check inventory was by performing physical inventory counts before the merchandise was moved into its rightful place inside the distribution center. However, according to FE-13, the excess inventory at Dollar General made physical inventory counts virtually impossible, including because the distribution centers were littered with pallets of merchandise all over the floor as there was nowhere else to store it. FE-13 said that an inventory checker could not even walk through the floor of the distribution center to ascertain what was on a pallet—and there was a disconnect

between what was in the pallet and what was counted as being in the pallet. FE-13 said that the failure to perform physical inventory counts, as per the correct process, made it impossible to get a true handle on the inventory on hand at Dollar General. FE-13 also explained that the distribution center did not receive seasonal items anywhere near the timing of that season, and they had to figure out what to do with that merchandise. FE-13 said that *all levels of the distribution center operations knew* about these inventory management issues.

96. Former employee #25 ("FE-25") was an Executive Assistant in Dollar General's C-suite offices from October 2018 to May 2021.[7] She assisted multiple members of the Company's C-suite, including Defendant Owen, then Dollar General's COO (later CEO), and Jason Reiser, Dollar General's Executive Vice President and Chief Merchandising Officer. FE-25 reported to Tammy Mosley, who served as the Executive Assistant to Defendant Vasos and also was his personal secretary. FE-25 worked along with multiple other assistants to Dollar General's executive officers, including Nancy Abbott, the Executive Assistant to Defendant Garratt; Amanda Watts and Kammy Johns, who both assisted Mr. Zuazo; and Julie Filson, the Executive Assistant to Dollar General's head of legal, and head of HR, Chief People Officer.

97. FE-25 stated that, if an employee expressed concerns in an email, members of the Dollar General C-suite would have read those emails sent to them. Further, FE-25 explained that, if there was a concern about something being mentioned to the media, that would be an immediate red flag and would be sent to the Chief Executive Officer (Vasos) and the communications team. FE-25 also confirmed that the executive assistants were mostly there to keep Dollar General's C-suite executives informed.

---

[7] As noted above, "C-suite" refers to a Company's senior executives with "Chief" in their titles and, at Dollar General, the "C-suite" necessarily included Defendants Vasos (CEO), Owen (COO), Garratt (CFO), and Dilts (CFO).

98. FE-25 also stated that, at Dollar General, a complaint sent over email from a customer related to a store incident would be sent to Defendants Owen and Vasos for their review. For example, FE-25 stated that she would place those complaints straight onto Defendant Owen's desk and they would be placed on Tammy [Mosley's] desk to be given to Defendant Vasos.

99. Former employee #26 ("FE-26") was a Vice President, Distribution Centers at Dollar General from July 2016 to September 2022. She was in charge of a third of all of Dollar General's Distribution Centers in the U.S. She reported first to the SVP of Supply Chain, Mike Kindy, and then to Mr. Zuazo starting in April 2021 when he became the EVP, Global Supply Chain. Mr. Kindy and Mr. Zuazo in turn reported to Defendants Owen and Vasos during their respective tenures as CEO.

100. FE-26 recounted that "space was a major concern at the distribution centers" and that Dollar General acquired trailers to store the excess inventory. FE-26 stated that she personally attended meetings with Defendant Vasos where inventory management was discussed, including "executive meetings" with the leaders of the Company wherein the agenda topics included Dollar General's inventory management. According to FE-26, these "executive meetings" occurred once a month throughout her entire tenure at Dollar General (2016 to 9/2022). She explained that Defendant Vasos liked to hear issues straight from the horse's mouth. For instance, FE-26 recalled that Defendant Vasos directly questioned her about the Company's distribution centers and whether they were overstocked and she explained that, therefore, Defendant Vasos was aware of inventory issues at distribution centers.

101. As another example, FE-26 recalled that, in 2020, Defendant Vasos followed up on FE-26's request for $6 million in expenditures to buy storage trailers for the distribution network. She recounted that the purpose of these trailers was to deal with the distribution centers not having

42

enough space for excess inventory. FE-26 further explained that Defendant Vasos followed up with her to ask about the status of the storage trailers and whether the trailers were helping the Company manage its excess inventory. FE-26 stated, however, that the storage trailers did not solve the excess inventory problems because the merchandise in them was ***not entered into the Company's inventory management system***, including because there was ***no system to track the location of where merchandise was stored in the trailers***. FE-26 specifically confirmed that she had one-on-one conversations with Defendant Vasos about how the distribution centers were doing. For example, FE-26 stated that, when Vasos asked her how the distribution centers were doing, FE-26 told Vasos that, from an inventory standpoint, the distribution centers were ***full and out of space***.

102. FE-26 further stated that Defendant Vasos also knew about the Company's excess inventory issues from Mr. Zuazo. Mr. Zuazo regularly reported information to Defendant Vasos about inventory management issues, including through meetings with him on a weekly basis. FE-26 personally attended these meetings, as did the other two VPs of Distribution Centers. FE-26 stated that the topics she and Mr. Zuazo regularly discussed included specific problems that Dollar General's inventory management systems were causing at the distribution centers, including costs, wasted resources and inventory, and safety and space issues resulting from having excess inventory. FE-26 stated that all of this information was provided to Zuazo and, as such, there was no question that Zuazo knew about the significant inventory management issues at Dollar General.

103. FE-26 also stated that she needed Kindy and Zuazo's approval for multi-million dollar appropriation requests for inventory management expenses at the distribution centers. FE-26 provided appropriation requests for the Company's acquisition of trailers to store excess

43

inventory to Kindy and Zuazo so that they could present them upwards for approval by the CFO, Defendant Garratt.

104.    Former employee #27 ("FE-27") worked at Dollar General from February 2010 to December 2024.  She served as a Store Manager at Dollar General for 19 years, and then a District Manager for 5 years.  During her tenure as District Manager, the Company had consistent problems with inventory levels.  She stated that excess inventory was frequently kept in backrooms due to a lack of space to store it.  FE-27 also reported that Dollar General stores could not keep up with inventory management because they were so short-staffed.

105.    FE-27 stated that Dollar General's executive leadership knew about the problems with inventory because there were meetings and conference calls about how to handle those issues. For example, FE-27 stated that on August 1 of every year while she worked at the Company (from 2012 to 12/2024), the Company's CEO[8] held an annual meeting that discussed inventory issues. FE-27 confirmed that she personally attended all of these annual meetings during her tenure at the Company.  FE-27 stated that all Chief Officers of the Company also attended these annual meetings, including Defendants Vasos (CEO from 2015 to 11/2022 and 10/2023 to present), Owen (COO from 8/2019 to 11/2022 and CEO from 11/2022 to 10/2023), Garratt (CFO from 12/2015 to 4/2023), and Dilts (CFO from 5/2023 to present), while they were Chief Officers at the Company.  FE-27 stated that Dollar General's problems with inventory were always discussed during these meetings.  FE-27 also stated that there were periodic conference calls at the Company where the same inventory issues were discussed.

106.    FE-27 stated that, at both the August 1 meetings and periodic conference calls, Dollar General's leadership indicated they were aware of the issues with inventory management.

---

[8] During this period, Dollar General's CEO was Defendant Vasos or Owen.

She said that, despite saying they would try different approaches with the distribution centers to cut back inventory, those changes never happened.

107. FE-27 also confirmed that there was a direct correlation between understaffing and the Company's excessive inventory. For example, she said there were times when stores had only one employee working by themself, which was not enough staffing to get the products out onto the floor.

108. Former employee #28 ("FE-28") was a District Manager from June 2017 to April 2023. As a District Manager, she managed 21 Dollar General stores.

109. FE-28 stated that, at the Dollar General stores she managed, there were problems with inventory levels. She stated that the Company had an inventory monitoring system in place that did not work because of problems with its automatic replenishment function. As a result, she explained, stores always had too much inventory and warehouses continued to send out inventory to stores that did not need the inventory and had no place to store it. FE-28 stated that there was not enough staff to address these problems or even achieve what needed to be done. FE-28 stated that the main problems facing the Company concerned excess inventory, understaffing, safety and OSHA violations. She explained that the OSHA violations occurred because there was so much excess inventory blocking Dollar General stores' exits.

110. FE-28 also stated that, at least every few months, customers wrote complaints into Dollar General's corporate office about problems in stores. When this occurred, the corporate office would provide the customer complaints to the Regional Manager who oversaw the store, who would then discuss the complaints with District Managers like FE-28. FE-28 further stated that the concerns regarding excess inventory and understaffing were always reported up the chain to management.

111. As confirmed by FE-25 (*see supra* at ¶¶96-98), at Dollar General, when the Company received complaints from customers or about problems in stores, the emails would specifically be sent to Defendants Owen (COO and later CEO) and Vasos (CEO)—and a printed hard copy would be placed on their desks.

112. Former employee #29 ("FE-29") was an Assistant Manager at a Dollar General store from December 2019 to February 2023. FE-29 reported that there was an abundance of obsolete inventory at her store, which was stored on carts in the store. FE-29 further stated that she had worked at multiple Dollar General store locations and there was never enough staff. For example, FE-29 said that there was supposed to be more than one employee at the store so that no one worked by themselves, but several store locations opened and closed with only one employee working the whole day. She elaborated that it was unsafe to be in a store working alone. FE-29 also stated that there was a process for stores to scan inventory to indicate if there was too much or too little of a certain product, but it was impossible to scan the inventory products on a regular basis due to the lack of staff.

113. FE-29 stated that Company management was completely aware of these problems. She elaborated that, despite store managers complaining about these problems to upper-level management, no changes were made. For example, FE-29 said that multiple Dollar General stores that sold food and pet products were in violation of health codes and had mice problems. When management reported the problem to Dollar General's corporate office, they did not shut down the stores, and the infestations continued. FE-29 stated that, during the entire time she worked the Company, management did absolutely nothing to help and instead cut hours for employees.

114. FE-29 stated that Vice Presidents visited the stores and saw the problems with inventory and store employees discussed concerns with them. FE-29 also reported that the

46

Company received complaints about the stores from customers. She stated that the issues with inventory and staffing were affecting stores across multiple districts, and there was no way the Company's leadership did not hear about the complaints.[9]

115. Former employee #30 ("FE-30") was a Director, Private Fleet at Dollar General from May 2023 to September 2024. In this position, FE-30 was responsible for managing outbound transportation of inventory for Dollar General's private fleet, which comprised 2,500 people and handled 50% of all shipments.

116. FE-30 stated that the Company's inventory management was dysfunctional because it did not clear up inventory problems as it grew the number of stores. FE-30 stated that the Company's algorithms for inventory planning were deficient because they assumed more demand for inventory than there actually was in stores. She explained that store deliveries were scheduled once a week. However, there were frequently times when drivers would arrive at stores to find there was no room in the backroom for drivers to drop off the incoming inventory because stores had not put away the previous delivery. Drivers were frustrated when they needed to put inventory back on the truck due to lack of space in stores. FE-30 stated that those situations were specifically escalated to Dollar General's corporate office. FE-30 stated that there was a centralized customer service line where drivers placed complaints in the hopes that corporate planners would adjust inventory management according to stores' actual inventory needs. She said that, typically, these complaints also went to a regional or district operations manager who had responsibility for keeping the stores functioning properly.

---

[9] As noted above, *supra* at ¶¶96-98, 108-10, 112-14, customer complaints at Dollar General would be reported to Defendants Owen and Vasos.

117. Former employee #31 ("FE-31") was a Director, Merchandise Planning at Dollar General from August 2017 to June 2021. She worked on the corporate team and managed the merchandiser's financial planning, including by reviewing merchandise planning, profitability to meet targets, and sales and margins. She was also responsible for maintaining proper inventory levels. She was involved in creating and managing inventory levels for the non-consumables side of the business, which represented approximately 24% of sales volumes and 46% of the gross margin.

118. FE-31 reported that it was always a disaster when Dollar General stores received a shipment of inventory. She explained that regional managers were frequently put in a position where they had to get creative to deal with excess inventory their stores could not handle, such as by organizing a container to store the product or figure out something else to do with it. FE-31 stated that stores often ended up with only one person working, which was not sufficient labor to handle unloading shipments of inventory and run the store. She stated that it was inevitable that there was a correlation between understaffing and excess inventory. FE-31 explained that she had never worked somewhere that was so strict on staffing levels in the stores. She stated that there were too few employees working at the store with a lot to do, including organizing, pricing products and dealing with inventory, which caused a cascade effect.

119. FE-31 also described problems at the Company's distribution centers. For example, there was a problem with product being backed up at the distribution centers, especially for packaged items with expiration dates four to six months out. These items were subject to slow downs and would sit in distribution centers. The Company often did not account for changes in demand and inventory needs when buying merchandise, which resulted in a surplus of items like seasonal items, such as back-to-school, Halloween or Christmas products. For example, the

48

Company offered the same $2 holiday lights from year to year, and employees were instructed to store the lights in tote bags for the following year. However, nine months later, employee turnover made it impossible to find the totes, so the item was re-ordered and sent to stores again. As a result, per FE-31, there were a lot of products that built up at the Company with not a lot of demand.

120. FE-31 stated that Dollar General did not want to mark down out of season inventory to move it out of warehouses and, instead, waited to sell these excess products when they came back into season the following year. This caused significant amounts of unwanted products to pile up in the distribution centers for a whole year until the Company could attempt to sell them again.

121. FE-31 also stated that Dollar General's corporate controller, Anita Elliot, monitored aging inventory and regularly produced a report regarding inventory that was between six and eighteen months old. FE-31 personally reviewed these reports and confirmed that Dollar General's leadership received the reports and had visibility to aging inventory through the reports and store visits. For example, based on FE-31's firsthand experience, these reports contained information about product SKU numbers, product descriptions, when the products were first received, last received, the recent flow, the total quantity bought, total quantity on hand, sales, how much supply was left and whether products were older than six months or a year and a half. The report was reviewed by the Company's merchant staff and then by senior leadership, including the Company's C-suite and their direct reports. The report was only four to five pages and easily readable with 30 to 40 SKUs per page and a couple hundred SKUs in total. The reports were run monthly and reviewed once a quarter.

122. FE-31 stated that Defendants Vasos, Dilts, Garratt, and Owen all received information concerning these inventory issues. For example, FE-31 stated that when large amounts of inventory built up, controllers had to plead their case for why they ordered that much

49

inventory to Defendants Vasos, Dilts, Garratt, and Owen. As another example, FE-31 attended monthly forecast reviews with Defendant Garratt (CFO) where there were discussions about how the Company got to where they were and if changes needed to be made. The chief merchants, Defendant Garratt or Defendant Dilts attended those meetings and had an opportunity to express their concerns. FE-31 attended those monthly forecasting meetings, along with Defendant Garratt, Defendant Dilts, and the chief merchant throughout duration of her time there. There were three meetings every month regarding forecasts; the first one occurred with FE-31's team the first week of the month regarding forecast planning; the second meeting was with the Senior Vice President, Chief Financial Officer, and General Merchandise Manager about issues regarding what went wrong. The following week, the General Merchandise Manager took that information to Defendant Vasos and the rest of C-suite. These meetings happened consistently every month, with the exception of a possible cancellation during Christmas week.

123. FE-31 also stated that she personally interacted with Defendant Vasos about a dozen times and routinely prepared her manager for conversations with Defendant Vasos about inventory issues.

124. FE-31 explained that the Dollar General C-suite, including Defendants Vasos, Dilts, Garratt, and Owen, had knowledge that one-third of stores had way too much product, as that information was reported up from the store operations group, which was in charge of pricing and tasks lists. The head of store operations reported directly to Defendant Owen as COO. The stores were backed up with inventory, and 75% of the complaints from employees in the stores related to understaffing.

125. FE-31 also reported personally attending Dollar General held town hall meetings where inventory and staffing issues were regularly discussed. Defendant Vasos ran the meetings

50

with the corporate office and Defendant Owen ran the meetings with regional teams.  FE-31 stated that no one spent a dime at the Company without the approval of an executive or C-level leader, and they exercised tight control over how much was spent.  For example, FE-31 explained that the demand chain team had to defend how much they had for a basic product for replenishment quantities.  If FE-31 exceeded $1,000 on an order, she needed to explain herself and defend that order.

126.    Former employee #32 ("FE-32") was a District Manager, Regional Director at Dollar General from November 2020 to July 2024.  She managed 20 to 24 stores and worked on inventory.

127.    FE-32 stated that there were ridiculous amounts of obsolete merchandise, sometimes up to five years old, piled up at Dollar General stores.  FE-32 stated that this excess inventory was stored in the backrooms of stores in grey moving boxes called totes or rolltainers.  She stated that stores were understaffed and had too much going on to deal with the amount of inventory they were receiving, which caused excessive inventory increases.  She stated that all 20 of the stores she oversaw had these problems.  She stated that Dollar General had the worst inventory system she had ever seen.

128.    FE-32 stated that Dollar General had no exit strategy to deal with the excessive, unnecessary inventory that built up in the stores.  For instance, FE-32 stated that, while attempting to deal with excess inventory, she found "New Years 1999" key chains.  The Company did not have a strategy to get rid of the products and there was no way the stores would sell New Year's keychains from 1999.

129.    FE-32 stated that once a year, a third-party company would come to stores to perform inventory audits and he had to report inventory and shrink.  These reports came in within

several weeks of the audits, and contained information showing how much inventory actually had versus what they were supposed to have, and whether there were discontinued items stocked. FE-32 stated that all of this information was at the fingertips of Dollar General executives. FE-32 also raised concerns about understaffing with her bosses and bosses' boss.

130. Former employee #33 ("FE-33") was a Regional Director in Training at Dollar General from November 2020 to February 2022. As a Regional Director, FE-33 oversaw 16 Dollar General stores in Birmingham, Alabama. FE-33 reported to Trey Ruzic, Regional Director.

131. FE-33 reported that the Company's stores had excessive merchandise. She also stated that the backrooms of the stores were impacted with a lot of inventory and the Company did not have enough staff to get it out on the floor. According to FE-33, there was always excessive inventory in the backroom and too much product to put on the floor—it was not possible to get it done. She stated that to deal with excess inventory in the stores, District Managers used offsite storage units to keep the product—and she did not know how the inventory possibly could have been properly tracked when kept offsite.

132. FE-33 reported that the Company had a third-party perform inventory counts every year. She stated that the inventory counts revealed that each store had more inventory than the year before. The audit results were reported up the chain, including to the CFO (Defendant Garratt), and the CEO (Defendant Vasos).

133. Former employee #34 ("FE-34") was a Merchandising Director at Dollar General from February 2019 to March 2025. She worked as a senior buyer and merchant in the corporate office.

134. FE-34 also described Dollar General's stores as a "sh*t show." She reported that Dollar General's inventory replenishment system was based on averages rather than real inventory

data, so stores did not receive the appropriate amount of inventory that they needed. She reported that Dollar General stores also often had only one person in the store and too much inventory for one person to put out on the shelves. FE-34 explained that not all stores did inventory counts because there was not enough staff in store to perform them. FE-34 further stated that the inventory management system was very outdated. She stated that, despite knowing these systems were ineffective, the Company did not want to invest resources into updating their inventory management systems. FE-34 also described inventory management problems at the distribution centers. She recounted instances where she was told inventory items were never received from the supplier, but in fact they were sitting in a metal shipping container in the distribution center yard. FE-34 reported that the merchandising team openly joked that the amount of shipping containers of inventory in distribution center yards could wrap around the globe at least once.

135. FE-34 stated that the C-suite[10] was 1000% aware of the problems with Dollar General's excess inventory levels. Indeed, FE-34 explained that Defendants Vasos, Garratt, Owen, and Dilts and Mr. Zuazo all knew about the excess inventory problems because they all attended meetings about it, which FE-34's direct supervisor, Rick Channels (VP, Divisional Merchandise Management) personally described to her. FE-34 further reported being in multiple meetings with Defendant Vasos, including on a video conference call during which Vasos accused FE-34's team of not working hard enough to fix Dollar General's inventory problems. In addition, she stated that the Company held town hall meetings at the end of 2023 during which the inventory issues were discussed. FE-34 confirmed that she personally attended these meetings.

---

[10] As discussed *supra* (*e.g.*, ¶11 n.1), the Dollar General "C-suite" included Defendants Vasos, Garratt, Owen, and Dilts.

136. FE-34 further stated that Dollar General's excess inventory problems were frequently discussed by senior and executive leaders through meetings and via email. For example, she stated that the Senior Vice President personally attended business and line reviews and Dollar General Inventory Directors, Vice Presidents, and Senior Vice Presidents of Inventory communicated over email about the problems with inventory levels. As a result, Dollar General's leadership had a clear line of sight into the inventory levels.

137. FE-34 stated that the Company's disappointing financial quarters in 2022 were not because of Winter Storm Elliot, but in fact had to do with issues with excess inventory. She explained that all of the Dollar General employees knew this.

**C.      Multiple Former Employees Confirmed That Dollar General Failed To Properly Account For Inventory, Including Inventory That Was Improperly Thrown Into Dumpsters**

138. As summarized above, several former employees reported that Dollar General lacked basic inventory controls, including for example FE-3, FE-5, FE-6, and FE-13. These consistent reports from insiders who worked at the Company demonstrate that Dollar General could not track the excess inventory that was being stored in its off-site warehouses. Accordingly, Defendants were necessarily unable to properly account for the inventory in these off-site warehouses, *i.e.*, provide adequate reserves given the inventory's reduced utility to the Company.

139. Several former Dollar General employees further highlighted the fact that the Company was not adequately accounting for its inventory—and elaborated that Dollar General was improperly disposing of massive amounts of inventory in dumpsters. The facts supplied by these former Company insiders further confirm that Defendants' inventory-related statements detailed below were materially false and misleading when made.

140. The multiple former Dollar General employee reports explaining that the Company was not properly tracking, or accounting for, its inventory expose a host of additional statements

54

made by Defendants as materially false and misleading. For example, Defendants assured investors that Dollar General performed "an annual LIFO analysis whereby *all merchandise units* [we]re considered for inclusion in the index formulation" and an "[a]n *actual valuation of inventory* . . . at the end of each year."[11] These statements were materially false and misleading because the Company was not tracking all of its inventory and, therefore, it could not possibly have considered "all merchandise" in analyzing inventory and it could not have performed a proper "actual valuation" of its inventory. Relatedly, Defendants disclosed on a quarterly and annual basis certain key financial metrics that depended on a materially accurate/proper valuation of Dollar General's inventory, including, for example, gross profit and related metrics (as detailed below). These financial metrics were also rendered materially false and misleading when made by the fact that, as Defendants knew or ignored, Dollar General was not properly tracking or accounting for inventory, as summarized herein.

141. For example, former employee #14 ("FE-14") was an Inventory Control Counter in Dollar General's Jonesville, South Carolina distribution center from November 2010 through March 2022. FE-14's job responsibilities included inventory counts. By the time FE-14 left the Company, she was doing two counts per day because the distribution center was losing track of so much of the inventory. FE-14 also reported that a lot of product at her distribution center was *being thrown away without proper accounting*. According to FE-14, Dollar General's distribution centers were required to perform an audit or "inventory count" every quarter to ensure that inventory was stored in the correct amounts and locations reflected in the WMS. FE-14 said that she did not know how the Company passed its inventory counts when the distribution center

---

[11] As explained further below in ¶494, LIFO refers to the "last-in, first-out" inventory costing method that assumes for accounting purposes that the last goods purchased or manufactured are the first ones sold, irrespective of the actual physical flow of goods.

was disposing of so much product. Indeed, according to FE-14, the Jonesville distribution center was throwing so much product away that a rubbish disposal company was *coming two times each day to empty dumpsters*. By March 2022, FE-14 reported seeing the dumpsters containing Dollar General inventory *being emptied four times in one day*. FE-14 stated, "I knew we should not have been able to pass inventory [*i.e.*, inventory counts] but with the way management did the numbers, we somehow passed."

142. FE-14 recounted hearing that 14 trailers of bottled water "*went missing*" because they were unloaded in another warehouse without being properly input into the WMS. FE-14 also witnessed the hiding of product in trailers. She said that Dollar General employees "would pack product in trailers and put it out on the yard," or other random incorrect locations, which caused the inventory checkers to lose track of the product and not enter it into the WMS. When this happened, according to FE-14, the product was referred to as "stray product," and the proper procedure was to find the correct location and enter it into the system. FE-14 reported that the Jonesville, S.C. distribution center had so much stray inventory to offload that Company management had employees ship it to stores at random, which FE-14 referred to as a "force-out." This resulted in Dollar General stores receiving product that they did not need. Meanwhile, FE-14 said the product was still not accounted for in the WMS. According to FE-14, this practice made it impossible for the Company to have a handle on inventory, much less to conduct proper inventory management.

143. FE-14 reported that she was terminated as retaliation for raising these inventory management issues. In the course of performing her duties, FE-14 took it upon herself to spend two-to-three weeks finding product in the distribution center and placing it where it was supposed to go. Instead of appreciating her effort, FE-14 said her managers felt she was overstepping,

accused her of doing things that she was not asked to do, and threatened to fire her. At this point, she called Corporate to complain about the Senior Manager of Human Resources, Drake Jackson, and her manager, Janet Andrews. However, instead of performing an investigation into her complaints and the inventory management issues, Dollar General terminated FE-14.

144. Former employee #15 ("FE-15") worked as a Senior Supply Chain Specialist in Dollar General's Jonesville, South Carolina distribution center from January 2021 to March 2022. FE-15 had significant experience working in the retail supply chain business, as she had worked in supply logistics at Walmart for 30 years prior to joining Dollar General.

145. FE-15 reported witnessing a *significant amount of intentional disregard of compliance with SOX [i.e., the Sarbanes-Oxley Act]* at Dollar General. FE-15 said she knew "for a fact" that Dollar General's Jonesville distribution center had *over $2 million* in physical inventory that was "*not showing on paper*." She said this was a "*nightmare*" to someone with her prior experience in retail. FE-15 explained that this $2 million in missing merchandise was simply billed to stores—instead of investigating where the product was and removing it from store invoices. According to FE-15, "Anyone from an external (inventory) counting team could do a count of inventory, and after 30 minutes they'd be able to say *this whole thing is built on sand*."

146. FE-15 explained that the Company was hauling away *up to four compact trash containers of merchandise a day* at the Jonesville distribution center. According to FE-15, extra merchandise would sit on racks without identifying labels, and a supervisor would have to force-bill it to a store, which she said was a common occurrence. FE-15 also stated that product was set aside in "rework areas" to determine where it would be stored—but the inventory would be simply thrown away, and not properly "damaged out" [*i.e.*, reduced in value or marked down] in the Company's system. To FE-15, Dollar General's discarding of product without damaging it out of

the system via proper accounting was a SOX violation. As FE-15 explained, a company must by law account for all merchandise, even if it is damaged out. But, as FE-15 recounted, this is not the process Dollar General followed, as it did not even have proper documentation for merchandise. FE-15 stated that these practices led to a massive amount of missing and unaccounted for product at Dollar General.

147. FE-15 said she took her concerns to the highest levels in the Company that she felt she was permitted—*i.e.*, her Vice President—and she "screamed it from the highest mountain." She reported using pictures, videos, and paperwork to try to show how bad things were to higher ups in the Company, including Dollar General directors and assistant directors. FE-15 said that they assured her that action would be taken, but ultimately they appeared to have no interest in doing things the right way.

148. Former employee #16 ("FE-16") was a Senior Internal Auditor, from May 2017 through April 2023. FE-16 said that the Company's purchasing of merchandise was focused on margin pressure. By the time FE-16 left the Company in April 2023, she said the buyers were *"**definitely**"* being instructed to make purchasing decisions based on how it would affect the Company's margins—instead of buying merchandise based on an analysis of actual demand.

149. As FE-16 explained, depending on what the numbers looked like at the end of a quarter, the Company ***would buy unnecessary*** items to bring the margin way down or way up, depending on how they wanted the financial statements to look. She referred to this conduct as "manipulation," explaining that the Company's "margin at the end of a quarter is the number they have achieved . . . but not exactly what the actual margin would be if operating like normal."

150. Former employee #17 ("FE-17") worked as a Distribution Supervisor in Dollar General's Indianola, Mississippi distribution center, which she said was approximately 800,000 square feet, from 2020 to 2023.

151. FE-17 reported that inventory at the Dollar General Indianola distribution center was "*grossly mismanaged*." FE-17 further explained that, at the Indianola distribution center, multiple dumpsters were filled daily with damaged dry goods. She estimated that, in her department (about 1/3 of the facility), $10,000 to $15,000 in damaged sellable freight was being *thrown into dumpsters every day*—and the total number could "very well" have been *three times* that for the whole facility. FE-17 further recounted that, when inventory was damaged at her facility, it was thrown away with no way of tracking it. According to FE-17, when something is thrown away, it is supposed to be accounted for through a specific process and, at Dollar General, that process was supposed to be managed by the inventory control department at each distribution center. But FE-17 stated that this process was *not* followed at Dollar General's Indianola distribution center. Instead, FE-17 reported that "*dumpsters full of un-accounted for merchandise were taken away every day*." FE-17 also compared notes with Dollar General employees at the distribution center in Jackson, Georgia, which had an "identical" problem.

152. According to FE-17, rather than address any of the underlying issues arising from the Company's poor inventory controls, management masked the problem. For example, FE-17 explained that if there was supposed to be 20 cases of something in the distribution center and the inventory count performed reflects only five cases left, but instead they found 15, they would throw out the 10 cases to make the inventory numbers match or would arbitrarily ship the 10 excess cases to random store locations on random shipments to make the numbers match.

153. Former employee #18 ("FE-18") was an Inventory Control/Quality & WMS SuperUser Manager in Dollar General's Atlanta metro area distribution center that housed perishable items from May 2021 through January 2022. She reported to Brandy Payne, the distribution center's General Manager.

154. FE-18 stated that inventory at the distribution center was never accurate. As she explained, at Dollar General, when product arrives at the distribution center it is accompanied by a purchase order. According to FE-18, at Dollar General, inventory was routinely accounted for incorrectly and then the purchase order would be closed—and, once closed, the purchase order could not be re-opened. Consequently, FE-18 explained, the Company's inventory control team was unable to ascertain that the purchase orders were short and make the necessary adjustments with the finance team. FE-18 found ***thousands of improperly accounted for inbound purchase orders, which amounted to millions of dollars' worth of merchandise.***

155. FE-18 further explained that inventory was not properly accounted for when received by the Company *and* it was not properly accounted for when discarded by Dollar General. The Company stored obsolete inventory in the distribution center and, according to FE-18, waste management was called for much of the obsolete merchandise, and ***it was never properly damaged out*** by the Company.

156. FE-18 also recounted persistent issues of excess inventory at Dollar General. FE-18's inventory control team would perform physical counts of the merchandise, which were referred to as cycle counts and FE-18's superior, Ms. Payne, had to sign off on them. FE-18 explained that these counts always revealed that inventory was excessively high. When FE-18 would meet with Ms. Payne and tell her they were high, Ms. Payne would laugh and say there was nothing that could be done about it.

157. FE-18 also explained that, when distribution centers sent product to the stores, if there was an error, the stores would create ticket requests for the distribution centers, indicating that the orders were inaccurate. Dollar General's internal "goal" was to have no more than 10 tickets a day. But FE-18 recounted that her inventory team at the distribution center would receive *thousands* of these tickets every week—indeed, at one point, FE-18's team was receiving *around 6,000 tickets a week* from stores.

158. FE-18 said that she clearly communicated these issues—both in writing and verbally—to her immediate superior, Ms. Payne, as well as the District Operations Manager, and a visiting General Manager. However, according to FE-18, this fell on deaf ears, and she felt her integrity was being compromised. As FE-18 elaborated:

> If you deposit $200 in a bank, you expect to get that (full amount) when you go back and ask for it. If there's only $150 there, you would be upset. The customers are expecting us to hold inventory *with integrity, and it was not there*.

FE-18 also raised this issue with human resources at the distribution center, as well as with a Dollar General representative at Corporate named Mr. Wilson. Mr. Wilson visited the distribution center and FE-18 explained the inventory issues plaguing the center. Mr. Wilson told FE-18 that he would investigate these issues, but he never got back to her. FE-18 said that there was *never any push to make changes* and address these problems. Ultimately, FE-18 left the Company because she felt her integrity was jeopardized by these issues.

