IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:23-cv-01250**<br>**Judge Aleta A. Trauger** |
| **DOLLAR GENERAL CORPORATION, TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, and KELLY M. DILTS,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

The defendants have filed a Motion to Dismiss the Third Consolidated Amended Complaint (Doc. No. 113). For the reasons set forth herein, the Motion will be granted and the Third Consolidated Amended Complaint ("TAC") (Doc. No. 110) will be dismissed with prejudice.

## I. PROCEDURAL HISTORY

Lead plaintiffs Universal-Investment-Gesellschaft mbH and Quoniam Asset Management GmbH[1] allege a putative securities fraud class action on behalf those who acquired Dollar General Corporation common stock between May 28, 2020 and August 28, 2024, inclusive (the "Class Period") against Dollar General Corporation ("Dollar General" or the "Company") and four

[1] Washtenaw County Employees' Retirement System originally filed this action. (Doc. No. 1.) After briefing, the court appointed the current lead plaintiffs and approved lead and liaison counsel. (Doc. No. 51 at 7.)

executives: Todd Vasos, Jeffrey Owen, Kelly Dilts, and John Garratt (the "Individual Defendants"). (TAC at 9.)

After extensive briefing on the defendants' previous Motion to Dismiss (Doc. No. 76; *see* Doc. Nos. 81, 84, 86), the court dismissed the Second Consolidated Amended Complaint ("SAC") (Doc. No. 73) without prejudice. (Doc. No. 89.) The plaintiffs then filed a Motion for Leave to File a Third Amended Complaint (Doc. No. 93), which the parties briefed (Doc. Nos. 94, 98, 100) and the court granted (Doc. No. 109). The TAC is the operative pleading.

Dollar General is "one of the largest discount retailers in the United States." (TAC ¶ 3.) Near the end of the Class Period, it had over 20,000 stores in 48 states and Mexico. (*Id.* ¶ 28.) The plaintiffs allege, on the basis of public information and the observations of thirty-six former employee anonymous witnesses ("FEs"), that, at the same time the Company inadequately staffed stores and improperly managed a glut of merchandise it improvidently ordered—which caused myriad problems—its corporate officers painted a misleadingly rosy picture through over one hundred false or misleading statements ("Misstatements") in financial filings and meetings. Dollar General's mismanagement came to light, the plaintiffs allege, through a series of corrective disclosures. As a result, the plaintiffs allege, the Company's stock price plummeted, to the detriment of shareholders who acquired Dollar General stock while it was artificially high. Meanwhile, the plaintiffs allege, Vasos and Garratt, but not Owen and Dilts, took advantage of insider information to trade considerable amounts of Dollar General stock.

On the basis of these allegations, the plaintiffs bring claims against all defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rules 10b-5(a) and (c), 17 C.F.R. § 240.10b-

5(a) & (c) (scheme liability), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) (securities fraud)[2] (Count I) (*id.* ¶¶ 606–16); a claim against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Count II) (*id.* ¶¶ 617–23); and a claim against Vasos and Garratt for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 (Count III) (*id.* ¶¶ 624–33). The plaintiffs seek class certification, compensatory damages, costs, and fees. (TAC at 252.)

The defendants have filed a Motion to Dismiss the TAC (Doc. No. 113) under Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of the TAC with prejudice. In support of their Motion, the defendants have filed a Memorandum (Doc. No. 114) with Appendices (Doc. Nos. 114-1 through 114-4) and the Declaration of defense counsel Milton McGee (Doc. No. 115), with Exhibits (Doc. Nos. 115-1 through 115-76). The plaintiffs have filed a Response (Doc. No. 116) with Appendices (Doc. Nos. 116-1 through 116-4) and the Declaration of plaintiffs' counsel Alexander Noble (Doc. No. 117), with Exhibits (Doc. Nos. 117-1 through 117-5). The defendants have filed a Reply. (Doc. No. 118.)