159. Former employee #19 ("FE-19") was an Inbound Outbound Operations Manager in Dollar General's Bessemer, Alabama distribution center from November 2019 through November 2022. The distribution center was run by a director who reported to a Regional Director.

160. In FE-19's experience, the elevated inventory levels at Dollar General were caused by a lack of properly followed process—particularly around accounting for damaged inventory.

61

For example, FE-19 explained that if a "pallet"[12] of inventory fell off a rack in the distribution center and inventory was partially damaged, the correct process for accounting for that merchandise was to review the inventory, pull out what could be salvaged, and "damage out the rest." However, according to FE-19, this process was not followed at Dollar General. Instead, FE-19 reported that the Company **discarded the damaged merchandise without performing the proper accounting for it**. FE-19 said she knew *"for a fact"* that the damaging out of merchandise was not handled correctly in Dollar General's Bessemer distribution center.

161. Former employee #23 ("FE-23") was a District Manager for 26 Dollar General stores in Arkansas and Missouri from November 2016 through December 2023. FE-23 reported to a Regional Director who reported to a Division Vice President. FE-23 explained that most of the stores she oversaw suffered from excess inventory issues. FE-23 also recounted disarray in the inventory write-down process. She said that stale or outdated inventory needed to be marked down because inventories were climbing. However, FE-23 explained that when district managers marked down the excess inventory they were fired by the Company. As FE-23 explained, this was dead inventory, but it would still be listed at the same price it was listed a year prior. FE-23 said that the Company would twice a year put those items on sale for 50% or buy one get one free, instead of the correct process: instituting a progressive markdown followed by "damaging out" the inventory and allowing a bargain outlet to buy it.

162. Former employee #35 ("FE-35") was an Assistant Director at a Dollar General distribution center from 2018 to mid-2020. FE-35 stated that there was an abundance of excessive inventory at her distribution center. She recounted that her distribution center fell behind on

---

[12] A "pallet" is a flat wooden platform used to hold a batch of product in a warehouse. Pallets typically have a hollowed-out center to make it easy for forklift trucks to lift and move them.

shipments to stores—leaving days' worth of inventory on carts that were not even processed. FE-35 also reported that there were a lot of shady practices going on at Dollar General's distribution centers. For example, she recounted an instance where the director of a Dollar General distribution center in Mississippi received a shipment of merchandise and simply dumped it because his distribution center could not handle the inventory.

163. FE-35 stated that Dollar General's warehouses "got away with murder" because of the lack of accounting for inventory at the Company. She reported this problem to her boss and her boss's boss but no changes were made. According to FE-35, the Company's leadership knew what was going but cared only about maintaining or increasing Dollar General's stock price.

164. Former employee #36 ("FE-36") was a District Manager at Dollar General from December 2010 to January 2025. Prior to becoming a District Manager, she worked as a Store Manager for five years.

165. Like the other former employees, FE-36 also reported that Dollar General's inventory system was "broken." For example, FE-36 reported that trucks would deliver 1,000 pieces of products to stores within her district each week, even though the stores could not sell 1,000 pieces of inventory every week. FE-36 recounted that the Company's distribution centers needed to get rid of backlogged inventory, and the Company did not care that stores could not sell all of that inventory—they just wanted it out of the warehouses.

166. Dollar General systematically covered up this excess inventory from investors. For example, FE-36 reported that there were at least three instances where the District Vice President sent out emails requesting volunteers to go to New Jersey a week ahead of investor visits to clean up the stores. FE-36 personally went to New Jersey and two stores in New Hampshire to "bail the stores out." FE-36 had firsthand knowledge of emails, phone calls, texts, and conference calls

wherein the Company requested volunteers to help with the store clean ups in advance of investor visits.

167. FE-36 reported that District Managers rented U-Haul trucks and stored excess inventory in the trucks during investor visits so that investors would not see how overstocked the stores were. FE-36 confirmed she personally had to hide inventory in the U-Haul trucks while investors toured the stores on three occasions. Indeed, FE-36 recounted that she had personally drove the rented U-Hauls and packed merchandise into the U-Haul, drove the U-Haul down the street, parked and padlocked it, and then drove it back to the stores and unloaded the excess inventory as soon as the investors left. FE-36 reported that the U-Haul was rented for as long as it needed to be until the investor meeting was over. FE-36 explained that the preparation of the store could start five days prior to the investor visit and continue each day until the investor's arrival.

168. FE-36 also recounted that, in preparation for the investor visits, she cleaned out backrooms and marked rolltainers to ensure that they went to the correct location. FE-36 reported that she returned merchandise into the backrooms, so it could be used later to stock the sales floor. FE-36 stated that nine out of ten stores did not keep up with getting backroom's stock onto the floor. FE-36 explained that the Company did this to hide the amount of products that were out of stock in the stores and to make it look like there was a good freight process when there was not. FE-36 described this practice as a "shell game" and "a pony horse show."

169. FE-36 reported that stores "blew their budgets" trying to prepare for the investor visits, including payments for renting the U-Haul, flights and hotels for employees who would come from out of town to help clean up the stores. FE-36 explained that, depending on the condition of the store and how many stores were being visited, *it sometimes required up to 50*

*people to prepare for the investor visits*. FE-36 recounted that the costs to prepare for the visit included up to 50 hotel rooms per night, $25 per-diem per person, salaries, plus travel to get to the locations (cars and planes). She also reported that, prior to the investor visits to the New Jersey stores, the Company hired salaried employees from other states to assist in the clean up process, and the payroll reflected overages in the districts where the employees came from. FE-36 further reported that Defendant Vasos would participate in these investor visits—flying by private jet to arrive at the long-scheduled visits—and that Vasos or his direct report (Steve Sunderland) approved the extra expenditures incurred in connection with hiding the extra inventory from investors (indeed, a District Vice President could not have approved that type of budget expense).

170. FE-36 confirmed that stores knew when investors planned to visit. FE-36 also explained that stores knew anywhere from two weeks to five days out where the private jet Defendant Vasos traveled in was going and when it would arrive.

171. FE-36 explained that there were two different payrolls, investor payroll and Dollar General payrolls, with an extra 100 hours a week for the stores to look good for investors. FE-36 reported that there were other Dollar General stores only 10 miles down the road with 80-100 less hours allocated to them, as those stores were not near the homes of investors.

### D. Defendants' Refusal To Invest In The Company's Workforce And Chronic Understaffing At Dollar General Stores Exacerbated The Excess Inventory Problems Plaguing The Company

172. With respect to their staffing practices, Defendants told investors during the Class Period that they "*proactively* seek ways to *continue investing in*" Dollar General's employees and boasted of "*record staffing levels*" at the Company. Defendants also repeatedly represented during the Class Period that Dollar General stores were "operated by a store manager, one or more assistant store managers, and three or more sales associates"—*i.e.*, *four or more employees*.

65

Contrary to Defendants' representations, multiple former Dollar General employees consistently reported that Company stores suffered from chronic understaffing, as summarized below.

173. Former employee #20 ("FE-20") worked for Dollar General for almost 15 years holding multiple retail-related positions, the last being a Senior Manager. FE-20 said she visited upwards of 2,500 stores during the period from 2020 to 2023.

174. FE-20 attributed Dollar General's excess inventory problem to two main reasons: first, Dollar General stores did not have enough people, nor the payroll, to get the stores stocked efficiently and, second, the product sent to the stores via the Company's replenishment system was not the product that the stores needed. With respect to the first issue, FE-20 explained that when product arrived at Dollar General stores, there were never enough "bodies" to get the product onto the shelves—and "stores *must* have the proper amount of people in place to stock the inventory when the truck arrives." Moreover, FE-20 recounted, because Dollar General stores typically do not have stockrooms, just small receiving rooms, the extra inventory ends up stacked on the sales floor, blocking aisles and egresses. As FE-20 explained, this led to the Company's OSHA violations. FE-20 recounted that Dollar General stores would operate with only *one individual* during the day for four- to five-hour stretches, which according to FE-20, is inadequate for a store to run properly. Among other things, this resulted in key tasks like price changes not being performed. FE-20 estimated that this occurred at *between 30% and 50% of Dollar General stores.*

175. On the second issue, FE-20 said that Dollar General's replenishment system was set up so that product was shipped in full packs, even when only a few items were needed. For example, as FE-20 explained, while a store might have a shelf that holds only eight bottles of Tylenol, the Company would ship multiple cases that hold 12 bottles each. According to FE-20,

the excess inventory would sit in the store with no way to have it rotated out to the shelves. FE-20 also recounted that understaffing posed a problem for inventory counts.

176. FE-20 stated that Dollar General Regional Directors held a meeting at the start of the fiscal year and the District Managers held an annual meeting near the end of July every year. FE-20 said that she occasionally attended these meetings and other attendees included Senior Vice Presidents, Vice Presidents and Directors. FE-20 said she believes that Defendant Owen, when he was COO, attended these meetings at some point. She noted that there was a marked change in the tone and content at the Regional Directors meeting in February 2023, as opposed to previous years. A lot of the topics had to do with safety regulations and getting stores up to standards. To FE-20, this seemed to be a reaction by the Company to the OSHA violations. Further, FE-20 recalled that when she heard about the Company investing $100 million to improve store standards, she understood it was in response to the OSHA violations and regulatory concerns.

177. Former employee #21 ("FE-21") was a Store Manager at Dollar General's New Braunfels, Texas store from August 2021 to November 2023. FE-21 recounted that the Company insisted that she could ***only use 119 work hours*** to schedule seven employees at her store, which was not enough hours for a store to correctly perform standard tasks such as stocking, receiving and cataloging inventory. Further, FE-21 stated that a Dollar General store is supposed to have $15,000 in inventory in its back room, but in some instances, the back room would have $100,000 in inventory because there were not enough staff hours to get the shelves stocked and inventory rotated. FE-21 attended meetings where the district and regional managers discussed inventory numbers, as well as inventory management issues from over the last year. FE-21 informed her district and regional managers about the inventory control issues in her stores. However, rather

67

than address any of systemic issues that led to these problems, these district and regional managers instead blamed FE-21.

178. Former employee #22 ("FE-22") worked at the Company from November 2013 to April 2023. She started her career working in Dollar General stores, was promoted to the Corporate side, and eventually became a Senior Project Manager in Project Execution Support, reporting to Dollar General's Director of Project Execution and Support. In this role, FE-22's primary job responsibility was leading remodel projects for Dollar General, and directing a group that oversaw six remodels every week per region.

179. FE-22 stated that, as part of her job responsibilities, she would pre-visit stores before remodels and speak to the District Managers and assess store conditions. FE-22 reported visiting 1,400 stores in 23 states over a two-year period and said that it was common for these stores to have *"impacted" stockrooms*—which (as noted above) meant that these stock rooms were too packed with inventory to find product. FE-22 attributed Dollar General's excess inventory problems to the fact that there were not enough staff members to put products on shelves to sell it—so instead, product ended up sitting in the store receiving room. FE-22 explained that these inventory management issues were systemic across the Company. FE-22 raised these inventory management issues with divisional vice presidents in the Operations Division, as well as senior directors and regional directors. The "constant theme" of these conversations was impacted stockrooms, and FE-22 copied her director on all the communications she had about this issue with regional directors.

180. FE-22 said that, at the store level, the Company lacked an inventory system that accurately reported the quantity of product or where it was located. FE-22 explained that this stemmed from the fact that there was typically no manifest to accompany truck deliveries to

68

stores—stores would be billed for inventory and the stores accepted whatever arrived without an itemized inventory to check. FE-22 also stated that, at Dollar General, there was a huge discrepancy between the amount of merchandise that came off a truck versus what the store would get billed for. FE-22 stated that the stores had no time to correct inventory discrepancies due to the Company's labor shortage. FE-22 explained that the elevated inventory issue was aggravated by the fact that some small stores were pressed for space causing them to have too much inventory per square foot which in turn led to regulatory compliance issues.

181. FE-23 (the former Dollar General District Manager for 26 stores discussed *supra* in ¶161) said that most of the stores she oversaw suffered from excess inventory issues—and explained that there is *"of course" a correlation between understaffing and the excess/elevated inventory*. FE-23 recounted the "terrible stress" on the team caused by this situation, as employees and store managers were constantly having to work overnight and come in early. FE-23 said that senior leadership at Dollar General knew about these inventory management issues. As she explained, due to regulatory violations, Dollar General started putting cameras in specific places within the stores. FE-23 said it used to be that only the loss prevention group had this sort of access to a store's security systems, but the Company changed this so that district managers all the way up to Senior Vice Presidents could access the cameras in any store nationwide. FE-23 stated that this was a reaction to the workplace safety violations the Company had been charged with. FE-23 said that district managers were mandated to watch the cameras and had to prove that they looked at every store and every view. According to FE-23, there was a tickler system within the program that tracked the number of views by a district manager. FE-23 stated that reports about camera views went up to the divisional level and Tod Boyster, Vice President, Operations.

182. Former employee #24 ("FE-24") was a District Manager at Dollar General for dozens of stores for multiple years during the Class Period. FE-24 recounted that, during her tenure, the stores she oversaw experienced chronic understaffing. FE-24 also stated that she visited the stores in her district and found them in disarray, suffering from myriad problems with inventory control, staffing, training, and employee retention. FE-24 said she witnessed these issues firsthand, including from store visits attended by the Company's executive leadership. For example, FE-24 recalled visiting a store in Madison, Tennessee with Steve Sutherland (Executive Vice President, Store Operations) and Connie Droge (Senior Vice President, Store Operations) because it had received so many complaints. According to FE-24, the store was a "wreck" during the visit and Mr. Sutherland and Ms. Droge saw boxes of excess inventory blocking fire exits.

183. FE-24 explained that the excess inventory in Dollar General stores was driven by inaccurate stock counts. According to FE-24, when stores could not provide an accurate accounting of their inventory, the Company would automatically ship them more product. For example, FE-24 stated that, if a store's inventory count showed a certain product was out of stock, the distribution center would register that as requiring an additional shipment, which the system automatically ordered. FE-24 also stated that "force-outs" contributed to the Dollar General stores' excess inventory problem. According to FE-24, a force-out occurred when Dollar General distribution centers, which were suffering from excess inventory problems of their own, would "force" product out to a store that did not need it. FE-24 reported that these force-outs further cramped the already tight spaces at stores—and they happened very often at Dollar General. FE-24 noted that, under Dollar General policy, stores were not allowed to refuse truck deliveries.

184. FE-24 stated that these problems caused *high turnover rates* in Dollar General store management positions. According to FE-24, the burden would fall on her, as a District Manager,

to fill the turnover in the store manager position with a "warm body," but without adequate resources to ensure competent managers were hired to perform inventory counts. As a result, according to FE-24, the problems were recurring at Dollar General. To make matters worse, FE-24 reported, the Company did not support its in-store employees, including by trimming labor hours.

185. FE-24 summarized that Dollar General's operations were "***not right***" from top to bottom. She explained: "I've been in them all [*i.e.*, the stores], and it's the same issues everywhere." FE-24 said that the Company had big box aspirations but used cost-cutter operations, with "disastrous results."

186. In addition, several additional former Dollar General employees (discussed *supra*) confirmed the staffing problems plaguing the Company. For example:

    a. FE-2 described chronic understaffing at Dollar General that was exacerbated by the fact that she was given limited labor hours to assign as well as a small staff to begin with, and that she had no control over staffing. As a result, a single store employee was expected to run a register and unload one rolltainer per hour, all while having to assist, and deal with, lines of purchasing customers.

    b. FE-10 explained that staffing restrictions were a consistent problem at Dollar General with the lack of hours provided to in-store teams to perform product pushouts causing disorganized stockpiles in inventory areas that spilled onto sales floors. Indeed, FE-10 said that Dollar General stores lacked the staff to make corrections to the Company's automatic inventory system. According to FE-10, the Company had a store manager internal pipeline structure in place to address the constant store manager turnover—so District Managers were expected to have a

pipeline of six associate managers ready at any time to be promoted to store manager due to the turnover. As FE-10 explained, the Company had a chronic issue with turnover because store managers would get burnt out from being overworked and exhausted from all the extra work expected of them as salaried employees. FE-10 said that store manager turnover was a metric that Dollar General tracked closely.

c. FE-19 explained that there was not enough manpower at the Company's Bessemer distribution center, which caused the mishandling of and improper accounting for product. She said the inventory management group at the Bessemer distribution center was "barely manned." As FE-19 explained, there is a correlation between staffing and elevated inventory levels—if a company is barely staffing for the work that needs to get done, then it also does not have the staff (nor time) to enforce the following of standard operating procedures.

d. Likewise, FE-18 explained that employee turnover was a constant issue at the Atlanta metro area distribution center.

e. FE-35 recounted the problems that Dollar General's inventory management created for its stores. She stated that, at Dollar General, it was up to one store employee to stock shelves and keep the store running. The warehouse sent inventory to stores, and the stores would not get it on shelves for two weeks. As a result, according to FE-35 there were carts full of inventory over two weeks to a month old that were reportedly received by the store but not put onto shelves. She said that, even where inventory was marked as received, it sat in the back room. FE-35 explained that

72

there was no way one person could run a Dollar General store by themself—and it was wrong for the Company to require it.

**E.     The Company's Excess Inventory And Chronic Understaffing Created Unsafe Working Conditions And Resulted In Numerous Regulatory Violations**

187.   Employers are required by federal law to provide safe and healthy workplaces.  As set forth above, during the Class Period, Dollar General had vast amounts of excess inventory constantly being delivered to its stores without any regard for demand—and those stores were woefully understaffed and had limited storage capacity.  These problems resulted in massive stockpiles of inventory lining the corridors at stores—to the extent that it blocked fire exits, impeded access to safety equipment, and otherwise created dangerously unsafe work conditions at Dollar General stores.

188.   These unsafe work conditions, in turn, caused Dollar General to face sanctions for regulatory violations under OSHA (defined above as the federal Occupational Safety and Health Act).  During the Class Period, Dollar General was the target of a total of 128 OSHA enforcement investigations that resulted in citations for OSHA violations.[13]  These included both "repeated" citations, which indicate that Dollar General had similar previous violations, and "willful" citations, which indicate intentional disregard for workplace safety.  These citations involved serious violations of safety standards, including repeated fines for failing to have clear paths to fire exits, blocked electrical panels that placed workers at risk of accidental fire, shock, and other damages, and improper stacks of merchandise and over-stocked materials that placed employees at risk of being seriously injured while at work.

---

[13] https://www.osha.gov/ords/imis/establishment.search?p_logger=1&establishment=Dollar+Gen eral&State=all&officetype=all&Office=all&sitezip=&p_case=all&p_violations_exist=yes&start month=05&startday=28&startyear=2020&endmonth=08&endday=31&endyear=2023.

189. For example, in August 2021, following inspections at three Dollar General stores in Mobile, Alabama, OSHA inspectors found *five willful violations*, including for exposing workers to fire hazards by failing to keep exit routes and workspaces around electrical panels clear, stacking materials in an unsafe manner, and failing to keep receiving areas clean and orderly. These violations exposed Dollar General to $683,680 in penalties under OSHA.

190. Also, in August 2021, OSHA issued citations to two Dollar General stores in Dalton, Georgia for two *willful violations and one repeat violation*, which exposed the Company to $364,629 in penalties. OSHA Regional Administrator Kurt Petermeyer in Atlanta stated:

> Dollar General's long and extensive history of workplace safety violations and repeated failures to protect its workers *shows willful recklessness*. Their blatant and continued disregard for the safety of their employees must come to an end. The U.S. Department of Labor's Occupational Safety and Health Administration will make every effort to hold them accountable for their failures.

191. On April 22, 2022, U.S. Senator Patty Murray (D-WA), Chair of the Senate Health, Education, Labor, and Pensions (HELP) Committee, wrote to Defendant Vasos demanding answers for the "unacceptable conditions for workers at Dollar General's stores and warehouses." Senator Murray wrote: "I call on you to explain *Dollar General's shameful labor practices* and commit to improving conditions for workers moving forward" and issued extensive requests for information from Dollar General.

192. On May 2, 2022, Dollar General employees coordinated walk-outs at various Dollar General locations. The mass walk-out was prompted by the firing of Mary Gundel, a Dollar General manager in Tampa, Fla., who posted a viral TikTok in which she discussed the poor working conditions at her location. The TikTok sparked a flood of similar videos from other Dollar General Employees, eventually leading to both the mass walk-out, and the United States Department of Labor proposing $3.3 million in fines to be levied on the Company for OSHA violations.

193.     In September 2022, OSHA widened the scope of its Severe Violator Enforcement Program to include as violators any company that willfully or repeatedly violated safety standards. Dollar General was the first company to be added under the program's expanded scope.  Douglas L. Parker, Assistant Secretary of Labor for OSHA, said in an interview with *The New York Times*, "What we have found time and time again at Dollar General stores is that there are obvious, preventable hazards that are putting workers at risk."[14]  Dollar General downplayed, diminished and denied the problems, stating *inter alia*: "we regularly review and refine our safety programs, and reinforce them through training . . . .  When we learn of situations where we have failed to live up to this commitment, we work to timely address the issue and ensure that the company's expectations regarding safety are clearly communicated, understood and implemented."

194.     In October 2022, in Waller, Texas, OSHA opened an inspection and discovered blocked exits and walkways, workers at risk of being struck by falling boxes, and boxes blocking electrical panels.  OSHA issued the Company a citation for three ***safety repeat violations*** and proposed $294,657 in penalties for these failures.  OSHA Regional Administrator Eric S. Harbin in Dallas stated:

> Once again, federal workplace safety inspectors have found Dollar General ***ignoring required safety measures*** and allowing blocked emergency exits and walkways that endanger everyone who works and shops at stores where these violations exist.  Seconds lost trying to move boxes to reach a fire extinguisher or get out a safety exit can be the difference between life and death in an emergency.  Allowing unsafe conditions like these to exist is a tragedy waiting to happen.[15]

---

[14] Michael Corkery, *Dollar General Is Deemed A Severe Violator By The Labor Dept.*, N.Y. TIMES (March 28, 2023), https://www.nytimes.com/2023/03/28/business/dollar-general-osha-fines.html.

[15] *'Danger Vu': Federal Inspection Again Finds Dollar General Exits, Walkways Blocked, Boxes Staffed Unsafely Workers at Risk in Texas, Wisconsin*, U.S. DEPT. OF LABOR (Apr. 13, 2023), https://www.dol.gov/newsroom/releases/osha/osha20230413-1.

195. In October and November 2022, two Dollar General stores located in Addison and Haleyville, Alabama were cited for safety violations by OSHA. The OSHA inspections found spare shelving, rolling containers and merchandise blocking exit routes, creating fire and entrapment hazards. OSHA also noted walkways blocked by merchandise and unsafely stacked items, exposing workers to trips and hazards from falling merchandise.

196. In December 2022, similar violations were found at a Dollar General store in Astor, Florida, where OSHA said items blocked fire extinguishers and materials were improperly stored around the space of an electrical panel. OSHA Area Director, Joe Batiz in Birmingham commented, "In one workplace after another, our ***investigators continue to find the same hazards*** at Dollar General stores. The Dollar General Corporation needs to make changes to address the recurring violations before there is a tragedy." The three stores were cited for eight repeat violations with proposed penalties of more than $1 million.

197. Between February 1, 2022 and April 20, 2023, OSHA inspectors assessed Dollar General ***nearly $9 million*** in proposed penalties after 28 investigations in Alabama, Florida, and Georgia.[16]

198. In December 2022, two Dollar General stores in southeast Oklahoma were cited for fire hazards. OSHA investigators found boxes of merchandise blocking walkways at the stores, which would prevent employees from evacuating in an emergency. Officials said that these are the same types of violations that investigators found in stores across the nation. OSHA issued Dollar General citations for ***two repeat and three serious violations*** and proposed $267,622 in penalties. OSHA Area Director Stephen Kirby in Oklahoma City commented,

---

[16] Leada Gore, *2 Dollar Generals in Alabama cited for safety violations such as blocked doors, fire hazards*, AL Com (June 5, 2023), https://www.al.com/news/2023/06/2-dollar-generals-in-alabama-cited-for-safety-violations-such-as-blocked-doors-fire-hazards.html.

Dollar General ***continues to ignore federal safety standards*** that would protect its employees and others in its stores. Our inspectors ***routinely identify hazards*** caused by poor housekeeping, unsafe storage and by walkways and exits blocked by merchandise. These conditions must be corrected before serious injuries or worse occur in an emergency.[17]

199. In Lamesa, Texas, a December 2022 federal workplace safety inspection found exit routes and walkways were blocked by unsafely stacked merchandise, exposing employees to fire hazards. OSHA cited the company for four ***repeat violations*** and proposed $294,646 in penalties. OSHA area director Elizabeth Linda Routh in Lubbock, Texas said,

> Dollar General's ***pattern of blocking emergency exits and pathways*** with ***boxes of merchandise, rolling carts and other materials*** jeopardizes the safety of everyone in their stores. Poor housekeeping can lead employees to suffer needless injuries and make it hard to exit the store quickly in a crisis. These conditions must be corrected immediately.[18]

200. In January 2023, during an inspection at a Brandon, Florida store, OSHA found exit routes blocked and electrical hazards. Two days later in Dade City, Florida, OSHA inspectors found an emergency exit blocked by rolling containers and merchandise, exposing workers to fire and entrapment hazards. After these inspections, OSHA issued citations to the Company for, *inter alia,* ***three repeat and two serious*** violations and proposed penalties of $342,282. An OSHA press release dated July 13, 2023 quotes OSHA Area Director Danelle Jindra from Tampa, Florida as stating:

> ***After more than 200 failed inspections, Dollar General cannot claim that they misunderstand federal safety requirements***. At this point, we can only conclude that ***they <u>choose</u> to continue exposing their employees to hazardous conditions***.

---

[17] K. Querry Thompson, *2 Oklahoma Dollar General stores cited for fire hazard*s, NBC – 4 KFOR (May 31, 2023), https://kfor.com/news/local/2-oklahoma-dollar-general-stores-cited-for-fire-hazards/.

[18] Alexandra Harrell, *All About Dollar General's $21 Million, 6-year safety failures*, SOURCING JOURNAL (June 9, 2023), https://sourcingjournal.com/topics/compliance/dollar-general-safety-21-million-dollar-tree-osha-department-of-labor-438831/.

Dollar General must make changes to correct these recurring violations before a worker is needlessly injured or worse.[19]

201.     In an OSHA news release issued on May 23, 2023, Douglas Parker, Assistant Secretary for Occupational Safety and Health was quoted as stating, "Dollar General *continues to expose its employees to unsafe conditions* at its stores across the nation."  He added that the Company must make "*corporate-wide changes* to protect the safety and well-being of the people they employ."[20]

202.     On July 11, 2024, OSHA announced that it had entered into a settlement agreement with Dollar General to resolve hundreds of outstanding regulatory complaints and citations issued against the Company as a result of the unsafe and hazardous conditions in its stores (defined above as the "OSHA Stipulation").  In connection with this settlement, Dollar General was required to pay $12 million in penalties and implement sweeping, corporate-wide changes to its inventory controls and practices, including to address many of the same deficiencies repeatedly described by the former employees herein.  Many of these citations and complaints arose from Dollar General's "willful" violation of OSHA regulations—the most serious type of OSHA violations.

203.     Further, as part of OSHA's investigation into the Company, Dollar General retained an inventory consultant that "analyzed [the Company's] current operating model, including . . . its stores, supply chain, logistics, merchandising, and other technological resources."  Based on this analysis, the consultant identified numerous deficiencies in the Company's inventory practices and identified reforms necessary to address excess inventory in "backroom receiving areas" and to

---

[19] *Department of Labor finds Dollar General continues to endanger workers as inspectors cite 8 violations at Tampa stores, propose $342K in penalties*, U.S. DEPT. OF LABOR (July 13, 2023), https://www.osha.gov/news/newsreleases/region4/07132023.

[20] *Nine inspections in four states find Dollar General exposed workers to obstructed exits, fire, electrical hazards; carry $3.4M in new penalties*, U.S. DEPT. OF LABOR (May 23, 2023), https://www.osha.gov/news/newsreleases/national/05232023-0.

"reduce overstock, increase storage capacity, and augment operational efficiencies." To facilitate the resolution of OSHA's investigation into the Company, Dollar General internally prepared a "proprietary and confidential" analysis and summary of the consultant's findings and recommendations, which the Company privately shared with OSHA on June 5, 2023 and January 30, 2024. This internal Dollar General analysis, which facilitated the OSHA settlement, was kept secret by the Company and Defendants.

204. The OSHA Stipulation requires Dollar General to implement these reforms, including: "***reducing the amount of inventory*** by stock-keeping unit (SKU) count, reducing the use of floor stands, using closed circuit television (CCTV) cameras to monitor safety issues and to identify stores that may need additional support, and implementing phased distribution enhancements to improve tote assortment and increase stocking efficiency."

205. Additionally, the OSHA Stipulation requires Dollar General to "develop and implement policies and procedures to manage truck deliveries" to its stores. These reforms address, among other things, the Company's pervasive practice of "force-outs," *i.e.*, distribution centers offloading excess inventory by shipping it to stores with no need for it, as described by FE-1, FE-14 and FE-24 above. Consistent with these former employees' accounts that the Company gave store managers no effective means to turn away unnecessary deliveries of excess inventory, the OSHA Stipulation requires Dollar General to implement policies authorizing Regional Directors "to stop a truck delivery when appropriate based on a store's backroom capacity that may create reasonable concerns about emergency exit route and safety conditions."

206. Further corroborating the accounts of multiple former employees set forth herein, Dollar General is also required to implement reforms to prevent excess inventory from dangerously accumulating in its stores. Under the OSHA Stipulation, Dollar General is required to ensure that

79

"sales floor aisles and hallways are free of obstructions" and "totes, other containers, and loose inventory are stacked and limited in height so that they are stable and secure against sliding and collapse." Further, Dollar General stores may "utilize a storage pod to temporarily manage excess inventory, provided that employees can safely access the storage pods to perform work duties at all times" and they must utilize "brightly colored safety lines" and "do not block" signage to ensure clearance around electrical panels and exit doors at Company stores.

207. The OSHA Stipulation also subjects Dollar General to ongoing monitoring and reporting requirements to ensure that the above reforms are properly implemented—and in doing so, specifically targeted Defendants. For instance, the OSHA Stipulation requires Dollar General's CEO (Defendant Vasos), its Director of Safety, and "all other senior executive leadership" to "receive training regarding corporate responsibility for workplace safety and health, the components of Respondent's safety and health program, and the terms of [the OSHA Stipulation]." Further, the OSHA Stipulation required the Company's "senior leadership" to review the Company's compliance with the OSHA Stipulation on a quarterly basis, including the OSHA-mandated overhaul of the Company's inventory and distribution systems described above.

208. According to a complaint filed in a derivative lawsuit commenced in the Middle District of Tennessee (the "Derivative Action"), Defendants Vasos and Owen were provided on multiple occasions documents that highlighted the Company's non-compliance with OSHA regulations.[21] For example, as alleged in the Derivative Action based on Company documents produced to the Derivative plaintiff, Defendant Vasos and Owen received "notice of the Company's blatant workplace safety noncompliance and record-breaking OSHA penalties in

---

[21] Complaint, *Conforti v. Owen et al.*, Case No. 3:23-cv-00059 (M.D. Tenn. Jan. 20, 2023), ECF No. 1. The Derivative Action was dismissed on demand futility grounds.

2020" but failed to implement "meaningful corporate reform."[22]   As further alleged in the Derivative Action, instead of "addressing the issue of workplace safety head-on," the Company "chose to sweep its hazardous employee safety violations under the rug," which gave rise to "one, gigantic problem."[23]

### F.   The Company's Chronic Understaffing And Inventory Control Problems Also Gave Rise To Pricing Discrepancies That Sparked Regulatory Investigations And Penalties

209.   Understaffed stores, high turnover and reduced hours for Dollar General employees led to widespread discrepancies between the price Dollar General's customers were charged at the register and the price displayed on the shelf at Dollar General stores.  As set forth below, these discrepancies disproportionately led to Dollar General customers being overcharged.  Moreover, this happened so often that various state Attorneys General investigated the Company's stores, found the pricing errors to be widespread, and instituted adverse regulatory actions.