## II. LEGAL STANDARD – RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the complaint's legal sufficiency. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for

[2] *Accord Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 958 (6th Cir. 2026) (distinguishing a "garden variety securities fraud claim under Rule 10b-5(b)" from "a 'scheme liability' claim under Rule 10b–5(a) and (c)").

relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). But a complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557). In ruling on a motion to dismiss for failure to state a claim, the court accepts the complaint's well-pleaded allegations as true, construes the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in the plaintiff's favor. *Eastep v. City of Nashville*, 156 F.4th 819, 826 (6th Cir. 2025) (citing *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016)), *cert. denied sub nom. Eastep v. Carrick*, 146 S. Ct. 1816 (2026).

## III. DISCUSSION

The plaintiffs bring three claims under different provisions of the Exchange Act and its implementing rules. "Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)). Section 20(a) "provides liability for 'every person who, directly or indirectly, controls any person liable' for violation of the securities law." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 816 (6th Cir. 2022) (quoting 15 U.S.C. § 78t(a)) (alteration adopted)). And Section 20A creates a cause of action for "any person" who traded "securities of the same class" "contemporaneously" with someone who traded stock "while in possession of material, nonpublic information." 15 U.S.C. § 78t-1(a).

### A. The Exchange Act, Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "plead with particularity" six elements. *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023). The six elements are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, --- F.4th ----, No. 25-3765, 2026 WL 2454184, at *9 (6th Cir. Aug. 21, 2026) (quoting *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014)).

The court presumes familiarity with its Memorandum ("Mem.") addressing the defendants' Motion to Dismiss the SAC (Doc. No. 88) and its discussion of relevant law. In brief, securities fraud claims are subject to Rule 9(b)'s heightened pleading standard and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, which "imposes additional and more 'exacting pleading requirements' for pleading scienter in a securities fraud case." *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 478 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (alteration adopted)). The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA is an "elephant-sized boulder" whose heightened pleading standard is "not easily satisfied." *Omnicare*, 769 F.3d at 461; *see also Newtyn Partners*, 165 F.4th at 965 ("Pleading scienter under the PSLRA is a tall order."). As with the Motion to Dismiss the SAC, the court's analysis begins and ends with scienter, which the Six Circuit has recently discussed:

> [A] plaintiff must establish that the defendant made the false or misleading representation with scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud. Scienter can be established either by knowing and

> deliberate conduct or by reckless conduct. We have defined recklessness in this context as highly unreasonable conduct which is an extreme departure from the standards of ordinary care. Recklessness requires more than negligence and is akin to conscious disregard. Before drawing an inference of recklessness, courts typically require multiple, obvious red flags.

*Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *9 (citations and internal quotation marks omitted).

Courts in this circuit look to "nine non-exclusive factors for determining whether to infer that a defendant acted with intent to deceive." *Newtyn Partners*, 165 F.4th at 965 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (listing factors), *abrogated on other grounds by Tellabs*, 551 U.S.). Although "we do not require a plaintiff to demonstrate the presence of all, or even most, of the factors," *Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *16, "[t]he more of these factors that are present, the stronger the inference that the defendant acted with the requisite state of mind." *ServiceMaster*, 83 F.4th at 527 (alteration adopted). The "*Helwig* factors" are:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *16–17 (quoting *Helwig*, 215 F.3d at 552).

**B. The plaintiffs' Rule 10b-5(b) claim**

In its ruling discussing the previous Motion to Dismiss, the court found that, of the six *Helwig* factors the plaintiffs contended were present in the SAC, none were. (Mem. at 31–32.) Moreover, the court found that a nonculpable inference was more plausible than an inference of scienter: "as the Company emerged from the pandemic, and demand shifted, and as the Company addressed some operational challenges it disclosed over time, the stock price dropped—without any of the defendants intentionally or recklessly making false or misleading statements or trading on inside information." (*Id.*) The TAC adds roughly 100 paragraphs, including allegations based on the observations of twelve additional FEs. The plaintiffs argue that they have now pleaded scienter. (Doc. No. 116 at 27–52.) The defendants disagree. (Doc. No. 114 at 32–54; Doc. No. 118 at 8–15.)