210.   In November 2022, Ohio Attorney General Dave Yost brought a lawsuit against the Company after an audit found pricing error rates ranging from 16.7% to 88.2% at Dollar General stores located across Ohio.  In January 2023, Yost filed a request for a temporary restraining order against the Company, citing ongoing violations of the Ohio Consumer Sales Practices Act because multiple auditors continued to find that many product prices did not match the prices charged by Dollar General.  Mr. Yost's office received 116 complaints regarding Dollar General's shelf-pricing issues.  Mr. Yost stated: "There's a mountain of evidence showing that Dollar General

---

[22] *Id.*at ¶65.

[23] *Id*. at ¶68.

simply doesn't care to fix the issue."[24]  In October 2023, Dollar General reached a $1 million settlement with the state of Ohio regarding these overpricing issues.[25]

211.    In March 2023, *Barron's* published an article titled, "When the Price Isn't Right: Dollar General's Record of Overcharging."[26]  The article noted that the states of Arizona, Louisiana, Mississippi, and North Carolina also fined Dollar General for similar pricing irregularities in 2021 and 2022.

212.    Former Dollar General employees interviewed in connection with Plaintiffs' investigation recounted that the pricing problems were the direct result of the Company's staffing issues.  For example, FE-11 (*supra* ¶¶91-93) stated that store employees faced constant difficulties in carrying out price adjustments of merchandise.  According to FE-11, at Dollar General, every week prices changed and needed to be updated—but understaffing caused prices not to be changed in a timely manner.  FE-11 said that she witnessed huge issues in the difference between prices on the shelf and when a product is scanned for purchase and elaborated that: "All the prices were off in the stores."  FE-11 said that, based on calls that she personally attended, the pricing discrepancies were known to directors at the regional level—such as Regional Director of Operations, Tracy DiBiase, and by the Vice Presidents of each operation zone, who deal with sales. Likewise, FE-10 (*supra* ¶¶89-90) described that overburdened store employees had to perform

---

[24] Press Release, OHIO ATTORNEY GENERAL, *AG Yost Continues to Apply Pressure to Dollar General Stores to Stop Its Deceptive Pricing* (Jan. 11, 2023), https://www.ohioattorneygeneral.gov/Media/News-Releases/January-2023/AG-Yost-Continues-to-Apply-Pressure-to-Dollar-Gene.

[25] Alex Bitter, *Dollar General must pay $1 million after charging customers too much at checkout*, BUSINESS INSIDER (Oct. 25, 2023), https://www.businessinsider.com/dollar-general-pays-1-million-settle-claims-overcharged-employees-checkout-2023-10.

[26] Catherine Dunn, *When the Price Isn't Right: Dollar General's Record of Overcharging*, BARRON'S ONLINE (March 27, 2023), https://www.barrons.com/articles/dollar-general-stores-overcharging-prices-129addef.

price changes in between serving customers and stocking, and on a weekly basis there were sheets of price changes that needed to be worked on. According to FE-10, during the Class Period, there was a constant flux of price adjustments, which amounted to up to 20 sheets of price changes a week, and stores were not given more labor hours to change all the prices.

213. On September 13, 2023, Missouri's Attorney General Andrew Bailey filed suit claiming hundreds of the Company's retail stores in Missouri were offering "unfair and deceptive pricing." Mr. Bailey determined that Dollar General violated Missouri's consumer protection laws by advertising one price at the shelf and charging a higher price at the register upon checkout. The investigation revealed that price discrepancies ranged up to as much as $6.50 per item, with an average overcharge of $2.71 for over 5,000 items price checked by investigators.[27]

214. In November 2023, Dollar General agreed to pay over $850,000 for overcharging customers at Company stores in Wisconsin. The Wisconsin Department of Agriculture, Trade, and Consumer Protection ("DATCP") verified prices on over 7,000 products in over 200 Dollar General stores and found 662 instances where the Company's signage falsely represented the prices on the shelves and the prices were higher at checkout. On average, prices were 17% more when they were scanned.[28] In the press release announcing the non-public settlement agreement, which was not itself made public, DATCP Secretary Randy Romanski stated that "[t]he accuracy of prices on store shelves is among the most basic and essential protections consumers have," and

---

[27] Victoria Kemper, *Attorney General files suit against Dollar General for deceptive pricing*, THE DAILY JOURNAL ONLINE (Sept. 19, 2023), https://dailyjournalonline.com/2023/09/19/attorney-general-files-suit-against-dollar-general-for-deceptive-pricing/.

[28] Bill Wilson, *Dollar General reaches settlement on inflated prices*, SUPERMARKET NEWS (Nov. 21, 2023), https://www.supermarketnews.com/retail-financial/dollar-general-reaches-settlement-inflated-prices.

"consumers should be able to trust that the prices advertised to them are accurate, and they have a right to be informed of the laws protecting them."[29]

215. Also in November 2023, Dollar General agreed to pay $1.2 million to resolve claims that the Company violated New Jersey's Consumer Fraud Act and Weights and Measures Act by "selling a variety of merchandise that scanned at the cash register for higher prices than were posted where the merchandise was displayed for sale."[30] This settlement is the largest ever obtained by the New Jersey Office of Weights and Management. These claims were resolved in a Consent Order filed with the New Jersey Division of Consumer Affairs.

## V. THE TRUTH GRADUALLY EMERGES

216. The truth about Defendants' misrepresentations and omissions was revealed to investors through a series of corrective disclosures on December 1, 2022, February 23, 2023, March 16, 2023, June 1, 2023, August 31, 2023, March 14, 2024, May 30, 2024, and August 29, 2024. Through these disclosures, Defendants gradually revealed, *inter alia*, higher inventory shrink and damages, the Company's need to invest over $170 million to remedy staffing problems, and Dollar General's need to markdown its existing inventory by $95 million. After August 31, 2023, Defendants told investors that they were remediating the Company's serious inventory problems and that Dollar General was involved in a business turnaround. Despite those assurances, on August 29, 2024, Defendants finally revealed that the Company's inventory problems were far more severe, wide-ranging, and persistent than previously disclosed. Each of

---

[29] *DATCP Announces Settlement with Dollar General for Price Accuracy Violations*, Wisconsin Dept. of Agriculture, Trade and Consumer Protection (Nov. 20, 2023), https://datcp.wi.gov/Documents2/20231120DollarGeneralSettlement.pdf.

[30] *New Jersey Division of Consumer Affairs Reaches Settlement with Dollar General Over Allegations of Pricing Violations*, New Jersey Division of Consumer Affairs (Nov. 28, 2023), https://www.njconsumeraffairs.gov/News/Pages/11282023.aspx.

84

these corrective disclosures caused the price of Dollar General's stock to decline significantly on high trading volume—and, collectively, they wiped out billions of dollars in shareholder value. Investors suffered enormous damages when the truth was revealed.

A. **Dollar General's 3Q22 Adverse Financial Results Announced on December 1, 2022**

217. On December 1, 2022, Dollar General issued a press release prior to market open, and hosted a conference call during market hours, which reported the Company's financial results for the third quarter ended October 28, 2022 ("3Q22"). Among other things, Dollar General reported that its diluted EPS for 3Q22 was $2.33—below the Street consensus of $2.54. Defendants also revised down their guidance for fiscal year 2022, including their diluted earnings per share estimate, due to "greater-than-anticipated gross margin pressures" related to "inventory shrink and damages" and "higher-than-anticipated supply chain costs."

218. During Dollar General's 3Q22 earnings call on December 1, 2022, Defendant Owen stated, "During the quarter, we experienced significantly higher than anticipated cost pressures, including challenges within our internal supply chain, sales mix pressures, and *higher inventory damages and shrink, all of which impacted gross margin*." Defendant Owen also stated that the Company faced "more than $40 million in additional supply chain costs in Q3." Defendant Garratt stated that "we are seeing a greater headwind from *inventory shrink and damages* than we anticipated for the back half of this year."

219. These disclosures caused the price of Dollar General stock to decline significantly by $19.34 per share, or approximately 7.56%, from a closing price of $255.69 on November 30, 2022, to a closing price of $236.34 on December 1, 2022, on high trading volume.

220. Defendants nevertheless sought to misleadingly assure investors that there was no cause for concern—portraying the Company's inventory and supply chain issues as minor and

temporary.  For example, Defendant Garratt stated that "the quality of our inventory is in good shape" and "we anticipate that we will begin to see lower levels of inventory growth beginning in Q4."  He further stated, "[i]f you look at the majority of the inventory growth, it's really driven by inflation . . . we feel very good about the quality of the inventory [and our] ability to mitigate the markdown risk."  Defendant Garratt also assured investors that they expected the supply chain cost pressures "will largely be resolved in Q1 of next year."  He further stated, "We see most of the pressures as transitory."

221.  Defendants also told investors that EPS would rebound in the short-term.  Defendant Garratt stated on the 3Q22 earnings call, "But again, as you look at the fundamentals of the business, they're very strong.  ***We continue to see ourselves as 10% EPS growers over the long term***."

222.  Analysts accepted Defendants' reassurances, crediting that Dollar General's inventory and supply chain issues were minor, isolated, and temporary.  For example:

   a.  BMO Capital Markets issued an analyst report on December 1, 2022, stating, "DG reported a rare EPS miss in F2Q23 on weaker-than-expected gross margins due to stronger consumables mix shift and ***supply chain challenges from temporary warehousing, container fees, and inefficiencies*** . . . the incremental supply chain related costs should be ***isolated & transitory***[.]"

   b.  Guggenheim's analyst reported the same day, "**Key Message:** A rare guide-down, due to somewhat ***transitory supply chain and sales mix issues***, has created an incremental buying opportunity, in our view.  Bottom-line, profit pressure around warehousing capacity constraints will be short-lived while macro-oriented softness in discretionary comps should prove manageable, in our view.  In fact, despite

reducing 2022 FIFO EBITDA forecast, *we raise our 2023 outlook to reflect stronger consumable sales and the resulting expense leverage*."

c.  Oppenheimer's analyst also concluded, on the same day, that "DG reported softer than expected Q3:22 results.  EPS of $2.33 fell short of a Street forecast of $2.54, driven primarily by higher supply chain costs.  Management also lowered FY22 EPS guidance to growth of 7-8% vs. 12-14% previously, reflecting higher supply chain costs, mix, and shrink/damage. . . .  Although the bottom-line delivery was weaker than anticipated, our longer-term thesis remains unchanged as comp momentum remains strong."

**B.  Dollar General's Adverse February 23, 2023 Earnings Press Release**

223.  On February 23, 2023, the Company issued a Form 8-K reporting preliminary financial results for the fourth quarter and full year ended February 3, 2023 that were below expectations, including disappointing diluted earnings per share.  Defendants disclosed that "*higher-than-anticipated inventory damages*" caused the Company's "lower-than-expected results."

224.  This news caused Dollar General's stock price to decline significantly, falling by $8.16 per share, or approximately 3.62%, from a closing price of $225.27 on February 22, 2023, to a closing price of $217.11 on February 23, 2023, on high trading volume.

225.  Defendants, however, pointed to Winter Storm Elliott as the reason behind the Company's disappointing results.  Thus, Defendants signaled to investors that the Company's inventory problems were due to an isolated, one-time, external event—*i.e.*, a storm—and not the systemic internal deficiencies with Dollar General's inventory controls and staffing levels detailed above.

226.  Analysts accepted Defendants' assurances.  For example:

a. KeyBanc's analyst reported, "Management believes the softer results are primarily attributable to lower than expected sales and higher than anticipated inventory damages, both of which were negatively impacted by Winter Storm Elliott during 4Q22."

b. Jefferies LLC wrote, "DG's preannounced result fell short of the company's and Street expectations, largely driven by the negative impacts of the Winter Storm Elliott on sales and inventory damages," and maintained that "DG's FY outlook appears to be achievable, with room for potential upside ahead."

c. Telsey Advisory Group wrote, "we are a bit disappointed by the profit impact," but "[t]he good news is that Dollar General is still generating solid sales—aside from the winter storm in December[.]"

**C. Dollar General's Adverse 4Q22 and FY22 Results Announced On March 16, 2023**

227. On March 16, 2023, Defendants reported Dollar General's financial results for the fourth quarter (4Q22) and fiscal year ended February 3, 2023 (FY22) in a Form 8-K. Defendants revealed that Dollar General's results were "below our expectations." The Company reported in its 4Q22 Form 8-K that, "Gross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022 compared to 31.2% in the fourth quarter of 2021, *a decrease of 35 basis points*." The Company also reported that, "Gross profit as a percentage of net sales was 31.2% in fiscal year 2022, compared to 31.6% in fiscal year 2021, *a decrease of 37 basis points*." Defendants attributed each of these "gross profit rate decrease[s]" to an "increased LIFO provision" driven by *inter alia* "*increases in inventory shrink, damages and markdowns*."

88

228. In the March 16, 2023 Form 8-K, Defendants also revealed that the Company had to make "an incremental investment of approximately **$100 million** in our stores, primarily in **incremental labor hours**."

229. In a conference call held on March 16, 2023, Defendant Owen stated, "The quarter was also impacted **by greater than anticipated inventory damages, which contributed to diluted EPS results that were below our expectations**." Defendant Garratt stated that, "[f]or Q4, gross profit as a percentage of sales was 30.9%, a decrease of 35 basis points," which he attributed to *inter alia* "an increase in inventory shrink, damages and markdowns." Defendant Garratt also stated that, for 4Q22, "[a]s a percentage of sales, operating profit was 9.1%, a decrease of 6 basis points."

230. On the March 16, 2023 call, Defendants also discussed the fact that Dollar General had to remedy its staffing shortfall by making a massive investment in its workforce. For example, Defendant Owen discussed the Company's need to make a "targeted, incremental investment of approximately **$100 million** in our stores this year," which would "primarily consist of **incremental labor hours**" including to "drive greater on-shelf availability."

231. These disclosures caused Dollar General's stock price to decline by $6.47 per share, or 2.96%, from a closing price of $218.56 on March 15, 2023, to a closing price of $212.09 on March 16, 2023 on high trading volume. Dollar General's stock price continued to decline on March 17, 2023, falling another $3.26 or 1.54% to a closing price of $208.83 on heavy trading volume of over 7.6 million shares.

232. However, Defendants still reassured investors regarding the Company's inventory and staffing problems, which kept the Company's stock price artificially inflated. For example, on the 4Q22 earnings call, Defendant Owen stated, "However, *our December sales performance*

89

*was negatively impacted by Winter Storm Elliott* which had the most significant effect on our stores in the final days leading up to Christmas." Defendant Owen also stated, "*we are pleased to have the storage capacity constraints largely behind us which we believe positions us well moving forward*." Defendant Garratt maintained that Dollar General's inventory was not a long-term problem, stating, "*Importantly, we continue to believe the quality of our inventory is in good shape*" and "as we look further, *we expect inventory levels to normalize*."

233. Regarding staffing, Defendant Owen assured investors that, for example, "we are pleased with our staffing levels and applicant flow." He further stated, "we feel great about our staffing levels, our ability to attract, and our ability to retain our talent. And so that's why we're investing in hours, and right now we're very pleased to see that wage grow 23% over the last three years. So we're in a great position and that's why we're able to put this investment more towards the hours in the store rather than having to catch up on wages."

234. Analysts credited Defendants' reassuring statements. For example:

a. Telsey Advisory Group's analyst acknowledged the Winter Storm Elliott explanation, citing "a headwind related to Winter Storm Elliott that pressured sales, damaged inventory, and resulted in higher operating costs."

b. Goldman Sachs's analyst repeated Defendant Garratt's statement that "lower supply chain costs should be a tailwind with increasing momentum throughout the year."

c. A Guggenheim analyst wrote that Dollar General's management "expressed a strong belief that the worst of the supply chain disruptions are now behind us . . . . Well-positioned and well-run businesses, like DG, do not lose their way overnight, in our view, even during periods of above-average senior management change."

90

The Guggenheim analyst continued, "supply chain should transition from modest headwind to significant tailwind now that new capacity has been brought online and costs are normalizing."

d. Piper Sandler's analyst stated, "We continue to think DG will be a beacon of stability in 2023, with greater upside potential if the economy slows[.]"

**D.     Dollar General's Adverse 1Q23 Results Announced On June 1, 2023**

235.     On June 1, 2023, Dollar General reported its financial results for the quarter ended May 5, 2023 (1Q23) in a Form 8-K and a Form 10-Q.  Defendants reported *inter alia* diluted earnings per share of $2.34 in 1Q23, a decrease of 2.9% from $2.41 in 1Q22; and operating profit of $740.9 million in 1Q23, a decrease of 0.7% from $746 million in 1Q22.  They also reported that total merchandise inventories were $7.3 billion compared to $6.1 billion as of April 29, 2022.  Further, Defendants slashed Dollar General's outlook for fiscal full year 2023 ("FY23"), including by disclosing that they expected *inter alia* the Company's diluted earnings per share to be "in the range of an approximate 8% decline to flat."

236.     In Dollar General's Form 10-Q also filed on June 1, 2023, Defendants reported the above financial metrics and stated,

> During the second half of 2022, we experienced ***higher inventory damages and shrink*** than we anticipated, which we believe was due primarily to the challenging macroeconomic environment, materially higher inventory levels, and, as to damages, Winter Storm Elliot in December.  In addition, we believe some portion of the increase in damages was a residual impact of the warehouse capacity constraints and associated store and supply chain inefficiencies we faced during the same period.  We continued to experience higher shrink and inventory damages in the first quarter of 2023.

237.     Also on June 1, 2023, Defendants held a conference call to discuss Dollar General's 1Q23 results.  On inventory, Defendant Dilts reported "increases in shrink, markdowns and inventory damages."  Regarding staffing, Defendant Dilts revealed on the June 1, 2023 call that,

of the $100 million investment, the Company had to "pull[] forward a larger portion of our labor investment and anticipate more than $40 million of the investment will be made in the second quarter." Defendant Owen also stated that they were "pulling forward our labor investment into the second quarter," including to "make improvements in the store that we need to do."

238. These disclosures caused Dollar General's stock price to decline significantly from a closing price of $201.09 on May 31, 2023, to close at $161.86 on June 1, 2023, *a staggering decline of $39.23 or over 19.5% in a single day* on very high trading volume of more than 18.2 million shares.

239. However, once again Defendants failed to disclose the full truth regarding Dollar General's business and operations, causing the price of Dollar General stock to remain artificially inflated. For example, with respect to the Company's increased inventory levels, Dollar General's Form 8-K misleadingly stated that the "increase primarily reflects the impact of product cost inflation." In Dollar General's Form 10-Q, as noted in the above quote, Defendants attributed the Company's higher inventory damages to *inter alia* "Winter Storm Elliott in December."

240. Defendants also falsely assured investors that the Company's inventory problems were under control. For example, during the June 1, 2023 earnings call, Defendant Dilts stated that the "pace" of inventory growth had "moderated from its peak last year" and "[l]ooking ahead, we plan to further sharpen our focus on inventory and we continue to anticipate more normalized growth rates as we move through the back half of the year. Importantly, we continue to believe *the quality of our inventory is in good shape*."

241. During the June 1, 2023 conference call, an analyst noted that Dollar General's "inventory balance was up . . . 20% year-over-year" and asked Defendants "how [they] feel about the health of the inventory position"? Defendant Dilts responded: "We continue to feel good about

the quality of the inventory" and stated, "we're going to continue working on reducing those [inventory] levels . . . and we believe that the new structure we've put in place will ***make sure*** that we get that done."

242. Analysts were surprised by these disclosures, but credited Defendants' reassuring statements. For example:

  a. Guggenheim analysts accepted Defendants' assurances that the Company's inventory problems were under control, and thus would "limit the scope for markdowns later in the year. With the supply chain fixed, it will be possible to chase sales if demand is stronger than expected."

  b. Wolfe Research analysts credited Defendants' reports of "positive results" from Dollar General's $100 million investment in labor. Evercore analysts stated "[t]he $100mn in labor investment is helping to improve customer perception of store experience, with $27mn in Q1 and an incremental $40mn in Q2, as management pulls ahead the spend to drive traffic."

  c. TAG analysts credited Defendants' claims of "improving the operating model, supply chain, and inventory management," and "focusing on associates."

  d. Argus analysts credited Defendants' assurances about its inventory improvements, writing: "DG's logistics are very efficient, with procedures for loading trucks and delivering merchandise that allow stores to quickly restock their shelves."

**E.  Dollar General's Adverse 2Q23 Results Announced On August 31, 2023**

243. On August 31, 2023, Dollar General surprised the market by reporting disastrous financial results for the second quarter of 2023 ended August 4, 2023 ("2Q23") in a Form 8-K and Form 10-Q. The Company reported that the Company's operating profit was $692.3 million in 2Q23, a decrease of 24.2% from $913.4 million in the prior quarter; net income was $468.8 million

in 2Q23, a decrease of 30.9% from $678 million in the prior quarter; and diluted earnings per share were $2.13, a decrease of 28.5% from the prior quarter. Defendants also revealed that gross profit as a percentage of sales was 31.1% in 2Q23 compared to 32.3% in 2Q22, "a decrease of 126 basis points," which they attributed to *inter alia* "***increased shrink, markdowns, and inventory damages***." Further, Dollar General disclosed that total merchandise inventories were $7.5 billion compared to $6.9 billion the prior year.

244. In the Company's August 31, 2023 press release regarding the 2Q23 results, Defendants also disclosed that they now expected "an incremental operating profit headwind of up to ***$170 million*** in the second half of 2023" due to their need to "accelerate the pace of [Dollar General's] ***inventory reduction efforts***," make "***additional investments in targeted areas, such as retail labor***," and due to "an increase in expected inventory shrink for the second half of 2023." Specifically, Defendants disclosed they "now expect approximately $100 million of additional shrink headwind since last quarter's call." Thus, Defendants had to reduce their outlook for Dollar General's fiscal year 2023, including by revising down diluted earnings per share to "approximately $7.10 to $8.30, or a decline of 34% to 22%, compared to its previous year-over-year change expectation of an approximate 8% decline to flat growth." Defendants also had to decrease their expectations for net sales growth and same-store sales growth for fiscal year 2023.

245. On the Company's conference call held on August 31, 2023:

a. Defendant Owen stated that they expected markdowns on Dollar General's inventory to "result in an operating profit headwind of approximately $95 million in the back half of the year," including to "more quickly reduce excess inventory."

b. Defendant Owen also stated that the Company was increasing its "planned investment in incremental retail labor from approximately $100 million this year to approximately $150 million"—an increase of $50 million.

c. Defendant Owen further stated that they planned "to invest up to $25 million" including in "an improved inventory demand forecasting tool to better support our stores and distribution centers."

d. Defendant Dilts explained that the expected $170 million investment, which directly impacted operating profit, represented nearly "$0.60 of EPS" and was "due to the increased markdown activity, additional labor, and investments in other areas."

246. Also on the August 31, 2023 earnings call, Defendant Dilts disclosed that the Company expected "approximately $100 million of additional shrink headwind since last quarter's call."

247. However, Defendants reassured investors that the Company was successfully and proactively addressing its inventory problems, which caused the price of Dollar General stock to remain artificially inflated. For example:

a. Defendant Owen assured investors that Defendants had made "significant progress" including in "reducing our inventory growth rate."

b. In response to an analyst question, Defendant Owen stated that the Company is "starting to see the theme of stability" and, therefore, the $150 million investment was "the right amount to get us to excellence that we're accustomed to achieving . . . through the back half of . . . 2023."

c. When asked about "comps and where they're performing," Defendant Owen responded that he felt "Really good about the plan on driving continued performance," particularly because of "the labor investment we've made, the signs that we're seeing[.]"

d. Defendant Owen also stated that, "service levels, in-stock levels, and on-time delivery rates from our distribution centers have all returned to the levels we saw before our capacity challenges began last year," which has "benefited our overall supply chain cost."

e. Defendant Dilts told investors that the Company had "made progress towards our goal of reducing inventory growth rates by the end of the year" and that "we continue to believe the quality of our inventory is in good shape."

Further, throughout the August 31, 2023 earnings call, Defendants emphasized their expectation that the Company's inventory problems would be resolved in, for example, "the back half of the year." Indeed, when asked about the Company returning to its prior growth rates "by 2024," Defendant Dilts responded affirmatively, stating that, "we feel good about the investments that we're making and the ability for those to set us up for 2024 and beyond."

248. Analysts were surprised by Dollar General's continued inventory and labor problems—but also were comforted by Defendants' reassurances that the Company was addressing these problems and would recover in the near term. For example:

a. Evercore's analyst stated, "the company is making necessary investments to clean up inventory, improve its store labor/shopping experience, and enhance[e] its price perception as well as its overall supply chain infrastructure. . . . **Bottom line: DG**

**is taking painful but necessary action to address several key challenges we see facing the business: store labor, supply chain, inventory and pricing.**"

b. The Loop Capital analyst wrote, "**Management outlines turnaround initiatives**. Management outlined the following turnaround initiatives: (1) increasing promotional markdowns (primarily in discretionary items) by $95M in F2H 2023; (2) increasing its planned F2023 store labor investments to $150M from $100M (including $80M in F2H 2023); and (3) investing $25M in other areas, including an improved demand forecasting tool."

c. The Raymond James analyst wrote, "While today's cut is meaningful we believe the accelerated wage and inventory actions are the right strategy given today's retail environment (DG's peers are investing in wages)."

d. BMO Capital Markets' analyst wrote, "**Certain Pressures May Prove Transitory.** From a gross margin standpoint, our new F25E EPS assumes $95mm out of the $195mm shrink and markdown pressure called out this year may revert next year."

249. These disclosures caused the price of Dollar General's stock to decline by $19.16 per share, or 12%, from a closing price of $157.66 on August 30, 2023 to a closing price of $138.50 on August 31, 2023, on unusually high trading volume of more than 19.3 million shares. As the market continued to react to the Company's negative disclosures, the Company's share price declined another 5.94% on September 1, 2023, closing that day at $130.27 per share, on unusually high trading volume of more than 10.6 million shares. And after the Labor Day weekend (when the markets were closed), on September 5, 2023, Dollar General's share price continued to decline another 2.34%, closing at $126.46 per share that day, on unusually high trading volume of over 8

million shares.  Finally, on September 6, 2023, the stock price declined another 0.6% to close at $126.46 per share that day, on unusually high trading volume of over 5.5 million shares.

**F.      Dollar General Terminates Defendant Owen And Rehires Defendant Vasos**

250.    On October 12, 2023, the Company announced that Defendant Owen was being terminated less than a year after he was appointed as CEO.  As noted above, when announcing Defendant Owen's termination, the Company's Chairman of the Board stated: "[t]he Board has determined that a change in leadership is necessary to restore stability and confidence in the Company moving forward."  Defendant Owen was replaced by Defendant Vasos.

251.    Analysts were comforted that the CEO change further signaled that Dollar General had a handle on its problems and was on the road to recovery.  For example:

    a.  Oppenheimer's analyst wrote, "Following significant execution challenges in recent quarters, we believe this change will be well-received by investors and could help to reinstill confidence in the longer-term DG bull case."

    b.  Evercore ISI's analyst similarly stated that the CEO change would "likely be viewed as a positive step in stabilizing the business and rebuilding investor trust."

252.    Investors were also reassured.  In response to this news, Dollar General's stock price increased over 9%, from a closing price of $101.83 on October 12, 2023, to a closing price of $111.16 on October 13, 2023, on unusually high trading volume shares.

**G.      Dollar General's 3Q23 Results Announced On December 7, 2023**

253.    On December 7, 2023, Dollar General reported its financial results for the quarter ended November 3, 2023 (3Q23) in an earnings release attached to Form 8-K, a Form 10-Q, and an earnings call.  The Company reported that the Company's operating profit was $433.5 million in 3Q23, a decrease of 41.1% from $735.5 million in 3Q22; net income was $276.2 million in 3Q23, a decrease of 47.5% from $526.2 million in 3Q22; and diluted earnings per share were

$1.26, a decrease of 45.9% from 3Q22.  Defendants also revealed that gross profit as a percentage of sales was 29.0% in 3Q23 compared to 30.5% in 3Q22, "a decrease of 147 basis points," which they attributed to, *inter alia*, "**increased shrink, lower inventory markups, and increased markdowns**."  Dollar General's 3Q23 press release quoted Defendant Vasos as stating: "Over the last several weeks, we have spent significant time reviewing all areas of the business, and we have identified key opportunities for improvement both in the near term and over the longer term."

254.    In Defendant Vasos's first earnings call after his return as CEO, the Company announced the launch of its "Back to Basics" remediation plan.  This campaign involved dedicating labor hours to "store-level inventory management activities," including "reemphasizing the role played by [Company] store teams in our perpetual inventory management process."  Defendant Vasos also announced a plan to "better optimize the inventory within our distribution centers," including by "taking steps to reduce inventory" and "reducing the number of temporary outside warehouse facilities being used to store product as inventory flows more effectively to and through our existing distribution centers."  He further stated, "we expect to transition out of many of" the temporary warehouse facilities "in Q4 and into next year."

255.    Also on the 3Q23 earnings call, Defendants made several statements to reassure investors that the Company was experiencing a turnaround.  For example:

   a.    Defendant Vasos stated, "After starting the quarter slightly negative, traffic turned positive in the middle period and improved sequentially each period of the quarter" and that they saw "early traction from our work on getting back to the basics here at Dollar General."

b. Defendant Vasos also reassured investors that the Company would see improvement in the near term. For example, Vasos stated "we've [*sic*] actually have seen our in-stock rates markedly improve over the last few weeks."

c. When an analyst asked about the expected timing of the Company's inventory initiatives, Defendant Dilts responded, "we should feel pretty good about where we're landing *at the end of 2023*, but we're going to feel even better as we see continued improvement in inventory levels as we move through 2024." Defendant Vasos echoed this, stating that he felt "*very good about what we see going into the back half of this year and 2024*."

d. Defendant Dilts stated that the shrink headwind was something "we're mitigating along the way." Likewise, she stated: "Partially offsetting [shrink] challenges, we expect benefits from greater distribution center capacity and performance."

256. Analysts were comforted by Defendants' reassuring statements. For example:

a. Evercore ISI's analyst stated, "Bottom line: DG is taking action to turn its comps positive and stabilize margin," and noted Defendant Vasos's "plans to stabilize traffic, manage inventory and enhance store labor."

b. Jefferies' analyst stated: "We LIKED In The Quarter" that "Inventory Management Continues to Be a Priority" and noted that as "a part of the new CEO's recent assessment of the business, DG is reemphasizing the stores' role in its inventory management as well as rationalizing underperforming SKUs."

c. Oppenheimer's analyst credited "CEO Todd Vasos's commentary" that "suggests the company has identified key opportunities for improvement both in the near term and over the longer term." The analyst also flagged that "management announced

Case 3:23-cv-01250    Document 110    Filed 03/24/26    Page 108 of 253 PageID #: 4537

more conservative growth plans, which we believe will be well-received by the market." The analyst concluded, "We view today's actions as a step in the right direction to help stabilize profitability."

257. In response, Dollar General's stock price decreased by $1.62, from a closing price of $133.92 on December 6, 2023 to a closing price of $132.30 on December 7, 2023, on unusually high trading volume.

### H. Dollar General's Adverse 4Q23 And Fiscal Year 2023 Results Announced On March 14, 2024

258. On March 14, 2024, Dollar General reported its financial results for the fourth quarter (4Q23) and fiscal year (FY23) ended February 2, 2024 in an earnings release attached to a Form 8-K. Defendants reported, *inter alia*, decreased operating profit of $579.7 million in 4Q23, which was down 37.9% from $933.2 million in 4Q22, and operating profit of $2.4 billion in FY23, which was down 26.5% from $3.3 billion in FY22. Dollar General's net income was $401.8 million for 4Q23, a decrease of 39% from $659.1 million in 4Q22, and $1.7 billion for FY23, a decrease of 31.2% from $2.4 billion in FY2022. The Company's reported diluted earnings per share was $1.83 in 4Q23, a decrease of 38.2% from $2.96 in 4Q22, and was $7.55 in FY23, a decrease of 29.3% from $10.68 in FY22. Dollar General's reported gross profit as a percentage of net sales decreased 138 basis points from 4Q22 to 4Q23 to 29.5% and decreased by 94 basis points from FY22 to FY23 to 30.3%. Defendants attributed the 4Q23 and FY23 gross profit declines to *inter alia* "***increased shrink and inventory markdowns***." Defendants also provided full year financial guidance, including diluted earnings per share "in the range of approximately $6.80 to $7.55."