As the Sixth Circuit has recently explained, "[i]f the inference of scienter is 'cogent and at least as compelling' as any benign explanation, the plaintiff has established a 'strong' inference." *Newtyn Partners*, 165 F.4th at 965 (quoting *Tellabs*, 551 U.S. at 324). "But if the plaintiff's inference is not 'strong in light of other explanations,' the claim cannot go forward." *Id.* (quoting *Tellabs*, 551 U.S. at 324); *see also Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *17 ("If a plaintiff adduces evidence to support a finding of scienter, it may still be negated by the presence of good faith or innocent motivations." (citing *Stavroff v. Meyo*, 129 F.3d 1265 (6th Cir. 1997) (unpublished table decision))). Put another way it, "is not enough that the inference is 'merely plausible or reasonable.'" *Pittman v. Unum Grp.*, 861 F. App'x 51, 54 (6th Cir. 2021) (quoting *Tellabs*, 551 U.S. at 314).

The court has reviewed the TAC's "allegations holistically 'to determine whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Taylor*, 29 F.4th at

812 (quoting *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (some internal quotation marks omitted)). The court finds that they do not. In this case, the inference of scienter is not "'cogent and at least as compelling' as [a] benign explanation" of corporate mismanagement, at worst. *Newtyn Partners*, 165 F.4th (quoting *Tellabs*, 551 U.S. at 324).

Because the parties brief at length *Helwig* factors 1 and 2, and because *Helwig* factor 2, the divergence between internal reports and external statements on the same subject, is "the key factor to a finding of scienter," *Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *18 (quoting *Dougherty*, 905 F.3d at 981 (internal quotation marks omitted)), the court will discuss them as illustrative examples of the TAC's pleading deficiencies with respect to scienter.

*1.* Helwig *Factor 1*

*Helwig* factor 1 is insider trading at a suspicious time or in an unusual amount. *Helwig*, 251 F.3d at 552. The SAC alleged that two of the four Individual Defendants, Vasos and Garratt, sold millions of dollars worth of stock suspiciously timed to follow Misstatements. The court found that any inference of scienter the court could draw would be undermined by the lack of alleged insider trading by the other two Individual Defendants. As the court put it, the SAC "allege[d] no facts to explain why, in an alleged securities fraud scheme, half of the Individual Defendants did not engage in insider trading." (Mem. at 16 (citations omitted).)[3]

The plaintiffs plead new facts in this regard. Under Company policy, senior officers were required to "retain ownership of 50% of all net after-tax shares issuable upon vesting or exercise

[3] *Accord Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821 (E.D. Ky. 2008) (finding no inference of scienter from suspicious stock trades where, for among other reasons, "three of the eight individual Defendants sold no stock at all during the Class Period"); *Local N. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84–85 (1st Cir. 2016) (finding that an increase in stock sales by some defendants did not support the inference of scienter where other defendants did not suspiciously trade, and where there was no explanation for a difference in knowledge among the defendants).

of compensatory awards until the target ownership level is achieved" within a "five-year time period," which the court infers to be after appointment to a position governed by the policy. (TAC ¶¶ 523–24.) When Dilts was promoted to "CFO and EVP" in May 2023, "she was required to *increase* her holdings of Dollar General stock." (*Id.*¶ 531.) As the plaintiffs put it, "Dilts did not sell" meaningful amounts of stock "because she was scrambling to acquire more shares in an effort to satisfy executive stock holding requirements under Dollar General's corporate policies." (*Id.*) Similarly, Company "share ownership requirements prevented Defendant Owen from selling stock during the Class Period." (*Id.* ¶ 532.)

The defendants make several arguments in response. Most significantly, the defendants argue that, according to the plain text of the policy, each Defendant could have sold half of their shares. (Doc. No. 114 at 34.) The plaintiffs respond that, because Owen and Dilts "were subject to target ownership levels," this "provides a reasonable explanation for why Owen and Dilts did not sell during the Class Period." (Doc. No. 116 at 44–45 (citation and internal quotation marks omitted).) The court is not persuaded.