259. Also on March 14, 2024, Defendants held an earnings conference call to discuss the Company's results. On that call:

a. Defendant Vasos acknowledged that the Company faced inventory "*shrink headwinds*" and "*more markdowns*."

b. He also discussed the Company's ongoing inventory remediation efforts, which included "adding specific inventory management shifts and specialized inventory training in each store;" efforts to "continue inventory flow"; and added "labor . . . to keep our on-hand and perpetual inventory counts more accurate."

c. Tellingly, Defendant Vasos admitted, "any time you have *too much inventory in the store*, you've got *too much shrink and damages*" and "damages, by the way, is just known shrink."

260. However, Defendants failed to disclose the full truth regarding Dollar General's inventory problems, which caused the price of Dollar General's stock to remain artificially inflated. Indeed, to reassure investors, Defendants represented that Dollar General was on the road to recovery. For example, in the Company's March 14, 2024 earnings release:

a. Defendant Vasos was quoted as saying "[w]e have made solid progress executing on our 'Back to Basics' strategy, which we believe supported our improved operational performance during the quarter"; "we are pleased with the operational improvement we have seen" and still "believe that significant opportunity remains"; and we "are confident that we are taking the right actions to further solidify our foundation for future growth and create sustainable long-term value for our shareholders."

b. Defendant Dilts was quoted as saying regarding the Company's outlook "[w]e are encouraged by the progress we are making with our efforts in getting Back to the Basics, and we anticipate the benefit of these actions will continue to grow as we

102

move throughout fiscal year 2024" and highlighted "anticipated strong EPS growth in the back half of the year."

261. On the 4Q23 earnings call, Defendants continued to reassure investors that Defendants were remedying Dollar General's inventory problems. For example:

a. Defendant Vasos stated that Defendants' Back to Basics remediation plan "will have a significant mitigation impact in the back half of the year and into 2025" and result in "improvements in financial results, including sales and shrink."

b. Vasos also stated "I believe that we'll be in a really good position . . . especially to start delivering on that EPS growth of 10%-plus," as shrink and other poorly-performing metrics "start to heal."

c. He explained that the Company would remove self-checkout from approximately 9,000 stores with a focus on "more than 300 of our highest shrink stores" in order to "have a material and positive impact on shrink as we move into the back half of the year and into 2025."

d. He also claimed that "Since Q3, we have seen significant improvements in our on-time deliveries as well as customer service levels" and expected to reduce product by 1,000 SKUs.

Defendant Vasos also sought to reassure the market regarding the efficacy of Defendants' labor investment. For example, Defendant Vasos stated "we have done a lot of work in ensuring we've got the right amount of labor inside our stores, $150 million in labor investments in 2023."

262. Analysts were concerned about Dollar General's continuing inventory problems but reassured by Defendants' insistence that their Back to Basics remediation campaign was working. For example:

a. Piper Sandler's analyst stated "DG missed on gross margin (-140 bps y/y) mostly on shrink and mix headwinds. While shrink was noted as a significant margin headwind that will continue near-term, mgmt. highlighted an array of initiatives to reduce the effects, which should be felt in 2H. Also of note, inventory levels improved meaningfully, DG continues to make changes on the labor front, and there are signs of impending Discretionary stabilization. Despite this, 2024 EPS was guided to $7.18 at the midpoint—below consensus of $7.42."

b. Barclays' analyst wrote, "Gross margin weaker but inventory improving; GM was down about 140 bps reflecting similar issues to last quarter, although margins did improve sequentially from Q3 which they typically do. Importantly, inventory is getting cleaner, down 1.1% y/y on a per store basis." In a follow-up report, the analyst wrote, "Company seems to have clear mitigation plans in place, including added labor (in SG&A)."

c. Evercore ISI's analyst emphasized that the Company's same-store sales guidance "suggests DG could return to its traditional performance," and that, "DG has been making necessary investments to 1) clean up inventory, 2) improve its store labor/shopping experience, 3) enhance its price competitiveness and 4) shore up its distribution infrastructure."

263. As a result of these disclosures, Dollar General's stock price declined from a closing price of $158.17 on March 13, 2024 to a closing price of $150.06 on March 14, 2024, a significant decline of $8.11 or over 5% on abnormally high trading volume.

**I.      Dollar General's Adverse 1Q24 Results Announced On May 30, 2024**

264. On May 30, 2024, Dollar General reported its financial results for the first quarter ended May 3, 2024 (1Q24) in an earnings release attached to Form 8-K, a Form 10-Q, and an

earnings call.  Defendants reported, *inter alia*, that Dollar General's gross profit as a percentage of sales was 30.2% in 1Q24, a decrease of 145 basis points from 31.6% in 1Q23, which Defendants attributed to *inter alia* "**increased shrink and inventory markdowns**."  Dollar General's reported operating profit was $546.1 million in 1Q24, a decrease of 26.3% from $740.9 million in 1Q23; net income was $363.3 million in 1Q24, a decrease of 29.4% compared to $514.4 million in 1Q23; and diluted earnings per share decreased to $1.65 for 1Q24, down 29.5% from $2.34 in 1Q23.  In addition, Defendants reaffirmed their previously provided fiscal year financial guidance, including diluted earnings per share "in the range of approximately $6.80 to $7.55."

265.    Also on May 30, 2024, Defendants held the Company's 1Q24 earnings call.  On the call, Defendant Vasos disclosed that "***Shrink continues to be the most significant headwind in our business***."  Likewise, Defendant Dilts stated "***Shrink continues to be our most significant headwind*** and was 59 basis points worse in the first quarter compared to prior year."  She continued, "shrink is currently trending worse than we initially expected coming into the year, and we now expect this headwind to be greater in 2024 than what was originally contemplated in the financial guidance we provided on our earnings call in March."

266.    However, Defendants continued to insist that they were mitigating the Company's continued inventory problems, including by addressing increased shrink.  For example:

   a. When asked, "why is shrink worse than you expected," Defendant Vasos responded that while shrink "will take a little longer to manifest itself in a real positive manner," the Company's "proprietary predictive model" and "shrink indicators" "are now flashing green or positive with the majority of the items we look at for shrink."  Accordingly, he continued, "we feel pretty good about what that would

indicate for the back half of the year and what that will indicate hopefully for 2025 and beyond."

b. In response to an analyst question about the Back to Basics initiative, Defendant Vasos replied that while shrink is, "A little worse than we thought in Q1," there were still "green shoots" which "really give us the confidence to reiterate our guidance for full year because we're starting to see some of that occur, and of course, those positive sales and transactions, I don't want to minimize that."

c. Similarly, when asked about "the level of investment required to address shrink," Defendant Vasos stated: "I just want to reiterate, shrink was worse than we thought it would have been in Q1, but we are seeing those green shoots, which gives us confidence to reiterate our guidance long-term."

d. Defendants Dilts stated, "We're taking aggressive and decisive action to mitigate this challenge.  And we're expecting to see improvement later in the back half of 2024 than we had previously anticipated and more significantly into 2025."  She also emphasized, "we do expect to see improvement in the second half of the year."

e. When asked if she was confident in the "pretty strong second half profit recovery" predicted by the Company's full year guidance, Defendant Dilts stated, "we are certainly pleased to be able to reiterate our guidance that we gave.  And to your point, it does indicate a stronger back half, and we really see the momentum of our actions on all of our 'Back to Basic' work will fuel that back half, and looking forward to a strong top line and bottom line growth in the back half."

267.     Analysts reacted to these disclosures by noting the negative impact of Dollar General's increased shrink but echoing Defendants' positive outlook on the Company's purported turnaround.  For example:

a.  J.P. Morgan's analyst lowered his gross margin estimate and wrote "**On shrink:** mgmt. cited **1Q shrink came in worse than expected, but is seeing 'greenshoots' to reiterate its long term confidence around shrink recapture**."

b.  KeyBanc's analyst expressed disappointment in Dollar General's increased shrink but credited Defendants' turnaround efforts, stating: "Management is encouraged by the continued progress in executing the Company's 'Back to the Basics' strategy.  Management noted that shrink and sales mix headwinds are greater than initially anticipated, but the Company is working to mitigate the impact of these challenges and is still able to reiterate its full-year guidance."  In a follow-up report, the analyst reiterated, "The outlook for shrink and discretionary mix remain overhang s for the MT margin outlook for DG.  1Q results showed improvement, with solid comps, but margins still pressured by the aforementioned factors."

c.  Piper Sandler's analyst stated "EPS guidance for Q2 was set below expectations which now makes the margin rebound in 2H implied in guidance look even more significant."  The analyst continued, "YTD, shrink is trending slightly worse than expected.  While DG continues shrink reduction efforts and is starting to see green shoots, mgmt. noted improvement is expected later on in 2H24 than previously anticipated – with much to be seen in 2025."

d.  Telsey Advisory Group's analyst noted that the earnings per share guidance was "soft," attributable to "the unfavorable product mix and higher shrink, markdowns,

107

and labor costs." But the analyst was generally "encouraged by the continued positive comp and traffic trends, as well as market share gains."

    e. Barclays' analyst noted that the Company's EPS guidance was below consensus, and that "commentary suggested shrink and mix headwinds greater than initially expected coming into year," but stated "we were encouraged by better sales and reduction in inventory[.]"

268. As a result of these disclosures, Dollar General's stock price declined from a closing price of $139.28 on May 29, 2024 to a closing price of $127.94 on May 30, 2024, a decline of $11.34 or over 8% on abnormally high trading volume.

**J.    Dollar General's Adverse 2Q24 Results Announced On August 29, 2024**

269. On August 29, 2024, Dollar General reported its financial results for the second quarter ended August 2, 2024 (2Q24) in an earnings release attached to Form 8-K, on a Form 10-Q, and in an earnings call. Defendants reported that, *inter alia*, gross profit as a percentage of net sales was 30% in 2Q24, a decrease of 112 basis points from 31.1% in 2Q23, which they attributed to *inter alia* "**increased markdowns**," "**increased inventory damages**," and "**increased shrink**." Dollar General also reported (i) operating profit of $550 million in 2Q24, a decrease of 20.6% from $692.3 million in 2Q23; (ii) net income of $374.2 million for 2Q24, a decrease of 20.2% compared to $468.8 million in 2Q23; and (iii) diluted earnings per share of $1.70 for 2Q24, a decrease of 20.2% compared to diluted EPS of $2.13 in 2Q23.

270. Finally acknowledging that the Company's inventory problems were more severe, far-ranging, and persistent than previously disclosed, Defendants significantly cut Dollar General's financial guidance, including by slashing diluted earnings per share expectations. For example, Defendants reported that they now expected *inter alia* Dollar General's "diluted earnings

per share [to be] in the range of approximately $5.50 to $6.20, compared to its previous expectation of approximately $6.80 to $7.55."

271. On the 2Q24 earnings call, Defendants acknowledged the disappointing results and outlook. For example:

a. Defendant Vasos admitted that Defendants were "not satisfied by [the Company's] overall financial results." Likewise, Defendant Dilts stated "we're not satisfied with the financial results for the second quarter."

b. Defendant Dilts explained that "shrink was a year-over-year headwind of 21 basis points in Q2" and shrink "continues to be a significant headwind."

c. As to financial outlook, Defendant Dilts said, "[t]urning to gross margin, we expect *additional pressure as a result of the increased promotional markdown activity*"; "with regard to damages, our guidance now assumes *no improvements in the back half of the year*"; and "we expect *shrink to be a headwind for the full year*."

d. In response to an analyst question regarding markdowns, Defendant Dilt stated that "what we're looking at in this back half is going to be a *similar markdown rate to what we saw last year in the back half* . . . . So *more than we had anticipated*."

e. Defendant Dilts further stated that they "we're certainly experiencing" "shrink and mix headwinds" and that "the damage piece of this as well is putting a little pressure on the second half."

f. Defendant Vasos also admitted that "margin" is a "bump[] in the road" and that "*now, shrink is a constant battle*."

g. In response to a question about the revised guidance, Defendant Dilts responded that it was "margin and then the markdowns" that were "really the primary drivers."

272. In sum, Defendants' August 29, 2024 disclosures revealed to the market that, contrary to their assurances over the prior year, the Company's inventory problems were more severe, far-ranging, and persistent than previously disclosed.

273. Analysts were shocked to discover that, after multiple quarters of assurances that the Company was remedying its inventory issues, the Company still faced such significant and persistent inventory-related problems, including increased shrink, markdowns, and damages. For example:

   a. Barclays's analyst wrote: "we believe damages haven't improved as much as expected yet, and that's what is embedded in new guidance (in addition to markdown and mix headwinds)."

   b. BNP Paribas's analyst stated: "Margins take another sizable reset lower, hard to see a path to recovery" in part because "incremental markdowns given elevated promotional activity" "could drive ~40bps of pressure in 2H"; markdowns and shrink were two of the three points that the analyst said were "reflecting ongoing pressure through the P&L."

   c. HSBC's analyst criticized the Company's miss in gross margin and operating income, and stated that, "DG plans to increase promotional and markdown activity efforts during 2H in order to drive store traffic and improve sales performance."

   d. Piper Sandler's analyst wrote, "Q2 Miss and Guide Down Seems to Represent a Seminal Moment for DG" and lowered his price target for the Company. The analyst wrote: "**What's New?** *(1) Significant Reduction in Guidance.* DG reduced full year guidance at the midpoint by -18% to a new range of $5.50-$6.20. . . . DG didn't guide gross margin but increased markdowns are expected (see below). . .

***(3) Increasing Promotions to Drive Sales.*** DG plans to continue its promo activity through 2H – which will place markdown activity flat y/y."

274. These disclosures caused Dollar General's stock to decline by a staggering $39.81, or over 32%, from a closing price of $123.84 on August 28, 2024 to a closing price of $84.03 on August 29, 2024 on abnormally high trading volume.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

275. Defendants made materially false and misleading statements and omissions during the Class Period concerning the Company's (i) inventory management and controls, (ii) staffing levels, (iii) pricing practices, (iv) financial metrics, (v) accounting practices and policies, and (vi) the additional subjects set forth below.

### A. Defendants' Material Misstatements And Omissions Concerning Inventory

#### 1. Defendants' Recurring Misstatements Regarding Inventory Management And Controls

276. Throughout the Class Period, Defendants repeated similar or identical misstatements concerning inventory management and/or controls.

277. Defendants stated, "[o]n an ongoing basis, ***we closely monitor and manage our inventory balances***." This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's

Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023 and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. This statement was also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts. This statement was also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

278.    The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to "closely monitor and manage" Dollar General's inventory and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory

stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

279. Defendants further stated repeatedly that "***efficient management of our inventory has been and continues to be an area of focus for us***." This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. This statement was also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by

Defendants Vasos and Dilts.  This statement was also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

280.    The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to manage Dollar General's inventory efficiently and, instead, allowed the Company to be clogged with a massive glut of excess inventory.  Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

281.    Defendants also stated repeatedly that they "utilize key performance indicators ('KPIs') in the management of our business," including "***inventory turnover***," which they claimed "is calculated based on total cost of goods sold for the preceding four quarters divided by the average inventory balance as of the ending date of the reporting period, including the end of the fiscal year, the beginning of the fiscal year, and the end of each of our three interim fiscal quarters." This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period.  Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020,

August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. This statement was also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts. This statement was also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

282. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, Defendants'

115

calculation of inventory turnover was necessarily misleading and omitted to state the material fact that the Company was plagued by vast amounts of excess inventory and was not properly tracking or accounting for inventory.

283. Defendants stated, "***Efficient inventory management is a key component of our business success and profitability***."  This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period.  Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt.  This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt.  This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt.  This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts.  This statement was also incorporated into Dollar General's Form 10-

116

Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.  This statement was also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

284.  The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory.  Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

285.  Defendants stated, "We must maintain **sufficient inventory levels** and an appropriate product mix to meet our customers' demands **without allowing those levels to increase** such that the costs to store and hold the goods unduly impacts our financial results or **increases the risk of inventory shrinkage**."  This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period.  Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed

117

by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. This statement was also incorporated into Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts. This statement was also made in Dollar General's Form 10-K filed on March 25, 2024 (at which point the Company appended "or damages or impacts store standards" to the end of the statement), which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

286. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees

118

reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

287. Defendants stated, "Our *inventory balance* represented approximately 48% of our total assets exclusive of goodwill, operating lease assets, and other intangible assets as of January 29, 2021." This statement was repeated in sum and substance—with the only material changes being the inventory balance's percentage of total assets and the corresponding dates—in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's

119

Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. This statement was also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts. This statement was also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and was incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

288. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

289. Defendants made the following statements:

a. "Our cash flow from operations, profitability and financial condition may be negatively affected if we are not successful in managing our inventory balances."

b. "If we do not accurately predict customer trends, spending levels, or price sensitivity, we may have to take unanticipated markdowns to dispose of the excess inventory, which also can adversely affect our financial results."

c. "If we are not successful in managing our inventory balances, our cash flows from operations and financial condition may be negatively affected."

d. "A significant disruption to our distribution network, the capacity of our distribution centers or the timely receipt of inventory could adversely affect sales or increase our transportation costs, which would decrease our profitability."

These statements were repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, these statements were made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. These statements were also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. These statements were also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. These statements were also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed by Defendant Dilts and certified by Defendants Owen and Dilts. These statements were also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts. These statements

were also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and were incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

290. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, among other things, the above statements were half-truths that omitted critical qualifying information concerning Dollar General's excess inventory and deficient inventory management practices and controls.

**2.      May 28, 2020 Inventory Misstatements (1Q20 Earnings Period).**

291. On May 28, 2020, Dollar General hosted its 1Q20 earnings call to discuss its financial results for the quarter ended May 1, 2020. The call was led by Defendants Vasos, Garratt, and Owen. During this earnings call, Defendant Owen made misstatements and omissions relating to inventory.

292. During the 1Q20 earnings call, in response to a question about when Dollar General could "get[] the stores fully stocked[,]" Defendant Owen responded that:

> [T]he merchant team did an outstanding job and then ***the supply chain, obviously, you can't do that without the supply chain. So they were able to flex up to our demand.*** And then also, ***they're able to deliver the product to our stores on time.*** And then finally, as Todd mentioned as well, Fast Track earlier was one of our initiatives that really paid off during this ***because the stores were able to get the***

*product on the shelf.* . . . But I can tell you this. ***Our supply chain is ready to deliver the product to the stores when it's available. And our store teams are ready to get it on the shelf.***

Also during the 1Q20 earnings call, in response to a question about the Company's gross margin performance, Defendant Garratt responded that among the key "drivers" of the Company's gross margins, "the other one that we didn't really call out this quarter because ***it wasn't material was shrink***."

293. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants were shipping inventory without regard to demand and were not able to deliver product to stores on time. Further, multiple former Dollar General employees reported that because Dollar General stores were chronically understaffed and bombarded with excess inventory, the stores were not ready or able to get the product on the shelf. Nor was Dollar General ready to deliver the product to the stores when available because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Defendants' statement about inventory shrink was misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink at Dollar General because they were not tracking vast amounts of excess inventory.

### 3. August 27, 2020 Inventory Misstatements (2Q20 Earnings Period)

294. On August 27, 2020, Dollar General hosted its 2Q20 earnings call to discuss its financial results from the quarter ended August 1, 2020. The call was led by Defendants Vasos, Garratt, and Owen. During this earnings call, Defendant Owen made material misstatements and omissions relating to inventory.

123

295. On the 2Q20 earnings call, in response to a question about "challenges with out-of-stocks" and "where you guys are from the supply chain," Defendant Owen responded, "[A]s we look forward, *we see that the supply chain that we have is incredibly nimble and many of the initiatives we have in place have allowed us to get the products in and out of the supply chain and the distribution center fast*, so we'll be ready for that customer when the inventory is ready to distribute to them.  So we're pleased with the progress."

296. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently or nimbly manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory.  Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

### 4. September 9, 2020 Inventory Misstatements (Barclays Conference)

297. Defendants Vasos, Garratt, and Owen attended and spoke at the Barclays Global Consumer Staples Conference on September 9, 2020.  During this conference presentation, Defendant Owen made material misstatements and omissions relating to inventory.

298. During the conference, Defendants were asked how they are "thinking about the holiday" season "from an inventory perspective."  Defendant Owen responded, "*in a matter of weeks, we're able to bring that product in and get it on the shelf for the customer and to all of our stores.*  So I think that's a testament to the merchandising team's creativity and *the supply chain and the operator's ability to get it on the shelf*. . . .  And then in terms of the holiday merchandise, like Todd mentioned, same thing, our teams overseas were out in front of this as well

and it's pretty much business as usual and we're excited, in fact *we're able to accelerate some of the holiday merchandise into the stores well ahead of normal* because of the progress we've seen in some of the sell-throughs this summer."

299.    The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that because Dollar General stores were chronically understaffed and bombarded with excess inventory, Dollar General was not ready or able to get the product on the shelf.  Nor was Dollar General ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.  Indeed, former Dollar General employees confirmed that the Company was not timely delivering holiday merchandise to Dollar General stores.

### 5.    September 10, 2020 Inventory Misstatements (Goldman Sachs Conference)

300.    Defendants Vasos, Garratt, and Owen attended and spoke at the Goldman Sachs Annual Global Retailing Conference on September 10, 2020.  During this conference presentation, Defendants Vasos and Owen made material misstatements and omissions relating to inventory.

301.    On the panel, Defendants were asked "what other opportunities do you see in" "your supply chain."  Defendant Vasos responded, "So there's a lot of different moving parts that *we manage each and every day*, but I have to say that *our team is very good at stripping out cost as relates to both distribution as well as that transportation side*."

302.    The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to manage

125

Dollar General's inventory and, instead, allowed the Company to be clogged with a massive glut of excess inventory, which was increasing costs for distribution and transportation. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

303. Later, Defendants were asked, "what gives you confidence to manage your in-stock levels as you think about the coming two quarters?" Defendant Owen responded, "***we've been able to bring these items into the supply chain in a matter of weeks and get them through the supply chain on the shelf for the customer***. . . . We're business as usual there and we've been able to bring inventory over, and quite honestly, ***we've been able to ship inventory holiday merchandise early to our stores*** in some cases because of the great sell-throughs we saw with the lawn and garden, some of the summer seasonal. . . . So, again, it's a day-to-day activity that our teams collaborate tremendously well with not only internally but externally and we'll continue to do that. But we feel like we're in a good position for the back half and we'll be there and ready to serve the customer."

304. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that because Dollar General stores were chronically understaffed and bombarded with excess inventory, the Company was not ready or able to get the product on the shelf or serve the customer. Nor was Dollar General's supply chain ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Indeed, former Dollar General

employees confirmed that the Company was not timely delivering holiday merchandise to Dollar General stores.

**6.  December 3, 2020 Inventory Misstatements (3Q20 Earnings Period)**

305.  December 3, 2020, Dollar General issued a news release regarding its 3Q20 financial results and operations attached to a Form 8-K.  That day, the Company also filed its 3Q20 SEC Form 10-Q, which set forth the Company's 3Q20 results and was signed and certified by Defendants Vasos and Garratt.  In the news release and Form 10-Q, Defendants made material misstatements and omissions relating to inventory.  They touted the Company's "reduction in markdowns as a percentage of net sales" and "reduction in inventory shrink as a percentage of net sales."

306.  On December 3, 2020, Dollar General hosted its 3Q20 earnings call to discuss its financial results from the quarter ended October 30, 2020.  The call was led by Defendants Vasos, Garratt, and Owen.

307.  Defendant Garratt stated on the call, "While out-of-stocks remain higher than normal for certain high-demand products, *we continue to make good progress with improving our in-stock position and are pleased with our overall inventory levels*."  Defendant Garratt also touted the Company's "*reduction in markdowns* as a percentage of sales" and "*reduction in shrink* as a percentage of sales."  He further stated, "we did have *lower shrink*, which we're pleased to see as a percent of sales."  In response to a subsequent analyst question about the Company's markdowns, Defendant Garratt elaborated, "We've been talking about *lower markdowns* as a percent of sales for a number of quarters, and the driver of that has been lower promotional activity."

308.  The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, as multiple

former Dollar General employees reported, Dollar General stores were chronically understaffed and bombarded with excess inventory—thus, it was materially false and misleading for Defendant Garratt to claim that Dollar General was pleased with its inventory levels. Nor was Dollar General ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Defendants' above statements about inventory shrink and markdowns were misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

**7. March 18-19, 2021 Inventory Misstatements (4Q20 Earnings Period)**

309. On March 18, 2021, Dollar General issued a news release regarding its FY20 and 4Q20 financial results and operations attached to a Form 8-K. On March 19, 2021, Dollar General filed its SEC Form 10-K for the fiscal year ended January 29, 2021, which set forth the Company's results for FY20 and for 4Q20 and was signed and certified by Defendants Vasos and Garratt. In the news release and Form 10-K, Defendants made material misstatements and omissions relating to inventory. They touted the Company's "reduction in markdowns as a percentage of net sales" and "reduction in inventory shrink as a percentage of net sales." In the Form 10-K, Defendants Vasos and Garratt stated, "We also experienced a lower rate of inventory shrink in 2020 compared to 2019."

310. On March 18, 2021, Dollar General hosted its earnings call to discuss its financial results for the fourth quarter ended January 29, 2021. The call was led by Defendants Vasos, Garratt, and Owen. On the call, Defendant Garratt touted the Company's "reduction in markdowns as a percentage of sales" and "reduction in shrink as a percentage of sales."

128

311.     The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, as multiple former Dollar General employees reported, Dollar General stores were chronically understaffed and bombarded with excess inventory.  Defendants also did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.  Defendants' above statements about inventory shrink and markdowns were misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

### 8.     May 27, 2021 Inventory Misstatements (1Q21 Earnings Period)

312.     On May 27, 2021, Dollar General issued a news release reporting its 1Q21 financial results and operations attached to a Form 8-K.  Also, on May 27, 2021, Dollar General filed its 1Q21 SEC Form 10-Q, which reported the Company's 1Q21 results and was signed and certified by Defendants Vasos and Garratt.  In the news release and Form 10-Q, Defendants made material misstatements and omissions relating to inventory.  They touted the Company's "reduction in markdowns as a percentage of net sales" and "reduction in inventory shrink as a percentage of net sales."

313.     On May 27, 2021, Dollar General hosted an earnings call to discuss its financial results for the quarter ended April 30, 2021.  The call was led by Defendants Vasos, Garratt, and Owen.

314.     On the 1Q21 earnings call, Defendant Garratt again touted the Company's "reduction in markdowns as a percentage of sales" and "reduction in shrink as a percentage of

sales." He also stated, "we continue to make good progress with improving our in-stock position and are pleased with the overall quality of our inventory."

315. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory—which rendered misleading Defendant Garratt's statement about being pleased with the overall quality of Dollar General's inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Defendants' above statements about inventory shrink and markdowns were misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

### 9. August 26, 2021 Inventory Misstatements (2Q21 Earnings Period)

316. On August 26, 2021, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended July 30, 2021. That day, Dollar General issued a news release reporting its 2Q21 financial results and operations attached to a Form 8-K. Also, on August 26, 2021, Dollar General filed its 2Q21 SEC Form 10-Q, which set forth the Company's 2Q21 results and was signed and certified by Defendants Vasos and Garratt. In the news release and Form 10-Q, they touted the Company's "reduction in inventory shrink as a percentage of net sales." In the Form 10-Q, Defendants touted the Company's "reduction in markdowns as a percentage of net sales."

130

317. On August 26, 2021, Dollar General hosted an earnings call to discuss its financial results for the quarter ended July 30, 2021. The call was led by Defendants Vasos, Garratt, and Owen.

318. On that call, Defendant Garratt again touted the Company's "reduction in shrink as a percentage of sales" and "reduction in markdowns." He also stated, "we were pleased with our strong inventory position for the back-to-school shopping season and our teams continue to work closely with suppliers to ensure delivery of seasonal and other goods in the remaining back half of the year."

319. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Dollar General stores were chronically understaffed and bombarded with excess inventory—thus, Dollar General did not have a "strong inventory position" or the ability to deliver seasonal and other goods in a timely and efficient manner. Dollar General was not ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Indeed, former Dollar General employees confirmed that the Company was not timely delivering holiday merchandise to Dollar General stores. Defendants' above statements about inventory shrink and markdowns were misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

131

### 10. September 8, 2021 Inventory Misstatements (Barclays Conference)

320. Defendants Vasos, Garratt, and Owen participated on a panel at the Barclays Global Consumer Staples Conference on September 8, 2021. During the conference presentation, Defendant Owen made material misstatements and omissions relating to inventory.

321. At the conference, an analyst asked about Dollar General's holiday inventory levels. Defendant Owen responded, "First, when we think about the holiday season starting with back to school, *we were really pleased with our inventory position in back to school*. So, that's step one. And then as you think about the future and the back half of the year, when you think about harvest and Halloween and holiday, *we feel good about our inventory position*. Of course, we're facing some of the same challenges as others, but *our team has done a really nice job of really working a multitude of levers to get the merchandise here for us and for the customer*. And so many, many different things the team is doing. So, *we feel good about the assortment and merchandise is outstanding*."

322. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Dollar General stores were chronically understaffed and bombarded with excess inventory. Dollar General also was not ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Indeed, former Dollar General employees confirmed that the Company was not timely delivering seasonal merchandise to Dollar General stores.

132

### 11. December 2, 2021 Inventory Misstatements (3Q21 Earnings Period)

323. On December 2, 2021, Dollar General issued a news release reporting its 3Q21 financial results and operations attached to a Form 8-K. Also, on December 2, 2021, Dollar General filed its 3Q21 SEC Form 10-Q, which reported the Company's 3Q21 results and was signed by Defendants Vasos and Garratt and certified by Defendants Vasos and Garratt. In the news release and Form 10-Q, Defendants touted the Company's "reduction in inventory shrink as a percentage of net sales." In the Form 10-Q, Defendants touted the Company's "lower inventory shrink rate and a reduction in markdowns as a percentage of net sales."

324. On December 2, 2021, Dollar General hosted an earnings call to discuss its financial results for the quarter ended October 29, 2021. The call was led by Defendants Vasos, Garratt, and Owen.

325. On that call, Defendant Garratt again touted the Company's "reduction in shrink as a percentage of sales." He also stated, "*we are pleased with our inventory position* for the holiday shopping season, and our teams continue to work closely with suppliers to ensure delivery of goods for the remainder of the year."

326. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Dollar General stores were chronically understaffed and bombarded with excess inventory. Dollar General also was not ready to timely deliver inventory to the stores because Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Indeed, former Dollar General employees confirmed that the Company was not timely delivering holiday merchandise to Dollar General stores. Defendants' above statements about inventory shrink and markdowns were misleading

133

when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

327. Later in the Q&A portion of the call, Defendants were asked same-store sales growth in 2023. Defendant Garratt responded, "*we've never felt better about the business model. We feel great about the fundamentals.* . . . And then also as you think about next year in general, we come into the year with elevated inflationary pressures. We have, as we said, expectations that the supply chain costs will continue to be elevated through Q4, and they won't magically drop right out of the gate in Q1, as well as the product cost pressures. But we do think there's reasons to think that this is supply and demand calculation here and over time it will moderate and so that could flip as you move through the year into tailwind. So more to come on the specifics, but as you think about next year, *I would tell you the fundamentals are fantastic*."

328. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants were bombarding Dollar General stores with massive amounts of excess inventory—without regard for demand or even need at the stores.

**12.     March 17-18, 2022 Inventory Misstatements (4Q21 Earnings Period)**

329. On March 17, 2022, Dollar General issued a news release regarding its FY21 and 4Q21 financial results and operations attached to a Form 8-K. Also, on March 18, 2022, Dollar General filed its SEC Form 10-K for the fiscal year ended January 28, 2022 (the "FY21 10-K), which set forth the Company's results for FY21 and for 4Q21 and was signed by Defendants Vasos and Garratt and certified by Defendants Vasos and Garratt. In the news release and Form 10-K, Defendants touted the Company's "reduction in markdowns as a percentage of net sales, and a

134

lower inventory shrink rate." In the Form 10-K, Defendants also repeated their earlier statement that, "We also experienced a lower rate of inventory shrink in 2020 compared to 2019."