As the plaintiffs make explicit, this policy applied to all of the Individual Defendants. (TAC ¶ 524.) While the TAC alleges that the Company policy "effectively prevented Defendants Dilts and Owen from selling Dollar General Stock during the Class Period" (TAC ¶ 530), the plaintiffs concede the defendants' argument that "Owen and Dilts were still technically able to sell some of their holdings." (Doc. No. 116 at 45 (citing Doc. No. 114 at 34).) But, the plaintiffs argue, the defendants, by making this argument, "miss the forest for the trees." (*Id.*) According to the plaintiffs, corporate executives subject to minimum shareholding requirements "have a powerful incentive to *not* sell their company holdings, regardless of whether they are technically able to or not." (*Id.*) Thus, according to the plaintiffs: "the fact that Defendants were subject to [Dollar

General] share ownership requirements both provides a reasonable explanation for Owen and Dilts' lack of sales *and* heightens the strong inference of scienter arising from Vasos and Garratt's sales, *i.e.*, because they sold notwithstanding the [Dollar General] policies encouraging them not to do so." (*Id.*) The court finds that the plaintiffs have not adequately explained how the same policy, applicable to all of the Individual Defendants, could explain both the lack of trading by some and why trading by others was suspicious.

*2.* Helwig *Factor 2*

In the SAC, the plaintiffs alleged the existence of emails, on the one hand, and meetings, on the other, that they contended constituted internal reports that diverged from external statements on the same subject. The TAC adds allegations regarding these emails and meetings.

*Emails.* The SAC alleged that two FEs, who each managed one store, sent three emails to some of the Individual Defendants between July 2021 and June 2022, in which they relayed problems about their stores. The court found that the emails did not constitute internal reports, among other reasons, because the plaintiffs did not allege that any of the Individual Defendants, high-level Dollar General executives, read these emails. (Mem. at 18–20.)

To cure this pleading deficiency, the TAC adds the account of FE-25, an Executive Assistant who left Dollar General in May 2021, before the first email was allegedly sent. (TAC ¶ 96.) FE-25 "assisted . . . Owen," among other members of the "Company's C-suite" and reported to Vasos' executive assistant, Tammy Mosley. (*Id.*) According to FE-25, "if an employee expressed concerns in an email," as FE-1 and FE-2 did, "members of the Dollar General C-suite *would have read those emails sent to them*." (*Id.* ¶ 97 (emphasis added).) The TAC also describes FE-25's account of customer complaints: "FE-25 . . . would place those complaints straight onto . . . Owen's desk and they would be placed on Tammy Mosley's desk to be given to Defendant Vasos." (*Id.* ¶ 98 (alteration adopted).)

The plaintiffs argue that these new allegations cure the pleading deficiency the court described. According to the plaintiffs, "FE-25 . . . reported that established Dollar General practices required that Vasos, Garratt, and Owen personally review these emails [sent by FE-1 and FE-2]." (Doc. No. 116 at 28 (citing TAC ¶¶ 53, 58, 96–98).) For their part, the defendants argue that, because FE-25 left Dollar General before the emails were sent, and because she was an assistant only to Owen, she had no basis to say that anyone actually read these emails, and furthermore she does not allege that any defendant was consulted regarding customer complaints. (Doc. No. 114 at 41.) Rather, "FE-25 only speculates that certain defendants 'would have read' the emails." (Doc. No. 118 (quoting Doc. No. 116 at 31).)

The court finds that an executive assistant's assurances that three of the Individual Defendants would have read three emails after she left Dollar General, pursuant to a policy in place during her employment requiring them to, does not meet the PSLRA's requirement that the plaintiff must "state with *particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *accord Newtyn Partners*, 165 F.4th at 966 ("Allegations resting on mere information and belief cannot support a strong inference of scienter." (citation modified)). The plaintiffs' claim that the "TAC alleges Defendants *actually received (and reviewed) the emails*" is not quite accurate. (Doc. No. 116 at 36 n.14.)

*Meetings*. The SAC alleged that, at several Company meetings and calls, participants discussed Company issues. These discussions, the plaintiffs alleged, constituted reports that diverged from external statements on the same subject. In ruling on the Motion to Dismiss the SAC, the court found that, among other reasons, the meetings and calls did not constitute internal

reports because the SAC did not allege that the Individual Defendants attended them or were apprised of their contents. (Mem. at 21–25.)