330. On March 17, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended January 28, 2022. The call was led by Defendants Vasos, Garratt, and Owen. On that call, Defendant Garratt again touted the Company's "reduction in markdowns as a percentage of sales." Defendant Vasos stated on the call that, "we are seeing a meaningful improvement in our in-stock positions." Defendant Garratt also stated on the call, "Importantly, as Todd noted, we have begun to see a meaningful improvement in our in-stock levels since the end of the year and expect continued improvement as we move through 2022, underscoring our optimism that we are well positioned to serve our customers with the products they want and need."

331. During the same call, Defendants were asked about their anticipated growth in same-store sales. Defendant Garratt responded, "***And the other thing to point out is we're improving our in-stocks [and] as we improve our in-stocks, that's driving sales as well***." Defendants were also asked about "the impact that in-stocks have had on comps" and "where you are on the restoration of those in-stocks?" Defendant Vasos responded, "we had some labor challenges in Q3 and Q4 in distribution. We're happy to report that we are now back to pre-pandemic levels on staffing. . . . Now as we move through Q4 and now into Q1, ***we feel much, much better about where our in-stock levels are.***"

332. The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Defendants knew or recklessly ignored that they were not improving the Company's "in-stock" position or levels. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to closely monitor or manage Dollar General's inventory balances and, instead,

allowed the Company to be clogged with a massive glut of excess inventory. Moreover, Defendants did not even have visibility into the Company's "in-stock" position or levels because, as confirmed by multiple former Dollar General employees, Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Defendants' above statements about inventory shrink and markdowns were misleading when made because there is a direct link between excess inventory and increased shrink and Defendants did not have visibility into the actual amount of shrink or the need to markdown inventory at Dollar General because they were not tracking vast amounts of inventory.

### 13. May 26, 2022 Inventory Misstatements (1Q22 Earnings Period)

333. On May 26, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended April 29, 2022. The call was led by Defendants Vasos, Garratt, and Owen. During this earnings call, Defendant Vasos made misstatements and omissions relating to inventory.

334. On the call, Defendant Vasos stated, "I'm also pleased to report that we have *continued to make improvements in our overall in-stock position*, which we believe positions us well to drive strong top line performance through the remainder of the year."

335. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. Defendants knew or recklessly ignored that they were not improving the Company's "in-stock" position. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to closely monitor or manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, Defendants did not even have visibility into the Company's "in-stock" position because, as confirmed by multiple former Dollar

136

General employees, Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

336. Later on in the 1Q22 earnings call, an analyst asked about changes in consumer behavior. Defendant Vasos responded, we "feel really good about our inventory levels there and not concerned at all at this point on any markdown risks that may be there."

337. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to closely monitor or manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, Defendants did not have visibility into the Company's "inventory levels" or "markdown risks" because, as confirmed by multiple former Dollar General employees, Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

**14. August 25, 2022 Inventory Misstatements (2Q22 Earnings Period)**

338. On August 25, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended July 29, 2022. The call was led by defendants Vasos, Garratt, and Owen. During this earnings call, Defendants Vasos, Garratt, and Owen made misstatements and omissions relating to inventory.

339. Defendant Vasos reported "***an improvement in our overall in-stock position and our strong sales results***" and Defendant Garratt assured investors that Defendants "continue[d] to believe the ***quality of our inventory is in good shape***," and were "pleased with the improvements we saw in our ***in-stock levels*** during the quarter and expect continued improvement as we move

through 2022." Also on the call, Defendant Owen touted the Company's purported "***data-driven inventory management***."

340. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Defendants knew or recklessly ignored that they were not improving the Company's "in-stock" position or levels, the quality of the Company's inventory was not in "good shape" and the Company was not able to rely upon "data driven" inventory management. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to closely monitor or manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory to stores that did not need it and could not properly store it. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, it was materially misleading for Defendants to tout Dollar General's purported "data-driven inventory management."

341. During this call, in response to an analyst question about the Company's ability to service an increasing number of stores, Defendant Owen further stated: "we're very pleased at our ability to expand our distribution network because what it's going to do for us is it's going to ***continue to allow us to serve our stores better, make it more efficient,*** be able to pull cost out of the system and enable us to continue to grow. And as you can tell, we have significant growth prospects in the future. And that's all this is, is being able to make sure that ***our distribution is in***

*line with our store opening plans, and those two teams work very, very well together to plan accordingly*."

342. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory along the Company's supply chain to stores that did not need it and could not properly store it. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, it was misleading for Defendants to tout the purported efficiency of Dollar General's distribution network.

343. Following up on Defendants' statements regarding the Company's inventory management, analyst Michael Lasser observed, "[y]ou have a lot of inventory" and asked how the Company's mounting inventory factored into its financial condition. In response, Defendant Vasos stated, "As it relates to the inventory levels, *we couldn't be happier with where we sit today on inventory. We did all the right things early on. . . . We were well ahead of any inventory issues that may pop up, unlike some of our competitors out there*." Defendant Vasos added, "So we feel very strong. *The quality of our inventory couldn't be better*. And as we move forward, we believe that will benefit us as we move into the back half of this year and into next year."

344. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple

139

former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, it was materially misleading for Defendants to tout the quality of the Company's inventory and to claim that they purportedly "did all the right things early on" and were "well ahead of any inventory issues."

**15.    December 1, 2022 Inventory Misstatements (3Q22 Earnings Period)**

345.    On December 1, 2022, prior to the opening of trading, Dollar General issued a press release reporting the Company's results for the third quarter ended October 28, 2022 ("3Q22"). The press release was attached to the Company's Form 8-K filed with the SEC on December 1, 2022. Also on December 1, 2022, Dollar General filed with the SEC its 3Q22 Form 10-Q, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt.

346.    In the earnings release, Defendants partially disclosed the Company's inventory problems, but did not accurately disclose their true nature, severity, or causes. The release, quoting Defendant Owen, admitted that the Company had experienced "a challenging economic and operating environment," including "cost pressures we experienced during the quarter, as well as challenges within our internal supply chain resulting in higher-than-anticipated distribution and transportation costs." Dollar General's press release and the 3Q22 10-Q further stated, "During the third quarter, the Company experienced unanticipated delays in acquiring additional temporary warehouse space sufficient for its inventory needs, which caused inefficiencies within the Company's internal supply chain. These challenges resulted in higher-than-anticipated supply chain costs, including fees incurred for delays in returning shipping containers, and higher

transportation costs caused by the need to service stores from less-than-optimal distribution center alignments."

347. However, in the Company's press release, Defendant Owen also reassured investors that "We believe the majority of *these and other gross margin pressures are largely temporary*, and we are confident in *our plans to drive greater supply chain efficiencies moving forward*." In the 3Q22 10-Q, Defendants further assured investors that, "we have made progress in acquiring additional warehouse capacity, and expect to add a significant amount of additional warehouse capacity through the remainder of 2022 and in 2023. We believe these additional facilities will drive greater efficiencies throughout our supply chain."

348. During the December 1, 2022 earnings call, Defendant Garratt also assured investors "[i]mportantly, we continue to believe the quality of our inventory is in good shape, and we anticipate that we will begin to see *lower levels of inventory growth beginning in Q4*." Defendant Garratt similarly stated, "we are making good progress towards resolving our storage capacity constraints." Further, Defendant Owen concluded the earnings call by reassuring investors that the Company's inventory issues were under control, stating, "while we had some unanticipated challenges within our supply chain during the quarter, we're confident in the actions we've taken to address these near-term issues and expect continued improvement as we move through Q4 and into next year." During the December 1, 2022 earnings call, Defendant Owen touted the Company's "data-driven inventory management."

349. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants' partial disclosures of supply chain inefficiencies did not fully disclose the true nature, scope, severity, or causes of these issues. Defendants did not disclose that, as confirmed by

141

multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory along the Company's supply chain to stores that did not need it and could not properly store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, it was materially misleading for Defendants to tout Dollar General's purported "data-driven inventory management."

### 16. February 23, 2023 Inventory Misstatements (4Q22 and FY22)

350. On February 23, 2023, Dollar General issued a news release reporting certain preliminary financial results for the Company's 4Q22 and FY22 results for the fiscal year ended February 3, 2023. The news release was attached to the Company's Form 8-K filed with the SEC. In the news release, Dollar General attributed the Company's "lower-than-expected results," including reduced expected diluted earnings per share for 4Q22, to "lower-than-anticipated sales and higher-than-anticipated inventory damages" due to the negative impact of "Winter Storm Elliott during the fourth quarter."

351. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. Among other things, Defendants did not fully disclose the true nature, scope, severity, or causes of the problems plaguing Dollar General. Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further,

Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory along the Company's supply chain to stores that did not need it and could not properly store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

### 17. March 16, 2023 Inventory Misstatements (4Q22 and FY22)

352. On March 16, 2023, Dollar General issued a release reporting the Company's 4Q22 and FY22 results for the fiscal year ended February 3, 2023. The release was attached to the Company's Form 8-K filed with the SEC.

353. On March 16, 2023, Defendants Owen and Garratt led a conference call to discuss the Company's 4Q22 and FY22 earnings. During the call, analyst Scot Ciccarelli asked Defendant Garratt to "provide any more color on what's happening" with inventory. Defendant Garratt responded, "as we look further, we expect inventory levels to normalize. As you look at in Q4, we saw inventory per store drop in half. It was 14% on a per store basis which was about half the growth rate we saw in the previous period – previous quarter. And again, it reflects the same drivers. It's really ***the product cost inflation and a greater mix of higher value products particularly in NCI as we completed the rollout of that***. The important thing to note here is it is ***seasonal goods or early receipt of seasonal goods was our other driver***. But it's important to note that these are evergreen type products which aren't time sensitive ***so we feel really good about the quality of the inventory, the ability to move through that, and expect this to continue to normalize as we move through the year***."

354. In describing the impact of the Company's mounting inventory on the earnings call, Defendant Owen told investors, "The quarter was also impacted by greater than anticipated

143

inventory damages, which contributed to diluted EPS results that were below our expectations. While the storm had some damages impact, we also incurred higher damages than expected as we worked through the residual impact of the storage capacity constraints and related store and distribution inefficiencies we experienced during the second half of the year. Although we expect some of these related impacts to be with us through the end of Q1, we are pleased to have ***the storage capacity constraints largely behind us*** which we believe positions us well moving forward."

355. Defendant Owen added on the call that the Company, "made strong progress in our supply chain, reducing our storage capacity constraints and improving operations during the quarter."

356. The statements emphasized above each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants did not fully disclose the true nature, scope, severity or causes of the problems plaguing Dollar General. Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory along the Company's supply chain to stores that did not need it and could not properly store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

**18.** **March 24, 2023 Inventory Misstatements (4Q22 and FY22)**

357. On March 24, 2023, Dollar General filed with the SEC its fiscal year 2022 financial report on Form 10-K, which was signed and certified by Defendants Owen and Garratt.

358. In the 2022 Form 10-K, Defendants stated, "*We continually evaluate the needs and demands of our customers and modify our merchandise selections and pricing accordingly,* while remaining focused on increasing profitability, cash generation and returns for our shareholders." Defendants continued, "In the second half of 2022, *we experienced a temporary shortage of available warehouse capacity, primarily due to delays in opening temporary warehouse space*. This shortage resulted in a significant impact to our operating results due to increased costs associated with delays in unloading inventory into warehouse space, as well as inefficiencies in moving goods throughout our internal supply chain. *With the opening of three permanent distribution facilities in the fourth quarter of 2022, significant warehouse capacity is now available and has relieved the vast majority of these constraints*." In the 2022 Form 10-K, Defendants further stated, "*We regularly analyze and rebalance the network with a goal of ensuring that it remains efficient and provides the service levels our stores require*."

359. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to closely monitor or manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, as confirmed by former Dollar General employees, Defendants had no regard for customer demand or need when ordering excess inventory or when forcing the excess inventory to stores that did not need it and could not properly store it. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site

145

warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

**19.     June 1, 2023 Inventory Misstatements (1Q23 Earnings Period)**

360.     On June 1, 2023, Defendants Owen and Dilts hosted an earnings call discussing the Company's results for 1Q23 ended May 5, 2023.

361.     On the June 1, 2023 call, Defendant Owen told investors that Defendants were "refining our *inventory management process*, including making some structural reporting realignments within our team to allow us to move more nimbly *to respond to customer demand and the needs of the business*."

362.     Also during the June 1, 2023 call, analyst Rupesh Parikh, noting the Company's "inventory balance was up, I think, 20% year-over-year," asked Defendants "how you feel about the health of the inventory position and opportunities you see to improve from here." Defendants Dilts responded, "*We continue to feel good about the quality of the inventory.  But I will say, inventory management remains a focus for us.*  So inventory growth was relatively consistent with Q4, although we had hope[d] that it would come in somewhat lower this quarter.  *The good news here is what I would say is we made some progress on working down the non-consumable inventory.  It was offset though by improved consumable in-stock levels.  And as Jeff noted with the supply chain health, that's where we got those in-stock levels from*."  She continued, "*our supply chain service levels improved faster than we expected*, and that drove some consumable products to the store, which was one of the main contributors as you look on either a year-over-year basis or a quarter-over-quarter basis.  So I'd just end with we know that *inventory remains an opportunity for us and we're going to continue working on reducing those levels*, with the goal to remain in line with sales, and we believe that *the new structure we've put in place will make sure that we get that done*."

146

363. Also during the June 1, 2023 earnings call, Defendant Dilts told investors: "Importantly, we continue to believe *the quality of our inventory is in good shape*."

364. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants did not fully disclose the true nature, scope, severity or causes of the Company's inventory management problems. For example, Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants did not disclose that, as confirmed by former Company employees, Dollar General's inventory management process had no regard for demand or need when ordering inventory or forcing it along the Company's supply chain to store that did not need it and could not store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.

**20.     December 7, 2023 Inventory Misstatements (3Q23 Earnings Period)**

365. On December 7, 2023, Defendants Vasos and Dilts hosted an earnings call discussing the Company's results for 3Q23 ended November 3, 2023, and Dollar General issued a release reporting the Company's 3Q23 results for the same period attached to the Company's Form 8-K filed with the SEC. Also on December 7, 2023, Dollar General filed with the SEC its 3Q23 Form 10-Q, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

366. During the December 7, 2023 call, an analyst asked Defendants whether the Company "can sustain a 6%-plus operating margin level longer term," "get back to 8%-plus" margins, and what "the bigger buckets of opportunity" were to achieve higher margins. Defendant

Dilts responded, "overall, *the fundamentals of this business are absolutely unchanged and this model remains strong*."

367. Also during the December 7, 2023 earnings call, an analyst asked, regarding "progress rightsizing your inventory position, whether Defendants expected "to exit the year clean" or would "still need some incremental actions into next year." Defendant Dilts responded, "*I think the good news for us is that the quality of our inventory is good* . . . . *I would say our progress is on track in our reduction efforts, and you saw a little bit of that in the numbers today*." Defendant Vasos then stated, "as you look at our results in Q3 and how that relates to any activity around clearing this inventory, *I would tell you that I feel very good about the balance here*." He continued, "*early results would say it's right in line where we thought it would be right now and actually, in some areas, a little bit better*. *But as I look at the quality of our inventory, it is in very good shape*." He then concluded, "So, feel very good about that and very good about what we see going into the back half of this year and 2024."

368. Also during the December 7, 2023 call, an analyst asked Defendants to "give more texture and timing" about "a few factors that are going to weigh on Dollar General's profitability" such as "shrink." Defendant Vasos responded, "We feel that *we're on the right track* with our back to basics moves here both in our labor investments, *in our inventory investments* as well as in our supply chain and merchandising. . . . *But rest assured, we're hitting every single item and we're monitoring every single item every week here to make sure it's on the right track. And if it happens not to move the way we want, we will then make an adjustment to ensure that it does*."

369. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants did not fully disclose the true nature, scope, severity or causes of the Company's

148

inventory management problems. For example, Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants did not disclose that, as confirmed by former Company employees, Dollar General's inventory management process had no regard for demand or need when ordering inventory or forcing it along the Company's supply chain to store that did not need it and could not store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. In addition, the above statements each were half-truths that omitted critical qualifying information concerning Dollar General's excess inventory and deficient inventory management practices and controls, and the full nature, scope, severity or causes of the Company's inventory management problems.

### 21. March 14 and 25, 2024 Inventory Misstatements (4Q23 and Fiscal Year 2023 Earnings Period)

370. On March 14, 2024, Defendants Vasos and Dilts hosted an earnings call discussing the Company's results for 4Q23 and FY23, both ended February 2, 2024, and Dollar General issued a release reporting the Company's financial results for the same periods attached to the Company's Form 8-K filed with the SEC.

371. During the March 14, 2024 earnings call, Defendant Dilts stated that, "***We've made significant progress optimizing our inventory mix and levels and we continue to believe that the quality of our inventory remains good***." She also touted Dollar General's purportedly lower inventory levels, stating, "Overall, we are pleased with the progress we are making, including gains

149

in customer traffic and market share, ***lower inventory levels*** and improving cash flow from operations.

372. On March 25, 2024, Dollar General filed its SEC Form 10-K for the fiscal year ended February 2, 2024, which set forth the Company's results for FY23 and 4Q23 and was signed by Defendants Vasos and Dilts and certified by Defendants Vasos and Dilts. In the Form 10-K, Defendants stated, "***As of fiscal year-end, and discussed further below, we have materially reduced inventory levels***."

373. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants did not fully disclose the true nature, scope, severity or causes of the Company's inventory management problems. For example, Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants did not disclose that, as confirmed by former Company employees, Dollar General's inventory management process had no regard for demand or need when ordering inventory or forcing it along the Company's supply chain to store that did not need it and could not store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. In addition, the above statements each were half-truths that omitted critical qualifying information concerning Dollar General's excess inventory and deficient inventory management practices and controls, and the full nature, scope, severity or causes of the Company's inventory management problems.

**22.     May 30, 2024 Inventory Misstatements (1Q24 Earnings Period)**

374.     On May 30, 2024, Defendants Vasos and Dilts hosted an earnings call discussing the Company's results for 1Q24 ended May 3, 2024, and Dollar General issued a release reporting the Company's financial results for the same period attached to the Company's Form 8-K filed with the SEC.

375.     During the May 30, 2024 call, Defendant Dilts stated, "***The team continues to do great work reducing our overall inventory position*** while simultaneously optimizing our mix and driving higher-end stocks.  We're pleased with the significant progress on this important goal, which not only frees up more cash in the business, but also helps to mitigate further shrink risk. ***And importantly, we continue to believe the quality of our inventory remains good***."  Defendant Dilts continued, "***Overall, we're pleased with our progress and proud of these results, including*** gains in customer traffic and market share, ***significantly lower inventory levels*** and improved cash flow from operations."

376.     Also during the May 30, 2024 call, analyst Seth Sigman asked, "how confident are you that the investments you're making and including what you've done from a payroll perspective is really fully baked in here, and is not going to have to step-up again?"  Defendant Vasos responded, "I just want to reiterate, shrink was worse than we thought it would have been in Q1, ***but we are seeing those green shoots, which gives us confidence to reiterate our guidance long-term***.  … ***when you look at inventory levels across the store, I mean, pretty aggressive but impressive reduction in inventory in light of rising sales*** … ***our inventory is in really good shape as far as the quality and always has been*** . . . ***we feel good about all the investments we've made*** . . . ***We feel that they're right on track***."

377.     The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  Among other things,

Defendants did not fully disclose the true nature, scope, severity or causes of the Company's inventory management problems. For example, Defendants did not disclose that, as confirmed by multiple Dollar General employees, they knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Further, Defendants did not disclose that, as confirmed by former Company employees, Dollar General's inventory management process had no regard for demand or need when ordering inventory or forcing it along the Company's supply chain to store that did not need it and could not store it. Moreover, Defendants did not disclose, as confirmed by multiple former Dollar General employees, that they did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. In addition, the above statements each were half-truths that omitted critical qualifying information concerning Dollar General's excess inventory and deficient inventory management practices and controls, and the full nature, scope, severity or causes of the Company's inventory management problems.

## B. Defendants' Staffing-Related Misstatements

### 1. Recurring Staffing Material Misstatements And Omissions Throughout the Class Period

378. Throughout the Class Period, Defendants repeated similar or identical misstatements and omissions regarding their staffing-related practices.

379. Defendants repeatedly stated, "The typical Dollar General store is *operated by a store manager, one or more assistant store managers, and three or more sales associates*." This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, this statement was made in Dollar General's Form

10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also incorporated into Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Q filed on June 1, 2023, which was signed by Defendant Dilts and certified by Defendants Owen and Dilts.

380. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores—including for example by staffing them with only *one individual during the day*. This, coupled with the massive glut of excess inventory, led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

153

381. Defendants repeatedly stated that they "***proactively seek ways to continue investing in***" Dollar General's employees. This statement was made in the Company's Form 10-Q filed on May 28, 2020, signed by Defendant Garratt and accompanied by certifications signed by Defendants Garratt and Vasos; and Form 10-Q filed on August 27, 2020, signed by Defendant Garratt and accompanied by certifications signed by Defendants Garratt and Vasos. Defendants also stated that they "***proactively seek ways to continue investing in them*** [*i.e., employees' development*]." This statement was repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, this statement was made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. This statement was also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. This statement was also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt

154

and was incorporated into Dollar General's Form 10-Q filed on June 1, 2023, which was signed by Defendant Dilts and certified by Defendants Owen and Dilts.

382. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores—including for example by staffing them with only one individual during the day—and did not invest in Dollar General's employees. This, coupled with the massive glut of excess inventory, led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

383. Defendants also stated:

a. "Failure to attract, train and retain qualified employees while controlling labor costs, as well as other labor issues, including employee safety issues, could adversely affect our financial performance."

b. "If we are unable to attract, train and retain adequate numbers of qualified employees, our operations, customer service levels, legal and regulatory compliance, and support functions could suffer."

These statements (with minor variations) were repeated in each Form 10-K that Dollar General filed with the SEC throughout the Class Period, which were respectively incorporated by reference into each Form 10-Q that Dollar General filed during the Class Period. Thus, these statements were made in Dollar General's Form 10-K for the fiscal year ended January 31, 2020, which was signed and certified by Defendants Vasos and Garratt, and was incorporated by reference into each

155

Form 10-Q filed by Dollar General in 2020, including each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, and December 3, 2020, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. These statements were also made in Dollar General's Form 10-Ks filed on March 19, 2021 and March 18, 2022, which were signed and certified by Defendants Vasos and Garratt, and were incorporated by reference into each Form 10-Q filed by Dollar General in 2021 and 2022, including Dollar General's 10-Qs dated May 27, 2021, August 26, 2021, December 2, 2021, May 26, 2022, and August 25, 2022, which were signed by Defendant Garratt and certified by Defendants Vasos and Garratt. These statements were also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. These statements were also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt and was incorporated into Dollar General's Form 10-Q filed on June 1, 2023, which was signed by Defendant Dilts and certified by Defendants Owen and Dilts.

384. The above statements were each untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws. Further, among other things, the above statements were half-truths that omitted critical qualifying information, including that Defendants chronically understaffed Dollar General stores and had high employee turnover and dangerously unsafe work conditions that resulted in massive fines and penalties.

**2.      August 27, 2020 Staffing Misstatements (2Q20 Earnings Period)**

385.     On August 27, 2020, Dollar General hosted its 2Q20 earnings call to discuss its financial results from the quarter ended August 1, 2020.  The call was led by Defendants Vasos, Garratt, and Owen.  On the call, Defendant Owen stated, "As a result of our efforts to date, *our store associates are able to better serve our customers* during this period of *heightened demand* as evidenced by our recent customer survey results, which we are seeing overall satisfaction at all-time highs."

386.     The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.  Further, Defendants had no regard for demand or need when ordering inventory or forcing it to stores that did not need it and could not properly store it.

**3.      December 3, 2020 Staffing Misstatements (3Q20 Earnings Period)**

387.     On December 3, 2020, Dollar General hosted its 3Q20 earnings call to discuss its financial results from the quarter ended October 30, 2020.  The call was led by Defendants Vasos, Garratt, and Owen.

388.     On the call, Defendant Owen stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment, and inclusion. [ . . . ]. Importantly, we believe these investments continue to yield positive results across our store base, *as evidenced by*

*continued record low store manager turnover, record staffing levels, healthy applicant flows, and a robust internal promotion pipeline*."

389. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 4. May 26, 2021 Staffing Misstatements (Shareholder Meeting)

390. On May 26, 2021, Dollar General hosted its annual Shareholder Meeting. At the meeting, Defendant Vasos stated, "*Our investments in our people are paying dividends across the organization*. And in 2020, we saw *our lowest store manager turnover on record*. In addition, we now have more than 12,000 store managers who were promoted from within the company, further demonstrating the culture of development and growth at Dollar General."

391. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 5. May 27, 2021 Staffing Misstatements (1Q21 Earnings Period)

392. On May 27, 2021, Dollar General hosted an earnings call to discuss its financial results for the quarter ended April 30, 2021. On the call, Defendant Owen stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment and inclusion. [ . . . ] Importantly, we believe these efforts continue to ***yield positive results*** across our organization and are ***an important driver of our consistent and strong execution***. At the store level, we continue to be pleased with our robust internal promotion pipeline and ***store manager turnover***, which continues to trend below historic levels."

393. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 6. September 8, 2021 Staffing Misstatements (Barclays Conference)

394. Defendants Vasos, Garratt, and Owen participated on a panel at the Barclays Global Consumer Staples Conference on September 8, 2021. During the conference presentation, an analyst asked about Dollar General's "wage positioning." Defendant Owen responded, "***we continue to make the investments we need to, but we don't feel like we need to make any meaningful ones*** [ . . . ] ***And, again, we feel like we're in really good position.*** Our pipeline is doing very well, and we'll continue to watch that but feel good about it right now."

395. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former

159

Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 7. December 2, 2021 Staffing Misstatements (3Q21 Earnings Period)

396. On December 2, 2021, Dollar General hosted an earnings call to discuss its financial results from the quarter ended October 29, 2021. On the call, Defendant Owen stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment and inclusion. . . . *[W]e continue to innovate on the development opportunities we offer our teams. Importantly, we believe these efforts continue to yield positive results across our store base, as evidenced by our robust promotion pipeline, healthy applicant flows and staffing above traditional levels*."

397. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 8. March 17-18, 2022 Staffing Misstatements (4Q21 Earnings Period)

398. On March 17, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended January 28, 2022. On the call, Defendants were asked about their

160

operating margin.  In response, Defendant Garratt stated, "*And we're in a great spot in terms of staffing levels*."

399.     The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 9.     May 25, 2022 Staffing Misstatements (Shareholder Meeting)

400.     On May 25, 2022, Dollar General hosted its annual Shareholder Meeting.  During that meeting, Defendant Vasos stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment and inclusion.  *We continue to focus on attracting, developing and retaining talented employees.  We have made significant investments in wages, benefits and training opportunities,* which we believe are resonating with our team, as we drive improvements across the organization, that better position our associates for future success."

401.     The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 10. May 26, 2022 Staffing Misstatements (1Q22 Earnings Period)

402. On May 26, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended April 29, 2022. During the call, Defendant Owen stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment, and inclusion" and "*we are pleased with our turnover rates, staffing levels and applicant flow*."

403. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

### 11. August 25, 2022 Staffing Misstatements (2Q22 Earnings Period)

404. On August 25, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended July 29, 2022. The call was led by defendants Vasos, Garratt, and Owen.

405. During this earnings call, Defendant Garratt stated, "[f]inally, and consistent with Q2, our outlook includes continued investments to further enhance the customer experience, including incremental labor hours and wages to drive continued improvement in overall in-stock levels and customer service." During the call, Defendant Owen further stated that the Company's "fourth operating priority is investing in our diverse teams through development, empowerment and inclusion" and "[w]e also continue to *be pleased with our turnover rates*, *staffing levels* and applicant flow, further validating our belief that we are taking the right actions to attract and retain talent." Later in the call, Defendant Vasos added, "[d]uring the quarter, and from a position of

162

strength, we made targeted investments in both incremental labor hours and wages to further enhance the customer experience and build on our sales momentum.  We believe these investments contributed to an improvement in our overall in-stock position and our strong sales results."

406.    The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

**12.    December 1, 2022 Staffing Misstatements (3Q22 Earnings Period)**

407.    On December 1, 2022, Dollar General hosted an earnings call to discuss its financial results for the quarter ended October 28, 2022.  During the December 1, 2022 conference call, Defendant Garratt told investors that the Company made "continued investments to further enhance the customer experience primarily toward incremental labor hours to drive continued improvement in overall ***in-stock levels*** and customer experience."  On the call, Defendant Owen further stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment and inclusion" and "[w]e are ***pleased with our turnover trends and staffing levels***.  And applicant flow continues to be strong, further validating our confidence that we are taking the right actions to attract and retain talent."

408.    The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to

serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws. Further, Defendants were not improving their "in-stock levels" because, as set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company's supply chain to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Thus, Defendants did not even have visibility into Dollar General's "overall in-stock levels."

### 13. March 16, 2023 Staffing Misstatements (4Q22 and FY22)

409. On March 16, 2023, Defendants Owen and Garratt led a conference call to discuss the Company's 4Q22 and FY22 earnings. During the call, Defendant Owen stated, "Our fourth operating priority is investing in our diverse teams through development, empowerment and inclusion"; "[w]e continue to have great success hiring the talent we need, and we are pleased with our staffing levels and applicant flow"; and "*we have made significant investments in our people including raising average hourly retail wages by approximately 23% over the last three years and investing over 4 million training hours in 2022 to promote education and development*." During the call, analyst Simeon Gutman asked Defendants about the Company's $100 million expenditure toward labor. Describing it as an "investment," Defendant Owen explained the cost would go to increasing hours rather than wages. Still Defendant Owen touted to investors that "*our staffing levels being very robust which we mentioned*" and "we're pleased that what we

believe this will do to elevate our store standards and our consistency which we believe the customer will benefit and the associate will benefit."

410. During the March 16, 2023 earnings call, analyst Karen Short asked Defendants about the wages they paid to employees. In response, Defendant Owen touted the Company's staffing levels, stating: "*we feel great about our staffing levels, our ability to attract, and our ability to retain our talent*. And so that's why *we're investing in hours, and right now we're very pleased to see that wage grow 23% over the last three years*. So we're in a great position and *that's why we're able to put this investment more towards the hours in the store rather than having to catch up on wages*."

411. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. Among other things, Defendants did not disclose the nature, severity, or effect of the staffing issues facing the Company. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability to serve Dollar General customers or properly maintain Dollar General stores, high employee turnover, and dangerously unsafe work conditions, which in turn exposed the Company to regulatory citations, penalties, and fines, including under workplace safety laws.

C. **Defendants' Misstatements Concerning Dollar General's Pricing**

1. **May 28, 2020 Pricing Misstatements (1Q20 Earnings Period)**

412. On May 28, 2020, Dollar General hosted its earnings call to discuss its financial results for the first quarter ended May 1, 2020. The call was led by Defendants Vasos, Garratt, and Owen.

413.   On the 1Q20 earnings call, Defendants Garratt and Vasos made material misstatements and omissions about Dollar General's pricing.  Defendant Garratt stated "we believe *we're in a great position right now with price* and believe we're making the right investments to drive margin expansion over the long-term, and believe we have the levers to do so."

414.   Further, on the call, Defendant Vasos stated "our pricing is as competitive as it's been" and "we don't see a need to lean in any further on price, because we're so well priced today against all classes of trade. Now, we'll continue to watch that if something changes.  The other thing to keep in mind is that we've been very, very vigilant around price, especially during this time."

415.   The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores.  In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 2.   August 27, 2020 Pricing Misstatements (2Q20 Earnings Period)

416.   On August 27, 2020, Dollar General hosted its earnings call to discuss its financial results for the second quarter ended July 31, 2020.  The call was led by Defendants Vasos, Garratt, and Owen.  On the call, Defendant Garratt made material misstatements and omissions about Dollar General's pricing.  When an analyst asked, "how best to think about the drivers of gross margin", Defendant Garratt responded, "we'll always watch price, *but we feel very good about where we're priced now*."

417. Defendant Garratt's statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 3. December 3, 2020 Pricing Misstatements (3Q20 Earnings Period)

418. On December 3, 2020, Dollar General hosted its earnings call to discuss its financial results for the third quarter ended October 30, 2020. The call was led by Defendants Vasos, Garratt, and Owen.

419. On the call, Defendants Garratt and Vasos made material misstatements and omissions about Dollar General's pricing. When asked by an analyst about gross margins, Defendant Garratt responded, "*we're currently in a great spot on price and don't see the need to make any investments there right now*. So, I believe we're making the right investments and have the levers to continue to improve gross margins and operating margins over the long term."

420. Later in the call, Defendants were asked about whether they expected to use "all the good margin expansion potential that you could have and reinvest that back in price[.]" Defendant Vasos responded, "Well, we always say, *we always reserve the right to lower price to ensure that we keep those footsteps coming into Dollar General and, more importantly, service that consumer*. As we sit right now, though, Michael, we don't see any evidence and/or need to pull a price lever. [ . . . ] But as we continue to watch the environment, *we'll do whatever we have to do to ensure that we're priced right*. But I think it's also important to note that in the 12 years

that I've been here, ***this is the best competitive positioning we've ever been in on price; the very best***.  So, from a position of strength, ***we've already lowered price***, ***got it where it needs to be, and are in very good shape*** as we move into 2021."

421.    The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores.  In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 4.    March 18, 2021 Pricing Misstatements (4Q20 Earnings Period)

422.    On March 18, 2021, Dollar General hosted its earnings call to discuss its financial results for the fourth quarter ended January 29, 2021.  The call was led by Defendants Vasos, Garratt, and Owen.

423.    On the call, Defendant Garratt made material misstatements and omissions about Dollar General's pricing.   When an analyst asked about gross margins, Defendant Garratt responded, "***And on the price front,*** we'll always reserve the right to invest as needed, but as ***we look at it now and as we've seen for quite a while now, we feel like we're in the best position on pricing we've been in and don't see, at least for the foreseeable future, the need to invest there***."

424.    The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to

168

properly price merchandise at Dollar General stores.  In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 5.  December 2, 2021 Pricing Misstatements (3Q21 Earnings Period)

425.  On December 2, 2021, Dollar General hosted an earnings call to discuss its financial results for the third quarter ended October 29, 2021.  The call was led by Defendants Vasos, Garratt, and Owen.

426.  On the call, Defendant Vasos made material misstatements and omissions about Dollar General's pricing.  Defendant Vasos stated, "Looking ahead, we believe we are well-positioned to navigate the current environment, and although we've experienced higher-than-expected costs, both from a product and supply chain perspective, *we're very confident in our price position as our price indexes relative to our competitors and other classes of trade remain in line with our targeted and historical ranges.  And because so many families depend on us for everyday essentials at the right price, we believe products at the $1 price point are important for our customers, and they will continue to have a significant presence in our assortment*.  In fact, approximately 20% of our overall assortment remains at $1 or less.  And moving forward, we will continue to foster and grow this program where appropriate."

427.  Later, during the Q&A portion of the call, Defendants were asked about the strength of their customer base.  Defendant Vasos responded, "When you look at how we operate, *our pricing is as good as ever* against all classes of trade.  *And as we talked about on our prepared remarks, we're not walking away from a $1 price point*."

428.  The above statements were untrue statements of material fact or omitted to state material facts necessary in order to make it not misleading.  As set forth herein, multiple former

169

Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

**6. March 17, 2022 Pricing Misstatements (4Q21 and FY21 Earnings Period)**

429. On March 17, 2022, Dollar General hosted an earnings call to discuss its financial results for the fourth quarter and fiscal year ended January 28, 2022. The call was led by Defendants Vasos, Garratt, and Owen.

430. On the call, Defendant Vasos made material misstatements and omissions about Dollar General's pricing. Defendant Vasos stated, "*we are very confident in our price position as our price indexes relative to competitors and other classes of trade remain in line with our targeted and historical ranges*. And because so many families depend on us for everyday essentials at the right price, we believe products at the $1 price point are important to our customers, and they will continue to have a significant presence in our assortment. In fact, approximately 20% of our overall assortment is $1 or less. And moving forward, we expect to continue to foster and grow this program where appropriate." Defendant Vasos further stated, "*Matter of fact, our pricing position has never been better. And as I said in my prepared remarks, our indexes are as good if not better than they've ever been. So we feel great about our everyday price*."

431. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple

former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores.  In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 7. May 26, 2022 Pricing Misstatements (1Q22 Earnings Period)

432. On May 26, 2022, Dollar General hosted an earnings call to discuss its financial results for the first quarter ended April 29, 2022.  The call was led by Defendants Vasos, Garratt, and Owen.

433. On the call, Defendants Vasos and Garratt made material misstatements and omissions related to Dollar General's pricing.  Defendant Vasos stated, "In addition, while we continue to see ongoing product cost inflation, ***we feel good about our price position*** as our price indexes relative to competitors and other classes of trade remain in line with our targeted and historical ranges."

434. During the call, Defendants were asked whether "you'll need to take down your prices further and maintain that price gap to continue to enjoy the success that Dollar General has achieved?"  Defendant Vasos responded, "***The great thing is that our prices are right in our historical ranges. And we feel great about price.  We've got plenty of ammunition to do whatever we need to do. But I would tell you that we've never felt better about our price position as we continue to move through Q2 and into the back half of the year***.  We've taken the opportunity, and I've mentioned this before, over the many, many months through COVID to sharpen our prices even more.  ***And I believe that what we're seeing right now against all classes of trade would tell you that Dollar General is in a great spot and has all of the levers at its disposal to continue to***

171

*keep that positioning. We don't see anything on the horizon that gives us any concern there at all*."

435. During call, Defendants were asked about gross margin. Defendant Garratt responded, "And as we work the other levers we've talked about, as we leverage our scale, and as Todd mentioned, *we're in a very good place in price*."

436. Later on the 1Q22 earnings call, Defendants were asked whether the Company would apply the lessons of the 2008-09 recession. Defendant Vasos responded, "*I mentioned and the reason we're leaning into that $1 price point is because we know how important that is during those times. . . . You'll see more endcaps, more off-shelf displays of both $1 and private brand as we move through Q2 and into the back half of the year. . . . So we're really good and nimble as you know and be able to move really quickly*. . . . We're so different as a company than we were in 2008, 2009*. I would hate to be fixing fundamentals right now* because the opportunity to gain share is going to be tremendous as we, I believe, move through this year. *And we're so far beyond that with all of the initiatives that we've put in place over the last 6, 7 years*[.]"

437. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

**8.     August 25, 2022 Pricing Misstatements (2Q22 Earnings Period)**

438.    On August 25, 2022, Dollar General hosted an earnings call to discuss its financial results for the second quarter ended July 29, 2022.  The call was led by Defendants Vasos, Garratt, and Owen

439.    On the call, Defendants Vasos and Garratt made material misstatements and omissions about Dollar General's pricing.  Defendant Vasos stated, "Importantly, *we continue to feel very good about our price position relative to competitors and other classes of trade*.  And with more than 18,500 stores located within five miles, about 75% of the US population, we believe we are well positioned to navigate the current environment, while continuing to support our customers through our unique combination of value and convenience."

440.    During the call, analyst Rupesh Parikh asked Defendants, "how do you feel about your pricing position today in light of some of the competitive actions that are taking place right now and are expected to happen going forward?"  Defendant Vasos responded, "*We feel great about our price position*.  I just want to remind everybody, well over a year ago, we took a very aggressive price stance, as you may recall me talking about over the last 18 months or so. And it positions us so well in the pandemic and now exiting the pandemic timeframe.  *And we feel great about where we are on prices against all classes of trade*, and of course, against even our chief competitors.  *We're in really good shape.*"  Later in the call, Defendant Garratt added, "Todd talked about *being in a great spot on price position*.  And again, as a limited SKU operator with our growth in size, I think *it really positions us well in this environment to serve that customer very well.  Be sharp on price, but to continue to expand our margins over the long term*."

441.    The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar

General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 9. September 7, 2022 Pricing Misstatements (Goldman Sachs Global Retailing Conference)

442. On September 7, 2022, Defendants Vasos, Garratt, and Owen participated in the Goldman Sachs Global Retailing Conference.

443. During the conference, an analyst asked about the Company's pricing charged to customers. Defendant Vasos responded, "When I think about Dollar General, and *we look at our pricing position, we've never felt better about our positioning.* Many of you have heard, over the last few quarters, myself talking about, *we took the opportunity from a position of strength during the pandemic to lower prices*. [ . . . ] *But again, from a position of strength, the lower prices.* And at that point, we had the best indexes that I've been – that I've seen against all classes of trade since I've been in Dollar General."

444. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 10. March 16, 2023 Pricing Misstatements (4Q22 and FY22)

445. On March 16, 2023, Defendants Owen and Garratt led a conference call to discuss the Company's 4Q22 and FY22 earnings for the year ended February 3, 2023.

446. On the call, Defendant Owen stated that, "***We remain focused on our goal to be priced at relative parity with mass merchants and we continue to feel very good about our price position relative to competitors and all classes of trade***."

447. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 11. May 31, 2023 Pricing Misstatements (2023 Annual General Meeting)

448. On May 31, 2023, Defendants held an Annual General Meeting in which Defendant Owen made material misstatements and omissions regarding Dollar General's pricing.

449. During the meeting, Defendants were asked, "We have one last question. I had problems with my local store. The price on shelf often did not match the price charged at checkout. What steps have been taken or will be taken to prevent this?" In response, Defendant Owen stated, "***[w]e strive to provide our customers with convenient shopping experience, which includes providing them with the shelf pricing they can count on every day. In those situations where we fail to live up to this expectation, we take swift action to identify the root cause of the issue and***

175

*correct it. Sometimes those root causes relate to systems and sometimes they relate to store level execution. Regardless, we take action designed to ensure we prevent their reoccurrence*."

450. The above statement was an untrue statement of material fact or omitted to state material facts necessary in order to make it not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores. In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

### 12. June 1, 2023 Pricing Misstatements (1Q23 Earnings Period)

451. On June 1, 2023, Dollar General hosted an earnings call to discuss its financial results for the first quarter ended May 5, 2023. The call was led by Defendants Owen and Dilts. On the call, Defendants Owen and Dilts made material misstatements and omissions about Dollar General's pricing.

452. In response to an analyst question, Defendant Owen stated: "We're going to be there for affordability, primarily through the items that matter most to her, and so we're going to get even sharper, *even though we're pleased with our pricing position overall, and have been for quite some time. We think there's an opportunity to be there for her even more, and so the team has already taken action on pricing on the items that matter most. We're doing it surgically like we always do*, and very pleased with where we're seeing the customer resonate. But certainly, that'll take time to drive traffic as it typically will do."

453. Also during the call, analyst Matthew R. Boss asked Defendant Dilts, ". . . how do you feel about your pricing position today?" In response, she stated, "*We feel great about our*

*pricing position*.  And just like Jeff said, we're investing in a targeted everyday low-price investment."  Defendant Dilts added that "*it's the right thing to do for our customers and for our business, and we're expecting sustained benefit from that investment.  And while we do like the momentum that we're building with these actions on price and labor investment*, we think that sets us up for the back half of the year because there could just be a little bit of a lag to the full benefit of those investments."

454.  Further, during the call, analyst Michael Lasser asked Defendants about the Company's pricing.  In response, Defendant Owen stated: "*as we've said historically, and continue to say, our price position relative to competition continues to be strong.  And quite honestly, our philosophy on price has not changed.*"  Defendant Owen continued, "And so we believe, again, *this is a very targeted structural approach – excuse me, targeted and surgical approach to being able to be there for this customer*."

455.  The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants chronically understaffed Dollar General stores and, coupled with the massive glut of excess inventory, this led to an inability of employees to properly price merchandise at Dollar General stores.  In turn, this exposed Dollar General to regulatory investigations, citations, fines, and penalties, including for overpricing merchandise such that customers were charged higher prices at the point of sale than the merchandise was priced on the shelves.

**D. Defendants' Materially Misleading Financial Metrics During The Class Period**

456. Throughout the Class Period, Defendants misrepresented their financial metrics in Dollar General Forms 8-K, Forms 10-Q, and Forms 10-K filed with the SEC and published for investors.

**1. May 28, 2020 Earnings Misstatements (1Q20 Earnings Period)**

457. On May 28, 2020, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended May 1, 2020. That day, Dollar General issued a news release reporting its 1Q20 financial results and operations attached to a Form 8-K. Also on May 28, 2020, Dollar General filed its 1Q20 SEC Form 10-Q, which reported the 1Q20 results and was signed and certified by Defendants Vasos and Garratt.

458. In the 1Q20 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a. Operating Profit of $866.8 million.

b. Net income of $650 million.

c. Gross Profit as a percentage of net sales of 30.7% or $2.6 billion.

d. Net sales of $8.4 billion.

e. Diluted Earnings Per Share of $2.56.

f. Total merchandise inventories, at cost, of $4.1 billion.

g. Inventory turnover of 4.7 times on a rolling four-quarter basis.

h. A LIFO provision of $1.6 million.

459. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to

178

efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 2. August 27, 2020 Earnings Metrics Misstatements (2Q20 Earnings Period)

460. On August 27, 2020, Defendants made material misstatements and omissions relating to Dollar General's results for the period ended July 31, 2020. That day, Dollar General issued a news release regarding its 2Q20 financial results and operations attached to a Form 8-K. Also, on August 27, 2020, Dollar General filed its 2Q20 SEC Form 10-Q, which set forth the Company's 2Q20 results and was signed and certified by Defendants Vasos and Garratt.

461. In the 2Q20 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a. Operating Profit of $1.0 million.

b. Net income of $787.6 million.

c. Gross Profit as a percentage of net sales of 32.5% or $2.8 billion.

d. Net sales of $8.7 billion.

e. Diluted Earnings Per Share of $3.12.

f. Total merchandise inventories, at cost, of $4.4 billion.

g. Inventory turnover of 4.9 times on a rolling four-quarter basis.

179

h. A LIFO provision of $0.1 million for the 13-week period ended July 31, 2020 and $1.7 million for the 26-week period ended July 31, 2020.

462. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 3. December 3, 2020 Earnings Metrics Misstatements (3Q20 Earnings Period)

463. On December 3, 2020, Defendants made material misstatements and omissions relating to Dollar General's results for the period ended October 30, 2020. That day, Dollar General issued a news release regarding its 3Q20 financial results and operations attached to a Form 8-K. Also, on December 3, 2020, Dollar General filed its 3Q20 SEC Form 10-Q, which set forth the Company's 3Q20 results and was signed and certified by Defendants Vasos and Garratt.

464. In the 3Q20 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a. Operating Profit of $773.1 million.

b. Net income of $574.3 million.

c. Gross Profit as a percentage of net sales of 31.3% or $2.57 billion.

d. Net sales of $8.2 billion.

e. Diluted Earnings Per Share of $2.31.

f. Total merchandise inventories, at cost, of $5.0 billion.

g. Inventory turnover of 4.9 times on a rolling four-quarter basis.

h. A LIFO provision of $1.6 million for the 13-week period ended October 30, 2020 and $9.7 million for the 26-week period ended October 30, 2020.

465. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 4. March 18-19, 2021 Earnings Metrics Misstatements (FY20 and 4Q20 Earnings Period)

466. On March 18 and 19, 2021, Defendants made material misstatements and omissions relating to Dollar General's annual and quarterly results for the fourth quarter and fiscal year ended January 29, 2021. On March 18, 2021, Dollar General issued a news release regarding its FY20 and 4Q20 financial results and operations attached to a Form 8-K. On March 19, 2021, Dollar General filed its SEC Form 10-K for the fiscal year ended January 29, 2021, which set forth the

Company's results for FY20 and for 4Q20 and was signed and certified by Defendants Vasos and Garratt.

467. In the FY20 and 4Q20 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

    a. Operating Profit of $3.6 billion for FY20 and of $872.2 million for 4Q20.

    b. Net income of $2.7 billion for FY20 and of $642.7 million for 4Q20.

    c. Gross Profit as a percentage of net sales of 31.8% or $10.7 billion for FY20 and of 32.5% or $2.7 billion for 4Q20.

    d. Net sales of $33.7 billion for FY20 and of $8.4 billion for 4Q20.

    e. Diluted Earnings Per Share of $10.62 for FY20 and of $2.62 for 4Q20.

    f. Total merchandise inventories, at cost, of $5.2 billion for FY20.

    g. Inventory turnover of 4.9 times on a rolling four-quarter basis.

    h. A LIFO provision of $5.1 million in FY20.

468. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 5. May 27, 2021 Earnings Metrics Misstatements (1Q21 Earnings Period)

469. On May 27, 2021, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended April 30, 2021. That day, Dollar General issued a news release reporting its 1Q21 financial results and operations attached to a Form 8-K. Also, on May 27, 2021, Dollar General filed its 1Q21 SEC Form 10-Q, which reported the Company's 1Q21 results and was signed and certified by Defendants Vasos and Garratt.

470. In the 1Q21 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a. Operating Profit of $908.9 million.

b. Net income of $6.77.7 million.

c. Gross Profit as a percentage of net sales of 32.8% or $2.6 billion.

d. Net sales of $8.4 billion.

e. Diluted Earnings Per Share of $2.82.

f. Total merchandise inventories, at cost, of $5.1 billion.

g. Inventory turnover of 4.8 times on a rolling four-quarter basis.

h. A LIFO provision of $12.3 million for the 13-week period ended April 30, 2021.

471. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered

183

into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 6. August 26, 2021 Earnings Metrics Misstatements (2Q21 Earnings Period)

472. On August 26, 2021, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended July 30, 2021. That day, Dollar General issued a news release reporting its 2Q21 financial results and operations attached to a Form 8-K. Also, on August 26, 2021, Dollar General filed its 2Q21 SEC Form 10-Q, which set forth the Company's 2Q21 results and was signed and certified by Defendants Vasos and Garratt.

473. In the 2Q21 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

    a.   Operating Profit of $849.6 million.

    b.   Net income of $637 million.

    c.   Gross Profit as a percentage of net sales of 31.6% or $2.7 billion.

    d.   Net sales of $8.7 billion.

    e.   Diluted Earnings Per Share of $2.69.

    f.   Total merchandise inventories, at cost, of $5.3 billion.

    g.   Inventory turnover of 4.6 times on a rolling four-quarter basis.

    h.   A LIFO provision of $36 million for the 13-week period ended July 30, 2021 and $48.2 million for the 26-week period ended July 30, 2021.

474. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to

184

efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 7. December 2, 2021 Earnings Metrics Misstatements (3Q21 Earnings Period)

475. On December 2, 2021, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended October 29, 2021. That day, Dollar General issued a news release reporting its 3Q21 financial results and operations attached to a Form 8-K. Also, on December 2, 2021, Dollar General filed its 3Q21 SEC Form 10-Q, which reported the Company's 3Q21 results and was signed by Defendants Vasos and Garratt and certified by Defendants Vasos and Garratt. Defendants Vasos, Owen and Garratt also discussed the 3Q21 results on a conference call held on December 2, 2021. These materials are collectively referred to below as the "3Q21 Results."

476. In the 3Q21 Results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a. Operating Profit of $665.6 million.

b. Net income of $487 million.

c. Gross Profit as a percentage of net sales of 30.8% or $2.6 billion.

d. Net sales of $8.5 billion.

e. Diluted Earnings Per Share of $2.08.

185

f. Total merchandise inventories, at cost, of $5.3 billion.

g. Inventory turnover of 4.5 times on a rolling four-quarter basis.

h. A LIFO provision of $60.5 million for the 13-week period ended October 29, 2021 and $108.7 million for the 26-week period ended October 29, 2021.

477. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

**8. March 17-18, 2022 Earnings Metrics Misstatements (FY21 and 4Q21 Earnings Periods)**

478. On March 17 and 18, 2022, Defendants made material misstatements and omissions relating to Dollar General's annual and quarterly earnings results. On March 17, 2022, Dollar General issued a news release regarding its FY21 and 4Q21 financial results and operations attached to a Form 8-K, which was signed by Rhonda M. Taylor, Exec. V.P. and General Counsel. Also on March 18, 2022, Dollar General filed its SEC Form 10-K for the fiscal year ended January 28, 2022 (the "FY21 10-K"), which set forth the Company's results for FY21 and for 4Q21 and was signed by Defendants Vasos and Garratt and certified by Defendants Vasos and Garratt. Defendants Vasos, Owen, and Garratt also discussed the FY21 and 4Q21 results on a conference

186

call held on March 17, 2022. These materials are collectively referred to below as the "FY21 and 4Q21 Results."

479. In the FY21 and 4Q21 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

    a. Operating Profit of $3.2 billion for FY21 and of $796.7 million for 4Q21.

    b. Net income of $2.4 billion for FY21 and of $597.4 million for 4Q21.

    c. Gross Profit as a percentage of net sales of 31.6% or $10.8 billion for FY21 and of 31.2% or $2.7 billion for 4Q21.

    d. Net sales of $34.2 billion for FY21 and of $8.7 billion for 4Q21.

    e. Diluted Earnings Per Share of $10.17 for FY21 and of $2.57 for 4Q21.

    f. Total merchandise inventories, at cost, of $5.6 billion for FY21 and for 4Q21.

    g. Inventory turnover of 4.4 times for FY21.

    h. A LIFO provision of $180.4 million in FY21.

480. The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading. As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

**9.     May 26, 2022 Earnings Metrics Misstatements (1Q22 earnings period)**

481.     On May 26, 2022, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended April 29, 2022.  That day, Dollar General issued a news release reporting its 1Q22 financial results and operations attached to a Form 8-K.  Also, on May 26, 2022, Dollar General filed its 1Q22 SEC Form 10-Q, which reported the Company's 1Q22 results and was signed and certified by Defendants Vasos and Garratt.

482.     In the 1Q22 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a.   Operating Profit of $746.2 million.

b.   Net income of $552.7 million.

c.   Gross Profit as a percentage of net sales of 31.3% or $2.7 billion.

d.   Net sales of $8.8 billion.

e.   Diluted Earnings Per Share of $2.41.

f.   Total merchandise inventories, at cost, of $6.1 billion.

g.   Inventory turnover of 4.3 times on a rolling four-quarter basis.

h.   A LIFO provision of $61.4 million for the 13-week period ended April 29, 2022.

483.     The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory.  Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.  Further, former Dollar General employees

188

reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

**10.  August 25, 2022 Earnings Metrics Misstatements (2Q22 Earnings Period)**

484.  On August 25, 2022, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended July 29, 2022.  That day, Dollar General issued a news release reporting its 2Q22 financial results and operations attached to a Form 8-K. Also, on August 25, 2022, Dollar General filed its 2Q22 SEC Form 10-Q, which reported the Company's 2Q22 results and was signed and certified by Defendants Vasos and Garratt.

485.  In the 2Q22 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

a.  Operating Profit of $913.4 million.

b.  Net income of $678 million.

c.  Gross Profit as a percentage of net sales of 32.3% or $3 billion.

d.  Net sales of $9.4 billion.

e.  Diluted Earnings Per Share of $2.98.

f.  Total merchandise inventories, at cost, of $6.9 billion.

g.  Inventory turnover of 4.1 times on a rolling four-quarter basis.

h.  A LIFO provision of $144.4 million for the 13-week period ended July 29, 2022 and $205.8 million for the 26-week period ended July 29, 2022.

486.  The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be

189

clogged with a massive glut of excess inventory. Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system. Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

### 11. December 1, 2022 Earnings Metrics Misstatements (3Q22 Earnings Period)

487. On December 1, 2022, Defendants made material misstatements and omissions relating to Dollar General's results for the quarter ended October 28, 2022. That day, Dollar General issued a news release reporting its 3Q22 financial results and operations attached to a Form 8-K. Also, on December 1, 2022, Dollar General filed its 3Q22 SEC Form 10-Q, which reported the Company's 3Q22 results and was signed and certified by Defendants Owen and Garratt.

488. In the 3Q22 results, Defendants provided certain financial metrics that were tied to or impacted by inventory, including:

    a. Operating Profit of $735.5 million.

    b. Net income of $526.2 million.

    c. Gross Profit as a percentage of net sales of 30.5% or $2.9 billion.

    d. Net sales of $9.5 billion.

    e. Diluted Earnings Per Share of $2.33.

    f. Total merchandise inventories, at cost, of $7.1 billion.

    g. Inventory turnover of 4.0 times on a rolling four-quarter basis.

h.  A LIFO provision of $147.8 million for the 13-week period ended October 28, 2022 and $353.6 million for the 26-week period ended October 28, 2022.

489.  The above statements each were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, multiple former Dollar General employees reported that Defendants knowingly or recklessly failed to efficiently manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory.  Moreover, multiple former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.  Further, former Dollar General employees reported that Defendants failed to properly account for excess inventory and, among other things, failed to properly damage out obsolete or damaged inventory.

**E.  Defendants' Material Misrepresentations Concerning Dollar General's Accounting Practices and Policies**

490.  Throughout the Class Period, Defendants repeated similar or identical misstatements regarding their purported compliance with GAAP and usage of LIFO accounting:

a.  Defendants repeatedly stated that their financial results "have been prepared in accordance with accounting principles generally accepted in the United States of America ('U.S. GAAP') or interim financial information and are presented in accordance with the requirements of Form 10-Q and Rule 10-01 of Regulation S-X."

b.  Defendants also repeatedly stated: "The Company uses the last-in, first-out ('LIFO') method of valuing inventory.  An actual valuation of inventory under the

LIFO method is made at the end of each year based on the inventory levels and costs at that time."

c. Defendants also repeatedly stated: "We perform physical inventories in virtually all of our stores on an annual basis. We calculate our shrink provision based on actual physical inventory results during the fiscal period and an accrual for estimate shrink occurring subsequent to a physical inventory through the end of the fiscal reporting period." Defendants modified this statement slightly to, "we perform physical inventories in *a significant majority* of our stores on an annual basis" beginning with their Form 10-K filed with the SEC on March 24, 2023.

These statements were made in each Form 10-Q and Form 10-K that Dollar General filed with the SEC throughout the Class Period, including in Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, December 3, 2020, May 27, 2021, August 26, 2021, December 1, 2021, March 18, 2022, May 26, 2022, and August 25, 2022, and Form 10-Ks filed on March 19, 2020 (which was incorporated by reference into each Form 10-Q filed during 2020), March 19, 2021 (which was incorporated by reference into each Form 10-Q filed during 2021), and March 18, 2022 (which was incorporated by reference into each Form 10-Q filed during 2022), which were signed and certified by Defendants Vasos and Garratt. These statements were also made in Dollar General's Form 10-Q filed on December 1, 2022, which was signed by Defendant Garratt and certified by Defendants Owen and Garratt. These statements were also made in Dollar General's Form 10-K filed on March 24, 2023, which was signed and certified by Defendants Owen and Garratt, and were incorporated into Dollar General's Form 10-Qs filed on June 1, 2023, and August 31, 2023, which were signed and certified by Defendants Owen and Dilts. These statements were also made in Dollar General's Form 10-Q filed on December 7, 2023, which was signed by

Defendant Dilts and certified by Defendants Vasos and Dilts. These statements were also made in Dollar General's Form 10-K filed on March 25, 2024, which was signed and certified by Defendants Vasos and Dilts, and were incorporated by reference into Dollar General's Form 10-Q filed on May 30, 2024, which was signed by Defendant Dilts and certified by Defendants Vasos and Dilts.

491. Defendants' statements set forth *supra* in ¶490 (a) and (b) regarding compliance with GAAP and use of the LIFO method of valuing inventory were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading, as summarized below.

492. Compliance with generally accepted accounting principles ("GAAP") is a fundamental obligation of publicly traded companies such as Dollar General. GAAP is the official standard for accounting accepted by the SEC and is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), which standards are referenced as "Accounting Standards Codification" ("ASC"). GAAP is recognized by the accounting profession as conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the basis and framework for the promulgation of accounting standards.

493. SEC Regulation S-X provides that the Company's annual and interim financial statements filed with the SEC "which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a).

494. In particular, Defendants violated the following "Inventory Measured Using LIFO or the Retail Inventory Method" standards:

> **ASC-330-10-35-1C**: A departure from the cost basis of pricing inventory measured using LIFO or the retail inventory method is required when the utility of the goods is no longer as great as their cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to damage, physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

> **ASC-330-10-35-2**: The cost basis of recording inventory ordinarily achieves the objective of a proper matching of costs and revenues. However, under certain circumstances cost may not be the amount properly chargeable against the revenues of future periods. A departure from cost is required in these circumstances because cost is satisfactory only if the utility of the goods has not diminished since their acquisition; a loss of utility shall be reflected as a charge against the revenues of the period in which it occurs. Thus, in accounting for inventories, a loss shall be recognized whenever the utility of goods is impaired by damage, deterioration, changes in price levels, or other causes. The measurement of such losses for inventory using LIFO or the retail inventory method shall be accomplished by applying the rule of pricing inventories at the lower of cost or market. This provides a practical means of measuring utility and thereby determining the amount of the loss to be recognized and accounted for in the current period.

In order to properly account for inventory by using the LIFO method, Defendants were required to (but did not) recognize the difference between the book value and the market value of Dollar General's inventory as a loss during the period when the damage or obsolescence occurs when they were faced with evidence that the sale value of the inventory, in the regular course of business, will be less than cost, due to, for example, damage, obsolescence, or other causes.

495. As confirmed by numerous former employees, at Dollar General: (i) damaged inventory was routinely disposed of without undergoing the proper damaging out process; (ii) inventory was also disposed of without proper accounting; and (iii) the Company stored vast amounts of excess inventory in off-site facilities, with zero ability to track this inventory or processes in place to get it to stores' shelves to be sold, which rendered this inventory obsolete but

194

the Company failed to properly account for this obsolescence by establishing reserves for the loss of value.

496.    Further, Defendants' statements set forth *supra* in ¶490 (b) and (c) regarding purportedly conducting an "actual valuation of inventory" each year "based on the inventory levels and costs at the time" and performing "physical inventories in virtually all of our stores on an annual basis" were untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein, former Dollar General employees reported that Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system.  Nor could the Company conduct physical inventory counts in its stores, as they were jammed with "impacted", inaccessible, and un-trackable inventory.  Thus, Defendants could not possibly conduct an accurate actual valuation based on inventory levels, as they had no visibility into the actual inventory at the Company during the Class Period.

### F.    Defendants' Misleading Certifications During the Class Period

497.    During the Class Period, Defendants issued certifications under the Securities and Exchange Act Rule 13a-14(a) and under 18 U.S.C. § 1350 in connection with Dollar General's quarterly Form 10-Qs and annual Form 10-Ks.  In these certifications, Dollar General's principal executive and financial officers *inter alia* each certified the financial and other information contained in Dollar General's quarterly and annual reports.  Defendants Vasos and Garratt provided these certifications in each of Dollar General's Form 10-Qs filed on May 28, 2020, August 27, 2020, December 3, 2020, May 27, 2021, August 26, 2021, December 1, 2021, March 18, 2022, May 26, 2022, and August 25, 2022, and its Form 10-Ks filed on March 19, 2020 (which was incorporated by reference into each Form 10-Q filed during 2020), March 19, 2021 (which

was incorporated by reference into each Form 10-Q filed during 2021), and March 18, 2022 (which was incorporated by reference into each Form 10-Q filed during 2022). Defendants Owen and Garratt provided these certifications in Dollar General's Form 10-Q filed on December 1, 2022 and its Form 10-K filed on March 24, 2023 (which was incorporated by reference into each Form 10-Q filed during 2023). Defendants Owen and Dilts provided these certifications in Dollar General's Form 10-Q filed on June 1, 2023, and August 31, 2023. Defendants Vasos and Dilts provided these certifications in Dollar General's Form 10-Qs filed on December 7, 2023, March 25, 2024, and May 30, 2024, and Dollar General's Form 10-K. Defendants Vasos and Dilts also provided these certifications in Dollar General's Form 10-K filed on March 25, 2024 (which was incorporated by reference into each Form 10-Q filed during 2024 during the Class Period).

498. Defendants' certifications under Securities and Exchange Act Rule 13a-14(a) stated:

1. I have reviewed this [report on Form 10-Q or 10-K] of Dollar General Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

499. Defendants' certifications under 18 U.S.C. § 1350 stated:

"Each of the undersigned hereby certifies that to his knowledge the [Report on Form 10-K or Form 10-Q] for the [relevant reporting period] of Dollar General Corporation (the "Company") filed with the Securities and Exchange Commission on the date hereof fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of the Company."

500.    The certifications set forth above each contained untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.  As set forth herein:

a.  Dollar General's 10-Qs and 10-Ks during the Class Period contained untrue statements of material fact or omitted to state material facts necessary in order to make them not misleading.

b.  Dollar General's 10-Qs and 10-Ks during the Class Period did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company for the relevant periods.

c.  Dollar General lacked sufficient controls over inventory.

d.  Defendants did not disclose all significant deficiencies and material weaknesses in the design or operation of internal control or any fraud that involved management.

**G.    Defendants Violated Item 303(a) of Regulation S-K By Making Materially False And Misleading Statements And Omissions In Dollar General's SEC Filings**

501.    Defendants also violated Item 303(a) of Regulation S-K ("Item 303") by making materially false and misleading statements and omissions in Dollar General's Forms 10-Q and 10-K during the Class Period, including by making "half-truth" statements and failing to disclose information required to be disclosed therein under Item 303.  17 C.F.R. § 299.303.  Item 303 required Defendants to describe, among other things, "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Further, Item 303 provides: "If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or

materials or price increases or ***inventory adjustments***), the change in the relationship must be disclosed.

502. Defendants' materially false and misleading statements and/or half-truth statements made during the Class Period included:

a. Defendants' statements that they "closely monitor and manage our inventory balances," as discussed *supra* in ¶277.

b. Defendants' statements that "efficient management of our inventory has been and continues to be an area of focus for us," as discussed *supra* in ¶279.

c. Defendants' statements that they "utilize key performance indicators ('KPIs') in the management of our business," including "inventory turnover", as discussed *supra* in ¶281.

d. Defendants' statements about "inventory balance" as a percentage of total assets, as discussed *supra* in ¶287.

e. Defendants' statements about reductions in "inventory shrink" and "markdowns," as discussed *supra* in ¶¶285, 289, 292, 305, 307, 309-10, 312, 314, 316, 318, 323, 329-30, 336.

f. Defendants' reported financial metrics impacted by inventory, as discussed *supra* in ¶¶456-89.

g. Defendants' statements regarding levels of "[m]erchandise inventories" and inventory levels in the "consumables category", the "seasonal category", the "home products category", and the "apparel category," as discussed *supra* in ¶¶298, 303, 318, 321, 353, 358.

h. Defendants' statements regarding performing "an annual LIFO analysis whereby all merchandise units are considered for inclusion"; "[a]n actual valuation of inventory under the LIFO method is made at the end of the year based on the inventory levels and costs at that time"; and "physical inventories in virtually all of our stores on an annual basis," as discussed herein in ¶¶140, 490.

503. Throughout the Class Period, Defendants were required under Item 303 to disclose *inter alia* that (as detailed above): (i) Defendants knowingly or recklessly failed to manage Dollar General's inventory balances and, instead, allowed the Company to be clogged with a massive glut of excess inventory; (ii) Defendants had no regard for demand or need when ordering excess inventory or when forcing the excess inventory to stores that did not need it and could not properly store it; (iii) Defendants did not have the ability to track the vast amounts of excess inventory stored in Dollar General's off-site warehouses and that inventory was not even entered into the Company's WMS inventory tracking system; (iv) Defendants chronically understaffed Dollar General stores; and (v) Defendants' conduct led to dangerously unsafe work conditions at Dollar General stores and pricing discrepancies that exposed the Company to regulatory sanctions, penalties and fines.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

### A. Defendants Knew Or Recklessly Disregarded Dollar General's Inventory And Staffing Problems

504. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth herein were materially false and misleading when made and omitted to state material facts necessary to make the statements not misleading. The facts set forth herein, considered collectively, demonstrate a strong inference that Defendants each knew or recklessly disregarded that they were making, the above-detailed materially false and misleading statements

and omissions of material fact.  In conjunction with and in addition to the facts set forth above, Defendants' scienter is evidenced by the facts summarized below.

### 1. Defendants Were Told About The Inventory Problems Plaguing The Company

505.    A strong inference of Defendants' knowledge or reckless disregard of the excess inventory problems at Dollar General is established by the fact that they were specifically and repeatedly informed of these problems.  For example:

a. FE-1 personally emailed Defendant Vasos (CEO) in February 2022 and explained that Dollar General stores were being ***bombarded with merchandise they did not need***.  Defendant Vasos's personal secretary responded to this email—but showed more concern about the possible publication of the Company's problems than addressing them.

b. FE-2 said she sent two emails to Dollar General's leadership reporting the inventory problems, including an email that she sent directly to Defendants Vasos (CEO), Garratt (CFO), and Owen (COO/CEO) in June 2022.  This email elicited a response from Defendants, as a Senior VP responded to FE-2 with a phone call during which the Company's inventory management issues were specifically discussed.

c. FE-25 confirmed that, pursuant to established Dollar General practices, Defendants Vasos, Garratt and Owen would have specifically read the above emails.

d. FE-3 recounted a senior leadership call in February or March 2023 involving senior company officials where Snr. V.P. Rod West estimated that there were ***31 football fields worth of trailers*** sitting on parking lots with unloaded inventory and incurring detention fees, which was costing the Company ***$19 million a month in detention fees***.  FE-3 emphasized that it was a "***big red flag***" and "***very unusual***"

201

for the Company to have 31 football fields of trucks and 10,000 trailers on its lots. As such, FE-3 believed that senior leadership at the Company "absolutely" knew about the inventory management issues. Further, according to FE-3, Company leadership knew that inventory delivered to the off-site facilities was not being entered and processed into the WMS. She recounted that the Company "understood it was going to be financially impacted, so it was trying to **sweep the problem under the rug** and **hide the fact that its inventory looked this way**."

e. FE-4 explained that Defendant Owen (then COO and later CEO) was informed of the inventory issues because the decisions being made on the above-discussed Sunday calls affected store operations, which Defendant Owen was in charge of as COO. FE-4 also stated that it was likely that Defendant Vasos also knew about the inventory issues and their impact.

f. FE-5 also reported that Defendant Owen over-focused on stocking inventory, which resulted in the over-ordering of inventory.

g. FE-7 reported that the inventory problems at Dollar General's distribution centers and the need to get them cleaned up was a constant topic of discussion at Company Town Hall meetings—where Dollar General Vice Presidents and Senior Directors would always explain that directives regarding the distribution centers were "**coming from the top**." Referring to Dollar General executives, FE-7 added "**they were fully aware**."

h. FE-20 recalled annual meetings, which she believed were attended by Defendant Owen, concerning safety regulations and in reaction to the OSHA violations.

202

i. FE-26 reported that Defendant Vasos knew of the excess inventory problems at the distribution centers, including because Vasos personally approved $6 million in expenditures for extra storage trailers for inventory that could not fit within the distribution centers. FE-26 noted that she had one-on-one conversations with Defendant Vasos about inventory issues, including where FE-26 told Vasos that the distribution centers were filled with excess inventory and out of space. Similarly, FE-26 reported that Defendant Garratt knew of the inventory problems through having to approve multi-million dollar appropriation requests escalated by FE-26's direct superiors Mr. Kindy and Mr. Zuazo.

j. FE-27 stated that Dollar General's executive leadership, including Defendants Vasos, Owen, Garratt and Dilts, knew about the problems with inventory because they attended and participated in regularly-held Company meetings and conference calls about how to handle those issues.

k. FE-34 reported that Defendants Vasos, Garratt, Owen, and Dilts and Mr. Zuazo all knew about the excess inventory problems because they all attended meetings about it, FE-34 further reported being in multiple meetings with Vasos, including on a video conference call during which Vasos accused FE-34's team of not working hard enough to fix Dollar General's inventory problems.

506. The fact that Dollar General was targeted by repeated regulatory investigations and faced *more than $21 million in fines*, and an additional *$12 million settlement*, after more than over 110 citations under OSHA (because Company stores were so clogged with inventory, they had no safe place to store it all) further demonstrates Defendants' direct knowledge of the excess inventory and labor problems. As OSHA Area Director, Danelle Jindra, stated:

After more than 200 failed inspections, Dollar General cannot claim that they misunderstand federal safety requirements.  At this point, we can only conclude that ***they <u>choose</u> to continue exposing their employees to hazardous conditions***.

507.     To resolve these claims, the OSHA Stipulation specifically required, *inter alia*, Dollar General's CEO (Vasos) and "all other senior executive leadership" to implement remedial actions in response to dangers posed to the Company's employees from the glut of excess inventory and insufficient staffing, including mandating that the Company's "senior leadership" review the Company's compliance with the OSHA Stipulation on a quarterly basis.

508.     Relatedly, as discussed above, according to the complaint filed in the Derivative Action, Company documents show that Defendants Vasos and Owen received "notice of the Company's blatant workplace safety noncompliance and record-breaking OSHA penalties ***in 2020***" but failed to implement "meaningful corporate reform" and, instead, "chose to sweep [Dollar General's] hazardous employee safety violations under the rug."  In addition, Dollar General swiftly entered into settlement agreements that remain secret with state regulators and resolved actions from state regulators arising from the Company's fraudulent pricing practices. As detailed herein, Dollar General's workplace safety violations,  pricing problems, and OSHA penalties arose from the massive glut of excess inventory clogging the Company and Defendants' chronic understaffing at Dollar General.

**2.      Defendants Repeatedly Spoke About Issues At The Center Of The Fraud**

509.     As set forth above in ¶¶275-455 throughout the Class Period, Defendants repeatedly spoke about the Company's inventory and staffing and related issues.  Plus, the frequent questioning on these issues by securities analysts during the Class Period demonstrates that Defendants had knowledge of and access to information about these topics that they personally

addressed on conference calls or, at the very least, that they were deliberately reckless in failing to investigate these issues before responding to investor questions on the topics.

510. Investors are entitled to rely on statements made by senior public company officials like Defendants, who are understood to be informed as to the topics on which they speak. Defendants' repeated statements on matters directly concerning the fraud alleged herein strongly and plausibly indicates that each Defendant had access to negative, material, undisclosed information—which thereby strengthens the inference of scienter.

### 3. Dollar General's Inventory And Staffing Practices Were Critical Operations During The Class Period

511. During the Class Period, Defendants knew that proper inventory management practices and sufficient staffing were critical to the Company's operations, financial health, and business success. Indeed, Dollar General's SEC filings and other public disclosures confirmed the importance of both inventory and staffing practices to the Company's sound operation.

512. Moreover, the importance of these issues is underscored by the fact that Dollar General was subjected to intense regulatory scrutiny—as well as penalties and fines—for both workplace safety violations and pricing discrepancies growing out of Dollar General's inventory problems and staffing shortages.

### 4. Consistent Reports From Multiple Former Employees In Different Positions And Diverse Geographical Locations Further Support A Strong Inference Of Scienter

513. Contrary to Defendants' public statements, numerous former Dollar General employees reported that, *inter alia*, the Company suffered from massive amounts of excess inventory, lacked basic inventory controls, and chronically understaffed Company stores. These former employees also recounted facts establishing Defendants' knowledge of the inventory control deficiencies, or at minimum their reckless disregard of those problems.

514. These accounts were provided by multiple individuals who had direct experience working at Dollar General in different roles, at different times, and from an array of different geographical locations—but their reports are strikingly consistent and, thus, corroborating.

515. Moreover, the fact that multiple former employees from different positions and different locations all consistently observed and reported the same conduct powerfully indicates a strong inference of Defendants' knowledge or reckless disregard of these facts.

**B.** **Defendants Made Suspiciously Timed Insider Trades During The Class Period, Which Allowed Them To Pocket Millions In Proceeds**

516. Insider sales by Defendants Vasos and Garratt (the "Insider Trading Defendants") are further probative of a strong inference of their scienter.

517. At the same time that Defendants and Dollar General issued materially false and misleading statements to investors, the Insider Trading Defendants collectively sold 1,476,667 shares of their Dollar General stock at artificially inflated prices as high as $244.90 per share, for illegal insider trading proceeds in excess of *$315 million*.

518. Defendants Vasos and Garratt sold their shares throughout the Class Period, reaping millions of dollars of proceeds while they engaged in the fraudulent acts discussed in this Complaint. From May 29, 2020, through June 6, 2023, Defendant Vasos sold 1,322,681 shares, for a gross profit of $283,571,252.76. Defendant Vasos's illegal insider sales during the Class Period are set forth below:

| Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Vasos | 5/29/2020 | 300 | $192.01 | $57,603.51 |
| | 5/29/2020 | 165,224 | $191.10 | $31,574,289.88 |
| | 9/1/2020 | 3,500 | $202.17 | $707,590.10 |
| | 9/1/2020 | 157,263 | $200.29 | $31,497,655.85 |
| | 9/2/2020 | 37,237 | $200.07 | $7,449,920.94 |
| | 5/28/2021 | 2,600 | $205.33 | $533,846.56 |
| | 5/28/2021 | 25,763 | $204.62 | $5,271,730.69 |

206

| Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| | 5/28/2021 | 65,875 | $203.62 | $13,413,414.80 |
| | 5/28/2021 | 160,956 | $202.90 | $32,658,664.51 |
| | 12/3/2021 | 3,377 | $218.22 | $736,929.28 |
| | 12/3/2021 | 13,477 | $219.72 | $2,961,117.92 |
| | 12/3/2021 | 16,155 | $216.45 | $3,496,668.98 |
| | 12/3/2021 | 31,229 | $223.40 | $6,976,711.62 |
| | 12/3/2021 | 38,682 | $220.61 | $8,533,519.97 |
| | 12/3/2021 | 46,319 | $217.44 | $10,071,714.53 |
| | 12/3/2021 | 85,389 | $222.43 | $18,993,382.67 |
| | 12/3/2021 | 102,828 | $221.70 | $22,797,060.15 |
| | 8/26/2022 | 1,110 | $244.14 | $271,000.62 |
| | 8/26/2022 | 10,709 | $243.40 | $2,606,596.30 |
| | 8/26/2022 | 12,052 | $241.45 | $2,910,008.43 |
| | 8/26/2022 | 14,557 | $242.68 | $3,532,707.32 |
| | 8/26/2022 | 70,109 | $240.29 | $16,846,751.01 |
| | 8/29/2022 | 108,145 | $239.18 | $25,866,499.61 |
| | 8/30/2022 | 25,239 | $239.02 | $6,032,499.59 |
| | 9/1/2022 | 929 | $239.33 | $222,337.11 |
| | 9/1/2022 | 14,595 | $240.70 | $3,512,947.90 |
| | 9/1/2022 | 18,887 | $242.23 | $4,575,030.12 |
| | 9/1/2022 | 62,848 | $241.57 | $15,182,166.22 |
| | 6/6/2023 | 27,327 | $156.65 | $4,280,886.59 |
| | **TOTAL:** | **1,322,681** | | **$283,571,252.76** |

519. By comparison, Defendant Vasos sold approximately 44,357 shares for total proceeds of $5,067,294.81 in the 51 months directly preceding the Class Period.

520. Defendant Vasos's proceeds from his insider sales significantly exceeded his baseline level of compensation, which ranged from approximately $1,340,000 to $1,400,000 during the Class Period.

521. Similarly, from May 29, 2020 to August 29, 2022, Defendant Garratt sold 153,986 shares, for a gross profit of $31,664,213.11. Defendant Garratt's illegal insider sales during the Class Period are set forth below:

207

| Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Garratt | 5/29/2020 | 6,668 | $188.66 | $1,257,978.21 |
| | 5/29/2020 | 38,332 | $187.74 | $7,196,514.84 |
| | 9/1/2020 | 200 | $203.04 | $40,608.24 |
| | 9/1/2020 | 2,105 | $202.02 | $425,258.20 |
| | 9/1/2020 | 6,454 | $200.88 | $1,296,486.62 |
| | 3/23/2021 | 5,830 | $199.75 | $1,164,538.42 |
| | 3/23/2021 | 20,297 | $199.24 | $4,043,887.00 |
| | 5/28/2021 | 30,311 | $205.05 | $6,215,176.59 |
| | 12/3/2021 | 6,300 | $223.70 | $1,409,296.77 |
| | 12/3/2021 | 23,112 | $223.20 | $5,158,503.64 |
| | 8/26/2022 | 4,807 | $244.90 | $1,177,240.07 |
| | 8/29/2022 | 2,693 | $238.02 | $640,981.40 |
| | 8/29/2022 | 6,877 | $238.15 | $1,637,743.11 |
| | TOTAL: | 153,986 | | $31,664,213.11 |

522. By comparison, Defendant Garratt sold approximately 7,837 shares for total proceeds of $909,624.90 in the 51 months directly preceding the Class Period. Defendant Garratt's proceeds from his Class Period insider sales significantly exceeded his baseline level of annual compensation, which ranged from approximately $725,000 to $850,000 during the Class Period.

**C.** **The Executive Defendants Were Subject to Share Ownership and Stock Holding Requirements That Restricted Defendants Owen and Dilts from Selling Stock During the Class Period**

523. During the Class Period, Dollar General had corporate governance policies that specifically included "share ownership guidelines and holding requirements," as reflected in Dollar General's Definitive Proxy Statement filed on Section 14A with the SEC on April 1, 2021.

524. Under these policies, Dollar General required each "senior officer," which included all officers at or above the level of Senior Vice President—or, in other words, Defendants—"to retain ownership of 50% of all net after-tax shares issuable upon vesting or exercise of compensatory awards until the target ownership level is achieved." The target ownership levels were defined as multiples of the senior officer's annual base salary and needed to be achieved within a five-year time period.

525.    For the entire time they were employed at Dollar General during the Class Period, the Executive Defendants were subject to the requirements because they all held positions of Senior Vice President and above.

526.    Defendant Vasos, as CEO, was required to retain shares equal to a multiple of six-times his base salary of $1,350,000, or at least $8.1 million.

527.    Defendant Garratt, as CFO and Executive Vice President, was required to retain shares equal to three-times his base salary of $767,284, or at least $2.3 million.

528.    Defendant Owen held the position of COO starting in 2019 until November 2022, when he was promoted to CEO and remained in that role until October 2023. As COO, Owen was required to retain shares equal to four-times his base salary of $845,241, or at least $3.3 million to maintain his position as COO. When he was promoted to CEO, he was required to increase his holdings to at least six-times his base salary of $962,310, or at least $5.7 million.

529.    Defendant Dilts joined the Company as a Senior Vice President, Finance, in July 2019, and held that position until May 2023, when she was promoted to CFO and Executive Vice President. As Senior Vice President, Dilts was required to retain shares equal to a multiple of two-times her base salary, until her promotion to CFO and EVP, which required her to increase her holdings to at least three-times her base salary (which increased to approximately $760,000), or at least $2.28 million.

530.    Due to the above-described requirements, the Executive Defendants were required to retain significant amounts of Dollar General stock that they were unable to sell during the Class Period. As such, these Company requirements effectively prevented Defendants Dilts and Owen from selling Dollar General stock during the Class Period—and they explain why these Defendants did not engage in insider sales of their Dollar General holdings during the Class Period.

209

531.     For example, when Defendant Dilts was promoted to CFO and EVP in May 2023, she was required to *increase* her holdings of Dollar General stock—which were, as of May 1, 2023, only 5,851 shares, worth approximately $1.29 million—to at least $2.28 million.  This required her to acquire in excess of approximately 4,300 of additional Dollar General shares to comply with Dollar General's share ownership requirements.  Thereafter, she acquired 904 shares on March 12, 2024, but notably, she did not pay any cash to acquire these shares—they were the result of PSUs vesting that she acquired under Dollar General's Long-Term Incentive Plan (defined and discussed below).  Notably, on April 1, 2024, Defendant Dilts did engage in a sale of 607 shares of Dollar General stock but it was purely to cover the tax liability occasioned by her acquisition of stock options.  On July 11, 2025, the day Defendant Dilts announced her resignation from Dollar General, Dollar General's share price closed at $113.14 per share.  Thus, Defendant Dilts 6,148 Dollar General shares were valued at $695,584.72, which is below the threshold of $2.28 million she needed to have as CFO.  In other words, Defendant Dilts did not sell any meaningful amounts of her shareholdings during the Class Period (save a small amount to cover a tax liability) because she was scrambling to acquire more shares in an effort to satisfy executive stock holding requirements under Dollar General's corporate policies.

532.     Similarly, the Company's share ownership requirements prevented Defendant Owen from selling stock during the Class Period.  Defendant Owen's first alleged misstatement to investors was made on December 1, 2022, shortly after his promotion to CEO.  When Defendant Owen was promoted to CEO, he was required under Company policy to increase his holdings from four-times his base salary to six-times his base salary, or from $3.3 million worth of Dollar General stock to $5.7 million.  This required Defendant Owen to increase his holdings of Dollar General, effectively preventing him from selling shares during the Class Period.

533. In sum, Company policy requiring Defendants Dilts and Owen to increase their holdings of Dollar General stock meant as a practical matter that they could not make meaningful sales of their Dollar General stock holdings, which explains why they did not participate in the suspicious insider selling that Defendants Vasos and Garratt engaged in during the Class Period.

**D.** **The Executive Defendants Were Also Motivated By Lucrative Bonuses and Additional Financial Benefits To Misrepresent and Conceal Dollar General's Excess Inventory and Staffing Problems**

534. The Executive Defendants were also motivated to misrepresent and conceal Dollar General's excess inventory and staffing problems in order to profit from the Company's lucrative incentive-based compensation packages. Thus, the Executive Defendants were motivated to misrepresent and conceal serious problems at Dollar General so they could reap huge financial rewards and they could retain their positions of power, prestige, and profit.

535. On March 17, 2020, shortly before the start of the Class Period, Dollar General adopted a short-term incentive plan for certain executives, including the Executive Defendants, called the "2020 Teamshare" bonus program. Under the 2020 Teamshare bonus program, the Executive Defendants were eligible to receive "a cash bonus payment equal to a certain percentage [their] Applicable Base Pay based upon Dollar General's achievement of one or more pre-established financial performance measure for a specified Performance Period." As reflected in Dollar General's 2019 Form 10-K filed on March 19, 2020, the plan specified that the Company's EBIT in the form of Operating Profit was the relevant performance metric. The relevant period was the 2020 fiscal year from February 1, 2020 to January 29, 2021. Under the 2020 Teamshare plan, if the Company hit the specified Operating Profit level, Defendants Vasos, Owen and Garratt would receive baseline bonus payments equal to 150%, 100% and 75% of their base salaries, respectively. The bonuses, however, operated "on a graduated scale." While Defendants needed to hit a minimum of the target metric to receive their baseline bonuses, they would receive

211

additional bonuses up to 300% of their base salary as they drove up the profit metric, to a maximum cap of 120% of the profit metric (beyond which no additional bonuses would be paid).

536. Dollar General also had a long-term incentive plan, which made Defendants eligible to receive lucrative performance share units ("PSU"), a type of equity-based compensation tied to specific performance goals or milestones. On March 17, 2020, the same day the Executive Defendants entered into the 2020 Teamshare bonus program, they entered into Dollar General's "Long-Term Incentive Program," which awarded them PSUs for hitting certain profit-related performance metrics. Specifically, as reflected in Dollar General's 2019 10-K, "Fifty percent of the target number of PSUs is subject to an adjusted EBITDA performance measure with a performance period of the Company's fiscal year 2020. The other fifty percent of the target number of PSUs is subject to an adjusted ROIC performance measure which is the average of adjusted ROIC for the Company's fiscal years 2020, 2021 and 2022." All of these measures were established on March 17, 2020, shortly before the Class Period began. But these PSUs would only vest if the Company achieved the profit measures set forth in the plan. This PSU award scheme was similarly graduated, meaning Defendants would receive a baseline number of PSUs for hitting the target threshold, but would receive proportionally more PSUs for hitting up to a certain percentage of the target metric.

537. By pegging the Executive Defendants' bonuses directly to the amount of profit Dollar General reported, these Company incentive compensation plans gave the Executive Defendants direct financial motive to make the misleading statements and omissions alleged herein. For example, Dollar General's Teamshare plan specifically selected "Operating Profit," which (as per Dollar General's 2020 Form 10-K) was calculated as the amount of Dollar General's "Gross profit," minus the amount of "Selling, general and administrative expenses" or "SG&A"

costs. This specifically incentivized Defendants to avoid addressing the inventory and staffing problems they concealed from investors. As confirmed by Defendants' corrective disclosures (discussed *supra* at ¶¶216-74), addressing Dollar General's inventory and staffing problems required the Company to incur massive SG&A costs to overhaul the Company's inventory and staffing practices, which directly reduced Operating Profit and thus reduced the bonuses Defendants received. For example, when Defendants were forced to reveal on August 31, 2023 that the Company incurred $150 million in additional labor expenses—it directly reduced the Company's reported ***Operating Profit*** and reduced their bonuses for the 2023 fiscal year. Thus, Defendants were motivated to avoid this direct hit to Operating Profit for as long as possible to continue to enjoy the benefit of the Teamshare incentive compensation plan.

538. Dollar General's performance metrics for the Long-Term Incentive Program similarly incentivized Defendants to commit the fraud alleged herein. To receive the lucrative PSUs, Defendants needed to hit "Adjusted EBITDA" and "ROIC" targets that similarly would be directly reduced by the income losses and additional expenses that were required if Defendants had addressed Dollar General's inventory and staffing problems. Additionally, since the PSUs vested as shares of Dollar General common stock, Defendants had direct, personal incentives to keep Dollar General's stock price as high as possible as these PSUs vested throughout the Class Period.

539. In fiscal year 2020, Defendants received significant personal financial benefits under both the Teamshare bonus program and the Long-Term Incentive Program. As reflected in the Company's 2021 proxy materials filed with the SEC on April 1, 2021, "In connection with our 2020 Teamshare bonus program, we achieved 2020 adjusted EBIT (as defined and calculated for purposes of the Teamshare bonus program) of $3.630 billion, or 145.0% of the adjusted EBIT

target, which being greater than the maximum achievement level of 120% allowed under the program, resulted in a 2020 Teamshare payout to each named executive officer employed on the payment date at the maximum level of 300.0% of his or her target Teamshare bonus percentage opportunity." In other words, Defendants Vasos, Owen and Garratt each received payments equal to 300% of their base salaries. Specifically, Defendant Vasos received a payout of approximately $6.1 million, Defendant Owen received approximately $2.48 million, and Defendant Garratt received approximately $1.73 million.

540. Similarly, these Defendants received the lucrative PSUs based on this same financial performance in fiscal year 2020: "The portion of the awards granted in March 2020 subject to 2020 adjusted EBITDA performance was earned at a maximum of 300.0% of target, based on achieving adjusted EBITDA of $4.199 billion, or 136.7% of the adjusted EBITDA target (which is greater than the maximum achievement level of 120%)." Specifically, as a result of Dollar General's fiscal year 2020 performance, Defendant Vasos received 42,741 PSUs, Defendant Garratt received 7,599 PSUs, and Defendant Owen received 10,449 PSUs. These PSUs, which vested as shares of Dollar General common stock, were worth tens of millions of dollars. During fiscal year 2020, Defendant Owen's PSUs were valued at $3,228,904, Defendant Vasos's were valued at $13,209,533, and Defendant Garratt's were valued at $2,348,547.

541. On March 16, 2021, Dollar General renewed the Teamshare bonus program for the 2021 fiscal year. The 2021 Teamshare program similarly defined Operating Profit as the relevant financial benchmark. The 2021 Teamshare bonus program similarly made the Executive Defendants eligible for bonus payments between 75% to 300% of their base salaries, provided that the Company achieved new operating profit metrics for the Company's 2021 fiscal year from January 30, 2021 to January 28, 2022. However, the 2021 Teamshare bonus program *raised the*

*cap* on the graduated bonus scale from 120% to 130%, making Defendants eligible for *even greater individual payouts* in proportion to the amount they drove up Dollar General's publicly-reported profit metrics during the 2021 fiscal year.

542. Defendants succeeded in triggering these payouts under the 2021 Teamshare program. In fiscal year 2021, Dollar General reported that "We achieved 2021 adjusted EBIT (as defined and calculated for purposes of the 2021 Teamshare bonus program) of $3.468 billion, or 118.7% of the adjusted EBIT target, which resulted in a 2021 Teamshare payout to each named executive officer of 224.4% of his or her target Teamshare bonus percentage opportunity." As a result, Defendant Vasos received a bonus payment of $4,544,529, Defendant Garratt received a bonus payment of $1,344,028, and Defendant Owen received a bonus payment of $1,904,528.

543. Similarly, under the Long-Term Incentive Program, Dollar General reported that: "The portion of the awards granted in March 2021 subject to 2021 adjusted EBITDA performance was earned at 196.1% of target, based on achieving adjusted EBITDA of $4.103 billion, or 114.4% of the adjusted EBITDA target, and the portion of the awards granted in March 2019 subject to 2019-2021 adjusted ROIC performance was earned at the maximum of 300.0% of target based on achieving adjusted ROIC of 24.72%, or 119.5% of the adjusted ROIC three-year 2019-2021 target (which is greater than the maximum achievement level of 104.8%), in each case as defined and calculated in the PSU award agreements." As a result, Defendant Vasos was awarded 26,240 PSUs, Defendant Garratt was awarded 4,199 PSUs, and Defendant Owen was awarded 5,434 PSUs. These PSUS were extremely valuable. Defendant Vasos's were valued at $15,538,775, Defendant Garratt's were valued at $2,486,343, and Defendant Owen's were valued at $3,217,382.

544. In March 2022, Dollar General renewed the Teamshare bonus program for fiscal year 2022. The 2022 Teamshare program similarly defined Operating Profit as the relevant

financial benchmark. The 2022 Teamshare bonus program similarly made the Executive Defendants eligible for bonus payments between 50% to 300% of their base salaries, provided that the Company achieved new operating profit metrics for the Company's 2022 fiscal year from January 29, 2022 to February 3, 2023. However, the program raised the amount of the minimum Defendants needed to reach to trigger the bonuses from 85% of the benchmark to 90%, further incentivizing Defendants to misrepresent and conceal the extent of the Company's inventory and staffing problems to ensure the Company publicly reported Operating Profit to reach this elevated 90% threshold.

545. Defendants succeeded in triggering these payouts under the 2022 Teamshare program. As reflected in Dollar General's 2023 Proxy Statement: "We achieved 2022 adjusted EBIT (as defined and calculated for purposes of the 2022 Teamshare bonus program) of $3.905 billion, or 107.0% of the adjusted EBIT target, which, after applying negative discretion as allowed by the Teamshare program, resulted in a 2022 Teamshare payout to each named executive officer of 120.0% of his or her target Teamshare bonus percentage opportunity." As a result, Defendant Owenn received a bonus payment of $1,344,299, Defendant Vasos received a bonus payment of $2,520,000, and Defendant Garratt received a bonus payment of $884,766.[31]

546. Defendants also received PSUs under the Long-Term Incentive Program in 2022 as a result of hitting the prescribed profit targets. Specifically, Defendant Owen received 5,668 PSUs, Defendant Vasos received 20,072 PSUs, and Defendant Garratt received 3,779 PSUs. These PSUs were extremely lucrative. In fiscal year 2022, Defendant Owens PSUs were valued

---

[31] Mr. Zuazo was also a participant in the 2022 Teamshare program. He received a bonus payment worth 300% of his base salary of $450,000 or a bonus payment of $1,350,000.

at \$4,474,068, Defendant Vasos's were valued at \$16,777,061, and Defendant Garratt's were valued at \$3,157,831.

547. In 2023, Dollar General renewed the Teamshare bonus program. The 2023 Teamshare program similarly defined Operating Profit as the relevant financial benchmark. The 2023 Teamshare bonus program similarly made the Executive Defendants eligible for bonus payments, provided that the Company achieved new operating profit metrics for the Company's 2023 fiscal year from February 4, 2023 to February 2, 2024. This continued to incentivize Defendants to misrepresent and conceal the extent of the Company's inventory and staffing problems, including Defendant Vasos. When Vasos was reappointed as CEO in October 2023, he was granted a new 2023 Teamshare bonus opportunity, with threshold, target and maximum payout opportunities of \$328,846, \$657,692 and \$1,973,077 for the time he was employed during fiscal year 2023.

548. However, as a result of Defendants being forced to partially reveal and address the Company's inventory and staffing, the Company reported in its 2024 Proxy Statement: "We achieved 2023 adjusted EBIT of \$2.597 billion, or 72.3% of the adjusted EBIT target, *which was below the threshold required for a payout to named executive officers*." Thus, *none of the Executive Defendants received any Teamshare bonus for the 2023 fiscal year*.

549. Similarly, due to the Company failing to meet the threshold profit level for the Long-Term Incentive Program in fiscal year 2023, Dollar General reported: "We achieved 2023 adjusted EBITDA of \$3.437 billion, or 77.6% of the adjusted EBITDA target related to the portion of the awards granted in March 2023 subject to 2023 adjusted EBITDA performance, which was below the threshold required to earn such performance share units ('PSUs')." However, as a result of the preceding years' profits, Dollar General achieved the ROIC targets for the period of 2021-

217

2023 that were required for Defendants to earn PSUs in fiscal year 2023. As the Company reported: "The portion of the PSUs granted in March 2021 subject to 2021-2023 adjusted ROIC performance was earned at 287.09% of target based on achieving adjusted ROIC of 22.98%, or 104.2% of the adjusted ROIC three-year 2021-2023 target." Thus, Defendant Owen was awarded PSUs valued at $9,311,528, and Defendant Dilts was awarded PSU valued at $413,971. However, because Defendant Owen was terminated in 2023, he forfeited all of these PSUs. Since the programs provided that the Executive Defendants would lose their PSUs if they were terminated, that provided an additional motive for them to misrepresent and conceal the inventory and staffing problems that would result in their firing if investors learned the truth.

550. In 2024, Dollar General renewed the Teamshare bonus program for Dollar General's fiscal year 2024. The 2024 Teamshare program similarly defined Operating Profit as the relevant financial benchmark, but also added Net sales as a second financial performance metric to the Teamshare bonus program beginning in 2024. However, net sales was assigned a only a 20% weighting and the Operating Profit metric remained the dominant metric with an 80% weighting. The 2024 Teamshare bonus program similarly made the Executive Defendants Vasos and Dilts eligible for bonus payments, provided that the Company achieved the new target financial metrics for the Company's 2024 fiscal year from February 3, 2024 to January 31, 2025.

551. Defendants succeeded in triggering these payouts under the 2024 Teamshare program. As reflected in Dollar General's 2025 Proxy Statement: "We achieved 2024 adjusted EBIT of $1.863 billion, or 71.9% of the adjusted EBIT target, and 2024 net sales of $40.612 billion, or 98.4% of the net sales target, which resulted in a 2024 Teamshare payout to each named executive officer of 10.2% of his or her target Teamshare bonus percentage opportunity." Specifically, Defendant Vasos received a bonus payment of $214,849, and Defendant Dilts

218

received a bonus payment of $58,700. Defendant Dilts received PSUs worth $1,931,018. Defendant Vasos was not eligible to receive any that year.

552. These personal financial incentives motivated Defendants to misrepresent and conceal the truth about Dollar General's inventory and staffing problems for the full duration of the Class Period, until the truth was finally revealed. In sum, the Executive Defendants were motivated to misrepresent and conceal serious problems at Dollar General so they could reap huge financial rewards and they could retain their positions of power, prestige, and profit.

**E.      Defendants' Disclosures of Accounting Information Required a High Degree of Sophistication**

553. As discussed *supra* at ¶¶457-89, 490-96, Defendants disclosed on a quarterly and annual basis certain key financial metrics that depended on valuations of Dollar General's inventory, including, for example, gross profit and related metrics. Those metrics and valuation were purportedly based on Dollar General's application of its LIFO methodology, which stated, *inter alia*, that "We perform physical inventories in virtually all of our stores on an annual basis. We calculate our shrink provision based on actual physical inventory results during the fiscal period and an accrual for estimate shrink occurring subsequent to a physical inventory through the end of the fiscal reporting period." In the first three fiscal quarters of the year that did ***not*** purport to value inventory based on a physical count, Dollar General stated that it calculated inventory using an "index formulation" through its application of LIFO.

554. Investors would have required an exceptionally high degree of sophistication to understand the Company's actual inventory levels because Defendants presented the information confusingly through Defendants' opaque LIFO calculation process. For example, on March 21, 2023, Credit Suisse published a report that discussed Dollar General's application of LIFO in light of "client feedback and related misperceptions in the marketplace." Credit Suisse described having

219

to conduct "follow-up calls with the company," which revealed that "DG is discussing the potential impact of LIFO in 2023 on a net basis, rather than a gross basis. Said differently, DG believes net LIFO will be more or less neutral to earnings in 2023 *and this is not clearly understood based on our calls*." Credit Suisse also explained that "*it is unclear how much DG has raised (and will continue to raise) prices to mitigate LIFO headwinds*," and emphasized that "[i]n the wake of a tougher pricing environment and increasing competition in 2023, price gaps will be top of mind as we progress throughout 2023." In sum, Credit Suisse's report confirmed that Dollar General disclosed its LIFO accounting practices in a confusing manner and such that its negative implications could only be understood by someone with a high degree of sophistication.

555. The fact that even highly sophisticated investors struggled to understand Dollar General's confusing application of LIFO for the Company's inventory further supports the inference of Defendants' scienter.

## VIII. LOSS CAUSATION

556. The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein.

557. During the Class Period, Plaintiffs and Class members purchased or otherwise acquired Dollar General common stock at artificially inflated prices, and were damaged thereby when the price of Dollar General common stock declined in response to a series of partial corrective disclosures. Throughout the Class Period, the price of Dollar General common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Dollar General common stock significantly declined, causing investors to suffer losses, in response to a series of disclosures concerning or connected to the facts misrepresented or concealed by Defendants, on December 1, 2022, February

220

23, 2023, March 16, 2023, June 1, 2023, August 31, 2023, December 7, 2023, March 14, 2024, May 30, 2024, and August 29, 2024. These disclosures reduced the amount of inflation in the price of Dollar General's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

### A. Dollar General's 3Q22 Adverse Financial Results Announced On December 1, 2022

558. On December 1, 2022, Dollar General issued a press release prior to market open, and hosted a conference call during market hours, which reported the Company's financial results for the third quarter ended October 28, 2022 ("3Q22"). Among other things, Dollar General reported that its diluted EPS for 3Q22 was $2.33—below the Street consensus of $2.54. Defendants also revised down their guidance for fiscal year 2022, including their diluted earnings per share estimate, due to "greater-than-anticipated gross margin pressures" related to "inventory shrink and damages" and "higher-than-anticipated supply chain costs."

559. During Dollar General's 3Q22 earnings call on December 1, 2022, Defendant Owen stated, "During the quarter, we experienced significantly higher than anticipated cost pressures, including challenges within our internal supply chain, sales mix pressures, and higher inventory damages and shrink, all of which impacted gross margin." Defendant Owen also stated that the Company faced "more than $40 million in additional supply chain costs in Q3." Defendant Garratt stated that "we are seeing a greater headwind from inventory shrink and damages than we anticipated for the back half of this year." Later in the call, in response to an analyst question about what was driving the higher shrink, Defendant Garratt further stated, "it's largely attributable to the inflationary environment coupled with higher inventory levels."

560. These disclosures caused the price of Dollar General stock to decline significantly by $19.34 per share, or approximately 7.56%, from a closing price of $255.69 on November 30, 2022, to a closing price of $236.34 on December 1, 2022 on high trading volume.

**B. Dollar General's Adverse Financial Results Announced On February 23, 2023**

561. On February 23, 2023, the Company issued a Form 8-K reporting preliminary financial results for the fourth quarter and full year ended February 3, 2023 that were below expectations, including disappointing diluted earnings per share. Defendants disclosed that "*higher-than-anticipated inventory damages*" caused the Company's "lower-than-expected results."

562. This news caused Dollar General's stock price to decline significantly, falling by $8.16 per share, or approximately 3.62%, from a closing price of $225.27 on February 22, 2023, to a closing price of $217.11 on February 23, 2023, on high trading volume.

**C. Dollar General's Adverse 4Q22 and FY22 Results Announced On March 16, 2023**

563. On March 16, 2023, Defendants reported Dollar General's financial results for the fourth quarter (4Q22) and fiscal year ended February 3, 2023 (FY22) in a Form 8-K and a Form 10-Q. Defendants revealed that Dollar General's results were "below our expectations." The Company reported in its 4Q22 Form 8-K that, "Gross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022 compared to 31.2% in the fourth quarter of 2021, a decrease of 35 basis points." The Company also reported that, "Gross profit as a percentage of net sales was 31.2% in fiscal year 2022, compared to 31.6% in fiscal year 2021, a decrease of 37 basis points." Defendants attributed each of these "gross profit rate decrease[s]" to an "increased LIFO provision" driven by *inter alia* "*increases in inventory shrink, damages and markdowns*."

564. In the March 16, 2023 Form 8-K, Defendants also revealed that the Company had to make "an incremental investment of approximately *$100 million* in our stores, primarily in *incremental labor hours*."

565. In a conference call held on March 16, 2023, Defendant Owen stated, "The quarter was also impacted *by greater than anticipated inventory damages, which contributed to diluted EPS results that were below our expectations*." Defendant Garratt stated that, "[f]or Q4, gross profit as a percentage of sales was 30.9%, a decrease of 35 basis points," which he attributed to *inter alia* "an increase in inventory shrink, damages and markdowns." Defendant Garratt also stated that, for 4Q22, "[a]s a percentage of sales, operating profit was 9.1%, a decrease of 6 basis points."

566. On the March 16, 2023 call, Defendants also reported that Dollar General had to remedy its staffing shortfall by making a massive investment in its workforce. For example, Defendant Owen discussed the Company's need to make a "targeted, incremental investment of approximately *$100 million* in our stores this year," which would "primarily consist of *incremental labor hours*" including to "drive greater on-shelf availability."

567. These disclosures caused Dollar General's stock price to decline by $6.47 per share, or 2.96%, from a closing price of $218.56 on March 15, 2023, to a closing price of $212.09 on March 16, 2023 on high trading volume. Dollar General's stock price continued to decline on March 17, 2023, falling another $3.26 or 1.54% to a closing price of $208.83 on heavy trading volume of over 7.6 million shares.

**D.    Dollar General's Adverse 1Q23 Results Announced On June 1, 2023**

568. On June 1, 2023, Dollar General reported its financial results for the quarter ended May 5, 2023 (1Q23) in a Form 8-K and a Form 10-Q. Defendants reported *inter alia* diluted earnings per share of $2.34 in 1Q23, a decrease of 2.9% from $2.41 in 1Q22; and operating profit

of $740.9 million in 1Q23, a decrease of 0.7% from $746 million in 1Q22.  They also reported that total merchandise inventories were $7.3 billion compared to $6.1 billion as of April 29, 2022.  Further, Defendants slashed Dollar General's outlook for fiscal full year 2023 ("FY23"), including by disclosing that they expected *inter alia* the Company's diluted earnings per share to be "in the range of an approximate 8% decline to flat."

569.    In Dollar General's Form 10-Q also filed on June 1, 2023, Defendants reported the above financial metrics and stated,

> During the second half of 2022, we experienced ***higher inventory damages and shrink than we anticipated***, which we believe was due primarily to the challenging macroeconomic environment, materially higher inventory levels, and, as to damages, Winter Storm Elliot in December.  In addition, we believe some portion of the increase in damages was a residual impact of the warehouse capacity constraints and associated store and supply chain inefficiencies we faced during the same period.  We continued to experience higher shrink and inventory damages in the first quarter of 2023.

570.    Also on June 1, 2023, Defendants held a conference call to discuss Dollar General's 1Q23 results.  On inventory, Defendant Dilts reported "increases in shrink, markdowns and inventory damages."  Regarding staffing, Defendant Dilts revealed on the June 1, 2023 call that, of the $100 million investment, the Company had to "pull[] forward a larger portion of our labor investment and anticipate more than $40 million of the investment will be made in the second quarter."  Defendant Owen also stated that they were "pulling forward our labor investment into the second quarter," including to "make improvements in the store that we need to do."

571.    These disclosures caused Dollar General's stock price to decline significantly from a closing price of $201.09 on May 31, 2023, to close at $161.86 on June 1, 2023, a staggering decline of $39.23 or over 19.5% in a single day on very high trading volume of more than 18.2 million shares.

**E.      Dollar General's Adverse 2Q23 Results Announced On August 31, 2023**

572.     On August 31, 2023, Dollar General surprised the market by reporting disastrous financial results for the second quarter of 2023 ended August 4, 2023 ("2Q23") in a Form 8-K and Form 10-Q.  The Company reported that the Company's operating profit was $692.3 million in 2Q23, a decrease of 24.2% from $913.4 million in the prior quarter; net income was $468.8 million in 2Q23, a decrease of 30.9% from $678 million in the prior quarter; and diluted earnings per share were $2.13, a decrease of 28.5% from the prior quarter.  Defendants also revealed that gross profit as a percentage of sales was 31.1% in 2Q23 compared to 32.3% in 2Q22, "a decrease of 126 basis points," which they attributed to *inter alia* "***increased shrink, markdowns, and inventory damages***."  Further, Dollar General disclosed that total merchandise inventories were $7.5 billion compared to $6.9 billion the prior year.  Defendant Owen stated that Defendants were "not satisfied with our overall financial results" but had made "significant progress" including in "reducing our inventory growth rate."

573.     In the Company's August 31, 2023 press release regarding the 2Q23 results, Defendants also disclosed that they now expected "an incremental operating profit headwind of up to ***$170 million*** in the second half of 2023" due to their need to "accelerate the pace of [Dollar General's] ***inventory reduction efforts***," make "***additional investments in targeted areas, such as retail labor***," and "an increase in expected inventory shrink for the second half of 2023."  Thus, Defendants had to reduce their outlook for Dollar General's fiscal year 2023, including by revising down diluted earnings per share to "approximately $7.10 to $8.30, or a decline of 34% to 22%, compared to its previous year-over-year change expectation of an approximate 8% decline to flat growth."  Defendants also had to decrease their expectations for net sales growth and same-store sales growth for fiscal year 2023.

574.     On the Company's conference call held on August 31, 2023:

a. Defendant Owen stated that they expected markdowns on Dollar General's inventory to "result in an operating profit headwind of approximately $95 million in the back half of the year," including to "more quickly reduce excess inventory."

b. Defendant Owen also stated that the Company was increasing its "planned investment in incremental retail labor from approximately $100 million this year to approximately $150 million"—an increase of $50 million.

c. Defendant Owen further stated that they planned "to invest up to $25 million" including in "an improved inventory demand forecasting tool to better support our stores and distribution centers."

d. Defendant Dilts explained that the expected $170 million investment, which directly impacted operating profit, represented nearly "$0.60 of EPS" and was "due to the increased markdown activity, additional labor, and investments in other areas."

575. Also on the August 31, 2023 earnings call, Defendant Dilts disclosed that the Company expected "approximately $100 million of additional shrink headwind since last quarter's call."

576. The market was surprised by Defendants' revelations, but Defendants reassured investors that the Company was successfully and proactively addressing its inventory problems. For example, as set forth above in Section V.E., analysts were surprised by Dollar General's continued inventory and labor problems, but were also comforted by Defendants' reassurances that the Company was addressing these problems and would recover in the near term, including Evercore, The Loop Capital, The Raymond James, and BMO Capital Markets. *See supra* ¶248.

226

577. Defendants' August 31, 2023 disclosures caused the price of Dollar General's stock to decline by $19.16 per share, or 12%, from a closing price of $157.66 on August 30, 2023 to a closing price of $138.50 on August 31, 2023, on unusually high trading volume of more than 19.3 million shares. As the market continued to react to the Company's adverse disclosures, the Company's share price declined another 5.94% on September 1, 2023, closing that day at $130.27 per share, on unusually high trading volume of more than 10.6 million shares. And after the Labor Day weekend (when the markets were closed), on September 5, 2023, Dollar General's share price continued to decline another 2.34%, closing at $126.46 per share that day, on unusually high trading volume of over 8 million shares. Finally, on September 6, 2023, the stock price declined another 0.6% to close at $126.46 per share that day, on unusually high trading volume of over 5.5 million shares.

**F.    Dollar General's 3Q23 Results Announced On December 7, 2023**

578. On December 7, 2023, Dollar General reported its financial results for the quarter ended November 3, 2023 (3Q23) in an earnings release attached to Form 8-K, a Form 10-Q, and an earnings call. The Company reported that the Company's (i) operating profit was $433.5 million in 3Q23, a decrease of 41.1% from $735.5 million in 3Q22; (ii) net income was $276.2 million in 3Q23, a decrease of 47.5% from $526.2 million in 3Q22; and (iii) diluted earnings per share were $1.26, a decrease of 45.9% from 3Q22. Defendants also revealed that gross profit as a percentage of sales was 29.0% in 3Q23 compared to 30.5% in 3Q22, "a decrease of 147 basis points," which they attributed to, *inter alia*, "***increased shrink, lower inventory markups, and increased markdowns***." Dollar General's 3Q23 press release quoted Defendant Vasos as stating: "Over the last several weeks, we have spent significant time reviewing all areas of the business, and we have identified key opportunities for improvement both in the near term and over the longer term."

227

579. In Defendant Vasos's first earnings call after his return as CEO (and the ouster of Defendant Owen), the Company announced the launch of its "Back to Basics" remediation plan. This campaign involved dedicating labor hours to "store-level inventory management activities," including "reemphasizing the role played by [Company] store teams in our perpetually inventory management process." Defendant Vasos also announced a plan to "better optimize the inventory within our distribution centers," including by "taking steps to reduce inventory" and "reducing the number of temporary outside warehouse facilities being used to store product as inventory flows more effectively to and through our existing distribution centers." He further stated, "we expect to transition out of many of" the temporary warehouse facilities "in Q4 and into next year."

580. In response to these disclosures, Dollar General's stock price decreased by $1.62, from a closing price of $133.92 on December 6, 2023 to a closing price of $132.30 on December 7, 2023, on unusually high trading volume.

**G. Dollar General's Adverse 4Q23 And Fiscal Year 2023 Results Announced On March 14, 2024**

581. On March 14, 2024, Dollar General reported its financial results for the fourth quarter (4Q23) and fiscal year (FY23) ended February 2, 2024 in an earnings release attached to a Form 8-K. Defendants reported, *inter alia*, decreased operating profit of $579.7 million in 4Q23, which was down 37.9% from $933.2 million in 4Q22, and operating profit of $2.4 billion in FY23, which was down 26.5% from $3.3 billion in FY22. Dollar General's net income was $401.8 million for 4Q23, a decrease of 39% from $659.1 million in 4Q22, and $1.7 billion for FY23, a decrease of 31.2% from $2.4 billion in FY2022. The Company's reported diluted earnings per share was $1.83 in 4Q23, a decrease of 38.2% from $2.96 in 4Q22, and was $7.55 in FY23, a decrease of 29.3% from $10.68 in FY22. Dollar General's reported gross profit as a percentage of net sales decreased 138 basis points from 4Q22 to 29.5% in 4Q23 and decreased by 94 basis

points from FY22 to 30.3% in FY23. Defendants attributed the 4Q23 and FY23 gross profit declines to *inter alia* "**increased shrink and inventory markdowns**." Defendants also provided full year financial guidance, including diluted earnings per share "in the range of approximately $6.80 to $7.55."

582. Also on March 14, 2024, Defendants held an earnings call to discuss the Company's results. On that call:

   a. Defendant Vasos acknowledged that the Company faced inventory "**shrink headwinds**" and "**more markdowns**."

   b. He also discussed the ongoing remediation efforts, which included "adding specific inventory management shifts and specialized inventory training in each store;" efforts to "continue inventory flow"; and added "labor . . . to keep our on-hand and perpetual inventory counts more accurate."

   c. Tellingly, Defendant Vasos admitted, "any time you have **too much inventory in the store**, you've got **too much shrink and damages**" and "damages, by the way, is just known shrink."

583. As a result of these disclosures, Dollar General's stock price declined from a closing price of $158.17 on March 13, 2024 to a closing price of $150.06 on March 14, 2024, a significant decline of $8.11 or over 5% on high trading volume.

### H. Dollar General's Adverse 1Q24 Results Announced On May 30, 2024

584. On May 30, 2024, Dollar General reported its financial results for the first quarter ended May 3, 2024 (1Q24) in an earnings release attached to Form 8-K, a Form 10-Q, and an earnings call. Defendants reported, *inter alia*, that Dollar General's gross profit as a percentage of sales was 30.2% in 1Q24, a decrease of 145 basis points from 31.6% in 1Q23, which Defendants attributed to *inter alia* "**increased shrink and inventory markdowns**." Dollar General's reported

(i) operating profit was $546.1 million in 1Q24, a decrease of 26.3% from $740.9 million in 1Q23; (ii) net income was $363.3 million in 1Q24, a decrease of 29.4% compared to $514.4 million in 1Q23; and (iii) diluted earnings per share decreased to $1.65 for 1Q24, down 29.5% from $2.34 in 1Q23.

585. Also on May 30, 2024, Defendants held the Company's 1Q24 earnings call. On the call, Defendant Vasos disclosed that "***Shrink continues to be the most significant headwind in our business***." Likewise, Defendant Dilts stated "Shrink continues to be our most significant headwind and was 59 basis points worse in the first quarter compared to prior year." She continued, "shrink is currently trending worse than we initially expected coming into the year, and we now expect this headwind to be greater in 2024 than what was originally contemplated in the financial guidance we provided on our earnings call in March."

586. As a result of these disclosures, Dollar General's stock price declined from a closing price of $139.28 on May 29, 2024 to a closing price of $127.94 on May 30, 2024, a decline of $11.34 or over 8% on abnormally high trading volume.

## I. Dollar General's Adverse 2Q24 Results Announced On August 29, 2024

587. On August 29, 2024, Dollar General reported its financial results for the second quarter ended August 2, 2024 (2Q24) in an earnings release attached to Form 8-K, on a Form 10-Q, and in an earnings call. Defendants reported that, *inter alia*, gross profit as a percentage of net sales was 30% in 2Q24, a decrease of 112 basis points from 31.1% in 2Q23, which they attributed to *inter alia* "***increased markdowns***," "***increased inventory damages***," and "***increased shrink***." Dollar General also reported (i) operating profit of $550 million in 2Q24, a decrease of 20.6% from $692.3 million in 2Q23; (ii) net income of $374.2 million for 2Q24, a decrease of 20.2% compared to $468.8 million in 2Q23; and (iii) diluted earnings per share of $1.70 for 2Q24, a decrease of 20.2% compared to diluted EPS of $2.13 in 2Q23.

230

588. Acknowledging that the Company's inventory problems were far more severe, far-ranging, and persistent than previously disclosed, Defendants also slashed Dollar General's financial guidance, reporting that the Company now expected *inter alia* "diluted earnings per share in the range of approximately $5.50 to $6.20, compared to its previous expectation of approximately $6.80 to $7.55."

589. On the 2Q24 earnings call, Defendants acknowledged the disappointing results. For example:

    a. Defendant Vasos admitted that Defendants were "not satisfied by [the Company's] overall financial results." Likewise, Defendant Dilts stated "we're not satisfied with the financial results for the second quarter."

    b. Defendant Dilts explained that "shrink was a year-over-year headwind of 21 basis points in Q2" and shrink "continues to be a significant headwind."

    c. As to financial outlook, Defendant Dilts said, "[t]urning to gross margin, we expect ***additional pressure as a result of the increased promotional markdown activity***"; "with regard to damages, our guidance now assumes ***no improvements in the back half of the year***"; and "we expect ***shrink to be a headwind for the full year***."

    d. In response to an analyst question regarding markdowns, Defendant Dilt stated that "what we're looking at in this back half is going to be a ***similar markdown rate to what we saw last year in the back half*** . . . so ***more than we had anticipated***."

    e. Defendant Dilts further stated that they "we're certainly experiencing" "shrink and mix headwinds" and that "the damage piece of this as well is putting a little pressure on the second half."

f. Defendant Vasos also admitted that "margin" is a "bump[] in the road" and that "***now, shrink is a constant battle***."

g. In response to a question about the revised guidance, Defendant Dilts responded that it was "margin and then the markdowns" that were "really the primary drivers."

590. In sum, Defendants' August 29, 2024 disclosures revealed to the market that, contrary to Defendants' assurances over the prior year, the Company's inventory problems were more severe, far-ranging, and persistent than previously disclosed.

591. Analysts were shocked to discover that, after multiple quarters of assurances that the Company was remedying its inventory problems, the Company still faced such significant and persistent inventory-related problems, including shrink, markdowns, and damages. *See supra* ¶273.

592. These disclosures caused Dollar General's stock declined a staggering $39.81, or over 32%, from a closing price of $123.84 on August 28, 2024 to a closing price of $84.03 on August 29, 2024 on abnormally high trading volume of nearly 42 million shares.

593. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate, or maintain the existing artificial inflation of, the price of Dollar General common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' material misstatements and omissions was removed when Defendants revealed the truth to investors. Thus, the stock price declines described above were directly or proximately caused by Defendants' materially false and misleading statements or omissions.

## IX. PRESUMPTION OF RELIANCE

594. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Dollar General's common stock was efficient for the following reasons, among others:

a. Dollar General's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b. Dollar General's common stock traded at high weekly volumes;

c. As a regulated issuer, Dollar General filed periodic reports with the SEC;

d. Dollar General was eligible to file registration statements with the SEC on Form S-3;

e. Dollar General regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f. Dollar General was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Dollar General common stock; and

h. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the class purchased or acquired Dollar

General common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

595. As a result of the foregoing, the market for Dollar General's common stock reasonably promptly digested current information regarding Dollar General from all publicly available sources and reflected such information in the price of Dollar General's common stock. All purchasers of Dollar General common stock during the Class Period suffered similar injury through their purchase of Dollar General common stock at artificially inflated prices, and a presumption of reliance applies.

596. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in Affiliated *Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose the inventory and staffing problems detailed herein—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, *i.e.*, that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of inventory and staffing practices to Dollar General, as set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

597. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false and misleading statements set forth herein. The misstatements complained of herein were historical statements or statements

of purportedly current facts and conditions existing at the time or prior to when the statements were made.

598. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Sections IV and VII *supra*), then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

599. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Dollar General who knew that the statement was false or misleading when made.

## XI. CLASS ACTION ALLEGATIONS

600. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Dollar General common stock from May 28, 2020 through August 28, 2024, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

601. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dollar General common stock was actively traded on the New York Stock Exchange. As stated in the Company's April 8, 2024 proxy materials, there were approximately 219,670,239 shares of Dollar General common stock outstanding at that point during the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the Class. Class members who purchased Dollar General common stock may be identified from records maintained by Dollar General or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

602. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

603. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests that conflict with the interests of the Class.

604. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a. Whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b.   Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

c.   Whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

d.   Whether the members of the Class have sustained damages, and the proper measure of damage.

605.   A class action is superior to all other available methods for the fair and efficient adjudication of this action.   Joinder of all Class members is impracticable.   Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5(a), (b), and (c) Promulgated Thereunder
(Against All Defendants)**

606.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

607.   This Count is asserted on behalf of all members of the Class against Dollar General and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a), (b), and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a), (b), and (c).

608.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

237

including Plaintiffs and other Class members, as alleged in this Complaint; and (ii) caused Plaintiffs and other members of the Class to purchase Dollar General stock at artificially depressed prices.

609. Defendants (i) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; (ii) employed devices, schemes, and artifices to defraud; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the investors in the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

610. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

611. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Dollar General common stock during the Class Period.

612. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class;

made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Dollar General common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, Dollar General's inventory, labor, pricing financial metrics, and accounting; (b) artificially inflated and/or maintained the price of Dollar General common stock; and (c) caused Plaintiffs and other members of the Class to purchase Dollar General common stock at artificially inflated prices and suffer loss when the true facts became known.

613. Dollar General and the Executive Defendants are all liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above.

614. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Dollar General stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

615. Lead Plaintiffs and the Class suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Dollar General common stock, which inflation was removed from its price when the true facts became known. Plaintiffs and the Class would not have purchased Dollar General common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

239

616.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Dollar General common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against The Executive Defendants)

617.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

618.    This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

619.    The Executive Defendants acted as controlling persons of Dollar General within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

620.    By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Dollar General during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these

statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

621. Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Dollar General during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

622. By virtue of their positions as controlling persons of Dollar General and as a result of their own aforementioned misconduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired Dollar General securities. As detailed above, during the respective times, the Executive Defendants served as officers and/or directors of Dollar General.

623. As a direct and proximate result of the Executive Defendants conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of Dollar General common stock.

## COUNT III

### For Violations of Section 20A of the Exchange Act
### (Against Defendants Vasos and Garratt)

624. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

625. This count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 on behalf of Plaintiffs Quoniam and Universal and all other members of the Class who purchased shares of Dollar General Common stock contemporaneously with the sale of Dollar General common stock by Defendants Vasos and Garratt while they were in possession of material, nonpublic adverse information as alleged herein, including concerning Dollar General's inventory, earnings, staffing, pricing, and accounting practices.

626. Section 20A of the Exchange Act provides that:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

627. As set forth herein, Defendants Vasos and Garratt violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. Additionally, Defendants Vasos and Garratt further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of Dollar General common stock while in possession of material, nonpublic adverse information concerning Dollar General's inventory, earnings, staffing, pricing, and accounting practices, as alleged herein, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

628. Contemporaneously with (i) Defendant Vasos's insider sales of Dollar General common stock on September 2, 2020, May 28, 2021, December 3, 2021, August 26, 29, and 30, 2022, and September 1, 2022, and (ii) Defendant Garratt's insider sales of Dollar General common stock on March 23, 2021, May 28, 2021, December 3, 2021, and August 26 and 29, 2022—Universal purchased Dollar General common stock on September 9, 2020, March 25, 2021, June

242

1, 2021, December 7 and 9, 2021, and September 1, 2 and 7, 2022 on a national securities exchange and in an open and efficient market, while Defendants Vasos and Garratt were in possession of material, nonpublic adverse information they had a duty to disclose, but failed to disclose, including information concerning Dollar General's inventory, earnings, staffing, pricing, and accounting practices, as alleged herein.

629. Other Class members also purchased shares of Dollar General common stock contemporaneously with Defendant Vasos's and Garratt's insider sales of Dollar General common stock.

630. Plaintiffs and other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

631. By reason of the violations of the Exchange Act alleged herein, Defendants Vasos and Garratt are liable to Plaintiffs and other members of the Class who purchased shares of Dollar General common stock contemporaneously with Defendant Vasos's and Garratt's sales of Dollar General common stock during the Class Period.

632. Plaintiffs and other members of the Class who purchased contemporaneously with Defendant Vasos's and Garratt's insider sales of Dollar General securities seek disgorgement by Defendant Vasos and Garratt of profits gained or losses avoided from Defendant Vasos's and Garratt's transactions in Dollar General common stock contemporaneous with Plaintiffs and the other members of the Class.

633. This action was brought within five years after the date of the last transaction that is the subject of Defendant Vasos's and Garratt's violations of Section 20A, and, with respect to the underlying violations of the Exchange Act alleged in this Count and in Count I above, was

brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Defendant Vasos and Garratt.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.  Awarding compensatory damages in favor of Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.  Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

634.  Plaintiffs hereby demand a trial by jury.

244

DATED: August 25, 2025                    Respectfully submitted,

**SANFORD HEISLER SHARP, LLP**

*/s/ Kristi S. McGregor*
Kristi S. McGregor (GA Bar No. 674012)
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7001
Facsimile: (615) 434-7020
kmcgregor@sanfordheisler.com

*Liaison Counsel for Lead Plaintiff Universal and Quoniam and  Liaison Counsel  for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

*/s/ Jeremy P. Robinson*
Salvatore J. Graziano (admitted *pro hac vice*)
Jeremy P. Robinson (admitted *pro hac vice*)
Alexander Noble (admitted *pro hac vice*)
Jonathan D'Errico (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com

*Counsel for Lead Plaintiff Universal and Quoniam and Lead Counsel for the Class*