The TAC adds allegations to bolster the account of meetings. For example, FE-26, a Vice President of Distribution Centers until September 2022, recalled attending monthly "executive meetings" with Vasos "where inventory management was discussed," and "Vasos directly questioned her about the Company's distribution centers and whether they were overstocked." (TAC ¶¶ 99–100.) FE-26 also reports that she had weekly meetings with Antonio Zuazo, with whom she "regularly discussed . . . specific problems that Dollar General's inventory management systems were causing at the distribution centers, including costs, wasted resources and inventory, and safety and space issues resulting from having excess inventory." (*Id.* ¶ 102.) According to FE-26, Zuazo "regularly reported information to Defendant Vasos about inventory management issues." (*Id.*) Similarly, FE-27, a District Manager during the Class Period, attended annual meetings, convened by Dollar General's CEO, during which "inventory issues" were "discussed." (*Id.* ¶¶ 104–05.) In addition, at both the annual meetings and "periodic conference calls, Dollar General's leadership indicated they were aware of the issues with inventory management." (*Id.* ¶ 106.) FE-31, Director of Merchandise Planning until June 2021, attended "town hall meetings where inventory and staffing issues were regularly discussed." (*Id.* ¶¶ 117, 125.) FE-34, a Merchandizing Director throughout the Class Period, was told by her supervisor that the Individual Defendants "all knew about the excess inventory problems because they all attended meetings about it." (*Id.* ¶¶ 133, 135.) She also attended town hall meetings "at the end of 2023 during which the inventory issues were discussed." (*Id.* ¶ 135.)

The plaintiffs argue that the meetings constitute internal reports that diverge from external statements on the same subject. (Doc. No. 116 at 32–34.) That is, the plaintiffs argue,

"[c]ollectively, these allegations of recurring meetings with Defendants 'about the excess inventory problems' establish a strong inference of [scienter] spanning the entire Class Period." (*Id.* at 33 (quoting TAC ¶ 135).) As the defendants put it, however, the "allegation that a large retailer . . . regularly discussed inventory management at ordinary course meetings is entirely expected and unremarkable; it in no way suggests scienter." (Doc. No. 114 at 43.) The court agrees.

**C. The plaintiffs' Rule 10b-5(a) and (c) scheme liability claim**

Rules 10b-5(a) and (c) "[t]ogether . . . proscribe 'employ[ing] any device, scheme, or artifice to defraud' or 'engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.'" *Newtyn Partners*, 165 F.4th at 971 (quoting 17 C.F.R. § 240.10b–5(a), (c)). To state a claim for "scheme liability" under Rule 10b-5(a) and (c), a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Oakland Cnty. Emps.' Ret. Sys. v. Sotera Health Co.*, No. 25-3311, 2026 WL 508962, at *7 (6th Cir. Feb. 24, 2026) (quoting *ServiceMaster*, 83 F.4th at 525).

While a plaintiff can "bring a scheme-liability claim separate from a Rule 10b-5(b) claim," *id.*, if the scheme liability claim relies on the same basic facts as the Rule 10b-5(b) claim, it fails if the Rule 10b-5(b) claim fails. *Newtyn Partners*, 165 F.4th at 971. However, as the defendants argue (Doc. No. 114 at 78–79), the TAC alleges no separate basis for the scheme liability claim, and the plaintiffs' one sentence argument to the contrary (Doc. No. 116 at 85 (citing TAC ¶¶ 166–71, 187–208)) does not convince this court otherwise. The TAC fails to state a scheme liability claim.

### D. The plaintiffs' Section 20(a) and Section 20A claims

Section 20(a) and 20A claims require an underlying violation of securities law. (Mem. at 32 (citations omitted).) The plaintiffs have not stated a violation of securities law, so their Section 20(a) and 20A claims also must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 113) will be granted, and the TAC (Doc. No. 110) will be dismissed with prejudice.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge